# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

### MARSHALL DIVISION

| | | |
|---|---|---|
| **VERSATA SOFTWARE, INC., F/K/A** | § | |
| **TRILOGY SOFTWARE, INC.;** | § | |
| **VERSATA DEVELOPMENT GROUP,** | § | |
| **INC., F/K/A TRILOGY DEVELOPMENT** | § | |
| **GROUP, INC.; AND** | § | |
| **VERSATA COMPUTER INDUSTRY** | § | |
| **SOLUTIONS, INC., F/K/A TRILOGY** | § | |
| **COMPUTER INDUSTRY** | § | |
| **SOLUTIONS, INC.,** | § | **CIVIL ACTION NO. 2:07-cv-153 CE** |
| | § | |
| **Plaintiffs,** | § | |
| | § | **JURY DEMAND** |
| **v.** | § | |
| | § | |
| **SAP AMERICA, INC. AND** | § | |
| **SAP AG** | § | |
| | § | |
| **Defendants.** | § | |

### SAP AMERICA, INC.'s AND SAP AG's
### SECOND AMENDED ANSWER AND COUNTERCLAIMS

## ANSWER

Defendants SAP America, Inc. and SAP AG (collectively, "SAP") hereby amends its answer to the allegations set forth in the complaint of Versata Software, Inc., F/K/A Trilogy Software, Inc.; Versata Development Group, Inc., F/K/A Trilogy Development Group, Inc.; and Versata Computer Industry Solutions, Inc., F/K/A Trilogy Computer Industry Solutions, Inc. (collectively, "Versata") as follows:

## THE PARTIES

1.      SAP lacks knowledge and information sufficient to form a belief as to the truth of the allegations of paragraph 1 and denies them on this basis.

2.      SAP lacks knowledge and information sufficient to form a belief as to the truth of the allegations of paragraph 2 and denies them on this basis.

3.      SAP lacks knowledge and information sufficient to form a belief as to the truth of the allegations of paragraph 3 and denies them on this basis.

4.      SAP admits that SAP America is a corporation existing under the laws of Delaware but denies the remaining allegations of paragraph 4.

5.      SAP admits that SAP AG is a corporation existing under the laws of Germany but denies the remaining allegations of paragraph 5.

## JURISDICTION AND VENUE

6.      Admitted.

7.      Admitted.

8.      Admitted.

1

## BACKGROUND

9.      SAP admits that the United States Patent No. 5,708,798 ("the '798 patent") indicates on its face that it was issued on January 13, 1998.  SAP lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 9 and denies them on this basis.

10.     SAP admits that the United States Patent No. 5,878,400 ("the '400 patent") indicates on its face that it was issued on March 2, 1999.  SAP lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 10 and denies them on this basis.

11.     SAP admits that the United States Patent No. 6,002,854 ("the '854 patent") indicates on its face that it was issued on December 14, 1999.  SAP lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 11 and denies them on this basis.

12.     SAP admits that the United States Patent No. 6,553,350 ("the '350 patent") indicates on its face that it was issued on April 22, 2003.  SAP lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 12 and denies them on this basis.

13.     SAP admits that the United States Patent No. 7,069,235 ("the '235 patent") indicates on its face that it was issued on June 27, 2006.  SAP lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13 and denies them on this basis.

14.     SAP denies the allegations of paragraph 14.

## COUNT I:  THE '798 PATENT

15.    SAP incorporates its responses to and denials of the allegations contained in paragraphs 1-14 of Versata's Complaint, as if fully set forth herein.

16.    SAP denies the allegations of paragraph 16.

17.    SAP denies the allegations of paragraph 17.

18.    SAP denies the allegations of paragraph 18.

## COUNT II:  THE '400 PATENT

19.    SAP incorporates its responses to and denials of the allegations contained in paragraphs 1-14 of Versata's Complaint, as if fully set forth herein.

20.    SAP denies the allegations of paragraph 20.

21.    SAP denies the allegations of paragraph 21.

22.    SAP denies the allegations of paragraph 22.

## COUNT III:  THE '854 PATENT

23.    SAP incorporates its responses to and denials of the allegations contained in paragraphs 1-14 of Versata's Complaint, as if fully set forth herein.

24.    SAP denies the allegations of paragraph 24.

25.    SAP denies the allegations of paragraph 25.

26.    SAP denies the allegations of paragraph 26.

## COUNT IV:  THE '350 PATENT

27.    SAP incorporates its responses to and denials of the allegations contained in paragraphs 1-14 of Versata's Complaint, as if fully set forth herein.

28.    SAP denies the allegations of paragraph 28.

29.    SAP denies the allegations of paragraph 29.

30.    SAP denies the allegations of paragraph 30.

## COUNT V:  THE '235 PATENT

31.     SAP incorporates its responses to and denials of the allegations contained in paragraphs 1-14 of Versata's Complaint, as if fully set forth herein.

32.     SAP denies the allegations of paragraph 32.

33.     SAP denies the allegations of paragraph 33.

34.     SAP denies the allegations of paragraph 34.

## VERSATA'S "PRAYER FOR RELIEF"

35.     SAP denies that Versata should be granted any of the "relief" sought in subparagraphs A-F of the Prayer for Relief of the Complaint.

## AFFIRMATIVE DEFENSES

SAP asserts the following defenses to Versata's Complaint.  Assertion of a defense is not a concession that SAP has the burden of proving the matter asserted.

## FIRST AFFIRMATIVE DEFENSE – NO INFRINGEMENT

36.     SAP does not infringe and has not infringed, directly or indirectly, literally or by the doctrine of equivalents, any valid and enforceable claim of the '798, '400, '854, '350, or '235 patents.

## SECOND AFFIRMATIVE DEFENSE – INVALIDITY

37.     The claims of the '798, '400, '854, '350, and '235 patents are invalid because they fail to satisfy the conditions for patentability under Title 35 of the United States Code, including without limitation one or more of §§ 41, 101, 102, 103, 112, 116 and 282.

## THIRD AFFIRMATIVE DEFENSE – UNENFORCEABILITY

38.     One or more of the asserted patents is unenforceable because of laches, waiver, implied license, equitable estoppel, unclean hands, or other applicable equitable doctrines.

## FOURTH AFFIRMATIVE DEFENSE – LIMITATIONS ON DAMAGES

39.     Versata's right to seek damages is limited, including without limitation by 35 U.S.C. §§ 286 and 287.

## FIFTH AFFIRMATIVE DEFENSE – INEQUITABLE CONDUCT RELATED TO THE '798 PATENT AND THE '854 PATENT

40.     The application for the '798 patent, Serial No. 484,947, was filed on June 7, 1995, issued on January 13, 1998, and claims priority from United States Patent No. 5,515,524 ("'524 patent"), Serial No. 39,949, filed March 29, 1993 and issued May 7, 1996.

41.     The application for the '854 patent, Serial No. 08/815,399, was filed on March 10, 1997, issued on December 14, 1999, and claims priority from the '798 patent, which itself claims priority from the '524 patent, filed March 29, 1993.

42.     On information and belief, the '798 and '854 patents are unenforceable due to inequitable conduct by one or more individuals substantively involved in the filing and prosecution of the applications that led to the patents ("Configuration Applicants"), in particular Versata and its agents, including:  Joseph Liemandt, Tom Carter, and Christy Jones; the named inventors John Lynch and David Franke; the prosecuting attorneys at Hecker & Harriman, including J. D. Harriman II, Gary A. Hecker, J. Thein, Christopher Matthews, and Carole A. Quinn.

43.     On information and belief, on March 29, 1993, Configuration Applicants, including at least John Lynch, David Franke, J.D. Harriman II, Gary A. Hecker, Joseph Liemandt, and Tom Carter, filed application Ser. No. 39,949 with the Patent Office, which was later issued as the '524 patent.  On information and belief, on June 7, 1995, Configuration Applicants, including at least John Lynch, David Franke, J.D. Harriman II, Gary A. Hecker, Joseph Liemandt,  and Tom Carter, filed application Ser. No. 484,947 with the Patent Office (as

a continuation of application No. 39,949), which later issued as the '798 patent.  On information

and belief, on March 10, 1997, Configuration Applicants, including at least John Lynch, David

Franke, J.D. Harriman II, Gary A. Hecker, Joseph Liemandt,  and Tom Carter, filed application

Ser. No. 08/815,399 with the Patent Office (as a continuation of application No. 484,947), which

later issued as the '854 patent.  On information and belief, before the issuance of the '798 and the

'854 patents, one or more of the Configuration Applicants were aware of one or more items of

material information and either affirmatively misrepresented a material fact, failed to disclose

material information and/or submitted false or misleading information with an intent to deceive

the United States Patent and Trademark Office ("Patent Office").

44.     On information and belief, the prosecuting patent attorneys at Hecker & Harriman

(now known as The Hecker Law Group, both entities will be referred to as "Hecker &

Harriman"), including J.D. Harriman II and Gary A. Hecker, and the named inventors, John

Lynch and David Franke, were aware of their duty to disclose material information to the Patent

Office.  The '524 patent file history contains a declaration signed on May 10, 1993, by John

Lynch and David Franke, the named inventors of the '798 and '854 patents, stating that they

"acknowledge the duty to disclose material information as defined in Title 37, Code of Federal

Regulations, Section 1.56(a)."  On information and belief, Joseph Liemandt, Andrew Price and

Bhalchandra Ghatate, named inventors on U.S. Patent No. 6,115,547 ("'547 patent"), also were

aware of the duty to disclose material information to the U.S. Patent Office.

45.     On information and belief, the Configuration Applicants were aware of each of

the following items of material information during prosecution of the '798 and '854 patents.

Yet, the Configuration Applicants never disclosed (i.e., provided copies of the following material

information) to the Patent Office during prosecution of the applications that led to the '798 and

'854 patents:

- John McDermott, "R1: A Rule-Based Configurer of Computer Systems," 19 *Artificial Intelligence* 39-88 (1982) ("*McDermott*");

- Sanjay Mittal & Felix Frayman, "Towards a Generic Model of Configuration Tasks", Eleventh Int'l Conf. on AI (1989) ("*Mittal*");

- Felix Frayman & Sanjay Mittal, "COSSACK: A Constraints-Based Expert System for Configuration Tasks", in Knowledge Based Expert Systems in Engineering: Planning and Design 143 (D. Sriram & R.A. Adey eds., 1987) ("*Frayman*");

- Michael Heinrich & Ernst Werner Jüngst, A Resource-Based Paradigm for the Configuring of Technical Systems from Modular Components, in Proceedings of the Seventh IEEE Conference on Artificial Intelligence Applications 257 (1991) ( "*Heinrich*");

- PCT Application No. PCT/US92/05650 (PCT WO 93/01557) to Stephen Quintero and Jim Smith, entitled "Design Tool and Method for Preparing Parametric Assemblies," filed July 7, 1992, published Jan. 21, 1993, priority July 8, 1991 ("Quintero PCT application") and the 5/10/96 Supplemental European Search Report in the European counterpart application EP 949 12345;

- Documentation for Trilogy's SalesBUILDER system;

- Karen D. Moser, "Trilogy System to Ease Design of POS Apps," 9 PCWeek 61 (March 16, 1992) ("*Moser*");

- H. Lee Hales, "Automating and Integrating the Sales Function: How to Profit from Complexity and Customization," Enterprise Integration Strategies, Vol. IX, No. 11 (1992) ("Enterprise Integration article");

- David Franke and Dan Dvorak, "CC:  Component Models for Qualitative Simulation – A User's Guide" (Jan. 1990) ("CC User Guide");

- David W. Franke and Daniel L. Dvorak, "Component Connection Models," Workshop on Model-Based Reasoning (1989) ("CC Models"); and

- David Franke, "A Theory of Teleology," Ph.D. Dissertation, Department of Computer Sciences, University of Texas at Austin (May 1992) ("Franke Thesis").

### Nondisclosure and Misleading Characterizations of the McDermott Article and R1

46.     In 1982, the *McDermott* article, listing as author John McDermott and entitled

"R1: A Rule-Based Configurer of Computer Systems," was published in the journal *Artificial*

*Intelligence*, eleven years before the priority date of the '798 and '854 patents.  The *McDermott*

article describes (1) the R1/XCON configurator that the author developed at Carnegie-Mellon

University with the support of Digital Equipment Corporation, and (2) provides supplemental

teaching regarding the field of computer-based system configuration.

47.     The *McDermott* article was noted in the common specification of the '524, '798,

'854 patent specification.  On information and belief, the Configuration Applicants, including at

least David Franke, John Lynch, Joseph Liemandt, J.D. Harriman II, and Gary A. Hecker, knew

of the significance of the *McDermott* article, the pioneering R1/XCON system for configuring

computer systems that had been developed more than a decade before by McDermott and others,

and of other articles regarding R1/XCON.

48.     On information and belief, the '798 and '854 patent specifications each contain

misleading characterizations of the R1/XCON system and the *McDermott* article that omit

descriptions of the more relevant and material features of *McDermott* and R1/XCON.  For

example, the specification provides this misleading statement that does not provide any

description of McDermott's most relevant teachings or of R1's most relevant features:

> Early computer-based configuration systems employed an approach referred to as
> the rule-based approach. Rule-based configuration systems define rules (i.e., "if
> A, then B") to validate a selection of configuration alternatives.  Digital
> Equipment Corporation's system, called R1/XCON (described in McDermott,
> John, "R1: A Rule-Based Configurer of Computer Systems", *Artificial*
> *Intelligence* 19, (1982), pp. 39-88) is an example of a rule-based configuration
> system. R1/XCON evaluates an existing independently-generated system order
> and identifies any required modifications to the system to satisfy the model's
> configuration rules.  The rules used to perform the configuration and validation
> processes are numerous, interwoven, and interdependent.  Before any

modification can be made to these rules, the spider's web created by these rules must be understood.  Any changes to these must be made by an individual that is experienced and knowledgeable regarding the effect that any modifications will have to the entire set of rules.  Therefore, it is difficult and time-consuming to maintain these rules.

A possible solution to the problems associated with rule-based systems is a constraint-based system.  A constraint-based system places constraints on the use of a component in a configuration.   ('798 Patent col. 2:43-66.)

On information and belief, one or more of the Configuration Applicants, including at least David Franke, John Lynch, Joseph Liemandt, J.D. Harriman II and Gary A. Hecker, reviewed the applications that led to the '524, '798, and '854 patents before filing or during prosecution and were aware of these misleading characterizations of the prior art, including *McDermott* and the R1/XCON system, and were aware of the relevance of the *McDermott* article, the R1/XCON computer configurator, other information describing R1/XCON, and the misleading descriptions of the prior art in the patent, during prosecution of the '798 and '854 patents.

49.     Yet, on information and belief, in prosecuting the '798 and '854 patents, the Configuration Applicants never provided a copy of the *McDermott* article, any articles describing the relevant features of the R1/XCON configurator that were omitted from the misleading description of *McDermott* and R1, nor any information inconsistent with the '798 and '854 patent's misleading descriptions of *McDermott* and the R1/XCON prior art system to the Patent Office.

50.     On information and belief, these nondisclosures, omissions, and misleading descriptions of *McDermott* article and the R1/XCON configurator were material because, for example, *McDermott* describes key features of the well-known R1/XCON configuration system, features that are relevant to the '798 and '854 patents, and are not merely cumulative to the art of record in the '798 and '854 file histories.

51.     On information and belief, the Configuration Applicants made material omissions, nondisclosures, misleading representations and submissions regarding *McDermott* and the R1/XCON configurator with an intent to deceive the Patent Office.

### Nondisclosure and Misrepresentations of the Mittal and Frayman Articles and the COSSACK System

52.     In 1989, the *Mittal* article, listing as authors Sanjay Mittal and Felix Frayman and entitled "Towards a Generic Model of Configuration Tasks," was published in the Proceedings of the Eleventh International Conference on Artificial Intelligence, four years before the priority date of the '798 and '854 patents.  The *Mittal* article (1) describes the COSSACK configurator that the authors developed at Xerox PARC, and (2) provides supplemental teaching regarding the field of computer-based system configuration.

53.     In 1987, the *Frayman* article, listing as authors Felix Frayman and Sanjay Mittal and entitled "COSSACK: A Constraints-Based Expert System for Configuration Tasks," was published in Knowledge Based Expert Systems in Engineering: Planning and Design, six years before the priority date of the '798 and '854 patents.  The *Frayman* article (1) describes the COSSACK configurator that the authors developed at Xerox PARC, and (2) provides supplemental teaching regarding the field of computer-based system configuration.

54.     On information and belief, one or more of the Configuration Applicants reviewed the applications that led to the '524, '798, and '854 patents before filing and was aware of their misstatements regarding the prior art COSSACK system and the *Mittal* and *Frayman* prior art articles, for example:

> The Cossack system employs a functional hierarchy-based configuration system. According to Cossack, a system using a functional hierarchy must identify a configured system's required functions. Once the required functions are identified, Cossack must identify some particular component, or components, that are crucial, or key, to the implementation of these required functions. The Cossack representation does not make structure explicit. Further, Cossack does

not provide mechanisms for reasoning about or with structural information. Therefore, Cossack cannot make any structure-based inferences. For example, the internal data transfer paths within components are not represented. Therefore, there is no ability to trace data transfer within a component, and no ability to establish a data connection with another element.  ('798 Patent col. 4:64-5:11.)

55.     On information and belief, these misstatements regarding the state of the prior art are contradicted by the text of the *Mittal* and *Frayman* prior art articles, which the Configuration Applicants never provided to the Patent Office.  On information and belief, Configuration Applicants knowingly did not provide copies of *Mittal* and *Frayman* or information describing the prior art COSSACK system to the Patent Office in prosecution of the '798 and '854 patents. On information and belief, Configuration Applicants also omitted material information regarding *Mittal, Frayman,* and COSSACK in the patents' description of this prior art.  This information would have been important to a reasonable patent examiner, *inter alia*, because it contradicted misstatements about prior art in the patent and described the same technology as in the '798 and '854 patents.  On information and belief, the *Mittal* and *Frayman* articles, the COSSACK system, and the misrepresentations and omissions regarding them were material and not merely cumulative to any art of record in the '798 and '854 patent file histories.

56.     On information and belief, one or more of the Configuration Applicants, including at least David Franke, John Lynch, Joseph Liemandt, J.D. Harriman II, and Gary A. Hecker, were concurrently prosecuting applications that led to the '524, '798, and '854 patents, were aware of the significance and relevance of the *Mittal* and *Frayman* references, of the mischaracterizations of those references (and the systems they described, including COSSACK) in the '798 and '854 patents' common specification, and of other prior art describing key features of the COSSACK prior art system.  Yet, the Configuration Applicants never provided copies of this information to the Patent Office in the prosecution of the '524, '798, or '854 patents.  On

information and belief, these nondisclosures, misrepresentations and false submissions were intended to deceive the Patent Office.

### *Misrepresentations Regarding the Bennett Patent and Nondisclosure of the Teknowledge Configurator*

57.     U.S. Patent No. 4,591,983 ("the Bennett patent"), issued on May 27, 1986, is entitled "Hierarchical Knowledge System," and lists as the assignee, Teknowledge, Inc.  The Bennett patent (1) describes the Bennett configurator developed at Teknowledge (the "Teknowledge configurator"), and (2) provides supplemental teaching regarding the field of computer-based system configuration.

58.     On information and belief, one or more of the Configuration Applicants, including David Franke, John Lynch, Joseph Liemandt, J.D. Harriman II and Gary A. Hecker, misrepresented the state of the prior art by mischaracterizing the Bennett patent and failing to include the most relevant information about the Teknowledge configurator in the common specification of the '798 and '854 patents.  For example, the '798 patent describes the Bennett patent as follows:

> Bennett et al., U.S. Pat. No. 4,591,983 provides an example of a constraint-based system that employs a recognition or verification approach to system configuration instead of a generative approach. That is, Bennett merely validates an independently-configured system.  In essence, an order is generated by an independent source such as a salesperson, and Bennett is used to verify that the system contained in the order does not violate any constraints. Bennett does not generate a system configuration based on needs or component requests (i.e., a generative approach). Thus, Bennett does not provide the capability to interactively configure a system by interactively selecting its components.

> A model consists of all of the elements that may be included in a configured system. In Bennett, the model elements are grouped into an aggregation hierarchy. An aggregation hierarchy creates hierarchical levels that represent a group of elements. Branches from one entry in the current level expand the entry, and the entry is "composed of" the elements in the lower level branches. For example, a desktop computer system is "composed of" a keyboard, a monitor, and a system box. A system box is "composed of" a power supply, motherboard, cards, and storage devices. The "composed of" relationship merely describes the elements

that comprise another element. However, the "composed of" relationship does not
define the structural relationships between the model elements. The "composed
of" relationship does not describe the physical, structural relationships among the
elements such as "physically contained inside," "physically subordinate part of,"
and "physically connected to." Using the desktop computer system previously
described, it cannot be determined whether or not a monitor is "physically
contained inside" a desktop computer system.  A system box is "composed of"
storage devices, however it cannot be determined whether one or more of the
storage devices are "physically contained inside" the system box.  ('798 Patent
col. 3:16-53.)

59.     On information and belief, during prosecution of the '798 and '854 patents,

Configuration Applicants were aware of the Bennett patent, its description of the Teknowledge

configurator and the field of computer-based system configuration, the Teknowledge

configurator, and other information regarding the prior art Teknowledge configurator.

60.     During prosecution of applications that led to the '798 and '854 patents, on or

about December 8, 1994, Trilogy sued Teknowledge, the assignee of the Bennett patent in the

Northern District of California, for a declaratory judgment of noninfringement of the Bennett

patent (*Trilogy Dev. Group v. Teknowledge Corp.*, No. 3:94-cv-0422 ("*Teknowledge*

litigation")).  On or about August 27, 1996, Trilogy and Teknowledge settled the litigation.  On

information and belief, during the pendency of the *Teknowledge* litigation, the Configuration

Applicants read the Bennett patent and were aware of its teachings and of information produced

by Teknowledge in the litigation that were inconsistent with the Configuration Applicants'

description of the Bennett patent, the state of the art, and the Teknowledge configurator in the

'798 and '854 patents.  Yet the Configuration Applicants failed to disclose such information to

the Patent Office in prosecution of the '798 and '854 patents.

61.     On information and belief, the Bennett patent, the Teknowledge configurator, and

the misrepresentations, nondisclosure, or omissions regarding material features of the Bennett

patent or the Teknowledge configurator, were material and would have been important to a

reasonable patent examiner, *inter alia*, because they contradicted misstatements about prior art in the patent and described the same technology as in the '798 and '854 patents. On information and belief, the Bennett patent, the Teknowledge configurator, and the misrepresentations, nondisclosure and omissions regarding them were material and not merely cumulative to the art of record in the '798 and '854 patent file histories.

62.     Yet, the Configuration Applicants never provided copies of this information to the Patent Office in the prosecution of the '524, '798, or '854 patents. On information and belief, these nondisclosures, misrepresentations and false submissions were intended to deceive the Patent Office.

### Nondisclosure of the Heinrich Article and the COSMOS System

63.     In 1991, the *Heinrich* article, listing as authors Michael Heinrich and Ernst Werner Jüngst and entitled "A Resource-Based Paradigm for the Configuring of Technical Systems from Modular Components," was published in the Proceedings of the Seventh IEEE Conference on Artificial Intelligence Applications, two years before the priority date of the '798 and '854 patents. The *Heinrich* article (1) describes the COSMOS configurator that the authors developed at Daimler-Benz, and (2) provides supplemental teaching regarding the field of computer-based system configuration.

64.     On information and belief, during prosecution of the '798 and '854 patents, one or more Configuration Applicants, including David Franke and Joseph Liemandt, knew of the *Heinrich* article, the prior art Daimler-Benz COSMOS configurator, and M. Heinrich's and E.W. Jüngst's pre-1993 research in configuration.

65.     On information and belief, before issuance of the '798 and '854 patents, one or more Configuration Applicants, including David Franke, John Lynch, Joseph Liemandt, and J.D.

Harriman II, were aware of the significance and relevance of *Heinrich* and the COSMOS prior

art system to the '798 and '854 patents and yet did not disclose the *Heinrich* article to the Patent

Office.

66.     On information and belief, the *Heinrich* article and information regarding the

COSMOS configurator were material because, for example, they described key features of the

well-known COSMOS configuration system and the same technology as the '798 and '854

patents and were not cumulative of the art of record in the '798 and '854 file histories.  On

information and belief, the Configuration Applicants failed to disclose this material information

with an intent to deceive the Patent Office.

### *Nondisclosure of the Quintero PCT Application*

67.     On information and belief, the Configuration Applicants, including at least David

Franke, John Lynch, Joseph Liemandt, J.D. Harriman II, and Gary A. Hecker, were aware of the

Quintero PCT application and its relevance to the '798 and '854 patent claims before issuance of

the '798 and '854 patents, and intentionally failed to disclose this material prior art to the Patent

Office.

68.     On information and belief, Configuration Applicants, including at least Joseph

Liemandt, David Franke, and John Lynch, the Hecker & Harriman law firm, including J.D.

Harriman II and Gary A. Hecker, filed an international patent application based on the '524

patent application, listing as inventors David Franke and John Lynch, which received the number

PCT/US94/034457 (also WO 94/23372).  On information and belief, Configuration Applicants

arranged for a European counterpart application (claiming the same priority date and application

as the '524, '798 and '854 patents) to be filed on March 21, 1994.  This European patent

application was given the number EP 94 91 2345 ("European counterpart application").

69.     On May 10, 1996, the European Patent Office issued a Supplemental European

Search Report in the European counterpart application.  That Supplemental European Search

Report listed the Quintero PCT Application No. WO 93/01557 ("Quintero PCT application") as

a document that was "particularly relevant if taken alone" with respect to certain claims (1-4)

pending in the European counterpart application.  On information and belief, those claims

pending in the European counterpart application were essentially identical to claims pending and

issued in the '798 and '854 patents.

70.     On information and belief, the Configuration Applicants were aware of their duty

to disclose the Quintero PCT application and the May 10, 1996 Supplemental European Search

Report, since the Patent Office's Manual of Patent Examining Procedure ("MPEP") § 2001.06(a)

states:  "Applicants and other individuals, as set forth in 37 C.F.R. 1.56, have a duty to bring to

the attention of the Office *any material prior art or other information cited or brought to their*

*attention in any related foreign application*." (emphasis added).

71.     On information and belief, Configuration Applicants received a copy of the May

10, 1996 Supplemental European Search Report listing the Quintero PCT application and a copy

of the Quintero PCT application.  On information and belief, despite receiving this information

and knowing of the duty to disclose information in any related foreign application, the

Configuration Applicants failed to disclose the Quintero international application and the

Supplemental European Search Report to the Patent Office during prosecution of the '798 and

'854 patents.

72.     On information and belief, the Quintero PCT application and the Supplemental

European Search Report were material because, *inter alia*, the European Patent Office

considered the Quintero PCT application to be a novelty-destroying reference to claims that were

similar to one or more claims of the '798 and '854 patents, and required the Configuration

Applicants to narrow the claims of the European counterpart application to overcome the

European Patent Office's rejection of the claims in light of the Quintero PCT application.  On

information and belief, Configuration Applicants narrowed the claims of the European

counterpart application in response to the European Patent Office's rejection of the claims in

light of the Quintero PCT application.  On information and belief, the Quintero PCT application

and the Supplemental European Search Report are material and not cumulative of the art of

record in the '798 and '854 file histories.

73.     On information and belief, by failing to disclose the Quintero PCT application

and Supplemental European Search Report to the Patent Office in prosecuting the '798 and '854

patents, the Configuration Applicants intended to deceive the Patent Office.

### *Nondisclosure of Trilogy's Own SalesBUILDER Configurator and Documentation as Prior Art*

74.     On information and belief, Trilogy's first product was a configuration software

product called "SalesBUILDER," a "configuration-management-system development system

targeted at companies configuring their own products for sale to customers," which included

pricing and quoter functions (as described in the *Dyson* article at page 7).

75.     On information and belief, Trilogy's SalesBUILDER product was offered for

sale, sold, publicly used, or known to others more than one year before the priority date of the

'798 and '854 patents (Mar. 29, 1993).  On information and belief, by at least March 28, 1992,

Trilogy had sold or offered to sell SalesBUILDER (including versions 1.0 and 2.0 and earlier

versions) to customers and potential customers, including Silicon Graphics, Inc., Pyramid

Technology, LSI Logic, Octel Communications, Hewlett-Packard, Convex Computer

Corporation, and Ungermann-Bass.

76.     A March 16, 1992, PCWeek article written by Karen D. Moser (9 PCWeek 61) ("*Moser*") reported that SalesBUILDER 1.0 was on sale to customers by March 16, 1992.  An Oct. 31, 1991 article by Esther Dyson published in RELEASE 1.0 ("*Dyson*"), reported that SalesBUILDER was offered for sale by October 1991:  "Trilogy launched SalesBUILDER quietly last year to a small number of customers with which it is working closely."  The *Dyson* article also reported the names of several of Trilogy's SalesBUILDER customers, including LSI Logic, Silicon Graphics, Inc., and Pyramid Technology.

77.     On information and belief, a publication entitled "SalesBUILDER: Redefining Sales in Configurable Products" ("*SalesBUILDER: Redefining Sales*"), bearing a copyright date of 1991, a printing date of 1992, and a last modification date of February 25, 1992, was distributed by the Configuration Applicants to third parties for sales and marketing purposes prior to March 28, 1992.  *SalesBUILDER: Redefining Sales* describes various SalesBUILDER features, including the use of a model or library of components, generation of configurations, needs and resource analysis, interactive addition and removal of components from a product configuration, generation of quotes, and satisfaction of constraints.

78.     On information and belief, during prosecution of the '798 and '854 patents, one or more of the Configuration Applicants, including at least Joseph Liemandt, David Franke, John Lynch, J.D. Harriman II, and Gary A. Hecker, knew of:  (1) Trilogy's configurator systems that existed before March 29, 1992, including SalesBUILDER, (2) documentation of the relevant features of the SalesBUILDER configurator, (3) Trilogy's offers for sale and sales of SalesBUILDER and earlier configurators that occurred more than one year before the priority date of the '798 and '854 patents (March 29, 1993), and (4) the relevance of such information to the patentability of the '798 and '854 patents.

79.     On information and belief, during prosecution of the '798 and '854 patents, the Configuration Applicants also were aware of third party publications regarding SalesBUILDER, including the 1992 article entitled "Automating and Integrating the Sales Function: How to Profit from Complexity and Customization" ("Enterprise Integration article") edited by H. Lee Hales and the 1992 *Moser* article, both describing SalesBUILDER.  In the prosecution of a co-pending Trilogy application (the '400 patent), the Patent Office issued an Office Action dated January 6, 1998, rejecting claims of the '400 patent application as obvious in light of the 1992 Enterprise Integration article, noting that it described Trilogy's own product, SalesBUILDER, and citing the 1992 Moser article.  On information and belief, the same law firm, Hecker & Harriman, prosecuted Trilogy's '798 and '854 configuration patents as well as Trilogy's pricing patents (the '400 and '350 patents).

80.     On information and belief, during prosecution of the '798 and '854 patents, the Configuration Applicants knew that the 1992 Enterprise Integration article, as well as other articles and documentation about Trilogy's own SalesBUILDER configuration software, were relevant to the '798 and '854 patents.  For example, the Enterprise Integration article (at pages 2-3) described SalesBUILDER as having a model of components, constraints associated with components, and generating new configurations in response to requests as claimed in '854 claims 1 and 30:

> Key elements of the SalesBUILDER application include customer needs analysis, generation of appropriate configuration, graphical display of the recommended customer solution, interactive system planning, and customer quote generation. . . . Simple diagrams represent the relationships between components.  . . .  SalesBUILDER models only those components or parts that are affected by configuration. . . . According to Trilogy, Digital's system requires over 10,000 rules to configure a VAX; SalesBUILDER, in contrast, is said to need less than 40 constraints to configure a comparable product line, ranging in unit value from $5,000 to $500,000.  This economy is achieved with an object-oriented approach and the use of generic configuration algorithms.  Components of a product are represented as objects. These provide resources to and require resources from

other objects, subject to constraints.  In addition to technical constraints in design and production, marketing constraints can also be defined. For example, the system will prevent a technically valid configuration that the manufacturer does not offer.

81.     On information and belief, in the prosecution of the '798 and '854 patents, the Configuration Applicants never disclosed to the Patent Office:  (1) its offers for sale, sales, or public uses of SalesBUILDER or its other early configurators before March 29, 1992, (2) documentation regarding SalesBUILDER's relevant features; (3) and articles describing SalesBUILDER's relevant features, including the 1992 Enterprise Integration article, the Moser article, or the Dyson 1992 article.

82.     On information and belief, the information that the Configuration Applicants failed to disclose to the Patent Office, including documentation regarding SalesBUILDER's relevant features (including the 1992 Enterprise Integration, *Moser*, *Dyson*, and *SalesBUILDER: Redefining Sales* articles), and Trilogy's early commercialization of SalesBUILDER, was material because, *inter alia*, it would have been important to a reasonable patent examiner and not cumulative to the art of record in the '798 and '854 file histories.

83.     On information and belief, the Configuration Applicants withheld this material information during prosecution of the '798 and '854 patents with an intent to deceive the Patent Office.

***Nondisclosure of Franke's Component Connection Model and Articles***

84.     On information and belief, more than one year before the priority date of the '798 and '854 patents, at least two articles published listing David Franke as a co-author:  CC User Guide (1990) and CC Models (1989).  By May 1992, David Franke's Ph.D. thesis also published.  These publications ("CC Model prior publications") (1) describe the Component Connection Model system developed by David Franke and Daniel Dvorak while graduate

students at the University of Texas at Austin, and (2) provide supplemental teaching regarding the field of computer-based system design and configuration.

85.     On information and belief, during prosecution of the '798 and '854 patents, the Configuration Applicants, were aware of:  (a) David Franke's own CC Model prior publications, (b) the duty to disclose material prior art to the Patent Office, and (c) the relevance of the CC Model prior publications to the claims of the '798 and '854 patents.  On information and belief, the Configuration Applicants never disclosed the CC Model prior publications or the CC Model system to the Patent Office.

86.     On information and belief, the CC Model prior publications are material because they describe the same technology as described in the '798 and '854 patents and are not merely cumulative of the prior art of record.  On information and belief, the Configuration Applicants failed to disclose these material CC Model prior publications with an intent to deceive the Patent Office.

### SIXTH AFFIRMATIVE DEFENSE – INEQUITABLE CONDUCT RELATED TO THE '400 AND '350 PATENTS

87.     SAP incorporates by reference paragraphs 40 - 86 as if fully set forth herein.

88.     The application for the '400 patent, Serial No. 08/664,837, was filed on June 17, 1996, and issued on March 2, 1999.  The application for the '350 patent, Serial No. 09/253,427, was filed on February 19, 1999, issued on April 22, 2003, and claims the priority date of the '400 patent.

89.     On information and belief, the '400 and '350 patents are unenforceable due to inequitable conduct by one or more individuals substantively involved in the filing and prosecution of the applications that led to the patents ("Pricing Applicants"), in particular Versata and its agents, including:  Joseph Liemandt, Phil London, Christy Jones and David

Franke; the named inventor Thomas J. Carter, III; Trilogy's in-house patent counsel, Kent

Chambers, and the patent attorneys at Hecker & Harriman, including J. D. Harriman II, Gary A.

Hecker, Frank M. Weyer, J. Thein, Christopher Matthews, and Carole A. Quinn.

90.     On information and belief, the Pricing Applicants, including the named inventor,

Thomas J. Carter, III, were aware of their duty to disclose material information to the Patent

Office, including prior art and information inconsistent with positions taken in support of

patentability.

### *Nondisclosure of SalesBUILDER or Documents on its Pricing Features as Prior Art*

91.     On information and belief, each of the Pricing Applicants was aware of:  (1)

SalesBUILDER, (2) commercial sales of SalesBUILDER more than one year before the priority

date of the '400 and '350 patents (June 17, 1996), and (3) SalesBUILDER's Pricing and Quoter

functions for calculating prices of products.

92.     On information and belief, Pricing Applicants, including J.D. Harriman II, Frank

M. Weyer, Gary A. Hecker, Tom Carter, Joseph Liemandt, and David Franke, received copies of

a January 6, 1998 Office Action in the '400 patent file history, rejecting all claims as obvious in

light of the U.S. Patent No. 5,053,957 ("the Suzuki patent") and the 1992 Enterprise Integration

article describing Trilogy's SalesBUILDER.  On information and belief, each of the Pricing

Applicants was aware that the Patent Office, in a January 6, 1998 Office Action, had rejected the

claims as obvious in light of Trilogy's own SalesBUILDER (as described in the Enterprise

Integration article) as prior art, stating:

> SalesBuilder discloses an automated pricing system developed by the assignee of
> the present invention and teaches hierarchies of products in which new products
> are defined in terms of existing product classes because new products are often
> variations of existing products.  Since the Applicant was one of the principals
> developing SalesBuilder, it would have been obvious to him to combine the
> hierarchical structure of SalesBuilder with the product/organization pricing

system of Suzuki.  See SalesBuilder at pages 3-4.  The motivation to do so would be to avoid the maintenance overhead associated with updating large databases. See SalesBuilder at page 3.  ('400 Patent File History, Jan. 6, 1998 Office Action (Paper No. 4) at p. 4.)

93.     On information and belief, the Pricing Applicants' arguments in response to the

Patent Office were misleading and deceptive.  For example, Pricing Applicants' misleading

statements regarding SalesBuilder and its teachings can be found in the June 8, 1998

Amendment filed by J.D. Harriman II in the '400 prosecution history:

> To the extent, if any, that SalesBuilder teaches or suggests using hierarchies of product groups, it would not be obvious to combine such hierarchical structure with the product/organizational pricing system of Suzuki.  Furthermore, the result of such combination would not be the hierarchical arrangement of products and organizational groups claimed in claim 1.  Claim 1 as amended claims arranging product and organizational groups in hierarchies in which a group at a lower level of the hierarchy is a subset of a group above that group in the hierarchy. . . . Applicant respectfully submits that arranging product and organizational groups in hierarchies as claimed in claim 1 as amended are not disclosed or suggested by Suzuki and SalesBuilder, alone or in combination.  ('400 Patent File History, June 8, 1998 Amendment and Response (Paper No. 6) at 16-17.)

94.     On information and belief, Pricing Applicants were aware of information

regarding Trilogy's own SalesBUILDER that contradicted these statements and never disclosed

such information to the Patent Office.

95.     On information and belief, Pricing Applicants failed to disclose to the Patent

Office material information regarding SalesBUILDER and its pricing and quote generation

functions during prosecution of the '400 and '350 patents.  On information and belief, during

prosecution of the '400 and '350 patents, Pricing Applicants knew that the SalesBUILDER

product had material features that were used for pricing and were not described in the Enterprise

Integration Strategies article cited by the Patent Office.  Yet, on information and belief, Pricing

Applicants never disclosed this information, which contradicted its arguments for patentability,

to the Patent Office.

96.     On information and belief, Trilogy's SalesBUILDER, including its Quoter function which was used for determining pricing of products, and documentation describing this functionality, was in the possession of the Pricing Applicants and was inconsistent with positions taken during prosecution of the '400 and '350 patents.  On information and belief, this information and documentation was material because, *inter alia*, a reasonable patent examiner would have considered it important, especially in light of the examiner's obviousness rejection based on SalesBuilder in the '400 patent file history.  On information and belief, documentation describing how SalesBUILDER calculated prices and used its Quoter function was not cumulative of any art of record in the '400 or '350 patent file histories.

97.     On information and belief, by their nondisclosures, omissions, misrepresentations and misleading statements made to the Patent Office during prosecution of the '400 and '350 patents, Pricing Applicants intended to deceive the Patent Office.

### *Nondisclosure of Information on SAP's Prior Art R/3 Pricing Functions*

98.     On information and belief, during prosecution of the '400 and '350 patents, Pricing Applicants, including at least Tom Carter, Joseph Liemandt, David Franke, J.D. Harriman II, Gary A. Hecker and Kent Chambers, (1) knew about SAP's R/3 pricing functions and how one could use R/3 to calculate prices using price information associated with a product hierarchy and a customer hierarchy, and (2) possessed or had access to documentation describing R/3's pricing functions.

99.     The '400 and '350 patent specifications mention SAP's R/3 product as prior art, establishing that at least the named inventor, Tom Carter, and the patent attorney, J.D. Harriman II, knew about R/3 as prior art:

A pricing application called R3 made by SAP has the prior art disadvantages explained above.  For example, R3 requires a number of price adjustment tables and a number of database queries to retrieve applicable price adjustments.

. . .

In contrast, the prior art systems do not use denormalized price tables.  For example, a pricing application called R3 made by SAP, does not utilize denormalized price tables.  As a result, R3 has the prior art disadvantages in requiring a number of price adjustment tables and a number of database queries to retrieve applicable price adjustments.  ('400 Patent col. 2:53-56, and col. 11:34-39.)

100.     On information and belief, Pricing Applicants, including Tom Carter and Joseph Liemandt, possessed information on the R/3 systems' pricing features before issuance of the '400 and '350 patents, and nevertheless failed to disclose this information to the Patent Office.

101.     In the '350 patent file history, the Patent Office issued an Office Action dated June 23, 2000, rejecting all pending claims as obvious in light of U.S. Patent No. 5,774,868 ("the Cragun patent") and the prior art cited in the Background section of the '350 patent.  This Background prior art included both the SAP R/3 pricing application as well as "an order entry application made by Oracle" ('350 Patent col. 2:60).  On information and belief, on October 23, 2000, on April 24, 2001, and on January 31, 2002, Pricing Applicants, including at least Gary A. Hecker, Kent Chambers, Tom Carter, and Joseph Liemandt, made numerous misleading and false representations to the Patent Office regarding the state of the prior art cited in the Background section of the '350 patent.  For example, in the October 23, 2000 Amendment filed by Gary A. Hecker, Pricing Applicants stated:

Neither Cragun nor the Background teach, suggest or describe a method for determining the price of a product offered to purchasing organizations, and does not teach, suggest or describe retrieving pricing information stored in a database using the steps of the methods of the claimed invention.  . . . the Background does not teach, suggest or describe the step of identifying organizational groups of which a purchasing organization is a member. . . .  The claimed invention is a system for pricing products in multi-level product and organizational groups. While both inventions are related to methods involving the sale of products, they

are not analogous art.  Therefore, there is no motivation to combine the admitted prior art of product pricing programs with the invention of Cragun for automated sales promotion.  ('350 Patent File History, Oct. 23, 2000 Amendment and Response (Paper No. 6) at 8-11.) (emphasis omitted).

102.    As another example, the April 24, 2001, Amendment filed by Gary A. Hecker

made similar numerous misrepresentations about the prior art in the Background of the '350

patent:

Neither the prior art in the Background nor Cragun, nor any combination of the two, suggest or describe a method for determining the price of a product by sorting pricing information according to pricing types, product hierarchy and organizational hierarchy and determining the price from sorted pricing information in an order. . . . Applicant believes that no effort has been made in the previous art to employ hierarchical sorting techniques to *reduce* the number of options that must be considered and the amount of computation required. . . . There is no suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the references, or to combine reference teachings, to generate the invention claimed here.  ('350 patent file history, Apr. 24, 2001 Amendment and Response (Paper No. 9) at 8-9 and 13.) (emphasis omitted).

103.    As another example, in the January 31, 2002 Amendment filed by Kent

Chambers, Pricing Applicants asserted:

Applicant respectfully submits that the APA [admitted prior art] does not teach or suggest "pricing information associated with one or more . . . organizational groups" and "one or more product groups" as recited by amended claim 51.

. . .

Furthermore, in addition to failing to teach or suggest "pricing information associated with . . . groups", neither APA [Applicant's Admitted Prior Art] nor Cragun teach or suggest "organizational groups, within a hierarchy of organizational groups" or "product groups, within a hierarchy of product groups" as required by amended claim 51.  ('350 Patent File History, Jan. 31, 2002 Amendment and Response (Paper No. 15) at 11-14.)

104.    On information and belief, Pricing Applicants, including Tom Carter and Joseph

Liemandt, knew that these statements were false or misleading and that the Background prior art

could use pricing information associated with organization groups and product groups.  On

information and belief, before issuance of the '350 patent, Pricing Applicants, including Tom

Carter and Joseph Liemandt, knew of and possessed or had access to documents and other

information that contradicted their statements regarding the Background prior art to the Patent

Office in support of patentability.  On information and belief, Pricing Applicants failed to

disclose this information to the Patent Office.

106.    On information and belief, documents and other information describing the R/3

system's pricing functions, the Background prior art pricing functions, and contradicting the

Pricing Applicants' statements regarding the Background prior art during prosecution, would

have been important to a reasonable examiner, and therefore are material.  Such information also

was not cumulative of the prior art of record.

106.    On information and belief, documents and other information describing R/3's

pricing functions and the Background prior art's pricing functions, as well as documents and

other information that are inconsistent with the Pricing Applicants' arguments made during

prosecution of the '400 and '350 patents, were withheld by Pricing Applicants with an intent to

deceive the Patent Office.

### *Mischaracterizations about the R/3 Prior Art Pricing System in the '400 and '350 Patents*

107.    On information and belief, the Pricing Applicants misrepresented and

mischaracterized the capabilities of prior art pricing systems, including R/3, in the specification

of the '400 and '350 patents, asserting for example, that:  "[t]he prior art pricing systems utilize

fixed and predetermined pricing and price adjustment tables that are 'hard-coded' and cannot be

changed to match a particular user's pricing preferences or the user's method of doing business."

('400 Patent col. 11:25-29).  On information and belief, before issuance of the '400 or '350

patent, Pricing Applicants were aware that the R/3 pricing features rendered this statement inaccurate.

108.    On information and belief, the Pricing Applicants also misleadingly described their alleged invention as a "simplification of the prior art's price and price adjustment tables" by "permit[ing] the user to select a tax rate for purchasing organizations located in various geographic locations," the implication being that the existing prior art did not so permit.  ('400 Patent col. 17:65-18:3.)  But on information and belief, Pricing Applicants knew that R/3 contained a tax jurisdiction feature.  On information and belief, further misrepresentations or misleading statements regarding the prior art in the '400 patent are at cols.11:45-54,12:1-3,12:65-13:3, and 13:3-9, and Pricing Applicants were aware of contradictory information and documentation.

109.    On information and belief, before issuance of the '400 or '350 patents, on or about 1995, Pricing Applicants, including at least Thomas Carter and Joseph Liemandt, led a project to integrate SAP's R/3 technology with Trilogy's technology and therefore were familiar with the functionalities of R/3 and had access to documentation and articles about R/3.  Thus, on information and belief, Pricing Applicants, including Thomas Carter and Joseph Liemandt, had access to and were familiar with documentation and articles about R/3 and failed to disclose this material information to the Patent Office during the prosecution of the '400 and '350 patents with an intent to deceive the Patent Office.

110.    On information and belief, the documentation and information describing R/3's pricing functions that Pricing Applicants possessed or had access to were material to the '400 and '350 patents and contradicted Pricing Applicants' statements to the Patent Office regarding the Background prior art.  On information and belief, such undisclosed documentation and

information was not cumulative to the prior art of record in the '400 and '350 patent file histories.  On information and belief, the Pricing Applicants' nondisclosure of this material information and misrepresentations of the prior art were done with an intent to deceive the Patent Office, constituting inequitable conduct.

## SEVENTH AFFIRMATIVE DEFENSE – INEQUITABLE CONDUCT RELATED TO THE '235 PATENT

111.    On information and belief, the '235 patent is unenforceable due to inequitable conduct by one or more individuals substantively involved in the prosecution of the application that led to the '235 patent, including at least Igor Postelnik, Jocelyn E. Goldfein, Phil G. Gilbert, Linda Ginac, Rick Friedman, Joseph Liemandt, Christy Jones, Kent B. Chambers, Samuel G. Campbell, Stephen A. Terrile, D'Ann Naylor Rafai, and T. Patrick Kelly (the "'235 Applicants").

112.    The prosecution history of the '235 patent contains a declaration executed on April 27, May 1, and May 3, 2000, by Igor Postelnik, Phil G. Gilbert, and Jocelyn E. Goldfein, respectively, the named inventors of the '235 patent, stating, in part, "I acknowledge the duty to disclose information, which is material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56."  On information and belief, the named inventors and the prosecuting patent attorneys of the '235 patent were aware of their duty to disclose information material to patentability and/or inconsistent with arguments made in support of patentability to the Patent Office.

### *Nondisclosure of the Kennedy Patent*

113.    U.S. Patent No. 6,963,847 ("the Kennedy patent"), entitled "System and Method for Managing ATP Data in a Distributed Supply Chain Planning Environment," claimed priority

to an application filed September 18, 1998, and issued from application U.S. Ser. No.

09/398,171, filed September 17, 1999.

114.    On information and belief, the '235 Applicants were aware of the Kennedy patent

and its materiality, and nevertheless failed to properly disclose it to the Patent Office, with an

intent to deceive the Patent Office.

115.    On March 16, 2006, after receiving a Notice of Allowance of the '235 patent

claims, the '235 Applicants filed a defective Information Disclosure Statement listing the

Kennedy patent.

116.    On the same day, March 16, 2005, the '235 Applicants disclosed the Kennedy

patent to the Patent Office in a related patent application U.S. Ser. No. 09/519,049.  This related

application had essentially the same specification disclosure and was filed on the same day that

the '235 patent application was filed (March 3, 2000).

117.    On May 26, 2006, the '235 Applicants disclosed the Kennedy Patent to the Patent

Office in a continuation application of the '235 patent, U.S. Ser. No. 11/442,620.  On

information and belief, the '235 Applicants' disclosures of the Kennedy Patent to the Patent

Office in two related applications reflect their awareness of the relevance and materiality of the

Kennedy Patent to the '235 patent claims.

118.    On May 2, 2006, the Patent Office rejected the defective Information Disclosure

Statement sought to be filed in the '235 patent prosecution, stating:

> *[t]he information disclosure statement filed March 16, 2006 fails to comply with*
> *37 CFR 1.97(d)* because it lacks a statement as specified in 37 CFR 1.97(e).  It
> has been placed in the application file, but *the information referred to therein*
> *has not been considered*. (emphasis added).

119.    On information and belief, the '235 Applicants did not provide the required

statement as specified in 37 CFR 1.97(e) (that the '235 Applicants had known of the prior art for

less than three months before seeking to disclose it to the Patent Office) because they had known about the Kennedy patent for more than 3 months and yet had failed to disclose it to the Patent Office.

120.    On information and belief, the Patent Office rules provided the '235 Applicants another option:  to refile the application as a continuation and properly submit the Kennedy patent for consideration by the Patent Office.  On information and belief, the '235 Applicants instead chose not to disclose the Kennedy patent in the '235 patent's prosecution history and to let the '235 patent issue without consideration of the material Kennedy patent.

121.    Despite understanding the Kennedy patent's materiality, as evidenced by the '235 Applicants' failed attempt to include Kennedy in the art of record even after the examiner of the '235 patent had issued a notice of allowance, and despite being alerted to the deficiency of the March 16 Information Disclosure Statement and being instructed on the exact method of curing the deficiency, the '235 Applicants failed to take the proper actions to ensure that Kennedy was made of record in the '235 patent.

122.    On information and belief, the Kennedy patent was material to the '235 patent because, *inter alia*, it described the same technology and a reasonable patent examiner would have considered it important to patentability.  On information and belief, the Kennedy patent was not merely cumulative to the prior art of record.  On information and belief, by failing to disclose properly the Kennedy patent, the '235 Applicants intended to deceive the Patent Office.

### *Nondisclosure of OrderServer and Documents Describing Its Functions*

123.    The '235 patent lists pcOrder.com as the assignee.  The '235 patent describes the OrderServer product as an example of an order request servicing system of the patent:

> An example of an order request servicing system 110 is the OrderServer™ product by pcOrder.com, Inc.  ('235 Patent col. 6:38-40).

124.    On information and belief, by August 13, 2000, pcOrder.com was selling its distributed order management software, OrderServer version 2.0.  On information and belief, earlier versions of OrderServer or similar software products that embodied the subject matter of the '235 patent were sold, offered for sale, publicly used, or known to others more than one year before the '235 patent's priority date (March 3, 2000).

125.    On information and belief, the '235 Applicants were (1) aware of the functionality of pcOrder.com's own distributed order processing and management software products, including OrderServer version 2.0, version 1.0, and earlier versions, (2) aware of the dates on which their own company, pcOrder.com, sold, offered to sell or publicly used any such products; (3) aware of any such products that were sold, offered for sale or publicly used before March 3, 1999; and (4) in possession of documentation describing the relevant functions of one or more of such products.  On information and belief, the '235 Applicants knew of the materiality of any such products or documents since they related to the same subject matter as the '235 patent, and yet failed to disclose such information to the Patent Office with the intent to deceive the Patent Office.

*Nondisclosure of the OrderTrust System and Documents Describing Its Functions*

126.    On information and belief, by August 24, 1998, OrderTrust LLC had created, demonstrated publicly, offered for sale, and sold access to its order request servicing system (the "OrderTrust System") that at least received and processed orders into processed order requests, transmitted each processed order to a selected fulfillment partner, received from each of the fulfillment partners data associated with each processed order request, and integrated the received data from the fulfillment partners.

127.    On information and belief, by at least May 1999, one or more of the '235

Applicants, including Jocelyn Goldfein:  (1) were aware of the OrderTrust System's order

request servicing functionalities, (2) were aware and in possession of documentation describing

the OrderTrust System's order request servicing functionalities, (3) had conducted competitive

analyses of the OrderTrust System's order request servicing functions and compared them to the

planned features of the Trilogy/PCOrder OrderServer product, during whose development the

named inventors are purported to have conceived of and reduced to practice their invention, and

concluded that the OrderTrust system was the closest competitor to their planned product; and

(5) at all relevant times prior to and following the submission of their patent application on

March 3, 2000, considered the OrderTrust System to be the closest technology in the order

management field to what the inventors believed they had invented.  On information and belief,

the '235 Applicants knew of the materiality of the OrderTrust System, and yet failed to disclose

such information to the Patent Office with the intent to deceive the Patent Office.

### *Nondisclosure of the Baker Street System and Documents Describing Its Functions*

128.    On information and belief, by October 1997, Baker Street Technologies, Inc. had

created, demonstrated publicly, offered for sale, and sold access enterprise application

integration software and access to its Web-hosted service (the "Baker Street System") that at

least received and processed orders into processed order requests, transmitted each processed

order to a selected fulfillment partner, received from each of the fulfillment partners data

associated with each processed order request, and integrated the received data from the

fulfillment partners.  On information and belief, by October 1997, the Baker Street System was

installed and in use by Compugen Systems Ltd. in Canada as an activity hub for order fulfillment

to connect six major customers with six suppliers.

129.    On information and belief, in January 1999, one or more of the '235 Applicants, including Phil Gilbert and Igor Postelnik, met in person with senior executives for Baker Street Technologies who: (1) disclosed details of the order request servicing functionalities of the Baker Street System in a presentation given to the '235 Applicants; (2) demonstrated the order request servicing functionalities of the Baker Street System in a live software demonstration given to the '235 Applicants; and (3) discussed the possibility of partnering with the '235 Applicants.

130.    On information and belief, by August 25, 1999, the '235 Applicants: (1) were aware of the Baker Street System's order request servicing functionalities; (2) were aware and in possession of documentation describing Baker Street System's order request servicing functionalities; (3) were aware of and had witnessed a software demonstration of the Baker Street System's order request servicing functionalities; (4) knew that a working implementation of the Baker Street System was being used by Compugen and had been used by Compugen since 1997 as an order request servicing system that linked several customers to several suppliers; and (5) considered the Baker Street System to be a competitor of OrderServer.  On information and belief, the '235 Applicants knew of the materiality of the Baker Street System, and yet failed to disclose such information to the Patent Office with the intent to deceive the Patent Office.

### *Non-disclosure of material Examiner statements and characterizations of those references cited in the co-pending '049 Application*

131.    On March 3, 2000, the '235 Applicants filed two patent applications: Application No. 09/518,766 (which issued as the '235 patent), and Application No. 09/519,049 (the "'049 Application"), which addressed similar "Order Server" technology.  The two applications were examined by different Patent Office art groups, and thus by different Examiners. Throughout the prosecution of the '235 patent, the '049 Application was co-pending.  During the co-pending

period, the '235 Applicants were under an affirmative duty to disclose material, non-cumulative,

references and Examiner statements between the co-pending applications.  All claims of the '049

application were rejected as obvious or anticipated in at least five separate office actions during

the co-pending period (Jan. 15, 2003; Sept. 8, 2003; June 4, 2004; May 6, 2005; Feb. 22, 2006).

The '049 Office Actions — and the bases of the Examiner's rejections contained therein — were

material to the patentability of the subject matter of the '235 patent.  However, at no time were

those office actions and their bases disclosed to the '235 Examiner.  On information and belief,

the '235 Applicants knew of the materiality of the references, Office Actions and Examiner

statements issued in the co-pending application, and yet failed to disclose such information to the

Patent Office with the intent to deceive the Patent Office.

## EIGHTH AFFIRMATIVE DEFENSE – USE OR MANUFACTURE BY OR FOR THE UNITED STATES

132.    To the extent that SAP's accused products have been used or manufactured by or

for the United States, Versata's claims and demands for relief are barred from recovery in this

Court in whole or in part pursuant to 28 U.S.C. § 1498.

## NINTH AFFIRMATIVE DEFENSE – OBVIOUSNESS-TYPE DOUBLE PATENTING

133.    The asserted claims of the '350 patent are invalid for double patenting over the

claims of the '400 patent.

## OTHER AFFIRMATIVE DEFENSES

134.    SAP hereby gives notice that it intends to rely upon any other defense that may

become available in this case and hereby reserves the right to amend this Answer to assert any

such defense.

## COUNTERCLAIMS

SAP asserts the following counterclaims against Versata:

## THE PARTIES

135.    SAP America, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3999 West Chester Pike, Newtown Square, Pennsylvania 19073.

136.    SAP AG is a corporation organized and existing under the laws of the Federal Republic of Germany with its principal place of business at Neurottstrasse 16, 69190 Walldorf, Federal Republic of Germany.

137.    On information and belief, Versata Software, Inc. is a corporation existing under the laws of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

138.    On information and belief, Versata Development Group, Inc. is a corporation existing under the laws of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

139.    On information and belief, Versata Computer Industry Solutions, Inc., is a corporation existing under the laws of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

## JURISDICTION AND VENUE

140.    SAP's counterclaims arise under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and under the patent laws of the United States, 35 U.S.C. §§ 101, *et seq*.

141.    By its counterclaims, SAP seeks to obtain a judgment declaring that SAP does not and has not infringed the '798, '400, '854, '350, and '235 patents, and that the '798, '400, '854, '350, and '235 patents are invalid and unenforceable.

142.    Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331, 1338(a), and 2201.

143.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c).

## FIRST COUNTERCLAIM

### (Declaration of Non-Infringement, Invalidity, and/or Unenforceability of the '798 Patent)

144.    SAP incorporates by reference paragraphs 38, 40-86 as if fully set forth herein.

145.    Versata claims that it is the owner of the '798 patent, that the '798 patent is valid and enforceable, and that SAP infringes the '798 patent.

146.    SAP denies that it does infringe or has infringed any claim of the '798 patent.

147.    Insofar as SAP is determined to infringe any claim of the '798 patent, SAP contends said claim is invalid and unenforceable under one or more of 35 U.S.C. §§ 41, 101, 102, 103, 112, 116, 282 and/or pursuant to applicable equitable doctrines.

148.    Accordingly, a valid and justiciable controversy has arisen and exists between SAP and Versata.  SAP desires a judicial determination and declaration of the respective rights and duties of the parties.  Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## SECOND COUNTERCLAIM

### (Declaration of Non-Infringement, Invalidity, and/or Unenforceability of the '400 Patent)

149.    SAP incorporates by reference paragraphs 38, 87-110 as if fully set forth herein.

150.    Versata claims that it is the owner of the '400 patent, that the '400 patent is valid and enforceable, and that SAP infringes the '400 patent.

151.    SAP denies that it does infringe or has infringed any claim of the '400 patent.

152.    Insofar as SAP is determined to infringe any claim of the '400 patent, SAP contends said claim is invalid and unenforceable under one or more of 35 U.S.C. §§ 41, 101, 102, 103, 112, 116, 282 and/or pursuant to applicable equitable doctrines.

153.    Accordingly, a valid and justiciable controversy has arisen and exists between SAP and Versata.  SAP desires a judicial determination and declaration of the respective rights and duties of the parties.  Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

### THIRD COUNTERCLAIM

### (Declaration of Non-Infringement, Invalidity, and/or Unenforceability of the '854 Patent)

154.    SAP incorporates by reference paragraphs 38, 40-86 as if fully set forth herein.

155.    Versata claims that it is the owner of the '854 patent, that the '854 patent is valid and enforceable, and that SAP infringes the '854 patent.

156.    SAP denies that it does infringe or has infringed any claim of the '854 patent.

157.    Insofar as SAP is determined to infringe any claim of the '854 patent, SAP contends said claim is invalid and unenforceable under one or more of 35 U.S.C. §§ 41, 101, 102, 103, 112, 116, 282 and/or pursuant to applicable equitable doctrines.

158.    Accordingly, a valid and justiciable controversy has arisen and exists between SAP and Versata.  SAP desires a judicial determination and declaration of the respective rights and duties of the parties.  Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

### FOURTH COUNTERCLAIM

### (Declaration of Non-Infringement, Invalidity, and/or Unenforceability of the '350 Patent)

159.    SAP incorporates by reference paragraphs 38, 87-110, and 133 as if fully set forth herein.

160.    Versata claims that it is the owner of the '350 patent, that the '350 patent is valid and enforceable, and that SAP infringes the '350 patent.

161.     SAP denies that it does infringe or has infringed any claim of the '350 patent.

162.     Insofar as SAP is determined to infringe any claim of the '350 patent, SAP contends said claim is invalid and unenforceable under one or more of 35 U.S.C. §§ 41, 101, 102, 103, 112, 116, 282 and/or pursuant to applicable equitable doctrines.

163.     Accordingly, a valid and justiciable controversy has arisen and exists between SAP and Versata.  SAP desires a judicial determination and declaration of the respective rights and duties of the parties.  Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## FIFTH COUNTERCLAIM

### (Declaration of Non-Infringement, Invalidity, and/or Unenforceability of the '235 Patent)

164.     SAP incorporates by reference paragraphs 38, 111-131 as if fully set forth herein.

165.     Versata claims that it is the owner of the '235 patent, that the '235 patent is valid and enforceable, and that SAP infringes the '235 patent.

166.     SAP denies that it does infringe or has infringed any claim of the '235 patent.

167.     Insofar as SAP is determined to infringe any claim of the '235 patent, SAP contends said claim is invalid and unenforceable under one or more of 35 U.S.C. §§ 41, 101, 102, 103, 112, 116, 282 and/or pursuant to applicable equitable doctrines.

168.     Accordingly, a valid and justiciable controversy has arisen and exists between SAP and Versata.  SAP desires a judicial determination and declaration of the respective rights and duties of the parties.  Such a determination is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## REQUESTED RELIEF

SAP requests the following relief:

(a)     Dismissal of Versata's Complaint in its entirety, with prejudice;

(b)     Judgment that Versata take nothing by way of its Complaint;

(c)     Judgment that SAP does not infringe, contributorily infringe, or induce

infringement of any of the claims of the '798, '400, '854, '350, and '235 patents,

and has not done so;

(d)     Judgment that the '798, '400, '854, '350, and '235 patents are invalid and

unenforceable;

(e)     Declaration that this case is an exceptional case within the meaning of 35 U.S.C.

§ 285, with an award to SAP of the costs of this action, including reasonable

attorneys' fees; and

(f)     Any other relief that this Court deems just and proper.

## JURY DEMAND

SAP demands a trial by jury on all issues so triable.


Dated:  February 20, 2009                   Respectfully Submitted,


                                            By:  _/s/ Nicholas H. Patton_____
                                                 (*with permission Victoria Q. Smith*)
                                            Nicholas H. Patton
                                            Texas Bar No. 15631000
                                            nickpatton@texarkanalaw.com
                                            **PATTON, TIDWELL & SCHROEDER, LLP**
                                            4605 Texas Blvd.
                                            P.O. Box 5398
                                            Texarkana, Texas 75505-5398

                                            Patricia L. Peden
                                            California Bar No. 206440
                                            ppeden@pedenlawfirm.com
                                            **LAW OFFICES OF PATRICIA L. PEDEN**
                                            610 16th Street, Suite 400
                                            Oakland, CA 94612

Lloyd R. Day (*pro hac vice*)
lrday@daycasebeer.com
James R. Batchelder (*pro hac vice*)
jbatchelder@daycasebeer.com
Paul S. Grewal (*pro hac vice*)
pgrewal@daycasebeer.com
William P. Nelson (*pro hac vice*)
wnelson@daycasebeer.com
**DAY CASEBEER MADRID**
  **& BATCHELDER LLP**
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA  95014
Tel:  (408) 873-0110
Fax: (408) 873-0220


**ATTORNEYS FOR DEFENDANTS
SAP AMERICA, INC. AND SAP AG**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Therefore, this document was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed.R.Civ.P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of this document via email, facsimile and/or U. S. First Class Mail.


Dated:  February 20, 2009

_____
*/s/ Victoria O. Smith*
Victoria Q. Smith

1