**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., ET AL. | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-153 |
| | § | |
| SAP AMERICA, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

In this case, the plaintiffs, Versata Software, Inc., Versata Development Group, Inc., and

Versata Computer Industry Solutions, Inc. (collectively, "Versata"), contend that SAP America,

Inc., and SAP AG (collectively, "SAP"), infringe various claims of United States Patent Nos.

5,708,798 ("the '798 patent"), 6,002,854 ("the '854 patent"), 5,878,400 ("the '400 patent"),

6,553,350 B2 ("the '350 patent"), and 7,069,235 ("the '235 patent").  Pursuant to a February 21,

2008 order, the court consolidated portions of the claim construction hearing with a separate

case, *Versata Software, Inc., et al. v. Sun Microsystems, Inc.*, E.D. Tex. Case No. 2:06-CV-358-

TJW.   For the purposes of the present case, the consolidated claim construction hearing

addressed the '798 and '854 patents.  A claim construction order for those patents subsequently

issued on August 19, 2008.  This order addresses the claim construction disputes concerning the

'400, '350, and '235 patents.  The order will first briefly address the technology at issue in the

case and then turn to the merits of the claim construction issues.

### II.    Background of the Technology

The technology related to the three patents may be divided into two broad categories—

pricer technology (the '400 and '350 patents) and order server technology (the '235 patent).

The '400 and '350 patents relate to pricer technology, which concerns the electronic pricing of products and services for large entities with many products and customers.

The '400 patent, titled "Method and Apparatus for Pricing Products in Multi-Level Product and Organizational Groups," issued on March 2, 1999. The '350 patent is a continuation of the '400 patent and issued on April 22, 2003. Consequently, the '350 and '400 patents share a similar specification.

The abstract of the '400 patent describes the invention generally and states as follows:

> The invention organizes various pricing tables and price adjustment tables and various products and purchasing organizations based on "who" (i.e. which purchasing organization) is purchasing "what" (i.e. which product). The invention utilizes a denormalized table to relate the "who" to the "what" using denormalized numbers. The invention further organizes various purchasing organizations and products into hierarchical tables. These hierarchical tables are called organizational groups and product groups. Various price adjustments may be specified for each level of the organizational groups and product groups hierarchies. The price adjustments for a particular purchasing organization are determined by retrieving the price adjustments for that particular purchasing organization as well as the price adjustments for organizational groups above the particular purchasing organization in the organizational groups hierarchy. Likewise, the price adjustments for a particular product are determined by retrieving the price adjustments for that particular product as well as the price adjustments for product groups above the particular product in the product groups hierarchy. The invention sorts the various pricing adjustments applicable to a particular product offered to a particular purchasing group based on several criteria. After the sorting is accomplished the pricing adjustments are applied in sequence to arrive at a final price at which a particular product can be sold to a particular purchasing organization.

The '235 patent relates to order server technology, which concerns the efficient receipt and fulfillment of order requests from customers in a multi-source transactional environment. The '235 patent, titled "System and Method for Multi-Source Transaction Processing," issued on June 27, 2006.

The abstract of the '235 patent describes the intention generally and states as follows:

A system and method for multi-source transaction processing receives order requests from a client system operated by a user. The order requests may include order placements and order inquiries. For example, an order request may be a placement for a computer system and associated peripherals. The user may have particular fulfillment organization preferences, and different components of the computer system and associated peripherals may be fulfilled by different fulfillment partners. Accordingly, the orders order requests are processed by an order request servicing system to, for example, split the order request into multiple processed order requests and each of the processed order requests is associated with an order request management system and prepared for transmission to the associated order request management system. The order request management systems can utilize the processed order requests to fulfill the order request. The order request management systems transmit order request management system data which provides, for example, order status information, financial information, and other data. The order request servicing system may, for example, internally process the order request management system data associated with an order request, transmit the order request management system data to the client system, or transmit the order request management system data to another system depending upon the nature of the order request management system data. Thus, the order request servicing system can transparently link users to one or more order request management systems. Additionally, the order request management systems can be linked together over a network, such as the Internet, to provide a network of order request management systems.

Across the three patents, the parties dispute approximately 24 claim terms and phrases. They raise additional disputes concerning the application of 35 U.S.C. § 112(6). The parties have agreed to construe the disputed claim terms and phrases in the pricer patents similarly. For the purposes of claim construction, the court will organize its analysis of the disputed claim terms and phrases in the same manner as addressed by the parties.

## III.    Discussion

### A.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction

is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the

patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and

intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id.* at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the

proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

While the disputed claim terms appear in multiple asserted claims, the parties agree that each term should be consistently construed in every claim term in which it appears. The court now turns to a discussion of the disputed claim terms.

## B. Disputed Claim Terms and Phrases - The Pricer Patents

### 1. "pricing adjustment(s)"; "price adjustment(s)"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"pricing adjustment(s)"** **"price adjustment(s)"** | Plain meaning. If further construction required, this term means: "adjustment(s) related to pricing." | The terms "pricing adjustment" and "price adjustment" mean a denormalized number that may affect the determined price. |

With respect to these terms, the key dispute is whether they should be limited to "denormalized numbers," as suggested by SAP.[1]

Versata argues that the claims are not so limited, and that claim differentiation and consistency counsel against SAP's proposed limitation. For example, claims 6 and 7 of the '350 patent read as follows:

> 6. The method of claim 1 wherein the pricing information comprises <u>pricing adjustments</u>.

> 7. The method of claim 6 where the <u>pricing adjustments</u> comprise <u>denormalized</u> pricing adjustments. (emphasis added).

Versata argues that the doctrine of claim differentiation directs that the disputed term as contained in claim 6, e.g., should not be limited by a specific limitation appearing in a subsequent dependent claim.[2]

Regarding consistency, claim 2 of the '400 patent requires a "pricing adjustment" to include one or more "pricing types." Applying the stipulated construction of "pricing type"—a class or category of pricing adjustments—and a citation from the specification which indicates that various "pricing types" may include non-denormalized numbers, Versata argues that the court's goal of defining each term consistently would be undermined through the imposition of the limitation urged by SAP. *See* '350 Patent, col. 14, ll. 7-13; Fig. 7.

Turning to the specification, Versata further argues that "denormalized" describes a preferred embodiment. For example, Versata asserts that the specification simply discusses the *possibility* of using denormalized numbers, which teaches against a limiting construction. *See* '400 Patent, col. 10, ll. 45-48 (stating, "The numbers in this column are used to arrive at a price

---

[1] The '400 patent expressly defines a "denormalized number." "'[D]enormalized' numbers refers to numbers that do not have a fixed unit and may assume a different meaning and different units depending on the pricing operation that is being performed. In other words, each denormalized number has a unique significance." '400 Patent, col. 8, ll. 47-52.

[2] Versata also argues that the use of "comprising" indicates that claim 7 may include, but is not limited to, denormalized pricing adjustments.

adjustment. The numbers in this column are 'denormalized,' meaning that each number in this column has a unique significance.").

In response, SAP argues that pricing adjustments are properly limited to "denormalized numbers" as suggested through the patent's consistent use and reference to the "denormalized" embodiment as "this invention," and through the specification's emphasis on "denormalized" as a distinguishing feature over prior art. *See* '400 Patent, col. 4, ll. 27-30; col. 8, l. 40-col. 9, l. 2; col. 10, l. 54-col. 11, l. 25; col. 11, ll. 15-36; col. 11, ll. 34-44; col. 11, ll. 45-67. SAP further argues that the patents' use of "this invention" in the abstract and summary of the invention sections provides even stronger support for its contention. *See* '400 Patent, abstract; col. 3, l. 63-col. 4, l. 6. SAP also addresses Versata's argument, asserting (1) the claimed embodiment is manufactured by Versata; (2) the doctrine of claim differentiation is trumped by the disclaimer as addressed above; and (3) the "non-denormalized" examples cited by Versata are actually discussions of "denormalized" price adjustments.

The court concludes that SAP's argument is persuasive. Under these circumstances, there is convincing evidence that the scope of the invention is limited as proposed by SAP, even in light of the doctrine of claim differentiation and the court's goal of construing claim terms consistently. *See O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1582 (Fed. Cir. 1997); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999). The specification consistently describes "this invention" as utilizing denormalized numbers—the patent discusses "this invention" in the context of denormalized numbers or tables no less than ten times. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1368-69 (Fed. Cir. 2003); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004); *Verizon Servs. Corp. v. Vonage Holds. Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007);

*Honeywell Int'l Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). Second, there are a number of instances in which the specification distinguishes the present invention over prior art precisely for the reason that the prior art did not use denormalized numbers—in fact, in one instance, the specification distinguishes SAP's R3 product as disadvantaged because R3 does not use denormalized price tables. '400 Patent, col. 11, ll. 34-44. The failure to use denormalized tables is criticized because it requires numerous database accesses to multiple price tables. *See Astrazeneca v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004); *O.I. Corp.*, 115 F.3d at 1581-82; *Alloc, Inc.*, 342 F.3d at 1368-72; *Honeywell Int'l*, 452 F.3d at 1318. Under the circumstances, the patentee limited the scope of price adjustments to denormalized numbers.

For these reasons, the court defines "pricing adjustment(s)" and "price adjustment(s)" as **"a denormalized number that may affect the determined price."**

### 2. "pricing information"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"pricing information"** | Plain meaning. If further construction required, this term means: "information related to pricing." | The term "pricing information" means any information relating to price other than an adjustment to price that is not a denormalized number. |

This term appears in only the '350 patent. The issue regarding this term, similar to the previous term, is whether the term excludes price adjustments that are not denormalized numbers.

Versata argues that "pricing information," as used in the specification, refers to a number of various types of information relating to pricing. *See* '350 Patent, col. 1, ll. 26-27; col. 9, ll. 12-15; Fig. 1; cl. 8; cl. 9. Furthermore, as indicated by claims 6 and 24, "pricing information" encompasses both price adjustments and denormalized price adjustments. As this term appears

in only the '350 patent, SAP argues that the disclaimers that effectively limit the above terms also limit the scope of "pricing information."

As discussed earlier, the '350 patent is a continuation of the '400 patent. "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original becomes abandoned or patented." MPEP § 201.07 (rev. July 2008); *see also Microsoft Corp.*, 357 F.3d at 1348-49 (finding disclaimer across three continuation patents).

The court is persuaded that the patentee limited price adjustments to denormalized numbers. As such, the court limits the scope of "pricing information," as well and adopts SAP's construction.

### 3. "applicable pricing adjustment(s)"; "applicable price adjustment(s)"; "pricing information applicable"; "applicable pricing information"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"applicable pricing adjustment(s)"; "applicable price adjustment(s)"** | Plain meaning. If further construction required, this term means: "associated adjustment(s) related to pricing." | a pricing adjustment that corresponds to a given level in the pricing hierarchy either because that pricing adjustment is associated directly with that level, or because that pricing adjustment is associated with a higher level in the hierarchy. |
| **"pricing information applicable"; "applicable pricing information"** | Plain meaning. No construction needed. If further construction required, this term means: "associated information related to pricing." | pricing information that corresponds to a given level in the hierarchy either because that pricing information is associated directly with that level, or because that pricing information is associated with a higher level in the hierarchy. |

The fundamental dispute here is the definition of "applicable." In construing the term, SAP urges a definition that includes adjustments or information corresponding to a hierarchy at the same level or at a higher level. Versata argues that the terms need no construction.

Versata asserts that the limitation imposed is improper for generally three reasons. First, the limitation makes further claim limitations superfluous. For example, the pertinent portion of claim 1 of the '400 patent reads as follows:

retrieving <u>applicable pricing adjustments</u> corresponding to each of the following:
    a particular purchasing organization;
    each organizational group <u>above</u> said particular purchasing organization in said organizational group hierarchy;
    a particular product; and
    each product group above said particular product in said product group hierarchy . . . .

Versata argues that the suggested limitation would render the above-emphasized portions unnecessary. Second, Versata argues that SAP's construction would not allow for price adjustments from more than a single level of a branch of a hierarchy in direct contravention of the specification. *See, e.g.*, '350 Patent, col. 9, l. 56-col. 10, l. 8; col. 10, ll. 23-30. Finally, Versata argues that the asserted limitation would require that adjustments come from a specific level, again contrary to the specification. *See* '350 Patent, Fig. 4A; col. 7, ll. 18-20; cl. 18; cl. 9.

SAP does not address many of Versata's arguments, but instead generally asserts that the use of "higher" will alleviate jury confusion or misinterpretation by the jury of Fig. 4B or the concept that a price adjustment is applicable based upon higher levels in the hierarchy—in essence, SAP wants to emphasize that the price adjustments roll downhill, not up.

The court agrees with Versata. Read in context of the claim as a whole, the alleged explanatory language/definition suggested by SAP would not clarify nor simplify the terms of the claim.

As such, the court gives the above terms their plain meanings.

### 4.     "retrieving"; "retrieve"; "retrieved"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"retrieving"; "retrieve"; "retrieved"** | Obtaining data from a storage location in a data source by one access | Plain meaning |

The issue regarding this term is whether it allows for multiple accesses, as SAP suggests, or one access, as Versata argues.

In support of its limitation, Versata points to portions of the specification that "consistently describes the use of an access to a data source in order to retrieve information." Pls.' Opening Brief at 14; *see, e.g.*, '350 Patent, col. 19, ll. 7-22; Figs. 15A-C; col. 8, ll. 17-30. Furthermore, Versata cites to claim 20 of the '350 patent. Specifically, the cited portion states, "using a query to a data source." Finally, Versata cites one instance in which the patentee discusses a disadvantage of prior art—that being multiple database queries.

As argued by SAP, however, Versata's assertions are not persuasive. First, Versata overlooks the rule "that 'a' or 'an' can mean 'one or more.'" *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008). Second, claim 20 is a dependent claim, and construing all the claims in such a limiting manner would not be consistent with the doctrine of claims differentiation. *See Phillips*, 415 F.3d at 1315. Finally, those portions of the specification cited by Versata in support of its limitation do not rise to the level required to find that the patentee disclaimed multiple accesses and/or expressly claimed only a single embodiment.

For these reasons, the court adopts SAP's construction.

### 5. "applying"; "applied"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| "applying"; "applied" | Determine how to use and use in the manner determined. | use to influence the computation of price. |

The central issue concerning this term is best understood through the application of each construction to a disclosed embodiment. An aspect of the patent involves the "application" of

price adjustments to determine a "final price."  A portion of the specification indicates as follows:

> In step 1522 the price of the user specified product is set to zero so that the price can be determined by <u>application</u> of the sorted pricing adjustments.  In step 1524 the various Pricing Types included in the sorted pricing adjustments are <u>applied</u> in the user specified pricing sequence.  Thus, the price of the user specified product is increased, decreased, <u>and/or overridden</u> until the final price is determined.  '400 patent, col. 19, ll. 42-50 (emphasis added).

In light of the specification, any construction should allow that a price adjustment is "applied" even if the adjustment is ultimately ignored or overridden.  In this sense, SAP's construction is too limiting because a price adjustment that is overridden would not influence the computation of the price.  Versata's construction more properly encompasses what the patent teaches.  It implicitly recognizes at least a consideration of all price adjustments, whether increased, decreased, ignored, and/or overridden.  The court adopts Versata's construction.

### 6. "sorting the retrieved pricing information"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"sorting the retrieved pricing information"** | The retrieved pricing information is ordered. | The referenced pricing information is first retrieved, and then sorted. |

This phrase appears in only claim 1 of the '350 patent.  The issue with respect to this term is whether the phrase requires a specific sequential order of steps, i.e., whether "retrieving" must occur prior to "sorting."

The steps of a method claim do not typically need to be performed in the recited order, unless the "method steps implicitly require that they be performed in the order written."  *GWIN, Inc. v. Don Best Sports*, 548 F. Supp. 2d 342, 348-49 (E.D. Tex. 2008) (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) and *Interactive Gift Express, Inc. v.*

*Compuserve Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001)).  A two-part test is used to determine if the method steps "implicitly require" an order:

> First, method steps implicitly require sequential performance if the claim language, as a matter of logic, requires the steps be performed in the order written.  Second, if, as a matter of logic, the claim language does not require the steps be performed in the order written, method steps implicitly require sequential performance if the specification directly or implicitly requires such a narrow construction.  *GWIN*, 548 F.Supp.2d at 349 (internal citations omitted).

Here, claim 1 of the '350 patent recites two retrieval steps and a sorting step.  The applicable portions of claim 1 reads as follows:

> <u>retrieving</u> from the data source the <u>pricing information</u> applicable to the one or more identified organizational groups;
> identifying one or more product groups, within a hierarchy of product groups, of which the product is a member, wherein pricing information is (i) stored in a data source and (ii) associated with one or more of the product groups;
> <u>retrieving</u> from the data source the <u>pricing information</u> applicable to the one or more identified product groups;
> <u>sorting the retrieved pricing information</u> applicable to the one or more identified organizational groups and the one or more identified product groups according to pricing types, the hierarchy of product groups and the hierarchy of organizational groups . . . .  (emphasis added).

As the claims indicate, the retrieving steps must be performed before the sorting step.  *See E-Pass Tech., Inc. v. 3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (the step of "transferring a data set" must come before the later recited step of "storing said transferred data set"); *see also Mantech Envir. Corp. v. Hudson Envir. Servs.*, Inc., 152 F.3d 1368 (Fed. Cir. 1998) ("the sequential nature of the claim steps is apparent from the plain meaning of the claim language.").

What distinguishes the present case from the cases cited by the plaintiff is the reference to a previous action—"retrieved pricing information."  Under the claim language, the pricing information must have already been retrieved for it to be sorted.  *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368-1371 (Fed. Cir. 2003); *Respironics, Inc. v. Invacare*, 2008 WL

5216019 (Fed. Cir. 2008); *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1343

(Fed. Cir. 2001).

Accordingly, the court adopts SAP's construction.

### 7. "sorting the pricing information"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"sorting the pricing information"** | The pricing information is ordered. | SAP believes the term "sorting the pricing information" is indefinite |

This phrase appears in only claim 17 of the '350 patent.

SAP contends that this term is indefinite as the phrase has no antecedent basis. The

applicable portion of the claim reads as follows:

> storing [1] pricing information in a data source, wherein the pricing information is
> associated, with . . . ;
> retrieving applicable [2] pricing information corresponding to the product, the
> purchasing organization, each product group above the product group in
> each branch of the hierarchy of product groups in which the product is a
> member, and each organizational group above the purchasing organization
> . . . ;
> sorting the pricing information according to the pricing types, the product, the
> purchasing organization, the hierarchy of product groups, and the
> hierarchy of 25 organizational groups; . . . . (emphasis added)

SAP contends that "the" in the disputed phrase can reference either one of the above two,

numbered alternatives.

As argued by Versata, the phrase is not insolubly ambiguous. Both the claim language

and the specification provided guidance in construing the phrase. Claim 17 requires "storing

pricing information in a data source," and there are a number of references in the specification

that describe sorting pricing information, providing additional evidence from which a

construction may be discerned. The term "pricing information" is a term used throughout the

specification and is a disputed term in this case.  *See, e.g.*, '350 Patent, col. 3, ll. 59-65; col. 19, ll. 23-25; Figs. 15B-C.[3]

For these reasons, the disputed phrase is not indefinite, and the court adopts Versata's construction.

### 8. "pricing information that is less restrictive for the same pricing type"; "the pricing information that is less restrictive"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
| --- | --- | --- |
| **"pricing information that is less restrictive for the same pricing type"** | Pricing information that is less specifically applicable to an organizational group or a product group for a given pricing type. | For a given pricing type, the pricing information applicable to all of the same products or purchasing organizations, plus one or more other products or purchasing organizations |
| **"the pricing information that is less restrictive"** | Pricing information that is less specifically applicable to a product, a purchasing organization, an organizational group or a product group. | The pricing information applicable to all of the same products or purchasing organizations, plus one or more other products or purchasing organizations |

These two disputed phrases are used in claims 1 and 17, respectively, of the '350 patent. The issue with respect to these terms is the correct interpretation of "less restrictive."  Versata would read "less restrictive" to mean "less specifically applicable," while SAP would read "less restrictive" to mean "pricing information applicable to all of the same products or purchasing organizations, plus one or more other products or purchasing organizations."

As shown in Figures 4A and 4B, and as discussed in the specification, price adjustments may arise from a number of categories, both at a lower or higher level in the hierarchy and in combination with one another.  A plain reading of the claims in light of the specification

---

[3] Furthermore, although not dispositive of the issue, SAP initially proposed a construction for this term.  A party's proposed construction of a disputed term in its P.R. 4-3 disclosures supports the conclusion that a disputed term is not indefinite.  "There are additional reasons why the Court rejects Artesyn's indefiniteness argument.  First, Artesyn initially proposed a construction of 'POL register' indicating that the meaning of this term can be discerned. See Joint Claim Construction Statement."  *Power-One, Inc. v. Atesyn Techs., Inc.*, 2008 WL 4065871 (E.D. Tex. 2008).

indicates that the patent discloses eliminating "less restrictive" pricing information, i.e., pricing information that is less specific to the purchaser or product. SAP's proposed construction is overly narrow; there is no implicit requirement that a comparison be made as to numbers of products or purchasing organizations to determine the "less restrictive" pricing information. As suggested by Versata, SAP's proposed construction does not account for time specific restrictions.

Accordingly, the court adopts Versata's construction.

## C.    Disputed Claim Terms and Phrases – The Order Server Patent

### 1.    Sequential Ordering of the '235 Patent Claims

Versata asserts a number of independent claims of the '235 patent that recite various steps to be performed. The parties dispute, however, whether the steps must be performed in the recited order. The disputed step-claims can be further subdivided into method claim 1 and device and system claims 15, 23, and 26.

#### a.    Method Claim 1

The pertinent portion of claim 1 reads as follows:

the method for utilizing the order request servicing system comprising:
    <u>receiving</u> with the order request servicing system an order request from a client system;
    <u>processing</u>, by the order request servicing system, the received order request into multiple processed order requests;
    <u>selecting</u>, by the order request servicing system, fulfillment partners for each of the processed order requests;
    for each of the processed order requests, <u>transmitting</u> the processed order request to the ORMS of the selected fulfillment partner;
    <u>receiving</u> from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners; and
    <u>integrating</u> the received ORMS data from the ORMSs of the fulfillment partners. (emphasis added).

SAP cites two independent reasons for asserting that the asserted claims of the '235 require sequential ordering: (1) the output of each claim limitation becomes the input of the next claim limitation, and (2) during prosecution, in response to an invalidity rejection, the applicant changed the order in which the "processing" and "selecting" steps took place, and relied on that sequence-changing amendment to secure allowance. *See E-Pass Tech., Inc. v. 3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007); *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998).

Versata argues, to the contrary, that because the claims do not actually recite an order, nor do they implicitly require an order, the method claims do not need to be performed in the order recited. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2008); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1328 (Fed. Cir. 2001).

As the Federal Circuit instructs in *Altiris*, the court will first "look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Altiris*, 318 F.3d at 1369 (citing *Interactive Gift Express*, 256 F.3d at 1343). As indicated by the above-highlighted language, both logic and grammar suggest an order. As argued by SAP, the output of the prior limitation becomes the input of the subsequent limitation. The claims at issue here are similar to the claims at issue in both *E-Pass* and *Mantech*. *See E-Pass* Tech, 473 F.3d at 1222; *Mantech Envtl. Corp.*, 152 F.3d at 1376. Additionally, the claims here are distinguishable from those at issue in *Interactive Gift*, *Altiris*, and *Respironics*; none of the claims at issue in those cases reads like the claim at issue here. *See Altiris*, 318 F.3d at 1369; *Interactive Gift Express*, 256 F.3d at 1328; *Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865, 869-70

(Fed. Cir. 2008). Because the court finds that logic and grammar impose an order, the court need not consider the second step of the analysis. *See Altiris*, 318 F.3d at 1369.[4]

For these reasons, the court construes claim 1 to require the limitations to be performed in the order recited.

### b. Device and System Claims 15, 23, and 26

Claims 15, 23, and 26 each disclose devices and systems that perform essentially similar steps as claim 1. Both the Federal Circuit and this court have, under certain circumstances, imposed a sequential order of method steps in the context of device and system claims. *See Oak Tech., Inc. v. ITC*, 248 F.3d 1316, 1325 (Fed. Cir. 2001); *Visto Corp. v. Good Tech., Inc.*, 2008 WL 163576, *6 (E.D. Tex. 2008). For this reason and the reasons discussed above, the court construes claims 15, 23, and 26 to require the limitations to be performed in the order recited.

### 2. "integrating the received ORMS data from the ORMSs of the fulfillment partners"; "integrate the received ORMS data from the ORMSs of the fulfillment partners"[5]

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **"integrating the received ORMS data from the ORMSs of the fulfillment partners"; "integrate the received ORMS data from the ORMSs of the fulfillment partners"** | storing in the same database, or otherwise combining, received ORMS data to provide a single source of information. | storing in the same database, or otherwise combining, received ORMS data. |

The dispute over the construction of this phrase is straightforward. Versata seeks to add language to SAP's construction and define the term by addressing its use.

As argued by Versata, the patent, in multiple instances, discusses the receipt of a single, integrated source of information. *See* '235 Patent, col. 7, ll. 16-21 ("integrates . . . providing a

---

[4] The court notes that, while not dispositive, the patentee's responses to an invalidity rejection during prosecution also strongly support the imposition of an order to the steps of claims 1 and 23. *See* Ex. F to Defs.' Resp. Claim Construction Brief at 2, 27.

[5] ORMS stands for Order Request Management Systems.

single integrated source"); col. 10, ll. 8-11 ("integrated order status"); col. 17, ll. 47-52 ("integrated to provide an overall order status"). Furthermore, Versata suggests that the specification expressly defines integration of the ORMS data as encompassing more than just the storing of information in a centralized store, but also as providing a single source of information for the order status.

> The term <u>centralized is used to describe the order request servicing system 110 not because of its physical location</u>, but because communications between client systems 105 and order request management systems 120 pass through the order request servicing system 110. The <u>centralized nature</u> of the communications provides the client with a <u>single integrated source of order information, the order request servicing system 110</u>. '235 Patent, col. 7. l. 66-col. 8,l. 6 (emphasis added).

SAP argues, first, that Versata is improperly defining the term by its use, rather than simply by what the term means. Second, SAP asserts that a number of Versata's examples do not support the premise for which they are cited.

SAP's arguments are unpersuasive. The claims, when read in the context of the specification, support such a construction. The inclusion of "to provide a single source of information" adequately describes the scope of the claim limitation in the context of the patent as a whole.

For these reasons, the court defines the above terms as **"storing in the same database, or otherwise combining, received ORMS data to provide a single source of information."**

3.     "transmitting the processed order request to the ORMS of the selected fulfillment partner"; "transmit the processed order request to the ORMS of the selected fulfillment partner"; "receiving from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners"; "receive from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners"

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| "transmitting the processed order request to the ORMS of the selected fulfillment partner"; "transmit the processed order request to the ORMS of the selected fulfillment partner" | The order request servicing system electronically transmits the processed order request to the ORMS of the selected fulfillment partner. | These terms should be given their plain meaning given the definitions already addressed: "transmitting the processed order request to the ORMS of the selected fulfillment partner" "transmit the processed order request to the ORMS of the selected fulfillment partner" |
| "receiving from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners"; "receive from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners" | The order request servicing system electronically receives from the ORMS of the selected fulfillment partner data associated with the processed order request. | These terms should be given their plain meaning given the definitions already addressed: "receiving from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners" "receive from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners" |

With respect to these phrases, the parties dispute (1) whether the transmission and receiving of "processed order[s]" and "ORMS data" occurs "electronically," as suggested by Versata, and (2) whether "each of" should be eliminated from the "receiving" phrase construction, also as suggested by Versata.

Regarding "electronically," Versata urges a limiting construction, premised on an alleged continuous and consistent use—indeed, it seeks to limit the terms to a disclosed embodiment. *See* '235 Patent, Fig. 1; col. 12, ll. 42-51; Fig. 5.    SAP argues, however, that this is impermissible, not only because Versata's proposed construction limits the claim to a disclosed

embodiment, but also because "electronic" appears in other claim language.  *See* '235 Patent, col. 22, ll. 52-54 (first limitation of claim 26).  Despise SAP's position, the court agrees with Versata.  The consistent use of "electronically" throughout the patent suggests that the patentee intended to claim only "electronic" means of transmitting.

Turning to the remaining dispute, SAP's position is persuasive.  The claim language specifically requires that the data be received from "each of" the ORMS.  Versata's construction would also re-write the "integrating" step by deleting the claim's requirement that data received from "each of" the ORMSs be integrated.  SAP's construction is also supported by the prosecution history; the patentee added the phrase "each of" to the claims, arguing that this added phrase distinguished its invention from prior art on the ground that it did not receive or integrate ORMS data from "each of" the referenced ORMSs.  *See* '235 File History, November 25, 2002 Resp. to Non-Final Office Action at 9, 11.

Accordingly, the court construes the above phrases as follows.

The court defines "transmitting the processed order request to the ORMS of the selected fulfillment partner" and "transmit the processed order request to the ORMS of the selected fulfillment partner" as follows:

**"the order request servicing system electronically transmits the processed order request to the ORMS of the selected fulfillment partner."**

The court defines "receiving from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners" and "receive from each of the ORMSs of the selected fulfillment partners ORMS data associated with the processed order request transmitted to the ORMS of the fulfillment partners" as follows:

**"the order request servicing system electronically receives from each of the ORMS of the selected fulfillment partner data associated with the processed order request."**

4. **"a request to view information related to orders including ORMS catalog information"**

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **a request to view information related to orders including ORMS catalog information** | An order-related request for information including but not limited to ORMS catalog information. | An order-related request for information that includes information derived from or relating to an ORMS catalog, or a request for information about orders that include information derived from or relating to an ORMS catalog. |

Versata suggests an appropriate, clarifying construction of the above phrase that is supported by both the specification and the plain reading of the claims. *See* '235 Patent, col. 5, ll. 23-24 (describing a request to "view information relating to orders, such as catalog information"); col. 5, ll. 24-25 (explaining that these requests include an order request related to a catalog, "where the response is to present the catalog to the customer").

Despite SAP's criticism of this definition, Versata's construction provides a clear and concise interpretation of the disputed phrase that is consistent with the scope of the invention.

The court adopts Versata's construction.

5. **"business relationships of the client"**

| Disputed Claim Term or Phrase | Versata's Proposed Construction | SAP's Proposed Construction |
|---|---|---|
| **business relationships of the client** | Client information, used to identify fulfillment partner(s). | Business relationships that may affect the fulfillment of the client's order request, including business relationships between the client and the order servicing organization, between the client and the fulfillment partner, or between the order servicing organization and the fulfillment partner. |

This phrase is used in claim 4 of the '235 patent. The pertinent language of claim 4 reads as follows:

using electronically stored routing rules to select a fulfillment partner from
<u>business relationships of the client</u> to provide each item ordered.

SAP's suggested construction attempts to capture the portion of the specification which describes various relationships which a client, an order servicing organization, and a fulfillment partner *may* have. See '235 Patent, col. 6, ll. 12-30. SAP's construction, however, allows for a relationship between an order servicing organization and a fulfillment partner, a relationship not contemplated by the cited examples. In fact, each of the additional examples cited by Versata includes relationships between, at a minimum, the client and either the order servicing organization or the fulfillment partner. *See, e.g.*, '235 Patent, col. 3, ll. 10-18; col. 7, ll. 6-14; col. 8, ll. 13-21; col. 10; ll. 34-40; col. 10, ll. 41-47; col. 11, ll. 1-9; and col. 12; ll. 1-15. Absent any example of a relationship that excludes a client, the court is unwilling to expand the scope of this term to include such an example in its construction.

Accordingly, the court construes "business relationships of the client" as **"business relationships that may affect the fulfillment of the client's order request, including business relationships between the client and the order servicing organization, or between the client and the fulfillment partner."**

### D.     Application of 35 U.S.C. § 112(6)

SAP contends that a number of terms in the asserted claims of the '350, '400 and '235 patents containing "computer readable program code" or similar language are governed by 35 U.S.C. §112(6) and should therefore be construed as means-plus-function terms. SAP's basis for its contention here is similar to its argument concerning comparable claim terms previously construed. As in the previous claim construction opinion, none of the elements SAP identifies contains the term "means" and therefore are presumptively not subject to means-plus-function construction under § 112(6). *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369

(Fed. Cir. 2002); *Watts v. XL Sys., Inc.*, 232 F. 3d 877, 880-81 (Fed. Cir. 2000). This presumption against means-plus-function treatment is not readily overcome. *See Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). As in the previous instance, SAP has not overcome the presumption in this case. Therefore, the court declines to construe these terms as means-plus-function limitations.

IV.     **Conclusion**

The court adopts the constructions set forth in this opinion for the disputed terms of the patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 19th day of May, 2009.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE