# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| VERSATA SOFTWARE, INC., et al | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-153-CE |
| | § | |
| SAP AMERICA, INC. and SAP, AG | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants SAP America, Inc. and SAP, AG's ("SAP's") claim of inequitable conduct. The Court conducted a bench trial on April 27, 2010 on SAP's claim of inequitable conduct and the parties submitted briefing supporting their positions prior to the trial. (Dkt. Nos. 352, 358, 367, 371). For the following reasons, the Court DENIES Defendants' claim of inequitable conduct on the '400 and '350 patents.[1]

**I.    BACKGROUND**

Trial in this case occurred between August 17-26, 2009 on patent infringement claims raised by Plaintiffs[2] against SAP based on the '400 and '350 patents. The jury returned a verdict that SAP directly infringed claims 26, 28, and 29 of the '350 patent, induced and contributed to infringement of claim 29 of the '350 patent, and directly infringed claims 31, 35, and 36 of the '400 patent. (Dkt. No. 318). SAP raised an invalidity issue, alleging that the asserted claims of the '400 and '350 patents are invalid for failure to disclose the inventor's best mode, but the jury found SAP failed to

---

[1] The patents at issue in SAP's inequitable conduct claim are U.S. Patent Nos. 5,878,400 ("the '400 patent") and 6,553,350 B2 ("the '350 patent"). Both list Thomas J. Carter as the inventor and share a common specification.

[2] Plaintiffs in this case include Versata Software, Inc., f/k/a Trilogy Software, Inc., Versata Development Group, Inc., f/k/a Trilogy Development Group, Inc., and Versata Computer Industry Solutions, Inc., f/k/a Trilogy Computer Industry Solutions, Inc. The Court will refer to these entities collectively as "Versata."

prove its contention by clear and convincing evidence. The Jury awarded $138,641,000.00 in damages. After the jury trial, the parties submitted briefing on SAP's claims of inequitable conduct and the Court conducted a bench trial on April 27, 2010.

## II.　LEGAL STANDARDS

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006); *see also* 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). Thus, "[a] party may show inequitable conduct by producing clear and convincing evidence of (1) material prior art, (2) knowledge chargeable to the patent applicant of prior art and its materiality, and (3) the applicant's failure to disclose the prior art to the PTO with intent to mislead." *Avid Identification Systems, Inc. v. Crystal Import Corp.*, 603 F.3d 967, 972 (Fed. Cir. 2010).[3]

The materiality of information withheld during prosecution may be judged by the "reasonable examiner" standard. *See Digital Control*, 437 F.3d at 1316. That is, "[m]ateriality . . . embraces any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent." *Akron Polymer Container Corp. v. Exxel*

---

[3] The Federal Circuit has recently signaled that it may modify or clarify the standards on inequitable conduct, including whether the standard should be tied to fraud or unclean hands, the appropriate standard for materiality, and when it is proper to infer intent from materiality. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 374 Fed.Appx. 35 (Fed. Cir. Apr. 26, 2010).

*Container, Inc.*, 148 F.3d 1380, 1382 (Fed. Cir. 1998) (citations omitted); *see Avid*, 603 F.3d at 972. Moreover, "[i]nformation concealed from the PTO may be material even though it would not invalidate the patent." *Li Second Family Ltd. Partnership v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000). "However, a withheld otherwise material prior art reference is not material for the purposes of inequitable conduct if it is merely cumulative to that information considered by the examiner." *Digital Control*, 437 F.3d at 1319. "[T]he scope and content of prior art and what the prior art teaches are questions of fact." *Id.* "[T]he facts in inequitable conduct cases rarely, if ever, include direct evidence of admitted deceitful conduct." *Akron Polymer*, 148 F.3d at 1384. "The intent element of the offense is thus in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *Id.* "However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible." *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). In addition, "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part).

"The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." *Digital Control*, 437 F.3d at 1313. "Only after adequate showings are made as to both materiality and deceptive intent may the district court look to the equities by weighing the facts underlying those showings." *Star Scientific, Inc. v. R.J. Reynolds*

*Tobacco Co., et al.*, 537 F.3d 1357, 1367 (Fed. Cir. 2008). "The court must then determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the other.'" *Digital Control*, 437 F.3d at 1313 (*quoting Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir. 2001)).

### III. DISCUSSION

#### A. Factual Background

In April 2007, Versata initiated this litigation by asserting the '400 and '350 patents (among others) against SAP. During the course of litigation, SAP discovered that the inventor of the '400 and '350 patents, Thomas Carter, was familiar with SAP's R/3 2.2 product at the time the application that led to the '400 and '350 patents was filed. Specifically, Mr. Carter was studying R/3 2.2 to make a "bridge" to allow conversion of customer pricing information from R/3 2.2 to Versata's pricing program. Mr. Carter's work, which occurred prior to and contemporaneously with the filing of his patent application, involved exporting the pricing information from SAP's systems as a "flat file" and then reading that information into his system. For different customers who used different features in their SAP pricing system, Mr. Carter had to expand his "bridge" to cover a wider range of features. Trilogy did not have access to its own SAP installation, but instead had to use an installation owned by another company called ICS.

In the specification of his application, Mr. Carter described a hierarchical access system and explained that the R/3 system lacked that feature. Additionally, Mr. Carter explained that the prior art R/3 system lacked "denormalized tables." The hierarchical access system was fundamental to the invention, as it allowed the retrieval of pricing information with far fewer accesses and a much

4

smaller system of tables. As a result, pricing quotes could be generated at a customer site using a laptop computer rather than at the central office using a mainframe computer. Neither R/3 nor any other prior art pricing system allowed the efficient access of hierarchical customer and product pricing information.

During prosecution, the examiner found several references where customer and/or product hierarchies were used in pricing applications. Mr. Carter distinguished his invention over the prior art, in part, by describing how his invention employed and accessed hierarchies of product and customer groups. Among those references was an article by Mark Parenti that discloses a software package that employs "hierarchies" of item and customer discounts to determine pricing. According to Defendants' expert, the techniques described in Parenti are similar to those used by the prior art R/3 system to determine pricing.

### B. SAP's Inequitable Conduct Claim

To prevail on its claim of inequitable conduct, SAP must prove by clear and convincing evidence that Mr. Carter knew of the hierarchical structure employed by SAP's prior art R/3 system at the time that he made representations to the patent office and subjectively appreciated the materiality of this information. Additionally, SAP must prove that R/3's system is not cumulative of the art of record, and that Mr. Carter subjectively appreciated that R/3 was not cumulative. Further, SAP must prove that Mr. Carter intentionally decided to withhold information about R/3 from the patent office for the specific purpose of deceiving it.

#### 1. Mr. Carter's Knowledge of SAP's R/3 2.2

SAP relies on five documents and Mr. Carter's attempt to "bridge" SAP pricing data into SC Pricer pricing data to prove Mr. Carter had knowledge of SAP's use of hierarchies in pricing at the

time the patent was filed. These documents and Mr. Carter's testimony on his "bridge" between SC Pricer and SAP's R/3 do not support such a conclusion.

The first document SAP relies on is an overview of SAP pricing prepared by ICS for use in converting SAP pricing data. (Dkt. No. 352-19). The record indicates ICS provided this document to Mr. Carter in August of 1995. The document shows a graphic of an SAP screen where conditions HI01 and HI02, named "hierarchy" and "hierarchie/material" are available but unused. The document makes no other reference to hierarchies or these condition fields. The document contains a table contemplating future features to add to the interface product, and no mention is made of hierarchies. This document, containing only the words "hierarchy" and "hierarchie," without any context, cannot support SAP's assertion that Mr. Carter had detailed knowledge of product or customer group hierarchies in R/3.

The second document SAP relies on is a "price scenario specification" prepared by ICS for Versata's SAP interface product in or around April of 1996. (Dkt. No. 352-22). This document indicates that SAP's pricing database utilized two fields corresponding with the HI01 and HI02 conditions. Despite the names of these fields, their existence in R/3 did not denote the existence of product or group hierarchies. The HI01 and HI02 fields could be used as conditions in pricing, but, according to the document, were arbitrary fields and did not create or represent actual hierarchies. (Dkt. No. 352-22, p. 7). Merely using the word "hierarchy" to name a field in a database does not create product and customer group hierarchies. This document thus cannot support SAP's assertion that Mr. Carter had detailed knowledge of product or customer group hierarchies in R/3.

The third document SAP relies on is an undated spreadsheet generated by Mr. Carter at some time in 1996. (Dkt. No. 352-24). The second page of the document indicates that Mr. Carter was

aware of some hierarchy techniques SAP's customers used in R/3, but did not yet know how to address them. *Id*. at 3. Contrary to SAP's assertion that Mr. Carter had sufficient knowledge to determine the materiality of R/3's use of hierarchies, this document indicates he was still grappling with how R/3's hierarchy implementation worked and how to convert a simple three level product hierarchy to his SC Pricer system. This document thus cannot support SAP's assertion that Mr. Carter had detailed knowledge of product or customer group hierarchies in R/3.

The fourth document SAP relies on is an email chain containing an email from Sameer Dholakia to Bryan Rollins and Mr. Carter sent in February of 1996. (Dkt. No. 352-25). This document indicates that it was receiving conflicting information from its customers regarding the capabilities of SAP's R/3. This document evidences a lack of knowledge of SAP's treatment of product or customer group hierarchies in R/3 at Versata during the period in question.

The fifth document SAP relies on is an email that appears to be from an SAP user group mailing list. (Dkt. No. 352-26, p. 38). While the document discusses hierarchies, it discloses no hierarchy functionality in R/3. Rather, it discloses a work-around for the lack of hierarchy functionality in R/3. The user here must enter data containing the hierarchy information in a separate field then use special database commands to select groups by performing operations on that field. This document thus cannot evidence knowledge of product and customer group hierarchies in R/3.

At the bench trial on inequitable conduct, the Court heard testimony that Mr. Carter used a "flat file" generated from SAP's R/3 pricing by a third party. While SAP claims the data in its R/3 system was being organized in a hierarchy, the data Mr. Carter dealt with was not organized in a hierarchy. Mr. Carter knew enough of the function of SAP's R/3 2.2 to read data out of a flat file and into his own data structure and then reproduce a compatible flat file to read back into the R/3

7

system. Mr. Carter was not attempting to reverse engineer SAP's system, and the record does not suggest that he had complete knowledge of SAP's inner workings. At trial, Mr. Carter also explained that he was implementing new functionality into his "bridge" program as new customers required different SAP fields be converted into SC Pricer. His conversion program was piecemeal, and SAP presented no evidence that Mr. Carter successfully translated the "hierarchy" fields of the R/3 flat file into a hierarchical structure within SC Pricer.

Although Mr. Carter unquestionably knew of R/3 2.2, and knew its records could contain fields called "hierarchies," SAP has failed to produce sufficient evidence to show that Mr. Carter knew the details of R/3's alleged hierarchical structure sufficient to distinguish it from hierarchical structures described in the art of record. Further, the evidence indicates that Mr. Carter believed the pricing tables used by SAP grew exponentially with the number of features offered and required a mainframe computer for operation. Because his pricing system did not suffer from those limitations, he reasonably believed it differed in structure from SAP's R/3 2.2. The evidence at trial revealed that SAP changed its system and adopted the hierarchical access feature described in the patents in 1998, well after the priority date of the '400 and '350 patents. Accordingly, the Court finds it unlikely that Mr. Carter possessed knowledge of hierarchies in the R/3 2.2 system sufficient to make the detailed disclosure to the patent office that SAP claims would have been proper.

2.      **Materiality of R/3 2.2**

SAP has failed to show that its R/3 2.2 system, as it existed prior to the filing of application to which the '350 and '400 patents claim priority, was material to patentability. While the R/3 system was a pricing software system that used hierarchies of customer and product groups, the Parenti reference also disclosed a pricing software system that used hierarchies of customer and

8

product groups. SAP contends that Parenti makes no such disclosure, but clearly misreads the reference. Parenti discloses the use of hierarchies for customer, item, and linked customer-item pricing and discounts. (Dkt. No. 358-55, p. 3). The description of the Parenti system closely follows the background section of the '400 and '350 patents, as well as the vivid description at trial of customer issues with SAP's R/3 2.2 system that were addressed by the improvements offered by SC Pricer during the time period when the patents-in-suit were filed and prosecuted. *See* 8/17/2009 Dholakia PM Tr. 105:24-116:19, Dkt. No. 331. SAP has failed to support its contention that its R/3 system would have been material to patentability, has offered no expert testimony on the materiality of R/3 over Parenti, and did not assert any theories of invalidity at trial that used its prior art R/3 system as a reference for either anticipation or obviousness.

### 3. Mr. Carter's Subjective Appreciation of the Materiality of SAP's use of Hierarchies

SAP's use of pricing hierarchies, or at least what Mr. Carter knew of it, was cumulative of Parenti. SAP claims Parenti's disclosure of hierarchies is limited by its relatively sparse description of its implementation of hierarchies, but SAP has failed to demonstrate to the Court that its own use of hierarchies was any more relevant to the claims at issue. Additionally, even if SAP's R/3 had more sophisticated hierarchy functionality than that contemplated by Parenti, SAP has failed to demonstrate that Mr. Carter knew of that more sophisticated functionality. At best, SAP has established that Mr. Carter could have known that SAP used hierarchies, which is exactly what Parenti disclosed.

Additionally, SAP, with the benefit of complete knowledge of the prior art R/3 system, hindsight and incentive to invalidate, did not assert its prior art R/3 2.2 system against the '400 or

9

'350 patents. If R/3 system were non-cumulative and material to patentability, the Court would expect SAP to argue for invalidity by anticipation and obviousness. Instead, SAP made no summary judgment challenge to the validity of the '400 or '350 patents and only advanced a best mode attack at trial. When the stakes were highest, SAP did not believe its prior art system was material to patentability. If SAP, with complete knowledge of its prior art system, hindsight, and incentive to find anticipatory references did not deem its system material to the validity of the '400 or '350 patents, Mr. Carter, with very little information about R/3, could not be expected to appreciate the possible materiality of SAP's system over the similar systems asserted by the patent office.

### 4. Mr. Carter's Withholding of Information

SAP has also failed to demonstrate what material knowledge Mr. Carter had of R/3 that he withheld. Product and customer groups in software pricing applications was already part of the art of record through Parenti, so to prevail, SAP must produce evidence of some other knowledge of R/3 that Mr. Carter possessed and withheld that was material to patentability. SAP has provided no such evidence, and merely asserted that prior art R/3 is more similar to the claims than Parenti. The Court finds this argument unpersuasive.

SAP also asserts that Mr. Carter's disclosure of R/3 in the specification of his patent application was part of a carefully crafted scheme to conceal R/3 from the patent office. The Court finds this argument similarly unavailing. Mr. Carter disclosed R/3 in the background section of his patent application in characterizing prior art pricing architectures, and SAP does not dispute any of the characterizations made there. SAP claims Mr. Carter knew of hierarchies in R/3, but has failed to demonstrate that he knew any more of SAP's hierarchies than was disclosed by Parenti and the patent application. The notion that Mr. Carter, who the evidence shows was struggling to understand

and "bridge" data to and from R/3, anticipated the rejections at issue, understood some as yet undisclosed distinction between R/3 and the art that would later be asserted by the patent office and conspired with his attorney to conceal that distinction strains credibility.

SAP has failed to provide a document that Mr. Carter possessed that he should have disclosed, and what evidence SAP has produced regarding Mr. Carter's knowledge of hierarchies in R/3 does not provide sufficient detail for meaningful disclosure to the patent office. Mr. Carter was working to understand SAP's data without the assistance of SAP, without direct access to an SAP system, and without any SAP documentation. Given that product and customer group hierarchies in a software pricing application are already in the art of record through Parenti, SAP must produce some evidence of knowledge of SAP's R/3 that Mr. Carter withheld beyond the mere existence of a database field titled "hierarchies" in SAP's pricing system. SAP has failed to do so.

### 5. Deceptive Intent

SAP offers no evidence of deceptive intent by Mr. Carter, but asks the Court to infer deceptive intent from his actions. The Court finds no suggestion of deception from any of the actions SAP complains about. The far more likely inference, based on the record, is that Mr. Carter lacked the knowledge of SAP's R/3 system to distinguish it over Parenti, understand that it may be material to patentability, and intelligently disclose it to the patent office.

The next most likely inference, based on the record, is that Mr. Carter failed to remember what he did know of hierarchies in SAP's R/3 system. The record indicates that hierarchies in SAP's pricing system were at best a minor part of Mr. Carter's bridge project. SAP could produce only a handful of documents that mentioned hierarchies in SAP over the year surrounding Mr. Carter's application date, and only one that addressed hierarchies in any detail. SAP's evidence indicates that

bridging the hierarchy data was not a priority and Mr. Carter's notes indicate that he likely did not understand how SAP's hierarchies were implemented, if they were hierarchies at all. One of the documents SAP advances as evidence of Mr. Carter's knowledge, received after the filing date of Mr. Carter's application, is a forward of a mailing list response suggesting a workaround for the lack of hierarchy functionality in SAP. If Mr. Carter knew of hierarchies in SAP's pricing functionality, any failure to disclose that to the patent office was more likely the result of innocent neglect than deceptive intent.

## IV.   CONCLUSION

Having found that SAP has not met its burden of proving inequitable conduct by clear and convincing evidence, the Court concludes that Versata did not commit inequitable conduct toward the PTO. The court therefore finds that the '400 and '350 patents are enforceable and DENIES SAP's affirmative defense and counterclaim of inequitable conduct.

SIGNED this 21st day of December, 2010.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE