```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4    VERSATA SOFTWARE, INC.,  )(

 5    Formerly known as        )(   CIVIL DOCKET NO.

 6    Trilogy Software, Inc.   )(   2:07-CV-153-CE

 7    VS.                      )(    MARSHALL, TEXAS

 8                             )(

 9    SAP AMERICA, INC.,       )(   APRIL 29, 2011

10    ET AL                    )(   9:00 A.M.

11                       JURY SELECTION

12          BEFORE THE HONORABLE JUDGE CHAD EVERINGHAM

13               UNITED STATES MAGISTRATE JUDGE

14

15    APPEARANCES:

16

17    FOR THE PLAINTIFF:   (See attached sign-in sheet.)

18

19    FOR THE DEFENDANTS:  (See attached sign-in sheet.)

20

21    COURT REPORTER:      MS. SHELLY HOLMES, CSR
                           Deputy Official Court Reporter
22                         2593 Myrtle Road
                           Diana, Texas  75640
23                         (903) 663-5082

24

25    (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

2

```
 1                            I N D E X

 2

 3   April 29, 2011

 4                                             Page

 5      Appearances                            2

 6      Hearing                                3

 7      Court Reporter's Certificate           107

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           LAW CLERK:  All rise.

2           THE COURT:  Thank you.  Please be seated.

3           Good morning, ladies and gentlemen.  Welcome

4    to jury selection today.

5           My name is Chad Everingham.  I'm a

6    magistrate judge that sits here in Marshall.  I'll be

7    presiding over the jury selection today in the case as

8    well as over the trial of the case for those of you who

9    are selected to serve on the jury.

10          We're here today to pick a jury in a civil

11   case.  It's not a criminal case.  It's a civil matter.

12   It's a case that arises under the patent laws of the

13   United States, and it's a case that is essentially to a

14   large measure to determine the amount of damages, if

15   any, that the plaintiff is entitled to as a result of

16   acts of infringement of a -- of a U.S. patent.

17          So those of you who are selected, that's the

18   type of case that you're going to be hearing.  I -- in a

19   few moments, each of you is going to be called upon to

20   stand and give the answers to the nine questions that

21   are up there on the overhead.

22          Just so you know that I wouldn't ask you to

23   do anything I wouldn't do myself, I'll give you my

24   answers to kind of show you the process.  Again, my name

25   is Chad Everingham.  I live up Highway 154 in a little

4

1    town called Diana.  I've got two small children.  I work

2    here in Marshall at the courthouse.  I've worked here in

3    Marshall since -- well, worked for the Court since about

4    2000.  I've been a judge now for just over four years.

5    My educational background, I went to high school over in

6    Longview at Pine Tree High School.  I went to Stephen F.

7    Austin State University in Nacogdoches, and I then went

8    as far away as Waco to go to Baylor Law School.  That's

9    where I got my law degree. So those are my -- that's my

10   educational background.  My wife's name is Wendi.  She

11   works here in Marshall for the Casa Organization of

12   Harrison County.  She has been there for just under two

13   years.  And prior jury services, I served on a civil

14   case.  It was a landlord tenant-type dispute in the

15   justice of the peace court when Wendi and I lived over

16   in Gregg County.  So those are my answers to the nine

17   questions.

18              In just a little bit, each of you are going

19   to stand and give your own answers to those questions.

20   After each of you has given your answers, then the

21   lawyers are going to have the opportunity to ask some

22   additional follow-up questions.  Now, they're not trying

23   to prior unduly into your personal affairs, but they're

24   entitled to gather some information from you to assess

25   whether you could be a fair and impartial jury in this

1    particular type of case.  I don't think it will happen

2    in this case, but, occasionally, a lawyer will ask a

3    question that a member of the venire is embarrassed to

4    answer in front of the rest of the folks on the panel.

5    If that happens, just say, "You know, that's something

6    I'd rather talk to the Judge in private about," and we

7    can have a conference up here at the bench during one of

8    our recesses.

9            So once the lawyers are done asking

10   questions, we're going to take a break for the actual

11   selection process, and then we'll call you back in the

12   courtroom.  Those of you who are selected will be seated

13   and sworn as the jury, and those of you who are not

14   selected will be dismissed in jury service, and this

15   term of court will be over.  So I'll try to get -- I'll

16   try to move it along as quickly as I can today, but I'd

17   anticipate being through with this selection around

18   11:00 o'clock this morning.  That's the process for

19   today.

20           With that, that concludes my preliminary

21   remarks.

22           I'll call for announcements in the case of

23   Versata Software and others against SAP America.  It's

24   case 2:07-CV-153.

25           When you make your announcements, if you'd

1    introduce the folks that you're working with today.

2              MR. BAXTER:  Thank you, Your Honor.

3              Sam Baxter, McKool Smith, representing

4    Versata.  I have with me my partner, Scott Cole, Your

5    Honor, and we are ready to go.

6              THE COURT:  All right.  For the defendant?

7              MR. MELSHEIMER:  May it please the Court.

8    Your Honor, my name is Tom Melsheimer.  I'm here for

9    SAP.  With me at the table is my colleague, Renee

10   Skinner, Chris Bunt, and our client from SAP, Jack

11   Childs.

12             THE COURT:  All right.  Thank you.

13             With that, if you'll pass the microphone to

14   Ms. Hawkins.  When you stand and give your answers, if

15   you'll hold your numbers in front of you, and, likewise,

16   if you have an affirmative response to one of the

17   lawyer's questions and it calls for a yes answer, if

18   you'll just raise your numbers and they'll take your

19   numbers down and follow up with you to the extent they

20   need to.

21             MS. HAWKINS:  Okay.  My name is Debra

22   Hawkins.  I live in Hughes Springs, Texas, County Road

23   2976.  I've got three grown children.  I work at the

24   Springs Nursing Facility.  I've been there for about

25   five years.  I'm a licensed vocational nurse.  I work

1    the graveyard shift.  I've had some education in high

2    school, and then I went to college for the LVN program.

3    My spouse's name is Royce Hawkins.  He is a jailer at

4    Cass County jailhouse.  He's been there for a couple of

5    years.  This is his second time there.  I've never

6    worked on the -- I've not been picked for a jury at all.

7              THE COURT:  All right.  Thank you.  If

8    you'll just pass the microphone down to Mr. Roberson.

9              MR. ROBERSON:  James Roberson.  I have two

10   grown children.  I retired from Texas Department of

11   Public Transportation.  I was there 35 years and

12   Longview Asphalt for 10.  Marshall High School.  My

13   wife's name is Sarah.  She was a hair dresser for about

14   34 years.  She's retired.  No prior jury service.

15             MS. RICHARDSON:  I'm Marilyn Richardson.  I

16   live in Marshall, Texas.  I have no children.  I work

17   with the Texas Association of Developing Colleges where

18   I've been director of programs for 33 years.  I

19   graduated Pemberton High School here in Marshall, and I

20   got a bachelor's and master's of public administration

21   from University of Texas at Tyler.  I'm not married.

22   And I have prior jury service, but it was 30 years ago,

23   and, I'm sorry, I don't even remember it.

24             MS. BORENS:  My name is Eva Borens.  I have

25   two grown children.  And I work at a day care as a cook,

1   and I've been there for three years.  And I have a

2   high -- I have a high school education, and I'm not

3   married, and I've never -- I've been chosen, but I was

4   an alternate on a civil case.

5                MR. LUMAN:  Larry Luman.  I've got one

6   daughter.  I work for Union Pacific Railroad.  I've been

7   there 38 and a half years.  I went to Hallsville High

8   School.  Graduated from there.  I'm divorced.  And I did

9   serve on one civil jury.

10                MR. ALDRIDGE:  My name is Tommy Aldridge.  I

11   live in Gladewater, Texas.  I have one grown son.  I

12   worked 37 years at Longview ISD, retired last year, and

13   went back to work this past year with Union Grove ISD.

14   I have a master's degree from Stephen F. Austin.  Wife

15   is Patty.  She was a beautician for 35 years.  I served

16   on a criminal case, but it's been a lot of years ago.

17                MS. FAULKNER:  My name is Dorie Faulkner.  I

18   live on County Road 1584 in Avinger, Texas.  I have two

19   biological children on my own and four step children

20   which are all grown.  My place of employment is

21   Encompass Home Health.  I've been there for 10 years.

22   My education is Avinger High School.  Some college.  My

23   spouse's name is Randy Dale Faulkner.  He's been at

24   U. S. Steel for 28 years.  And I have no prior jury

25   service.

1            MS. BANKSTON:  My name is Sherry Bankston.

2    I live in Marshall or outside of Marshall on Walker

3    Road.  I have three adult children.  I work for Marshall

4    ISD.  I've been there 18, 19 years.  I'm -- I'm

5    secretary there.  I graduated from Marshall High School,

6    went to commercial college, and have an administrative

7    degree in secretarial administration.  My husband is

8    Tony Bankston.  He retired from Army National Guard full

9    time in 2004, and now works part time at the Star

10   Historical Site.  He's been there about three and a half

11   years after retiring from the military.  I have one jury

12   service.  I believe it was a civil case about five or

13   six years ago.

14            MR. DENTON:  My name is Michael Denton.  I

15   have two kids, one still in high school and the other's

16   in college.  I work for West Lake Chemical Company as a

17   calibration analyst.  I've been there 24 years.  I

18   graduated from Hallsville High School in 1985.  My

19   spouse's name is Madelyn Denton.  She works for

20   Hallsville Independent School District.  She's been

21   there probably six years.  And I have been on jury duty.

22   I did both civil and criminal, and I just got off grand

23   jury duty.

24            MR. HANNA:  My name is Danny Hanna.  I live

25   in Hallsville, Texas.  I have one son.  I am a retired

1  senior cost accountant for Texas Eastman Company of

2  Eastman Chemical.  I worked there approximately 33

3  years.  I have a bachelor's degree in business

4  administration.  My wife's name is Carol Hanna.  She

5  retired last year from the Hallsville Independent School

6  District, and she was a computer tech with them and

7  teacher.  And we have served -- let's see, I was on a

8  criminal case two years ago.  Last year, I was on the

9  Harrison County Grand Jury.

10         MS. MCCOMMON:  My name is Kathy McCommon.  I

11  live in Longview, Texas.  635 Kiefer Road.  I have three

12  grown daughters.  The type of work I do is I go into

13  home schools, businesses, and churches and teach about

14  health and nutrition.  And I work part time for a

15  naturopath.  I have been doing this work for five years.

16  I have some college background.  I graduated from

17  Marshall High School.  My husband's name is Douglas

18  McCommon.  He is self-employed and has been for 36

19  years.  He is a structural steel detailer and a

20  developer of computer software.  I have been called for

21  jury duty but have not served in any criminal or civil

22  cases on jury.

23         MS. PLASCHKE:  My name is Debbie Plaschke.

24  I live in Hallsville.  We have two kids.  Right now I'm

25  staying at home for the last three years, I think.  I

1   graduated from Hallsville.  Went to Kilgore.  Graduated.

2   My husband is Randy Plaschke.  He's a service manager

3   for WPI in Kilgore.  He's worked there for, like, 20

4   years.  And I've never been picked for a jury.

5            MS. PARKER:  My name is Celeta Parker, and I

6   live in Atlanta, Texas, and I have four children, one

7   still in college, the others are in their twenties, and

8   I teach gymnastics part time, and my educational

9   background, I have three years of college at Baylor and

10  U. T. Arlington, and my husband's name is Gene Parker,

11  and he is a pastor at Smyrna Baptist Church, and we've

12  been there for 24 years, and I've been called but never

13  selected for a jury.

14           MR. FRITZ:  My name is Vernon Fritz.  I live

15  at Tejas Village, Lake O' the Pines.  I have two grown

16  daughters and a grown stepson.  I work -- I am retired

17  from Rexam Beverage Company in Longview.  I worked there

18  33 years in several different jobs, millwright, CPO,

19  fork truck driver.  I graduated from Gladewater High

20  School.  I attended Kilgore College for one year.  My

21  spouse's name is Bonnie Fritz.  She is also retired.

22  She was a QA manager for Republic Industries here in

23  Marshall.  She worked there about 15 years.  I have had

24  prior jury service in Galveston, Texas, on a civil

25  matter and federal court over in Tyler also on a civil

1   matter.

2              MS. MCMILLAN:  My name is Jill McMillan.

3   I'm from Gladewater, Texas.  I have three grown

4   children.  I am retired from U. T. Hospital in Tyler.  I

5   worked there for a year and a half.  I graduated from

6   high school.  My husband's name is Bobby.  He's retired

7   from LeTourneau.  He worked there for 25 years.  And I

8   have no prior jury services.

9              MR. WATTERS:  My name is Andy Watters.  I

10  live about 10 miles east of Winnsboro in the woods.  I

11  have two kids.  I work at HR McCrary Hardware in

12  Winnsboro, Texas, and I've been there about 10 years.  I

13  have an associate's degree.  My wife's name is Twyla

14  Watters, and she's a stay-at-home mom.  And I've never

15  been on a jury.

16             MS. CLEMENTS:  My name is Gina Clements.

17  I'm from Atlanta, Texas.  I have two grown children.  I

18  am a teacher with Atlanta Independent School District,

19  and I've been there for 24 years.  I have a bachelor's

20  degree in education.  My husband's name is Jay Clements,

21  Junior.  He works with -- in a family business which is

22  real estate and timber and construction.  He's been

23  there for about 30 years.  And I have no prior jury

24  service.

25             MR. HALL:  My name is -- my name is Bruce

```
 1    Hall, and I live in the city of East Mountain in Upshur

 2    County.  I have four grown kids.  I'm retired for

 3    Albertson's for -- I worked with them for 20 years.  And

 4    I worked at Gilmer High School.  My wife's name is

 5    Doris, and she works at Wal-Mart.  And she's been there

 6    15 years now.  I served on a civil jury in Gilmer about

 7    two years ago.

 8             MS. VAUGHAN:  My name is Becky Vaughan.  I'm

 9    from Pittsburg, Texas, and I've got one child in

10    college.  I work for AEP SWEPCO for 33 years.  And I've

11    had high school with some college.  My husband's name is

12    Michael.  He works at Priefert Manufacturing, been there

13    22 years.  And I've been on one criminal case in

14    Pittsburg.

15             MS. MCINTOSH:  My name is Debra McIntosh.  I

16    live in Harleton.  I have three children.  For about a

17    year now, I've been working with a young lady who is

18    mentally handicapped.  I graduated from Marshall High

19    School.  I have a bachelor's of business administration.

20    I am not married.  And I've served on one criminal case.

21    That was here in Harrison County.

22             MR. WILLIAMS:  My name is Chris Williams.

23    Don't have any children.  Never been married.  I do dirt

24    work, build oilfield locations.  Been doing it 20 years,

25    plus.  Went to Marshall High School.  Never been on a
```

1    jury.

2              MR. JACKSON:  My name is Robert Jackson.  I

3    live in Gilmer, Texas.  I have three grown daughters.  I

4    work presently at LeTourneau Technologies in Longview,

5    been there 28 years.  Went to high school in Dallas, no

6    college.  My wife's name is Robin Jackson.  She is

7    presently unemployed.  Before that she worked for the

8    Strategic Company in Longview.  She worked there for

9    about almost a year.  And I have no prior services for

10   jury.

11             THE COURT:  All right.  Thank you, ladies

12   and gentlemen.

13             I'll discuss with you briefly the schedule

14   for the trial of the case.  For those of you who are

15   selected to serve, the trial is scheduled to start on

16   Monday, May the 9th at 8:30 in the morning.  It will

17   last for, I anticipate, four days, and we would be done

18   Thursday May the 12th.

19             Now, having given you that schedule, what I

20   need you to be thinking about is whether any of you has

21   a scheduling conflict that would present an undue

22   hardship for you to serve on a jury from the 9th through

23   the 12th.  And I promise you I'll come back to that when

24   we're done with the lawyer questioning, but I need you

25   to be thinking about, for instance, do you have a

1   prepaid vacation that's scheduled for that week?  Do you

2   or a close family member or someone with whose care you

3   have been entrusted have a surgery scheduled, something

4   that you just could not reschedule?

5           I'll be up front with you, generally

6   speaking, work-related excuses do not qualify as undue

7   hardships, but I will -- I understand that every case is

8   different, and some of you may have something going on

9   in your employment that would just really present a

10  problem if you had to be gone from your job for a week.

11  So if you'll be thinking about that while the lawyers

12  are asking you some questions, I promise you I'll come

13  back to it before we do the actual selection process.

14          Now, as I indicated, this is what's called a

15  patent infringement case, and it arises under the patent

16  laws of the United States.  The plaintiff in this case

17  was issued a patent.  It's been determined that the

18  defendants were selling products that infringe the

19  patent and that the patent is valid.  You are going to

20  decide what amount of money damages is necessary to

21  adequately compensate the plaintiff for the patent

22  infringement that's occurred.

23          Now, the defendants have since modified

24  their products, and those of you who are selected, it

25  will also be your responsibility to decide whether these

1  modified products still infringe the patent.  If you

2  decide that the modified products still infringe, you'll

3  decide what amount of money damages is necessary to

4  adequately compensate the plaintiff for the additional

5  patent infringement, if any, that has occurred.  You

6  will decide this case solely upon the evidence that you

7  hear in the courtroom and the documents that I permit to

8  be used in the trial.  And you will also have some final

9  instructions as to how you go about determining

10  infringement and damages in a patent case.  I'm just

11  giving you this overview now so that you maybe will be

12  able to put the questions that you're asked by the

13  lawyers into a little bit better context.

14          You're also going to be required to apply a

15  burden of proof to the evidence.  The burden is on the

16  plaintiff in the case to prove by both damages and

17  continued infringement by a preponderance of the

18  evidence.  And so that there won't be any argument about

19  what that means, I'm going to define it for you now.

20          Preponderance of the evidence means that

21  when we speak of something being true by a preponderance

22  of the evidence, it means that based upon all the

23  evidence that you hear, when you judge the credibility

24  of the witnesses, that in order to meet their burden by

25  a preponderance of the evidence, you have to believe

1      that something is more likely true than not true.

2              You see the Scales of Justice here.  The

3      parties in the case start out even.  You've heard no

4      evidence and you're not going to hear any evidence

5      today.  What you're going to hear are statements from

6      the lawyers, and what the lawyers say is not evidence.

7      But at the end of the case, if the Scales of Justice

8      after you've heard all the evidence and weighed the

9      credibility of the testimony, if the scales tip in favor

10     of the plaintiff, then the -- we say that the plaintiff

11     has satisfied its burden of proof by a preponderance of

12     the evidence.

13             So that's what it means, and I'm giving you

14     instructions about the burden of proof because I

15     anticipate that the lawyers may want to ask you some

16     questions about your ability to apply that burden of

17     proof, and I want to give you an instruction as to what

18     it means before they get started.

19             Okay.  With that, Mr. Baxter --

20             MR. BAXTER:  Thank you, Your Honor.

21             THE COURT:  -- you may address the jury.

22             Each side, ladies and gentlemen, has 30

23     minutes to ask questions.

24             I'll let you know, Mr. Baxter, when you've

25     got five minutes left and then one minute left.

```
 1              MR. BAXTER:  Thank you, Your Honor.

 2              THE COURT:  Okay.

 3              MR. BAXTER:  Good morning, ladies and

 4    gentlemen.  As I introduced myself, I'm Sam Baxter.  I

 5    work for a law firm called McKool Smith.  Our office is

 6    actually right next door to the courthouse.  And as

 7    Judge Everingham told you, this is a patent lawsuit

 8    between a company that I represent called Versata, and

 9    I'm -- I'm amiss of not introducing my CEO, Randy Jacob.

10              Randy, stand up just a moment, please.

11    Thank you.

12              Versata is in Austin, Texas.

13              Thank you, Randy.

14              I just have to tell you this because he's

15    the only person that I know that's in this shape.  Randy

16    has eight children, and the oldest one is 12.  So he

17    left those kids at home with the wife and is glad to be

18    in Marshall, Texas, I'll assure you.

19              In any case, Versata is basically a software

20    company.  We make software.  This is a patent about

21    software, and it's a little unusual because, as Judge

22    Everingham told you, this is a case in which the

23    defendants, which is SAP, it's a German company, has

24    already been determined to infringe our patent.

25              Patents have a long number, but generally
```

1    when we speak of patents we shorten it down to the last

2    three numbers of the patent.  So you're going to hear a

3    lot about the last three numbers of the patent.  It's

4    called the '350 patent.

5             This patent has to do with pricing, it's

6    called the Pricer software, and you're going to hear

7    actually from the inventor who was working at Versata,

8    Mr. Tom Carter, that invented this particular software

9    that has to do with pricing.  You're going to hear some

10   about that.

11            In an ordinary case, what the jury would

12   decide to begin with is whether or not the defendants

13   infringe the patent.  As Judge Everingham told you,

14   that's already been decided, that this company does, in

15   fact, infringe the '350 patent.  And as Judge Everingham

16   told you, it has been determined that the patent is

17   valid.  So those issues are off the table.

18            There are going to be two issues for you as

19   we go forward in this case, and the first one is what

20   damage is, something called a reasonable royalty should

21   the defendants have to pay Versata for the use of their

22   patent.  That's number one.

23            Number two, as Judge Everingham told you,

24   since it was determined that SAP infringes the patent,

25   they have modified their own product, and I think

1   they're going to represent to you if you're on this jury

2   that the changes they made to their product keeps their

3   product from infringing, and that's important because as

4   going forward from a certain date, the jury is going to

5   be asked whether or not that product has been changed

6   enough so that it doesn't infringe anymore or if those

7   changes simply didn't make any difference and it still

8   infringes and therefore damages are to be assessed for

9   the period between the change and right now.  But up

10  until the change, the jury -- you are not going to be

11  asked whether or not the patent infringes.  Judge

12  Everingham has already told you that it does, and your

13  job is going to be talking about damages.

14          So this morning we're going to talk a little

15  bit about damages.  I want to ask you a few questions

16  about that.  I'm going to try to be brief.  As he said,

17  we're not going to pry.

18          Like Judge Everingham, let me tell you a

19  little bit about myself.  I'm a lawyer, obviously.  I've

20  been in Marshall, Texas, for about 41 years practicing

21  law.  The name of my law firm is McKool Smith.  I'm a

22  single parent, and I have three adopted children.  My

23  oldest child is from Brazil.  My middle child, who is in

24  college at LSU, is from Thailand.  And I have a young

25  daughter that goes to Hallsville, is in junior high

```
 1   right now, next year in high school.  Sophie is 14, and
 2   she's from India.  So some of you that are teachers in
 3   Hallsville, my oldest son is Andrew, and he got through,
 4   and I'm always asked about Andrew.  He's a very
 5   wonderful child.  He works here in Marshall at the Boys
 6   and Girls Club.  But if you had Andrew, I want to see
 7   your hand right now because you and I need to visit
 8   about that.
 9            The -- this case, as Judge Everingham told
10   you, is going to involve a burden of proof.  And the
11   burden of proof is a preponderance of evidence.  And as
12   he told you, the plaintiff has the burden, and we have
13   the burden in this case in two respects.  One is on the
14   product that they changed, whether or not it infringes
15   is going to be our burden, and that's by a preponderance
16   of the evidence, and as he told you, you generally look
17   at the scales that Lady Justice is holding here, and if
18   you were to tip those scales ever so slightly, then the
19   plaintiff has met the burden of proof.
20            We'll also have the burden of proof on
21   what's known as a reasonable royalty, that is, what
22   amount of money should the defendants pay the plaintiff
23   for the use of their patent, and that also is going to
24   be by a preponderance of the evidence, and you're going
25   to hear experts testify about the value of the patent
```

1   and the use by SAP.

2            Is there anybody on the jury panel that

3   would have any trouble if Judge Everingham, as he

4   already has, tells you that that is the burden of proof?

5   Is there anyone that would have any trouble with that,

6   that would say, "Well, you know, maybe I ought to apply

7   a different burden.  I've heard about reasonable doubt

8   in criminal case, or I've been on a criminal case, and

9   that's what they talked about, maybe that's what it

10  ought to be"?  Does anybody feel that way?

11           Can everybody -- show me your hands.  Can

12  everybody say, "Preponderance of evidence, if it's what

13  the Judge tells me, that's what I'm going to do? Can

14  everybody do that?

15           Okay.  The defendant in this case, as I told

16  you, is a German company called SAP and is represented

17  by three law firms, actually.  The first is a law firm

18  called Fish and Richardson, and it is a law firm that

19  has Mr. Tom Melsheimer, which is right here, he's from

20  Dallas, actually.  Anybody ever heard of Fish and

21  Richardson or Mr. Melsheimer?

22           Their next group of lawyers is Mr. Chris

23  Bunt.  Mr. Bunt actually grew up over in Hallsville, is

24  in Tyler now practicing law over there with Parker,

25  Bunt, and Ainsworth.  Anybody know Mr. Bunt from

1   Hallsville or know him as a lawyer, anybody at all?  Any

2   Hallsville folks know Mr. Bunt?  I think he's still got

3   relatives over there.

4           The third lawyer -- group of lawyers is

5   Mr. Batchelder, who's back here in the back.  I think

6   you'll see him at counsel table when we try this case,

7   and he's with a law firm -- I believe Mr. Batchelder is

8   from California, and he's with a law firm called Ropes

9   and Gray.  Anybody -- anybody heard of Ropes and Gray

10  and Mr. Batchelder?

11          Anybody heard of the German company SAP,

12  that basically is a software company.

13          You have, sir?

14          THE COURT:  If you'll raise your number up,

15  please, sir.  Thank you.  Appreciate it.

16          MR. BAXTER:  Mr. Hanna, how do you know SAP,

17  sir?

18          MR. HANNA:  Sir, I was employed by Eastman

19  Chemical at the time they made the decision to implement

20  what we call R2 of SAP at our facility as a test site

21  for the entire company.

22          MR. BAXTER:  Okay.  Well, Mr. Hanna, as you

23  well know, sir, I think that SAP sells what I can only

24  call a suite of software.  Would that -- would that be

25  what you were involved with?

1            MR. HANNA:  I'm sorry, I didn't hear the

2    type of software.

3            MR. BAXTER:  A suite of software, software

4    that does a whole bunch of stuff.

5            MR. HANNA:  Yes, sir.

6            MR. BAXTER:  Did you have a particular

7    portion -- you were in accounting, is that right, sir?

8            MR. HANNA:  Yes, sir, I was in cost

9    accounting.

10           MR. BAXTER:  Did you test out the accounting

11   portion of their program?

12           MR. HANNA:  I was responsible for

13   implementing it into the chemical plants I was assigned

14   with -- along with the programmers.

15           MR. BAXTER:  Okay.  Did you have to modify

16   that program in any way, or did it come out of the box

17   and you tested it and it worked and that's what you

18   used, or how did that work?

19           MR. HANNA:  At the time, I was presented

20   objectives that would be compared to the output of the

21   software.  I had no modifications, per se, of this

22   software.  I was evaluating the performance against the

23   established software that we were using at the time

24   which was in-house produced.

25           MR. BAXTER:  Okay.  Did you use that soft --

1  did you end up buying SAP?

2          MR. HANNA:  Yes, sir.  The company has went

3  on it.  We were the test site, and the company adopted

4  it --

5          MR. BAXTER:  Okay.

6          MR. HANNA:  -- worldwide.

7          MR. BAXTER:  There was a function of that

8  software called Pricer.  Did you have any experience

9  with that, Mr. Hanna?

10          MR. HANNA:  Again the word, please, sir?

11          MR. BAXTER:  Pricer.

12          MR. HANNA:  I am not familiar with that,

13  sir.

14          MR. BAXTER:  Okay.  All right.  Anything

15  about that, Mr. Hanna, because you use their software

16  that's either going to give them an advantage or

17  disadvantage if you're on this jury?

18          MR. HANNA:  No, sir.  My job was to

19  implement it.

20          MR. BAXTER:  Okay.

21          MR. HANNA:  Not -- or implement in the sense

22  that the results agreed to what we were using currently.

23          MR. BAXTER:  And that's what you did?

24          MR. HANNA:  Yes, sir.

25          MR. BAXTER:  Did you ever deal with any of

1    the technicians that came out that explained it or

2    helped you implement it, did you deal with those folks?

3            MR. HANNA:  No, sir.  Our company took the

4    approach that our own employees would take training and

5    would be the interface to the SAP company.  I had no

6    direct in -- operation with any of them.

7            MR. BAXTER:  Okay.  Thank you, Mr. Hanna.  I

8    appreciate it, sir.

9            Anybody else know SAP or ever heard or used

10   any of their software?

11           Okay.  Tell me who uses a computer at work,

12   just raise your hand.  Is there anybody that doesn't use

13   a computer at work?  We have two back here, No. 21 and

14   No. -- you're 18, aren't you?

15           MR. HALL:  Yes, sir.

16           MR. BAXTER:  Okay.  Yes, ma'am, you don't

17   use a computer at work? All right.  And No. 4.

18           All right.  Who uses -- who -- let me do it

19   this way, who doesn't use a computer at home?  All

20   right.  No. 14, No. 18, No. 21, and No. 6.

21           Mr. Aldridge, you don't have a computer at

22   your home, sir?

23           MR. ALDRIDGE:  No, I've got a little laptop

24   I don't use very much.

25           MR. BAXTER:  Okay.  Mr. Aldridge, you

```
 1   introduced yourself as being at Union Grove, but it was

 2   a little bit more than that, wasn't it?  You were the

 3   baseball coach over at Longview for about a hundred

 4   years; is that right?

 5                 MR. ALDRIDGE:  33.

 6                 MR. BAXTER:  Okay.  And had really good

 7   teams all 33 years, didn't you?

 8                 MR. ALDRIDGE:  We had pretty good teams.

 9                 MR. BAXTER:  And just used to beat the

10   Dickens out of Marshall all the time; is that right?

11                 MR. ALDRIDGE:  We didn't mean to.

12                 MR. BAXTER:  I was just going to compliment

13   you being a brave man and showing up, Mr. Aldridge,

14   given the success that you had over the years.  How is

15   basketball at Union Grove?

16                 MR. ALDRIDGE:  Well, it's -- it's a start.

17                 MR. BAXTER:  Okay.  It -- you --

18                 MR. ALDRIDGE:  Trying to rebuild.  I

19   graduated from there in '64.

20                 MR. BAXTER:  Oh, did you really?

21                 MR. ALDRIDGE:  Yeah, and then I got out

22   there, they had one team, no 9th grade, no JV, so we're

23   really starting from scratch.

24                 MR. BAXTER:  All right.  And that's a -- you

25   like that rebuilding process?
```

 1            MR. ALDRIDGE:  It's good and quiet.  I like

 2    it's off I-20.

 3            MR. BAXTER:  Yes, sir.

 4            MR. ALDRIDGE:  I'm four or five minutes from

 5    work.

 6            MR. BAXTER:  All right.  Are you -- are you

 7    out on Lake Gladewater?

 8            MR. ALDRIDGE:  I live about four blocks from

 9    the lake.

10            MR. BAXTER:  Okay.  I've got a house out

11    there.  That's a pretty lake, isn't it?

12            MR. ALDRIDGE:  It is nice.

13            MR. BAXTER:  All right.  Thank you,

14    Mr. Aldridge.

15            MR. ALDRIDGE:  You bet.

16            MR. BAXTER:  Who else didn't use a computer

17    at home?  Do you have to use one at --

18            Mr. Aldridge, do you have to use one at

19    school?

20            MR. ALDRIDGE:  Yes.

21            MR. BAXTER:  Have you got to import that

22    stuff in school and keep attendance or put in grades,

23    any of that stuff?

24            MR. ALDRIDGE:  That's where I do all mine.

25            MR. BAXTER:  No. 18, you do not have a

1    computer at home, sir?

2              MR. HALL:  I have a computer.

3              MR. BAXTER:  Do you use it?

4              MR. HALL:  No.

5              MR. BAXTER:  Does your wife use it?

6              MR. HALL:  Yes.

7              MR. BAXTER:  Okay.  You ever ask her to get

8    on the internet for you or look anything up or --

9              MR. HALL:  On occasion, I have.

10             MR. BAXTER:  See who the Cowboys drafted or

11   any of that?

12             MR. HALL:  No.

13             MR. BAXTER:  Okay.  All right.  Thank you,

14   sir.

15             Anybody else doesn't use a computer at home?

16             THE COURT:  You've got an affirmative

17   response back here.

18             MR. BAXTER:  Oh, yes, sir.  You do not?

19   You're Mr. Fritz?

20             MR. FRITZ:  Yes.

21             MR. BAXTER:  No computer at home, Mr. Fritz?

22             MR. FRITZ:  No.

23             MR. BAXTER:  Any at work?

24             MR. FRITZ:  I'm retired.

25             MR. BAXTER:  Okay.

1           MR. FRITZ:  I had one at work, but I used a

2   little -- used it at work, but we don't have one at

3   home.

4           MR. BAXTER:  Okay.  All right.  Thank you,

5   Mr. Fritz.  I appreciate it.

6           Is there anyone that knows how to program a

7   computer, has -- can write computer program, whether

8   it's C++ or whatever it is they do these days, can

9   anybody do that, write -- write programs?

10          You can, Mr. Hanna, is that what you --

11          MR. HANNA:  Yes, sir.

12          MR. BAXTER:  Tell me, Mr. Hanna, what kind

13  of program experience you've got.

14          MR. HANNA:  Well, this is a little

15  embarrassing.  It's simple programming.  At the time I

16  became an accountant, computers were monster machines.

17  Our company got the IBM PC, and then we got what was

18  called a minicomputer.  I went to classes to learn

19  Fortran.  I used it to write short programs to help me

20  do my work to manage 20 plants.  Basically, there was no

21  VisiCalc or Excel or Lotus at the time.

22          MR. BAXTER:  You can't -- you can't write

23  C++ or any of that, can you?

24          MR. HANNA:  I have took classes in it, yes,

25  sir.

```
 1              MR. BAXTER:  Okay.  Can you -- can you write
 2    some of that program or at least read some of it if
 3    you --
 4              MR. HANNA:  I can read a little bit, but it
 5    has been nine years since I have written any C or C++
 6    programs.
 7              MR. BAXTER:  All right.  Thank you, Mr.
 8    Hanna.  I appreciate it.
 9              Is there anybody else that can do any
10    programming?  Is there anybody else that knows how to
11    repair a computer, knows how to fix one?
12              16, yes, sir Mr. Watters?
13              MR. WATTERS:  Yes.
14              MR. BAXTER:  You know how to repair a
15    computer?
16              MR. WATTERS:  Yes, I was in PC repair years
17    ago.
18              MR. BAXTER:  What kind of work did you do on
19    those, Mr. Watters?
20              MR. WATTERS:  Well, I basically just
21    repaired -- most of the time it was modems when
22    lightning hit.
23              MR. BAXTER:  Yes, sir.
24              MR. WATTERS:  Just general hardware.
25              MR. BAXTER:  Okay.
```

```
 1              MR. WATTERS:  No really programming.

 2              MR. BAXTER:  What company did you work for

 3     when you did that, Mr. Watters?

 4              MR. WATTERS:  It was a local company in

 5     Winnsboro.

 6              MR. BAXTER:  Yes, sir.

 7              MR. WATTERS:  YCS.

 8              MR. BAXTER:  All right, sir.  You don't do

 9     that anymore?

10              MR. WATTERS:  Just for myself.

11              MR. BAXTER:  Okay.  All right.  Anybody else

12     besides Mr. Watters that knows how to work on a computer

13     or can crack one open and at least replace a motherboard

14     if you had to?

15              Mr. Hanna can.  Anybody else?

16              Yes, ma'am, No. 1?

17              MS. HAWKINS:  I've replaced the modem, but

18     that's it.

19              MR. BAXTER:  Okay.  Did someone walk you

20     through that?

21              MS. HAWKINS:  I took it to the shop.

22              MR. BAXTER:  Okay.  Okay.  All right.

23     Anybody else know how to work on a computer?  Is there

24     anybody on the jury panel that's ever applied for a

25     patent or knows anyone that has applied for a patent?
```

```
 1                  Yes, ma'am, Ms. Hawkins?

 2                  MS. HAWKINS:  I did.

 3                  MR. BAXTER:  Tell me about that.

 4                  MS. HAWKINS:  I did apply for a patent for a

 5      boot that I made for a little woman that I worked for.

 6                  MR. BAXTER:  Well, that's a diabetic boot,

 7      isn't it?

 8                  MS. HAWKINS:  Yes, sir.

 9                  MR. BAXTER:  Yeah, I'm interested in that

10      because I'm a diabetic.  How did you do on that?

11                  MS. HAWKINS:  Well, I was supposed to pay up

12      money, about $10,000.00 up front.  I paid maybe 7,000

13      and something, fell behind on my payments, so I

14      forfeited my --

15                  MR. BAXTER:  Okay.

16                  MS. HAWKINS:  -- whatever.  But --

17                  MR. BAXTER:  Yes, ma'am?

18                  MS. HAWKINS:  -- the little woman still kept

19      her leg.

20                  MR. BAXTER:  Right.

21                  MS. HAWKINS:  That's what I made it for.

22                  MR. BAXTER:  Okay.  Well, you did good,

23      then.  Did you -- did you fill out a bunch of forms

24      to -- to go to the Patent Office?

25                  MS. HAWKINS:  Yes, sir.
```

1              MR. BAXTER:  Okay.  Did you ever get -- have

2    any interaction with the Patent Office?  Did they send

3    you stuff back, or how did that work?

4              MS. HAWKINS:  They -- yeah, they sent me a

5    book, and I was supposed to have gone through -- they

6    were supposed to show it and try to market it in New

7    York, I believe --

8              MR. BAXTER:  Okay.

9              MS. HAWKINS:  -- and that kind of stuff, but

10   like I say, I just --

11             MR. BAXTER:  It's an expensive process,

12   isn't it?

13             MS. HAWKINS:  Yes, sir.

14             MR. BAXTER:  Okay.  All right.  Yes, ma'am,

15   you have applied for a patent, or you have someone that

16   did?

17             MS. MCCOMMON:  It's my husband --

18             MR. BAXTER:  You're Ms. McCommon, are you

19   not?

20             MS. MCCOMMON:  Yes.  My husband applied for

21   a patent.

22             MR. BAXTER:  Do you know what it was over,

23   Ms. McCommon?

24             MS. MCCOMMON:  What was the patent on?

25             MR. BAXTER:  Yes, ma'am.

1                  MS. MCCOMMON:  We developed some computer

2      software for structural steel detailing.

3                  MR. BAXTER:  Okay.  I meant to come back to

4      you.  Your husband is a software programmer?

5                  MS. MCCOMMON:  Well, actually, he's a

6      structural steel detailer.

7                  MR. BAXTER:  Okay.

8                  MS. MCCOMMON:  And he hired a computer

9      programmer to take his ideas and put it into a program.

10                 MR. BAXTER:  And did you get very far in

11     that patent application?

12                 MS. MCCOMMON:  We went through -- all the

13     way through the patent application, yes, sir.

14                 MR. BAXTER:  Did you get a patent?

15                 MS. MCCOMMON:  Yes, sir.

16                 MR. BAXTER:  Oh, you do?

17                 MS. MCCOMMON:  Yes, sir.

18                 MR. BAXTER:  He has a patent now?

19                 MS. MCCOMMON:  Yes, sir.

20                 MR. BAXTER:  Okay.  Has he been able to --

21     to develop or market that patent?

22                 MS. MCCOMMON:  We lost our computer

23     programmer.

24                 MR. BAXTER:  Yes, ma'am.

25                 MS. MCCOMMON:  And there was some conflict

1   there.

2               MR. BAXTER:  Okay.  All right.  All right.

3   Thank you, Ms. McCommon.

4               MS. MCCOMMON:  You're welcome.

5               MR. BAXTER:  I appreciate it.

6               Anybody else have any experience with the

7   Patent Office?

8               Yes, ma'am, Ms. Clements?

9               MS. CLEMENTS:  I haven't, but my

10  father-in-law has a patent on -- we have real estate and

11  apartments and a lot of rental property.

12              MR. BAXTER:  Yes, ma'am.

13              MS. CLEMENTS:  And it's a card that you --

14  when they -- if we -- if they -- if we pay their bills

15  for them -- in other words, if they're not -- don't pay

16  their rent -- when they come pay their rent, they get

17  this prepaid card that is their electricity.

18              MR. BAXTER:  Oh, okay.

19              MS. CLEMENTS:  And if they don't pay their

20  bill or their rent, then, of course, they won't have

21  electricity.

22              MR. BAXTER:  And you have a patent on that?

23              MS. CLEMENTS:  My father-in-law.

24              MR. BAXTER:  Your father did?

25              MS. CLEMENTS:  My father-in-law.

1           MR. BAXTER:  Do -- do you know what he went

2    through to get that, or were you involved in any of

3    that?

4           MS. CLEMENTS:  I do -- I do not.

5           MR. BAXTER:  Okay.

6           MS. CLEMENTS:  I just know that he did that,

7    and that's been a few years ago.

8           MR. BAXTER:  Is he proud of his patent?

9           MS. CLEMENTS:  Probably, yes.

10          MR. BAXTER:  Okay.  All right.  Thank you,

11   ma'am.

12          Who all works for a company -- I know,

13   Mr. Hanna, I'm going to get -- your hand's up, and I'm

14   going to ask you about it in a minute.

15          But who works for a company that owns

16   intellectual property, that has patents or -- or trade

17   secrets or anything of that sort?

18          All right.  I'm going to start with you,

19   sir.  Mr. Denton, you are a -- work for a chemical

20   company, do you not?

21          MR. DENTON:  Yes, sir, I do.

22          MR. BAXTER:  And tell me again what you do.

23          MR. DENTON:  I'm a calibration analyst.

24          MR. BAXTER:  Tell me what that is.

25          MR. DENTON:  That is to make sure all the

1    equipment is up to par to run tests on.

2              MR. BAXTER:  Okay.  So you're the person

3    that makes sure the equipment has whatever variables

4    it's got, you're going to get it within tolerance?

5              MR. DENTON:  Yes, sir.

6              MR. BAXTER:  All right, sir.  Tell me about

7    the patents for your company.

8              MR. DENTON:  Well, it's mostly chemicals,

9    and I don't really have anything to do with them, but I

10   just know that we do have patents --

11             MR. BAXTER:  Okay.

12             MR. DENTON:  -- on different chemical

13   products.

14             MR. BAXTER:  All right.  All right.

15   Mr. Hanna, I know that Texas Eastman had a ton of

16   patents, did they not?

17             MR. HANNA:  Yes, sir.  They -- before they

18   were spun off, they were part of Eastman Kodak, which

19   has beaucoups of them.  At one time, they were in the

20   top 10 in patent lists.

21             MR. BAXTER:  Well, let me ask you this,

22   Mr. Hanna, what did they do to protect their

23   intellectual property, do you know?

24             MR. HANNA:  The -- in what sense, sir?

25             MR. BAXTER:  Well --

```
 1              MR. HANNA:  The employees or --
 2              MR. BAXTER:  No, no.  From somebody on the
 3    outside.  If they had a patent on a chemical process and
 4    they felt that somebody else was using their idea and
 5    violating their patent, do you know what they did to
 6    enforce their patent?
 7              MR. HANNA:  Litigation, sir.
 8              MR. BAXTER:  Okay.  Is there anything wrong
 9    with that, Mr. Hanna, because that's why we're in here
10    now, we're in litigation, and, obviously, part of it's
11    behind us, but some of it is in front of us, which is
12    what this jury is going to determine.  Is there anything
13    wrong with that?
14              MR. HANNA:  No, sir.
15              MR. BAXTER:  Do you know of any other way,
16    Mr. Hanna, that a company or an individual can enforce
17    their patent rights other than coming to the courthouse?
18              MR. HANNA:  Other than getting into
19    agreements and buying the usage of various patents,
20    which my company I worked for did, along with others.
21              MR. BAXTER:  Okay.
22              MR. HANNA:  We shared ours with others.
23              MR. BAXTER:  So what you can do is you can
24    go to someone and say, "I'd like to use your idea in
25    your patent, and I'd like to pay you some money for it,
```

1    or I'll give you some of mine, and you give me some of

2    yours"?

3              MR. HANNA:  Yes, sir, a contractual

4    agreement.

5              MR. BAXTER:  Okay.  Other than that, can you

6    think of any other way that a company can enforce its

7    intellectual property rights other than coming to the

8    courthouse?

9              MR. HANNA:  No, sir.  As I understand it,

10   they would lose them if they did not enforce them.

11             MR. BAXTER:  Okay.  All right.  Thank you,

12   Mr. Hanna.

13             Is there anybody else on the jury panel that

14   works for a company that has patents or intellectual

15   property, anybody at all?

16             All right.  Now, that brings us to the

17   question of lawsuits sort of generally.  How many people

18   think there are both too many lawyers and too many

19   lawsuits?  I'm going to raise my hand on that one, too.

20   Here's one too many right here.

21             Now, everybody, I think, thinks that there

22   are too many lawsuits.  I know Judge Everingham thinks

23   there's too many lawsuits because he just --

24             THE COURT:  Don't bring me into this.

25             MR. BAXTER:  But I think what generally

1   people talk about are sort of frivolous lawsuits.

2            Would that -- Mr. Roberson, is that what you

3   have in mind, sir?

4            MR. ROBERSON:  I guess so.

5            MR. BAXTER:  Okay.  Now, Mr. Aldridge, just

6   to give Marshall High School equal time, Mr. Roberson --

7   give Mr. Roberson the mic here, Mr. McAteer.

8            Mr. Roberson had a son that was on the state

9   champion Marshall High School football team.

10           Isn't that right, Mr. Roberson?

11           MR. ROBERSON:  Yes, sir.

12           MR. BAXTER:  What year was that?

13           MR. ROBERSON:  Sir?

14           MR. BAXTER:  What year was that?

15           MR. ROBERSON:  1990.

16           MR. BAXTER:  He played in the line, didn't

17   he?

18           MR. ROBERSON:  Yes, sir, right guard.

19           MR. BAXTER:  All right.  And was pretty

20   good, wasn't he?

21           MR. ROBERSON:  Well, I think he was.

22           MR. BAXTER:  Yeah, all right.

23           See Marshall won a state championship.

24           Mr. Roberson, as long as you've got that

25   mic, I understand that everybody's against frivolous

1    lawsuits, but a lawsuit involving a -- two companies

2    where one of them has already been found to infringe the

3    patent, have you got any problem with that?

4              MR. ROBERSON:  No, sir, I don't have no

5    problem with that.

6              MR. BAXTER:  All right.  Does anybody

7    disagree with Mr. Roberson about that, that, in fact,

8    there are lawsuits that are -- have merit and that the

9    only place you pretty much can get them decided is the

10   courthouse?  Anybody disagree with that?

11             Thank you, Mr. Roberson.  Appreciate it.

12             MR. ROBERSON:  Thank you.

13             MR. BAXTER:  Now, let me kind of pose this

14   problem to you.  Let's assume for a moment that you've

15   got a piece of property, say it's a gun, and somebody

16   takes your gun and appropriates it one way or another,

17   and you find out who it is, and they say, "Well, I don't

18   have the gun anymore."  And you say, "Well, I'd like to

19   get paid for it."

20             How many people think that when they pay you

21   back, they ought to pay you half price for the gun?  How

22   about 10 percent of the value of the gun?  How many

23   people think that you ought to get full value for the

24   property they took?  Well, what if they say, "Wait a

25   minute, wait a minute, I gave that gun away to my

1  cousin, and since I didn't get anything out of it, I

2  gave it away for free, I shouldn't have to pay you

3  anything."  How many people think that's right?

4          THE COURT:  You've got five minutes

5  remaining.

6          MR. BAXTER:  Thank you, Your Honor.

7          How many people think that's wrong?

8          Okay.  Now, as I told you, one of the issues

9  I think you're going to be faced with in this jury is

10  that the defendant in this case said, "Well, after I was

11  found to infringe your patent, I have a work-around.  I

12  have a different way of doing it."  You're going to hear

13  expert testimony about that, and I think probably from

14  both sides, about what the changes were and whether or

15  not those changes were effective or not.

16          Once again, as Judge Everingham told you,

17  that's going to be judged by a preponderance of the

18  evidence.  Now, the burden is on the plaintiff to prove

19  that the changes still infringe, but if the plaintiff

20  does that by a preponderance of the evidence, that

21  tilting of the scales, is there anybody that would have

22  any problem saying, "Well, they still owe you money for

23  using your product because the work-around just didn't

24  work"?  Raise your hand if you can do that.  Everybody

25  do that?  Anybody have any trouble doing that?

```
 1                Mr. Hall?  Where is Mr. Hall?

 2                Mr. Hall, I'm going to ask him a question

 3    here, Mr. McAteer.  I -- you folks were kind enough to

 4    fill out jury questionnaires, and I hope you didn't find

 5    them too burdensome, and I notice, Mr. Hall, that one of

 6    the things you said was that you had a case against a

 7    hospital one time.  Can you tell me about that?

 8                MR. HALL:  That's true.

 9                MR. BAXTER:  All right.  That wasn't a good

10    result?

11                MR. HALL:  What do you mean, the outcome or

12    what?

13                MR. BAXTER:  Yes, sir.  Yes, sir.

14                MR. HALL:  I didn't think so, no.

15                MR. BAXTER:  Okay.  All right.  Was there a

16    lawsuit involved in that, Mr. Hall?

17                MR. HALL:  Yes, sir.

18                MR. BAXTER:  Okay.  Did you actually go to

19    court?

20                MR. HALL:  No.

21                MR. BAXTER:  No.  Didn't have a jury trial?

22                MR. HALL:  No.

23                MR. BAXTER:  Okay.  Anything about that,

24    Mr. Hall, that will flop over into this case?

25                MR. HALL:  Not that I know of.
```

1           MR. BAXTER:  Okay.  All right.  Thank you,

2    sir.

3           One of the things you're going to hear in

4    this case that Judge Everingham, I think, will instruct

5    you about at the end of this case is something called a

6    hypothetical negotiation, and he's going to give you

7    instructions about that, but, basically, it's going to

8    be how do you determine what a reasonable royalty is?

9           And, remember, we said a royalty is the

10   damages that the defendant ought to pay for using

11   someone's patent, and I think there's going to be

12   testimony from experts about this hypothetical

13   negotiation in which the Court will tell you that the

14   plaintiff and the defendant get in basically a locked

15   room, everybody agrees the patent's infringed, everybody

16   agrees that the patent is valid, just like we have in

17   this case, and they'll work out a reasonable royalty.

18   It's a little convoluted, but it's what I think the law

19   requires Judge Everingham to instruct you about.

20          Anybody kind of got a problem with that

21   concept that we're going to have, in effect, an

22   artificial negotiation that did not take place, but

23   that's how you're to view what the damages are in this

24   patent?  If Judge Everingham tells you that at least on

25   that damage component that's how you view the world and

1    you view it, once again, through this preponderance of

2    the evidence lens, anybody have any problem with that?

3              THE COURT:  You have one minute left.

4              MR. BAXTER:  Thank you, Your Honor.

5              Is there anybody that knows any reason that

6    they shouldn't sit on this jury or they couldn't be a

7    fair and impartial juror?

8              If not, I thank you very much for your time,

9    and we very much look forward to bringing this case to

10   you on behalf of Versata.

11             Thank you, Your Honor.

12             THE COURT:  Thank you, Mr. Baxter.

13             Mr. Melsheimer.

14             MR. MELSHEIMER:  May it please the Court,

15   Your Honor.

16             THE COURT:  Mr. Melsheimer.

17             MR. MELSHEIMER:  Good morning.  My name is

18   Tom Melsheimer, and I'm here on behalf of SAP.  Now,

19   that stands for Systems Applications and Processes.

20   It's a company that was formed about 40 years ago by

21   some young engineers from IBM in Germany.  They set up

22   the company in Germany.  And today the company is all

23   over the world, including about a thousand people right

24   here in Texas, Dallas and Austin and elsewhere.

25             The company makes a software product that

```
 1   really helps other companies run their business, so it
 2   can help manage your inventory, it can help track
 3   shipping, it can help schedule employees, it can do
 4   financial reporting, it can track benefits, it can
 5   really do anything the company wants to do.  And you've
 6   probably never heard of SAP, except for you, Mr. Hanna,
 7   but you've probably done business with folks who have
 8   used SAP.  Brookshire's here in this area uses SAP.  A
 9   lot of other companies, do, too.  Actually, the
10   government uses SAP for law enforcement and
11   counter-terrorism.  So it's a very broad kind of
12   software.  It's not like Outlook or Word that might be
13   more specialized.  It's a little bit more broader than
14   that, and that's what -- that's what we do.
15           Let me tell you a little bit about me.  So
16   Mr. Baxter and I have a little bit in common besides we
17   go to the same barber.  I didn't always use to get
18   smiles from that, but I'm getting more and more as I get
19   older.  But I have three children, as well.  One of my
20   girls, my little girl is from Romania, and we had two
21   boys, and we had to have a girl, so now we have a
22   10-year-old girl, and I may ask you, Mr. Aldridge, some
23   tips on how to get her interested in basketball.
24           I am from Dallas.  And I'll be working on
25   this trial with several lawyers from my firm along with
```

1    people that have been introduced.  I want to make sure

2    that we have all the people introduced.  Now, you see

3    Ms. Joanne Garrett.  I don't know if you know her.

4    She's sitting right next to -- to Mr. Jacobs.  Joanne

5    Garrett works for Mr. Baxter and McKool Smith.  Her

6    husband is one of our terrific courtroom security

7    officers.  So does anyone know Ms. Garrett?

8            McKool Smith is a big law firm with offices

9    in different parts of the country.  There's some other

10   lawyers that you might have heard about that may be

11   involved in this case, and I want to ask you about them.

12   Ted Stephenson, anyone know Ted Stephenson from their

13   office in Dallas, or Lori Fitzgerald, anybody know Lori

14   Fitzgerald?  All right.  I think you've met everyone

15   that's going to be involved in the case.

16           As you heard Mr. Baxter say, this is a case

17   in which there's been a determination that SAP infringes

18   a small part of one of the Versata patents.  And I want

19   to make it real clear that we do not dispute that at

20   all.  There's no argument about it, we're not contesting

21   that in this case.  That's something that's already been

22   determined, and we don't dispute it.  What hasn't been

23   determined at all by anyone is what is the correct

24   amount of money that Versata is entitled to for the use

25   of that patent, and that's what we're here to talk about

1    when the trial gets started, is what the value is, and

2    no one -- no one has done that.  No one has ever looked

3    at that in a proper way.

4              So I want to ask you some questions about

5    that as we go along, and I want to also point out, as

6    you heard from the Judge, that although most of the case

7    is about that, and that's not the whole case, because

8    after it was determined that we were using a small part

9    of Versata's patent in our software, we decided to act

10   responsibly and change it.  Didn't want to be using

11   someone else's property, so we changed it and took out

12   that feature or disabled it.

13             Now, they don't agree with us about that,

14   and so that -- the trial is also going to be in part --

15   in part about that.  You're going to hear evidence on

16   that.  You're going to hear evidence that the parties

17   are very far apart on what this feature of this software

18   is worth.  So let me just take a minute to tell you

19   about that.

20             Our software literally does thousands and

21   thousands of things.  If you can imagine this, it's a

22   hundred million lines of software code, and it does

23   thousands of different things.  This case is about one

24   small feature.  And we believe that the value of that

25   feature, the fair value, is several million dollars.

1    They say it's a whole lot more than that, a whole lot

2    more than that.  And that's why we're here today.

3    Because the law says, and you're going to hear this word

4    a lot from us during the trial, the law says that the

5    damages have to be reasonable.  They have to be

6    reasonable.  And the plaintiff has to prove that they

7    are reasonable.  We don't believe their evidence is

8    reasonable, and we're going to try to show you what that

9    reasonable amount is during the trial.  Does that make

10   sense?

11         All right.  Now, lawyers worry about a lot

12   of things when we come to trial the night before.  I

13   worry about am I going to wear the right tie, is my hair

14   going to be combed right, am I going to remember

15   everything I'm supposed to say?

16         Well, here's something I'm worried about in

17   this case, and that's this, that because we come into

18   this case, SAP does, it already having been determined

19   that we infringe a small part of one of the Versata

20   patents, that somehow I'm going to start off behind,

21   that you folks hear that and you think, well, gee,

22   that's already been decided.  This is going to be easy

23   because really SAP is starting out kind of behind.

24         So does anyone feel like that just because

25   this is a case primarily about damages, not all about

1    damages, anyone feel like that somehow my client is

2    starting out a little bit behind?

3              Mr. Hanna, how about you, sir, do you feel

4    like we're starting out behind in some way because

5    there's already been a determination that -- that we are

6    infringing a small part of their patent?

7              MR. HANNA:  No, sir, you've already

8    addressed that.  I believe that in your statement, you

9    said this is what this trial was about.

10              MR. MELSHEIMER:  Okay.  So -- so you could

11    look at the evidence and not start off with putting the

12    plaintiff a little bit ahead or putting SAP a little bit

13    behind?

14              MR. HANNA:  No, sir.

15              MR. MELSHEIMER:  Okay.  Does any -- does

16    everyone agree with Mr. Hanna that if you're seated on

17    this jury, that you would not start out with SAP behind

18    in some way, but, in fact, we'd start out even, and

19    you'd make the plaintiff prove what the reasonable

20    damages are?  Can you -- can you raise your hand if you

21    agree with that?  All right.  I'm going to raise my

22    hand, too, because I agree with that, and that is the

23    law that you'll hear from Judge Everingham.

24              Thank you.  Thank you, Mr. Hanna.  I

25    appreciate it.

1              Let me -- let me visit with some of you

2     about -- and part of this process is to get to know you

3     a little bit.  As Judge Everingham said, I -- it's not

4     in any way to -- to pry, but simply to find out if

5     you'd -- you'd be the right juror for -- for this case.

6              So I want to start off with Ms. Hawkins.

7              Ma'am, good morning.

8              MS. HAWKINS:  Good morning.

9              MR. MELSHEIMER:  I just want to ask you,

10    now, this -- you -- you had this patent or you invented

11    a -- a sheep skin boot for -- for a diabetic person.

12    Now, this case, of course, is about something that they

13    invented.

14              MS. HAWKINS:  I understand that.

15              MR. MELSHEIMER:  And so do you think you'd

16    start off this case maybe a little bit more favorable

17    to -- to the plaintiff in the case because you kind of

18    maybe might see yourself in the -- in the same position

19    as them somewhat?

20              MS. HAWKINS:  No.  Actually, I think I have

21    to use other people's stuff that they patent in order to

22    make my product better, like snaps and hooks and Velcro.

23    So I have to use that in order to secure my -- my boot.

24              MR. MELSHEIMER:  Okay.  Now, ma'am --

25              MS. HAWKINS:  But that's their product, not

1   mine.

2            MR. MELSHEIMER:  Well, let me ask you this,

3   do you think that every different part of the boot that

4   you invented, is every part of it of the same

5   importance, or is some of it a little more important

6   than other parts?

7            MS. HAWKINS:  It's just a simple little

8   product, so I thought it would just --

9            MR. MELSHEIMER:  One thing.

10           MS. HAWKINS:  Yeah.  It --

11           MR. MELSHEIMER:  Okay.

12           MS. HAWKINS:  -- provided a service for one

13   type of -- one lady that had diabetes that had a bunch

14   of leg bruises and skin tears, and I went home and made

15   her something that I thought was going to keep -- be

16   cost effective for the facility that I work with instead

17   of wrapping her foot with gauze and causing edema,

18   swelling, occlusion.  This was to prevent her from

19   losing her leg.

20           MR. MELSHEIMER:  And did it work?

21           MS. HAWKINS:  Yes, sir.

22           MR. MELSHEIMER:  All right.  Well, I bet she

23   felt pretty good about that, I bet.

24           MS. HAWKINS:  Well, she probably didn't

25   realize it, but her doctor did.

1              MR. MELSHEIMER:  Well, thank you, ma'am.  I

2      appreciate it.  Thank you, Ms. Hawkins.

3              Mr. -- Mr. Roberson?

4              MR. ROBERSON:  Yes, sir.

5              MR. MELSHEIMER:  So I wanted to ask you, in

6      your questionnaire, you mentioned something about being

7      involved in some depositions previously.  Do I have that

8      right?

9              MR. ROBERSON:  Doing what?

10             MR. MELSHEIMER:  Be involved in some --

11     maybe giving some testimony for TXDOT, is that --

12             MR. ROBERSON:  Yes, sir, I have.

13             MR. MELSHEIMER:  Tell me what that is, sir.

14             MR. ROBERSON:  It was civil cases, two or

15     three of them.

16             MR. MELSHEIMER:  And what did those cases

17     involve?

18             MR. ROBERSON:  People getting hurt out on

19     the right-of-way, Texas highway right-of-way.

20             MR. MELSHEIMER:  And what kind of testimony

21     were you giving, what were you talking about when you

22     gave your testimony?

23             MR. ROBERSON:  Man, that's been -- that's

24     probably within 25 years.  I don't really remember.

25             MR. MELSHEIMER:  Okay.  All right, sir.  Are

1  you someone -- I noticed you raised your hand.  Are you

2  confident that -- that you're going to be able to start

3  off with -- with both parties here on equal footing?

4              MR. ROBERSON:  Well, no, not really.

5              MR. MELSHEIMER:  All right, sir.  Well, tell

6  me why you --

7              MR. ROBERSON:  You already admitted that you

8  was guilty.

9              MR. MELSHEIMER:  All right.  Well, sir --

10             MR. ROBERSON:  Didn't you say you had

11 infringed on their --

12             MR. MELSHEIMER:  Well, I said --

13             MR. ROBERSON:  -- patent?

14             MR. MELSHEIMER:  What I said, sir -- and I

15 appreciate your -- I appreciate --

16             MR. ROBERSON:  I'm going to be honest with

17 you.

18             MR. MELSHEIMER:  Boy, I sure want you to be.

19             MR. ROBERSON:  Okay.

20             MR. MELSHEIMER:  So it has been determined

21 that we infringe a piece of one of their patents, that's

22 true, and that's not what this case is about.  What this

23 case is about --

24             MR. ROBERSON:  Well, what's it about, then?

25             MR. MELSHEIMER:  -- how much -- how much

```
 1   that's worth, and that's what you'd be deciding if you

 2   were on this jury.  Do you think you could do that?

 3             MR. ROBERSON:  I think so.

 4             MR. MELSHEIMER:  Or do you think you might

 5   tend to lean a little bit more towards the plaintiff?

 6             MR. ROBERSON:  Well, like I said, you

 7   already admitted you were guilty.

 8             MR. MELSHEIMER:  All right.  Well, I

 9   appreciate you, sir.  I appreciate it.  I appreciate you

10   saying that.

11             Ms. Richardson, good morning.

12             MS. RICHARDSON:  Good morning.

13             MR. MELSHEIMER:  Now, ma'am, first of all,

14   you were -- were you yourself in the Army Reserves, do I

15   have that right?

16             MS. RICHARDSON:  Yes.

17             MR. MELSHEIMER:  Well, thank you.  Thank you

18   for your service.  23 years, as I understand it.

19             MS. RICHARDSON:  Uh-huh.

20             MR. MELSHEIMER:  All right.  You are now

21   working in -- in a college program that helps kids get

22   ready for college; is that right?

23             MS. RICHARDSON:  Well, basically adults, but

24   we do serve some high school seniors.

25             MR. MELSHEIMER:  All right.  Can you -- can
```

1    you tell me kind of what you do in that job?

2              MS. RICHARDSON:  Well, it's funded by the

3    U.S. Department of Education, and we provide assistance

4    applying for admissions to college, applying for

5    financial aid for college, registering for college

6    placement exams, and anything else that helps the

7    student actually get enrolled.

8              MR. MELSHEIMER:  Okay.  Have you been able

9    to help a lot of people?

10             MS. RICHARDSON:  Yes, over 33 years, a

11   bunch.

12             MR. MELSHEIMER:  All right.  Well, I'm sure

13   they're appreciative of that.  Thank you, ma'am.

14             MS. RICHARDSON:  Uh-huh.

15             MR. MELSHEIMER:  Let me ask you before

16   you -- before you go.  Do you think -- I'm going to ask

17   you that -- that question.  Do you think that you could

18   be fair and start out with both sides on -- on equal

19   footing in terms of what this is -- case is really

20   about?

21             MS. RICHARDSON:  I think I can start out

22   waiting to hear information from both sides, yes.

23             MR. MELSHEIMER:  All right.  Because you

24   hadn't heard anything yet really --

25             MS. RICHARDSON:  Correct.

```
 1              MR. MELSHEIMER:  -- except some -- some

 2    questions.  All right.  Thank you, ma'am.

 3              Ms. Borens, good morning.  How are you?

 4              MS. BORENS:  Very well, thank you.  How are

 5    you?

 6              MR. MELSHEIMER:  I'm doing very well.  Do

 7    you think, ma'am, you could be fair to both sides here

 8    and not start out favoring the plaintiff in this case?

 9              MS. BORENS:  Yes, I do.

10              MR. MELSHEIMER:  Do you think it's going to

11    be difficult to do that, or do you think it's going to

12    be easy for you to do that?

13              MS. BORENS:  I don't know.

14              MR. MELSHEIMER:  Okay.  You haven't -- you

15    haven't heard anything yet?

16              MS. BORENS:  Right.

17              MR. MELSHEIMER:  All right.  But do you

18    understand that this case is just going to be about how

19    much something's worth?

20              MS. BORENS:  Yes.

21              MR. MELSHEIMER:  Have you ever had a dispute

22    with anyone about what something's worth?

23              MS. BORENS:  No.

24              MR. MELSHEIMER:  Okay.  All right.  Thank

25    you, ma'am.  Thank you, Ms. Borens.
```

1          MS. BORENS:  You're welcome.

2          MR. MELSHEIMER:  Mr. Lumen, how are you,

3     sir?

4          MR. LUMAN:  Doing good, sir.  Thank you.

5          MR. MELSHEIMER:  You were -- did you give

6     a -- did you give a deposition once in a lawsuit for a

7     friend?  Is that right?

8          MR. LUMAN:  Well, it was a co-worker, yes.

9          MR. MELSHEIMER:  Co-worker?

10         MR. LUMAN:  Yes.

11         MR. MELSHEIMER:  Tell me about that, sir.

12         MR. LUMAN:  We were riding on the side of a

13    car on the switch at the railroad, and we were riding on

14    the side of the car that derailed and turned over.  I

15    was not injured, he was, and, of course, he sued the

16    railroad, and -- and I had to give the test -- you know,

17    deposition of what happened.

18         MR. MELSHEIMER:  All right.  Anything about

19    that experience you think is going to cause you to maybe

20    lean toward one side or another in this case?

21         MR. LUMAN:  I don't think, not really, no.

22         MR. MELSHEIMER:  All right, sir.  And do you

23    think you can -- can start out with both sides even?

24         MR. LUMAN:  Yes.

25         MR. MELSHEIMER:  Thank you.  Thank you,

1    Mr. Lumen, I appreciate it.

2              Mr. Aldridge, Coach Aldridge, good morning.

3              MR. ALDRIDGE:  Good morning.

4              MR. MELSHEIMER:  So 30 years of winning

5    seasons; is that right?

6              MR. ALDRIDGE:  Well, I was 37 years with

7    LISD, 33 with our girls' program.

8              MR. MELSHEIMER:  All right.

9              MR. ALDRIDGE:  Four with our boys' program.

10             MR. MELSHEIMER:  Oh, okay.  And you -- you

11   won -- someone told me you won maybe close to a thousand

12   games; is that --

13             MR. ALDRIDGE:  Well, we were successful.

14             MR. MELSHEIMER:  All right, sir.  Now,

15   you've had some -- some business training, some

16   management training; am I right about that?

17             MR. ALDRIDGE:  I have a double major.  I

18   have -- I took -- I have about 18 hours of business

19   courses from East Texas Baptist University, and I looked

20   at tax accounting, looked at actually teaching business

21   as a second subject area.

22             MR. MELSHEIMER:  All right, sir.  But you

23   have been -- you have worked in basically education for

24   all your professional life; is that fair?

25             MR. ALDRIDGE:  Yes, yes.

1              MR. MELSHEIMER:  All right.  Thank you.

2    Appreciate it.

3              Ms. Faulkner, good morning.  How are you?

4              MS. FAULKNER:  Good morning, sir.  I'm fine.

5              MR. MELSHEIMER:  Ma'am, do you think you can

6    be -- keep both sides on even footing starting out the

7    trial?

8              MS. FAULKNER:  Yes, sir.

9              MR. MELSHEIMER:  Okay.  Just decide the case

10   based on what the --

11             MS. FAULKNER:  On the evidence.

12             MR. MELSHEIMER:  On the evidence.  Now, let

13   me ask you, have you ever had a situation in -- in your

14   life where you've had a dispute about the value of

15   something, what something was worth, either selling a

16   house or buying a house or anything like that?

17             MS. FAULKNER:  No, I haven't.

18             MR. MELSHEIMER:  All right.  The -- your

19   husband works at the -- for U.S. Steel, is that correct,

20   ma'am?

21             MS. FAULKNER:  Which -- which used to be

22   Lone Star Steel.

23             MR. MELSHEIMER:  Lone Star Steel.

24             MS. FAULKNER:  Yes.

25             MR. MELSHEIMER:  What does he do for them?

```
 1                MS. FAULKNER:  He operates a crane.

 2                MR. MELSHEIMER:  How long has he been doing

 3     that?

 4                MS. FAULKNER:  Oh, about 28 years.

 5                MR. MELSHEIMER:  All right.  Thank you,

 6     ma'am.

 7                Ms. Bankston?

 8                MS. BANKSTON:  Yes.

 9                MR. MELSHEIMER:  There's a pattern

10     developing on these numbers, isn't there?  I'm going one

11     at a time.

12                Ma'am, you've had some -- a lot of your

13     family has been in the military, isn't that right, your

14     son?

15                MS. BANKSTON:  Yes, sir.

16                MR. MELSHEIMER:  All right.  Well, thank you

17     very much for your service.  Are you proud of them?

18                MS. BANKSTON:  Certainly.

19                MR. MELSHEIMER:  Do you ever worry about

20     them?

21                MS. BANKSTON:  All the time.

22                MR. MELSHEIMER:  I bet.  And your -- your

23     husband is also retired military; is that right?

24                MS. BANKSTON:  Yes, sir.

25                MR. MELSHEIMER:  Ma'am, have you ever had
```

1    any kind of an issue with trying to figure out what

2    something's worth, ever argued, ever argued or -- not

3    argued in a bad way, but just had a -- had a

4    disagreement about what something was worth?

5                MS. BANKSTON:  Yes, sir.

6                MR. MELSHEIMER:  Can you tell me about that?

7                MS. BANKSTON:  Mineral rights.

8                MR. MELSHEIMER:  All right.  And did you own

9    the mineral rights?

10               MS. BANKSTON:  Yes, sir.

11               MR. MELSHEIMER:  And you thought they were

12   worth something, and somebody else thought they were

13   worth less than that?

14               MS. BANKSTON:  Comparatively speaking to

15   what was being offered in the area.

16               MR. MELSHEIMER:  And how did you go about

17   resolving that or -- if you did?

18               MS. BANKSTON:  We were very patient, just

19   waited.

20               MR. MELSHEIMER:  All right.  Did you

21   eventually get it resolved?

22               MS. BANKSTON:  There were some successes,

23   and there were some not success.

24               MR. MELSHEIMER:  Well, let me ask you this,

25   did you -- in terms of the value of the mineral rights,

```
 1   did you look to comparable mineral rights in the area to

 2   try to get a good idea what the value was?

 3              MS. BANKSTON:  That's how we handled it?

 4              MR. MELSHEIMER:  That's a pretty fair way to

 5   do it, isn't it?

 6              MS. BANKSTON:  Yes.

 7              MR. MELSHEIMER:  Look at how much you've

 8   got, how much that's worth compared to what other people

 9   have been paid for what they got, right?

10              MS. BANKSTON:  Yes, sir.

11              MR. MELSHEIMER:  And if you had more mineral

12   rights, you'd be entitled to more money than someone

13   that had less mineral rights; is that a -- is that a

14   fair statement?

15              MS. BANKSTON:  Would you repeat that?

16              MR. MELSHEIMER:  Well, if you had more

17   rights, more mineral rights, say more land, you know, a

18   better --

19              MS. BANKSTON:  Sure.  Sure.

20              MR. MELSHEIMER:  -- valuation, you'd be

21   entitled to more than someone that had less; is that

22   correct?

23              MS. BANKSTON:  Correct.

24              MR. MELSHEIMER:  Okay.  Thank you.  Thank

25   you, ma'am.
```

1              Mr. Denton, good morning.

2              MR. DENTON:  Good morning.

3              MR. MELSHEIMER:  How are you doing today?

4              MR. DENTON:  I'm doing great.  How are you?

5              MR. MELSHEIMER:  All right.  You got some --

6   you said your company has some patents on chemicals?

7              MR. DENTON:  Plastic.

8              MR. MELSHEIMER:  Plastics?

9              MR. DENTON:   Yes.

10             MR. MELSHEIMER:  And that's not something

11  you're involved in, though, are you, sir?

12             MR. DENTON:  No.

13             MR. MELSHEIMER:  Now, sir, do you think --

14  let me ask you this question, do you think that all of

15  the patents that your company has are worth the same, or

16  do you think some are worth more than others and some

17  are worth less?

18             MR. DENTON:  Some are probably worth more

19  than others.

20             MR. MELSHEIMER:  And what do you think would

21  make a patent worth more than another one?

22             MR. DENTON:  I'm going to say that the --

23  what they put into it, basically, the amount of time and

24  the -- just different stuff they put into it.

25             MR. MELSHEIMER:  Right.  How about whether

1   or not the patent was on something big versus on

2   something real small?

3           MR. DENTON:  That's what I'm trying --

4           MR. MELSHEIMER:  Would that be relevant to

5   you?

6           MR. DENTON:  That's right, sir.

7           MR. MELSHEIMER:  Is that something you'd

8   want to know before --

9           MR. DENTON:  Yes.

10           MR. MELSHEIMER:  -- you valued a patent?

11   Okay.  All right.  Thank you, sir.  I appreciate it.

12           Mr. Hanna, same question to you, do you

13   think all the Eastman patents, and, boy, they had a

14   bunch of them, do you think they're all worth the same

15   or some are worth more than others?

16           MR. HANNA:  It depends on the application,

17   sir.

18           MR. MELSHEIMER:  And tell me what you mean

19   by that, Mr. Hanna.

20           MR. HANNA:  As an example, the process to

21   put silver on film was never patented by Kodak, that was

22   a trade secret.  The process of producing film and

23   developing film was patented and licensed to other

24   manufacturers.

25           MR. MELSHEIMER:  Okay.  And do you think

1    that -- do you think that the patents that Eastman held,

2    that some of them might be more valuable than others

3    because of how they were used?

4            MR. HANNA:  Obviously, sir, all patents'

5    are -- value is, is  it used, is it used by others, sir?

6            MR. MELSHEIMER:  Okay.  Thank you.  Thank

7    you Mr. Hanna.

8            Ms. McCommon, good morning.  Now, your --

9    your husband's got some -- got some software programs.

10           MS. MCCOMMON:  Yes, sir.

11           MR. MELSHEIMER:  Okay.  So this case

12    involves a software program.

13           MS. MCCOMMON:  Yes.

14           MR. MELSHEIMER:  A real big one that does

15    thousands of different things.  Now, was the software

16    program your husband developed, was a -- a broader

17    program or maybe a more narrow program?

18           MS. MCCOMMON:  It was a very broad program.

19           MR. MELSHEIMER:  Okay.  What did it do?

20           MS. MCCOMMON:  It went in and took the

21    engineering drawings on structural steel things like --

22    like Texas Eastman or down at Texas City, it would take

23    the steel and detail it out, and then send it over to

24    the fabricating company, and they would use it to do the

25    templates to cut out the steel, and it would also count

1  the bolts, and it would then send the erection drawings

2  to the field to be erected by, and there was nothing in

3  the industry that could match it.

4          MR. MELSHEIMER:  So it sounds like it was

5  something that somebody that was doing that kind of

6  project, they would use it pretty much from A to Z, it

7  sounds like.

8          MS. MCCOMMON:  Yes, sir.

9          MR. MELSHEIMER:  Okay.  Have you ever worked

10  with any accounting software or any kind of other

11  software like that?

12          MS. MCCOMMON:  No, only QuickBooks.

13          MR. MELSHEIMER:  QuickBooks.  Okay.  So

14  QuickBooks and things like that, okay.  Thank you,

15  ma'am.  Appreciate it.

16          MS. MCCOMMON:  Okay.

17          MR. MELSHEIMER:  Ms. Parker, good morning.

18          MS. PLASCHKE:  Plaschke.

19          MR. MELSHEIMER:  Plaschke, I'm sorry.  I

20  apologize.  Ms. Parker is right next to you.  I

21  apologize, ma'am.

22          So did you have some study of accounting

23  ma'am?

24          MS. PLASCHKE:  Yes.

25          MR. MELSHEIMER:  Tell me -- tell me what

1   your accounting study was.

2           MS. PLASCHKE:  Two years at Kilgore College,

3   basically.

4           MR. MELSHEIMER:  Did you ever work with any

5   computer programs?

6           MS. PLASCHKE:  At Martin -- when I worked at

7   Martin, I was receptionist, not really accounting

8   programs, and just, you know, household -- I'd take care

9   of the things at the house, Quicken and that kind of

10  thing.

11          MR. MELSHEIMER:  Ma'am, let me ask you a

12  question that you've heard me ask before, but do you

13  think you could start out this trial giving both sides

14  kind of the same starting point and not put the

15  plaintiff a little bit ahead?

16          MS. PLASCHKE:  I think so.

17          MR. MELSHEIMER:  Okay.  Thank you, ma'am.

18          Ms. Parker, same question, ma'am, do you

19  think you could start out with -- with both sides on

20  equal footing and not maybe have SAP a little bit behind

21  in your mind?

22          MS. PARKER:  I'm sure I could -- just being

23  fair, you know, I think I could be fair with it --

24          MR. MELSHEIMER:  Okay.

25          MS. PARKER:  -- and start out even.

1           MR. MELSHEIMER:  Thank you, ma'am.  Now, you

2    teach tumbling?

3           MS. PARKER:  Yes.

4           MR. MELSHEIMER:  Is that something you do

5    every -- every day or is that something --

6           MS. PARKER:  No.

7           MR. MELSHEIMER:  Okay.  Tell me about that.

8           MS. PARKER:  Just -- I just -- in Atlanta, I

9    teach a couple nights a week for -- for somebody else.

10   I used to have my own place when I first got married,

11   and it's just easier to work for somebody else with

12   that, and I can --

13          MR. MELSHEIMER:  All right.  And what --

14   what age girls do you teach?  My daughter is 10.  Would

15   she be a good student for your tumbling?

16          MS. PARKER:  Uh-huh.  Three years old up

17   through high school.

18          MR. MELSHEIMER:  Okay.  Thank you, ma'am.

19          All right.  Mr. Fritz, you worked at the --

20   you are retired, sir?

21          MR. FRITZ:  Yes.

22          MR. MELSHEIMER:  How long have you been

23   retired?

24          MR. FRITZ:  Almost four years.

25          MR. MELSHEIMER:  Are you enjoying it?

1              MR. FRITZ:  Oh, yes.

2              MR. MELSHEIMER:  All right.  What do you do

3     in your -- in your free time, so to speak?

4              MR. FRITZ:  Hunt, fish, travel.

5              MR. MELSHEIMER:  Okay.  Thank you, sir.  I

6     appreciate it.

7              Ms. McMillan, good morning.

8              MS. MCMILLAN:  Morning.

9              MR. MELSHEIMER:  I'm going to get back to

10    you, Ms. McMillan, in just a second.

11             Let me ask, how many of y'all have one of

12    these cell phones?  Everybody have a cell phone?  How

13    many people have what they call a smart phone that has a

14    little -- like an iPhone or a Blackberry or something

15    like that?

16             You did, sir?  Are you Mr. Watters?  You

17    have -- you have a Blackberry or an iPhone?

18             MS. WATTERS:  It's a Thunderbolt.

19             MR. MELSHEIMER:  Thunderbolt.  Now, do

20    you -- would you say that that phone has a lot of

21    features besides just calling people?

22             MR. WATTERS:  Yeah, a lot more than I know

23    about right now.

24             MR. MELSHEIMER:  In other words, have you

25    ever had this experience, I had this the other day with

1    my -- my iPhone, that if you -- you didn't know you had

2    a feature on your phone, but there it is?

3              MR. WATTERS:  Yes.

4              MR. MELSHEIMER:  And would you say that all

5    the features of that phone, hundreds of them or

6    thousands of them, are they all worth the same, do you

7    think, or are some worth more than others?

8              MS. WATTERS:  I guess it depends on the

9    user.

10             MR. MELSHEIMER:  Why do you say that?

11             MS. WATTERS:  Well, because some people use

12   different things, and some things I just -- I just do

13   all the time and don't use all that, so...

14             MR. MELSHEIMER:  So somebody that might use

15   something a lot, it might be real valuable to them, but

16   to you, it might not be so valuable?

17             MR. WATTERS:  Right.

18             MR. MELSHEIMER:  Okay.  I found out on this

19   phone here that if you have a calculator and if you turn

20   it sideways, it turns into a scientific calculator.

21   This way is a regular calculator.  If you just turn it

22   sideways, it's a scientific.  I didn't know it'd do

23   that.  I don't know if your phone has something like

24   that or not, but features like that you just didn't know

25   you had --

```
 1              MR. WATTERS:  Right.

 2              MR. MELSHEIMER:  -- and you don't use them

 3    sometimes?

 4              MR. WATTERS:  Uh-huh.

 5              THE COURT:  You have five minutes remaining,

 6    Mr. Melsheimer.

 7              MR. MELSHEIMER:  Thank you.

 8              Ms. McMillan, the -- what did your husband

 9    do over at LeTourneau?

10              MS. MCMILLAN:  He worked in the steel mill

11    part of it keeping records.

12              MR. MELSHEIMER:  All right.  Is he still

13    doing that?

14              MS. MCMILLAN:  No, he's retired.

15              MR. MELSHEIMER:  How long has he been

16    retired, ma'am?

17              MS. MCMILLAN:  About three years, I think.

18              MR. MELSHEIMER:  Is he enjoying his

19    retirement?

20              MS. MCMILLAN:  Yes.

21              MR. MELSHEIMER:  Okay.  Are you?

22              MS. MCMILLAN:  Yes.

23              MR. MELSHEIMER:  Okay.  Mr. Watters, I just

24    want to get back to you real quick.  You actually work

25    for a computer repair, I believe you told Mr. Baxter, PC
```

1   Wrangler, is that the name of the outfit?

2          MR. WATTERS:  Yeah, that was, you know, back

3   in -- around 2000.

4          MR. MELSHEIMER:  And you had some experience

5   in software?

6          MR. WATTERS:  Well, none other than just

7   installing programs for people.  I don't program, but...

8          MR. MELSHEIMER:  If you had to put a value

9   on a piece of software, do you think it would be

10  important to know people -- what people that use the

11  software thought about the features?

12         MR. WATTERS:  Uh-huh, yes.

13         MR. MELSHEIMER:  And why would that be

14  important?

15         MR. WATTERS:  Well, it just -- you know,

16  like I said, different things are worth more to other

17  people, you know, so --

18         MR. MELSHEIMER:  So something that's maybe

19  not used wouldn't be worth as much as something that was

20  used a whole bunch; is that fair?

21         MR. WATTERS:  Right.

22         MR. MELSHEIMER:  Okay.  Thank you.

23         Ms. Clements, good morning.

24         MS. CLEMENTS:  Good morning.

25         MR. MELSHEIMER:  Ma'am, you're -- you have a

1    lot of experience in the real estate business or your

2    family does, right?

3              MS. CLEMENTS:  My family does.  I teach

4    school.

5              MR. MELSHEIMER:  All right.  And what

6    subject do you teach, ma'am?

7              MS. CLEMENTS:  Currently I teach science.

8              MR. MELSHEIMER:  Okay.  My wife is a school

9    teacher.  What -- what grades do you teach?

10             MS. CLEMENTS:  I'm teaching 5th grade.  I've

11   taught 4th and 5th grade for years.

12             MR. MELSHEIMER:  What's your favorite grade

13   to teach?

14             MS. CLEMENTS:  4th.

15             MR. MELSHEIMER:  Okay.  Now, ma'am, do you

16   ever get involve in your family's real estate business?

17   Do you get involved in hearing about valuing property or

18   arguments about how much a piece of property is worth?

19             MS. CLEMENTS:  I hear about it a lot when I

20   come home.  I'm not really involved in it.  My son works

21   for the family business as does my husband, so I -- I

22   hear it a lot, and I'm not real knowledgeable on it,

23   and -- but, yes, I hear it a lot.

24             MR. MELSHEIMER:  Well, ma'am, just -- let me

25   just ask you this, and really anyone can -- can think

1    about this, but have you ever been involved in buying or

2    selling a home?

3              MS. CLEMENTS:  No -- well, my personal home,

4    no.

5              MR. MELSHEIMER:  Okay.

6              MS. CLEMENTS:  We've built it and lived in

7    it for 30 years, so no.

8              MR. MELSHEIMER:  Okay.  Well, does your

9    family own homes that are bought and sold, or is it just

10   raw land?

11             MS. CLEMENTS:  Homes also and raw land.

12             MR. MELSHEIMER:  Okay.

13             MS. CLEMENTS:  It's -- and commercial

14   property, lots of things.

15             MR. MELSHEIMER:  And they're all different

16   values?

17             MS. CLEMENTS:  Yes.

18             MR. MELSHEIMER:  Do you think that a home --

19   that the value of a home that -- let's say -- let me

20   just pick a number, that a third of the value of a home

21   could be in some small feature like a -- like a ceiling

22   fan or a skylight or a sink or something, you think a

23   third of the value of a home could ever be on that kind

24   of a feature?

25             MS. CLEMENTS:  Not something that small, no.

1  I mean, but -- no, it depends I guess -- I know that

2  everything that goes into a home adds value to it, I

3  know that.

4           MR. MELSHEIMER:  And -- but as far as

5  whether or not something is worth 10 percent or 30

6  percent of the home, that would be -- that would depend

7  on the facts of the -- of the home, right?

8           MS. CLEMENTS:  Yes.

9           MR. MELSHEIMER:  Okay.  And same question to

10  you, ma'am, given that -- given that we're here just for

11  the damages part of the case, are you going to be able

12  to -- to start out with -- with both sides even and not

13  sort of favor the plaintiff or be against SAP because

14  this case is just about the damages?

15           MS. CLEMENTS:  Yes, I think --

16           MR. MELSHEIMER:  You can be fair to both

17  sides?  All right.  And that's really all that we --

18  that's really all that we want.

19           THE COURT:  You've got one minute left.

20           MR. MELSHEIMER:  Thank you.

21           Now, I want to thank y'all.  I ask this

22  question -- lawyers always ask it.  I've never seen

23  anyone answer it, okay, so it would be the first time.

24           Can anyone think of anything else that

25  you're thinking to yourself, you know what, if I were

```
 1   sitting over here, I sure wouldn't want me on that jury

 2   because of whatever, you know, I had a bad experience

 3   with SAP software, or I'm not going to be able to pay

 4   attention, or whatever it may be, can anyone think of

 5   anything of that kind of caliber that you might want to

 6   say now or say to the Judge later, anything like that?

 7               Yes, sir, Mr. Watters?

 8               MR. WATTERS:  Honestly -- honestly, to me,

 9   just up front without seeing any evidence, it's just

10   almost like a David versus Goliath thing to me.

11               MR. MELSHEIMER:  Okay.

12               MR. WATTERS:  But that's honestly what I

13   see.

14               MR. MELSHEIMER:  You think that because

15   Mr. Baxter is so much older and wiser than me, that I'm

16   kind of the David and he's --

17               MR. WATTERS:  No.

18               MR. MELSHEIMER:  -- the Goliath?

19               MR. WATTERS:  No, I was just -- you know,

20   there's three law firms over there, and there's one over

21   here.

22               MR. MELSHEIMER:  Okay.

23               MR. WATTERS:  So honestly that's --

24               MR. MELSHEIMER:  Well, would it change your

25   mind if you knew that the law firm over here has over a
```

1    hundred lawyers in three cities across the country?

2              MR. WATTERS:  Yeah, that would make a

3    difference, yeah.

4              MR. MELSHEIMER:  Okay.  It is, thank you.

5              Mr. Williams?

6              MR. WILLIAMS:  Yeah, I don't really know how

7    truthful y'all want me to be, but I'm going to just tell

8    you like it is.  I think most lawyers are parasites on

9    the back of the American people, and that greed has run

10   rampant in this country today.  That's what's wrong in

11   the country.

12             MR. MELSHEIMER:  All right, sir.  Well, I

13   cannot take that as a compliment, but there's -- there's

14   a hundred some odd lawyers at this table --

15             THE COURT:  We'll take that up at the bench.

16             MR. MELSHEIMER:  -- but we can take that up,

17   if you want to, Mr. Williams.

18             So that -- I think I'm out of time.  The

19   Judge is about to tell me I'm out of time.  Thank y'all

20   so much.  I really appreciate your candor.  I really

21   appreciate everyone's candor on the jury, because we

22   need to know where y'all are coming from, and that's all

23   we really want to know in this process, and I really,

24   really appreciate your answers.

25             THE COURT:  All right.  Counsel approach.

```
 1                 (Bench conference.)

 2                 THE COURT:  Who does the plaintiff have

 3       for individual voir dire?

 4                 MR. BAXTER:  No, Your Honor.

 5                 THE COURT:  Who does the defendant have for

 6       individual voir dire?

 7                 MR. MELSHEIMER:  No. 2, Mr. Roberson.

 8                 THE COURT: Okay.  Do you have anybody else?

 9                 MR. BAXTER:  You don't want the --

10                 THE COURT:  21.

11                 MR. MELSHEIMER:  We aren't going to reach

12       him.

13                 THE COURT:  Well, I don't know what the

14       scheduling conflicts are going to be.

15                 MR. MELSHEIMER:  Okay.  Well, then 21.

16                 MR. BAXTER:  Let's look at the scheduling

17       conflicts before we listen to him.

18                 MR. MELSHEIMER:  I think that's right.  I

19       don't think we'll ever reach him.

20                 THE COURT:  Well, I don't either, but I'm

21       going to ask first.  If there's a potential for it, I

22       want to take care of it now.

23                 MR. MELSHEIMER:  I'll just note, Your Honor,

24       that on his questionnaire he had a disqualifying answer,

25       as well.
```

```
 1                THE COURT:  Okay.  All right.  In that case,
 2    y'all stipulate, then?
 3                MR. BAXTER:  Yes, we would agree to strike
 4    him and the Court disqualify him.
 5                THE COURT:  Okay.  All right.  Y'all step
 6    back.
 7                MR. BAXTER:  All right.  Thank you, Your
 8    Honor.
 9                (Bench conference concluded.)
10                THE COURT:  All right.  Ladies and
11    gentlemen, I'm getting ready to excuse you now until
12    11:00 o'clock, but I promised you I'd come back to this.
13                Does anybody have a scheduling conflict for
14    the week of May the 9th through Thursday the 12th that
15    jury service would present an undue hardship along the
16    lines that I outlined for you previously?  If you do
17    have such a conflict, please raise your numbers at this
18    time.
19                MS. HAWKINS:  You already told me I couldn't
20    raise my number.  My job wouldn't do it.
21                THE COURT:  I also said that every -- every
22    case was different.
23                MS. HAWKINS:  I work graveyard, Monday,
24    Tuesday, Wednesday, Thursday --
25                THE COURT:  We'll take -- why don't -- why
```

 1   don't you stick around, and I'll visit with you about
 2   that, okay?
 3            MS. HAWKINS:  Okay.
 4            THE COURT:  All right.  The rest of you, I
 5   need numbers. 1, 2, 16, and 21 to remain in the
 6   courtroom.  The rest of y'all are excused now until
 7   11:00 o'clock.  Please gather outside the courtroom at
 8   11:00, be back ready to come into the courtroom at 11:00
 9   o'clock.  Thank you.  Y'all can leave your numbers in
10   your chairs.
11            Ms. Hawkins, come on up.
12            Counsel approach.
13            (Bench conference.)
14            THE COURT:  How are you?
15            MS. HAWKINS:  I'm fine.  My name is Debra
16   Hawkins.
17            THE COURT:  Yes, ma'am.  All right.  Tell me
18   about your work schedule.
19            MS. HAWKINS:  I work graveyard from 9:45 to
20   6:00, sometimes 6:30, 6:45 in the morning.  I worked
21   last night.  I work every Monday, Tuesday, Wednesday,
22   and Thursday night graveyard.
23            THE COURT:  Well, if you're -- if you're
24   doing jury duty during the day, are you excused from
25   work that evening?

1            MS. HAWKINS:  Actually, we have so many --

2     we have only so many LVNs, and I'm going to tell you

3     right now, it's hard for me to get a vacation because

4     they don't -- they don't have -- nobody wants to do

5     graveyards.

6            THE COURT:  Who's your employer?

7            MS. HAWKINS:  My employer is -- Tim Thornton

8     is the administrator, and Gretchen Trimble is my DON,

9     and Debbie Baxter is my ADON.

10           THE COURT:  Okay.

11           MS. HAWKINS:  Director of nurses and

12    assistant director of nurses.

13           THE COURT:  Mr. Baxter, do you have any

14    questions?

15           MR. BAXTER:  No, Your Honor.

16           THE COURT:  Mr. Melsheimer?

17           MR. MELSHEIMER:  I have no questions, Your

18    Honor.

19           THE COURT:  My inclination is -- is not to

20    excuse you from jury duty.

21           MS. HAWKINS:  Okay.

22           THE COURT:  If there's a problem with your

23    employer --

24           MS. HAWKINS:  That probably will suffice,

25    but I'm really dedicated to my job.

1                    THE COURT:  I know you are.  And I know that

2      it's an imposition to serve on a jury, but, you know,

3      all the folks are here just about in the same place you

4      are, okay?

5                    MS. HAWKINS:  Okay.

6                    THE COURT:  All right.

7                    MS. HAWKINS:  All right.  Thank you.

8                    THE COURT:  Be back ready to come in at

9      11:00 o'clock.

10                    MS. HAWKINS:  Okay.  Where do I put this?

11                    THE COURT:  You can just place that in your

12     chair.  Thank you.

13                    MR. BAXTER:  Not to interfere, Your Honor,

14     if the Court wants to excuse her, we don't have an

15     objection.

16                    MR. MELSHEIMER:  I don't either.

17                    THE COURT:  Okay.  I'll excuse her.  No. 1

18     is excused.

19                    Mr. Roberson -- Roberson, pardon me.

20                    MR. ROBERSON:  It don't make any difference.

21     I've been called worse.  Yes, sir?

22                    THE COURT:  Hi there.  How are you?

23                    MR. ROBERSON:  Fine.  How are you doing?

24                    THE COURT:  I'm okay.

25                    MR. ROBERSON:  Good.

```
 1                THE COURT:  Thank you for coming to jury

 2   duty today.  I think the lawyers have some additional

 3   questions that they wanted to follow up with you some of

 4   the answers that you gave.

 5                Mr. Melsheimer?

 6                MR. ROBERSON:  Good.

 7                MR. MELSHEIMER:  Good morning, sir.  So Mr.

 8   Roberson --

 9                MR. ROBERSON:  You've got to speak up just a

10   little bit.

11                MR. MELSHEIMER:  I'm sorry, okay.  So --

12                THE COURT:  Speak up just a little.

13                MR. MELSHEIMER:  You had -- you had said --

14   I think --

15                Can you hear me, ma'am?

16                THE REPORTER:  Speak a little bit louder.

17                MR. MELSHEIMER:  Okay.  You had said during

18   the questioning that -- and you were very candid about

19   it, you said, "Well, seems like you guys have already

20   admitted you're guilty."

21                MR. ROBERSON:  You did.

22                MR. MELSHEIMER:  Right.  And so I just

23   wanted to know that -- so, you know, I guess a couple of

24   questions about that.  So do you -- given that, even if

25   that's the way you heard that or that's the way you
```

1   see this going down, that you really think that you

2   would be -- would you be starting with the plaintiff a

3   little bit ahead of the defendant since, as you say, the

4   defendants admitted that they're -- they're guilty?

5          MR. ROBERSON:  Well, no, I'd like to hear

6   the case, but you already admitted that you're guilty --

7   y'all already admitted that y'all infringed on the

8   patent, right?  Is that guilt, or what is that?

9          MR. MELSHEIMER:  Well, I'll -- I'll let the

10  Judge -- of course, it's not guilt.  It's a civil case,

11  so it's not guilt --

12         MR. ROBERSON:  Well, not guilt, but --

13         MR. MELSHEIMER:  You heard it that way.  You

14  heard it that way, sir.

15         MR. ROBERSON:  That's the way I heard it,

16  right.

17         MR. MELSHEIMER:  Yes, sir.  Yes, sir.

18  And -- and don't you think that hearing it that way,

19  that that's going to make you -- and, again, it's

20  perfectly okay, but it's going to make you start out

21  with putting my client, who you say has admitted guilt,

22  a little bit behind the plaintiff?

23         MR. ROBERSON:  Well, sure.  Well, sure.

24         MR. MELSHEIMER:  Yeah, it's going to be hard

25  for you -- it's going to be hard for you to get that out

1    of your mind, isn't it, sir?

2             MR. ROBERSON:  Well, yeah, I mean, it's

3    there, you know.

4             MR. MELSHEIMER:  Yeah.  It's going to be

5    something that's going to be there really --

6             MR. ROBERSON:  All through the --

7             MR. MELSHEIMER:  -- throughout the trial,

8    isn't it?

9             MR. ROBERSON:  Yeah.

10            MR. MELSHEIMER:  Yeah.

11            MR. ROBERSON:  What -- what the deal is, is

12   if y'all done it, they want money and y'all don't want

13   them to have as much money as they want, right?

14            MR. MELSHEIMER:  That's -- that -- I think

15   that's a good summary.

16            MR. ROBERSON:  That's it.  So we're just

17   going to have to listen to the evidence and -- and see

18   which one is the best lawyer and who gets the most

19   money, right?

20            MR. MELSHEIMER:  Well, I don't want to -- I

21   don't want you to --

22            THE COURT:  Well --

23            MR. MELSHEIMER:  -- go on that, but --

24   but -- I'm sorry, Judge, go ahead.

25            THE COURT:  No, go ahead.

1            MR. MELSHEIMER:  Well, so -- and I hear you,

2    and I know you want to be fair because you've been on --

3            MR. ROBERSON:  Will be.  Will be.

4            MR. MELSHEIMER:  -- you've had prior jury

5    service, haven't you, sir?

6            MR. ROBERSON:  Yes, I will be fair.

7            MR. MELSHEIMER:  But when I hear you say

8    it's going to be in the back of your mind that we're

9    guilty, what I hear you saying is that --

10           MR. ROBERSON:  Well, you know, if you stand

11   up there and you admit you're guilty -- if you had never

12   admitted you're guilty, I wouldn't have known you were

13   guilty.

14           MR. MELSHEIMER:  Well, what if you -- what

15   if you had been told that during the middle of the trial

16   that infringement has already been determined?

17           MR. ROBERSON:  Well, I don't know.

18           MR. MELSHEIMER:  You see?  So I guess what

19   I'm saying is don't you think it's going to be hard for

20   you -- hard for you to put that aside during the trial,

21   that it might always be there in the back of your mind?

22           MR. ROBERSON:  I don't think so.

23           MR. MELSHEIMER:  You don't think it might be

24   something that you would say that plaintiff might just

25   be starting a little bit ahead, just a little bit?

1               MR. ROBERSON:  Yeah, probably is going to,

2   you know.

3               MR. MELSHEIMER:  Okay.  Well I appreciate --

4   I appreciate your -- appreciate that.

5               MR. ROBERSON:  Look, if I bite you -- if I'm

6   a dog and I bite you, you're bit, right?

7               MR. MELSHEIMER:  Yeah.

8               MR. ROBERSON:  It's not that I'm fixing to

9   bite you.  I just barely have bit you --

10              MR. MELSHEIMER:  Right.

11              MR. ROBERSON:  -- but, I mean, you're bit,

12  right?

13              THE COURT:  Mr. Baxter, do you have some

14  additional questions?

15              MR. BAXTER:  Yes, I do.

16              Mr. Roberson, here's the real issue, and the

17  Judge isn't going to ask you to put the fact that

18  they're an infringer out of your mind because he's going

19  to tell you they are.  He's already told you that.

20              Here's -- the question is, on the issue of

21  damages, are we starting off even on that?  You hadn't

22  heard any evidence, you don't know what it's worth, you

23  don't know if it's worth a lot, a little, and so that's

24  really the evidence you're going to be listening to --

25              MR. ROBERSON:  Right.

1          MR. BAXTER:  -- the damages issue.

2          MR. ROBERSON:  Right.

3          MR. BAXTER:  Now, on that issue, are we

4    starting even?

5          MR. ROBERSON:  Yes, sir.

6          MR. BAXTER:  Okay.

7          MR. ROBERSON:  You're starting even.

8          MR. BAXTER:  Well, that's all I ask of you.

9    I understand.

10          MR. ROBERSON:  Only thing I heard --

11          MR. BAXTER:  On that issue, can you be fair?

12          MR. ROBERSON:  Yes, sir, I can.

13          MR. BAXTER:  And view the evidence and just

14    nothing but the evidence?

15          MR. ROBERSON:  Right.

16          MR. BAXTER:  Okay.

17          MR. MELSHEIMER:  I got one question.

18          MR. ROBERSON:  Okay.

19          MR. MELSHEIMER:  So let's imagine this as a

20    race, okay, it's a race, we're starting here.  Here's

21    the starting line of the race.  Is Mr. Baxter's client

22    a little bit ahead of my client at this point in the

23    race?

24          MR. ROBERSON:  You're starting even right

25    now.

1             MR. MELSHEIMER:  Okay.  Okay.

2             MR. ROBERSON:  You're staring at the

3    starting line.

4             MR. MELSHEIMER:  All right.

5             THE COURT:  All right.  Thank you, sir.  If

6    you'll be --

7             MR. MELSHEIMER:  Thank you.

8             THE COURT:  -- back ready to come in the

9    courtroom at 11:00 o'clock.

10            MR. ROBERSON:  Okay.

11            THE COURT:  Thank you very much.

12            MR. ROBERSON:  Thank you, sir.

13            THE COURT:  Is there a motion?

14            MR. MELSHEIMER:  There's a motion to

15   disqualify him for cause.  I mean, he -- he -- he said

16   two or three different things, but he said several times

17   that -- that it would always be in the back of his mind

18   that we were guilty, and I think that, you know, you've

19   got plenty of jurors, and I just think this juror should

20   be excused for cause.

21            THE COURT:  It's overruled.

22            MR. BAXTER:  I don't think we need the last

23   one, do we, Judge?  I doubt we need the last one?

24            MR. MELSHEIMER:  That's the only one I have.

25            THE COURT:  16.

1            MR. BAXTER:  Oh, no, 16, we do need, yes,

2    sir.  I'm sorry.

3            MR. MELSHEIMER:  Yeah.

4            MR. BAXTER:  I forgot about 16.

5            THE COURT:  Mr. Watters?

6            Okay.  Hi, there.  It's nice to meet you.

7    Okay.  Tell me a little about what your conflict is.

8            MR. WATTERS:  Okay.  I have a family

9    business.

10            THE COURT:  Okay.

11            MR. WATTERS:  And we do -- it's a hardware

12    store, and I am pretty much responsible for ordering,

13    daily deposits, payroll, and all that kind of stuff.  So

14    as far as being out four days, that kind of throws a

15    kink in things, but being an hour and a half away --

16            THE COURT:  Who does those things when

17    you're not there?

18            MR. WATTERS:  Basically -- I mean, my dad

19    has some knowledge, but he doesn't have -- because he

20    runs the service business, so it's basically up to me,

21    so --

22            THE COURT:  All right.  I know it's an

23    imposition, but I can't excuse you for that.  You know,

24    I'm going to do my level best to move the case along and

25    get the evidence in as quickly as I can.

```
 1                 MR. WATTERS:  Okay.
 2                 THE COURT:  But it's -- that's not the kind
 3      of thing that I think should be --
 4                 MR. WATTERS:  Okay.  Is four days pretty
 5      much the --
 6                 THE COURT:  We'll try to finish it quicker
 7      than that, but I don't want you to count on that, okay?
 8                 MR. WATTERS:  Okay.
 9                 THE COURT:  I've given the lawyers a certain
10      amount of time in which they can present their cases,
11      and it's been my experience that they usually use the
12      time that I give them, so --
13                 MR. WATTERS:  Okay.
14                 THE COURT:  I'm just trying to level with
15      you.
16                 MR. WATTERS:  Okay.
17                 THE COURT:  That's about -- that's the
18      schedule I think you need to plan for.
19                 MR. MELSHEIMER:  Could I ask a question
20      here?
21                 THE COURT:  Yes.
22                 MR. MELSHEIMER:  May it please the Court.
23                 So you -- you made a comment at the end
24      about it looked like there were a whole bunch more
25      lawyers on one side than the other, that it looked like
```

1  a David and Goliath.  Could you -- could you maybe --

2           MR. WATTERS:  Well, honestly, I'm going to

3  be looking at things more from this point of view versus

4  big business.

5           MR. MELSHEIMER:  All right.

6           MR. WATTERS:  That's basically what I was --

7           MR. MELSHEIMER:  Yeah.  And so based on --

8           THE COURT:  Try and keep your voice up just

9  a little bit --

10          MR. WATTERS:  Okay.

11          THE COURT:  -- she's trying to make a good

12  record for us.

13          MR. MELSHEIMER:  And, Mr. Watters, I

14  appreciate your candor on that, and based on that, would

15  you say that starting out here in the trial, that if

16  this was a race, that maybe just in your mind the

17  plaintiff is going to be starting a little bit ahead of

18  the defendant because they are smaller business than

19  SAP?

20          MR. WATTERS:  The only thing that is in the

21  back of my mind is that if SAP infringed on this patent

22  in the first place, then why -- if it's such a good

23  company, why would they need to do that?

24          MR. MELSHEIMER:  All right.

25          MR. WATTERS:  That's just --

1            MR. MELSHEIMER:  And with that feeling that

2  you have, and I appreciate you saying that, would that

3  feeling that you have, would that kind of make you tend

4  to favor starting out the race that you put the

5  plaintiff just a little bit ahead of the defendant?

6            MR. WATTERS:  I could -- I could be fair,

7  but it's always in the back of my mind with my

8  background.

9            MR. MELSHEIMER:  Yeah.  And because -- you

10  think that background is something that's just always

11  going to be with you?

12            MR. WATTERS:  Well, it's just, you know,

13  small business is always having to fight bigger

14  businesses to stay in business.

15            MR. MELSHEIMER:  Right.

16            MR. WATTERS:  So I just have that kind of,

17  you know -- does that make sense?

18            MR. MELSHEIMER:  And that's totally -- we

19  all have our experiences, but because of that, isn't it

20  therefore likely to be the case because of that you're

21  going to start out the trial with the plaintiff a little

22  bit ahead than the defendant?

23            MR. WATTERS:  That's, yeah, basically in my

24  mind.

25            MR. MELSHEIMER:  And that's always going to

1   be there?

2              MR. WATTERS:  Unless I could see evidence

3   otherwise, strong evidence.

4              MR. MELSHEIMER:  But you'd start off with

5   that disposition?

6              MR. WATTERS:  Yes.

7              MR. MELSHEIMER:  Thank you.

8              MR. BAXTER:  Let me ask you this,

9   Mr. Watters, the Judge isn't ask -- going to ask you to

10  put out of your mind the fact that they infringe.  He's

11  already told you they do, and that's not going to go

12  away.  Here's the issue for us, is that on the issue of

13  damages how much they ought to pay for using our patent,

14  are we even on that?

15             MR. WATTERS:  As far as --

16             MR. BAXTER:  You hadn't heard any evidence.

17             MR. WATTERS:  Right.

18             MR. BAXTER:  You hadn't made up your mind.

19  He's not behind, I'm not ahead, I'm not behind, he's not

20  ahead, because you just hadn't heard anything, would

21  that be fair?

22             MR. WATTERS:  Right.  Right.

23             MR. BAXTER:  So on that issue, can you be

24  fair?

25             MR. WATTERS:  I believe so.

 1              MR. BAXTER:  Okay.  You -- you don't -- you

 2      don't have a predisposition they ought to pay a lot,

 3      they ought to pay a little, you don't know; is that

 4      fair?

 5              MR. WATTERS:  Yeah.

 6              MR. BAXTER:  Okay.  That's all I have,

 7      Judge.

 8              THE COURT:  Well, my question is do you

 9      think that throughout the trial, you're going to be able

10      to put aside your personal experiences of running a

11      small business and follow the law that the Court gives

12      you and apply to the evidence that you hear from the

13      witness stand and the documents, or is it the case that

14      you're always going to have in your mind the fact that

15      you're a small business owner and that you have to fight

16      large businesses to stay in business, and because of

17      that, Mr. Melsheimer's client is going to always start

18      behind?

19              MR. WATTERS:  Yeah.  I mean, I'm human.

20      It's -- you know, it's kind of hard to say I can totally

21      put that away, but I'm going to try.

22              THE COURT:  All right.

23              MR. WATTERS:  But, yeah.

24              THE COURT:  Thank you.  I understand.  No, I

25      appreciate -- appreciate your service.  Thank you, sir.

1              MR. WATTERS:  Okay.  Thank you.

2              MR. MELSHEIMER:  Thank you, sir.

3              THE COURT:  Be back ready to come in at

4    11:00 o'clock.

5              MR. WATTERS:  Okay.

6              THE COURT:  Is there a motion?

7              MR. MELSHEIMER:  A motion to disqualify for

8    cause.

9              THE COURT:  It's granted.

10             All right.  We've excused 1, I've excused,

11   let's see, it's No. 16 for cause.  I'm going to seat

12   eight.  You have four strikes each.  So that means take

13   down through 18.  If you strike below 18, you're burning

14   a strike, and I'll give you until 10 after to make your

15   strikes.

16             MR. MELSHEIMER:  Oh, thank you.

17             THE COURT:  Once you've -- once you've made

18   your strikes and turned your strike lists in to

19   Ms. Lockhart, exchange numbers with -- the people that

20   you struck, and if there's any additional challenges,

21   Batson challenges, then I'll take those up before I seat

22   the jury.

23             MR. MELSHEIMER: Okay.  Thank you.

24             THE COURT:  Okay.  But you've got -- you

25   have 21 minutes.  Somebody can use the down -- well --

1            MR. BAXTER:  We'll go next door, Your Honor,

2    and they can have it.

3            MR. MELSHEIMER:  Thank you.

4            THE COURT:  Mr. Williams, it's not

5    mathematically possible for us to reach you, so you're

6    going to be excused as soon as I let everybody go, but I

7    just -- I still need you to be back ready --

8            MR. WILLIAMS:  I'll just sit right there.

9            THE COURT: That will be fine.  Absolutely,

10   so you can just -- I'll dismiss you with the rest of the

11   folks, but it's -- there's -- we've got enough jurors

12   to --

13           MR. WILLIAMS:  I got -- my back is about

14   gone out on me, so I can't get around.

15           THE COURT:  Mr. Melsheimer?  Mr. Baxter?

16           MR. BAXTER:  Yes, Your Honor.

17           THE COURT:  I'm going to -- given his --

18   wait just a minute, Mr. Williams.  Given -- given your

19   back condition, I was going to go ahead and excuse him

20   at this time.

21           Is there any objection from the plaintiff?

22           MR. BAXTER:  No, Your Honor.

23           MR. MELSHEIMER:  No, Your Honor.

24           THE COURT:  Okay.  You're excused.  Thank

25   you.  Good luck.

```
 1                 (Bench conference concluded.)

 2                 Court's in recess.

 3                 COURT SECURITY OFFICER:  All rise.

 4                 (Recess.)

 5                 (Venire panel in.)

 6                 COURT SECURITY OFFICER:  All rise.

 7                 THE COURT:  Please be seated.

 8                 Ladies and gentlemen, please listen

 9      carefully, and if Ms. Lockhart calls your name, that

10      means that you've been selected to serve on this jury,

11      and if you will come forward at that time and take your

12      seat in the jury box.

13                 COURTROOM DEPUTY:  Marilyn Richardson, Eva

14      Borens, Larry Luman, Sherry Bankston, Michael Denton,

15      Celeta Parker, and Jill McMillan, and Gina Clements.

16                 THE COURT:  All right.  My next comments are

17      directed to those of y'all who are seated in the

18      audience.  Thank you for your patience today throughout

19      the process.  Our system won't work unless we summon

20      more folks than are actually needed to select any

21      particular jury, but you've performed a very important

22      public service for your country today just by being here

23      and participating in the -- the jury selection process.

24                 Our country is the only one in the world

25      that allows for trial by jury of civil disputes, and
```

1    that's by virtue of the 7th Amendment to the U.S.

2    Constitution.  So by being here today, you have done

3    your -- your part to participate in our constitutional

4    form of government, and for that, you've got the thanks

5    of both the parties and as well as of the Court for your

6    attention and your patience throughout the process

7    today.

8              Your jury service is now at an end.  This is

9    the only case that you're required to participate in

10   this term of court.  Please have a nice rest of the

11   afternoon, and don't forget to turn your buttons back in

12   to Ms. Anderson.  That will keep her off my back.  So

13   have a nice day and a nice weekend.  Y'all are excused.

14             (Venire panel out.)

15             THE COURT:  All right.  The folks that are

16   in the jury box, if you'll stand at this time and take

17   the oath of a juror.

18             COURTROOM DEPUTY:  Please raise your right

19   hand.

20             (Jurors sworn.)

21             THE COURT:  Okay.  If you'll have a seat,

22   I've got a few parting -- parting instructions for you.

23             You've now been selected as the jury in this

24   case.  When you go home tonight from, you know, jury

25   duty, your spouse or significant other, friends may say,

1    "Well, how was jury duty?"  And you're going to tell

2    them, "It was great.  I got picked."  Then they're going

3    to say, "Well, tell us what the case is about."  Don't

4    answer that question, okay?

5          Please just tell them, whoever is asking,

6    that the Judge said I'm not allowed to talk about the

7    case, because as soon as you answer that question, then

8    they're going to say, "Well, I know something about that

9    kind of case."  And that's -- you're getting information

10   from somebody that's external to the case and to the --

11   to the Court's processes, and I want you to decide this

12   case based on the testimony that you hear from the

13   witnesses who have sworn to tell you the truth under

14   oath and from the documents that the Court has reviewed

15   and that the Court's allowed into evidence for you to

16   consider.

17          So that's the -- those are the matters that

18   constitute evidence, and those are the matters that the

19   jury is bound to consider when deciding the issues in

20   the case.  So please, if somebody asks you what it's

21   about, please just tell them, "The Judge told me not to

22   talk about it."

23          The second thing is you should not do any

24   outside research, and this is for the same reason.  I

25   want you to decide the case based on the evidence that's

1    been admitted under the rules of the Court.  So don't --

2    if, for instance, there's a news broadcast on television

3    or a radio broadcast on the radio as you're driving back

4    and forth to the courthouse, you should change the

5    channel, change the station, and don't watch or listen

6    to those.

7            You shouldn't do any research into the

8    internet into the types -- type of case, the parties

9    that are involved, or the technology that's involved,

10   because, again, that's getting information that you

11   really should not consider in determining the facts.

12           So I don't know -- this is becoming more

13   common in recent years, but I don't know if any of y'all

14   use Twitter or Facebook or any type of social media

15   site, but you should not post anything about your jury

16   service of the case on any type of Facebook account or

17   any other type of social media website because there

18   have been cases that have been retried because jurors

19   communicated with other folks about their jury service

20   over their Facebook account.  So if -- if you have those

21   types of accounts, do not use them to discuss any part

22   of the -- of the lawsuit.

23           And, finally, I don't think that any -- I'm

24   confident this won't happen in this case, but I'm going

25   to give you the instruction anyway.  Nobody should

1   contact you about your jury service unless they are

2   associated with the Court.  Nobody associated with a law

3   firm or any type of a media outlet, any type of

4   investigator, nobody should be contacting you about your

5   jury service.  I don't think it will happen in this

6   case.  I would be shocked if it did happen, but if it

7   were to happen, you need to report that to the court

8   clerk immediately so we can discuss it.

9          Those are -- those are the legal

10  instructions.  Now I'll give some practical

11  instructions.  Our Court days generally go from 8:30 in

12  the morning until a little after 5:00 in the afternoon.

13  We'll take a morning recess about right around 10:00

14  o'clock for about 20 minutes, and then we'll take a

15  lunch recess from noon, I usually take an hour and 15

16  minutes.  That will give you an opportunity to have

17  lunch from about noon to 1:15.  Those times might vary

18  in case I've got another matter to take up over the

19  lunch hour, maybe we'll break at 12:15, and I'll bring

20  you back at 1:30, but you'll generally have an hour and

21  15 minutes for lunch.  You'll also have another 20

22  minute recess in the afternoon.

23          If you'll be here at the courthouse about

24  8:20, 8:25  in the morning, it will help us to start on

25  time.  I'll try to start every day on time.  There may

1   be situations where I have to take up a matter outside

2   your presence in this case or maybe even a different

3   case, but I'll try to start as close to 8:30 in the

4   morning as I can.

5           I believe that there are facilities in the

6   jury room for you to -- a microwave and refrigerator if

7   you want to bring your lunch.  There are several

8   restaurants around the square that you can walk to, and

9   you should have opportunity and ample time to go out to

10  lunch if you want to, but I usually bring mine when I'm

11  in trial.  But if you want to do that, you're free to do

12  that, as well.

13          If you don't mind, leave your contact

14  information, cell phone numbers, with Ms. Anderson when

15  you leave today, and should anything change about the

16  schedule, the court clerk will be able to get in touch

17  with you.

18          That's all I've got for you today.  Please

19  have a nice weekend.  Travel safely.  And I'll see you

20  the morning of the 9th.  You're excused.

21          COURT SECURITY OFFICER:  Rise for the jury.

22          (Jury out.)

23          THE COURT:  All right.  Anything further

24  from the plaintiff regarding jury selection?

25          MR. BAXTER:  No, Your Honor.

```
 1                  THE COURT:  From the defendant?

 2                  MR. MELSHEIMER:  No, Your Honor.

 3                  THE COURT:  All right.  I'll see you next --

 4       I believe it's next Friday at 3:00 o'clock.

 5                  MR. BAXTER:  Yes, Your Honor.

 6                  THE COURT:  That's our next meeting.  All

 7       right.

 8                  MR. BAXTER:  Thank you, Judge.

 9                  THE COURT:  Y'all have a nice weekend.

10                  Court's in recess.

11                  COURT SECURITY OFFICER:  All rise.

12                  (Jury selection concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of my ability.

 7

 8

 9
      SHELLY HOLMES                           Date
10    Deputy Official Reporter
      State of Texas No.: 7804
11    Expiration Date: 12/31/12

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```