```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  VERSATA SOFTWARE, INC.,  ) Civil Docket No.
    ET AL                    ) 2:07-CV-00153-CE
 4                           ) May 9, 2011
    VS.                      ) 8:30 A.M.
 5                           )
    SAP AMERICA, INC., ET AL )
 6

 7               TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE CHAD EVERINGHAM
 8               UNITED STATES MAGISTRATE JUDGE

 9  APPEARANCES:
    FOR THE PLAINTIFF:         MR. SAM BAXTER
10                             McKool Smith, P.C.
                               104 E. Houston Street
11                             Suite 300
                               Marshall, Texas  75670
12
                               MR. SCOTT L. COLE
13                             MR. STEVEN J. POLLINGER
                               MS. LAURIE L. FITZGERALD
14                             MR. KEVIN M. KNEUPPER
                               MS. LEAH B. BURATTI
15                             McKool Smith, P.C.
                               300 W. 6th Street, Suite 1700
16                             Austin, Texas 78701

17                             MS. ADA BROWN
                               MR. STEVEN CALLAHAN
18                             McKool Smith, P.C.
                               300 Crescent Court, Suite 1500
19                             Dallas, Texas 75201

20  APPEARANCES CONTINUED ON NEST PAGE:

21  COURT REPORTERS:           SHELLY HOLMES, CSR
                               GLENDA FULLER, CSR
22                             Deputy Official Court Reporters
                               100 East Houston, Suite 125
23                             Marshall, TX 75670
                               903/935-3868
24
    (Proceedings recorded by mechanical stenography,
25  transcript produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:        MR. THOMAS M. MELSHEIMER
                               MR. MICHAEL A. BITTNER
 3                             Fish & Richardson, P.C.
                               1717 Main Street, Suite 5000
 4                             Dallas, Texas 75201

 5                             MR. JOHN W. THORNBURGH
                               MR. JUSTIN M. BARNES
 6                             Fish & Richardson, P.C.
                               12390 El Camino Real
 7                             San Diego, California 92130

 8                             MR. JAMES R. BATCHELDER
                               Robes & Gray, LLP
 9                             1900 University Avenue
                               6th Floor
10                             East Palo Alto, California 94303

11                             MR. CHRISTOPHER BUNT
                               Parker Bunt & Ainsworth
12                             100 E. Ferguson, Suite 1114
                               Tyler, Texas 75702

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2  LAW CLERK:  All rise.

3                    (Jury in.)

4                    THE COURT:  Please be seated.

5                    Good morning, ladies and gentlemen.  I

6  hope you had a nice weekend.  The process today is going

7  to begin with some preliminary instructions that the

8  Court is going to give, followed by the opening

9  statements of the lawyers at which time it will probably

10  be pretty near time to take our morning recess, but we

11  may get a little bit of testimony in before we break.

12  But that's the process for the morning session.

13                    Members of the Jury, you have now been

14  sworn as the Jury to try this case.  As the Jury you

15  will decide the disputed questions of fact.

16                    As the Judge I will decide all questions

17  of law and procedure.  From time to time during the

18  trial and at the end of the trial, I will instruct you

19  on the rules of law that you must follow in making your

20  decision.

21                    First I'm going to talk about what a

22  patent is and how one is obtained.  This case involves a

23  dispute relating to a United States patent.  Before

24  summarizing the positions of the parties and the legal

25  issues involved in the dispute, let me take a moment to

1  explain what a patent is and how one is obtained.

2           The United States Constitution grants

3  Congress the powers to enact laws to promote the

4  progress of science and useful arts by securing for

5  limited times to authors and inventors the exclusive

6  rights to their respect writings and discoveries.  With

7  this power, Congress enacted the patent laws.

8           Patents are granted by the United States

9  Patent and Trademark Office, sometimes called the PTO.

10  The process of obtaining a patent is called patent

11  prosecution.  A valid United States patent gives the

12  patent owner the right for up to 20 years from the date

13  the patent application was filed to prevent others from

14  making, using, offering to sell, or selling the patented

15  invention within the United States or from importing it

16  into the United States without the patentholder's

17  permission.

18           A violation of the patent owner's rights

19  is called infringement.  The patent owner may try to

20  enforce a patent against persons believed to be

21  infringers by a lawsuit filed in federal court.

22           Now, to obtain a patent, one must file an

23  application with the PTO.  The PTO is an agency of the

24  federal government and employs trained examiners who

25  review applications for patents.  The application

1    includes what is called a specification, which must

2    contain a written description of the claimed invention

3    telling what the invention is, how it works, how to make

4    it, and how to use it so others skilled in the field

5    will know how to make and use it.

6           The specification concludes with one or

7    more numbered sentences; these are called patent claims.

8    When the patent is -- is eventually granted by the PTO,

9    the claims define the boundaries of its protection and

10   give notice to the public of those boundaries.

11          After the applicant files a patent

12   application, a PTO examiner reviews the patent

13   application to determine whether the claims are

14   patentable and whether the specification adequately

15   describes the invention claimed.  In examining a patent

16   application, the patent examiner reviews records

17   available to the PTO for what is referred to as prior

18   art.  The examiner also will review prior art if it is

19   submitted to the PTO by the applicant.

20          In general, prior art includes things that

21   existed before the claimed invention that were publicly

22   known or used in a publicly accessible way in this

23   country or that were patented or described in a

24   publication in any country.  The examiner considers,

25   among other things, whether each claim defines an

1  invention that is new, useful, and not obvious in view

2  of the prior art.

3             A patent lists the prior art that the

4  examiner considered.  This list is called the cited

5  references.  After the prior art search and examination

6  of the application, the patent examiner then informs the

7  applicant in writing what the examiner has found and

8  whether any claim is patentable and thus will be

9  allowed.  This writing from the patent examiner is

10 called an office action.

11            If the examiner rejects the claims, the

12 applicant then responds and sometimes changes the claims

13 or submits new claims.  This process which takes place

14 only between the examiner and the patent applicant may

15 go back and forth for some time until the examiner is

16 satisfied that the application and claims meet the

17 requirement for a patent.  The papers generated during

18 this time of communicating back and forth between the

19 patent examiner and the applicant make up what is called

20 the prosecution history.  All of this material becomes

21 available to the public no later than the date when the

22 patent issues.

23            Now, each of you will have a notebook

24 after the first break which contains the '350 patent and

25 the meaning of certain terms that are used in the '350

1    patent.  I'm going to give you some additional

2    instructions before we start the second session this

3    morning about the patent that's actually at issue in

4    this case, but you'll have that for your use during the

5    course of the trial along with the Court's definitions

6    of certain terms that are in the patent.

7                    But I want to give you an overview at this

8    time of the positions of the parties to this lawsuit.

9    And to help you follow the evidence, I'm going to give

10   you a summary of those positions.

11                   The Plaintiffs in this case are Versata

12   Software, Incorporated, formerly known as Trilogy

13   Software, Incorporated, Versata Development Group,

14   formerly know as Trinity -- or excuse me, Trilogy

15   Development Group, Incorporated, and Versata Computer

16   Industry Solutions, Incorporated, formerly known as

17   Trilogy Computer Industry Solutions, Incorporated.  I'll

18   refer to them collectively as either the Plaintiffs,

19   Versata or Trilogy.

20                   The Defendants in this case are SAP

21   America, Incorporated, and SAP AG.  I'll refer to them

22   collectively as either the Defendants or SAP.

23                   This is a trial in part on patent damages

24   and the one patent being asserted in this case is United

25   States Patent No. 6553350.  This patent may be referred

1  to as the '350 patent.  This patent may also be referred

2  to as either the patent at issue or the patent-in-suit.

3           It's been previously determined that the

4  '350 patent is valid and is infringed by the Defendants.

5  Your job as the Jury will be to determine the amount of

6  damages owed to the Plaintiff.

7           The Plaintiffs also allege that since May

8  the 6th, 2010, SAP has continued to directly infringe

9  certain claims of the '350 patent in connection with its

10  making, using, selling, offering to sell, and importing

11  certain products.

12           The Plaintiffs further allege that SAP has

13  continued to induce and contribute to the infringement

14  of the '350 patent by others.  SAP denies Versata's

15  claims.  SAP asserts that the Plaintiffs are not

16  entitled to the amount of damages they seek and that

17  since May 6th, 2010, its products no longer infringe the

18  claims of the '350 patent.

19           Your job will be to decide whether the

20  Defendants directly infringe or have induced

21  infringement of the asserted claims of the '350 patent

22  since May the 6th, 2010.  If you decide that the

23  Defendants have infringed or have induced infringement

24  of those claims, then you must determine any additional

25  money damages to be awarded to the Plaintiffs to

1  compensate them for the infringement.

2          Your job is also going to be to determine

3  the nature and amount of damages that the Plaintiffs are

4  entitled to as a result of the infringement that was

5  previously determined to have occurred.

6          So those are the types of facts that the

7  Jury in this case is going to be called upon to

8  determine.

9          Now, it's my job as Judge to determine the

10  meaning of any claim language that needs interpretation.

11  You must accept the meanings I give you and use them

12  when you decide whether any claim of the patent has been

13  infringed.  And you'll be provided, as I indicated, a

14  copy of the meanings of the claim terms later this

15  morning when you get your Jury notebooks.

16          I'll give you a brief outline of the

17  trial.  Soon the lawyers for the parties will make what

18  is called an opening statement.  Opening statements are

19  intended to assist you in understanding the evidence.

20  What the lawyers say is not evidence.

21          After the opening statements, the parties

22  will present their evidence.  After all the evidence is

23  presented, the lawyers will again address you to make

24  final arguments.  Then I will instruct you on the

25  applicable law and you'll then retire to deliberate on a

1  verdict.

2            I'll now say a few words about your

3  conduct as Jurors.  First, you are not to discuss this

4  case with anyone, including your fellow jurors, members

5  of your family, people involved in the trial or anyone

6  else, nor are you allowed to permit others to discuss

7  the case with you.  If anyone approaches you and tries

8  to talk to you about the case, please let me know about

9  it immediately.

10           Let me say another word about the use of

11  cell phones to communicate with people during the course

12  of the trial.  Not in this district but across the

13  United States in the last 18 months, there have been

14  more than one trial where Jurors during the course of

15  the day, lunch breaks or otherwise, have used their cell

16  phones to access Facebook or Twitter and they just

17  couldn't resist telling their friends how the trial was

18  going.

19           So what that eventually results in is the

20  Court having to grant a new trial and then the time and

21  effort that the parties and lawyers have spent getting

22  to this point will be wasted.  So please avoid using any

23  social media websites and the like during the course of

24  the trial, okay?

25           You also should not read any news stories

1    or articles or listen to any radio or television reports

2    about the case or anyone who's had anything to do with

3    it.  Third, do not do any research, such as consulting

4    dictionaries, searching the internet or using other

5    reference materials and do not make any investigation

6    about the case on your own.

7                Fourth, if you need to communicate with

8    me, simply give a signed note, either to the briefing

9    attorney, Mr. Woloson who's here, or to one of the

10   security officers outside the Jury room and they'll give

11   it to me.

12               Fifth, do not make up your mind about what

13   the verdict should be until after you've gone to the

14   Jury room to decide the case and you and your fellow

15   Jurors have discussed the evidence.  Keep an open mind

16   until then.

17               Now, during the trial it may be necessary

18   for me to confer with the lawyers out of your hearing or

19   to conduct a part of the trial outside of your presence.

20   I will handle these matters as briefly and as

21   conveniently for you as I can, but you should remember

22   that they are a necessary part of any trial.

23               Let's talk about what constitutes

24   evidence.  The evidence you are to consider in deciding

25   what the facts are consists of:  One, the sworn

1  testimony of any witness.  Two, the exhibits which are

2  received into evidence; and three, any facts to which

3  the lawyers stipulate.

4           What is not evidence?  The following

5  things are not evidence and you must not consider them

6  as evidence in deciding the facts of this case.  Number

7  one, statements and arguments of the attorneys.  Two,

8  questions and objections of the attorneys.  Three,

9  testimony that I instruct you to disregard; and four,

10 anything you may see or hear when the court is not in

11 session, even if what you see or hear is done or said by

12 one of the parties or by one of the witnesses.

13          Now, evidence may be direct or

14 circumstantial.  Direct evidence is direct proof of a

15 fact, such as testimony by a witness about what that

16 witness personally saw or heard or did.  Now,

17 circumstantial evidence is proof of one or more facts

18 from which you could find another fact.

19          Now, I'm going to give you an example that

20 I've used in prior cases about the difference between

21 direct and circumstantial evidence.  I have a young son

22 and he really likes cake, okay?  So that's -- his

23 favorite dessert is cake and occasionally his mother

24 will bake, on Sunday afternoons, a sheet cake, his

25 favorite is the yellow sheet cake with chocolate

1  frosting.  She'll set it out to cool in the afternoon

2  with the intention that it be for dessert after supper.

3         Now, occasionally I'll come into the

4  kitchen in the afternoon and a corner will be missing

5  from an otherwise perfectly rectangular cake.  And there

6  may be crumbs across the dining room floor into his

7  bedroom.  I might find him in the bedroom with chocolate

8  frosting on his cheeks and a smile on his face.  I might

9  ask him, now Chance, did you eat that piece of cake.

10 Now, he might tell me no and that would be direct

11 evidence, that's what a witness personally saw or heard

12 or did.

13         And as a parent I might choose to

14 disbelieve that direct evidence in favor of the

15 circumstantial evidence of the missing piece of cake,

16 crumbs across the floor, and the chocolate frosting on

17 his cheeks.  So that's why the law allows the Jurors to

18 consider both types of evidence.  And you should

19 consider both kinds of evidence and the law makes no

20 distinction between the weight to be given to either

21 direct or circumstantial evidence.  It's for to you

22 decide how much weight to give any evidence.

23         In deciding the facts in this case, you

24 may have to decide which testimony to believe and which

25 testimony not to believe.  You may believe everything a

1  witness says, part of it, or none of it.

2          In considering the testimony of any

3  witness, you may take into account:  One, the

4  opportunity and ability of the witness to see, hear, or

5  know the things testified to;

6          Number two, the witness' memory;

7          Three, the witness' manner while

8  testifying;

9          Four, the witness' interest in the outcome

10  of the case and any bias or prejudice;

11          Five, whether other evidence contradicted

12  the witness' testimony;

13          Six, the reasonableness of the witness'

14  testimony in light of all of the evidence;

15          And finally, seventh, any other factors

16  that bear on believability.

17          The weight of the evidence as to a fact

18  does not necessarily depend on the number of witnesses

19  who testify.

20          Now, you must consider only the evidence

21  in this case; however, you may draw such reasonable

22  inferences from the testimony and exhibits as you feel

23  are justified in the light of common experience.  You

24  may make deductions and reach conclusions that reason

25  and common sense leave you to make from the testimony in

1  evidence.  Your collective common sense will be the most

2  important tool that you will bring into the courtroom

3  today and throughout this trial.  Do not leave your

4  common sense outside the courtroom because that is what

5  will guide you through your decisions and your

6  deliberations.

7            Now, the testimony of a single witness may

8  be sufficient to prove any fact, even if a greater

9  number of witnesses may have testified to the contrary

10  if, after considering all the evidence, you believe that

11  single witness.

12            Now, when a party has the burden of proof

13  on any claim or affirmative defense by a preponderance

14  of the evidence, it means you must be persuaded by the

15  evidence that the claim or affirmative defense is more

16  likely true than not true.

17            When knowledge of technical subject matter

18  may be helpful to the Jury, a person who has special

19  training or experience in that technical field, called

20  an expert witness, is permitted to state his or her

21  opinion on those technical matters.  However, you are

22  not required to accept that opinion.  As with any other

23  witness, it is up to you to decide whether to rely upon

24  it.

25            Now, during the trial of this case,

1    certain testimony may be presented to you by way of

2    deposition.  The testimony of a -- of a witness who, for

3    some reason, cannot be present to testify from the

4    witness stand is usually presented in writing or by way

5    of video, under oath, in the form of a deposition.

6              Such testimony is entitled to the same

7    consideration and, insofar as possible, is to be judged

8    as to credibility, weighed and otherwise considered by

9    the Jury in the same way as if the witness had been

10   present and had given from the witness stand the

11   testimony read or shown to you from the deposition.

12             Now, it's the duty of the attorney on each

13   side of a case to object when the other side offers

14   testimony or other evidence which the Jury believes is

15   not properly admissible.  Now, upon allowing testimony

16   or other evidence to be introduced over the objection of

17   an attorney, the Court does not, unless expressly

18   stated, indicate any opinion as to the weight or effect

19   of such evidence.

20             As stated before, the Jurors are the sole

21   judges of the credibility of all the witnesses and the

22   weight and effect of all of the evidence.

23             Now, when the Court has sustained an

24   objection to a question addressed to a witness, the Jury

25   must disregard the question entirely and may draw no

1   inference from the wording of it or speculate as to what

2   the witness would have said if permitted to answer any

3   question.

4           Now, the law of the United States permits

5   the Judge to comment to the Jury on the evidence in the

6   case.  Such comments are only expressions of the Judge's

7   opinions as to the facts and the Jury may disregard them

8   entirely since the Jurors are the sole judges of the

9   fact.

10          Is the Rule to be invoked?

11          MR. COLE:  We don't need to, Your Honor.

12          MR. MELSHEIMER:  We don't need to either,

13  Your Honor.

14          THE COURT:  All right.  Well, this

15  concludes my preliminary remarks and instructions.

16          Is the Plaintiff ready to proceed?

17          MR. COLE:  Plaintiff is ready, Your Honor.

18          THE COURT:  Defense ready?

19          MR. MELSHEIMER:  We are, Your Honor.

20          THE COURT:  All right.  Plaintiff, you may

21  make your opening statement.

22          MR. COLE:  Thank you.

23          THE COURT:  I'll let you know when you

24  have five minutes left.  Mr. Cole.

25          MR. COLE:  May it please the Court.

1                    THE COURT:  Mr. Cole.

2                    MR. COLE:  Good morning.  We're here today

3    because the Defendant, SAP, saw our valuable software

4    invention in the market, realized that they needed it,

5    and then decided to just take it for themselves.  And

6    that infringed our patent.

7                    And as the Court told you, SAP's

8    infringement has already been decided.  They infringed

9    the patent.  We know that happened.

10                   Your question is to decide what is the --

11   what are the damages for that infringement?  How much

12   harm did the infringement cause to us?  And the evidence

13   will show you that in this industry, software is sold

14   for millions of dollars to very large companies.  And in

15   this industry we were successfully selling our patented

16   product to these very large companies, to dozens of

17   them.  That is, we were succeeding until SAP took our

18   invention and bundled it into their own competing

19   products and in the process, they turned a once thriving

20   business into a shadow of what it was before.

21                   And when SAP made the change to their

22   software that infringed the patent, that is what led to

23   the infringement.  That's what brought us here today.

24                   Now, my name is Scott Cole, I'm one of the

25   lawyers for the Plaintiff.  You've heard the names

1   Versata and Trilogy.  Trilogy is the old name for

2   Versata and since that was the name of the company back

3   at the time we're going to be talking about, we're going

4   to use the name Trilogy to try to keep things simple.

5   Most of the documents you'll see will talk about

6   Trilogy.

7           Now, I think you met my boss, Mr. Baxter,

8   at voir dire and just to briefly introduce the other

9   folks you'll see from our side, Ada Brown, Laurie

10  Fitzgerald, and then Steve Pollinger hiding in the back,

11  as well is Mr. Jacops, our CEO, and then Chris Smith,

12  who's also one of the Trilogy employees, he's the Chief

13  Operating Officer.  Then the last person I'll introduce

14  is sitting in the back is Tom Carter.  Mr. Carter is the

15  inventor of the patent that we're talking about here

16  today and he's going to be our first witness as soon as

17  we're done with opening statements.

18          Now, let me tell you a little bit about

19  Trilogy.  Trilogy is a software company based in Austin

20  and Trilogy specializes in building and selling business

21  software, which is software designed for big companies

22  to run, rather than things that you or me might use,

23  like QuickBooks or Microsoft Word or something like

24  that.

25          And in particular the particular area of

1    software is -- that we're going to be talking about is

2    called pricing software and it's software that lets big

3    companies efficiently organize and manage the prices

4    that they set when they're selling thousands of

5    different products to thousands of different customers

6    in thousands of different ways.  That's the technology

7    we'll be talking about here in this case.

8              Now, let me give you a little background

9    about Mr. Carter's invention in the area of pricing

10   software and we have to go back to 1995.  And Tom Carter

11   was out in 1995 selling Trilogy Software, traveling

12   around the country, talking to hundreds of these big

13   companies about their software needs.  And when he was

14   doing that, he noticed that in the area of pricing

15   software, these companies were having some serious

16   problems.

17             Are we -- are we switched to menu?  I'm

18   sorry.

19             Ah, there we go.  And the problems Mr.

20   Carter saw with the pricing systems that existed at the

21   time was, and you'll hear a lot about these, they were

22   hard to keep up-to-date and keep current.  They were

23   also very inflexible; they didn't let these companies

24   implement the kind of pricing strategies they always

25   wanted to do.  And the last thing he saw was that the

1  systems were very, very slow and that caused a lot of

2  problems in and of itself.

3          And when he saw these problems, something

4  occurred to him as a way to solve them.  Something that

5  cut totally against the grain of the conventional wisdom

6  at the time, and he -- he came up with a solution that

7  solved those problems and was a success in the

8  marketplace.

9          And with Mr. Carter's invention for the

10  very first time, you could actually take one of these

11  big corporate pricing systems and put it on a laptop

12  computer to give to your sales representatives when they

13  would go out and sit in the office with a customer

14  trying to close a deal.  And before that, they would

15  have to sit there, try to get the customer interested in

16  a product and then say okay, I've got to go back to the

17  corporate headquarters and tell you how much it's going

18  to cost.  And as you might imagine, sales reps do not

19  want to have to leave and go back when they're on the

20  verge of closing a sale.

21          With Mr. Carter's invention, you could do

22  it right then and there.  It was a revolutionary advance

23  in the field of pricing.

24          Mr. Carter filed for a patent on his idea

25  in 1996.  And the U.S. Patent Office reviewed it and

1 agreed that it was deserving of a patent, and this is a

2 copy of the '350 patent or the Carter patent, it's

3 Plaintiffs' Exhibit 2, you'll see this during the course

4 of the trial.

5          And not only did he file for a patent, he

6 also built a product based on his patented idea.  He

7 built a product called Pricer and then Trilogy set out

8 to go sell that to the marketplace and build a business

9 around it.  And when Pricer was launched, the

10 marketplace immediately saw the value that was there.

11          This is an article in February of 1998.

12 This is a couple of years after Pricer was launched and

13 this is from USA Today newspaper.  And they're noting

14 here that software pioneers, and that's talking about

15 Trilogy, had taken the pain out of pricing.  And the

16 quote you see here is from a guy named Jack Maynard of

17 the Aberdeen Group and who that is, that is -- that's a

18 consulting group that is paid by big companies to

19 evaluate software options and make recommendations to

20 these big companies on what they should buy.  And as he

21 said in 1998, Trilogy was the Rolls-Royce of the pricing

22 industry.

23          In the first three and a half years that

24 Trilogy was selling Pricer, this new product, from 1995

25 until late 1998, they sold it to over 50 companies.

1   Many of them some of the largest companies in the world;

2   Goodyear, Whirlpool, Bridgestone Tires and many, many

3   more.

4              Now, as -- as Trilogy was making these

5   sales and as Pricer was taking off in the marketplace,

6   another company noticed the product as well and that

7   company was SAP.  SAP was also selling business software

8   at the same time to the same kinds of companies.  And

9   what SAP saw when they saw Pricer was something

10  different.  They saw a threat.

11             This is an internal SAP e-mail from

12  November of 1997.  This is, again, before SAP introduced

13  the feature that changed their product.  And they're

14  talking about a sales opportunity that they were looking

15  at for Goodyear Tire.  As you can see here, there's an

16  urgent situation at Goodyear.  They have possibly 2,000

17  seats at risk, and what a seat is that's like an

18  individual software license.  In other words, Goodyear

19  would be buying 2,000 licenses to software.

20             SAP wanted that business and they saw that

21  Trilogy was there pushing their pricing offer.  And it

22  was particularly concerning to SAP because Goodyear was

23  one of SAP's oldest customers and if Trilogy could win

24  that account, it would be a major win.  Well, SAP's

25  concern was justified because Trilogy did win that

1    account.   They won the Goodyear business.

2                    Now, let me tell you a little more before

3    we go further about SAP.  SAP is the third largest

4    software company in the world behind Microsoft and

5    Oracle.  They're based in Germany and their traditional

6    strength is in the area of what's called back office

7    software.  It's a part of business software that's

8    designed to handle things like manufacturing or

9    accounting or warehouse and inventory.  The things that

10   are different than when you actually go and talk to the

11   customer, like the Trilogy software was.

12                   And SAP was very, very successful in back

13   office software.  And by the mid '90s and the late '90s,

14   they really dominated that industry.  But having

15   dominated that industry, it leads to a bit of a

16   challenge, which is how do we grow from here?  Once

17   we've gone this far, how do we keep growing.  And in

18   order to grow, they needed new products.  They needed

19   new ideas and new things to offer their customers.

20                   And so when SAP heard about Pricer, they

21   saw a threat as you saw, but they also saw an

22   opportunity.  And one of the things SAP thought about in

23   the early days, this is in May of 1997, was maybe we

24   could enter into negotiations with Trilogy to purchase

25   the code for SC Pricer.  This is an e-mail from a guy

1    named Dr. Bernhard Neumann, and you'll hear his name a

2    number of times.

3              So one thing they thought about, let's

4    talk to Trilogy about this product and maybe we can buy

5    it, maybe we can pay them for this new product so we can

6    offer it.  But that was not the decision SAP ultimately

7    made.

8              Instead, what they decided to do was to

9    just take Mr. Carter's idea and bundle that into their

10   own products, sell them themselves, and pay Trilogy

11   nothing.

12             And when that happened, Trilogy's sales

13   that had been -- Trilogy's sales that had been very

14   successful up until that point slowed down to --

15   sorry -- sorry.  Somehow I got off on my PowerPoint.

16             VIDEO TECH:  Scott, you need to turn the

17   switch on.

18             MR. COLE:  Oh, there you go.  Sorry.  This

19   is why -- do you have the -- the customer chart?  Well,

20   I -- I apologize, I had a chart in there.

21             Anyway, what you'll -- you will see

22   shortly a -- a demonstration of how much Trilogy

23   Software sold in the market and from 1995 until 1998

24   when SAP made the change to their software, you will see

25   about 60 customers that bought Pricer before SAP changed

1    its product.  And the sales went from two in 1995, then

2    they sold sixteen new customers in 1996, and then

3    eighteen new customers in 1997, twenty-five new

4    customers in 1998, and that's when SAP introduced their

5    new feature.  And once that happened, in 1999 at the

6    very height of the technology boom, SAP's Pricer sales

7    went from twenty-five to seven, and then four and then

8    one and then finally to none.

9           And that -- all of that happened once SAP

10   took our idea and put it into their own product.  That's

11   what they did.  They took Mr. Carter's idea.  Rather

12   than paying for the source code, they bundled it into

13   their own product, sold it in competition with us and

14   destroyed a business that was booming before that.  So

15   that's what they did.  That was what they did.

16          Let's talk a little bit about why they did

17   it.  Why did they go about it this way.

18          The reason is, to understand now we got to

19   go back in time.  About a year before they introduced

20   the new feature, to 1997, the feature was introduced in

21   October '98, this is about a year before that.  Again,

22   this is Dr. Bernhard Neumann, an SAP engineer, and

23   they're discussing a problem they were having at this

24   time.

25          He says, I'd like to make you aware of

1    some recent opinions from Paul Wahl.  And Paul Wahl was

2    the number one guy at SAP's America operation, he was

3    the head of their U.S. operations.  And the concern is

4    there's a fact that more and more SAP America sales

5    people are recommending our prospects and customers use

6    Trilogy's configurator and pricing engine.

7            Now, think about that for a minute.  SAP's

8    own sales people are recommending that their customers

9    use Trilogy's pricing solution.  SAP had their own

10   pricing solution at the time, but it had all those

11   problems that Mr. Carter had seen.  And because Pricer

12   was that much better, SAP's own sales people were

13   recommending it, they were recommending a competitor's

14   product.  That gives you a sense for the problems SAP

15   was having at the time.

16           Not only that, they saw that because of

17   the problems they were having, Trilogy was raking in the

18   cash among their customers and they didn't like that.

19   And Dr. Neumann, again, the same guy, again 1997, he was

20   really candid, he acknowledged it bothered him, bothered

21   him that Trilogy was always one step ahead in this

22   market.

23           But not for long because back at SAP's

24   research and development group in Germany, they were

25   studying Pricer to figure out how it worked to

1    understand why it was better and to decide how could

2    they improve their products to make it work like

3    Trilogy.  And their goal was clear.  This is the goal in

4    the research and development of coming up with a new

5    pricing product.  The goal was to stop Trilogy.  That's

6    why they were making the changes to their software

7    product.  Let's stop Trilogy and build market share in

8    the SCE/SPE market.  And SPE stands for sales pricing

9    engine and that was a pricing product that SAP was

10   working on to compete with Trilogy.

11           And once they learned about Pricer, once

12   they saw how it worked, they decided that their original

13   goal for R&D, their original approach to build a new

14   product was wrong.  They needed to change their

15   development strategy.  Here in 1998, this is a few

16   months later but still seven months before they came out

17   with the infringing feature, you can see here, this is

18   from Paul Wahl, again the number one guy at SAP's United

19   States operation, and he's sending it to a number of

20   people, including the guy at they very end, you see

21   Peter Zencke.  And Dr. Zencke was the worldwide head of

22   SAP's R&D Department and they're talking about the sales

23   pricing engine that they were working on.  You see here

24   this is internal distribution only.

25           And in background he says the original

1   requirement of the SPE was to provide standard R/3

2   pricing in its detached mode; in other words, the

3   original requirement was to use our normal pricing

4   approach, R/3 was a SAP product, use our normal approach

5   and try to put that on a laptop.  That's what we should

6   do.

7              But as you can see due to market pressures

8   from Trilogy and SAP development plans, the competitive

9   landscape has changed.  And because the competitive

10  landscape changed, they changed their development

11  efforts and that led to this feature.

12             You'll hear this word a lot, hierarchical

13  access.  In hierarchical access, that's the pricing

14  system that SAP came up with that included Mr. Carter's

15  invention that they sold in their own products.  This

16  came out in October 1998.  And what you see here, this

17  is a document that SAP would give to its customers that

18  bought hierarchical access explaining why it's valuable.

19             And what's interesting about this document

20  is they're now candidly talking about the problems they

21  had before hierarchical access, because now they have

22  the solution they can say, you know, before we had this

23  solution, we were having a bunch of problems.  See,

24  without hierarchy access you would need to -- and

25  there's a lot of technical stuff there that we'll

1  explain -- but denote they're honest about it, this

2  would not only take a great deal of time, in other

3  words, it would -- it would be a pain to maintain and

4  keep up-to-date, but without hierarchical access your

5  system performance would be reduced.  It would run

6  slower, again another advantage to Mr. Carter's

7  invention provided was the speeding it up.

8             It would force the system to use a rigidly

9  fixed sequence of accesses.  The old system was

10  inflexible; the new system was flexible, just like

11  Mr. Carter's invention.  And they note that this is a

12  major drawback especially for hierarchical data like a

13  product hierarchy or a customer hierarchy, you'll hear a

14  lot about hierarchies in this case, but the thing to

15  remember for now is the infringing hierarchical access

16  was especially made and especially beneficial for

17  hierarchies like customer hierarchies and product

18  hierarchies.

19             So that's the background.  Those are the

20  facts that brought us to the infringement determination

21  that was found and sets the stage for the main issue for

22  you, which is damages.

23             Now, to prove the amount of harm that's

24  been caused, here we will explain to you what

25  Mr. Carter's invention was, how it succeeded in the

1   marketplace, and why it's valuable.  We think the

2   evidence will show it was a very valuable invention.

3          And our claim here is if SAP had not taken

4   our technology, put it into their own products and sold

5   it to our customers, we would have made additional sales

6   just like we were making before they did that.  And our

7   claim is that if SAP hadn't infringed, we would have

8   done the -- had the same kind of success that we had in

9   the real world before they did this.  And our claim is

10  called -- it's called lost profits, that's the claim we

11  are making, that we lost sales and lost profits because

12  of SAP's infringement.  And that claim is based upon the

13  actual history that we had before this all happened to

14  us.

15         And here are -- here are the figures

16  you'll see.  In 1996, '97, and '98 before SAP came out

17  with hierarchical access, we sold eight new customers,

18  and these are just the Fortune 500 big companies, we're

19  only claiming lost sales on them, eight Fortune 500 type

20  companies in '96, and then eleven and then twelve.

21  That's what happened in the real world.  And once SAP

22  infringed, that fell off a cliff.

23         Our -- our claim, is that when our patent

24  issued, it issued a little later in 2003, we would have

25  experienced the same success we did before they took our

1   technology.  It's a -- it's based on history and facts

2   in the real world, and we would -- we would have made

3   the same sales, we actually start out a little lower

4   than we did in the real world getting up to twelve new

5   customers a year, that's what we did in 1998, and then

6   rather than continuing to grow, we just assumed we would

7   have leveled off at twelve.  This is the period of time

8   SAP was infringing.

9           They made infringing sales throughout this

10  whole time period, and during that time period they --

11  the evidence will show you that SAP sold the infringing

12  software to about thirteen hundred customers, thirteen

13  hundred customers, and during the period of time

14  we're -- we are -- we are going to show you that we

15  would have lost about ninety-three customers total out

16  of the thirteen hundred that they sold and about four

17  hundred and thirty of those were the Fortune 500 types,

18  that's -- that's what the evidence will show.

19          And the evidence will also show you that

20  when Trilogy made a sale of Pricer, it was -- it was

21  valuable enough that the profit we would make on a

22  typical deal for a big company was about three million

23  dollars per customer.  So it was about three million

24  dollars each and we lost about ninety-three customers

25  during an eight-year period of time.  That works out to

1   about thirty-five million dollars a year in lost

2   profits, over the whole time period, over all those

3   sales, it's about two hundred and eighty-five million

4   dollars.  That's -- that's the harm that was caused

5   here.

6           But we believe -- it's a lot of money, but

7   we believe it's realistic because it's based upon actual

8   history, what we actually did in the market before SAP

9   took our technology.

10          But SAP will tell you, it should be no

11  surprise, that they don't agree with our damage model.

12  They don't think that's realistic and SAP will tell you

13  that we didn't lose a single sale, not one sale because

14  of their infringement.  That's their position in this

15  case, not a single sale was lost because of their

16  infringement.

17          And they're going to have a lot of

18  arguments around that and -- but if you boil down SAP's

19  case, basically what they are going to tell you is

20  Mr. Carter's invention was valueless.  Nobody cared

21  about it.  It wasn't worth anything or hardly anything.

22  They're going to have a lot of ways to explain that to

23  you.

24          They'll -- they'll show you some Trilogy

25  e-mails back at the time that our sales started to slow

1   down, they were self-criticizing Pricer, wondering what

2   was going on, blaming ourselves for the -- for the

3   problems and they're going to tell you that means this

4   invention is really worth nothing or almost nothing.

5          And they're going to tell you that the

6   hierarchical access feature they introduced, the one I

7   showed you that solved the problems, they're going to

8   tell you none of their customers care about that.

9   Nobody uses it in the way Mr. Carter described and it's

10  just not a big deal at all.

11         But there's something that really is -- is

12  something very, very relevant on that point and that

13  brings us to the last thing that you will need to decide

14  which is:  Does SAP still infringe after they changed

15  their product?

16         So Judge Everingham told you, in May of

17  2010, this is after they were determined to infringe, in

18  May of 2010, SAP made a change to its product so that

19  they could come in here today and tell you that they

20  don't infringe anymore.  They've stopped infringing, not

21  a big deal.  That's what they're going to say.  But

22  after they were found to infringe, after that was

23  decided, they didn't just quit.  They didn't take

24  hierarchical access out of their system.  They left it

25  in.  That is not -- they didn't pull it out, even though

1   they're going to tell you nobody cares about it and

2   nobody uses it and it's valueless, they left it in even

3   after they were found to infringe.  That speaks volumes.

4             And let me tell you a little bit about

5   what they did.  They didn't take hierarchical access

6   out, what they did was they made a very small change to

7   some of the tools you can use to edit hierarchical

8   access.  And they implemented this change, in other

9   words they rolled this change out to their customers

10  through something called an SAP note.  It's kind of a

11  funny name, but basically this is a document that tells

12  SAP's customers we're making a change to our product,

13  here's what the change is and here's who it applies to.

14  This came out in May of 2010, after they were found to

15  infringe.

16            And you can see here, this is -- the thing

17  I have blown up here is the very first thing they tell

18  their customers in the note describing this change.

19  This is the very first thing.  They'll tell -- they're

20  telling their customers this and related notes implement

21  a change to the functionality of the hierarchical access

22  feature, hierarchical access change.  Now, the important

23  part is the highlighted section.  Application of these

24  notes, in other words taking this change is required,

25  but only for customers who obtain their initial license

1    for an SAP system after May of 2010.

2              Now, let's think about that for a minute.

3    They're telling their customers right off the bat, the

4    only people who -- who need to take this change are

5    people who have never had an SAP product until May of

6    2010.  But the reality is SAP has dominated this

7    industry for a long time and the vast, vast majority of

8    their customers have been SAP customers long before May

9    of 2010.

10             And so right off the bat they tell their

11   customers 99 percent of them, I mean, I -- I don't have

12   a precise number, but some very high percent of them,

13   you don't have to worry about this at all, it doesn't

14   apply to you.  And not only that, even for the people

15   who did get the change, who did take the note, they

16   grandfather in all of the access sequences, the

17   infringing access sequences that existed before they

18   made the change.

19             This is telling you for the people who

20   actually take this change, existing access sequences of

21   the type hierarchical access created before this note,

22   in other words created before 2010, will continue to

23   function as before.  So they grandfathered in all of

24   these existing data structures for all of the customers

25   that they sold hierarchical access to from 1998 until

1  2010.  That is twelve years worth of sales, and they

2  exempt all those data structures from their change.

3              THE COURT:  You have five minutes

4  remaining.

5              MR. COLE:  Thank you.

6              SAP is going to tell you that when they

7  made the change, nobody complained and that proves to

8  you that this change -- that this feature is irrelevant

9  and nobody cares about it because no one complained.

10 But the reality is no one complained because nobody who

11 cares about it had to suffer any consequences as a

12 result of this.  All the people who use and care about

13 this thing got grandfathered in.

14             So this is a big and it's an important

15 case.  You can tell from the courtroom there's a lot of

16 attention being paid here.  This is an important case.

17             And as I said at the beginning, the

18 fundamental facts here are that SAP they saw our

19 invention in the marketplace, they realized that they

20 needed it to fix their problems, and then they just took

21 it and paid us nothing.  And now they're going to tell

22 you that they should have to pay us almost nothing even

23 after they infringed.

24             Thank you very much.

25             THE COURT:  Thank you, Mr. Cole.

1        MR. MELSHEIMER:  May I have one moment,

2   Your Honor?

3        THE COURT:  Yes.

4        (Pause.)

5        MR. MELSHEIMER:  May it please the Court.

6        THE COURT:  Mr. Melsheimer.

7        MR. MELSHEIMER:  Ladies and Gentlemen,

8   you've heard their side of the story, and the evidence

9   will demonstrate that their story is inconsistent with

10  the facts, inconsistent with the evidence that you'll

11  hear and simply unreasonable.

12        I told you last week in jury selection

13  that SAP was willing to pay a reasonable amount for use

14  of the patented invention, but we were not willing to

15  pay for something unreasonable.  We were not willing to

16  pay for lost profits that would never have occurred

17  under any circumstances.

18        You see, Versata or Trilogy, they want to

19  take credit for their successes.  They want to claim all

20  the credit, but they don't want to take responsibility

21  for their failures.

22        And that's not how it works in this

23  country.  We're willing to pay what's fair and

24  reasonable and will do so, but we're not willing to pay

25  for something that's exaggerated and not supported by

1    the evidence.

2              Good morning.  My name is Tom Melsheimer,

3    as you know, and I'm here on behalf of the SAP.  You'll

4    hear some folks, you'll see some folks from our team.

5    Mr. Childs from SAP, you met him a week or so ago;

6    Ms. Skinner, my colleague; Mr. Bittner; Todd Clayton.

7    Mr. Clayton -- you'll see these folks during the trial.

8    You'll also see Mr. Jim Batchelder, who you met on the

9    first day of jury selection.

10             I'm here to tell you SAP's side of the

11   story.  But before I do that, I want to focus on a few

12   facts that I don't think will ever be disputed in this

13   case, and they're quite a bit different from the facts

14   you just heard from the Plaintiffs' lawyer.

15             Fact number one, you will not hear a

16   single customer testify that they decided not to buy,

17   not to buy Versata's Pricer product because SAP had this

18   hierarchy access pricing feature.  Not a single

19   customer.  Even their own witnesses will admit that

20   they've never heard of that happening.

21             But they want to say is that somehow

22   because we added this feature to our software that that

23   put them out of business when, in fact, no customer ever

24   said they didn't buy Versata or Trilogy because of that

25   feature in SAP.

1              Fact number two, and this is important,

2    back in 1998 when SAP added this pricing feature, there

3    was no infringement of any patent.

4              Let me say that again.  When we added this

5    feature in 1998, there was no infringement of any

6    patent.  The patent didn't come up until 2003.  Fact

7    number two.

8              Fact number three -- it's very

9    important -- for the time there was infringement, for

10   that period of time that infringement was determined, it

11   was not determined that that infringement was deliberate

12   or intentional.  It was not determined that it was in

13   any way intentional.  The legal term for that is

14   non-willful.

15             Now, you've heard this allegation -- you

16   just heard it -- that we somehow copied or took

17   something from -- from them, but, in fact, we didn't.

18   We used our own engineers.  We wrote our own software.

19   We did our own work.  The infringement was not willful.

20   And no one will say otherwise.

21             Because of these facts, these three facts

22   and others that you'll hear, we have refused to pay what

23   they've asked for because we believe it to be

24   unreasonable.  We've instead been patient.

25             We've chosen to bring forth evidence to

1    show what is truly reasonable for the narrow feature

2    involved in this case.  Not the picture that Versata

3    paints, but a very small part of SAP's software, a

4    software that has literally hundreds of thousands of

5    different features.

6              So let's talk some more about the evidence

7    you'll see in this case.  I want to talk to you first

8    about SAP and its software and about how this particular

9    pricing capability fits within the many thousands of

10   features that SAP has.

11             Next, we're going to talk about what

12   happened after SAP added this hierarchy access feature

13   in 1998 before Versata got a patent in 2003.

14             And finally, I want to talk about the

15   damages claim in this case.  I'll give you some examples

16   of why their damages claim just doesn't make any sense.

17   It doesn't square with what the Judge told you is the

18   most important thing you bring to this courtroom, your

19   common sense.

20             Let me talk to you first about SAP and its

21   software.  SAP is a company that helps many companies

22   and organizations all over the world run their business.

23   As you've heard, we're based in Germany, but we have our

24   roots in an American company called IBM.

25             About 40 years ago, a handful of engineers

1 left IBM to start SAP, and they had a vision or an idea

2 to come up with a software that could run all aspects of

3 a company's business, all aspects.

4 So this is a different kind of software

5 program than you might have heard of.  It's

6 comprehensive and customizable to fit the needs of any

7 business.  You probably use Word or maybe PowerPoint.

8 These -- those programs are pretty complex, but this

9 program is quite a bit different.

10 It allows an organization, whether it's a

11 business or a church or a charity to manage their entire

12 company.  It can help organizations hire and manage

13 personnel, order material, manufacture products, create

14 financial reports, schedule employees, and just about

15 anything else a business needs to do.  They call it

16 managing the business from A to Z.  That's what SAP

17 does.

18 Now, it sounds simple in a way to say

19 that, but, in fact, the software is very complicated.

20 It has 150,000 screens, 150,000 screens.  So it would be

21 impossible to describe to you all the different features

22 and functionalities.

23 In fact, there are whole books devoted to

24 nothing but SAP software.  And you'll see some of these

25 books in the trial that lay out all the different

1   qualities and features of SAP software.

2            Now, because of this, because it's very

3   comprehensive, it's flexible, and it's used by many

4   different businesses and organizations.

5            Let me just give you a sampling of the

6   kind of organizations that you'll see:  UPS, NASA,

7   Proctor & Gamble, the Red Cross, the Southern Baptist

8   Convention, Harley-Davidson, all varieties of

9   businesses, some charities, some for-profit businesses,

10  some government-type organizations.

11           So if you're a chemical company, maybe you

12  need to order many chemical supplies that your plant

13  uses.  SAP can do that.

14           If you're part of the military, maybe you

15  need to track parts and equipment for soldiers.  SAP

16  does that.

17           If you're a railroad, maybe you need to

18  arrange a schedule for hundreds of trains and thousands

19  of employees.  SAP does that.

20           The name for the software is called ERP,

21  Enterprise Resource Planning.  It simply means that any

22  enterprise, any organization can use SAP to make its

23  business work better.

24           Now, it's much broader and more

25  comprehensive than the kind of software Trilogy was

1   selling.  Trilogy was focused on a very narrow set of

2   products.  The SAP product is comprehensive.

3               Now, one thing the software has been doing

4   at SAP for decades was pricing.  SAP software had all

5   sorts of tools and options for customers to use pricing

6   long before -- long before Trilogy ever came along.

7               It could use hierarchies before Trilogy

8   came along.  It could use customer information before

9   Trilogy.  It could use product information.  In fact, it

10  had dozens of options for businesses to use for setting

11  their prices.

12              Now, you've heard from the Plaintiff that

13  maybe these options weren't so good, but SAP customers

14  who used pricing, and not all the customers do use it

15  for pricing, they like these features, and they use them

16  successfully.

17              Now, is this to say that SAP is never

18  trying to improve on its software?  Of course not.  It's

19  not perfect.  SAP's constantly looking for ways to make

20  its software better.

21              And it's because of one of those

22  improvements, one feature among hundreds of thousands

23  that we're here about today.  That's this hierarchy

24  access pricing feature that's being discussed.

25              Now, it was added in 1998.

1          Can I get the ELMO, please, ma'am?

2          COURTROOM DEPUTY:  Yes, sir.

3          MR. MELSHEIMER:  So the feature was added.

4    In 1998, the feature that we're talking about in this

5    case was added, all right?  There's some important dates

6    I want to help us keep track of.

7          Now, was this a major upgrade?  Was it

8    some drastic change?  No, it wasn't.  It was not major

9    at all.  It added one more option to the many pricing

10   options already existed.

11          Did SAP want to add it?  We did.

12          Was it an improvement?  Sure it was.

13          But was it big news to the company after

14   it happened?  Was it a game-changing feature?  It turned

15   out it wasn't.  It wasn't even close.  And you'll

16   hear -- you will hear evidence about that.

17          Now, as you think through the issues in

18   this case, one issue that you'll have to address is, how

19   much, how much is that one pricing feature worth among

20   the thousands of features in SAP's software code?

21          Now, you might think, well, that depends

22   on how important that one feature is, or it might depend

23   on how much that feature affected Trilogy's business.

24   And those are good questions.

25          I want to look at that with you during the

1   evidence in this case.  And to do that, we'll turn to

2   the time period between 1998 and 2003.  Because you may

3   have missed this, but the patent in this case didn't

4   issue until 2003.  1998, we add the feature; 2003, the

5   patent issued.

6           Now, what's going on in this timeframe?

7   What's going on between 1998 and 2003?  Well, it turns

8   out that Versata Trilogy sales were dropping during this

9   time period.  They were dropping during the time period

10  from 1998 to 2003.

11          Now, they want to tell you that that's our

12  fault.  They want to blame us for that dropoff in their

13  sales.  But what's the evidence that you'll see in the

14  case?

15          Well, the first thing we know is that in

16  1998, when we add this feature, we're not infringing

17  anyone's patent.  Not in 1999; not in 2000; not in 2001;

18  not in 2002.  No one can claim, not Trilogy, not

19  Versata, not anyone can complain -- can claim ownership

20  of this pricing feature during that time period.  So

21  it's totally public until 2003.

22          Now, let me mention one other point about

23  this time period.  The law has a lot of remedies for

24  companies who think they're being harmed.  You've heard

25  this accusation in the opening that we took it, that we

1    copied them.

2              But if Trilogy thought we were doing

3    something wrong in 1998, 1999, 2000, 2001, they had

4    remedies available.  But you won't hear in this trial

5    that anyone says that there's been any determination

6    that SAP stole anything from Trilogy, that we took their

7    source code, that we broke a promise that we made to

8    them, or that we interfered with their business.

9              For example, you'll hear about SAP signing

10   an agreement with Trilogy in the '98-'99 time period to

11   exchange certain information.  If they thought we were

12   breaking that agreement because it was an agreement to

13   keep it confidential, they could have brought that

14   claim, and they have never done so.

15             And in the same way, you won't hear

16   that -- any claim that SAP infringed any other patents

17   between 1998 and 2003.

18             So what SAP did with Versata and Trilogy

19   in 1998 was not patent infringement, and it was not any

20   other violation of law, and no one in this case will say

21   otherwise.  SAP wrote its own source code, used its own

22   employees, all to come up with a way to compete with

23   Trilogy.  We did that, and I don't think those facts

24   will be disputed.

25             Now, let's turn to another question,

1   though.  Did anything we did in this time period, '98

2   and following, did that have anything to do with the --

3   why the sales of Pricer dropped?

4               You heard him say our sales went down.  To

5   put it more specifically, did adding this feature in

6   1998 in SAP's software, did that cause the sales of

7   Pricer to go down?

8               As I told you, you're not going to hear a

9   single potential customer say:  I didn't buy Pricer

10  because of SAP -- not one customer -- because of that

11  hierarchical access feature.

12              So what's really going on?  What's the

13  truth?  Well, the truth is, is that early on in the

14  mid-'90s, Versata -- Trilogy's Pricer software was

15  attractive.  It was an attractive product for a small

16  group of companies that had very complex pricing needs.

17              But after those companies bought Pricer,

18  there weren't a whole lot of other companies that wanted

19  to pay close to 2 million or $3 million for pricing

20  software.  You don't have to accept what I'm saying

21  about that.  This is what --

22              Can I have the -- the other screen?

23  Sorry.

24              COURTROOM DEPUTY:  Yes, sir.

25              MR. MELSHEIMER:  This is what Trilogy is

1   saying in their own documents.  Let's take a look at it.

2   So let's look at Trilogy's documents back in 1998.  514,

3   e-mail internal within Trilogy, December 1998.

4            Now, he says:  Obviously, I did not want

5   to broadcast this note.  However, I think there's a

6   large point being missed here.  Our software is not what

7   we think it is.  After selling numerous deals at

8   Trilogy, I think our greatest core competency is our

9   presale staff.  They spin all manner of stories to sell

10  our code.  When someone attempts to deploy the code,

11  it's a nightmare.

12           Can we go to 514, Mr. Barnes?

13           Now, what do they say in February of 1998?

14           After eight months of working with this

15  market segment, SC Pricer has failed to reach

16  acceptance.  The SC Pricer team has met with over 40 SAP

17  and Oracle companies -- that's companies that run SAP or

18  Oracle software -- to run their business.  Only one of

19  these companies have subsequently purchased the

20  software.

21           So this is back in 1998.  They're saying

22  in their own documents they're having trouble selling

23  their software in the mainstream.  No mention of SAP.

24  No mention of hierarchy access.

25           Now, one thing they could have done -- and

1   you'll see this in the evidence -- is they could have

2   cut the price of their product.  They could have slashed

3   it down to $100,000 or $50,000.  You'll see documents

4   where their own people say:  If we want to make more

5   sales, we're going to have to cut the price.  But they

6   didn't do that.

7              So you're going to see some interesting

8   facts, I think, about Trilogy and the way they ran their

9   business.  Some lavish expenditures on things that maybe

10  weren't pushing their business forward.  You'll have to

11  ask yourself if all the money they spent, was it really

12  promoting the development of Pricer.

13             Well, what happened, though?  What

14  happened to Trilogy during this time period?  Well, you

15  had customer dissatisfaction.

16             This is a survey they commissioned in

17  2000, and what did they learn in 2000?  That 57.5

18  percent of the customers surveyed said that Trilogy had

19  fallen short of expectations.

20             Now, that's not something SAP did; that's

21  something Trilogy did with their people and their

22  software not providing and satisfying people's

23  expectations.

24             Now, does that sound like the mark of a

25  responsible business to come in and say:  You know what,

1  SAP; you're responsible for all this; we want you to pay

2  us for the lost sales?

3            But I tell you what.  There was a time

4  when people at Trilogy took responsibility.  I want to

5  show you something written a long time ago by that

6  gentleman right there, Mr. Tom Carter.  I hope you're

7  going to hear from him as their first witness.  He's a

8  bright fellow.

9            When they were having trouble back in

10  1998, he took responsibility for it.  You heard about

11  him.  What does he say?

12            Trilogy development in SAP:  We've

13  absolutely screwed up.  I have absolutely screwed up.

14  I've personally been involved in several SAP

15  installations and did the minimum necessary.  I

16  absolutely saw all the data in front of us.  I've

17  absolutely known what we needed to do and failed.

18            So, yes, our organization of stars has

19  completely failed, failed to do what we've needed to do.

20            You can admire someone, frankly, who's

21  willing to speak like that, make that kind of admission.

22            So what happened between this point and

23  now?  Because Mr. Carter has long since left the

24  company.  And he'll tell you that.  He left the company

25  five years ago.

1          So what's happened between now and then

2    when we find ourselves in this courtroom?  We'll talk

3    about that.

4          But one thing we know for sure is that it

5    was not this software feature of SAP that drove Pricer

6    sales into the ground.  It was not SAP software, because

7    the evidence will show that there were thousands of

8    companies out there that were not using any pricing of

9    SAP, that weren't SAP customers.

10          If their product, if Trilogy's product was

11    really so whiz bang, they could have sold to all those

12    companies.  They're would still be making plenty of

13    Pricer sales in 2001 and 2002.  But they're not.

14          So what was it?  If it wasn't SAP, what

15    caused Pricer sales to drop?

16          Well, you're going to hear a lot of things

17    about that.  You're going to hear about some changes in

18    technology, like speeds of computers and access to the

19    internet that started in 2000 and 2001 that ended up

20    making Trilogy's product just not as good as it was.

21          That's not a criticism of Mr. Carter or

22    his idea; it's just changing in technology that made it

23    not as useful to people.

24          And finally, it couldn't have helped.

25    Right around 2000, what was happening?  Remember all the

1   panic and mania about Y2K?

2                    Well, a lot of companies were focusing

3   their spending on Y2K problems, not on buying new

4   software for pricing.  So it's no surprise, during all

5   these circumstances, that Trilogy might see its software

6   drop.

7                    So let's look at this point between

8   2003 --

9                    Can I have the ELMO back?

10                   Let's look at this period after 2003,

11  because that's the period that we're talking about with

12  damages, okay?  We're talking about 2003 and later,

13  because, again, they can't get any damages for anything

14  that happened earlier because they didn't have a patent.

15                   The first thing to remember is:  What was

16  the infringement?  Well, remember, it was not

17  deliberate.  It was not intentional.

18                   Now, under the patent laws, you can be

19  liable for infringement even if you didn't know about

20  the patent.  And the evidence in this case is that we

21  didn't know about this patent until years later.  They

22  didn't tell us.  They didn't write us a letter.  They

23  didn't tell us about it.

24                   But that doesn't matter.  You can still be

25  responsible for infringement.  But that doesn't mean

1  that you've done it deliberately or intentionally.  And

2  we're not challenging that here.  We understand the law,

3  and we respect our obligations.

4          And even though we weren't determined to

5  deliberately infringe, we understand that we need to pay

6  a reasonable amount, a reasonable amount for the

7  infringement that was found.

8          So don't make -- don't let Trilogy make it

9  out to sound worse than it is.  You heard them say we

10  took; we copied; we stole.  That was the suggestion.

11  Well, you know what?  That's not what this case is

12  about.  What this case is about is valuing that damages.

13  What are the damages, and what's the valuation of it?

14          So let's talk about that.  Let's talk

15  about what's the calculation of damages in this case.

16  And I want to hear -- I want to start with something

17  that you've heard from the Judge already, and you're

18  going to hear it again.

19          The purpose of damages is not to punish.

20  You must not, however, award Versata more damages than

21  are adequate to compensate for the infringement nor

22  shall you include any additional amount for the purpose

23  of punishing SAP or setting an example.  That's the law.

24          And you know what?  That kind of squares

25  with your common sense, doesn't it?  Because it doesn't

1  make any sense to punish someone when the infringement
2  has not been determined to be deliberate or intentional.
3  And no one will dispute that in this case.
4          Now, what they say is, Trilogy Versata
5  says, they're entitled to lost profits.  We disagree.
6  Why we disagree that they're entitled to any lost
7  profits is because, first of all, they basically stopped
8  selling Pricer.  They stopped selling Pricer long before
9  the '350 patent issued in 2003 for reasons unrelated.
10          Any lost profits, any problems that
11  Versata had making sales in 1998, 1999, 2000, 2001,
12  that's their own responsibility.  That's not something
13  they can turn around and place on us.
14          I'm going to prove to you, showing you
15  Versata's own documents, showing you testimony from
16  their own witnesses, that the problems that they had
17  were their own fault, their own responsibility.
18          We'll also bring you an economist,
19  Dr. Stephen Becker, who will go through the lost profit
20  calculation with you.  He'll explain to you a lot of
21  problems with it.  You'll hear from him in a couple of
22  days, but let me -- let me -- let me give you a sense of
23  this.
24          One of the things you have to look at for
25  lost profits is, what's the demand for the feature?

1  What's the demand for the feature they claim is part of

2  their patent, this hierarchy access?

3           In other words, did this one feature, did

4  us putting that in our product that had thousands of

5  features, this one feature, cause people to rush to SAP

6  and buy the software?

7           He's going to tell you, not at all, that

8  that's not the case, because -- most important reason --

9  no one, no customer has ever come forward, even after

10  all -- as long as this case has been going on, no

11  customer has ever cited this feature as a reason to buy

12  SAP software.

13           Now, it's true.  We thought it would be a

14  good feature, so we added it to our hundreds of

15  thousands of features, but it turned out that no one

16  ever really used it.

17           Now, that's not a surprise, because it's

18  going to turn out that even though the infringement has

19  been determined, it's actually never been determined

20  that anyone actually uses this feature, that any

21  customer actually does pricing in the way that Trilogy

22  says is described in their patent.

23           Now, that may sound odd.  The reason for

24  that is this is a special kind of patent.  The '350

25  patent claims only require the capability of doing the

1  special pricing, the capability, not the actual doing

2  it.

3              So if the software code makes it possible,

4  there's infringement.  But when asking how much that is

5  worth, whether or not that drives demand, you need to

6  look at, okay, do people actually use it?  Is it

7  something important?  Is that capability important?

8              THE COURT:  You've got five minutes

9  remaining.

10             MR. MELSHEIMER:  Now, let's look at some

11  of the evidence -- the other evidence you'll see in this

12  case and how unimportant this pricing feature was to

13  customers.

14             We'll bring you Dr. Ray Mercer.

15  Dr. Mercer has looked at the changes that SAP made to

16  the software code after it was determined that SAP

17  infringed, and he'll explain to you that SAP has

18  disabled the features.  And it's not the story that you

19  heard about from the Plaintiff in the opening.

20             Secondly, he will tell you that he's done

21  research and analysis on exactly why this little feature

22  is not something that was important to SAP software or

23  the sales of the software or the customers buying the

24  software.

25             So let's turn back to damages.  They're

1  going to ask for lost profits, and one of the things

2  you're going to need to look at is, how much profit

3  Versata would gain on a lost sale, if they even made a

4  sale at all?

5           And, again, you'll see that their approach

6  to damages is the same unreasonableness that you'll see

7  throughout the case.  They overstate what they would

8  make; they understate their costs.  And they do that to

9  create the impression of a greater profitability, a

10  greater lost profit.  You'll see that in the evidence.

11           Now, do they get nothing?  If they're not

12  entitled lost profits, do they get nothing?  No.  No.

13  The law that governs this case is pretty clear.  If

14  Versata can't prove lost profits, then they are still

15  entitled to what's known as a reasonable royalty.

16  That's what we believe should be paid in this case:  A

17  reasonable royalty.

18           Now, they're not going to ask you for a

19  reasonable royalty.  They're not doing that.  They're

20  going to ask you for this gigantic lost profits number.

21  But we think that the reasonable royalty is, as it

22  sounds, the reasonable approach and the right result in

23  this case.

24           So what's the reasonable royalty for this

25  case?  To come up with that, we've hired a very

1  well-known damages expert, a man named Mike Wagner.

2  He's an accountant.  He's a businessman.  He's testified

3  in over a hundred patent trials.  He's been in this

4  courtroom before.

5              And here's a summary of what he found:  $2

6  million.  He says the reasonable royalty in this case

7  should be $2 million.

8              Now, I'm not saying that's nothing.  To

9  them, that's nothing.  Two million is nothing when

10  you're asking for 280 million.  But $2 million for a

11  feature that no one has ever been shown to use; $2

12  million for a feature that has never been cited by a

13  single customer as a reason to buy SAP software; $2

14  million for a feature that is one of hundreds of

15  thousands of features in the software, that is very,

16  very reasonable indeed.

17              I look forward to presenting all the

18  evidence to you in the case as we go forward.  The trial

19  is going to be pretty quick.  We're going to bring

20  witnesses.  We're going to bring documents to you.

21              We're going to show you that the story

22  that they've told is simply not supported by the facts

23  or the evidence and that they're seeking lost profits

24  that they never lost on sales that they never would have

25  made and money that they never would have made and it

1  had nothing to do with us.  It was all to do with their

2  own internal issues.

3          At the end of the day, when all the

4  evidence is in, I'm going to get back up and talk to you

5  again.  And I'm not going to ask you for a free pass.

6  I'm not going to ask you for a bargain.  I'm not going

7  to ask you for a pat on the back.

8          All I'm going to ask you for is a

9  reasonable royalty based on the facts and the evidence

10  that you've heard.  And I think that when you've heard

11  all that, you'll conclude that the reasonable royalty is

12  the way to go in this case, because that's what's

13  supported by the evidence.

14          Thank you for your time.

15          THE COURT:  Who will be your first

16  witness?

17          MR. COLE:  Your Honor, Plaintiff calls Tom

18  Carter.

19          THE COURT:  All right.  Mr. Carter, if

20  you'll stop right there and take the oath, please.

21          (Witness sworn.)

22          THE COURT:  Thank you.

23          If you don't mind, try to speak into the

24  microphone and keep your voice up.  It will be easier to

25  make a record, and try not to talk too quickly.

```
 1            THE WITNESS:  I'll try.

 2         TOM CARTER, PLAINTIFFS' WITNESS, SWORN

 3               DIRECT EXAMINATION

 4   BY MR. COLE:

 5      Q.   Morning, Mr. Carter.

 6      A.   Good morning.

 7      Q.   Could you please introduce yourself.

 8      A.   Hello everyone.  My name is Tom Carter.

 9      Q.   I think we've heard about this a lot, but are

10   you the inventor of the patent we're here on today?

11      A.   Yes, I am.

12      Q.   All right.  I take it you worked at Trilogy?

13      A.   Yes, I did.

14      Q.   Can you tell us how you came to work at

15   Trilogy?

16      A.   I was one of the founders of Trilogy.  A couple

17   of friends and I started the company out of college.  So

18   it was sort of the first real job we had, if you will.

19      Q.   What made you want to start your own company

20   out of college rather than go work for Microsoft or SAP

21   or somebody else?

22      A.   I guess I just kind of had that entrepreneurial

23   American spirit.  I wanted to start my own company and

24   do my own thing.

25      Q.   And when did you guys start Trilogy?
```

1      A.   We started it in 1989.

2      Q.   All right.  Now, let me ask you this:  What

3  kind of company is Trilogy?  Just at a high level, what

4  does Trilogy do?

5      A.   Trilogy sells business software.  So not

6  software that you and I would purchase as individuals;

7  software to big companies to run their operations.

8      Q.   All right.  So like you or me might go down and

9  buy a copy of QuickBooks or something for $79, is that

10 kind of the price level you're looking at in business

11 software?

12     A.   No, I'm not.

13     Q.   Can you give us an order of magnitude of what

14 does -- the kind of business software that Trilogy

15 sells, what does that sell for usually?

16     A.   It -- I mean, business -- the business software

17 will sell, on the low end, for hundreds of thousand of

18 dollars to, on the high end, tens of millions of

19 dollars.

20     Q.   Now, to kind of cut to the chase, I want to

21 fast-forward from when you guys started Trilogy in 1989

22 up to the mid-1990s.  And what were you doing for

23 Trilogy in the mid-'90s?

24     A.   In the mid-'90s, I was actually out selling to

25 our customers the software that we had at the time.  So

1    I was flying around on planes, visiting customers,

2    sometimes two or three a week.

3        Q.   Can you give us just a sense over however many

4    years you were doing that, two, three, four years, how

5    many companies did you meet with to talk about their

6    business software needs?

7        A.   I easily met with a couple hundred customers.

8        Q.   And are these -- what kind of companies are

9    they?  Big, small?

10       A.   Very, very big -- very big companies.  The --

11   most of the ones I met with were all Fortune 500

12   companies.

13       Q.   Okay.  Now, most people probably know, but just

14   in case, can you tell us what the Fortune 500 is?

15       A.   The Fortune 500 is the list of sort of the top

16   biggest 500 companies.  So it's specifically the top

17   500.

18       Q.   Okay.  Can you just -- just to put a little

19   context, give us a few of the names of companies you met

20   with in the mid-90's when you were selling software.

21       A.   Oh, I mean, many of the customer companies, you

22   would have heard -- I mean, IBM and Dell and Hewlett

23   Packard; automotive companies, like, you know, Ford and

24   Chevy and GM; and appliance companies, like Whirlpool;

25   insurance companies, you know, the Prudentials; American

1   Expresses.  So, I mean, all the big names you would have

2   heard of in those industries.

3       Q.   And I take it you were talking to the folks at

4   those big companies that buy business software; is that

5   fair?

6       A.   Yes, that's correct.

7       Q.   All right.  Well, when you were talking to

8   these companies over the years, did you notice any

9   particular areas that they were having problems in?

10      A.   Yes, I did.

11      Q.   And tell us about that.

12      A.   All these big companies were having problems

13  with their pricing.  It's not necessarily that they

14  couldn't come up with a price, but sales reps, when they

15  were talking to customers -- you know, this sales rep's

16  talking to you, and, you know, you say:  What's the

17  price?  I'd like to buy.

18           And if the sales rep says:  I'm sorry, I

19  have to go back to the central office, they would often

20  lose the deal.  The competitor would come in with a

21  price and lose the deal.

22           And, you know, it was the era that laptops

23  were just starting, and sales reps really wanted to be

24  able to close the deals.

25      Q.   So who cared most of these problems:  The sales

 1  reps, the sales force at the companies, or the IT

 2  department or both?

 3      A.   The sales force was really the one that cared

 4  about it.  The technical staff thought their systems

 5  were fine.  It was the sales reps who would lose the

 6  sales, and they were the ones talking to the customers,

 7  and they were the ones that really cared.

 8      Q.   I think this is kind of common sense, but is --

 9  is pricing -- is setting prices and being able to

10  execute prices, is that an important thing for companies

11  to do, or is that a relatively unimportant thing?

12      A.   It's incredibly important.

13      Q.   Okay.  Well, in a little more technical detail,

14  can you tell us, what was it -- what was it about the

15  pricing systems that existed back in the mid-'90s that

16  was causing the problems; in other words, that prevented

17  them from putting something on a laptop and letting

18  their sales reps go out and close deals right on the

19  spot?

20      A.   The old pricing systems would store each piece

21  of information in a different location.  And the

22  computers then would have to go get each piece one at a

23  time.  So --

24      Q.   What kinds of information are you talking

25  about?

1      A.   So information -- one piece of information

2   would be -- the list price in the United States would be

3   in one location versus the discount to gold customers

4   would be in another location or the discount for a

5   certain type of product would be in yet a different

6   locations.

7              So if you had to go get the list price and

8   one discount and another discount and another discount

9   and tax and shipping and something else, it was kind of

10   like if -- if I asked you to go into the kitchen, and I

11   said, go get a fork, and you came back, and I said, now

12   go get a spoon, or, you know, you were cooking, and I

13   said, go to the store and get this one ingredient, and

14   then you came back, and I said, oh, now I need you to

15   get another ingredient, and I kept sending you back and

16   forth to the store, that trip to the store can be very

17   expensive.

18      Q.   Okay.  And why were the systems at the time

19   organized so that you had to go and make a separate trip

20   to the store for each ingredient?  Why did they do that?

21      A.   That was just kind of the standard way people

22   did things.  It seemed to make sense that you'd put

23   different things in different locations, but there were

24   consequences to that.

25      Q.   Okay.  Was -- let me ask you this:  The people

1  you talked to, the business people at these big

2  companies, did they think about the pricing problem in

3  the same way that the systems were set up where you

4  would want to go get a different piece of information at

5  a different spot and then get it all one at a time and

6  bring it back?

7     A.    No.  Business people don't think about the

8  technical implementation or how the computer does it.

9  That's not how business people think.

10    Q.    Okay.  How did the business people think about

11 their pricing?

12    A.    Business people thought about it with sort of a

13 common sense approach.  They would say:  To whom are you

14 selling?  Who is the customer?  They would say:  What

15 are you selling?  What is the product?  And then just:

16 What is the price?

17          They didn't think about the details of the

18 separate locations, just who are you selling to, what

19 are you selling, and what is the price?  Not what are

20 all the different pieces of it, and where are they

21 located?

22    Q.    Now, did some ideas occur to you about how you

23 could improve upon the pricing systems that existed at

24 the time?

25    A.    Yes.

1    Q.    And just at a high level, what was your idea?

2    A.    At a high level, my idea was to go get all the

3  different pieces of information at the same time.

4            So if you were going to, you know, cook a

5  recipe, when you go to the store, go get every possible

6  ingredient that you might need.  You might even get an

7  ingredient you didn't need, but go get it all at once in

8  one trip rather than going for each piece one at a time.

9    Q.    Okay.  And is the way you organize your system,

10 is that the sort of same way that -- the old way -- the

11 old way of doing it where you would keep different

12 things in different places, or was yours -- how did

13 yours comport with the way businesses thought about

14 their pricing?

15   A.    The -- my system stored the information much

16 more like the business people bought it.  The business

17 people just thought about the price, so I put all of the

18 pieces of the pricing in one location so you could go

19 get it all at once.

20   Q.    Okay.  Now, in the '90s, when you were

21 talking -- traveling around the country talking to all

22 these big companies, did SAP have a pricing system at

23 the time?

24   A.    Yes, it did.

25   Q.    Okay.  And was SAP's system the multiple trips

1    to the store, or was it more in line with yours?

2       A.    It was the multiple trips to the store.

3       Q.    Did you actually talk to customers who had and

4    used SAP's old system at the time?

5       A.    Yes, I did.

6       Q.    Okay.  Can you give us a name or two of who was

7    doing that?

8       A.    Hewlett Packard, IBM, Allegiance -- I mean,

9    there were a large number of customers.

10      Q.    Okay.  And were the problems you noticed in

11   pricing, were those focused on a subset of customers, or

12   did that seem to be a widespread problem?

13      A.    It was absolutely widespread.  It didn't matter

14   what you were selling, if your sales rep couldn't give a

15   price to the customer in a timely fashion, they would

16   lose the deal, and every sales rep hates that, no matter

17   what they sell.

18      Q.    Okay.  And just tell -- just kind of factually

19   a little bit, can you tell us how you took your -- the

20   idea that occurred to you to rearrange pricing, and what

21   did you do with it next?

22      A.    As I mentioned, I was flying from customer to

23   customer, and so rather than reading a book or watching

24   a movie on the airplane, I used my own laptop, and I

25   actually developed the software to prove that my concept

1   would work.  And then after developing it and proving it

2   would work, I filed for the patent.

3       Q.   Okay.  And you filed for the patent in -- when

4   was that, '96?

5       A.   '96, yes.

6       Q.   All right.  And what was the product called

7   that you built?

8       A.   The -- we originally called it PriceBuilder,

9   but you'll also hear it as Pricer or SC Pricer.  The

10  marketing name has changed a little bit, but it was the

11  same core product.

12      Q.   Okay.  And you mentioned that you filed for the

13  patent in '96.  When was your patent actually granted by

14  the Patent Office?

15      A.   In 2003.

16      Q.   They moved fast.

17      A.   Yes.

18      Q.   All right.

19           MR. COLE:  Your Honor, may I approach?

20           THE COURT:  Yes.

21      Q.   (By Mr. Cole) I'm going to hand you Plaintiffs'

22  Exhibit 2 and just ask you to confirm, if you will, if

23  this is a copy of your patent.

24      A.   Yes, that is it.

25      Q.   If you could maybe just show -- show the jury

1   real briefly, so they can see what the kind of cover

2   looks like.

3       A.    (Complies.)

4       Q.    Thank you.

5             All right.  Now, when you wrote the patent

6   and applied for the patent, did you write that on a

7   small part or a little aspect of your product, or did

8   you write it on the guts of the product?

9       A.    No.  I wrote it on the guts, covering pretty

10  much everything.

11      Q.    Now, did your -- a technical question, did

12  your -- did your product -- did the Pricer products

13  embody the patent?

14      A.    Yes, the Pricer products embodied the patent.

15      Q.    All right.  I'd like to talk to you a little

16  bit about what it was about your product that you felt

17  was better than the old solutions at the time.

18            Let's see if I've got my PowerPoint

19  working now.  There we go.

20            Okay.  And we put on the board here a list

21  of three advantages, and I think we talked about this

22  yesterday.  If you could kind of take us through what

23  these advantages are and how -- how they were enabled by

24  your patented invention.

25      A.    Okay.  Speed being the first advantage, we've

1   talked about it a little bit.  So I put all the

2   different pieces of the pricing information in a common

3   location so that the customers only had to make one trip

4   to the store, if you will, to get all of that

5   information back.

6                And, you know, those trips to the store

7   often take more time than it does to actually cook a

8   meal or calculate the price in many cases.  The --

9        Q.   And what -- that made them -- how much faster

10  did that make the system?

11       A.   Oh, it made it a minimum of 10 times faster,

12  and in some cases, it was actually a hundred times

13  faster.  So it wasn't just a little bit; it was

14  dramatic.

15       Q.   And for the big companies -- you know, you

16  mentioned you'd have to go to the store one after the

17  other, one after the other.  How much -- how many

18  different sort of places would the big companies have to

19  look to do pricing?  I mean, how many trips were there?

20       A.   The bigger companies would have to look in a

21  minimum of 30 to 50 places, because they had 30 to 50

22  different types of information in their pricing.  And

23  that's at the low end.  The average was probably closer

24  to a hundred.

25                And for many of those companies, there

1   were several hundred places that they had to go, sort of

2   trips to the store, which was how my system could easily

3   be a hundred times faster.

4       Q.   So if they had to go to the store a hundred

5   times, with your invention, how many times would they

6   have to go?

7       A.   Once.

8       Q.   All right.  Okay.  Anything else about speed?

9       A.   I think that covers it.

10      Q.   Okay.  All right.  The next advantage here, it

11  says:  Flexibility and maintenance.  Can you tell us

12  what that is.

13      A.   As we mentioned before, the business people

14  just think of, who is the customer?  And they'll group

15  the customers, and they'll group them into a hierarchy.

16  So customers in the United States or customers in Texas.

17            And so my product would let the customers

18  think of it in just that term.  So it made it easier for

19  the business people.

20            The customers would ask, what is the

21  product?  And they would group that product and often

22  into a hierarchy.  So you might have automobiles, with

23  cars or trucks.  You might have electronics with

24  computers or software.

25            So my software would let them organize it

1  according to how they thought it -- thought about it.

2  So it was just a lot easier.

3           And then the pricing information they put

4  in one place, so they could go look for it and find it

5  in one place, and that also just made it easier instead

6  of having to go put it in a lot of different places.

7     Q.   Let me ask you this:  You mentioned the word

8  hierarchy.  Did you -- did you invent hierarchies in

9  general?

10    A.   No, absolutely not.

11    Q.   So what was it about hierarchies in your

12  invention that was -- that was new and novel?

13           In other words, was it the fact that you

14  used them or the way you used them?

15    A.   No.  It was the way I used them in order to

16  do -- reduce those trips to the store.

17    Q.   Okay.  And we also talk here about maintenance.

18  What's -- what is that, and how was that maintenance a

19  benefit of your invention?

20    A.   For the person who needs to enter the data, it

21  allowed them to -- they could either manually enter it,

22  or some of the technical people could write programs to

23  enter the data and it let them enter it in the format

24  that they thought about it as the business.

25           We didn't want them to have to change

1    their business to work with our software, so we allowed

2    them to do it the way they did it.  It just made it a

3    lot easier for them.

4        Q.   Okay.  Well, let me ask you this:  If you're

5    a -- if you're a big company and you're running one of

6    the old systems, like SAP's system, and you decide, we

7    want to create a new kind of pricing category; let's

8    group our customers into, you know, platinum, gold, and

9    silver or something like that, and you didn't have that

10   set up before, and you wanted to change your pricing

11   system to handle that, what would you have to do to

12   the -- to the guts of the software to implement that new

13   change?

14       A.   As I mentioned, each piece of information was

15   stored in a different location.  And so if a business

16   came up with a new type of information, a new type of

17   discount, they'd have to create a new location for it.

18            And creating that new location was not

19   something that the business people could usually do.

20   They'd need to get the technical software developers to

21   go add a new -- a new location that people would call a

22   database table, but it was a structural change.

23            So, I mean, it would be a -- more akin to

24   you having to add a whole new cupboard to your kitchen.

25   You couldn't just put information in a cupboard or

1  drawer that was there; you had to add a new one; you had

2  to remodel.

3            And people do it all the time, but it

4  requires skilled people to know what they're doing, and

5  it takes a little bit more time.

6       Q.   And with your invention, would you have to

7  create a new cupboard if you wanted to add some dishes?

8       A.   No.  Because as I mentioned, I put all the

9  dishes in, you know, one location.  I didn't need a

10  different location for each different type of

11  information.

12       Q.   Okay.  All right.  Anything else on those two?

13       A.   I think that covers them pretty well.

14       Q.   All right.  The last one we've heard a little

15  bit about already today.  It runs on a laptop.  I think

16  we've talked about that a little bit, but just -- if you

17  could tell us, what was it about the way you structured

18  data and the advantages that provided that enabled you

19  to run it on a laptop, other than just the fact that it

20  ran on a laptop?

21       A.   Yeah.  The -- the trips to the store is

22  probably the best way to think about it; that, you know,

23  if you have to make a lot of trips to the store, it's

24  going to be slower to begin with.

25            And laptops weren't as powerful, and so,

1    you know, if those trips to the store, you had to walk

2    to the store rather than taking your car, it was -- and

3    you had to do it a hundred times, it was going to be

4    even more slow.

5              So the performance helped a lot.  And also

6    storing the information in one main location rather than

7    lots of locations, the laptop computer just didn't need

8    as much capacity and space because the information

9    wasn't stored all over the place.

10        Q.   Well, let me ask you this:  If you had -- could

11   you have taken, for example, SAP's old software that you

12   saw in the mid-'90s and just literally just jammed it on

13   to a laptop, and if you did that, would it work very

14   well?

15        A.   It would not work very well.

16        Q.   And why wouldn't it work well?

17        A.   The number one reason is, it would be

18   incredibly slow.

19        Q.   Okay.  So it's not that you literally couldn't

20   do it; it was --

21        A.   It was just impractical.

22        Q.   Okay.  Let's pick back up again about the

23   Pricer product that you created, and I want to talk a

24   little bit about it and how it sold in the marketplace.

25              When you built the product, first of all,

1    did it work?

2         A.   Yes, it worked quite well.

3         Q.   And how did -- how did the -- how was the

4    product received when you started selling it?

5         A.   It was received incredibly well.  The customers

6    and the consultants and everybody, I mean, they loved

7    it.  They -- they saw that it worked.

8         Q.   Okay.  And when did you start actively selling

9    Pricer?

10        A.   Late 1995.

11        Q.   Okay.  Let's -- let me ask you about a

12   couple of other -- we saw this in opening statement, and

13   I want to ask you about this real briefly.

14             This is Plaintiffs' Exhibit 425.  It's a

15   USA Today article.  Can you tell us about -- about this

16   article and what its significance is?

17        A.   Yes.  So, first of all, the person in the quote

18   there, Jack Maynard of the Aberdeen Group, he was a

19   consultant hired to evaluate things for big companies.

20             If you're familiar with Consumer Reports,

21   the same way they'll give you advice on how to buy a

22   dishwasher, Jack Aberdeen -- or Jack Maynard and the

23   Aberdeen Group were that equivalent for big businesses.

24             So when those people come out and say, you

25   are the Rolls-Royce of the industry, that's not just

1   something that someone at home reads.  I mean, that is

2   the kind of thing that business people look for when

3   they go to buy their software.  So it was a big -- very

4   big deal at the time.

5       Q.   Great.  All right.  Let me look at another one.

6   And this is Plaintiffs' Exhibit 581.  Can you tell us

7   what this is.

8       A.   This is a report from the Gartner Group.  You

9   can see that kind of, you know, written up top.  It's

10  not very clear.  But Gartner Group was another one of

11  these industry analysts.  They were another

12  Consumer-Report-like service for the big companies who

13  evaluate software.  They make recommendations for it.

14      Q.   Okay.  And what are they saying here about your

15  Pricer product?

16      A.   So I guess the bottom part is the most telling.

17  It says they reviewed our product, and it says it was

18  the first product to provide the majority of features

19  that selling organizations require for pricing

20  configuration.

21      Q.   Now, was that consistent with your experience,

22  being out in the marketplace, that your product was the

23  first one to provide the majority of features that

24  selling organizations needed?

25      A.   Yes.

```
 1        Q.   All right.  Now I want to talk a little bit
 2   about how your product --
 3                  MR. COLE:  Well, I'm sorry.
 4                  THE COURT:  Mr. Cole, we'll pick up there.
 5   Let's take our morning recess.
 6                  Ladies and Gentlemen, let's take 20
 7   minutes.  Be back ready to come in the courtroom at
 8   10:30.  Remember my prior instructions, and don't talk
 9   about the case.  Have a nice break.
10                  LAW CLERK:  All rise.
11                  THE COURT:  Y'all are excused into the
12   jury room then.
13                  (Jury out.)
14                  THE COURT:  Please be seated.
15                  Step down, Mr. Carter.
16                  Y'all have an updated exhibit list that
17   reflects what's been admitted and what hasn't been
18   admitted?
19                  MR. COLE:  I think -- I think Ms. Lockhart
20   has that.
21                  THE COURT:  Okay.  All right.  I just
22   wanted to make sure we've gotten that.  That reflects
23   everything that's been ruled on, correct?
24                  MR. COLE:  I believe so, Your Honor.
25                  THE COURT:  All right.  Mr. Cole, can
```

1   y'all or Mr. Melsheimer have the jury notebooks a little

2   bit before 10:30?

3                   MR. MELSHEIMER:  I believe so, Your Honor.

4                   THE COURT:  All right.

5                   MR. MELSHEIMER:  Your Honor, may I ask a

6   question?

7                   THE COURT:  Yes.

8                   MR. MELSHEIMER:  I wonder if we might get

9   copies of the exhibits that he's going over with the

10  witness.  It makes it hard for me to make -- to

11  understand what's happening when I haven't been given a

12  set of the exhibits.

13                  I mean, we'll do that to them.  I just

14  want to make sure we --

15                  MR. COLE:  Sure.

16                  THE COURT:  Okay.

17                  MR. MELSHEIMER:  Thank you.

18                  THE COURT:  All right.  All right.

19  Court's in recess until 10:30.

20                  LAW CLERK:  All rise.

21                  (Recess.)

22                  LAW CLERK:  All rise.

23                  (Jury in.)

24                  THE COURT:  Please be seated.

25                  Mr. Cole, before we get started again, I

1   believe that there were notebooks placed in each of the

2   seats for the members of the Jury.  Let me give you some

3   brief instructions.  Ah, there we go.  I certainly don't

4   want to leave anyone out.

5          Let's take a minute and look at the patent

6   issued.  It should be behind Tab 1 of the notebook.

7   Now, the cover page of the patent provides some

8   identifying information.  It includes the date that the

9   patent issued, along with the patent number along the

10  top, the inventors' names, the bottom date, and a list

11  of the cited references considered by the PTO.  You see

12  the references cited over in the left-hand side of the

13  first column -- left-hand column down about the middle

14  of the page, and there's a list of things that the PTO

15  considered.

16         Now, over on the right-hand side of the

17  page, there's a heading entitled abstract and under the

18  specification of the patent begins with the abstract and

19  it's also found on the cover page, and the abstract is a

20  brief statement about the subject matter of the

21  invention.

22         Next come the drawings, and you'll see

23  several drawings if you just want to quickly flip

24  through the first few pages of the patent.  The drawings

25  illustrate various aspects or features of the invention.

1           Following the drawings, the written

2  description of the invention appears next.  It's

3  organized into two columns of text, and you'll see up at

4  the top left under Column 1, method and apparatus for

5  pricing products in a multilevel product and

6  organizational groups.  If you flip through the text,

7  over toward the end of the patent, the specification

8  ends with the numbered paragraphs.  I believe it's under

9  Column 19, toward the bottom of the page.  There is

10  sentence that says what is claimed and then lists

11  numbered paragraphs.

12           The numbered paragraphs are the patent

13  claims, and the patent claims define the scope of the

14  patentee's invention and gives the patentee the right to

15  exclude those matters that are contained in the claims.

16           Behind Tab 2 is a glossary of terms that

17  the Court has construed.  These are the definitions that

18  you need to use in determining the questions of

19  infringement that you'll be determining in this case.

20  So that's -- that's basically the organization of the

21  Jury notebook and we'll get into both the definitions

22  that are contained in the glossary as well as the

23  matters in the patent in more detail throughout the

24  course of the trial and the evidence.

25           So if you can feel free to refer to the

1    notebook throughout the trial as you -- you need to.

2                    Mr. Cole.

3        Q.   (By Mr. Cole)  Mr. Carter, let me ask you one

4    follow-up question from what the Court just went over.

5    I believe the Court mentioned a filing date and what was

6    the date of your invention -- the original filing date

7    where you claimed your invention?  1990 --

8        A.   It was 19 -- middle of 1996 --

9        Q.   Okay.

10       A.   -- I believe.  I don't remember the exact date.

11       Q.   Okay.  Thank you.  All right.  I -- I think we

12   were about to get into the subject of the sales of

13   Pricer in the -- the early time period and we have a

14   chart here, this is the one I was looking for in opening

15   and couldn't find, so now we found it.

16                    Can you tell us, if you would, what this

17   chart is, just kind of maybe take us through what's

18   shown here?

19       A.   The chart is showing all the individual sales

20   of my Pricer product.  So in 1995, I mentioned we

21   started selling late in the year, and we had two sales.

22   So the -- the sort of the first dot is too high on the

23   chart and above the 1995, you can see the names of the

24   specific customers that we sold to that year.

25       Q.   Okay.

1      A.    So Hewlett Packard and Reynolds and Reynolds.

2      Q.    Let me stop you there.  Can you tell us about

3  the Hewlett Packard deal?

4      A.    Hewlett Packard was already a customer of

5  Trilogy.  They had purchased some other software from

6  us, and Hewlett Packard was also an SAP customer.  So

7  they owned SAP, they owned Trilogy Software already when

8  we came out with the new product.  Hewlett Packard is

9  also known for doing very thorough evaluations of

10  software that can take many months, but fortunately the

11  Pricer product was so unique and different at the time,

12  it didn't take as long as usual, So we were able to get

13  that sale still in 1995 shortly after we came out with

14  the product.  And as I mentioned, they were already a

15  SAP customer and a Trilogy customer at that time.

16      Q.    Okay.  Now, let's move on to 1996.  How many

17  sales of Pricer did you make in 1996?

18      A.    We sold to 16 customers.  You can see the dot

19  on the line is up at 16, and above the 1996 year is the

20  list of the names of the 16 customers to whom we sold

21  the Pricer product that year.

22      Q.    Yeah.  Are the 16 here, does that include the

23  ones you sold in '95 or are those brand-new customers?

24      A.    Those are brand-new customers.  So Hewlett --

25  Hewlett Packard, as an example, remained a customer in

1  1996.  So in total we had 18 customers in total, but

2  those were just sixteen new customer -- brand-new

3  customers buying it that year.

4      Q.   Okay.  Now, let me ask you a couple of

5  specifics on -- in 1996.  Some of these deals are bold

6  and you can see it's a little hard to tell, but some of

7  them are bold.  What's the difference between the bold

8  and the -- the regular type?

9      A.   The -- the bold customers were ones who bought

10  really only the Pricer product.  Sometimes, as I

11  mentioned, Trilogy had other software, but the bold ones

12  only bought the Pricer product.

13      Q.   Okay.  And I see a couple of -- a couple of

14  questions about some of the bold ones, we're going to --

15  we're going to touch on some and other witnesses will

16  address other.  So BMC, can you tell me why did BMC buy

17  Trilogy Software in 1996?

18      A.   BMC was especially interested in the

19  flexibility for representing the software as they did.

20      Q.   Let me ask you just broader, did they buy

21  because of Pricer or some of your other software?

22      A.   Oh, I'm sorry, they bought because of the

23  Pricer product.

24      Q.   Okay.  And what was it at a high level about

25  Pricer that made BMC want to buy in 1996?

1    A.    BM -- BMC wanted those new features that were

2  different that no one else had and Pricer had just come

3  out with.

4    Q.    Okay.  And were those new features covered by

5  your patent or some other part of your product?

6    A.    They were covered by the patent.

7    Q.    Okay.  And the second one I'd like to ask you

8  about in 1996 is kind of down here in the middle,

9  Allegiance, Cardinal Health?

10   A.    Yes.

11   Q.    Why did they buy Trilogy Software in 1996?

12   A.    I mean they also bought the software because, I

13  mean, they saw the differences that, again, only the

14  Pricer product had.  Allegiance also owned SAP at that

15  time, and so they saw the difference, they saw the value

16  and they paid us for that.

17   Q.    Okay.  And Allegiance, they're a healthcare

18  company?

19   A.    Yes.

20   Q.    And what is BMC?

21   A.    BMC is a software company.

22   Q.    All right.  Let's move to 1997.  How many new

23  customers did you get in 1997?

24   A.    1997, we had 18 new customers.

25   Q.    All right.  And let me ask you about a couple

1  of the specifics here.  Towards the middle there you can

2  see Whirlpool?

3      A.   Yes.

4      Q.   Why did Whirlpool buy Trilogy Software in '97?

5      A.   Whirlpool also bought Trilogy and the Pricer

6  product.  Again, because of the differences in the

7  product that it had that no one else had, the -- the

8  advantages, like we talked about before that were

9  covered in the patent of the speed and performance of it

10 as well as the flexibility of the software.

11     Q.   Okay.  And the next one in '97, I need to ask

12 you about is Bridgestone; why did Bridgestone buy

13 Trilogy?

14     A.   Again, the similar story they were, again, also

15 an SAP customer already, and the SAP system wasn't doing

16 some of what they needed.  This -- my new product was

17 different.  It had new features that no one else did and

18 they bought it for those features.

19     Q.   Okay.  And for BMC, Allegiance, Whirlpool and

20 Bridgestone, were all of those Pricer led or Pricer only

21 deals as opposed to concluding other valuable Trilogy

22 Software?

23     A.   Yes, they were -- they were Pricer led.  I

24 think I may have overstated it before that it was only

25 Pricer.  There were other pieces of software needed to

1  deploy it, but it was absolutely for the value of

2  Pricer.

3       Q.   That's why they bought it?

4       A.   Yes.

5       Q.   All right.  All right.  '98.  Let's do that one

6  real quick.  How many new customers did you have in '98?

7       A.   I believe it was 25, yeah, so the dot on the

8  chart on the line is up at the 25 and then above 1998 it

9  lists the names of the customers we sold and, again,

10 those were only new -- those were new customers.

11      Q.   Okay.  And again, I've got to ask you about a

12 few of them, specifically Goodyear; was that at a Pricer

13 led deal?

14      A.   Yes.

15      Q.   And what -- what was it about Pricer that made

16 Goodyear buy?

17      A.   Again, it was the -- the features that were new

18 and different.  Goodyear also already owned SAP at the

19 time they bought our product, so they were buying it for

20 the things that were new and different that SAP and no

21 one else had done.

22      Q.   And were those covered by your patent?

23      A.   And those items were covered by the patent.

24      Q.   Okay.  Now, would it be fair, in your view, to

25 attribute all the money Goodyear paid in that deal to

1    Pricer as opposed to anything else?

2         A.    Yes, absolutely.

3         Q.    All right.  Two more specific ones I need to

4    ask you about.  In 1998, E.&J. Gallo, who is that?

5         A.    E.&J. Gallo is the wine company, makes the

6    Gallo wines.

7         Q.    Okay.  And why did that buy Trilogy in 98?

8         A.    They, too, needed the capabilities of Pricer

9    that only Pricer provided at that point.

10        Q.    Okay.  And were those covered by your patent?

11        A.    And those items were covered by the patent.

12        Q.    Okay.  Last one, Michelin here in the middle in

13   1998, why did they buy Trilogy?

14        A.    Yes, Michelin is the tire manufacturer, and

15   much like Goodyear, they needed the capabilities that

16   were new in Pricer that no one else had and were part of

17   what I put in the patent.

18        Q.    Okay.  Now, I want to ask you briefly, let's --

19   let's use this as a -- as a timeline, I want to ask you

20   about one of the documents Mr. Melsheimer showed in

21   opening statement that you wrote.  Now, before we get

22   there, what do you see -- this red line you see in the

23   end of '98, what's that?

24        A.    That is when SAP introduced the hierarchical

25   access into their system.

1    Q.   Okay.  And did you know at the time that they

2    had taken your technology and put it into hierarchical

3    access?

4    A.   No, of course not.

5    Q.   All right.

6              MR. COLE:  And Mr. Diaz, if we could put

7    up DX885, I believe that was the one we looked at

8    earlier.  Just give us one second.  And if you could

9    blow up kind of the first paragraph, that's one, and

10   the --

11   Q.   (By Mr. Cole)  You can see in the back there,

12   what's the date?

13   A.   I see December 16th, 1998.

14   Q.   Okay.  Is that before or after hierarchical

15   access came out?

16   A.   That was after hierarchical access came out.

17   Q.   All right.  Let's talk about what you say in

18   here.  Can you -- this is the -- we have absolutely

19   screwed up, I have absolutely screwed up section?

20   A.   Yes.

21   Q.   I think the suggestion was that there was

22   something fundamental about Pricer that had -- that you

23   had messed up or your team had messed up, was -- is that

24   what this document is about?

25   A.   No, that was not about the core product.

1      Q.   Okay.  Can you tell me, what was it that was

2  screwed up here in December of '98?

3      A.    It was discussing the integration between

4  Trilogy Software and SAP.  When our customers owned SAP

5  and owned Trilogy Software, if they were in the SAP

6  software and they wanted to get a price, they had to

7  call into our system to do it, so we had to do an

8  integration that would call between them.  And SAP kind

9  of made that as difficult as possible and didn't help us

10  at all, certainly, so we needed to do it all ourselves,

11  which required a lot of knowledge of the SAP system and

12  a lot of work.  And every time SAP changed their system,

13  it broke our integration.

14           So the start of that e-mail thread was

15  actually me as a manager kind of yelling at the

16  developers like, hey, could you do a little better and

17  make this a little more robust.  They were saying, well,

18  hey you as the manager, you didn't tell us this was so

19  hard or so critical.  And I'm not a manager to yell at

20  people, not accept responsibility and I was saying, yes,

21  you're right.  I mean, I should have seen more of this.

22  I should have put more emphasis on it.  I was still, you

23  know, technical I could have written more code.

24           Yeah, it was harder than any of us

25  expected to actually do the integration.  But it was not

1  the core product; it was how to actually talk to SAP's

2  system.

3            MR. COLE:  Mr. Diaz, if we can go back to

4  the chart we were on.

5      Q.   (By Mr. Cole)  Okay.  All right.  Let's just

6  finish out the charts here.  Can you tell me what

7  happened to your sales after the red line in '99 through

8  '03, just real briefly?

9      A.   Well, they started to drop quickly.  We thought

10  it was going to continue going up, but it dropped.  So

11  in 1999, you can see the dot on the line showed we only

12  got seven customers, I believe, that year and it lists

13  those that are the new ones that we had that year.

14      Q.   How was the market for technology sales in

15  1999?

16      A.   It was still very good.

17      Q.   Okay.

18      A.   It was excellent.

19      Q.   2000?

20      A.   2000, it was still good.  Things were, you

21  know, starting to maybe slow down because of that whole

22  dot com era thing, but this was -- I mean, this was

23  business software to help the sales rep sell, so people

24  were still buying that.  And as they mentioned before,

25  the whole Year 2K thing, businesses were all buying

1    software to help themselves at that point.

2        Q.    Okay.  All right.  Well, let me ask you just

3    at a high level, how important was your patented

4    invention to the sales of Pricer?

5        A.    It was absolutely critical.  If we didn't have

6    those capabilities, I mean, people didn't -- wouldn't

7    have had a great reason to buy it from us.

8        Q.    Okay.  And if you see on the chart, again, the

9    bold -- the bold Pricer led customers, did you have any

10   Pricer led sales after SAP introduced hierarchical

11   access?

12       A.    No, we did not.

13       Q.    Okay.  And how many did you have before?

14       A.    Before --

15       Q.    Before '90 -- before October '98?  I'm not

16   asking you to count, about 20?

17       A.    Yeah, about 20.

18       Q.    Okay.  Now, I want to show you a little

19   different version of this chart.  This one just kind of

20   highlights in blue the bold, I probably should have used

21   that one to start, it's a little clearer, but I want to

22   show you a different cut at the data here.  Now, we're

23   going to turn eight of those customers purple.  What

24   does -- what does the purple represent?

25       A.    I believe the purple customers are those who

1   already had SAP at the time that they purchased our

2   software.

3        Q.    And was there a market for bolt-on software for

4   pricing for SAP?  In other words, better additional

5   software on top of a customer already running SAP's ERP

6   system?

7        A.    Yes, that is exactly what we were doing was,

8   you know, offering a better mousetrap on top of what

9   they had and those are customers who were in exactly

10  that situation.

11       Q.    And was there a bolt-on market in SAP all the

12  way to 2006 when you left?

13       A.    Yes.

14       Q.    Okay.  Now, so what's the significance of the

15  fact that at one -- these purple customers, Allegiance,

16  Norand, Whirlpool, Bridgestone, Raychem, Goodyear, Bay

17  Networks and Axo, what's the significance of the fact

18  that they bought Pricer even though they already had

19  SAP?

20       A.    Since they already had SAP, if SAP's system did

21  what they need or did -- did what they needed or even a

22  portion of it, they could use SAP's system for that.  So

23  if they were going to pay us any amount of money in

24  addition to SAP, it was just for the capabilities that

25  we offered above and beyond SAP.

1              Intuitively I think that makes sense.

2  They already had the SAP.  If they were going to pay us

3  a certain amount, it's because our software provided

4  value that was at least as great to them if not much

5  more valuable than what they were paying us.

6       Q.   Now, let's talk about how much money these

7  purple customers were paying.  So I've broken out over

8  here on the right side of the chart all eight of those

9  customers with a column that says license revenue and

10 what is that, just briefly?

11      A.   That is the core purchase price for the

12 software.  There was additional money that they might

13 give us, but just for Pricer itself, you know, to buy

14 it, to have the right to use it, that is what they paid

15 us.

16      Q.   Okay.  And the total for these eight customers

17 is how much?

18      A.   $12,152,000.

19      Q.   Okay.  And how much did Mr. Melsheimer say that

20 the reasonable damages are for their infringement?

21      A.   I think they said two or three million dollars.

22      Q.   Okay.  And did you sell to more than just eight

23 customers in -- before October of '98?

24      A.   Yes.  Obviously we sold to far more than eight

25 customers.  Those were just the eight where it's

1    absolutely clear that they already owned SAP and so

2    every dollar they were paying was obviously for

3    capability and value that was above and beyond whatever

4    SAP's system had at that time.

5        Q.   Okay.  Now, let me ask you this:  In addition

6    to the license revenue, the basic license revenue, did

7    Trilogy also earn other money once it wins a customer

8    like that?

9        A.   Yes, we do.

10       Q.   Okay.  What -- what other kinds of money do

11   you -- do you earn typically once you win a customer?

12       A.    There are two main buckets of money that we

13   would also get.  The first bucket is for consulting

14   implementation, helping the customer install the

15   software.  If they're an SAP customer, to help them

16   integrate it to SAP.  So it's sort of as a consultant we

17   would send people to the customer who would work with

18   them to actually get the software up and running.

19       Q.   Okay.  And about how much over the life of your

20   relationship with a customer would you earn in

21   consulting as compared to the -- the license only?

22       A.    Right.  Obviously some customers need more

23   help, some need less, but on average, the figure we use

24   is over the lifetime it would work out to be roughly the

25   same amount as what the customer paid in license, we

1   would usually get in consulting revenue over the course

2   of however many years.

3        Q.   Okay.  So just to use that example here, if

4   it's 12 million in license, another 12 million in

5   consulting?

6        A.   Yes, that's correct.

7        Q.   Total of 24?

8        A.   Correct.

9        Q.   All right.  What's the third type of revenue

10   that you would earn once you were able to win a

11   customer?

12        A.   So the third type of money is what was referred

13   to as maintenance or maintenance and support, which was

14   somewhat of an industry standard that a customer would

15   pay 18 percent per year and what that would cover was

16   all the development efforts for new features, for bug

17   fixes, to update the software, you know, as the

18   operating system changed.  So to -- you know, they

19   essentially get those, you know, all those new bits of

20   work we would do are included in that 18 percent per

21   year.

22        Q.   Okay.  Now, and about how much -- how often --

23   or scratch that, sorry.

24             About how long would a typical customer, I

25   know it varies, but just on average would a customer pay

1 maintenance once you had won them over?

2    A.    They would pay for as long as they used the

3 software and on average that was probably six to eight

4 years.  Some customers would obviously use it much

5 longer, some less.  Probably about six to eight.

6    Q.    Okay.  Does that add up to about the same

7 amount as the license fee, too?

8    A.    Yeah.  Once again, it's just -- it's a rough

9 figure, but usually over the course of the six to eight

10 or however many years we'd make the -- you know, the

11 same amount of what the license was originally, we'd

12 make about that much more over the course of those

13 years.

14    Q.    Okay.  So if you added all those three together

15 for just these eight customers, just these eight, how

16 much total revenue would you have earned?

17    A.    So it would be about three times the figure

18 that's up there, so it would be about 36 million

19 dollars.

20    Q.    Now, Mr. Melsheimer made a passing reference in

21 opening that -- that all the customers you had here, all

22 these people who bought Pricer, they were all early

23 adopters and so you really can't infer much about the

24 demand for Pricer; would you agree with that

25 characterization?

1      A.    No, I completely disagree, actually.

2      Q.    Now, he also said that if Pricer was such a

3 greater product, why didn't you go out after October '98

4 and rather than selling to SAP customers, go out to sell

5 the Oracle customers or people that -- that don't have

6 SAP at all; why -- why didn't you do that?

7      A.    Well, we didn't really know what was going

8 wrong.  I mean, we certainly tried to figure it out and

9 as you saw in the e-mail before, I thought maybe I

10 didn't work hard enough, maybe I didn't push hard

11 enough.  So I didn't know that our sales problem was

12 necessarily related to SAP versus someone else.

13           So we were worried that, you know, we --

14 we might not be able to sell to anyone, and so we

15 focused our efforts on other things where we thought we

16 would make more money at that point.  So at the core, we

17 didn't know what -- what the real cause was.  So if

18 sales just aren't working, you, you know, you're not

19 going to beat a dead horse.  You'll just, you know, try

20 and make money the best way you can.

21     Q.    Okay.  And let me ask you this:  Were you --

22 did you stop trying to sell Pricer in '99, 2000?

23     A.    No, we definitely didn't stop.  It just -- it

24 changed from being the -- the focus, I mean in, you

25 know, '97 and '98, it was this was the great thing.  So

1    we still had it.  We still sold it.  But obviously our

2    sales reps would sell, you know, what they thought was

3    most likely to sell.  So the focus just shifted to other

4    things.

5        Q.    And in terms of the value of your invention and

6    your product, was it a -- typically a better fit for the

7    big kind of Fortune 500 companies, like the Goodyears

8    and Whirlpools and people like that or to small

9    businesses?

10       A.    I mean, it -- it was applicable to everyone.

11   As I said, if a sales rep couldn't give a price to the

12   customer, it doesn't matter whether it's a big company

13   or a small company.  Now -- now, big companies have more

14   complexity, but the problem that we were solving getting

15   an accurate price to the customer was something

16   everybody had.

17       Q.    Well, let me ask it this way, in terms of

18   priorities and -- and like the sweet spot for your --

19   for your product and your invention, was it larger

20   companies or smaller?

21       A.    The sweet spot was certainly larger companies.

22       Q.    Okay.

23       A.    I mean, they're larger they feel more pain,

24   they sell more product, so that was the sweet spot.

25       Q.    And in -- in the -- in the -- this time period

1    here, late '90s, early 2000s, did you have a sense for

2    of the Fortune 500 type, the sweet spot customers, how

3    many of those had -- were running the SAP ERP back

4    office system, just percentage-wise?

5         A.   Oh, SAP was dominant.  It was a majority.  I

6    don't know an exact figure.  I mean, more than half.

7         Q.   All right.  Now, after SAP introduced

8    hierarchical access, was price -- did Pricer lead

9    anymore deals for you after that?

10        A.   No, it did not.

11        Q.   All right.  Now, we talked a little bit about

12   Pricer leading deals and I think you mentioned Trilogy

13   had other business software that was -- was also

14   valuable.  Besides Pricer, what other products were

15   capable of leading deals for Trilogy back in this time

16   frame?

17        A.   When Pricer first came out, there was really

18   only one other product we had that would lead deals,

19   that was our configuration software and that was kind of

20   what Trilogy was originally known for.  Pricer became

21   the second product we had that led deals.  Later on we

22   also had a product that calculated sales rep

23   commissions, we called it the commission product, and so

24   that also became one that would lead deals.

25        Q.   Okay.  And I want to ask you about a few

1    products that were sold, I think, in connection with

2    some of these others in -- in support and -- and real

3    briefly just ask you whether customers would pay Trilogy

4    the money they did because of these other ancillary

5    products, I'll just list them out quickly and I'll try

6    to get them fast.  A product called Trilogy Backbone?

7         A.    No, no -- no one would buy it because of that.

8         Q.    They bought it to -- to what, to help --

9         A.    The Backbone --

10        Q.    -- the others work?

11        A.    Yes.  They buy it to help other things work.

12   It was -- it was glue.  It was packaging.

13        Q.    Okay.  And I think it was also called MCC

14   Platform at one point?

15        A.    Yes, we also called it MCC Platform.

16        Q.    Okay.  What about the Quote product you had?

17        A.    Quote was a display mechanism.  So once you

18   calculated the price, you just needed to put it up on

19   the screen.  There's lots of different ways to put it on

20   the screen.  You can -- you can display it in the screen

21   in SAP or something else.  Quote was a way we had to do

22   it.  That certainly didn't -- you know, nobody bought it

23   for that.

24        Q.    Okay.  Did people pay you a bunch of extra

25   money because your Quote product was really good?

1    A.   No, not when selling pricing.

2    Q.   So if you had a deal that had Pricer and Quote

3 together, how would you determine what they're paying

4 the money for?

5    A.   I believe they were paying everything for

6 pricing, and I mean, if they didn't want to use the

7 quoting, they could do it themselves another way.

8    Q.   All right.  So with that same concept in mind,

9 let me take off a few more.  SC Proposal?

10    A.   SC Proposal would take the pricing and put it

11 into a Microsoft Word document, just make it a little

12 bit easier.  Again, nobody -- no one bought the Pricer

13 product because we could put it in Microsoft Word.

14    Q.   So same as Quote?

15    A.   Same as Quote.

16    Q.   SC Order?

17    A.   SC Order was a bit more technical.  It would

18 just -- it would run on a server and listen for pricing

19 request.  It was -- you know, in the end people just

20 wanted to get the price.  It was another way to give it

21 to them.  Rather than giving it on the screen, you could

22 give it electronically through a server.

23    Q.   If somebody bought Pricer and SC Order

24 together, how would you allocate the -- the value in

25 that contract?

1      A.    I would -- I would allocate it all to Pricer.

2      Q.    Okay.  Is that consistent with your factual

3  experience when you were actually out there making

4  sales?

5      A.    Yes.  In fact, in many of the sales calls, I

6  mean the -- the discussions were all about Pricer.  It

7  was all about the value of Pricer.

8      Q.    Okay.

9      A.    And only at the very end, well, how do we

10  display it?  We'd discuss a couple ways and maybe they'd

11  use one of those products.

12      Q.    Okay.  SC Contract?

13      A.    SC Contract was, again, another one that would

14  take paragraphs of text, contract text, and put it in a

15  Word document.

16      Q.    Did anybody buy because of that?

17      A.    No.  They didn't buy the pricing product

18  because of that.

19      Q.    Did they pay more money because of that in your

20  Pricer deals?

21      A.    No.  In the negotiation the price was all about

22  Pricer.

23      Q.    Okay.  And let me ask you about a series --

24  there's a series of products that I think were kind

25  of -- went with Pricer as kind of a package and if you

1  could just confirm whether that's correct.  SC Pricer

2  Maintenance?

3      A.   Yes, the Maintenance product was just where

4  somebody would type values into the screen.

5      Q.   Price Book?

6      A.   Correct.  Price Book was another thing that

7  would take the prices and put it into Microsoft with

8  some nice formatting.

9      Q.   Would either of those two things work without

10  Pricer?

11      A.   No.  In fact, they'd be completely worthless

12  without Pricer.

13      Q.   And did -- did people buy Pricer because of

14  Price Book or did they buy Price Book because of Pricer?

15      A.   No, they got the Price Book because of Pricer.

16      Q.   And the same thing with the SC Pricer

17  Maintenance?

18      A.   Yes.

19      Q.   All right.  And then a product called Pricing

20  Analysis?

21      A.   Yes, again, it's the same thing.  The Pricing

22  Analysis would look at the prices and report on it, but

23  if you didn't have Pricer, it was -- it was worthless.

24      Q.   Okay.  And Price Server, SC Price Server?

25      A.   Yes, that was another mechanism to communicate

1  or get access to the prices electronically.

2     Q.   All right.  I've got two more and then we'll be

3  done with this.  I'm sorry, it's a little tedious.  A

4  product called Replication or Replicator?

5     A.   Correct.  So the Replicator would take pricing

6  data from the central server and help the sales reps get

7  it on a laptop.  And again, they weren't -- no one would

8  buy our Replicator to take someone else's pricing to run

9  on a laptop, especially if it didn't run on a laptop.

10 So it was -- they would buy our software, Pricer, to run

11 on a laptop and this would just help get the information

12 out.

13    Q.   And the last one is a product called Report or

14 Reporter, what about that one?

15    A.   Again, similar thing, would report on the

16 pricing information that the engine came up with.

17    Q.   Now, for any of these products we just went

18 over, did people pay you extra money in your Pricer

19 deals because of those ancillary products?

20    A.   No.

21    Q.   Okay.  All right.  Let's -- We're done with

22 that.

23         Let me ask you a couple more questions

24 about this.  Back in the '95, '98 time frame before

25 things started going down, what was your sense of the --

1  the sort of medium term and long-term market potential

2  for Pricer?

3      A.   I used to say, I mean, we believe because we

4  were selling these Fortune 500 companies that were

5  paying millions of dollars for it, that we believed it

6  was a billion dollar industry in total just over the

7  course of the lifetime.

8      Q.   Would you consider pricing a niche market?

9      A.   Not at all.  Every company prices, every -- and

10 every company will lose if they don't have the right

11 prices and they can't get it to the customers.  That's

12 not a niche.

13     Q.   All right.  And can you tell me what was the

14 reaction just for you personally and at Trilogy when,

15 you know, we got to '99 -- '98, '99, and things started

16 slowing down and then falling off, what was the

17 reaction?

18     A.   I was very hurt, frustrated.  I mean, it was my

19 product that we expected to, as I said, we thought it

20 could be a billion dollar market and it seemed to be

21 going away.  So there was a lot of frustration.

22     Q.   Okay.  Now, did you blame hierarchical access

23 at the time?  Did you say it's all because of

24 hierarchical access?

25     A.   No, I didn't know about the hierarchical

1   access.

2   Q.   Okay.  Well, let me ask you why that was.  Can

3   you tell me, did SAP launch a product, a stand-alone

4   product, that says we now have hierarchical access, it's

5   for sale, the cost is however many dollars?  Did they do

6   it that way?

7   A.   No.  I mean, as they said, they had, you know,

8   thousands of features and other things, and this just

9   became one more.  They -- they didn't even charge

10  anything for it.  So the customers that had it,

11  basically would just, you know, get it for free.  There

12  was no fanfare in that respect.  So I just didn't know

13  about it.

14  Q.   How --

15  A.   I mean, it was bundled in with everything else.

16  As I said, they had everything else and they bundled it

17  in with that.

18  Q.   How easy is it when you're trying to sell

19  software to compete with somebody selling the same thing

20  you have or something very similar to what you have for

21  free?

22  A.   It's -- when a big company gives it away for

23  free, it's almost impossible.  If -- if they have the

24  same thing you have, it's almost impossible.

25  Q.   And let's look here, if we can, at a document

1    that touches on that point.  This is Plaintiffs' Exhibit

2    270, and I know you didn't see this at the time because

3    this is an internal SAP e-mail in June of '98.  There is

4    one guy, I think, on there that you know.  Do you see

5    the name Bernhard Neumann?

6         A.    Yes, I knew Dr. Bernhard Neumann.

7         Q.    He was an SAP engineer?

8         A.    Yes, he was one of their best that actually, I

9    mean, ran a group for them.

10         Q.    Okay.  And here can you tell us what this is

11    talking about and what -- how -- how significant is this

12    in terms of the, you know, bundling concept you just

13    mentioned?  What is this -- what is this saying?

14              MR. MELSHEIMER:  I'm going to object, Your

15    Honor, he just told this witness it was an internal SAP

16    document.  He's asking him to interpret what it means.

17    So I object, lack of foundation.

18              THE COURT:  Well, you can explain what it

19    means to you.

20              THE WITNESS:  Okay.

21              THE COURT:  Okay.

22         A.    So it says they are bundling these three

23    products and the SPE stood for their sales pricing

24    engine.  So they were going to bundle them together to

25    discourage the usage of third-party components and then

1    they list Trilogy by name.  So to me this means that

2    they are including their new pricing with some other

3    things specifically to hurt me.

4        Q.   (By Mr. Cole)  Okay.  All right.  I want to

5    talk about a couple more things that Mr. Melsheimer

6    mentioned in opening.  I think he said something to the

7    effect that there's lots of other pricing companies out

8    there and, you know, nothing about them changed and so

9    you can't blame us for the drop in sales.  So I want to

10   ask you about some of the alternatives, the other

11   pricing systems that were available back in the late

12   '90s up until you left in 2006, okay?

13       A.   Okay.

14       Q.   All right.  Now, how about Oracle, did they

15   have a pricing -- did they have pricing functionality?

16       A.   Yes, they did.

17       Q.   Now, would Oracle be a commercially viable

18   alternative to a -- to a large SAP customer who wants

19   enhanced pricing on top of SAP?

20       A.   No.  Oracle was SAP's biggest competitor, so of

21   course, Oracle wasn't going to just take a piece of

22   their software and run it on SAP and SAP wouldn't really

23   allow it.  They're head-to-head competitors.  So to buy

24   Oracle software, a piece of it, to run on top of SAP

25   it's just -- it's impractical.  It's not going to

1    happen?

2         Q.    Did you ever see it happen?

3         A.    I certainly never saw it happen.

4         Q.    Okay.

5         A.    I never saw anybody even think about it.

6         Q.    All right.  Next one -- let me see if I can

7    group these two -- these together.  PeopleSoft, JD

8    Edwards and Baan, were those also ERP companies?

9         A.    Yes, also ERP vendors just like SAP and Oracle.

10        Q.    Okay.  And --

11        A.    PeopleSoft did human resources, so it was

12   slightly different.

13        Q.    Would -- would you -- would it ever be a viable

14   commercial alternative to a SA -- large SAP customer who

15   needs enhanced pricing to bolt on PeopleSoft or JD

16   Edwards or Baan Pricing?

17        A.    No, it would be impractical because they were

18   competitors, as I mentioned, and actually a couple of

19   those companies later got bought by Oracle, so they --

20   they became SAP's number -- they joined up and bought

21   each other to become the number one competitor.

22        Q.    So PeopleSoft was bought by Oracle in 2004?

23        A.    Correct.

24        Q.    And JD Edwards around the same time?

25        A.    Yes.  I don't remember the exact year.

1    Q.   Okay.  All right.  I've got, just to warn

2    everyone, I've probably got five or six more; we'll try

3    to get through them quickly, though.

4              What about a company called Siebel?

5    A.   Yeah, Siebel is -- started as an opportunity

6    management company, helping sales reps just keep track

7    of the list of names of customers and gained -- I mean,

8    they -- in fact, actually Siebel later talked to Trilogy

9    about buying our pricing product to be able to use

10   because they -- they didn't have anything originally,

11   and then when they did have something, it wasn't very

12   good, and so they actually looked to buy ours at one

13   point.

14   Q.   Was Siebel a viable commercial alternative to

15   meet the -- the pricing needs of SAP's large customers

16   back in the time you were at Trilogy?

17   A.   No.

18   Q.   Okay.  And, in fact, I think Siebel was bought

19   by Oracle, too?

20   A.   And Siebel became an Oracle company.  So in

21   addition to not having the technical capabilities, they

22   then became competitors, which nobody would use them for

23   it.

24   Q.   Okay.  Next company I would want to ask you

25   about is i2.  Would -- would i -- would i2's pricing

1  software be a viable commercial alternative to bolt on

2  top of SAP for big customers?

3      A.   No.

4      Q.   And why not?

5      A.   i2 was a supplying chain vendor.  They -- so

6  originally they didn't even have pricing for the longest

7  time.  They then created a small module which they used

8  as their own stand alone, but to the best of my

9  knowledge, they were not selling it as an add-on or

10 bolt-on to SAP.

11     Q.   Okay.  Next one is a company with a funny name

12 called Blue Martini --

13     A.   Yes.

14     Q.   -- what about them?

15     A.   Again, no, I don't believe that they were a

16 viable bolt-on to SAP.  They added some pricing

17 functionality into their product management system, but

18 that was not really what they were using, and if

19 anything, they would sometimes call back to SAP to get

20 SAP's pricing using SAP's.

21     Q.   Okay.  Four more.  Click Commerce?

22     A.   Click Commerce was a smaller company, as I

23 recall they worked mostly on Microsoft systems and

24 software.  I never saw them integrate to the ERP

25 vendors, do anything bolt-on-wise.

1    Q.   Including SAP?

2    A.   Including SAP.

3    Q.   Okay.  Company called Comergent?

4    A.   Comergent.  Yes.  Comergent, did -- they did do

5  bolt-ons, but as I recall, Comergent was more of an

6  auction software vendor.  So in that case, and when it's

7  auction software, you can imagine an auctioneer getting

8  up, they give you an initial price, but then everybody

9  bids on it and so that's not actually the final price.

10  So it -- it was different than what we were doing and

11  actually setting the real prices with the real discounts

12  for the end consumer to buy at that point.

13    Q.   Would Comergent been a replacement or

14  substitute for your invention?

15    A.   No, I don't believe so.

16    Q.   All right.  Two more.  Chrome, how about them?

17    A.   Chrome was a data provider in the automotive

18  industry.  So in the automotive industry when people

19  wanted to know what the MSRP price was and hopefully if

20  you buy a car, you know that you generally don't want to

21  pay MSRP price.  So Chrome would provide that data.  In

22  fact, Trilogy worked with Chrome quite a bit in the

23  automotive industry, because many of those customers

24  like Ford were automotive customers and we would work

25  with Chrome.  They would feed us a piece of information

1  which we would then use in the ultimate calculation.  So
2  I don't believe they were a viable bolt-on to SAP.
3      Q.   Okay.  Mercifully the last other competitor,
4  salesforce.com, would they have been a -- would they
5  have been a viable alternative, commercial alternative
6  for SAP big customers' pricing needs when you were at
7  Trilogy?
8      A.   No, I don't believe so, and to the best of my
9  knowledge, I don't believe salesforce.com even has a
10 pricing system of their own.  I believe they use -- I
11 mean, they let other people add in their own pricing
12 systems.
13     Q.   Okay.  Now, just in summary, any of the
14 companies we just went over, did any of their pricing
15 products offer the benefits of your invention in the
16 pricing field?
17     A.   No, absolutely not.
18     Q.   And that was true throughout the time period
19 you were at Trilogy up to 2006?
20     A.   Yeah.  To the best of my knowledge, I never saw
21 any of them have any of those capabilities we had.
22     Q.   Okay.  And I want to show you one more internal
23 SAP document, again, I won't ask you to --
24          MR. COLE:  Well, can we have PX, excuse
25 me, 2105, Mr. Diaz?

1    Q.   (By Mr. Cole)  This, again, I won't ask you

2  your own -- to interpret it -- what they were meaning,

3  but I want to see if it's consistent with your

4  understanding of the market.

5              MR. COLE:  And if you could look,

6  Mr. Diaz, at the -- the paragraph starting with the main

7  reason.

8    Q.   (By Mr. Cole)  This is a 2000 -- November 2003

9  SAP internal e-mail that says basically the important

10 point is:  All pricing and configuration providers worth

11 mentioning have disappeared from the market by 2003 all

12 together or they have been marginalized, specifically

13 Trilogy, or taken over by one of the large application

14 suite providers, Oracle, Siebel, PeopleSoft.  Is that

15 consistent with what you saw in the market in 2003?

16   A.   Yes, it is.

17   Q.   Has the disappearance of pricing configuration

18 vendors gotten -- have they reappeared since then or has

19 the disappearance of the small companies continued?

20   A.   It's continued and it's small companies and

21 large because, in fact, this is mentioning PeopleSoft

22 and Siebel acquiring other companies who, in turn, then,

23 were acquired by Oracle.  So even big companies it's

24 happening to.

25   Q.   Now, is it consistent with your experience as

1   of 2003 that Trilogy had been marginalized?

2        A.   Yes.

3        Q.   Okay.  Mr. Carter, this is the last topic, and

4   then I will leave you alone.  I want to talk briefly

5   about your thoughts at the time you came out with Pricer

6   about the best way to market; in other words, the best

7   fit for your invention.  Can you tell me what your

8   thought was on that?

9        A.   My thought for the best way to bring the

10  product to market, since it was new and it had

11  capabilities that nobody else had, was to actually

12  partner with SAP, who was the big company in the back

13  office.  So my -- I thought the best way was to partner

14  with them.

15       Q.   And what did do you to pursue that?

16       A.   I reached out to a person named Dr. Bernhard

17  Neumann, whose name we've seen before.  He was an

18  incredible engineer for SAP, high up, ran a development

19  team for them and I had a huge amount of respect for him

20  personally and professionally.  So I reached out to him

21  to say, hey, you know, we have this new thing, I think

22  it could be good for everybody.  Let's do a partnership.

23       Q.   And when was the first time you brought up a

24  possible partnership with SAP?

25       A.   Sometime in 1996.

1    Q.   All right.  Okay.  Now, I want to -- did you

2  get an immediate response from them?

3    A.   I mean, the immediate response was, hey, this

4  looks interesting, I'll go talk to other people.  I

5  didn't get any immediate official response, just that

6  Bernhard would continue to look --

7    Q.   Okay.

8    A.   -- into the matter.

9    Q.   And can you tell me now, what -- after that

10  first meeting in '96, what was the next thing that

11  happened in terms of your effort to partner with SAP on

12  Pricer?

13    A.   SAP had a sales conference in 1997, I believe,

14  the first one was in California, and I knew Bernhard

15  Neumann was going to come to that conference.  So I

16  offered to meet him there and bring him up to date on

17  the latest work that we had done, both with the product

18  and, as I mentioned, we had integrated our product to

19  SAP, so I thought he might particularly find that

20  interesting, so I wanted to tell him more about what we

21  had done at that point.

22    Q.   Okay.  You met with Dr. Neumann?  Did you show

23  him the product?

24    A.   Yes, we did.

25    Q.   Did he ask questions?

1    A.    Yes.

2    Q.    Was there anybody else there?

3    A.    I believe at that meeting he brought with him a

4    person named Wilifred Merkel, who was the person

5    responsible for the pricing software at SAP.  Bernhard

6    Neumann, his focus was elsewhere, even though he was

7    very senior, so he brought the person who was very

8    focussed on pricing.

9    Q.    Were Dr. Neumann and Wilifred Merkel involved

10   in SAP's research and development in the area of

11   pricing?

12   A.    Yes, they were.

13   Q.    And the -- the first meeting you mentioned in

14   '97, was that in about April of '97?

15   A.    Yes, that was April.

16   Q.    And where was that?

17   A.    I believe that was at Disneyland, actually.

18   Q.    All right.  Now, I want to fast forward a

19   little bit.  What was the next thing that happened after

20   your April '97 meeting?

21   A.    Well, SAP went from Disneyland to Disney World

22   and so there was another conference at Disney World in

23   Florida the next time and similar --

24   Q.    When was that?

25   A.    I believe that was August of '97.  And I

1   believed that Bernhard Neumann would be at that

2   conference like he was the last one, so I reached out

3   and said, hey, can we meet again?  Can I show you the

4   latest and keep trying to promote the partnership.

5       Q.   Okay.  And at the time did they continue to

6   seem interested?

7       A.   Yes.

8       Q.   All right.  Now, and -- so this was April and

9   August of 1997, right?

10      A.   Correct.

11      Q.   All right.  I want to show you, again --

12          MR. COLE:  Mr. Diaz if we could bring up

13   PX1637.

14      Q.   (By Mr. Cole)  -- I want to show you, again, a

15   couple of internal SAP e-mails that you would not have

16   had access to at the time and ask you about that.

17          First, is -- this is just a cover e-mail

18   and I just want to establish that --

19          MR. COLE:  If you could just zoom in to

20   show the date and the people.

21      Q.   (By Mr. Cole) -- it's an e-mail from a guy

22   named John Zmolek at SAP in January of '97, that was

23   before those meetings?

24      A.   Yes.  Correct.

25      Q.   All right.  And who -- do you see a couple of

1    names there, Wilifred Merkel and Bernhard Neumann?

2        A.    Yes, those are the two people I mentioned I met

3    with.

4        Q.    Okay.  And Peter Zencke, who is he?

5        A.    Peter Zencke was the head of all of SAP's

6    research and development.  He was the top of the top of

7    their engineering teams.

8        Q.    Okay.  And so in this January e-mail, they

9    attach a memo behind it?

10              MR. COLE:  And if we can bring that up.

11   It's PX1638.

12              All right.  And if we could blow up -- if

13   you could blow up this bottom paragraph here.

14       Q.    (By Mr. Cole) And the topic of this at the top

15   says:  Proposed guidelines for internal and external

16   communications on SAP's SFA strategy.

17              What's SFA?

18       A.    SFA stands for sales force automation.  It's

19   kind of the broad category of all the software that

20   would include pricing.

21       Q.    Okay.  And I want to focus your attention here

22   on the second bullet point.  It says:  For vendors we

23   are not planning to work with -- this is in January of

24   '97, and it gives some names, Calico, CWC, eventually,

25   Trilogy.

1          Now, let me ask you this.  When you met

2   with Dr. Neumann and Wilifred Merkel in April and August

3   of '97 and showed them Pricer, did they tell you they

4   had already decided not to work with Trilogy?

5        A.   Certainly not.

6        Q.   Would you have met with them and showed them

7   your product if they had told you they'd already made up

8   their minds; they weren't going to work with you?

9        A.   No, certainly not.

10       Q.   Thank you, Mr. Carter.

11               MR. COLE:  We'll pass the witness.

12               THE COURT:  Cross-examination.

13               MR. MELSHEIMER:  May it please the Court.

14                   CROSS-EXAMINATION

15   BY MR. MELSHEIMER:

16       Q.   Good morning, Mr. Carter.

17       A.   Good morning.

18       Q.   We just met out in the -- during the break,

19   didn't we?

20       A.   Yes.

21       Q.   All right.  Let me see if there's some things

22   that you and I can agree on, all right, sir?

23       A.   Okay.

24       Q.   So, first of all, you told the jury in your

25   direct examination that your '350 patent was filed in

1    1996.  Do you recall that?

2        A.    Yes.

3        Q.    Okay.  Let's take a look at the patent itself,

4    which the jury has.  And, of course, the filing date on

5    the patent itself, the '350 patent, the patent involved

6    in this case, is February 19th, 1999.  That's what it

7    says, right?

8        A.    Yes, that's correct.

9        Q.    Now, let's just be clear about what happens

10   when a patent is filed, an application is filed.  It's

11   not public when it's filed, is it, sir?

12       A.    I don't believe so.

13       Q.    In fact, when the patent application is filed,

14   there's lots of give and take between the Patent Office

15   and an inventor like yourself that takes place in

16   private; fair statement?

17       A.    Yes, that's correct.

18       Q.    And it's not like SAP or anyone could go to the

19   Patent Office in February of 1999 and say:  Hey, give me

20   Mr. Carter's patent application.  They couldn't do that,

21   right?

22       A.    Not that I know of anyway.

23       Q.    Right.  And you're not suggesting that they did

24   do that, are you?

25       A.    No.

1    Q.   Okay.  So -- and just so we're clear, so it's

2    filed not in '96, but in 1999.  It's private up until

3    the time it issues; fair statement?

4    A.   I believe so.

5    Q.   Okay.  And then let's look how long it took to

6    issue.  April 22nd, 2003.

7              Now, you made a little joke about this,

8    that it took them a while to kind of get to -- you

9    weren't -- you weren't criticizing the Patent Office,

10   were you?

11   A.   No.

12   Q.   Okay.  So -- but the point is, in this time

13   period, as far as you know, from 1999 to 2003, all the

14   materials describing your invention, your ideas, that's

15   secret, right?

16   A.   I believe so.

17   Q.   All right.  It's kept within the Patent Office.

18   You know about it, and the Patent Office knows about it,

19   but the Patent Office doesn't publish this or disclose

20   this to the world until the patent actually issues in

21   2003.  Do I have that about right?

22   A.   Again, I'm not the lawyer, but I believe that

23   is correct.

24   Q.   All right.  Now -- so I want to talk to you a

25   little bit about this chart that I put up.  You were

1  here for the opening.  I think I look -- I think I

2  looked right at you in the opening.

3       A.   Yes, sir.

4       Q.   Yes, sir.  Okay.

5            MR. MELSHEIMER:  Can I have the ELMO,

6  please, ma'am?

7            COURTROOM DEPUTY:  Yes, sir.

8       Q.   (By Mr. Melsheimer) All right.  Now, I just

9  want to make sure that you agree with the dates and the

10 relationships that I put up there.  Are you with me?

11      A.   Yes, I am.

12      Q.   All right, sir.  So there's no dispute that SAP

13 added this hierarchical access feature to its ERP

14 software.  We've got a lot of abbreviations working

15 here, don't we?

16      A.   Yeah.

17      Q.   Okay.  That we added that to our ERP software

18 in 1998, correct?

19      A.   Correct.

20      Q.   All right.  And your '350 patent did not issue

21 until 2003, right?

22      A.   That's correct.

23      Q.   And you didn't -- the filing date that was

24 reflected on that patent that we just looked at that the

25 jury has in their books is actually right around in

1  here, 1999, fair?

2      A.   Yes.

3      Q.   All right.  Now, we can agree, just as a basic

4  point, that from the period from 1998 to 2003, whatever

5  was going on in the world during that time period, there

6  was no infringement of the '350 patent; fair statement?

7      A.   I believe so.

8      Q.   Okay.

9              MR. MELSHEIMER:  Your Honor, I would offer

10  this as --

11     Q.   (By Mr. Melsheimer) Well, let me -- let me ask

12  you one more thing.  Sorry.

13              2007.  Now, you -- you left Trilogy in

14  2006, right?

15     A.   Yes, that's correct.

16     Q.   Now, when you left, was it still called

17  Trilogy?

18     A.   Yes.

19     Q.   Okay.  When did they change their name to

20  Versata?

21     A.   I honestly don't know.

22     Q.   You don't know.  Okay.  Well, fair enough.

23              Well, so you left in 2006, and this

24  lawsuit didn't get filed until 2007, fair, as far as you

25  know?

1    A.    As far as I know, yes.

2    Q.    All right.  And you also -- you don't have any

3 personal knowledge, do you, that anyone from Trilogy or

4 Versata told anyone at SAP about the '350 patent before

5 2007?

6    A.    No, I have no personal knowledge of that.

7    Q.    And just to go back to something you were

8 talking about with Mr. Cole a little bit earlier -- and

9 we'll talk about this more maybe before lunch, maybe --

10 maybe after lunch, but you were talking about these

11 communications that you were having with SAP about

12 having a partnership, right?

13   A.    Yes.

14   Q.    A couple things about that.

15         So you actually had those kinds of

16 communications with a whole bunch of different

17 companies, fair?

18   A.    Yes.

19   Q.    Oracle, right?

20   A.    Yes.

21   Q.    Microsoft?

22   A.    Yes.

23   Q.    Okay.  Didn't develop a partnership with

24 Oracle, did you?

25   A.    Not with the pricing product.

1    Q.   Didn't develop a pricing partnership with

2    Microsoft either.

3    A.   No.  That's correct.

4    Q.   Now, with respect to your meetings with SAP,

5    those meetings actually took place over a period of

6    years, fair?

7    A.   Yes.

8    Q.   And it's fair, isn't it, sir, that your lawyer

9    showed you some documents that you were not aware of

10   that -- internal SAP documents that you said you were

11   not aware of, right?

12   A.   Correct.

13   Q.   Well, now, there's some things, though, that

14   you didn't tell SAP during these conversations either;

15   isn't that fair?

16   A.   I'm sure it is.

17   Q.   Right.  Well, one thing you know you didn't

18   tell them is, you never told them during any of these

19   conversations in '97, '98, '99 -- when did they end, by

20   the way?  I just want to get it right.

21   A.   The conversations about partnership?

22   Q.   Yes, sir.

23   A.   Specific to the pricing product, I think it

24   ended about 1998.

25   Q.   '98 or so?

1      A.    About that, yes.

2      Q.    Okay.  I'm not fussing with you about the date,

3  sir --

4      A.    Yeah.

5      Q.    -- but the point is, you never told them that

6  you were thinking about filing any sort of patent, did

7  you, the '350 patent?

8                  Let me rephrase that.

9      A.    The '350 patent, no.  We had other patents

10  that --

11      Q.    Right.  You never told them that you had a

12  patent application for the '350, fair?

13      A.    Not that I remember.  I don't think so.

14      Q.    And I'm not complaining about that or fussing

15  at you about that at all, but I just want to make it

16  clear, you were having conversations with them, and

17  there were some things you didn't tell them, right?

18      A.    Yes.

19      Q.    And that's because in part, you were running a

20  business, right?

21      A.    Yes.

22      Q.    They were running a business?

23      A.    Yes.

24      Q.    You thought you might be able to have some

25  business that you might be able to do together, right?

1       A.    Yes.

2       Q.    But you were also competing to some extent with

3  them, right?

4       A.    That's correct.

5       Q.    And you don't fuss at SAP for trying to run

6  their business in a way that -- that tries to get as

7  many sales as they can get, fair?

8       A.    That's fair.

9       Q.    That's what you were trying to do, right?

10      A.    Yes.

11      Q.    Right.  You were trying to run your business to

12  get as many sales as you probably could ethically and

13  appropriately, fair?

14      A.    Yes.

15      Q.    And if you could do that -- if not telling SAP

16  something would help you do that, you'd sure do it,

17  right?

18      A.    Yes.  As you said, given all things being

19  ethically done, et cetera, yes.

20      Q.    Okay.  So -- and you're not saying that --

21  that -- in fact, one of these -- one of these meetings

22  that you had with SAP in the early time period -- maybe

23  we'll get to this a little bit later.  I don't want to

24  dwell on this too much.

25              But you had a meeting with them where you

1   had originally went into the meeting with an idea that

2   you were going to tell them a whole lot about your

3   product, right?

4       A.   Yeah.  You're referring to that configuration

5   meeting?

6       Q.   Yeah.  The configuration meeting, right?

7       A.   Correct.

8       Q.   Well, that's a good point.  Thanks for bringing

9   that up.  Because, in fact, the meetings you were having

10  with SAP were not just about Pricer, right?

11      A.   There were other meetings.  The ones that I had

12  with Bernhard were specific to pricing.

13      Q.   I'm sorry.  Let me make sure I got the question

14  right.

15           You had meetings with SAP regarding your

16  configuration product, right?

17      A.   Yes, that's correct.

18      Q.   Now, let's just make sure we understand what

19  that is.  What is a configuration product?  What does

20  that mean?

21      A.   Configuration software, or a product, allows a

22  customer to, you know, tell a sales rep what they want

23  at a high level, and it will come -- the configuration

24  software comes up with all the parts.

25           So imagine buying a computer and saying:

1    I want a computer that will do basic surfing of the web,

2    and that software comes back and tells you what CPU,

3    what memory and disk you need.  So it takes your

4    requirements as a customer and comes up with the parts

5    to sell you.

6         Q.    Right.  So that's -- that's pretty cool, isn't

7    it?

8         A.    We thought so.

9         Q.    You thought -- well, oh.  I'm not -- you can

10   brag away, if you want to.  It was -- it was a cool

11   product, wasn't it?

12        A.    Yes.

13        Q.    Now, it's not SC Pricer that we're talking

14   about in this case, right?

15        A.    That is correct.

16        Q.    It's a different product.

17        A.    Yes, that's correct.

18        Q.    In fact, I think I saw in one of those USA

19   Today articles that your lawyer put up -- maybe there

20   was a -- it was a way for like a shoe company to make

21   sure they had the right kind of -- the right -- right

22   number of ladies' shoes and the right styles of shoes

23   and the different heel lengths and all that stuff.  Have

24   I got that about right?

25        A.    Yes.

1    Q.   Okay.  So that was a product you were talking

2  about with SAP about possibly partnering with them,

3  correct?

4    A.   Yes.

5    Q.   And when you went into a meeting with them at

6  one point in the late '90s, mid-'90s, you actually

7  decided in the middle of the meeting -- you and

8  Mr. Liemandt stepped out of the meeting and decided that

9  you weren't going to tell SAP some things about your

10  product at that meeting.

11                  Remember that?

12    A.   Yes, I remember that.

13    Q.   Okay.  You had gone to the meeting with the

14  idea that:  Hey, we're going to be open and tell them a

15  bunch of details, but then you decided in the middle:

16  You know what?  We're going to play our cards a little

17  closer to the vest, right?

18    A.   That was decided.

19    Q.   Right.

20    A.   Characterizing that I was the one that decided

21  that may not be quite right.

22    Q.   Fair enough.  And -- Mr. Liemandt decided that?

23    A.   Someone else did.

24    Q.   He was the big boss, right?

25    A.   Yes.

1      Q.   He was the founder of the company?

2      A.   Yes.

3      Q.   And he went into this meeting with -- and

4  certainly, SAP, at that meeting, it was your

5  understanding they expected to get some information

6  about the configuration software, right?

7      A.   I mean, I can't say what they expected.  I

8  don't -- again, I don't know what's in their head, but

9  that was the original plan.

10      Q.   That was the original plan, and in the middle

11  of the meeting, you took a break, and Mr. Liemandt said:

12  Let's not tell them all this stuff (whispering), right?

13      A.   Effectively, yes.

14      Q.   All right.  Now, you didn't think there was

15  anything wrong with that, did you?

16      A.   No.  I mean, it was just a decision.

17      Q.   It was business, right?

18      A.   It was business.

19      Q.   It was a business meeting between two companies

20  that might have some business to do together but might

21  decide not to do business together; fair statement?

22      A.   Yes, that's a fair statement.

23      Q.   And you certainly didn't go in and tell

24  Trilogy -- or just tell SAP, after you came back from

25  that break:  Now, guys, we've had a little private

1  meeting out here, and we've decided not to tell you some

2  things that we intended to originally tell you.

3           You didn't tell them that, right?

4      A.   Actually, I think we did almost say that, but

5  it was kind of apologetic.  I'm sorry.  We're not going

6  to do this.

7      Q.   Oh, so you told them you were sorry that you

8  weren't going to reveal as much as maybe they expected,

9  fair?

10     A.   That's fair.

11     Q.   Okay.  But these meetings took place over a

12 period of years.  There were some ups; there were some

13 downs.  And ultimately, there was no agreement reached

14 to partner with SAP; fair statement?

15     A.   Correct.

16     Q.   Now, again, you had similar meetings with other

17 companies, like Microsoft and Oracle, and those

18 discussions didn't result in any partnership either,

19 fair?

20     A.   Yes.

21     Q.   Now, there were some disagreements within the

22 company, within your company, Trilogy, about whether or

23 not that was even a good idea, right, to have that kind

24 of partnership?

25     A.   Yes.

1    Q.   I mean, some people thought:  You know what?

2  Let's not do that.  Let's be our own independent

3  company, and let's not worry about SAP, fair?

4    A.   Yes, that's fair.

5    Q.   Some people said:  You know what?  Maybe we

6  should partner with them.  Maybe we can do some things

7  together.  Maybe we can develop some products together.

8  Maybe they can sell our product or resell our product.

9  Some people had that view, right?

10    A.   Yes.

11    Q.   And at the end of the day, the partnership

12  never materialized, fair?

13    A.   Yes.

14    Q.   All right.  Now, I want to talk a little bit

15  about a couple of other things I think we can agree on,

16  sir.  Let me go back to this.

17          MR. MELSHEIMER:  Can I have the ELMO back?

18    Q.   (By Mr. Melsheimer) All right.  So I've got a

19  miniature version of the chart that Mr. Cole put up

20  there, all right?

21          If it was someone's investment portfolio,

22  it wouldn't look too good, right?

23    A.   Correct.

24    Q.   Right.  Okay.  So let's take a look at it here.

25  And, in fact, if we start to move it over here a little

1  bit, right -- so this line is 1998, right?  This red

2  line that you talked about, that's 1998.

3            And, again, just -- it's kind of hard to

4  see because I haven't done it right, but -- 1998, that's

5  the red line, and then you've got this big dropping off

6  the cliff, right?

7      A.   Correct.

8      Q.   And that's a visual representation of it.

9      A.   Correct.

10     Q.   And just so we're on the same page, you

11  understand that Trilogy's position in this case is that

12  because SAP added this one feature in 1998, that Trilogy

13  was headed up through the moon or headed up or

14  continuing at the same pace, and because SAP did that --

15  again, I'm just asking you if you understand the

16  position here -- because SAP did that in 1998, that this

17  is what caused this big collapse.

18            Is that your understanding of what's going

19  on here?

20     A.   Yes, that's correct.

21     Q.   All right.  Now, again, just so we're clear, in

22  1998, when SAP added that feature, you didn't own it in

23  the '350 patent, fair?

24     A.   Yes.

25     Q.   Another point about this that was suggested,

1   just so there's no uncertainty here, you're not telling

2   the jury or anyone, because it would be totally wrong,

3   to suggest that SAP got Trilogy's source code and took

4   it and put it in its product.  You're not saying that,

5   are you?

6       A.   No.  I don't believe they had access to the

7   source code.

8       Q.   Okay.  Well -- and you -- so -- and before,

9   you've, in fact, testified that you do not believe that

10  SAP ever had any access to the secret source code in

11  part because you were the one in charge of it, right?

12      A.   Yeah.  No.  They -- they asked for it, and we

13  didn't give it to them.

14      Q.   Right.  And -- well, that's a good point, too.

15  They asked for some source code.  You wouldn't give it

16  to them.  You asked SAP for some stuff, and they

17  wouldn't give it to you either, right?

18      A.   Correct.

19      Q.   All right.  So when you said we didn't give it

20  to them, you weren't suggesting that they were trying to

21  steal your source code, were you?

22      A.   Again, I don't know what they were intending.

23      Q.   Okay.  But when you asked them -- let's put it

24  back another way, sir.

25               When you asked them for their source code,

1    for their interface code, you weren't trying to steal

2    that from them, were you?

3         A.   No, I was not.

4         Q.   Okay.  And you don't think anyone at Trilogy

5    was trying to steal anything doing that, right?

6         A.   No, I do not.

7         Q.   Okay.  So just so -- again, just so we're

8    perfectly clear, there's no suggestion that there is

9    software code that belongs to Trilogy that has shown up

10   in SAP's software in 1998, correct?

11        A.   Yes.  I believe there's no code of ours that

12   showed up in theirs.

13        Q.   And again, we know -- one thing we know

14   about -- so in addition to knowing that there's no

15   patent in 1998, we know that there's no stolen or taken

16   or ripped off software code in 1998, right?

17        A.   There's no software or --

18        Q.   No taken -- no software code taken from you at

19   Trilogy --

20        A.   Correct.  Correct.

21        Q.   -- and put into SAP, right?

22        A.   Correct.  I don't believe any actual code was

23   taken.

24        Q.   And indeed, the patent -- now, in fact --

25   again, just so we're orienting ourselves, you didn't

1    even file your patent until 1999, which is right

2    about -- sort of -- actually on the right side of the

3    red line is when you filed your patent, right?

4        A.   That's correct.

5        Q.   Okay.  All right.  So I want to talk to you --

6    so before we -- so here's what I want to do.  I want to

7    talk about a lot of things that were happening at

8    Trilogy from 1998 to about 2003.

9             Are you with me?

10       A.   Yes.

11       Q.   Okay.  Now, before we do that, I want to ask

12   you just a couple of big picture questions.

13            There's a note that I'm talking too fast.

14   I don't know if it just showed up or -- I'll slow down.

15   I'm sorry.

16       A.   They tell me the same thing.

17       Q.   So you get these notes sometimes, and you don't

18   know if they're old or -- all right.

19            MR. COLE:  That one was mine.  So sorry.

20   You're falsely accused.

21            MR. MELSHEIMER:  Okay.  Well, you were

22   talking too fast.

23       Q.   (By Mr. Melsheimer) Couple of big concepts,

24   Mr. -- Mr. Carter.

25            You agree that it's important for

1  companies, just like people, to take responsibility for

2  their actions, fair?

3      A.   That's fair.

4      Q.   If you make mistakes, if you make the wrong

5  decision, maybe in totally good faith -- you may have

6  thought you were making the right decision, but if you

7  make the wrong decision, you should have to accept the

8  consequences, right?

9      A.   Yes.

10     Q.   And in business, you had a lot of decisions to

11 make at Trilogy, right?

12     A.   Yes.

13     Q.   And you don't think that you made all the right

14 decisions, do you?

15     A.   No.

16     Q.   Because you'd be the first witness I'd ever

17 seen that said they made all the right decisions.  You,

18 in fact -- and no criticism of you at all, sir, but you,

19 in fact -- you and the company made some bad decisions

20 or wrong decisions during the course of your time at

21 Trilogy, fair?

22     A.   Yes, that's fair.

23     Q.   All right.  And it's also fair, isn't it, sir,

24 that when we're talking about what's going on in a

25 marketplace, why customers are buying, why they're not

1    buying, that there are many, many facts and

2    circumstances that determine what's happening, correct?

3        A.   Yes, that's correct.

4        Q.   And I think you've told us before that it's

5    pretty hard to ever pinpoint one thing in a marketplace

6    when you have a lot going on, fair?

7        A.   Yes.  It's -- it's difficult.

8        Q.   All right.  So with that in mind, sir, I want

9    to talk about 1998.

10           Now, the CEO of Trilogy, in 1998, was this

11   fellow Mr. Liemandt, right?

12       A.   Yes.

13       Q.   Smart guy, right?

14       A.   Absolutely.

15       Q.   Founder of the company?

16       A.   Yes.

17       Q.   Still alive and well?

18       A.   Yes.

19       Q.   Living here in Texas?

20       A.   Yes.

21       Q.   Okay.  Now, in 1998, Mr. Liemandt concluded

22   that at least to some respects, Pricer had failed to

23   deliver.  Remember that?

24       A.   Yes, I do.

25       Q.   All right.  Let's take a look at Defendants'

1    Exhibit 824.

2                  Now, sir --

3                  MR. MELSHEIMER:  Just one moment, Your

4    Honor.  May I?

5                  (Pause.)

6        Q.   (By Mr. Melsheimer) All right, sir.  So this is

7    a meeting -- the minutes of a board meeting in April of

8    '98, right?

9        A.   Yes.

10       Q.   Now, this is actually five or six months before

11   SAP introduces this hierarchy access feature among

12   thousands of features in the software, right?

13       A.   Yes, that's correct.

14       Q.   And what he concludes is -- now, this is --

15   this is an e-mail from Mr. Liemandt to a bunch of people

16   at Trilogy, right, including you?

17       A.   Yes.

18       Q.   And he's asking if he should send this to the

19   company; do you have any comments, right?

20       A.   Correct.

21       Q.   And he says:  With respect to SC -- now, that's

22   Pricer, right?

23       A.   Pricer is --

24       Q.   Selling chain.

25       A.   Pricer is a part of it.

```
 1        Q.    Part of --

 2        A.    Pricer is not the whole thing.

 3        Q.    Right.  Part of -- right.  Yes.  SC Pricer,

 4   selling chain -- Pricer is part of selling chain?

 5        A.    It is part of it.

 6        Q.    All right.

 7        A.    There are other products, like SC Commission

 8   and Config.  That are a part of it.

 9        Q.    Let me ask you something else -- and I hate to

10   jump around, but at the very end of your examination

11   with Mr. Cole, you were shown an e-mail about some

12   bundling, this idea that SAP would bundle some software

13   products together in one product.

14              Do you remember that?

15        A.    Yes.

16        Q.    Y'all do that.

17        A.    We -- yes.  Trilogy also would bundle products.

18        Q.    Yeah.  Nothing wrong with that, right?

19        A.    No.  Bundling by itself, there's nothing wrong.

20        Q.    Okay.  Because sometimes what you decide to do

21   as a business is, you decide to put a bunch of products

22   together to offer to the customer, right?

23        A.    Yes, that's correct.

24        Q.    And you might have all kinds of reasons for

25   doing that, true?
```

1    A.   Yes.

2    Q.   And sometimes it's because you want them to,

3 what, really like a certain add-on or something of that

4 nature, right?

5    A.   Yes, that's correct.

6    Q.   And maybe -- and you may or may not charge an

7 additional price for it, right?

8    A.   Yes, that's correct.

9    Q.   And if you don't charge an additional price for

10 it, there's nothing wrong with that, is there?

11    A.   No.   There's nothing wrong with that.

12    Q.   Okay.   So at this meeting -- let's go back.

13         April '98.   SC missed bookings by 50

14 percent.   Now, this is looking at the earlier period of

15 the year, right?   This is a quarterly review.

16    A.   Yes, that's correct.

17    Q.   So we're looking at the first four months of

18 1998, right?

19    A.   Yes, that's correct.

20    Q.   It says:   Missed bookings by 50 percent.   Bet

21 big on Pricer and failed to deliver, right?

22    A.   That is correct.

23    Q.   And he concludes or he states that Pricer was a

24 poor value proposition into SAP accounts.   Do you see

25 that?

1    A.    Yes, I do.

2    Q.    Now, I've read a lot of these e-mails, and you

3 guys at Trilogy and businesses everywhere use business

4 speak, don't you?

5    A.    Perhaps, yes.

6    Q.    Perhaps?

7    A.    Give me an example, yeah.

8    Q.    Value proposition.

9    A.    Yes.

10   Q.    That means -- when you say something is a poor

11 value proposition, you mean its benefits were not as

12 great as the costs, right?

13   A.    To -- to the specific person evaluating that,

14 correct.

15   Q.    Right.

16   A.    Different people perceive value differently.

17   Q.    Right.  And so SAP accounts, that is to say big

18 companies or small companies, that run SAP software

19 didn't think that Pricer was a good value for them.

20 That's what Mr. Liemandt is saying in this e-mail, fair?

21   A.    He was at least saying the people that we were

22 talking to then did not value it.

23   Q.    He says:  Too maintenance technical.  And

24 that's sort of a shorthand, I guess, because it's not

25 really a sentence.  Too maintenance technical.  Not

1  enough business benefits, right?

2      A.   Correct.

3      Q.   Mr. Liemandt, again, a guy that was pretty

4  plugged in to what was going on in the business, wasn't

5  he?

6      A.   Yes.

7      Q.   He wasn't one of these CEOs that's not involved

8  in the business or goes off on long vacations; he was

9  there every day working hard, immersing himself in the

10 facts, right?

11     A.   Yes, that's true.

12     Q.   And in that context, he was able to conclude

13 that -- that Pricer was a poor value proposition for SAP

14 people and that it didn't have enough business benefits

15 at least as of April 1998, right?

16     A.   Yes.  That's what he was saying there.

17     Q.   Just so we're clear on this, Pricer had been

18 around for several years in 1998, right?

19     A.   Yes.

20     Q.   First sale of it was in about '95 or '96; is

21 that right?

22     A.   Late '95, yes.

23     Q.   So three years into it, he's concluded that, at

24 least with respect to SAP, for this period of time,

25 didn't have the business benefits, fair?

1     A.    To the people that we were selling, yes.

2     Q.    Let's talk about that.

3           The people that you were selling to were

4   the businesses that you targeted that you thought might

5   need pricing software, fair?

6     A.    Yes.  I was implying the different people

7   within the business, but yes.

8     Q.    Sure.  And so you decided, when you went out

9   and met with people, you decided which customers to call

10  on, big or small, right?

11    A.    Not always.

12    Q.    Okay.  Let me ask another question.

13          When you first started selling Pricer, you

14  viewed the landscape as pretty open as to people you

15  could sell to, right?

16    A.    Yes.

17    Q.    You could sell to people who were running SAP,

18  right?

19    A.    Yes.

20    Q.    You could sell to people who were running

21  Oracle?

22    A.    Yes.

23    Q.    You could sell to people who were running other

24  ERP software?

25    A.    Yes, that's correct.

1    Q.   Okay.  Let's talk a little bit about ERP

2  software so we don't have to keep -- keep doing this.

3         Enterprise resource planning is a major

4  comprehensive piece of software that a business or an

5  organization could use to run all -- all aspects of

6  their business.  Is that a fair way of putting it?

7    A.   That's a fair way to put it, yes.

8    Q.   And it's much, much more than pricing, fair?

9    A.   Yes.

10   Q.   I'm not trying to --

11   A.   Oh, absolutely.

12   Q.   I'm not trying to diminish what you did, but

13  there's thousands and thousands of features in an ERP

14  program that never touch pricing, right?

15   A.   Yes.

16   Q.   That's true whether it's SAP selling that or

17  that's true whether it's Oracle selling that kind of

18  software, right?

19   A.   Correct.

20   Q.   And your product was a pretty narrow part of --

21  in the scheme of ERP world, was a pretty narrow part of

22  the business.  I know you think it's important, but

23  pretty narrow in terms of the scope of the software

24  completely; is that a fair amount?

25   A.   Yeah.  In the scope of the -- the whole domain

1    of ERP software, pricing is just one piece of that.

2        Q.    Because ERP software can do scheduling, right?

3        A.    Correct.

4        Q.    Can do ordering of materials, right?

5        A.    Yes.

6        Q.    It can do shipping and other logistics, right?

7        A.    Yes.

8        Q.    It can do financial reporting?

9        A.    Correct.

10       Q.    It can maintain HR records?

11       A.    Yes.

12       Q.    And none of those things, as I've listed them,

13   typically would involve pricing, fair?

14       A.    Yeah, that's -- that's fair.  I think sometimes

15   they might touch it, but for the most part, yes, I

16   understand your point.

17       Q.    You understand, too, sir, and we can agree,

18   that SAP had pricing in its ERP software for many, many

19   years, right?

20       A.    Absolutely.

21       Q.    You're not suggesting to the jury that before

22   Trilogy came along, SAP had no pricing capability at

23   all, right?

24       A.    No.

25       Q.    Now, you thought yours was better, fair?

1       A.   Yes.

2       Q.   Right?

3            But SAP had a lot of different ways of

4   doing pricing even before Trilogy came on the scene,

5   fair?

6       A.   Yes.

7       Q.   1998, I want to stay there.

8            Now, by the end of 1998 -- so we're in

9   April.  We start out in April.

10           MR. MELSHEIMER:  Can I get the ELMO?

11           COURTROOM DEPUTY:  Yes, sir.

12           MR. MELSHEIMER:  I'm sorry.

13           COURTROOM DEPUTY:  No.

14      Q.   (By Mr. Melsheimer) In April of 1998, we've got

15   that Liemandt e-mail, but let's go to the end of 1998.

16           By the end of 1998, Trilogy had lost a

17   number of accounts at SAP, customers.  Does that square

18   with your recollection?

19      A.   Yes.

20      Q.   And, again, when we say SAP customers, we mean

21   these businesses like UPS or Westlake Chemical or

22   Eastman -- or these businesses that run SAP software,

23   right?

24      A.   Correct.

25      Q.   Okay.  You had lost a number of accounts by the

1    end of 1998, right?

2        A.   Yeah.  And when you say lost accounts, not that

3    they've been with us and left; you mean we didn't get

4    the sale.

5        Q.   That's a fair -- that's a fair statement, sir.

6    Yes, you didn't get the sale.

7        A.   Correct.

8        Q.   Let's look at DX806.

9             So this is an e-mail at the end of the

10   year from a man named Mr. Snyder to some people

11   associated with the Pricer product, right?

12       A.   Correct.

13       Q.   And it says:  Deals affected by SAP integration

14   in the first half of 1999.  And what he's talking about

15   here is that because of S -- because of Trilogy's

16   inability to integrate its software to work with SAP,

17   there had been some accounts lost, and here's potential

18   accounts lost, and here's the list of them here.

19   Lennox, Eastman are two examples I see right there,

20   right?

21       A.   Yes, but just to be clear, you characterized

22   that we were unable to integrate.  We actually had done

23   integrations with them, with other customers at that

24   point.

25       Q.   But you ended up -- like, for example, for

1    Lennox, lost the Pricer portion of the deal due to

2    integration, right?

3        A.    And it says:  Due to integration deficiencies.

4    It wasn't that it didn't work at all; it wasn't that we

5    hadn't done it; it just -- it wasn't to their liking the

6    way it had been done or the status of it at that point.

7        Q.    Well, let's be fair about that.  If the

8    customer doesn't like it, it's a big problem.

9        A.    Oh, absolutely.

10       Q.    Okay.  And then with Eastman Chemical, they had

11   brought -- they had been involved in Pricer promotion

12   channel.  Overall added value did not outweigh

13   integration costs and concerns.

14            That's that -- that's that same thing

15   Mr. Liemandt was saying earlier about the business

16   benefits did not outweigh the costs, right?

17       A.    That's correct.

18       Q.    Now, you -- and I said this in my opening,

19   sir -- you actually took some responsibility for some of

20   these issues associated with the SAP integration, didn't

21   you?

22       A.    Yes, I did.

23       Q.    And we don't need to go over that e-mail, but

24   you said that you just didn't do enough.

25       A.    Yes, that's correct.

1    Q.   Now, you didn't say -- because I listened to

2 your direct examination, and you -- you didn't -- let's

3 go to that e-mail.  Let's go to DX885.

4              You didn't say in this e-mail what I

5 thought I heard you say to the jury.  Are you with me?

6    A.   Okay.

7    Q.   You didn't say in this e-mail that SAP had done

8 anything wrong to put you in this position.

9    A.   No.

10    Q.   All right.  You say that, for example:  I've

11 personally been involved in several SAP installations

12 and did the minimum necessary and that everyone with

13 contact with an SAP account has failed to learn even the

14 basics of SAP, right?

15    A.   Yes.  That's what I said.

16    Q.   So you said -- a minute ago in your direct, you

17 said:  Well, SAP didn't make it easy on us.  Do you

18 remember that?

19    A.   Yes, I did.

20    Q.   Okay.  Well, you didn't make it very easy on

21 yourself either to be fair, right?

22    A.   I certainly could have done more, as I said.

23    Q.   Well -- and I'm not -- I appreciate you saying

24 this, and I know it's -- it's -- it's got to be a

25 strange world to be sitting here looking at an e-mail

1    that you wrote 10 years ago.  I get that, okay?

2              But the point is, you said -- not that

3    SAP's making it difficult but that the folks at Trilogy

4    had failed to even learn the basics of SAP, right?  I

5    mean, that's what it says.

6         A.   Yes, that is definitely what it says.

7         Q.   SAP is complicated software, right?

8         A.   Yes.

9         Q.   You have to understand how it works to have a

10   product that works with it, right?

11        A.   Yes.

12        Q.   You can't just plug it in like you do something

13   in the wall and say there it goes, right?

14        A.   That is correct.

15        Q.   You've got to spend a lot of time and work and

16   effort figuring out all the different interrelationships

17   if you're going to add a product to another product like

18   SAP's or like Oracle's, fair?

19        A.   Yes, that's fair.

20        Q.   Now, part of the problem in making it better --

21   and you told us in this e-mail and you said just a

22   minute ago that you were -- you wanted to make it

23   better, right?

24        A.   Yes, that's correct.

25        Q.   But it wasn't just you, was it, that was

 1  involved in this, fair?

 2      A.   Yes, that's fair.

 3      Q.   The other problem you had --

 4           MR. MELSHEIMER:  And let's go to the next

 5  page.

 6      Q.   (By Mr. Melsheimer) The other problem that you

 7  had -- and this -- this is an e-mail from Mr. Royo.

 8      A.   That one appears to still be mine back to him.

 9      Q.   Okay.  But -- I'm sorry.  To -- thank you.

10  This is an e-mail from you to Jose Royo.  Who is Jose

11  Royo?

12      A.   I believe he was one of our developers at the

13  time.

14      Q.   And you say:  I have to address one of your

15  comments, Jose.  Nothing personal, but -- now that's

16  generally when you see that, something's bad coming,

17  right?

18      A.   Yes.

19      Q.   Okay.  So one of the things you say here is you

20  say that the number of people in development who have

21  even a base working knowledge of SAP's functionality can

22  be measured on one hand.

23           Now, my math says that's five or less,

24  right?

25      A.   That is correct.

1      Q.   And you say -- earlier you say:  Trilogy's SAP

2   represents the single biggest competitive threat to

3   Trilogy's vision of being the next great software

4   company, and as a whole, we know next to nothing about

5   them.

6             You said that.

7      A.   Yes, that's what I said.

8      Q.   Now, let's talk about that.  Now, you didn't

9   share this e-mail with SAP back in 1998, did you?

10      A.   No, I didn't.

11      Q.   You didn't tell -- when you were -- when you

12   were talking to -- to your contacts at -- at SAP -- who

13   were they again?  Mr. Neumann, Dr. Neumann?

14      A.   Bernhard Neumann was my main contact.

15      Q.   You didn't tell Dr. Neumann that you were

16   having private conversations within Trilogy where you

17   were describing SAP as a big threat.

18      A.   That is correct.

19      Q.   And there's nothing wrong with that.

20      A.   Yeah.

21      Q.   Okay.  Because that -- you were running your

22   business --

23      A.   Yes.

24      Q.   -- correct?

25      A.   Yes, correct.

1    Q.   And you were trying to compete fairly and as

2    fully as you could with SAP, right?

3    A.   Yes.

4    Q.   Even though at the same time, you were kind of

5    thinking about having a partnership with them.

6    A.   Yes.

7    Q.   Okay.  So -- now, I want to skip --

8              MR. MELSHEIMER:  Your Honor, are we going

9    to go a few more minutes or --

10             THE COURT:  Well, actually, I was getting

11   ready to break for the lunch recess.

12             MR. MELSHEIMER:  I'm not quite finished,

13   as you might have gathered, so if you would like to

14   break, this would be a great time to break.

15             THE COURT:  I've got another matter I need

16   to take up at noon, so I'm going to go ahead and break.

17             Ladies and Gentlemen, what I'm not sure

18   about is how long that other matter is going to take me

19   over the lunch hour.  So take until 1:30, take an hour

20   and a half for lunch.  I'm going to start it as quickly

21   as I can, but be back ready to come in the courtroom at

22   1:30.  Have a nice lunch, and don't talk about the case.

23             Y'all are excused.

24             LAW CLERK:  All rise for the jury.

25             (Jury out.)

1          THE COURT:  All right.  If y'all don't

2   mind, you might want to remove your papers from counsel

3   table.  I've got an injunction matter I want to hear at

4   noon or as quickly as I can.  Y'all are in recess until

5   1:30.

6          MR. MELSHEIMER:  Thank you, Your Honor.

7          LAW CLERK:  All rise.

8          (Lunch recess.)

1                        <u>CERTIFICATION</u>

2

3

4              I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10
     /s/_____              May 9, 2011
11   SHELLY HOLMES, CSR
     Deputy Official Court Reporter
12   State of Texas No. 7804
     Expiration Date:  12/31/12
13
     /s/_____              May 9, 2011
14   GLENDA FULLER, CSR
     Deputy Official Court Reporter
15   State of Texas No. 1042
     Expiration Date:  12/31/12
16

17

18

19

20

21

22

23

24

25