```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3  VERSATA SOFTWARE, INC.,   ) Civil Docket No.
   ET AL                     ) 2:07-CV-00153-CE
4                            ) May 9, 2011
   VS.                       ) 1:30 P.M.
5                            )
   SAP AMERICA, INC., ET AL )
6

7                  TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE CHAD EVERINGHAM
8                UNITED STATES MAGISTRATE JUDGE

9  APPEARANCES:
   FOR THE PLAINTIFF:          MR. SAM BAXTER
10                             McKool Smith, P.C.
                               104 E. Houston Street
11                             Suite 300
                               Marshall, Texas  75670
12
                               MR. SCOTT L. COLE
13                             MR. STEVEN J. POLLINGER
                               MS. LAURIE L. FITZGERALD
14                             MR. KEVIN M. KNEUPPER
                               MS. LEAH B. BURATTI
15                             McKool Smith, P.C.
                               300 W. 6th Street, Suite 1700
16                             Austin, Texas 78701

17                             MS. ADA BROWN
                               MR. STEVEN CALLAHAN
18                             McKool Smith, P.C.
                               300 Crescent Court, Suite 1500
19                             Dallas, Texas 75201

20 APPEARANCES CONTINUED ON NEST PAGE:

21 COURT REPORTERS:            SHELLY HOLMES, CSR
                               GLENDA FULLER, CSR
22                             Deputy Official Court Reporters
                               100 East Houston, Suite 125
23                             Marshall, TX 75670
                               903/935-3868
24
   (Proceedings recorded by mechanical stenography,
25 transcript produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:          MR. THOMAS M. MELSHEIMER
                                 MR. MICHAEL A. BITTNER
 3                               Fish & Richardson, P.C.
                                 1717 Main Street, Suite 5000
 4                               Dallas, Texas 75201

 5                               MR. JOHN W. THORNBURGH
                                 MR. JUSTIN M. BARNES
 6                               Fish & Richardson, P.C.
                                 12390 El Camino Real
 7                               San Diego, California 92130

 8                               MR. JAMES R. BATCHELDER
                                 Robes & Gray, LLP
 9                               1900 University Avenue
                                 6th Floor
10                               East Palo Alto, California 94303

11                               MR. CHRISTOPHER BUNT
                                 Parker Bunt & Ainsworth
12                               100 E. Ferguson, Suite 1114
                                 Tyler, Texas 75702

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

3   LAW CLERK:  All rise.

4   (Jury in.)

5   THE COURT:  Please be seated.

6   Good afternoon, ladies and gentlemen.

7   Mr. Melsheimer.

8   MR. MELSHEIMER:  May it please the Court.

9   THE COURT:  Proceed.

10   TOM CARTER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

11   DIRECT EXAMINATION (CONTINUED)

12   BY MR. MELSHEIMER:

13   Q.   Mr. Carter, welcome back.

14   A.   Thank you.

15   Q.   Did you get some lunch?

16   A.   I did.

17   Q.   All right.  So I want to come back to something

18   that we talked about at the very beginning of your

19   testimony, and that is this issue of the patent when it

20   became public, and I was actually -- during lunch I

21   looked at the patent a little more closely and I wanted

22   to show it just so there was no misunderstanding.

23   So it was filed in -- as we've established

24   on February 19th, '99, but then do you see this little

25   prior publication data, do you see that, February 28,

1    2002?

2         A.    Yes.

3         Q.    Now, is -- are you familiar enough with the

4    patent system to know that sometimes patents, if they've

5    been on file for a certain -- a certain period of time,

6    that they can actually be published even though they

7    haven't issued yet?

8         A.    I did not realize that.

9         Q.    Okay.

10        A.    So --

11        Q.    I wanted to -- I wanted to clarify that because

12   I didn't want to give you the wrong impression, but in

13   any event, even if it was published in 2002, that's --

14   that's about four years after SAP introduced this

15   hierarchical access pricing feature; I think we've

16   established that, right?

17        A.    Yes, that's correct.

18        Q.    All right.  And you don't know and you

19   haven't -- you have no basis to believe that in February

20   of 2002, anybody from Trilogy went to SAP and said oh,

21   by the way, you know, we've had this '350 patent

22   published, we want you to look at it?

23        A.    No, I'm not aware of that --

24        Q.    All right.

25        A.    -- anyone doing that.

1    Q.   All right.  Now, Do you remember saying in your

2  direct that -- that once SAP introduced this feature,

3  this hierarchical access feature, and just so we're

4  clear, that's basically a shorthand, isn't it, for

5  what -- what is covered by your patent, right?

6    A.   Yeah, I -- again, I'm not the lawyer.  I

7  believe it's a part of it.  It's not necessarily the

8  whole thing, but that was what was found to infringe.

9    Q.   Right.  So just so we're clear, hierarchical

10  access actually is not even a word that's used in your

11  patent, right?

12    A.   Oh, that is correct.  That's an --

13    Q.   Okay.

14    A.   -- SAP term for --

15    Q.   Got it.  Okay.  So I just -- and we'll talk

16  more about that, we'll talk more about that in a bit.

17         But I think you told us on direct that --

18  that after SAP introduced this feature, you basically

19  started to focus on other products and other things

20  within Trilogy; is that fair?

21    A.   Yes, that's fair.

22    Q.   Okay.  Well, let's talk about a document from

23  Trilogy before -- before SAP introduced this

24  hierarchical access feature; are you with me?

25    A.   Yes.

1    Q.    Let's talk about a document from January of

2  1998 --

3              MR. MELSHEIMER:  Mr. Barnes, can we have

4  that, please?

5    Q.    (By Mr. Melsheimer) -- Defendants' Exhibit 910

6  and you're actually a recipient of this slide deck,

7  right?

8    A.    Yes.

9    Q.    And it's -- it's called the final SAP slide

10  deck, and it's actually about 10 or 11 months before SAP

11  introduces this so called hierarchy access, right?

12    A.    Yes, that's correct.

13    Q.    Now, and I think what you told us on direct was

14  that when SAP introduced this feature and that started

15  to have an effect on your sales, you started to sense

16  those difficulties, but you didn't know why and then you

17  started to change your focus a little bit.  Do I have

18  that about right?

19    A.    Yes, I believe so.

20    Q.    Well, let's look at what Trilogy was thinking

21  before all that happened in January of 1998 and let's

22  look at Page 8 of this document, please, sir.

23              Now, in Page 8 we see a projection out

24  into the future at least one more year of revenue

25  percentage by product.  Do you see that?

1      A.   Yes, I do.

2      Q.   And this is looking at the various Trilogy

3  products configuration, Pricer, commission, other, and

4  basically how they're going to make up the company's

5  revenues over the years, right?

6      A.   Yes.

7      Q.   And in 1997 it's hard to see this and if I --

8  we can -- we can get you the -- we can get you the

9  original if you need it, but in 1997, this is Pricer.

10  Do you have any reason to doubt that?

11      A.   No.

12      Q.   So in 1997, you actually had the -- the

13  greatest revenue percentage associated with Pricer,

14  correct?

15      A.   Yes, that's correct.

16      Q.   And then already in 1998 it's starting to go

17  down, right, as a percentage?

18      A.   As a percentage, yes.

19      Q.   And then it's a projection because this

20  document is from January 1998, right?

21      A.   Yes, that's correct.

22      Q.   So before SAP introduces any feature in October

23  or November, you're already predicting a reduction in

24  the revenue percentage by product for Pricer; isn't that

25  right?

1    A.   Yes, a reduction in the percentage relative to

2  everything else.

3    Q.   Now, and then in 1999, which, again, is, again,

4  a year's projection, before SAP's ever gotten into the

5  market with this hierarchical access and the prediction

6  that you have in -- or that S -- that Trilogy had in

7  January of '98 is that Pricer will fall even farther as

8  a percentage of revenue.  Do I have that right?

9    A.   Yes, as a percentage of other revenue,

10  absolutely.

11    Q.   It's actually lower as a percentage of revenue

12  than two of the other Trilogy products, correct?

13    A.   Yes, correct.

14    Q.   So there was already an expectation in Trilogy,

15  before SAP added hierarchical access, that Pricer would

16  be less of a focus relative to Trilogy's other products;

17  isn't that right?

18    A.   Relative to other products, like the -- you

19  know, like the new one up there, yes.

20    Q.   Now, let's return to 1998, and we were talking

21  about some e-mails about the lack of knowledge of SAP

22  within the company, within Trilogy, right?

23    A.   Yes.

24    Q.   Remember we had that e-mail where -- where I

25  believe you said that you could count the people that

1  know about SAP technology on less than one hand, right?

2      A.   Yes.

3      Q.   Now, if there was an issue about not knowing

4  about SAP in 1998, can you agree with me there wasn't

5  any doubt that the folks at Trilogy, they knew how to

6  have fun in 1998, didn't they?

7      A.   Certainly some people did.

8      Q.   Well, I mean, and again, I'm not -- I'm not --

9  I'm not fussing at you about this, but back in 1998,

10  Versata was spending -- Trilogy was spending a lot of

11  money on recruiting, right?

12      A.   Yes.

13      Q.   They flew recruits to Austin, put them up in

14  fancy hotels, took them out to expensive dinners, fair?

15      A.   Definitely.

16      Q.   Took them to hip clubs in Downtown Austin,

17  right?

18      A.   Yes.

19      Q.   And they were offering salaries, generous

20  salaries, and bonuses and moving expenses and things

21  like that?

22      A.   Yes.

23      Q.   And I -- I read that every weekend in 1998 from

24  September through May, that -- that Trilogy flew in 20

25  or so recruits, put them up at the best hotels in Austin

1   and wowed them with really fancy dinners; does that --

2   does that sound about right?

3       A.   Yes.

4       Q.   And if it were a nice day, the Trilogy folks

5   might take the recruits out for a spin on a ski boat

6   that the company bought?

7       A.   Yes, we would.

8       Q.   All right.  And that sometimes the recruits

9   would be treated to a trip to Las Vegas, fair?

10      A.   Yes, that's true also.

11      Q.   Okay.  So let's move on to 1999, and again,

12  let's see what's happening with the perception of

13  Trilogy in 1999.  Now, in 1999 there were at least some

14  people at Trilogy that thought the software was -- was

15  pretty bad?

16      A.   Yes.

17      Q.   All right.  Let's take a look at Defendants'

18  Exhibit 957.

19          Now, this is an e-mail that ended up being

20  forwarded by Mr. Liemandt to a bunch of people at

21  Trilogy, including you, and let's just go to the e-mail.

22  This is an e-mail by a fellow named Howard Thompson, end

23  of 1998, beginning of 1999.  He's -- he's leaving the

24  company, that's his last day, right?

25      A.   Yeah, I believe that was his last day.

1    Q.    And he wanted to share some thoughts about his

2    views of the -- of the company, right?

3    A.    Yes.

4    Q.    And let's look at some things that he said.  He

5    said first, that the Trilogy software was bad, right?

6    A.    Yes, that is what he said.

7    Q.    And he said, ask any integrator, ask any user,

8    ask any customer, we currently have no referenceable

9    customers in indirect and selling chain.  No one in

10   position of authority will admit this.  This development

11   process and its results suffers greatly from the

12   immaturity of the culture and people.  The same mistakes

13   are made every time around.

14              Did I read that right?

15   A.    Yes, you read that right.

16   Q.    Now, what was Mr. Thompson's area?

17   A.    I can't remember if he was a developer or one

18   of the implementation consultants --

19   Q.    Okay.

20   A.    -- I don't remember.

21   Q.    All right.  Well, he worked at the company,

22   right?

23   A.    Oh, yes.

24   Q.    He was a technologist?

25   A.    Yes, he was a technologist.

1    Q.    He -- he -- he wasn't someone that didn't know

2  anything about the product, right?

3    A.    Yeah, I don't remember if he'd worked on Pricer

4  specifically.

5    Q.    All right.  Well, let's take a look at

6  something else that he said.  He talks about SAP.  And

7  he says:  This big new SAP push didn't come out of

8  nowhere.  There are strong competitors in the market who

9  are significantly better executers than Trilogy.  Do you

10  see that?

11    A.    Yes, I do.

12    Q.    And he talks about Siebel, right?

13    A.    Yes.

14    Q.    Three times the revenue of Trilogy and growing.

15  And SAP.  And he says something about SAP.  He says:

16  Their Config and pricing tools are the equal of

17  Trilogy's, in spite of what Joe says.  I've seen them.

18  Now, that's Joe Liemandt?

19    A.    Yes, that's correct.

20    Q.    And he says so -- he's saying that as of

21  December of 1998, beginning of 1999, that SAP's software

22  is better than Trilogy's, right?

23    A.    Yes, that is what he's saying.

24    Q.    And he's not saying -- let's make sure what

25  he's not saying.  He's not saying it's because they've

1    added this hierarchy access feature, right, doesn't say

2    that?

3        A.   No, it doesn't say that.

4        Q.   He doesn't say it's because they've done

5    anything improper or unethical; doesn't say that, does

6    he?

7        A.   No, he does not say that.

8        Q.   All right.  And then finally, let's look up to

9    number -- well, and let's -- let's -- let's finish this.

10            Trilogy's inability to scale may spell

11   disaster and no one is willing to think about

12   contingencies.  Tell us what it means for software to be

13   able to scale.

14       A.   There could be a couple different

15   interpretations, whether it is -- scale has to refer to

16   either the number of users you can handle, the number of

17   customers, the performance.  I mean, there's, you know,

18   scale implying something getting bigger, obviously.

19       Q.   So the concern would be that Trilogy's

20   ability -- is -- is I -- I want -- I don't want to put

21   words in your mouth, but the -- the notion being that

22   its inability to adjust to different size customers?

23       A.   That could be one of the things.  I'm not

24   sure -- I mean, I don't know if any of us know exactly

25   what was in Howard's head when he wrote all that.

1    Q.   Okay.  Well, you know, it's kind of interesting

2  that you say that because you were shown some SAP

3  documents, that you'd never seen before, on direct

4  examination and --

5    A.   Correct.

6    Q.   -- you didn't seem to have much of a problem

7  figuring out what was going on with those, but you're

8  telling me you don't know what was in Mr. Thompson's

9  head; is that your testimony?

10   A.   Yes, that's correct.

11   Q.   Okay.  Now, he also says that Trilogy doesn't

12 have much technology, this is a real big one for me.

13 Lots of VB, what's that?

14   A.   That's a programming language called Visual

15 Basic.

16   Q.   Lots of UIs, that's user interfaces?

17   A.   Yes, that's correct.

18   Q.   Not much interesting development going on at

19 all.  This past summer they gave interns some pretty

20 sweet projects, perhaps understandably.  What did he

21 mean by that?

22   A.   I'm not really sure.

23   Q.   Well, here's what I think -- and I -- again,

24 you worked there, but --

25   A.   Yeah.

1    Q.    -- to me what that says is, is that they were

2   giving the interns, the people who might be recruited to

3   come work there, some sweet projects to make them

4   interested in coming to work at Trilogy, even though

5   this fellow that had been there for a while said the

6   technology wasn't really much, fair?

7    A.    That could be fair, yes.

8    Q.    Okay.  Now, Mr. Thompson was not someone that

9   was just out there on an island, was he?

10    A.    You mean he wasn't the only one that --

11    Q.    Well, he wasn't -- not only -- not only was he

12   not the only one, but there were probably 50 people at

13   Trilogy in 1998, 1999, that felt the same way, right?

14    A.    I mean, to some degree, obviously, all of us

15   were, you know, yeah.  So all of us had concerns about

16   the company, myself included, as we showed in my e-mail

17   before, absolutely.

18    Q.    You had concerns about the software being bad?

19    A.    No, not about the software being bad.

20    Q.    Oh, about there not being much technology?

21    A.    No, in fact, I specifically disagree with that.

22   I mean --

23    Q.    Well --

24    A.    -- he mentions, like, Visual Basic but Pricer

25   wasn't written in Visual Basic, so that -- I mean, he

1  couldn't be talking about that in that case.

2      Q.   Well, it's true, isn't it, sir, that

3  probably -- probably 50 people within Trilogy had the

4  same views about the company at this time period as

5  Mr. Thompson, fair?

6      A.   No, I -- I disagree with that.

7      Q.   Okay.  Well, you're disagreeing with the big

8  boss, aren't you?

9      A.   I'm disagreeing with the big boss?

10     Q.   Yeah, Mr. Liemandt.  Let's take a look at his

11 e-mail up above.  So he circulates this and says:

12 Fairly -- he says let's -- let's use this as a learning

13 experience, but what does he say?  He says:  There are

14 about 50 people at Trilogy who have this same view.  Do

15 we really want them at Trilogy one more day?

16     A.   So yes, I see that, and so in that case, yes, I

17 would disagree with Joe Liemandt in that --

18     Q.   Okay.

19     A.   -- case.

20     Q.   You think there's a hundred?

21     A.   No, I -- I think Howard's views were extreme.

22 I think everyone in the company probably had

23 frustrations, myself included.  But to say we agreed

24 with everything Howard was saying or that I did, I think

25 50 is not close.

1     Q.    Well, at the very least, Joe Liemandt, who I

2   think you told us earlier, had his pulse pretty much on

3   the -- his finger on the pulse of the company.  He

4   thought there were about 50 people who had the same view

5   as Mr. Thompson, fair?

6     A.    Yes, and --

7     Q.    And that's what he's saying?

8     A.    Yeah, and I agree using any of that as a

9   learning is a good thing to do.

10    Q.    Now, let's move on to 2000.  Now, it's about

11  three years before your '350 patent's issued, right?

12    A.    Yes.

13    Q.    And let's talk about what's going on at the

14  company around 2000.  Now, in March of 2000, you and

15  others within the company were debating whether or not

16  Pricer was dead, right?

17    A.    Yes, I remember that.

18    Q.    Let's look at DX3105.  This is an e-mail chain

19  dated March 29th, of 2000.  This is an e-mail from

20  Mr. Shah to you and others and it's really a series of

21  comments about whether or not -- what the fate of Pricer

22  was, right?

23    A.    Okay.  Yeah, I don't remember the e-mail

24  offhand, but I'm --

25    Q.    Well --

1    A.   -- following.

2    Q.   -- the -- the PET meeting is the pricing expert

3 team --

4    A.   Yes, that's --

5    Q.   -- right?

6    A.   -- correct.  Yes.

7    Q.   So let's take a look at this.

8         MR. MELSHEIMER:  If we could blow this

9 out, Mr. Barnes, a little bit.

10   Q.   (By Mr. Melsheimer)  Okay.  He says --

11        MR. MELSHEIMER:  Actually, let's go to

12 the -- the back.  Let's go to the back of the e-mail,

13 first.

14   Q.   (By Mr. Melsheimer)  Okay.  This is an e-mail

15 from someone named Joy Beatty?

16   A.   Yes.

17   Q.   To the pricing expert team and she says:  I've

18 noticed a severe decline in participation in reaching

19 the pricing expert team goals the past month or so, so I

20 started wondering around asking people -- maybe that's

21 wandering around, but wandering around asking people

22 about it, trying to sense what is going on.  The biggest

23 thing I found is that many of the people in pricing

24 expert team are still under the impression that pricing

25 at Trilogy is dead, has no feature, the enthusiasm for

1   pricing is gone.  Do you see that?

2       A.   Yes, I do.

3       Q.   Who is Ms. Beatty?

4       A.   She was one of our consultants.

5       Q.   And members of PET, and let's go to this --

6   this phrase about rarely driving sales on its own, it's

7   a little bit higher up in the document.  In this

8   Mr. Buerkle kind of responds to this, now who's

9   Mr. Buerkle?

10      A.   He was another consultant at Trilogy.

11      Q.   Now, these were consultants hired to help you

12  run your business better?

13      A.   Yes.

14      Q.   Okay.

15      A.   I mean, they were employees of Trilogy doing

16  consulting implementation for customers.

17      Q.   Got it.  So he says -- Mr. Buerkle, smart guy?

18      A.   I believe so, yes.

19      Q.   Knew what he was talking about?

20      A.   I mean, within his domain, yes.

21      Q.   Yeah.  So my understanding of the problem is

22  that while Trilogy pricing is a nice to have feature, it

23  very rarely drives the sale on its own.  Do you see

24  that?

25      A.   Yeah, that's what I testified before --

1       Q.      Yeah.

2       A.      -- With Mr. Cole.

3       Q.      Now, there's nothing here -- nothing in -- in

4   Ms. Beatty's comments or Mr. Buerkle's comments about

5   SAP software, is there?

6       A.      No, there is not.

7       Q.      And you yourself told us, both in your direct

8   testimony and -- and earlier in this e-mail, that

9   pricing is not driving sales on its own.

10              MR. MELSHEIMER:  Can we find that,

11  Mr. Barnes?  You got to go up.

12      A.      That's it.

13      Q.      (By Mr. Melsheimer)  Okay.  My -- yeah, it's

14  nice to have, but rarely drives the sales on its own,

15  and you agree with that?

16      A.      Yeah, at that point in time, that was true.  It

17  drove them early, but as we saw, it stopped driving them

18  later on.

19      Q.      Now, there's nothing in this exhibit, sir, and

20  I've looked at it pretty closely, 3105, there's nothing

21  in this exhibit where any members of the pricing expert

22  team -- those are the people that know the most about

23  Pricer, right?

24      A.      Correct.

25      Q.      Where they point to anything with respect to

1   SAP as part of the problem for Pricer's death, fair?

2       A.   Yes, that's correct.

3       Q.   There's nowhere in this e-mail on the pricing

4   expert team that says we're losing sales in 2000 because

5   of SAP, right?

6       A.   That is correct.

7       Q.   Tell me about something called TOPS.

8       A.   TOPS was the -- I mean, stood for the, you

9   know, Trilogy Operations.  It was sort of a -- it was a,

10  you know, management team that had meetings periodically

11  to go over the operations of the company.

12      Q.   I want to get back to TOPS.  On that e-mail

13  there wasn't any -- there wasn't anything reported in

14  that e-mail where it said, you know, customers are

15  telling us -- back to 906 -- customers are telling us

16  that we're buying SAP instead of Pricer?

17      A.   Yeah, customers never tell you why they buy a

18  competitor.

19      Q.   There's nothing in that e-mail --

20      A.   No, not --

21      Q.   -- that indicates --

22      A.   -- in that e-mail.

23      Q.   -- that, right?

24      A.   No.

25      Q.   Now, let's talk about the kind of work you do

1  in the marketplace.  You get out -- you or people at

2  your direction get out in the marketplace all the time

3  to figure out what's going on, right?

4       A.   We get out to sell our software and in the

5  course of doing that, we obviously try to learn what's

6  going on, yes.

7       Q.   You spend money on reports from consultants who

8  describe the industry and the players and what's going

9  on, right?

10      A.   Oh, yes.

11      Q.   You visit with customers and you get all of the

12 information you can get about what they're wanting and

13 what they don't want and what their concerns are and

14 what their goals are, right?

15      A.   Yes, that's correct.

16      Q.   And when you get out and you find that -- and

17 you've, in fact -- Trilogy has, in fact, commissioned

18 surveys where they've gone out and interviewed customers

19 and tried to find out, okay, what is it, what do you

20 think about us?  What can we do better?  What are we

21 falling down on?  Things of that nature.

22      A.   Yes, that's correct.

23      Q.   And you yourself try to get out and people at

24 your direction try to get out and learn everything they

25 can about what's happening in the marketplace, fair?

1      A.    Yes, that's fair.

2      Q.    And one thing that happened in the marketplace

3   was that SAP introduced some new features in October of

4   1998, and one of them was hierarchical access, right?

5      A.    Yes, that's correct.

6      Q.    And in all the work that you did, that all of

7   your people did, you're telling the Jury that you never

8   knew -- you'd never even heard of hierarchy access until

9   after this lawsuit was filed, right?

10     A.    I don't remember if it was immediately -- if it

11  was before or after this lawsuit was filed, but it was

12  certainly not until years later.

13     Q.    You didn't hear about it '98, '99, 2000?

14     A.    No.

15     Q.    This feature that you now say was driving your

16  sales into the ground, you never even heard it described

17  in that way until right around when the lawsuit was

18  filed, fair statement?

19     A.    Yeah, I think that's fair.  I don't remember

20  the precise time that I learned, but it was certainly

21  years later, years later.

22     Q.    Let's be fair about something else.  When SAP

23  introduced hierarchy access as one of the features in

24  October of 1998, it wasn't just a release of hierarchy

25  access, right, you know that?

1    A.    I -- I mean, I don't know what was in the

2  release.  I would assume they released a number of

3  things because once software companies do, there's a

4  bunch of stuff there.

5    Q.    Right.  So it would not surprise you that when

6  SAP made this release in October of '78 (sic) we -- we

7  talk a lot about this hierarchy access, but it wouldn't

8  surprise you that there were a whole bunch of different

9  features released into the software at the same time,

10 fair?

11   A.    Yes, definitely fair.

12   Q.    That's the sort of stuff you would do at

13 software releases, right?

14   A.    Yes.  Yes.

15   Q.    You -- you would add maybe a dozen or more

16 features at one time potentially to a new software

17 release?

18   A.    Yes, that's correct.

19   Q.    Let's go back to the TOPS thing.  The TOPS is

20 basically the leaders of the company; is that fair?

21   A.    Yes.

22   Q.    So let's take a look at Defendants' Exhibit

23 947, focused on what's happening at Trilogy in 2000,

24 June 26th, 2000.  This is a pretty lengthy document,

25 Mr. Carter.  And first of all, have you ever seen this

1  sort of format before, notes from TOPS, June 26th, 2000,

2  TU section leads.  Have you ever seen that kind of

3  information put together?

4      A.   Yes, I have.

5      Q.   What's the purpose of it?

6      A.   To summarize the meeting that we had.

7      Q.   Is it intended to be truthful and accurate?

8      A.   Yes.

9      Q.   Is it intended to gather information good or

10  bad so that the company can understand what's happening

11  in the marketplace or what's happening within the

12  company?

13      A.   Yes, it is.

14      Q.   All right.  So let's take a look at a few

15  things that are happening in -- in June of 2000.  So one

16  thing that's being told, about four bullet points down,

17  makes same mistakes over and over, organization doesn't

18  learn; do you see that?

19      A.   Yes, I do.

20      Q.   What does that mean?

21      A.   It implies that mistakes were made more than

22  once.

23      Q.   Addicted to fire fights.  That's the next one.

24  What's that?

25      A.   That -- that is saying that it seems to be

1  implying we like, but that we would often get in

2  emergency situations.

3      Q.   And just so we're clear, this is actually a

4  summary of reasons that people gave, right, for, as I

5  read it, resigning from the company.  Does that -- does

6  that --

7      A.   No.

8      Q.   -- seem like that's what that is to you?

9      A.   No.  I believe that one of the things the

10  section leads did was an exercise.  Actually it says

11  read exercise.

12     Q.   Just kind of do a make-believe --

13     A.   Do a --

14     Q.   -- resignation?

15     A.   Yeah.

16     Q.   Okay.

17     A.   Yeah, just hypothetically if, you know, if you

18  were to leave.

19     Q.   Why would you leave?

20     A.   Why might you leave.

21     Q.   Well, you know what, you could have taken some

22  of these from old Mr. Thompson, right?

23     A.   Yes.

24     Q.   Because he had some of the same concerns back

25  in the end of 1998, right?

1    A.   Yes.

2    Q.   Let's keep going.  Lack of purpose and lack of

3  reason to stay.  More noticeable that we lack process.

4  Too much noise.  Not too much leadership shown.  Lost

5  focus on building great products.

6          Let's keep going.  Can't deliver good

7  products.  Not working on right things.  Can't grow.

8  Don't focus on long-term goals.  Do you see that?

9    A.   Yes, I do.

10   Q.   Now sir, I want to make clear, I'm not fussing

11 at you or anyone at Trilogy, but you --

12   A.   Right.

13   Q.   -- understand that Trilogy is here in court

14 saying that because SAP added a feature to its product,

15 its business went down the drain, right?

16   A.   Yep.

17   Q.   That's --

18   A.   Yes.

19   Q.   -- that's what this is about, and all I'm

20 trying to say is back in 2000 before anybody got to the

21 courthouse or thought about going to the courthouse or

22 even before you even got your '350 patent, you were

23 identifying things that could be pretty serious problems

24 with the business; isn't that fair?

25   A.   Yes.

1           MR. MELSHEIMER:  Go to the next page,

2    Mr. Barnes, if you would.  Go down to about five bullets

3    from the bottom.

4        Q.   (By Mr. Melsheimer)  We don't follow up well.

5    We have a lot of high-level stuff, but we have to make

6    it more real for people, not just the words but the set

7    of actions and results.  We do a good job of building up

8    expectation and not meeting it.  We are a culture of

9    starters, not finishers.  Do you see that?

10       A.   Yes.

11       Q.   Is that true?

12       A.   I don't believe so, no.

13       Q.   Somebody did, right?

14       A.   Yes, presume -- somebody did and --

15       Q.   Somebody within Trilogy thought this in June of

16   2000, right?

17       A.   Yep, and as it says, we were trying to work on

18   what we needed to do to educate people.

19           MR. MELSHEIMER:  Go to 1928, please, sir.

20       Q.   (By Mr. Melsheimer)  One of the biggest things

21   about selling software, sir, is satisfying the customer,

22   right?

23       A.   Yes, it is.

24       Q.   That's probably one of the biggest things about

25   selling anything --

1    A.   Yes.

2    Q.   -- satisfying the customer, and if you don't

3  have satisfied customers, you're not going to have good

4  references for your software, right?

5    A.   That's correct.

6    Q.   If you don't have customers that you can send

7  potential customers to and say, hey, here's a satisfied

8  customer that can brag on us, it might be hard to make a

9  sale of Pricer, right?

10   A.   Yes, it could definitely make that more

11 difficult.

12   Q.   And what is it, in fact, that there was an

13 issue that was identified --

14            MR. MELSHEIMER:  Are you on 1928?

15 Customer sat culture is what I'm looking for,

16 Mr. Barnes.  It's on 1928.  I think it's the next page.

17 Well, that's it.

18            MS. SKINNER:  They're all 1928.

19            MR. MELSHEIMER:  They're all 1928.  It's a

20 trick.  Okay.  All right.  They're all 1928.  All right.

21 So I'm looking for customer sat; do you see that, sir,

22 Mr. Barnes?  Keep going.  Keep going.  Yes, it's after

23 2001 plan, it's after that.  Here we go.  Right here.

24   Q.   (By Mr. Melsheimer)  So this is talking about

25 the customer sat culture, which I take it is the

1   customer satisfaction culture, right?

2        A.   Yes.

3        Q.   And there's a bunch of bullet points identified

4   there by the -- by the leaders of Trilogy.  Customer is

5   stupid attitude, right?

6        A.   Yes.

7        Q.   That's what it says?

8        A.   Yes, it does.

9        Q.   But you didn't think that?

10       A.   No, I mean --

11       Q.   But some people did?

12       A.   Some people did, yes.

13       Q.   If you think your customers are stupid, it's

14   going to be hard to sell to them, isn't it?

15       A.   Thinking they're stupid and selling are two

16   very different things, I mean --

17       Q.   Okay.  Interesting.  Okay.  So you think --

18       A.   Because the point of selling is --

19       Q.   -- that you could be a success -- I'm sorry --

20       A.   No, part of selling is educating the customer

21   in some cases and I think, you know, stupid versus not

22   understanding, I mean part of sales is education, help

23   them understand.

24       Q.   You think it's the mark of a successful selling

25   organization to have the attitude that the customer is

1  stupid?

2      A.    No.  That's not what I said.

3      Q.    Okay.

4      A.    What I'm saying is that if you think your

5  customer is stupid, that -- that alone -- that does not

6  make it -- necessarily mean you're not going to get

7  sales.  You have a -- if it's an indication that they

8  need to know more things, you have a responsibility to

9  help educate them.

10     Q.    Have you ever heard the phrase over promising

11  and under delivering?

12     A.    Yes, I have.

13     Q.    What does that mean?

14     A.    That means prior to a sale, you know, telling

15  the customer, you know, the product may do ten things

16  when it only does eight.

17     Q.    And in -- and in fact, that was a problem at

18  Trilogy, wasn't it, because the next bullet point in the

19  deal is what matters to Trilogy, delivery is slighted.

20  Meaning just get them -- get them to buy and then the

21  actual delivery of the product is not as important,

22  fair?

23     A.    No, I don't think that characterizes -- I don't

24  think that's an accurate characterization.  It's not

25  over selling and under delivering.  It is that during

1  the sales cycle, you may not draw attention to let's say

2  some of the difficult things.  You're not going to say,

3  oh, God, this part's going to be really, really hard,

4  right?  You say, look, we're going to get through this,

5  you know -- you know, let's work on it.  And of course,

6  after the fact, you know, some things are more

7  difficult.  You can't -- you can't even predict all of

8  the problems, right?  It's not like you buy a car and

9  hey, this thing could break down on you in another year.

10  You can't predict some of those.

11      Q.   Well, one of the problems that you had at

12  Trilogy was that you were vague sometimes about what the

13  product could actually do and when you got more -- and

14  that was actually a way of disguising some weaknesses in

15  the product; isn't that right?

16      A.   It could be.  I mean, but a lot of times the

17  vagueness was because you didn't have specific

18  requirements.  You didn't know what some of the things

19  coming up were going to be.

20      Q.   Okay.

21           MR. MELSHEIMER:  Let's go, it's a few

22  pages in, Mr. Barnes under sales plan.

23      Q.   (By Mr. Melsheimer)  We have been covering

24  up -- so let's back up.  Historically vagueness has

25  helped use -- helped with disguising weaknesses.  Being

1    more clear exposes our weaknesses.  Do you see that?

2        A.   Yes, I do.

3        Q.   We've been covering up.  The scary part of the

4    sale is when the customer asks for the doc.  What do you

5    suppose that means?

6        A.   Oh, when the customers would occasionally ask

7    for documentations on aspects for which we didn't have

8    some documentation, which was actually not uncommon when

9    let's say you're doing something new.

10       Q.   All right.  So this document -- were these

11   created on a pretty regular basis, these sort of issues

12   that the management of the company identified as being

13   issues or problems?

14       A.   Yeah, I think -- I mean, all good companies

15   should do it ideally once a year at least.  I don't

16   remember how regularly we did it, but I don't -- I

17   certainly know we did it more than once.

18       Q.   Now, you also did something in -- later in that

19   year, so this was in -- earlier in 2000.  Later in 2000,

20   in September, you hired a company to do a client

21   satisfaction study for Trilogy, right?

22       A.   I know we hired somebody to do it.  I don't

23   remember exactly the timing.

24       Q.   Take a look at 860.  I wouldn't expect you to,

25   sir.  Let me -- let me show you Defendants' Exhibit 860.

1  And again, you've been -- just so we're all fair, you've

2  been away from this company for five years?

3      A.   Yes.  Correct.

4      Q.   Okay.  So but back in 2000, you were still with

5  them and does this refresh your recollection that

6  Trilogy hired a company called Specifics,

7  Incorporated --

8      A.   Yes.

9      Q.   -- to do a client satisfaction study?

10     A.   Yes.

11     Q.   All right.  Well, let's take a look at some of

12 the findings of that?

13              MR. MELSHEIMER:  Mr. Barnes, if you could

14 go to Page -- it's not Bates -- well, it's Page 545-16.

15     Q.   (By Mr. Melsheimer)  For the current sample of

16 Trilogy clients, there appears to be a sizeable

17 disconnect between expectations that were set during the

18 sales and selection process and solutions.  Do you see

19 that?

20     A.   Yes, I do.

21     Q.   Now, that sounds to me like over promising and

22 under delivery.  Do you agree with that?

23     A.   It -- it sounds like it.

24     Q.   Okay.

25     A.   And --

1     Q.   And it said that the majority of respondents,

2  57.5 percent, have indicated that their expectations

3  have not been met, right?

4     A.   Yes, that's correct.

5     Q.   So that's over half the people that are

6  customers of Trilogy that are saying we were over

7  promised and under delivered?

8     A.   They're not saying they were over promised and

9  under delivered.  They're saying it didn't meet their

10  expectations independent of what the cause was.

11     Q.   Okay.  Let's take a look at some of the

12  specific findings as well.  Now, there were some good

13  things about this report as well, true?

14     A.   I'd say even the bad information is good.

15     Q.   Okay.  There were some things that Trilogy was

16  doing, you know, better at than some of the things

17  identified on that slide, fair?

18     A.   Uh-huh.

19          MR.  MELSHEIMER:  Let's take a look at

20  545118.  Sorry, 545118.

21     Q.   (By Mr. Melsheimer)  So this is a summary of

22  conclusions or recommendations and it says:  With

23  respect to the primary areas of performance, most of the

24  weighed satisfaction indices exceed 3.6 on a five point

25  scale.  Regarding individual attributes within these

1  categories, companies typically score between 3.8 and

2  4.5, with top performers scoring in the 4.1 to 4.5

3  range.  Trilogy's ratings were consistently lower than

4  the database averages indicating a need for improvement

5  in most areas.  Do you see that?

6      A.   Yes, I do.

7           MR. MELSHEIMER:  Take a look at the next

8  page, Mr. Barnes, 120.  Next one.

9      Q.   (By Mr. Melsheimer)  It talks about the need

10  for improvement.  A related concern is a perception

11  among many clients that Trilogy lacks a professional

12  approach towards their customers.  An unwillingness to

13  listen to the customer and understand their needs was a

14  recurring theme throughout the verbatim comments.  Do

15  you see that?

16      A.   Yes, I do.

17      Q.   Were you aware that was a problem at Trilogy

18  back in 2000?

19      A.   Yes, I believe I was.

20      Q.   All right.  Let's talk about 2001.  I think

21  you've told us before, sir, that in 2001, you had some

22  existing customers cancel contracts with Trilogy in

23  2001.  Do you remember that?

24      A.   I don't remember the specifics.

25      Q.   Okay.  Well, is it fair to say, sir, that you

1    can't recall anyone in 2001 telling you that they were

2    canceling a deal with Trilogy because SAP had offered

3    hierarchy access?

4         A.   Yes, that is fair.

5         Q.   No one ever told you that, that you can recall?

6         A.   That is correct.

7         Q.   So jumping ahead, by 2004 you yourself

8    acknowledged that Pricer for new business was dead,

9    right?

10        A.   I don't remember saying that it was dead, but

11   it was definitely not leading or driving sales or even

12   getting sales at that point.

13        Q.   Let's take a look at 2827, your e-mail to

14   Ms. Lohr.

15        A.   Yes.

16        Q.   2/25/2004.  Pricer for new biz is effectively

17   dead.

18        A.   Correct.

19        Q.   Okay.

20        A.   Key thing being, as we said, the new biz.  We

21   obviously had a lot of customers still actively using it

22   and maintaining it, so --

23        Q.   That was the --

24        A.   -- dead is just relative.

25        Q.   -- consulting -- you weren't selling to any new

 1  customers, you were still supporting some of the old

 2  ones?

 3      A.   Correct.  We would sell to somebody if they --

 4  you know, I mean, if somebody was interested, but that

 5  was not a focus of the sales at that point.

 6      Q.   All right.  I want to go back to -- and again,

 7  so that -- that was 2004, 2005, then you left the

 8  company in 2006, right?

 9      A.   Yes, that's correct.

10      Q.   I want to go back to the efforts to develop

11  this partnership with SAP.

12      A.   Okay.

13      Q.   All right.  Just a little bit.  It's true,

14  isn't it, sir, that the reason why the efforts to

15  develop a partnership with SAP were not successful prior

16  to 1998 was because of Trilogy?

17      A.   I disagree.

18      Q.   Okay.  Well, let's take a look at Defendants'

19  Exhibit 910.  Now, this is a man named Nath that wrote

20  this PowerPoint.  Naren Nath?

21      A.   Yes.

22      Q.   And he was someone hired from Microsoft,

23  correct?

24      A.   I believe that's correct.

25      Q.   He was hired in part -- one of his jobs was

1 supposed to be to help the company develop partnerships

2 with other vendors, right?

3     A.   Yes.

4     Q.   One of the vendors or businesses he looked at

5 was SAP, correct?

6     A.   Yes, that's correct.

7     Q.   And in this e-mail -- or excuse me, he creates

8 a slide deck that he's going to present to SAP in

9 January of 1998, right?

10     A.   Yes.

11     Q.   And let's take a look at Slide 27, Bates number

12 ending in 1101 (sic).  This is a presentation that

13 Trilogy was going to make to SAP, fair?

14     A.   Yes.

15     Q.   What they said was that there was a new mandate

16 from the Trilogy board to execute significant shift in

17 strategy towards alliances.  Brought me in, that's

18 Mr. Nath, from Microsoft where I ran the Content Media

19 Alliances Group, right?

20     A.   Yes.

21     Q.   Top priority was to establish a strategic

22 alliance with SAP, right?

23     A.   Yes.

24     Q.   And he says it was largely due to inexperience

25 and inability of Trilogy to handle partnerships, right?

1    A.    That is what he said in the slide.

2    Q.    Trilogy apologizes and accept responsibilities

3 and they want to make a new beginning with SAP?

4    A.    Yes.

5    Q.    Now, I take it you didn't agree with that?

6    A.    No, I believe a lot of that was said to get the

7 relationship going again.  I mean, classic, I mean, when

8 you're -- even if you, let's say, didn't do something

9 your wife disagreed with, you say I'm sorry, let's start

10 over.

11    Q.    Now, you're going to tell this Jury that you

12 apologize to your wife when you don't mean it?

13    A.    Yes, I am.  I am under oath.  That is

14 absolutely true.

15    Q.    So you're suggesting, then, that they didn't

16 mean it, that Mr. Nath didn't mean it.  Is that what

17 you're suggesting?

18    A.    To the full extent, I -- I don't think Trilogy

19 was 100 percent responsible for the lack of

20 partnerships, but we were happy to accept whatever

21 responsibility was necessary to try to get things

22 started again.

23    Q.    Is this the -- one of those examples of saying

24 anything to get the sale?

25    A.    Perhaps.  Along those lines.

1    Q.   So you were -- you were -- you were willing to

2    say anything to get this relationship going with SAP?

3    A.   No, not anything.

4    Q.   Okay.  But you didn't mind saying that you

5    apologized?

6    A.   Yes, that is correct.

7    Q.   Now, some of the things that Trilogy was

8    apologizing for were some, what you've called, missteps,

9    missteps that hurt the relationship between Trilogy and

10   SAP, right?

11   A.   Yes, that's correct.

12   Q.   For example, Trilogy had sales representatives

13   saying things in the marketplace about Trilogy and SAP

14   that were not true --

15   A.   Yes.

16   Q.   -- right?

17   A.   -- that is correct.

18   Q.   You had a sales representative making a claim

19   years before this, years before 1998, that Trilogy and

20   SAP were going to partner up and all the software would

21   be tightly integrated and that would lead the customer

22   to believe that using both companies would be a great

23   thing, even though there was no such partnership in

24   place, right?

25   A.   Yes, we did have a sales rep say that.

1    Q.    Some other things you did that you think were

2  missteps is that you -- you actually snuck in one time

3  to a Sapphire SAP conference, right?

4    A.    I -- yes.

5    Q.    Yeah.  I mean, this is an -- this is a

6  conference at one of these conventions that SAP has for

7  all users?

8    A.    Correct.

9    Q.    And y'all at Trilogy kind of snuck in there

10  without telling SAP, right?

11    A.    Yes, we went in without telling SAP.

12    Q.    Okay.  Another misstep that you made in the

13  relationship, in your view, was that you set up a

14  competing convention across the street from the SAP

15  convention in 1998 and gave away cameras and raffled off

16  cars and all kinds of things like that to draw attention

17  to your company, right?

18    A.    Yes.  I don't know it was a whole other

19  convention, but we definitely set up across the street

20  to try to attract customers to come listen to our story.

21    Q.    And you went -- after doing all that, one of

22  the things you did is you went to Germany in 1998 and

23  you apologized for some of that, right?

24    A.    Yes.

25    Q.    Okay.  One of the things that SAP and Trilogy

1  did in connection with this relationship, these

2  discussions in 1998, is you signed what's called an NDA,

3  right?

4       A.   Correct.

5       Q.   Tell the Jury what an NDA is?

6       A.   An NDA stands for nondisclosure agreement.  So

7  it is a legal document that says hey, you know,

8  depending on which side signs it, you know, we're going

9  to tell you something that may be confidential and you

10 agree not to disclose it to someone else.

11      Q.   And it's a mutual nondisclosure, right?

12      A.   Yes.  Nondisclosures can be one way or both

13 way.  I assume it was a nondisclosure.  I don't remember

14 exactly.

15      Q.   You promised not to disclose things that SAP

16 was telling you, and SAP promised not to tell things

17 that you were telling them, fair?

18      A.   Correct.

19      Q.   That's the way it typically works?

20      A.   Yes.

21      Q.   That's a normal business relationship when

22 you're talking to a potential partner?

23      A.   Yes.

24      Q.   Now sir, you know that there's never been any

25 suggestion -- there's -- strike that.

1            There's never been any claim brought that

2   SAP breached or violated that nondisclosure agreement,

3   right?

4       A.   Not that I know of.

5       Q.   There's never been a suggestion that, based

6   on -- there's never been a claim brought, based on that

7   meeting in 1998 that said:  You know, we gave you some

8   secret stuff, and you've breached this nondisclosure

9   agreement by using it.  You've never made that claim,

10  correct?

11      A.   I personally have not, and I'm not aware of

12  anyone else that has.

13      Q.   Let's talk about the marketplace a little bit.

14  Trilogy had lots of competitors in the marketplace,

15  right?

16      A.   Yes.

17      Q.   For all of its products?

18      A.   Yes.

19      Q.   Let's take a look at Defendants' Exhibit 1596,

20  this --

21           MR. MELSHEIMER:  Mr. Barnes, this is this

22  quadrant graph.

23      Q.   (By Mr. Melsheimer) Now, this is an --

24           MR. MELSHEIMER:  Let's stop right there.

25      Q.   (By Mr. Melsheimer) This is a -- are you

1    familiar with Gartner, the Gartner Company?

2         A.   Yes, I am.

3         Q.   Gartner is a very well-recognized firm that

4    gathers information about various businesses, and then

5    you can buy it and learn about the marketplace, right?

6         A.   Yes, that's correct.

7         Q.   It's well respected?

8         A.   Yes, it is.

9         Q.   It's considered relatively accurate, right?

10        A.   Yes.

11        Q.   They do their homework, right?

12        A.   Yes.

13        Q.   Let's take a look at this 1596.  It's a --

14             MR. MELSHEIMER:  Figure 4, Mr. Barnes.

15             That's it.

16        Q.   (By Mr. Melsheimer) So this is something

17   called the --

18             MR. MELSHEIMER:  Can you lower it just a

19   little bit, so I can make sure we can -- the jury can

20   see the -- bring it down here.

21        Q.   (By Mr. Melsheimer) Okay.  So this -- this is a

22   list of companies competing with Trilogy for business

23   software, right?

24        A.   Yes, that's correct.

25        Q.   You got Trilogy right here, and then you've got

1   all these other companies right here, including SAP,

2   Oracle, Siebel, PeopleSoft, some of the ones you talked

3   about in your direct examination, right?

4       A.   Correct.

5       Q.   So Trilogy competed with Firepond, did it not?

6       A.   Yes, it did.

7       Q.   And Baan?

8       A.   Yes.

9       Q.   Comergent?

10      A.   I don't remember running into Comergent in any

11  sales calls, but, I mean, they were certainly out there.

12      Q.   Cybrant?

13      A.   Yeah.  I don't remember going head-to-head with

14  Cybrant in any...

15      Q.   Let me be clear about one thing.  When you say

16  that you competed with these companies, no customer

17  would ever replace SAP with Trilogy software.

18      A.   They would -- they might not replace the whole

19  of SAP.  They might replace the pricing or the

20  configuration.  They might replace a piece of it.

21      Q.   They might replace or add on to SAP in a

22  pricing piece, but just so we're clear, Trilogy didn't

23  sell ERP comprehensive software the way SAP did.

24      A.   No.  That is correct.

25      Q.   So it's never going to be a situation, if

1  you're looking for comprehensive software, that it would

2  be SAP or Trilogy.  The comprehensive software would

3  have to be SAP or one of the other ERP companies, right?

4      A.   Yes, that's correct.

5      Q.   I want to talk just a little bit more about --

6  we talked about your SAP partnership efforts.  And you

7  remember before lunch, we talked about you keeping

8  certain things from SAP?

9      A.   Yes.

10     Q.   One of the things you kept from them was that

11 you were talking to Oracle as being a possible partner,

12 right?

13     A.   I don't remember if I kept that from them or

14 not.  I might have told them.  I don't remember.

15     Q.   You don't remember whether or not you told SAP

16 that you were talking with Oracle?

17     A.   Correct.

18     Q.   Okay.  And is it your testimony that you think

19 you told SAP that you were working on a partnership with

20 their biggest competitor?

21     A.   I don't remember if I did or I didn't, but I

22 might have, and I think it would also be reasonable that

23 they would even assume it for the most part.

24     Q.   Well, let's take a look at --

25               MR. MELSHEIMER:  Can we have the

1  deposition clip, Mr. Barnes?

2                  This is 16 -- sorry.  This is 12 --

3  sorry -- 15 dash -- Page 15, Lines 2 to 15 of Carter's

4  30(b)(6).

5                  VIDEO TECH:  Page number?

6                  MR. MELSHEIMER:  Yeah.  It's Page No. 15,

7  Lines 2 to 15.

8      Q.   (By Mr. Melsheimer) All right.  And just to be

9  fair with you, you said:

10                 QUESTION:  During that time that Trilogy

11 engaged in the partnership communication with Oracle,

12 did Trilogy tell Oracle that it was also engaged in

13 partnership communications with SAP?

14                 ANSWER:  I don't remember specifically

15 telling them, but I also don't remember trying to avoid

16 it.  So I don't think so, but I wouldn't -- I don't

17 know.

18                 QUESTION:  During the time that Trilogy

19 engaged in partnership communication with Oracle, did

20 Trilogy tell SAP that it was engaged in partnership

21 communications with Oracle?

22                 ANSWER:  I don't know.  I don't think so.

23 I don't think so, actually, in either case.

24                 Now, does this refresh your recollection

25 that you don't think you told them?

1      A.   Yes, it does.

2      Q.   Now --

3           MR. MELSHEIMER:  You can take that down.

4      Q.   (By Mr. Melsheimer) SAP and Oracle were big,

5  big competitors and still are today, right?

6      A.   Yes, absolutely.

7      Q.   Now, you also initiated partnership talks with

8  PeopleSoft, right?

9      A.   Yes.

10     Q.   You didn't tell SAP about PeopleSoft either,

11 did you?

12     A.   No, I -- I'll say, unlike Oracle, where I

13 wasn't sure, I don't believe we mentioned PeopleSoft.

14     Q.   Again, you were talking to one of SAP's biggest

15 competitors about being a partner, and you didn't think

16 there was anything wrong, and I'm not suggesting that

17 there is, by the way --

18     A.   Right.

19     Q.   -- with you not telling them about that.  But

20 you didn't tell them.

21     A.   I -- as I say, I don't remember, but in

22 PeopleSoft, no, I don't think we did tell them.

23          MR. MELSHEIMER:  Can we go -- Mr. Barnes,

24 do you have their chart that's got the purple and the

25 blue?

1    Q.   (By Mr. Melsheimer) I want to -- I'm almost

2  done, Mr. Carter.

3    A.   That's okay.  I'm good.  Keep going.

4    Q.   Well, I'm under a time limit, so I've got --

5  I've got to be careful, because we don't have a -- we

6  don't have an unlimited amount of time.

7           So this is this -- this is this chart

8  where -- make sure I understand the colors here.  The --

9  the purples are the ones that you sold Pricer to as a

10  bolt-on to SAP.

11    A.   I believe that's correct, yes.

12    Q.   And in the entire history of y'all selling

13  Pricer, you only did that one, two, three, four, five,

14  six, seven, eight times; isn't that right?

15    A.   No, that's not entirely accurate.  I believe

16  that was specifically for deals where Pricer had let it,

17  because, for example, I see like IBM was up there, and I

18  think we sold it to them as well, but IBM was also a

19  config. customer.  It was part of another thing.

20           So it was trying to pick the most

21  restrictive where it was just Pricer only.  SAP was

22  already a customer.

23    Q.   So you think there might be more that were sold

24  to SAP customers?

25    A.   Yes, I believe --

1    Q.   Because what I heard you say --

2    A.   -- there might be.

3    Q.   Excuse me.  I'm sorry.

4         What I heard you say was -- is that the

5    ones that were SAP customers were the ones in purple.

6    Is that not right?

7    A.   No.  It -- it was the subset.  So like Hewlett

8    Packard was also an SAP customer.  There's a number of

9    other SAP customers up there.  I believe the

10   highlighting was meant to indicate those who were

11   already SAP customers and who bought Pricer sort of

12   specifically by itself leading the deal.

13        It -- it wasn't just -- it wasn't the only

14   people that were SAP customers.  There's certainly other

15   SAP customers up there.

16   Q.   Well, sir, these other customers, though --

17   you've got other customers listed here from '95 to '98

18   that are not SAP customers, correct?

19   A.   Yes, we do.  That is correct.  That is a mix

20   of -- that is all the customers, whether they were with

21   SAP or not.

22   Q.   And you're not saying that these other

23   customers -- so these other customers were customers of

24   other ERP companies, like Oracle or PeopleSoft or things

25   like that?

1    A.   Yes.  Some of them were customers of the

2    competitors.

3    Q.   Okay.  And there was nothing --

4              MR. MELSHEIMER:  Well, strike that.

5    Q.   (By Mr. Melsheimer) You were willing and able

6    to offer and try to sell Pricer to those other companies

7    that were not customers of SAP, correct?

8    A.   Yes, that's correct.

9    Q.   You tried to do that real hard.

10   A.   Yes, we did.

11   Q.   You tried to do that even after 1998.

12   A.   Yes.  Our efforts after 1998 diminished, but,

13   yes, we definitely did.

14   Q.   And you weren't able to do it very successfully

15   with respect to people who were not SAP customers,

16   people who were not using SAP software, fair?

17   A.   Well, I mean, we were obviously -- we were

18   obviously still successful in selling.  The effort of

19   selling against an Oracle customer versus SAP was just

20   very different.

21   Q.   Well, you sold four in 2000 and one in 2001,

22   correct?

23   A.   Correct.

24   Q.   And there are a lot more than that -- than

25   those four companies -- there's a lot more than those

1     four companies available out there to sell to who are

2     non-SAP clients, fair?

3     A.   Oh, absolutely, that's fair.

4     Q.   Hundreds more companies, right?

5     A.   Yes.

6     Q.   And, in fact, this software, this Pricer

7     software could be used by big companies or small

8     companies, right?

9     A.   Yes, that's correct.

10     Q.   And there are -- you talk about the Fortune

11     500, but if you go beyond the Fortune 500, there are

12     thousands and thousands of companies that could be

13     potential clients for Pricer software, correct?

14     A.   Yes, that's correct.

15     Q.   Companies that have no connection or

16     relationship with SAP at all, correct?

17     A.   Yes, that's correct.

18     Q.   And you haven't been able to make those sales

19     either, have you, sir?

20     A.   We were able to.  We kind of stopped trying, as

21     we said.

22     Q.   You stopped trying to make sales to non-SAP

23     customers?

24     A.   Yes, that's correct.

25     Q.   You stopped trying to make sales to SAP

1  customers, what, in about 2001?

2      A.   Well -- well before then.

3      Q.   Okay.  1998, '99?

4      A.   '98 -- '90 -- yes, about then.

5      Q.   So I want to make this clear.  Your testimony

6  is -- is that you stopped making efforts to try to sell

7  Pricer to SAP customers in the '98 or '99 timeframe,

8  right?

9      A.   Yeah, in that rough timeframe.

10     Q.   And just so we're clear, that's thousands and

11  thousands of potential customers, fair?

12     A.   Yes, that's fair.

13     Q.   I want to end, Mr. Carter, with a few questions

14  about what you didn't invent and what you did invent.

15  Are you with me?

16     A.   Okay.

17     Q.   All right.  So we've been calling the feature

18  here hierarchical access, but, again, do you understand

19  that the feature within SAP software that's been

20  determined to infringe is not just hierarchical access

21  generally, correct?

22     A.   I -- yes, I believe that is correct.

23     Q.   So it's not just hierarchical access; it's a

24  particular way of the capability of such access, fair?

25     A.   I believe that's fair.

1    Q.   It's -- and tell me if I get this right.  It's

2    using hierarchical access to get a price when you use

3    information from a customer hierarchy and a product

4    hierarchy in the same determination.

5    A.   I believe that's fair.  Again, I'm not the

6    lawyer, and I know there's a lot of legal definitions,

7    but I believe that's fair.

8    Q.   That's your understanding at least.

9    A.   Yes.

10   Q.   So if an SAP customer uses hierarchical access

11   to determine a price using just customer information,

12   that's not an infringement that's been determined, true?

13   A.   I -- I get nervous when you say infringement,

14   because I know that has legal implications of things I'm

15   not going to understand.  So I think that's fair, but I,

16   obviously, defer to you, the lawyers.

17   Q.   Okay.  Well, do you understand that if an SAP

18   customer uses hierarchy access to determine a price

19   using just information about the product and not the

20   customer, that that is not part of what's been

21   determined to infringe, or is it the same answer?

22   A.   It's the same answer.

23   Q.   Okay.

24   A.   I mean, when we went through the trial, the

25   legal definitions of things were -- I left that to the

1   lawyers.

2        Q.    All right.  But at least you understand and

3   have an understanding even today, that it is not

4   hierarchy access that is the infringement that's been

5   determined, fair?

6        A.    I think that's fair.

7        Q.    Now, you're not claiming -- and these may sound

8   like some -- we've been going at it here, so it may

9   sound like these are some funny questions, but I just

10  want to make sure that we're all on the same page.

11              You're not claiming that you invented the

12  first pricing software, right?

13       A.    Definitely not.

14       Q.    Many companies were offering pricing software

15  long before 2003 when your patent issued, right?

16       A.    Absolutely.

17       Q.    Oracle was one.

18       A.    Yes.

19       Q.    SAP was one.

20       A.    Yes.

21       Q.    Now, there were some suggestions in your -- in

22  your direct examination that there were some benefits to

23  your product, to your invention, such as speed and

24  flexibility, right?

25       A.    That's correct.

1    Q.    Now, again, you're not claiming to have

2  invented speed or flexibility, right?

3    A.    No.

4    Q.    And you're not telling the jury that you

5  invented flexibility even in pricing, right?  Because

6  there were software programs that had flexible pricing

7  options before you, right?

8    A.    That's correct.

9    Q.    You talked about the pricing software being

10  able to go on a laptop, right?

11    A.    That's correct.

12    Q.    And the way you set it up, it was -- it could

13  run on a laptop, right?

14    A.    Yes.

15    Q.    You're not saying you invented the laptop,

16  right?

17    A.    No.

18    Q.    And we know that laptop speeds and computer

19  speeds are tremendously faster today than they were when

20  you came up with Pricer in 1995, fair?

21    A.    Yes, that's correct.

22    Q.    The speed and capacity of a laptop today, what

23  would you say, is 10, 20, 100 times greater than it was

24  in 1995?

25    A.    The CPU aspects of it at least are probably 10

1  times faster, yeah.

2       Q.   And the ability to manage data, big volumes of

3  data, that's a lot better today, a lot bigger today than

4  it was in 1995, correct?

5       A.   Yeah.   The hard drives are certainly bigger

6  today.

7       Q.   You also didn't invent in your patent the use

8  of hierarchies in patents, correct?

9       A.   That's correct.

10      Q.   You knew hierarchies were used in pricing

11  before you filed your '350 patent, right?

12      A.   That's correct.

13      Q.   And you knew that other companies used

14  hierarchies in pricing before your patent was issued in

15  April of 2003, right?

16      A.   That's correct.

17      Q.   You didn't invent customer hierarchies as a

18  concept, right?

19      A.   No.

20      Q.   You didn't invent product hierarchies.

21      A.   That's correct.

22      Q.   You didn't invent hierarchies for use in data

23  structures either.

24      A.   That's correct.

25      Q.   You -- in fact, you learned that one of the

1    companies that was doing hierarchies in pricing while

2    you were working on your patent was SAP?

3        A.    That's correct.

4        Q.    So SAP was doing, at least in a general way,

5    the concept of hierarchies in pricing before your patent

6    came out, fair?

7        A.    Yes, that's fair.

8        Q.    And the reason why I say you know all this is

9    because, in fact, a bunch of this is actually laid out

10   in your patent as part of the background of the

11   invention, right?

12       A.    Yes, that's correct.

13       Q.    One of the things that you do in a patent is

14   you lay out in a summary fashion everything that came

15   before to make sure what you're claiming is different

16   from what came before, right?

17       A.    Yes, that's correct.

18       Q.    And some of the products that came before were

19   SAP products.

20       A.    That's correct.

21            MR. MELSHEIMER:  Your Honor, may I just

22   have a moment?

23            THE COURT:  Yes.

24            (Pause.)

25       Q.    (By Mr. Melsheimer) Mr. Carter, I know I've

 1  left something out --

 2      A.   Okay.  Let's keep going.

 3      Q.   -- but I can't think of it.  So thank you for

 4  your courtesy.  I appreciate it.

 5      A.   Okay.  Thank you.

 6               THE COURT:  Redirect?

 7               MR. COLE:  Yes, Your Honor.  Thank you.

 8               May it please the Court.

 9               THE COURT:  Mr. Cole.

10                    REDIRECT EXAMINATION

11  BY MR. COLE:

12      Q.   Okay, Mr. Carter.  There's a lot of different

13  discrete areas, so I'm going to jump around a little

14  bit.  So bear with me.  I'll try to orient everybody.

15               Let me start, I guess, where

16  Mr. Melsheimer ended with what you didn't invent.  Can

17  you just tell us real briefly, what did you invent?

18      A.   I invented the use of hierarchies -- I didn't

19  create hierarchies -- to organize customer information,

20  to organize product information, and to then go get the

21  pricing data sort of all at once, as we were describing

22  before, without multiple trips to the store.

23      Q.   Okay.  And did anybody have that before you

24  invented it?

25      A.   No.

1    Q.    SAP have pricing before you came around?

2    A.    Absolutely.

3    Q.    Did SAP's pricing have your invention?

4    A.    No, it did not.

5    Q.    Did SAP take your invention and infringe it?

6    A.    Yes.

7    Q.    Okay.  Now, also I want to talk a little bit

8    about your patent.  And Mr. Melsheimer put something up

9    on the screen earlier to make a point.

10              MR. COLE:  Mr. Diaz, can we have PX2?

11   Q.    (By Mr. Cole) And he asked you about when you

12   filed this patent, and he said it was 1999, you know,

13   and after hierarchical access.  I want to show you

14   something, because there's some legalities here that are

15   important.

16              MR. COLE:  If you can blow up the top

17   section there, Mr. Diaz, until you get down to the

18   2000 -- yeah, right down there.

19   Q.    (By Mr. Cole) Now, let me ask you this:  When

20   did you file for the patent that ultimately came out

21   here in 19 -- excuse me -- 2003?  When did you

22   originally file?

23   A.    I originally filed in 1996.

24   Q.    Okay.  And that's what you said on direct.

25   A.    Yes.

1    Q.   And Mr. Melsheimer said that -- oh, no, no, no.

2  You actually filed it in 1999.  I want to scan down

3  and -- this is a little bit of legality, but it's

4  important here.

5         You see this thing down here (indicates)?

6  It says:  Continuation of application such and such

7  filed on June 17, 1996?

8    A.   Yes.

9    Q.   That's when your stake was in the ground, isn't

10  it?

11    A.   Yes.  That's when I --

12    Q.   Is it fair to suggest your stake wasn't in the

13  ground until 1999?

14            THE COURT:  Just a second.

15            Yes?

16            MR. MELSHEIMER:  Your Honor, may we

17  approach?

18            THE COURT:  Yes.

19            MR. MELSHEIMER:  It's a subject of the

20  Motion in Limine.

21            (Bench conference.)

22            MR. MELSHEIMER:  So, Your Honor, he's

23  about to introduce something they've tried to exclude,

24  which is the '400 patent.  And so if he does this, then

25  I believe I'm entitled to bring out that that patent has

1  been determined to be --

2              THE COURT:  I'm going to let him answer.

3  It's what you put up in front of this jury,

4  Mr. Melsheimer.  I'm sticking with my prior ruling now

5  that it's -- it's a continuation.

6              You got him to testify under oath that the

7  application that's at issue here was the -- was filed in

8  1999, and that may technically be true, but he's

9  entitled to answer what you suggested to the jury.

10             MR. MELSHEIMER:  Am I entitled then to

11 bring out that the '400 patent is not part of this case?

12 I don't have to say it's not infringed, but I can say

13 it's not part of this case.

14             MR. COLE:  I'll ask him.

15             THE COURT:  That's what I was going to

16 allow him to ask.

17             MR. MELSHEIMER:  Okay.

18             THE COURT:  You can say it's not at issue

19 in the case.

20             MR. MELSHEIMER:  Okay.  Thank you.

21             MR. COLE:  Thank you.

22             (Bench conference concluded.)

23    Q.   (By Mr. Cole) And, again, I know you're not a

24 lawyer, Mr. Carter, but would it be fair to suggest you

25 didn't have your stake in the ground in '96 like you

1  testified?

2      A.   No.

3      Q.   Okay.  Now, you mentioned there's this other

4  patent number here.  Just to be clear, that's not part

5  of this case, is it?

6      A.   I don't believe so.

7      Q.   Okay.

8           MR. COLE:  Thank you, Mr. Diaz.

9      Q.   (By Mr. Cole) Okay.  Let me -- let me shift

10 gears.  I want to talk about some of the discussion

11 Mr. Melsheimer had with you about what -- what SAP and

12 Trilogy talked about and who told who what and who

13 disclosed what.  And he mentioned in particular a

14 meeting -- I think it was 1994.  You remember that?

15 Where SAP flew into Austin?

16     A.   Yes, that's correct.

17     Q.   Okay.  Did that have anything to do with

18 pricing?

19     A.   No.  Pricing didn't exist then.

20     Q.   Okay.  And you mentioned that SAP came and

21 Mr. Liemandt set everybody aside and said:  Wait a

22 minute.  I think we don't want to show them the details

23 of our product.  Do you recall that?

24     A.   That's correct.

25     Q.   Let me ask you this:  Why did Mr. Liemandt say

1   he didn't want to show the details of your configuration

2   product to SAP in '94?

3      A.   He said he was afraid they would take it.

4      Q.   Okay.  Now, let's talk now -- not about

5   configuration but about pricing.

6              When you sat down with Bernhard Neumann

7   and Wilifred Merkel and showed them your Pricer product

8   in '97.  Do you remember that?

9      A.   Yes, I do.

10     Q.   Tell us -- give us a sense of what kinds of

11  things you went over with them in those two meetings.

12  What did you -- what did you teach them about?

13     A.   Well, I mean, we went through just about

14  everything.  We didn't look at source code, but we

15  showed them the maintenance system.  We showed them

16  entering new pricing, creating the rules of the pricing,

17  setting up the structure.

18              We talked in great detail about the

19  integration to SAP, so -- the function calls that would

20  be made to go back and forth at SAP and how the data was

21  mapped.

22     Q.   Okay.

23     A.   So --

24     Q.   Go ahead.

25     A.   No.

1    Q.   The information you told Dr. Neumann and

2  Mr. Merkel at the two meetings in 1997, was the same

3  kind of information that SAP wanted originally in '94,

4  or was it something different?

5    A.   Yes, it was.  It was the same kind of

6  information they wanted.

7    Q.   Okay.  You didn't share Mr. Liemandt's concern

8  about disclosing the details of your technology?

9    A.   No, I did not.

10    Q.   Okay.  Okay.  I also want to talk a little bit

11  about one of the e-mails that Mr. Melsheimer showed you.

12         MR. COLE:  It was DTX806, Mr. Diaz.  This

13  is the one talking about integration issues from

14  Mr. Liemandt.  If you could blow up kind of up to maybe

15  about there (indicates).  Great.

16    Q.   (By Mr. Cole) Now, let me ask you this:  This

17  is talking about integration problems, right?

18    A.   Yes.

19    Q.   And I think the suggestion was that this is --

20  that your problems with integration was a contributing

21  factor to the sales falloff; is that --

22    A.   Yes, that's fair.

23    Q.   Now, when you actually made sales to SAP

24  customers that we saw on the board, the purple

25  customers, in 1996, 1997, 1998, did you have to

1  integrate them?

2      A.    Yes, we did.

3      Q.    Was it easy or hard?

4      A.    It was hard.

5      Q.    Did the integration with SAP, was that -- was

6  that harder in '95, '96, '97, '98, as compared to later,

7  or the same or easier?

8      A.    It was -- it was at least as hard, probably

9  harder.

10     Q.    Okay.  Now, look at this note here about

11 Eastman Chemical.  It says:  Eastman Chemical promotion

12 channel.  Overall added value did not outweigh

13 integration costs and concerns.

14              What does that mean?

15     A.    That meant the -- the value of the soft --

16 software at that time being Pricer and promotion, you

17 know, the software itself has value.  Presumably,

18 they're going to make new sales.  They're going to save

19 costs.  It will be easier for their people.

20              And when they looked at the dollar value

21 of how much money they would save and how much money

22 they would make, they didn't think that was great enough

23 to justify the cost of having to do the integration.

24              It doesn't mean the value was less; it

25 just means it wasn't great enough.  Sometimes you still

1  make money, but if you're only going to make a little

2  bit, if it's a big hassle, you may still choose not to

3  do it.

4      Q.   Okay.  If it's a big hassle to integrate your

5  product and SAP, is a customer going to pay you a

6  significant amount of money if the pricing functionality

7  you offer is more or less the same things that SAP is

8  capable of already?

9      A.   No.  If the capabilities are the same, why

10  would anybody pay more or substantially more?

11     Q.   And not only do they have to pay more if they

12  want Pricer, are there also some headaches that go along

13  with that?

14     A.   Yes, absolutely.

15     Q.   Are they willing to put up with headaches and

16  pay more if they're getting the same thing from SAP?

17     A.   Yeah, correct.  They wouldn't.

18     Q.   Now, are -- were there things SAP could have

19  done to make it easier for your customers to integrate

20  with SAP back in the time period, '96 through '98?

21     A.   There were definitely things they could have

22  done, yes.

23     Q.   Okay.  Can you give us an example?

24     A.   SAP created functions.  They called them BAPIs,

25  business APIs.  They were specific points at which

1  customers could integrate with their system.  And they

2  created a number of these for a lot of different vendors

3  at the time.  And -- but they never did create one for

4  us specifically for the pricing.

5     Q.   Okay.  And now, we're talking about the '96

6  through '98 timeframe.  I understand that SAP may have

7  published some general APIs in the early 2000s.  Were

8  you aware of that?

9     A.   Yes.

10    Q.   Okay.  But now, by the time they issued these

11 public general BAPIs, was that after you had stopped

12 successfully selling?

13    A.   Yes, that's correct.

14    Q.   Okay.  And back when you were successfully

15 selling, did you ask them for a BAPI?

16    A.   Yes, we did.

17    Q.   And what did they say?

18    A.   It was -- I think it was a polite decline.

19    Q.   All right.

20             MR. COLE:  Mr. Diaz, could we have the

21 sales chart -- the mountain top, whatever we're calling

22 it.

23    Q.   (By Mr. Cole) Okay.  I want to make a couple

24 things clear as well.

25             Mr. Melsheimer mentioned correctly that

1  the patent didn't issue here until 2003?

2       A.   Yes, that's correct.

3       Q.   And that the hierarchical access came out and

4  that that was -- it was legitimate business all during

5  that period, correct?

6       A.   Correct.

7       Q.   I want to be very clear.  Is Trilogy asking for

8  any damages, any damages at all up until the date the

9  patent issued?

10      A.   No, not -- Trilogy is not asking for anything

11  before the patent --

12      Q.   Okay.

13      A.   -- issued.

14      Q.   So the damage -- the damage -- the damages

15  we're claiming start here in 2003, right?

16      A.   Yes, that's correct.

17      Q.   Well, let me ask you this:  If in 2003, when

18  your patent issued, you were able to reclaim the

19  exclusive rights to your invention at that point, do you

20  believe you would have been able to continue to sell in

21  2003 as you did here when you had it exclusively?

22      A.   Oh, absolutely.  When you're the only one to

23  have something, it changes -- it changes the game.  I

24  mean, you can imagine, if only one car manufacturer

25  could have air bags these days and nobody else could

1   make them, that would change -- even though everybody

2   has it today, if only one could have it, that changes

3   the game, absolutely.

4        Q.   And is that the nature of a patent?

5        A.   Yes, that is the nature of a patent.

6        Q.   Okay.  Now, I think you testified that you

7   weren't sure -- you didn't know about hierarchical

8   access at the time and weren't sure what was happening

9   with the business, right?

10       A.   Yes, that's correct.

11       Q.   Now, sitting here today -- hindsight is also

12  20/20, of course, but sitting here today, knowing what

13  we know now, do you have a view on why the sales did

14  this?

15       A.   Yes, I do.

16       Q.   What's that?

17       A.   I believe that, you know, SAP created the

18  hierarchical access, which used the -- infringed on the

19  patent and, you know, reduced the differentiation of the

20  product.

21            Suddenly, we weren't a hundred times

22  faster.  So customers weren't buying it.  And we were so

23  focused on SAP, you know, all of our sales efforts, that

24  it just, you know, kind of took away the steam that we

25  had.  I wouldn't have bought -- paid a lot of money for

1    something that wasn't different at the time.

2        Q.    Fair enough.

3              Shift gears again real briefly back to the

4    discussions you had with Dr. Neumann.

5              So I think the suggestion was made you

6    never told him you had filed for a patent or staked some

7    claim of ownership on this --

8        A.    Correct.

9        Q.    -- invention of yours, right?

10             Now, did you tell him that it would be

11   okay for SAP, if they wanted to, to just take their

12   invention and put it in the product?

13       A.    Certainly not.

14       Q.    Did you tell him it was public property?

15       A.    No.

16       Q.    Do you think he understood that it was

17   something you had invented and Trilogy owned?

18       A.    Yes, he certainly knew that.

19       Q.    Okay.  And Mr. Melsheimer also talked a lot

20   about how you didn't tell SAP or might not have told SAP

21   that you were considering a partnership with Oracle in

22   addition or as an alternative to SAP?

23       A.    Correct.

24       Q.    All right.  And that there were -- you know,

25   you guys were competitors.  You wouldn't always share

1   information.

2       A.    Correct.

3       Q.    And do you disagree with that?

4       A.    No, not at all.

5       Q.    Well, let me ask you this, though:  In your --

6   when you were discussing a potential partnership with

7   SAP, had you, at any point in time, decided:  You know

8   what; I know I'm not going to do a deal with SAP; I'm

9   going to do a deal with Oracle; I've already decided

10  that; but I'm going to keep talking to SAP anyway to

11  find out what other information I can?

12             Did that ever happen?

13      A.    No.

14      Q.    If you had made up your mind you weren't going

15  to do a deal with SAP or Oracle or anybody else, would

16  you have continued to sit down in meetings with them, to

17  talk with them, and to learn about their products?

18      A.    No.

19      Q.    Thank you very much, Mr. Carter.

20             MR. COLE:  Pass the witness.

21             THE COURT:  Recross?

22             MR. MELSHEIMER:  Briefly, Your Honor.

23             Exhibit 2, please, sir, Mr. Barnes, the

24  patent.

25                  RECROSS-EXAMINATION

1   BY MR. MELSHEIMER:

2       Q.   I want to make sure we're on the same page, Mr.

3   Carter.

4               So the application that became the '350

5   patent was filed on February 19th, 1999, right?

6       A.   I believe that's correct.

7       Q.   The related application that was filed in

8   January 1996, that's not a patent that's involved in

9   this case at all, true?

10      A.   I believe that's true, yes.

11      Q.   And just like with the '350 patent, whatever

12  this other patent was that's not involved in this case,

13  you understand that the filing of that patent is kept

14  private until either the patent issues or until a

15  certain period of time is elapsed, usually several

16  years, right?

17      A.   Correct.

18      Q.   So you're not trying to say that when you were

19  talking to SAP in 1996 and '97 and '98, that they knew

20  about this patent that you filed in 1996 that's not

21  involved in this lawsuit.

22      A.   No, that's not at all what I was saying.

23      Q.   I want to talk about this notion that -- if I

24  understand it correctly, that when your patent issued in

25  2003, you would have been able to rise up and make   93

1  additional sales, even though you'd gotten out of the

2  pricing software market in 2003 for your business.

3      A.   Yes, that's correct.

4      Q.   Is that your testimony?

5      A.   Yes, that's correct.

6      Q.   Okay.  And, in fact, this 93 sales, you had

7  never made 93 sales.

8      A.   That's correct.

9      Q.   Now, to make a sale of software like this, it's

10 not like putting an ad in the paper, right?

11     A.   That's correct.

12     Q.   It takes a lot of work, right?

13     A.   Yes.

14     Q.   A lot of time.

15     A.   Yes.

16     Q.   And a lot of money.

17     A.   Yes.

18     Q.   So it's not the case, for example, like selling

19 a CD.  You want to sell a hundred more CDs that have

20 music on them, you just burn a hundred more CDs, and you

21 can sell them.  That's nothing like what selling this

22 software is, right?

23     A.   That is correct.

24     Q.   It costs money to hire salespeople, right?

25     A.   If you don't already have the salespeople to do

1  it, yes.

2      Q.   It costs money to send those salespeople all

3  over the country to make sales?

4      A.   Yes.

5      Q.   The sales process can be months?

6      A.   Yes.

7      Q.   Six months?

8      A.   Yeah, absolutely.   It can be more than six

9  months.

10      Q.   It can be a year.

11      A.   Yes, it could.

12      Q.   You've got people traveling all over the

13  country, meeting with the customer, demonstrating to the

14  customer, and that's all on your nickel --

15      A.   Yes, it is.

16      Q.   -- right?

17           So it's not the situation that it's

18  effortless to sell Pricer at any time.

19      A.   No, it's not.

20      Q.   And the same efforts that you say you would

21  have made starting in 2003, you could have made those

22  efforts in 2002 or 2001 on customers who didn't use SAP

23  large and small, right?

24      A.   Yes, that's correct.

25      Q.   But you didn't do that.

1      A.    That's correct.

2      Q.    This suggestion that SAP didn't give you

3  something that would have been -- that would have helped

4  you with your product, you're not suggesting that a

5  competitor needs to share information with another

6  competitor, are you?

7      A.    No, that's not what I'm saying.

8      Q.    And you're not suggesting that there's anything

9  wrong with one company deciding:  You know what; I'm

10  going to keep this information to myself, and I'm going

11  to pursue a different line of business, right?

12      A.    No.   There's nothing wrong with that.

13      Q.    Thank you, Mr. Carter.

14            MR. COLE:  Very briefly, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. COLE:

17      Q.    Although SAP wasn't obligated to, they did

18  offer BAPIs to a lot of companies that they considered

19  non-threatening, right?

20      A.    Yes, they did.

21      Q.    All right.  But not Trilogy?

22      A.    That is correct.

23      Q.    Okay.  I want to follow up also -- one final

24  topic, the topic Mr. Melsheimer was asking you about,

25  the fact that it takes effort to sell this product.

1      A.    Yes.

2      Q.    So in 2003 -- let's just be clear -- to make

3 more copies of Pricer would not take any money or time

4 at all, right?

5      A.    That's correct.

6      Q.    But you would have to have a sales force to

7 sell it?

8      A.    Yes, that's correct.

9      Q.    Did Trilogy have a sales force?

10     A.    Yes.  We already had a sales force that were

11 selling out other products at the time.

12     Q.    Okay.  Would you have had to hire new people or

13 just add more products to the people already selling?

14     A.    No.  We would not have had that -- we would not

15 have had to hire more people.  The sales reps were

16 already traveling to the customers selling the other

17 products, and so they would simply offer that to those

18 customers as well.  And keep in mind, we still had many

19 customers using the product that could act as references

20 for it.

21          So, yeah, selling would not -- there are a

22 lot of costs in selling.  To start selling again in 2003

23 would not have been a dramatic difference for us.  We

24 just would have done it with the people we had.

25     Q.    And the same thing for software development,

1   people who build and maintain the software.  Did you

2   have a team that already did that?

3       A.   Yes.  Because we still had many of those

4   customers using the software.  So we still had a team to

5   do that.

6       Q.   Okay.  Could you have added Pricer to their

7   responsibilities without a dramatic increase in cost?

8       A.   Yes.

9       Q.   In 2003?

10      A.   Yes.

11      Q.   Okay.  Thank you very much.

12              MR. COLE:  Pass the witness.

13              MR. MELSHEIMER:  Nothing further, Your

14  Honor.

15              THE COURT:  All right.  You may step down.

16              THE WITNESS:  Thank you.

17              MR. COLE:  Your Honor, may Mr. Carter be

18  excused?

19              THE COURT:  Any objection?

20              MR. MELSHEIMER:  Yes, Your Honor.  No

21  problem.  No objection.

22              THE COURT:  You're finally excused.

23              THE WITNESS:  Thank you.

24              THE COURT:  Who will be your next witness?

25              MS. BROWN:  Mr. Dholakia.

 1                     THE COURT:  Okay.

 2                     MS. BROWN:  I'll be presenting.

 3                     THE COURT:  All right.  Mr. Dholakia, if

 4  you will stop right there and take the oath.

 5                     COURTROOM DEPUTY:  If you'll raise your

 6  right hand.

 7                     (Witness sworn.)

 8                     THE COURT:  Come around, please, sir.  Try

 9  to speak into the microphone and keep your voice up.

10        SAMEER DHOLAKIA, PLAINTIFF'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12  BY MS. BROWN:

13      Q.   I can tell you, I'm going to try to make

14  friends with the court reporter by asking you in advance

15  to spell your last name, if you will.

16      A.   Dholakia is spelled D, as in David,

17  H-O-L-A-K-I-A.  Not the easiest.

18      Q.   And now that you've spelled your name, if

19  you'll introduce yourself to the jury.

20      A.   Good afternoon.  My name is Sameer Dholakia.

21      Q.   And tell us a little bit about you.

22      A.   I am married to a wonderful wife, have a

23  4-and-a-half-year-old daughter and a 14-month-old son.

24  We live in the bay area of California.

25      Q.   Tell us a little bit about your education after

1  high school.

2      A.   I studied at Stanford University.  I have a

3  bachelor's in economics and studied sociology and earned

4  a master's with that.

5      Q.   Now, we just heard from Mr. Carter who talked

6  to us a little bit about Trilogy.  Tell us, what was

7  your role in that company?

8      A.   I joined on as the product manager for

9  Mr. Carter's invention for the Pricer product.

10     Q.   And what does a product manager do?

11     A.   A product manager is responsible effectively

12  for defining the market that the technology will be

13  applied to and figuring out how to go market and sell

14  that product to the market, to the -- to those

15  customers.

16     Q.   Did this mean -- you mentioned you were in

17  California.  Did this mean a change in location when you

18  came to Trilogy?

19     A.   Oh, yes.  Yeah.  After school, graduating

20  from -- from Stanford out in the bay area, we -- many of

21  us that joined all moved to the headquarters in Austin,

22  Texas.

23     Q.   And when you say headquarters, do you mean

24  Trilogy?

25     A.   Sorry.  Trilogy's corporate headquarters, yes,

1   in Austin.

2        Q.   What made you interested in working for

3   Trilogy?

4        A.   You know, the founders of the company were all

5   ex-graduates of Stanford, and so they did a lot of

6   recruiting back on campus, and so a lot of the folks

7   ahead of me, the people that I looked up to that

8   among -- among the best and brightest at school were all

9   joining this relatively, you know, small startup in

10  Austin, Texas, at the time probably had 50 people.

11            And as you probably heard in my

12  background, I was not a computer scientist.  I never

13  took any technology -- technical training of any kind.

14  So joining Trilogy was a bit of a right turn, but the --

15  the people in the classes ahead of me that were going

16  were some of the best folks on campus.  And so that

17  spoke volumes about the opportunity there.

18       Q.   What are you doing professionally right now?

19       A.   Up until just a few months ago, I was the CEO

20  of a software small startup company.  We actually just

21  got acquired a few months back, so I'm now helping

22  integrate that company into the larger organization.

23       Q.   How long were you with Trilogy?

24       A.   I worked at Trilogy for a total of -- well,

25  let's see, I was there from 1995 until 2007.  I spent

1    two years earning an MBA at Harvard in between there,

2    from 2002 to 2004.

3        Q.    And so total you worked 10 years?

4        A.    So 10 years, actually, at the company, yes.

5        Q.    Now, let's go back to when you first started

6    working at Trilogy.  And you're a project manager; is

7    that right?

8        A.    A product manager.

9        Q.    Product manager.

10       A.    Yes.

11       Q.    Pardon.

12       A.    No.  No problem.

13       Q.    Who was the target market for Pricer?  The

14   jury's heard a lot about this Pricer product.  Who was

15   your primary target?

16       A.    Yeah.  I think as Tom referenced, the primary

17   target were the Fortune 500, the largest -- the largest

18   corporations, because they simply derived the most

19   value.  They had the most complex problems, and thus,

20   with an innovative solution, they would derive the most

21   value from the software.

22       Q.    I think during the last questioning of the

23   witness, it was brought out that this is a product that

24   could have been used by large and small companies, but

25   by and large, why was it that you thought Fortune 500

1   companies would be more interested in Pricer?

2       A.   Well -- and I think Tom touched on it briefly.

3   Just the scale of what they did.  They just -- they had

4   so many customers, so many products, so many pricing

5   programs that the complexity was most -- was highest for

6   those kinds of organizations, and so they could get the

7   most value from it.  So that's really who we focused on

8   primarily.

9               MS. BROWN:  If we could, let's pull up our

10  first slide.

11      Q.   (By Ms. Brown) Let's tell the jury a little bit

12  about Pricer.  If you were going to ride with us in the

13  elevator and give us a pitch and give us the top three

14  things that make Pricer a great product, let's start

15  with the first one.

16      A.   Sure thing.  And I'll caveat this with it's

17  been many, many years since I've had to pitch the

18  product, but I'll do my best.

19              Flexibility and ease of maintenance was

20  obviously core.  The technology really was all about --

21  at a business level, was all about enabling somebody at

22  that Fortune 500 company who was responsible for pricing

23  to be able to do whatever they wanted to do from a

24  pricing perspective without having to worry about

25  whether their software system could accommodate it,

1    could handle it.

2            And so it was just -- the business aspect

3    of it was what drove it.  So, for example, at a

4    Goodyear, who was one of our customers, there was a

5    pricing manager there that would be responsible for a

6    tire line, and you wanted to make sure that that pricing

7    manager wasn't constrained by the system.

8            And so with -- with Pricer ease of

9    maintenance and flexibility, it meant that that Goodyear

10   pricing manager could recognize a trend in the market

11   and say:  Gee, I'm losing market share to Michelin in

12   the northeast on these snow tires, and so I want to put

13   in a special promotion for the next 90 days to any

14   retailers that have done this much business with me last

15   year and so on and so forth.  You know, you could make

16   these rather elaborate pricing decisions.

17           And before Pricer, they were very, very

18   difficult to get into the system.  And with Pricer, you

19   could, and it literally would take, you know, a few drag

20   and drops, a click, and you'd be done in a matter of

21   minutes.  And that was very, very different than -- than

22   prior systems.

23      Q.   I want to talk to you a little bit about the

24   difference that Pricer would make in human errors, too.

25   You mentioned about tires.

1              Let's -- let's pretend for -- let's say

2    that you were going to give a promotion for Spelman

3    College graduates, graduates from Spelman.  Spelman

4    College graduates -- you were going to give all Spelman

5    graduates 10 percent off.  Spelman is in Atlanta, and

6    I'll tell you we'll have about 2500 students at any

7    given time.

8              If I were to relay that, it sounds like

9    before Pricer, I would have to call the IT guy or

10   someone from headquarters and just kind of verbally

11   explain to them the kind of promotion I was interested

12   in.

13       A.   That's right.

14       Q.   If they misunderstood me, there's another

15   college called Stillman College in Alabama, totally

16   different demographics, totally different state.  What

17   if you just mis -- just transposed those just a bit?

18   How could that impact it on the quote you're giving me?

19       A.   Pretty significantly.  I mean, you could

20   implement the wrong price -- a pricing program for the

21   wrong customer base or customer group or customer set,

22   and pricing errors often accounted for 1 to 3 percent

23   of -- of -- of the revenues that a company would see.

24              And oftentimes a company would have to

25   simply eat those costs, because once you've told a

1  customer what the price is, if you got it wrong, well,

2  that's your fault, and it's awfully difficult to go back

3  to the customer and say:  You know, I know you decided

4  to buy my product because I told you the price was X,

5  and now I'm telling you the price is Y.

6         Most large enterprises aren't -- aren't --

7  don't desire to do that, and they simply take it upon

8  themselves to swallow the cost.  That was one of the big

9  drivers of the value.

10     Q.   And so the example I gave, let's say, was

11  pre-Pricer where I call up and I have to call an

12  old-fashioned IT guy and say:  I want to do a promotion

13  for Spelman College.  He overhears Stillman College,

14  gets the wrong state, wrong number of people.  How does

15  Pricer change this?

16     A.   Well, in the pricing world, with SC Pricer,

17  that pricing manager could literally make the change

18  themselves using the tool so that you didn't have to

19  pick up the phone and call somebody at IT that was

20  responsible for the software in the systems.

21         The price -- the business person that

22  decided, I'm losing market share to Michelin, I need to

23  do something about it, could make the changes

24  themselves, and thus the probability of the error would

25  go down a lot.

1      Q.   So if I'm the salesperson, and I want to do a

2   Spelman promotional, I just punch it in myself --

3      A.   That's right.

4      Q.   -- versus having to -- back -- back pre-Pricer,

5   calling somebody, hoping they're at their desk, hoping

6   they're not all off playing golf, hoping they punch in

7   the right state?

8      A.   That's exactly right.

9      Q.   Okay.  Let's go to the second benefit of

10   Pricer.  Disconnected pricing.  Tell me what that means?

11      A.   This is referring back to the idea of being

12   able to have the power of all of your pricing

13   calculations out on a laptop computer.

14           And so it was about allowing the sales rep

15   to close the deal so they could tell the customer:

16   Here's not only what you want, but specifically how much

17   it would cost you, Mr. or Mrs. Customer.

18           And that was all in the -- in the prior --

19   prior to SC Pricer, was very difficult to do.  You

20   couldn't put it on a laptop computer, and so you would

21   have to call back to somebody at headquarters, and you

22   would have all those concerns about pricing errors that

23   we were just talking about.

24           And the last thing you want to do as a

25   salesperson, of course, is to say:  Gee, I don't know

1  what the answer is to how much it will cost.  I'll have

2  to get back to you.  And that was something that SC

3  Pricer fixed.

4      Q.   And so if I -- if I went to Pricer, now I could

5  look it up myself, if I'm the person trying to close the

6  deal?

7      A.   If I'm the sales rep on the field, I could

8  simply specify who the customer is and what they wanted

9  to buy, and all the complexity of the logic that used to

10  be stored back at headquarters in these big software

11  systems could now run out on their little laptops.

12             And it would just dynamically calculate,

13  it would know, well, if it's Spelman College, I know

14  that that's in Georgia, and therefore, it has this tax

15  rate and has these pricing policies, and because they're

16  buying -- they bought this many tires last year, they're

17  one of my gold customers instead of my platinum

18  customers, and therefore, they get this other discount.

19             And so the pricing system would simply go

20  and get all that information and do lots of rather

21  complex calculations and deliver the answer right there

22  on the spot.

23      Q.   Let's talk about the third most important

24  feature.

25      A.   Speed performance was a big deal, as Tom

1   mentioned.  It was not at all uncommon for us to see

2   customer situations who had very complex pricing

3   requirements, and when they tried to put it in other

4   systems, SAP included, because of the -- just the way

5   those other systems were designed, in order to run

6   through the calculation, to go to find each and every

7   pricing rule that would be relevant to that particular

8   situation could take minutes, hours sometimes, if it was

9   a very complex program.

10            And, you know, for many Fortune 500

11   companies, they needed an answer to come back like that

12   (snaps fingers).

13   Q.   When you first came to Trilogy, how did you --

14   how did you first learn about the customer's need?  How

15   did you learn about kind of a thirst for -- saw your

16   water, made me think of thirst -- a thirst for Pricer?

17   How did you know there was a market there?

18   A.   Well, when we first started, I think Tom

19   recognized it first working with our initial

20   configuration customers.  I think he talked a little bit

21   about that, that they didn't have a great solution there

22   and hence came up with the invention to solve that

23   problem.

24            When I joined as the product manager, we

25   first had to go out and sell it directly to the

1    customers, and -- and we just kept seeing more and more

2    success with it.

3              We then, I think, recognized in -- I want

4    to say it was December of '96 was when we sold

5    Allegiance Healthcare, and I remember that being one of

6    the marquee deals.  It was one of our first seven-figure

7    deals, that they signed a contract with us for $2

8    million to buy our pricing software.

9              Again, this was a customer that had SAP

10   already that could have used their pricing functionality

11   at no additional cost to what they'd already spent with

12   them, and yet they evaluated our innovation, our

13   technology, and said:  This solves a real business

14   problem for us, and we'll write you a seven-figure

15   check.

16             And so that's really, I think, what first

17   kicked off the focus at Trilogy to say:  Gee, could we

18   go replicate that across -- across a broader base of SAP

19   customers.

20   Q.   Let's talk about some of the earliest sales of

21   Pricer.  P.H. Glatfelter, does that mean something to

22   you?

23   A.   It does.  I remember it well.  It was -- if you

24   were to look back on that eye chart, I personally sold

25   it.  It was a -- as the product manager, I went out

1    and -- you know, the first couple of wins, you had to go

2    out and convince the rest of the sales force that you

3    could do it.

4              And they were a paper company in rural

5    Pennsylvania.  And I remember well.  They had remarkably

6    complex pricing needs.  They wanted to be able to get it

7    out into the field, into the -- you know, on to those

8    laptops, and -- and so we sold them Pricer.

9              They were, I think, our very first

10   standalone Pricer deal, meaning not copied with the

11   product configuration software.

12   Q.    There was some discussion with the last witness

13   about what leads a deal.  Can you explain that to us in

14   layman's terms about what leads a deal?

15   A.    Yes.  Simply the -- the primary reason they're

16   buying from you in general.  And it was often the case

17   that Pricer was the -- the lead product in the deal, and

18   there may be other pieces of software, I think, as Tom

19   was describing, that may get added in as -- as something

20   used to view the price or whatnot, but Pricer was the

21   product that led the deal.  It was the reason they

22   engaged with us.

23   Q.    It was the motivator?

24   A.    The motivator, yes.

25   Q.    Going back to that first sale that you were

1    part of, P.H. Glatfelter, what led the deal?

2         A.    Pricer.

3         Q.    And how do you know that?

4         A.    Because I was there.

5         Q.    Do you remember what features were important

6    especially to Glatfelter?

7         A.    Yeah, two -- two things.  I think one was the

8    flexibility.  As I said, they had remarkably complex

9    pricing structures based on the thickness of the paper

10   and the size of the paper and the customer.  It was very

11   complex, so they needed the flexibility we offered that

12   other systems didn't.

13              And they needed the disconnected, running

14   on a laptop, capability.

15        Q.    Let's talk a little bit about the licensing

16   deal that Trilogy had with Thomas & Betts.  Does that

17   ring a beat?

18        A.    T&B, yeah.

19        Q.    Tell us about that.

20        A.    I remember them as well.  They were in Memphis,

21   Tennessee.  They're an electronics, electrical equipment

22   distributor, as I recall.  They were one of our first

23   million-dollar deals.  They spent a million dollars with

24   us for the software.

25              They had -- because they were a

1   distributor, they had -- so they didn't actually make

2   the products.  They were simply reselling it.  They had

3   probably, I would guess, 2 or 3,000 individual product

4   SKUs that they had to manage in the system, and they

5   were selling to thousands of retailers.

6                   And so the combination of those two things

7   made -- made the pricing very complex.  They needed the

8   flexibility of our system.  And because of the sheer

9   volume of orders that they were processing, that third

10  bullet that we were talking about earlier, speed and

11  performance, was -- was very important.

12      Q.   What about U.S. Surgical?  What does that mean

13  to you?

14      A.   Another Pricer-led deal.  They were a lot like

15  Allegiance Healthcare, you know, another -- basically

16  another healthcare company that had very much the same

17  set of problems, complexity in customer base, mass of

18  product, needed -- needed us for both the flexibility

19  and the ease of maintenance and the speed again.

20      Q.   What is Trilogy's relationship to Whirlpool?

21  Do you have any relationship there?

22      A.   Yes.  Trilogy started working with -- they

23  became probably our largest Pricer customer.  I think

24  they ended up -- they spent over -- I think it was $5

25  million with us just for the pricing software, let alone

1   the maintenance and the implementation services.

2           But we met them in -- I think it was '96,

3   started to work with them, and they signed up with us as

4   a customer.  Again, had SAP already, looked at our

5   software -- sorry.  I take that back.

6           They were in the process of evaluating SAP

7   and -- and other -- other solutions, looked at our

8   system, and said:  Well, we can't actually implement our

9   pricing the way we want in SAP, but we can do it if we

10  have Trilogy's SC Pricer.

11          So they ended up actually buying both.

12  They bought -- and started the deployment of the SAP

13  suite and Trilogy Pricer at the same time.

14      Q.   Do you know if there were any studies done on

15  the effectiveness of -- the bang for the buck, if you

16  will, that Whirlpool got for Pricer?

17      A.   Yeah.  Whirlpool, as I said, because they were

18  one of our largest customers, we, of course, touted them

19  as a reference.  There was discussion about how

20  important references are.  They are very important, and

21  these guys were our largest customer.

22          And they were a great reference for us.

23  They did -- they spent time with Gartner, who I think

24  was also cited previously.

25          Gartner was a technology analyst firm that

1    evaluated technology and provided advice to technology

2    decision-makers in the Fortune 500.  And Gartner did a

3    writeup of how successful the Pricer software had been

4    at -- at Whirlpool.

5                   MS. BROWN:  Mr. Diaz, if you could pull up

6    Plaintiffs' Exhibit 582, please, and I'd like to look at

7    the cover page.

8                   Okay.  If you could, let's focus on this

9    lower paragraph.  If you could blow that out for me

10   large enough for the jury to see.

11        Q.    (By Ms. Brown) This is a copy of that Gartner

12   report; is that right?

13        A.    That's right.

14        Q.    So what is the problem?

15        A.    So Whirlpool, as some of you may have heard of

16   the brand, they're an 11-billion-dollar maker of

17   appliances and the like.  They had all these -- you

18   know, you'll hear common referring in terms of the

19   problems that our customers were facing.

20                  They were very similar.  They had lots of

21   people in the field, account managers and

22   representatives, trying to sell through a very complex

23   distribution channel.

24                  So whether you were selling through Home

25   Depot or Lowe's or the mom and pop appliance store on

1  Main Street, you had to manage different pricing

2  programs for your washers and dryers versus your

3  refrigerators and so on.

4             The way they did that when they started to

5  evaluate our technology was this massive, very ugly

6  spreadsheet, because the business people needed to keep

7  track of all these things.

8             And as you can -- you can read up on

9  that -- that summary there, it took 110 days to update a

10 pricing change to that -- to that system, which, as you

11 would imagine, makes it very difficult to react to

12 competitive changes or trends in the market and

13 what-have-you.  By the time you make the change, the

14 market condition may have changed again.

15    Q.   And so before Whirlpool had Pricer, they

16 had a -- if I'm reading this correctly -- a 186,000-cell

17 spreadsheet.  Do you know what that looks like?

18    A.   It is very ugly.  I recall seeing it.

19    Q.   Actually, I think we have an animation that

20 will --

21             MS. BROWN:  If you can pull up Slide 2.

22    Q.   (By Ms. Brown) Okay.  So this is a 50-cell,

23 just a regular Excel spreadsheet, 100, 200 cells.  And

24 eventually, we're going to get out to 180,000 to give us

25 some idea of what Whirlpool was dealing with before they

1    had Pricer.

2        A.    That's right.

3        Q.    Goodness gracious.  And so how would this work?

4    If I'm Whirlpool, pre-Pricer, in order to come up with a

5    price for someone, I've got to navigate through all of

6    these cells.

7        A.    You can see why it took 110 days.  It's a very

8    complex process.

9              THE COURT:  Why don't we break right here

10   for our afternoon recess.

11             Ladies and Gentlemen, take 20 minutes.

12   Come back at -- be back ready to come in the courtroom

13   at 20 until 4:00.  Have a nice break, and don't talk

14   about the case.

15             LAW CLERK:  All rise for the jury.

16             (Jury out.)

17             THE COURT:  All right.  Court's in recess.

18             (Recess.)

19             LAW CLERK:  All rise.

20             (Jury in.)

21             THE COURT:  Please be seated.

22             MS. BROWN:  May it please the Court.

23             THE COURT:  Please continue.

24       Q.    (By Ms. Brown) So let's go back just a moment.

25   We were looking at the Gartner report that outlined the

 1 problem, Whirlpool Corporation, 11 billion dollar

 2 manufacturer.

 3             MS. BROWN:  If we could, Mr. Diaz, let's

 4 just highlight a couple of these numbers.

 5      Q.    (By Ms. Brown)  More than 200 account managers

 6 and 150 field marketing representatives.  What does that

 7 mean?

 8      A.    You have a lot of folks in the field that are

 9 providing pricing information to customers or potential

10 customers.

11      Q.    So all of those people are meeting to come up

12 with prices to accurately convey to -- to sell products?

13      A.    That's correct.

14      Q.    Forty-one distribution price -- distribution

15 channel price sheets updated four times a year and I

16 think you touched on this earlier, it took 110 days to

17 update before Pricer?

18      A.    That's right.

19      Q.    Not exactly following your trend quickly,

20 right?

21      A.    It's hard to react when it takes 110 days to

22 do -- to do something.

23      Q.    Let's highlight this last sentence.  A cool

24 spring season dictates a pricing adjustment decrease on

25 window air-conditioners, but because Whirlpool could not

1   distribute pricing updates quickly --

2               MS. BROWN:  We go to the next page and the

3   top paragraph.

4       Q.   (By Ms. Brown) -- it couldn't respond to this

5   market dynamic.  What does that mean to you?

6       A.   Well, this -- this really speaks to the -- to

7   the business importance or value of the software and in

8   the case of Whirlpool, we actually sold that software

9   to, guy's name was Greg McManus, I remember him well, he

10  was the Vice President of Sales and Distribution at

11  Whirlpool, and this problem materially impacted his

12  business and so the fact that we could solve it and

13  nobody else could was the reason he wrote -- was willing

14  to sponsor the deal and -- and sign a contract for five

15  million dollars for us.  It's a -- it's strategic to a

16  business executive to be able to respond when things are

17  changing in the market with your competition.

18              MS. BROWN:  And let's, if we can jump back

19  out, Mr. Diaz, let's go to the resolution.  We -- we

20  focussed on the problem.  Okay.  Blow up that paragraph.

21      Q.   (By Ms. Brown)  Let's talk about the results.

22  Would you mind walking us through what happened after

23  Pricer?

24      A.   The -- the results, I think, are pretty

25  compelling and spoke for themselves.  They were a great

1  reference for us and you can read the numbers there.

2  The time it took to update all the pricing information

3  went from 72 hours with multiple people to one hour, one

4  person.

5             The cycle time went from those 110 days

6  that we were just joking about to 14.  The process

7  change was 70 percent faster, 65 percent in terms of

8  head count reduction.  So all the numbers are -- were --

9  were pretty significant and they, you know, got a

10  good -- good ROI.

11     Q.    What is a conversion rate?  Tell the Jury.

12     A.    A conversion rate in sales and marketing terms

13  simply means, you know, the number if you're talking to

14  10 -- 10 potential customers, how many of them are you

15  able to convert into a -- into a customer.  So

16  conversion rate would be I've got 10 prospects, I've

17  sold two deals, therefore it would be 20 percent

18  conversion rate.

19     Q.    In its heyday what would Pricer's conversion

20  rate have been?

21     A.    I would guess it was probably about a third of

22  the -- a third of the customers that we would engage

23  with would end up becoming customers.

24     Q.    Did it stay that way?

25     A.    It didn't.

1     Q.   What happened?

2     A.   I suppose I should have answered that pre and

3  post 1998.  It -- it had been about a third.  It dropped

4  precipitously -- started in '98, '99 going forward down

5  to a couple percent.

6               MS. BROWN:  Mr. Diaz, if you'll pull up

7  Plaintiffs' Exhibit 1997, please.

8     Q.   (By Ms. Brown)  This is the cover of an

9  internal SAP document and the date on it is May of 1997.

10  Are you familiar with this document?

11    A.   I probably have seen it before.

12               MS. BROWN:  Can we turn to Page 14,

13  please?  It should be a pie chart.  If you can zoom in

14  on that top left corner.

15    Q.   (By Ms. Brown)  From the title of this it

16  appears to be SAP's business plan for 1997, and this is

17  Page 14 of that business plan.  I just want to ask you

18  as a former Trilogy employee, what does that mean to

19  you, this need to watch, colon, with Trilogy written up

20  on it?

21    A.   Well, I think it -- it reflects what we were

22  seeing in the field, which is that as it relates to this

23  market space, SAP was seeing the success that we were

24  having, and was watching us closely and trying to do

25  whatever it could to slow that down.

1    Q.   So you were quite literally at the top of their

2  list?

3    A.   Yeah.  Yes, ma'am.

4         MS. BROWN:  If we can, let's go to Page

5  35.

6    Q.   (By Ms. Brown)  Certainly Pricer had incredible

7  economic success.  What was the reaction at SAP to this

8  success?

9    A.   Well, as I said, I think the success we were

10  having was -- was certainly noted.  I think we were

11  clearly on the radar screen, and they were looking to

12  stall our continued successes the best they could.  And

13  what we were hearing in the field in sales conversations

14  where customers would tell us that SAP had told them

15  that they would be introducing our kind of capabilities

16  in short order, you know, soon enough.  It's

17  forthcoming.  And that's how they would freeze the

18  market.  That was one of the ways they would freeze the

19  market.

20         The other would -- they would reinforce

21  the fear in the customer's mind about the difficulty of

22  the integration, that they didn't want, Mr. Customer,

23  you shouldn't move your very strategic pricing

24  information out of SAP and put it into this -- into this

25  startup's pricing database.  You should always leave it

1    in SAP.

2        Q.    Now, this is Page 35 of the marketing plan for

3    SAP in 1997.  Can you walk us through just those top

4    bullet points?  What do -- what -- what do those mean to

5    you?

6        A.    Stall adoption of competitive solutions, let

7    our customers' sales force know our intentions.  We're

8    investing the opportunity, you know, of course,

9    basically the -- the types of things I was just

10   mentioning, to cause concern with the customers that

11   they ought to -- they ought to wait for SAP to deliver

12   it rather than buying it from Trilogy.

13       Q.    Okay.  Thank you.

14               MS. BROWN:  Pass the witness.

15               THE WITNESS:  You're welcome.  Thank you.

16               MR. BATCHELDER:  Your Honor, may we

17   approach?

18               THE COURT:  Yes.

19               (Bench conference.)

20               MR. BATCHELDER:  We -- we have an issue

21   with this gentleman was taken on a vacation paid for by

22   Joe Liemandt, the CEO of Trilogy.  It was a $400,000

23   dollar trip and it was -- it happened after this trial,

24   after this case began.  That's relevant to bias and we

25   would like to elicit that evidence to establish this

1  witness may be biased.

2           THE COURT:  Well, how many folks were on

3  the trip?

4           MR. BATCHELDER:  There were many.  It was

5  a large bachelor party, went to the Playboy Mansion and

6  went to Las Vegas.

7           MS. FITZGERALD:  May I respond, Your

8  Honor?

9           THE COURT:  Yes.

10          MS. FITZGERALD:  We have a motion in

11 limine that you granted on this very exact trip that was

12 paid for by Mr. Liemandt's personal money.  It was

13 not -- it was not paid for by the company at all.  And

14 as Mr. Nichols testified in his deposition, the trip had

15 about 250 people on it, only I believe less than 10

16 worked for Trilogy and it was friends and family of the

17 bachelor.

18          THE COURT:  Well, I'll let you establish

19 that you -- that he is friends with Mr. Liemandt and

20 that he's traveled with him, you know, that he's gone on

21 vacation trips with him, but beyond that don't go.

22          MR. BATCHELDER:  Okay.  Can I say that Joe

23 Liemandt paid for his vacation.

24          THE COURT:  You can say that he paid for a

25 trip that was not a business related trip and it was a

```
 1  vacation type trip.

 2              MR. BATCHELDER:  Okay.  Thank you.

 3              THE COURT:  Do that.  How many -- how long

 4  was the trip?

 5              MR. BATCHELDER:  I think it was several

 6  days.

 7              THE COURT:  Okay.  I'll let you -- I'll

 8  let you -- I'll let you establish it was several days,

 9  but don't get into where they went or anything like

10  that, okay?

11              MR. BATCHELDER:  Thank you.

12              MS. FITZGERALD:  Thank you.

13              (Bench conference concluded.)

14                     CROSS-EXAMINATION

15  BY MR. BATCHELDER:

16      Q.   Mr. Dholakia, good afternoon.

17      A.   Good afternoon as well.

18      Q.   My name is Jim Batchelder, along with Tom

19  Melsheimer here I'm going to be representing SAP in this

20  matter.

21      A.   Nice to see you again.

22      Q.   Thanks for being here.

23      A.   You bet.

24      Q.   Your first job out of school was at Trilogy,

25  right?
```

1     A.    Yes, sir.

2     Q.    All right.  And the very first job they gave to

3  you was to basically run the business of Pricer?

4     A.    That's correct.

5     Q.    You were the Product Manager?

6     A.    That's right.

7     Q.    And you were the first one to be Product

8  Manager for Pricer?

9     A.    Correct.

10    Q.    Okay.  So you were put on sort of the ground

11  floor of the team that just started out to sell Pricer

12  and you were the guy in charge of the business?

13    A.    I would say that -- that I was responsible for

14  the business aspects of Pricer.  Obviously Tom was a

15  founder of the company, so in terms of status and

16  hierarchy, I showed a fair deal of deference to him, so

17  I don't know that I would characterize it as running the

18  business at that stage when I first joined.

19    Q.    I understand.  I appreciate that?

20    A.    Okay.

21    Q.    It was your responsibility, though, as product

22  manager to put together the business plan for Pricer; is

23  that fair?

24    A.    That is fair, yes, sir.

25    Q.    All right.  Now, before I ask this next

1  question, I want to be very clear.  I don't mean to

2  criticize you in any way because I made more than my

3  fair share of mistakes in my first job.

4      A.    No problem.

5      Q.    But is it fair to say in your first job,

6  running the business plan for Pricer, putting that

7  together, looking back at it now you made some mistakes

8  and you would have done some things differently?

9      A.    I would have, yes.

10     Q.    All right.  Is it fair to say that maybe one of

11 those mistakes was that you and your team made some

12 assumptions about the marketplace for Pricer that turned

13 out to be not quite right?

14     A.    I would say that we made some assumptions that

15 we were trying to understand by 1998 and going into

16 1999, why we had seen such a precipitive (sic) stall off

17 and so we started to question some assumptions that we

18 had made, and all you could do is assume, well, one of

19 these must be wrong because I made a certain set of

20 assumptions to build the business.

21          We had seen a meteoric rise from the time

22 we started it to 1998.  And for those on the Jury who

23 may not be familiar with software, I referenced earlier

24 I'm a startup software guy, that's what I just -- that's

25 what I've been doing.  To have a software technology go

1    from zero to tens of millions in revenue in three years,

2    probably happens about one every thousand, 5,000 times,

3    is extraordinarily rare.

4            The software company I just sold spent

5    three years to get to three million in revenue before

6    another company came in and purchased our -- purchased

7    our business because it was so valuable.  So to see

8    something go from zero to tens of millions in the first

9    three years, actually would argue was -- was a great

10   success and -- and in '99 when everything fell apart, I

11   think we were struggling to understand what on earth

12   went wrong here and I think we then went back to the set

13   of assumptions we had made and said, well, one of these

14   must be wrong.  I don't know what changed, but

15   something's changed.

16           And so that's a long answer to your

17   question do I think we could have made some other

18   decisions, probably.  I would say that despite that, we

19   did very, very well taking the business from nothing to

20   significant in a very short period of time, and -- and

21   then, yes, we began to question our assumptions.

22   Q.   So sir, even in early '98, though, isn't it --

23   isn't it true that you were writing to your own team

24   members saying that you had assumed some things and that

25   business wasn't going in the direction that you hoped it

1    would?

2        A.   That's correct.

3        Q.   So why -- why don't we take a look at one of

4    the things you wrote.

5             MR. BATCHELDER:  Let's put up Exhibit 514,

6    please.  If you could start, Mr. Barnes, by just blowing

7    up the first couple of paragraphs.

8        Q.   (By Mr. Batchelder)  So first of all you called

9    this SC Pricer product positioning strategy development

10   in 1998, right?

11       A.   Yes.  Yes, sir.

12       Q.   Okay.  And this is something you wrote, you

13   can --

14             MR. BATCHELDER:  Mr. Barnes, actually if

15   you could just flip back to the metadata associated with

16   this document, it's -- it's in Exhibit 2567, just to

17   allow Mr. Dholakia to see that he wrote it in February.

18       Q.   (By Mr. Batchelder)  You can see that it was

19   created in February '98 and that you're the author; is

20   that right?

21       A.   Yes, sir.

22       Q.   Sameer Dholakia, that's you?

23       A.   That looks right --

24       Q.   Okay.

25       A.   -- yes, sir.

1    Q.   All right.  Thank you.

2         MR. BATCHELDER:  So Mr. Barnes, will you

3  come back to Exhibit 514?

4    Q.   (By Mr. Batchelder)  So at the top you start

5  off this memo --

6         MR. BATCHELDER:  Just blow up that --

7  yeah, thank you, that's great.

8    Q.   (By Mr. Batchelder)  -- you sell -- you say a

9  selling chain Pricer is at a critical junction in its

10 product life cycle, and its success requires significant

11 realignments in product strategy.  Do you see that?

12   A.   Uh-huh.

13   Q.   So that was in -- in February '98, not in '99

14 time period you were just talking about in your answer,

15 right?

16   A.   Well, Mr. Batchelder, as I think someone

17 mentioned in -- in previous conversations, the sales

18 cycles for these types of software packages are quite

19 lengthy, and so we started to see the effect of what

20 transpired in late '98 and '99, well before.  You can

21 see it in your pipeline and as the -- as the sales and

22 marketing lead, I could tell early in '98 that we were

23 seeing many either stalled conversations with customers

24 or customers coming back to us saying, well, we're

25 hearing that SAP might come out with something, so we're

1   going to wait.

2              And so yes, I -- to your question around

3   the time frame, that -- it was before I saw the

4   precipitous drop off in actual revenue, but it was not

5   before we saw the precipitous drop off in the pipeline.

6      Q.   February 1998 was months before hierarchical

7   access was added and it was before hierarchical access

8   was announced basically; isn't that right?

9      A.   In hindsight I understand that to be true.  I

10  didn't know what hierarchical accesses were at the --

11     Q.   Okay.

12     A.   -- time but I understand that to be true based

13  on the --

14     Q.   Okay.

15     A.   -- discussion this morning.

16     Q.   Before it was even announced or implemented,

17  you were noting these problems and saying, selling chain

18  Pricer was at a critical junction and success requires

19  significant realignment in product strategy, right?

20     A.   I would clarify the comment of publicly

21  announced, correct, what we were hearing from customers

22  was that there were many a private conversation that

23  said we have something coming.

24     Q.   You go on to say:  The many leading companies

25  from a variety of industries have embraced the product

1  and the vision for Pricer engineering.  One could

2  classify many of these companies as early adopters,

3  right?

4      A.    Yes, sir.

5      Q.    And by early adopters, you're referring to the

6  fact that for Pricer, as for many new products, the

7  customer is willing to pay top dollar, wind up early to

8  purchase a product, but after that sometimes sales can

9  be more difficult; is that right?

10     A.    In general that is true in terms of the

11  definition of -- of early adopters.  I would simply

12  caveat that, if you were to look at the licensed dollar

13  amount that Pricer was sold for, starting with the

14  earliest of adopters, P.H. Glatfelter, I mentioned, was

15  our first Pricer led sale I did personally, was 115K.

16  BMC Software, then a few months later it was 400K.

17  Thomas & Betts was a million dollars.  A month later was

18  Allegiance at two million dollars.  Whirlpool six months

19  after that was five million dollars.  My point simply

20  being that the earliest customers didn't pay the -- the

21  most.  It actually increased over time.

22     Q.    You say down here:  The current model will

23  neither scale in the horizontal product space nor enable

24  Trilogy to move SC Pricer past the early adopters and

25  into the mainstream, that's what you were writing to

1  your colleagues at the time, correct?

2      A.   Yes, sir.

3      Q.   And by the mainstream, you were referring to

4  the ERP customer base, right?

5      A.   Yes, sir.

6      Q.   Okay.  And you say:  Today the SC Pricer has

7  been sold to this target market, meaning this ERP

8  customer base, based on one message, enhanced SAP/Oracle

9  pricing and three very simple value propositions, ease

10 of maintenance, communication and disconnected

11 capabilities, right?

12     A.   Yes, sir.

13     Q.   And those are the very three things you pointed

14 to in your direct testimony, right?

15     A.   Yes, sir.

16     Q.   But you're saying here that they weren't

17 working very well, right?

18     A.   I actually am not sure that I see that I'm

19 saying that it's not working very well.

20     Q.   Okay.  Well, let's -- let's go to the --

21          MR. BATCHELDER:  If you could blow up this

22 next paragraph, please, Mr. Barnes.  Thank you.

23     Q.   (By Mr. Batchelder)  You say:  Current

24 challenges to going mainstream in the SC Pricer market

25 space selling to the mainstream, oh, we were just

1   reading that.  Then it'd say:  After eight months of

2   working with this market segment, SC Pricer has failed

3   to reach acceptance of this mainstream.  The SC Pricer

4   team has met with over forty SAP and Oracle companies,

5   only one of these companies has subsequently purchased

6   the software.  Do you see that there?

7        A.   Yes, sir.

8        Q.   That's what you were writing to your team,

9   right?

10       A.   Yes, sir.

11       Q.   Okay.  And then you say:  Several factors have

12  led to this failure, right?

13       A.   Yes, sir.

14       Q.   Okay.  Let's see.  You say:  The enhanced SAP

15  Oracle pricing message was invariably targeted at the

16  technical project teams.  And you say:  When Trilogy

17  targeted the V.P.s of sales distribution ratios

18  increased dramatically and the business owners

19  understood the benefits of the system and helped drive

20  the transactions, right?

21       A.   Yes, sir.

22       Q.   But your initial targets, that was a decision

23  you made and it really caused some -- it was a misstep,

24  it caused some problems for you?

25       A.   If I can provide a little more context to that.

1    Q.   Sir, I -- I'm sorry to interrupt you, but could

2 you just answer my question.  Is that right?

3    A.   Sorry, could you repeat the question?

4    Q.   Yeah.  So you originally targeted these --

5    A.   That's correct.  Oh, yes, and that caused some

6 problem, yes, that we were focused on for what I would

7 call the phase two period of our pursuit of the SAP

8 market where we focused on the technical IT person

9 instead of the business person who actually got the

10 value, it caused problems in that and I absolutely agree

11 it was a misstep, yes, sir.

12    Q.   All right.  And then you come down to this

13 paragraph, SAP project constraints.  You said:  Often

14 the timing of how far along in the ERP process the

15 company is can be a driving factor.  Do you see that?

16    A.   Yes, sir.

17    Q.   And you said:  For those accounts that are

18 still evaluating ERP packages or the -- of those that

19 are either just starting or have completely done

20 deployment, having SC Pricer is simply unnecessary risk

21 at an inopportune time.  Do you see that?

22    A.   Yes, sir.

23    Q.   So for a company that had already purchased SAP

24 and had the -- their business running on that ERP

25 system, you were saying for them adding SC Pricer is

1    simply an unnecessary risk at an inopportune time.

2    That's what you were telling your colleagues in February

3    of 1998, correct?

4        A.    I believe that was one of the hypotheses as to

5    which assumption was wrong, yes.

6        Q.    All right.

7                MR. BATCHELDER:  Can we go to the next

8    page, please, Mr. Barnes.  Now, at the very top, just

9    pull up that first chunk.  Thank you.

10       Q.    (By Mr. Batchelder)  So you say:  Integration

11   concerns because of the already high-risk factors

12   involved in deploying the ERP packages, most companies

13   have real concerns believing that Trilogy's bolt-on

14   pricing system actually integrates as seamlessly as the

15   phrase bolt-on would imply, right?

16       A.    Yes, sir.

17       Q.    And you said that because customers perceive

18   that ERP systems are really complicated and they're

19   having a hard time believing that integrating their ERP

20   systems with this new Pricer product would be as simple

21   as, perhaps, it was being pitched to be, correct?

22       A.    Actually I think it was predominantly that the

23   ERP deployments were so behind schedule and over budget,

24   but this may additionally be true, yes.

25       Q.    Sir, is it fair to say that customers had a

1  hard time believing it would be seamless to integrate

2  Pricer into their ERP systems?

3       A.   Yes.  They wanted to see more, yes.

4       Q.   All right.  And you even say without

5  productized demoable integration, sales cycles with many

6  prospects either lengthened or ceased all together,

7  right?

8       A.   Yes, sir.

9       Q.   Okay.  All right.  And then you go on to talk

10  about the cost of the software, that's down here, right?

11       A.   Yes, sir.

12       Q.   And you say:  For over the half the companies

13  with whom Trilogy met, the premium price of the software

14  presented a significant impediment to the company's

15  purchasing decision, right?

16       A.   Yes, sir.

17       Q.   And by premium price you meant expensive,

18  right?

19       A.   Yes, sir.

20       Q.   And then you go on to talk about value

21  propositions, we've heard that phrase before.  And you

22  say:  The benefit statement that Trilogy used to convey

23  why prospects should purchase SC Pricer simply have not

24  proven effective, right?

25       A.   Yes, sir.  I believe that the rest of the

1   document probably highlights the -- reemphasizes the

2   previous point that we were delivering the wrong value

3   propositions to the low level IT guy instead of the

4   business guy that would get the value.

5       Q.   And here you're talking about the value

6   propositions themselves.  And you say:  The benefits

7   statement that Trilogy used to convey why prospects

8   should purchase SC Pricer simply have not proven

9   effective.  That's what you're telling your colleagues,

10  right?

11      A.   Yes.  My colleagues would have implicitly

12  understood by the word prospects, I meant the prospects

13  we were targeting at that time, which happened to be the

14  technical low level IT person.

15      Q.   Okay.  Just to be clear, again, I don't mean to

16  criticize you, but the fact that you and your team were

17  targeting the wrong people at your target companies,

18  that -- that wasn't SAP's fault, right?

19      A.   Not at all, sir.  My -- my decision, my bad.

20      Q.   Okay.

21           MR. BATCHELDER:  If we could go to the

22  next page, please, Mr. Barnes.

23      Q.   (By Mr. Batchelder)  So up here you do sort of

24  a comparison, Trilogy to SAP, and you show both have

25  pricing execution, both have pricing maintenance, both

1  have -- well, you said disconnected pricing here and you

2  show the disconnected pricing is announced for 4.0.  And

3  then you have bolt-on versus integrated, right?

4      A.   Yes, sir.

5      Q.   And you say in each area of our value

6  propositions, SAP provides reasonably sufficient

7  capabilities to the mainstream.  That is, the majority

8  of SAP customers do not see orders of magnitude

9  difference in value among these parameters between the

10 two systems, right?

11     A.   This was the hypothesis based on the fact that

12 we had talked to those dozens of companies that were

13 running SAP in -- in that time frame and based on the

14 lack of conversion that we previously saw, we assumed

15 that SAP had -- was somehow closing the gap, that they

16 were therefore capable of delivering but substantively

17 the same functionality.

18     Q.   And this was your conclusion in February 1998,

19 right?

20     A.   Yes.

21     Q.   Okay.  Now, for disconnected pricing, you

22 believe that -- you believe then that that was the one

23 objective distinction between the two systems' pricing,

24 right, yours on the one hand and SAP's on the other?

25     A.   Yes, sir.

1    Q.   Okay.  And you said so in this document below,

2    right?

3              MR. BATCHELDER:  Can we go down, please,

4    further Mr. Barnes?  Right here.

5    Q.   (By Mr. Batchelder)  The ability to run pricing

6    remotely on laptops is the one objective distinction

7    between the two systems' pricing, correct?

8    A.   That -- that -- that is what I stated.  Whether

9    that's true or not, I don't know, but that's certainly

10   what I stated.

11   Q.   And then you said:  While this function is of

12   value for some SAP customers, again the mainstream

13   market has not indicated that the value of this function

14   is generally applicable, right?

15   A.   Yes, sir.

16   Q.   And that's what you believed in February '98,

17   right?

18   A.   That is what I hypothesized in '98 --

19   Q.   Okay.

20   A.   -- based on the before and after, yes.

21   Q.   All right.  A little later in that same year

22   you told your colleagues that Pricer was not compelling

23   to customers given the price that Trilogy was asking

24   for, right?

25   A.   I don't recall specifically was -- if there was

1  a particular conversation or e-mail or document.

2             MR. BATCHELDER:  Why don't we pull up

3  Exhibit 811, please, Mr. Barnes?  And if we go to the

4  third page of it -- let's see.  Actually, go to the

5  second page at the very bottom, there's a --

6      Q.   (By Mr. Batchelder)  That's you, Sameer

7  Dholakia, correct?

8      A.   Yes, sir.

9             MR. BATCHELDER:  Okay.  And then the next

10  page, please, Mr. Barnes.  And if you could just blow up

11  right up there, that value proposition paragraph.

12      Q.   (By Mr. Batchelder)  You say:  We went in with

13  a single point app, Pricer, and that's single point

14  application; is that what you mean by app?  APP is

15  application?

16      A.   Yes.  Sorry, I was just reading the -- the

17  number one, but yes, that's right on number two.

18      Q.   Okay.  We went in with a single point

19  application being Pricer with a value prop, meaning

20  proposition, correct?

21      A.   Yes, sir.

22      Q.   With a value proposition of easier maintenance,

23  better performance, greater flexibility, the very three

24  things you were just talking to the ladies and gentlemen

25  of the Jury about, correct?

1   A.   Yes, sir.

2   Q.   And you say:  Not compelling at one million

3   dollars, though it was at $50,000, right?

4   A.   And the reason I was reading number one is

5   because number two without the context of number one is

6   terribly misleading.  The number one specifies we --

7   well, you can read it, but it simply specifies we were

8   targeting these technical IT folks with a value

9   proposition that for them was worth $50,000.  But when I

10  sold it to Greg McManus, he was willing to write a check

11  for five million dollars.

12  Q.   Now, what I understand that sometimes he did

13  sell, but the point is that back here in these days, in

14  February 1998, you had been selling to the wrong people

15  and they hadn't found what you were pitching compelling,

16  right?

17  A.   That is absolutely correct.

18  Q.   Okay.

19  A.   Yes, sir.

20  Q.   Okay.  And again, it's not criticizing --

21  A.   I understand.

22  Q.   -- you but that's not SAP's fault, correct?

23  A.   No, sir.

24  Q.   Okay.

25          MR. BATCHELDER:  Mr. Barnes, can we please

1    go to Exhibit 806?

2        Q.   (By Mr. Batchelder)  And I think we've seen

3    this document before; I believe Mr. Carter spoke to it,

4    but your name is on it and you contributed some of it,

5    so I thought it'd be useful to have you talk about it as

6    well.  Again, that's you, Sameer Dholakia, correct?

7        A.   Yes, sir.

8        Q.   And this is Scott Snyder, he was the chief

9    engineer at Trilogy; is that right?

10       A.   He was in charge of our development team, yes,

11   sir.

12       Q.   Okay.  So he was a chief technologist?

13       A.   Sure.  Yes.

14       Q.   Okay.  And he says:  Got the following data

15   from Sameer, Chris, and Ajay, and that Sameer is you,

16   correct?

17       A.   Yes, sir.

18       Q.   So you had provided him with this information?

19       A.   I -- presumably, yes.

20       Q.   Okay.  So let's go down here to accounts we

21   have lost due to SAP integration issues.  So there's

22   Lennox, and that's one million dollars, lost Pricer

23   portion of deal due to integration deficiencies for

24   quotes, inquiries, etcetera, right?

25       A.   Yes, sir.

1    Q.   So Trilogy's integration for Lennox had been

2  deficient and lost them the deal, right?

3    A.   It's certainly specified as a contributing

4  factor, yes.

5    Q.   All right.  And then comes Eastman Chemical,

6  one to two million dollars, overall added value did not

7  outweigh integration costs/concerns, right?

8    A.   Yes, sir.

9    Q.   And this comes back to -- to some of the

10  testimony that Mr. Carter gave.  Integrating Pricer with

11  any ERP system is difficult, right?

12    A.   In the absence of an API, yes, sir.

13    Q.   It's not like snapping in a Lego into a Lego

14  set?

15    A.   In the absence of an API, that's correct, sir.

16    Q.   All right.  Then Colgate Palmolive 1Q99, could

17  not get into sales cycle, right?  So Colgate Palmolive

18  you never sold to; is that correct?

19    A.   To the best of my knowledge, that's correct,

20  yes.

21    Q.   Okay.  And then Moore Business Forms,

22  integration too hard.  Decided to customize SAP instead;

23  is that right?

24    A.   Yes, sir.

25    Q.   Okay.  And -- and that was a competitive

1    challenge for you.  Sometimes if a customer wanted more

2    bells and whistles in pricing, if they already had SAP

3    or Oracle, they could just customize it and add their

4    own functionality and that created competitive

5    challenges for you, correct?

6        A.   It could.

7        Q.   Yeah.

8        A.   In this case the timing, again with 20/20

9    hindsight is curious in terms of 3Q98 and when the new

10   functionality of hierarchical accesses was introduced,

11   it seems awfully close to the time that they decided to

12   not go with us and go with SAP.

13       Q.   Okay.  So I want to make sure that your answer

14   is in line with my question?

15       A.   Sure.

16       Q.   If a customer purchased an ERP product, and

17   they wanted more bells and whistles, they could

18   customize those products themselves, and that created

19   competition for you, correct?

20       A.   That's correct.  They could write software code

21   themselves.

22       Q.   Thank you.  Thank you.

23                All right.  And then we have:  Deluxe.

24   Pushed by SAP competition.  Likely loss.

25                Kennametal.  Order SAP integration issues

1    caused deal to slip.  Likely loss, et cetera, correct?

2        A.   Yes, sir.

3        Q.   All right.  Now, of all of these entities

4    listed here as having integration challenges, I know you

5    sold to Goodyear, but isn't it correct that none of

6    these other entities, Lennox, Eastman, Colgate, Moore,

7    Deluxe, Kennametal, Intel, Nestle, Miller, BASF --

8    Trilogy never sold to any of those, correct?

9        A.   That's correct.

10       Q.   All right.  So you reported all of these things

11   to Trilogy's head engineer, Mr. Snyder, and then that

12   same year, he wrote a memo of his own to all hands at

13   Trilogy talking about this very issue, right?

14       A.   Yes, sir.

15       Q.   Okay.

16            MR. BATCHELDER:  Why don't we put that one

17   up.  That's Exhibit 807, please, Mr. Barnes.

18       Q.   (By Mr. Batchelder) So this is Scott Snyder.

19   That's the head engineer we were talking about, right?

20       A.   Yes, sir.

21       Q.   And he sent this to -- this says Trilogians.  I

22   take it that means everybody at Trilogy, all hands?

23       A.   Yes, sir.

24       Q.   All right.  And he specifically cc'd Joe

25   Liemandt, who was the head guy, right?

1      A.    Yes, sir.

2      Q.    All right.  And he says:  Trilogy development

3    and SAP.  That's the subject, correct?

4      A.    Yes.  Yes, sir.

5      Q.    And you received this memo, correct?

6      A.    I must have, as a member of Trilogians groups,

7    yes.

8      Q.    All right.  And he says:  As we approach the

9    end of the first half of the fiscal year, I've been

10   going through an assessment of development across

11   Trilogy, right?

12     A.    Yes, sir.

13     Q.    And then he goes on --

14            MR. BATCHELDER:  Can you blow up this

15   (indicates), please, Mr. Barnes?

16     Q.    (By Mr. Batchelder) So at the top, he says:

17   After reviewing the resulting data, it became clear that

18   there is a very serious disconnect between what Trilogy

19   development is currently investing in and what Trilogy

20   needs development to deliver over the six months in

21   order for Trilogy to be successful, correct?

22     A.    Yes, sir.

23     Q.    And you agreed with that at the time, right?

24     A.    I imagine I would have, yes, sir.

25     Q.    Okay.  So let's see, down here starting at

1  looking, he says:  Looking forward, SAP is in or will be

2  in a huge percentage of our potential deals over the

3  next half.  Within Trilogy, however, our knowledge,

4  understanding, and prioritization of SAP integration

5  work has not reflected this market reality.

6            We have not invested seriously in building

7  a knowledge base on SAP technology, direction,

8  et cetera, to provide a basis for competing with them

9  nor have we recognized the importance of SAP integration

10  to the degree that we need to as we prioritize our work

11  on a day-to-day or release-to-release basis.

12            That's what the engineer was telling

13  Trilogy at the time, right?

14      A.    Yes, sir.

15      Q.    And that was a problem for Pricer, correct?

16      A.    Yes, sir.  What is the date of this document

17  again, if I may ask?

18      Q.    It's December of 1998.

19      A.    December of '98.  Okay.  Thank you.

20      Q.    Okay.

21            MR. BATCHELDER:  So could we go to the

22  next page, please, Mr. Barnes?  And if you could blow up

23  that top paragraph to start.

24      Q.    (By Mr. Batchelder) It says:  If we continue to

25  ignore SAP and focus on adding the next level of

1    incremental features to our own products, it will

2    continue to lose revenue opportunities, right?  He says

3    that, right?

4         A.    Yes, sir.

5         Q.    And then this paragraph, he says:  The number

6    of people in development who have even a base working

7    knowledge of SAP's functionality can be measured on one

8    hand, and the number of people who can even begin

9    talking cogently about how products would integrate with

10   SAP is closer to zero, right?

11        A.    Yes.

12        Q.    Now, this is -- again, this is December 1998.

13   This is nearly three years after you and your team have

14   been targeting SAP and others, but SAP and its customers

15   as the platform on which Pricer would sit, correct?

16        A.    Yes, sir.

17        Q.    And he's saying here, your chief engineer, that

18   the number of people in development that have even a

19   base working knowledge of SAP's functionality can be

20   measured on one hand, right?

21        A.    Yes, sir.  I think Tom Carter testified earlier

22   that we thought that the integration would be easier

23   than it turned out to be in the absence of deeper

24   cooperation with SAP on them providing the API that we

25   hoped for.

1     Q.   Okay.  And that was part of your business plan,

2  is to do integration, but it turned out to be

3  challenging, and your head engineer is saying Trilogy

4  hadn't invested enough to make that work.

5     A.   That's right.  We needed to change that, that's

6  correct.

7     Q.   Okay.

8          MR. BATCHELDER:  Mr. Barnes, can we go to

9  Exhibit 1030, please.

10         Actually, before we do, you can leave that

11 up, but I just wanted to make one point, because my

12 colleague passed me a note.

13    Q.   (By Mr. Batchelder) You put up that Excel

14 spreadsheet with all those cells.

15    A.   Yes, sir.

16    Q.   I just wanted to point out that was not an SAP

17 product, right?  That was Excel.

18    A.   That's correct.

19    Q.   All right.  So within DX1030 -- I'm going to

20 have to move, because this is an e-mail chain that

21 starts at the end of the document and moves forward.

22         MR. BATCHELDER:  Mr. Barnes, could you

23 turn to the last e-mail, please, in the document.  This

24 is from a Reuben Swartz at Trilogy.  Right down here

25 (indicates).

1    Q.   (By Mr. Batchelder) And he asks:  What are

2  current estimates for revenue from Pricer?  Can it lead

3  deals?

4              Do you see that?

5    A.   Yes, sir.

6    Q.   All right.  And then he gets a response from a

7  Molly Valim; is that right?

8    A.   Yes.

9    Q.   And she was on your team?

10    A.   Yes.  In a marketing capacity, yes.

11    Q.   Okay.  And she says:  Reuben, I'm right there

12  with you.  The truth is that I have the same questions.

13  Not sure how the new Pricer SAP approach differs from

14  the old one that didn't work.

15              Do you see that?

16    A.   Yes, sir.

17    Q.   Okay.

18    A.   I'm not sure what the new Pricer SAP approach

19  that she's referring to is, but I see the sentence.

20    Q.   Okay.  So they're asking:  What are we going to

21  do?  What's the plan?  How can we sell?

22              And then you respond here --

23              MR. BATCHELDER:  Sorry.  On the first

24  page, Mr. Barnes, at the bottom.  There you go.

25    Q.   (By Mr. Batchelder) And that's you, correct?

1     A.   Yes, sir.

2     Q.   And you respond saying:  Great set of

3  questions.  There is no clear, concise, generally agreed

4  upon answer.  My thoughts, opinions on the direction

5  would require a much longer response than e-mail would

6  allow, right?

7     A.   Yes, sir.

8     Q.   Okay.

9          MR. BATCHELDER:  All right.  Why don't we

10  go to 513, please, Mr. Barnes.

11    Q.   (By Mr. Batchelder) So around this -- all

12  right.  So this is written in '97.  So we're stepping

13  back a little bit in time.  At this time, you were

14  product manager for Pricer, right?

15    A.   Yes, sir.

16    Q.   And, again, the business plan was on your

17  shoulders, even though it was your first job.

18    A.   Yes, sir.

19    Q.   Okay.  And you concluded then that to defend

20  Pricer's market position, it would be critical for

21  Trilogy to create an easier, less expensive pricing

22  solution for customers without complicated pricing

23  structures; is that fair?

24    A.   I don't recall that, but it's entirely

25  possible.

1    Q.   Okay.

2          MR. BATCHELDER:  If we could, Mr. Barnes,

3 let's look at Page 1328 of Exhibit 513.

4    Q.   (By Mr. Batchelder) And, first of all, this is

5 an exhibit you wrote, correct?

6    A.   It looks like my --

7    Q.   Okay.

8    A.   -- type of document, yes, sir.

9    Q.   All right.  So let's see, at the top there --

10          MR. BATCHELDER:  I'm looking for the page,

11 Mr. Barnes, that starts:  Major product initiatives for

12 SC Pricer in 1998 at the top.

13          Okay.  There we go.  If you could blow up

14 that first chunk at the top.

15    Q.   (By Mr. Batchelder) And you talk about -- here

16 about something called Pricer Lite.  Do you see that?

17    A.   Oh, yes.

18    Q.   Does that ring a bell now?

19    A.   It does now, yes.  It's been 13 years.

20    Q.   No.  I understand.

21    A.   I haven't thought about that in a long time.

22    Q.   I understand.  It's a trip down memory lane.

23          All right.  So you call this thing Pricer

24 Lite, and you say:  This project stems from a need to

25 create an easier, though less powerful pricing solution

1    for customers without complicated pricing structures.

2                    Do you see that?

3        A.    Yes, sir.

4        Q.    Now, that was something you thought was in

5    need.  You say that right here, right?

6        A.    I believe I thought that at that point in time,

7    yes.

8        Q.    Okay.

9        A.    I don't think we ever -- I think the question

10   mark after the name is indicative of my certainty of

11   its -- of that being the decision we should go

12   implement, because I don't think we ever did it.  I

13   barely remember the concept of it, so...

14       Q.    Okay.  Let's keep reading then.

15                    You say:  Pricer Lite will prove critical

16   in defending our market position with respect to new

17   competitors.  We must have the Lite product in place

18   before our competitors come to market with a pricing

19   tool of their own, right?

20       A.    Yes, sir.

21       Q.    Okay.  So that's what you're saying, but as you

22   just said a moment ago, Trilogy never did this, right?

23       A.    Correct.

24       Q.    Okay.  All right.  And then is it fair to say

25   that in the same time period, you recognize that Pricer

1  was missing the kinds of features that are really needed

2  to be successful in going forward?

3      A.   I believe I thought there was a broader suite

4  of technologies that we could add to the Pricer product

5  line, if you will, but I don't believe that Pricer

6  itself was deficient in the problems that it solved.

7      Q.   Well, you did that there was that broader suite

8  that could -- would be critical in telling the Pricer

9  story, right?

10     A.   Yes, sir.

11     Q.   Okay.  All right.  Well, let's look at one of

12 those things.

13          MR. BATCHELDER:  It's right down a little

14 lower on the same page.  There's a paragraph about

15 Pricer analysis.  Okay.

16     Q.   (By Mr. Batchelder) And you talk about Pricer,

17 and you say:  Currently, SC Pricer enables execution of

18 a company's pricing strategy.  The tool only alleviates

19 the frustration of pricing managers who tire of IS

20 systems which cannot support rapid implementation of

21 pricing changes.

22          Do you see that?

23     A.   Yes, sir.

24     Q.   And then you go on to say:  The real pain felt

25 by pricing managers is the inability to access and

1    analyze data about pricing strategies and tactics,

2    right?

3        A.   Yes, sir.

4        Q.   And that was your conclusion at the time?

5        A.   I think I'm saying the -- additionally, the

6    biggest opportunity for us could potentially be to go at

7    capability that allowed a pricing manager to do the

8    analysis, yes.

9        Q.   Well, you say here that Pricer only alleviates

10   this thing, but the real pain was this other thing, and

11   you said:  Trend analysis on prices over time, gross

12   profit calculations by product line and customer groups,

13   and promotional price performance in the marketplace are

14   but a few ways to slice the data-rich Selling Chain

15   system to obtain vital pricing information, right?

16       A.   Yes, sir.

17            And for context, I was in the process, as

18   I recall, in trying to justify getting a bunch of

19   developers to help us go build that product.  So I'm

20   sure they stated its importance as strongly as I could.

21       Q.   And you believed it passionately, right?

22       A.   I believed that we needed to create the

23   product, yes.

24       Q.   Okay.  And then you say down here:  With the

25   long requested analysis tools --

1        MR. BATCHELDER:  You can blow it up, if

2   you would, Mr. Barnes.  Thank you.

3        Q.   (By Mr. Batchelder) -- the SC Pricer story

4   becomes far more compelling, particularly to pricing

5   managers and executives in sales and marketing.

6             And those are the folks that you were just

7   concluding or about to conclude are the real people you

8   wanted to pitch, right?

9        A.   Yes, sir.

10       Q.   So they really would be persuaded by this.  And

11  then you say:  Nothing is more important to the

12  development of the SC Pricer story than these analysis

13  tools, right?

14       A.   Yes, sir.

15       Q.   Nothing was more important, and yet Trilogy

16  never did it, right?

17       A.   Actually, that's not true.  We did -- we did

18  start the process.

19       Q.   Well, you never launched full scale these

20  analysis tools, correct?

21       A.   I can spend time answering that question, if

22  you like.  We actually put a development team on it.  We

23  started to build a product.  We had partnership

24  conversations with McKinsey & Company, which is the

25  preeminent consulting -- management consulting firm in

1    the world on the topic of pricing.

2              We invested quite a bit in it.

3    Unfortunately, when sales dried up towards the tail end

4    of '98 and '99, the justification internally for

5    continuing the investment went away.

6    Q.   Well, let's -- let's take a look, because you

7    testified about this before.

8              MR. BATCHELDER:  Could you put up,

9    Mr. Barnes, from the May 22nd testimony of Mr. Dholakia,

10   starting at Page 103, Line 22?

11   Q.   (By Mr. Batchelder) All right.  So I'm

12   reading --

13             MR. BATCHELDER:  Thank you.

14   Q.   (By Mr. Batchelder) So I said -- I'm talking

15   about the same document, and the first sentence there

16   is:  A vital piece of the SC Pricer story remains

17   untapped without pricing analysis tools.

18             So that's the same thing we were just

19   reading, correct?

20   A.   Yes, sir.

21   Q.   All right.  And I asked you:  Were those tools

22   ever developed?

23             And you said:  We did start down that

24   path, and we did create versions of it.  I think we may

25   have sold it to a couple of people, but I don't

1  remember.  This was around the time -- and you asked

2  when it was written again.

3            And you said:  I was going to say, by '98,

4  when we started to shift toward the vertical thing --

5  and that's referring to the fact that Trilogy shifted

6  from a horizontal product approach where you're selling

7  Pricer across industry to vertical where you were

8  selling all of your products within vertical strips,

9  like you were doing automotive, right?

10     A.   That's correct.

11     Q.   Okay.  Let's see where we were here -- vertical

12  things.  So I think, as often happens in the

13  organizations very much -- this is my master's in

14  organizational studies.  Organizations are very much

15  influenced by the way you structure them.

16            And when we were a product-oriented

17  organizational structure, there was lots of focus on

18  innovation and drive around the product, and when we

19  switched over to the automotive -- it's a vertical

20  piece -- and then drives that the product orientation

21  to, myself and others moved to different roles, I think

22  things just kind of fell off, right?

23     A.   Yes, sir.  And again, for context, that

24  realignments of the organization occurred after that

25  falloff.

1    Q.   Okay.  So you had a horizontal approach, and

2    then you change to a vertical approach, and when you

3    change to a vertical approach, building out the suite is

4    something that kind of fell off, right?

5    A.   Because we had climbed that mountain, and then

6    it just fell off, and the company said:  Well, that

7    approach isn't working.  Let's reorganize.  And they put

8    you on to different things, and that's exactly right.

9    Q.   Is it fair to say that when Versata switched

10   its business model in '99 from a horizontal to vertical,

11   you lost any horizontal product positioning you had

12   built?

13   A.   I think it certainly diminished.  I don't know

14   if I would say we lost it, but it was certainly

15   diminished, yes, sir.

16   Q.   Now, you worked at Trilogy for a long time,

17   right, 10 years?

18   A.   Yes, sir.

19   Q.   Across that entire 10-year time span, including

20   the time you were product manager for Pricer, is it fair

21   to say that you don't remember a single conversation

22   about whether SAP's pricing functionality made use of

23   any kind of hierarchy or hierarchies?

24   A.   I don't recall specific conversations about the

25   concept of hierarchies.  I recall many a conversation

1   about SAP closing the gap.  I think that's the phrase we

2   used.

3       Q.   Across the entire time span of your work at

4   Trilogy, you don't remember having any conversation at

5   all about hierarchies being an important concept or

6   something relevant to what you were doing, right?

7       A.   No.  I'm sure we talked about hierarchies as

8   a -- as a concept that was important to what we did and

9   how SAP did it.  I'm sorry.  I guess I should rephrase.

10            The notion of that hierarchical access,

11  that was -- that was a term I had never used, and we had

12  never talked about internally.

13            MR. BATCHELDER:  Mr. Barnes, could you put

14  up Mr. Dholakia's sworn testimony from May 22nd,

15  starting at Page 58, Line 12?

16      Q.   (By Mr. Batchelder) All right.

17            QUESTION:  What communications are you

18  aware of involving Trilogy in the early '96 timeframe

19  regarding whether SAP's pricing functionality made use

20  of any kind of hierarchy or hierarchies?

21            ANSWER:  I certainly couldn't think of any

22  particular conversation or e-mail thread or anything on

23  the topic.  It may exist, but not that I know of.

24            QUESTION:  Let me ask you that question

25  more generally as to time.  So across the entire time

1    span of your work at Trilogy what communications are you

2    aware of --

3                    MR. BATCHELDER:  Keep going, Mr. Barnes.

4        Q.   (By Mr. Batchelder) -- on the subject of

5    whether SAP's pricing functionality made use of one or

6    more hierarchies.

7                    And you say:  Same answer.  None that I

8    recall.  I mean, not a specific -- I don't -- I guess I

9    would frame it as I don't remember ever having -- ever

10   having specific conversations about hierarchies as some

11   important concept or word or something else that was

12   relevant to what we were doing, right?

13                   That was your sworn testimony at the time?

14       A.   Yes.

15       Q.   All right.

16                   MR. BATCHELDER:  No further questions.

17   Thank you.

18                   THE COURT:  Redirect?

19                   MS. BROWN:  Yes.  Please, Your Honor.

20                   May it please the Court.

21                   Let's pull up Exhibit 513, Defense

22   Exhibit 513, please.

23                   REDIRECT EXAMINATION

24   BY MS. BROWN:

25       Q.   Mr. Dholakia, have you had a chance to look at

1  this document?

2       A.   I don't know that I have.

3       Q.   This is dated June 30th of 1997, and it appears

4  to be the business and operational plans for Pricer.

5            MS. BROWN:  Let me turn to the page ending

6  in 332.  It should be the second page.  And if you

7  could, please -- it should be the following page.  Pause

8  for a moment.

9       Q.   (By Ms. Brown) What is a BAPI?

10      A.   A BAPI is a business API.  It's a thing that

11  would allow our -- would allow our software program, the

12  pricing technology, to access and get information and

13  exchange information, I guess, more accurately, with the

14  SAP system.

15      Q.   Is it sort of like a doorway?

16      A.   A doorway, sure, yeah.

17      Q.   If SAP had given Trilogy a BAPI, what impact

18  would that have had?

19      A.   A tremendous impact.  I think you've heard

20  all -- I've been sitting here hearing all morning and

21  all afternoon about the challenges of the integration

22  between our Trilogy Pricer and SAP and that that was a

23  real concern for customers, that those costs were real,

24  and if we had the BAPI, we would have been able to do

25  that integration more easily and been able to provide a

1   more compelling solution.

2                MS. BROWN:  If we can on -- Mr. Diaz, if

3   you'll go to the page ending in 1761334 in that same

4   exhibit.  There we go.

5                And if you could please zoom in on this

6   last paragraph entitled Disconnected Pricing.

7        Q.   (By Ms. Brown) I believe you were questioned

8   about this on cross-examination.

9        A.   Yes, ma'am.

10       Q.   Looking back at this document years later, how

11   much of it do you agree with now?  Let's just take this

12   statement.  How do you feel about it now?

13       A.    Well, I certainly agree with the bottom half,

14   which is many SAP customers are skeptical of the

15   Vaporware, but they've indicated a willingness to wait

16   for it.

17                This is kind of a manifestation of what I

18   was referring to earlier about the private

19   conversations, the private announcements of the

20   capabilities to come later in the year that caused many

21   customers to say:  We're willing to wait for it.

22                The top half of it, I'm not sure I agree

23   with it.  Again, I think I was an earnest -- a

24   hard-working guy trying to figure out why there was this

25   massive disconnect between incredible success in the

1  first two or three years and then just this precipitous

2  falloff, and we were searching for answers.

3            And so I think you'll see lots of

4  hypotheses in these decks.  Do I agree with all of the

5  hypotheses now?  I don't.  And were there plenty of

6  people at Trilogy who didn't agree with my hypotheses

7  then, Mr. Carter being one of them?  Certainly.

8            You know, we were just trying to -- we

9  were trying to understand what happened.

10     Q.    You mentioned ERP deployments were behind

11  schedule and over budget.  Do you remember talking about

12  that?

13     A.    Yes, ma'am.

14     Q.    What impact would that have?

15     A.    Well, it simply made a customer a lot more

16  reluctant to do anything else, to buy any more software,

17  to add another third party.  You know, we were a third

18  party to the SAP system.

19            And so they had -- they were already

20  stressed, working -- you know, had too few people

21  working on a project that was too big to deliver on time

22  and on budget, and so that certainly caused a concern

23  for the people making the decisions on whether they

24  wanted to buy our pricing system.  It raised the bar, I

25  guess I would say.

1    Q.   There was a -- kind of a fleeting discussion

2  about Pricer Lite.  Can you tell the jury, what is

3  Pricer Lite?

4    A.   I can tell you almost as much as what was on

5  that page, because that's about how much I remember

6  about it.  We didn't do very much with it.  And so

7  that's why I sort of chuckled when I saw it.  I don't

8  remember us doing very much with it.

9    Q.   Is it fair to say, there were lots and lots of

10  ideas that you came up with as part of your role?

11    A.   Yeah.  As -- again, for context, we were young.

12  We were in our 20s.  I had a futon in my office.  We

13  worked 16 hours a day.  There were lots of ideas

14  generated.  We worked hard.  We were trying to figure it

15  out.  I can't always say we figured it out, but we

16  tried.

17    Q.   What would you say -- overall, looking back,

18  hindsight is 20/20, what was the impact of SAP's stall

19  tactics?

20    A.   Oh, they were, very effective.  They were very

21  effective.  That's all I can tell you, because I -- like

22  I said, I saw the pipeline in late '97, early '98 for

23  what was going to happen, right.

24         In sales, you can predict the future when

25  you have a sales cycle that lasts six to twelve months.

1    And so I could tell by early then, that those stall

2    tactics were being very, very effective, because we were

3    just seeing conversation after conversation go nowhere.

4        Q.    Thank you.

5              MS. BROWN:  No further questions.

6              THE COURT:  Additional cross-examination?

7              MR. BATCHELDER:  Thank you, Your Honor.

8                    RECROSS-EXAMINATION

9    BY MR. BATCHELDER:

10       Q.    Just a couple of points, please, Mr. Dholakia.

11       A.    Yes, sir.

12       Q.    First of all, in the 2000-2001 time period,

13   there was something known as the dot.com bust.  Does

14   that ring a bell to you?

15       A.    Yes, sir.

16       Q.    What was that?

17       A.    There was an awful lot of capital poured into

18   startup companies trying to sell various products and

19   services over the internet, and they had the public

20   markets believe they would become worth infinite amounts

21   of money and their valuations became very, very high and

22   then reality occurred.

23              They didn't generate those kinds was

24   revenues and profits, and thus the market corrected, and

25   lots of people -- lots of wealth was destroyed in the

1  process.

2      Q.   So that happened a couple years before

3  Mr. Carter's '350 patent issued, correct?

4      A.   Yes, sir.

5      Q.   Okay.  Now, in that same timeframe, 2000-2001,

6  Trilogy's revenues sharply declined; is that fair?

7      A.   I believe that's about the timeframe that

8  things started to slow down.

9      Q.   Okay.

10     A.   Probably more 2001, 2002 than 2000, but

11  directionally, yes, sir.

12     Q.   Okay.  And is it fair to say that that sharp

13  decline suffered by Trilogy in your view was, more than

14  anything else, caused by that dot.com bust and not by

15  anything that SAP had done?

16     A.   I think you'd have to look at the portfolio of

17  where the revenues of Trilogy came from.  I believe our

18  product configuration business actually continued to do

19  reasonably well.  I think -- we saw our pricing business

20  fall off pretty considerably.

21              And I think we were selling an e-commerce

22  suite that was called MCC.  And I'm sure there are

23  people in the audience that could tell me what

24  MCC stands for.  I can't -- multichannel commerce.

25  That's what it stands for.  Multichannel commerce.

1              That system, the revenue associated with

2    that fell off, again, yes, correlated with the

3    e-commerce bust.  So I think different businesses had

4    dropoff for different reasons.

5              So in 20/20 hindsight, I would probably

6    attribute more the -- more of our issue in the pricing

7    business to SAP.  I didn't realize that at the time, but

8    in those other aspects of our business, no, I don't

9    think I would attribute it to SAP.

10   Q.   Okay.  So in -- in April 2007, this lawsuit was

11   filed; is that right?

12   A.   I don't know actually when it was filed, but I

13   believe you.

14   Q.   Okay.  I can represent that to you.

15   A.   Yes, sir, April 2007.  Sounds good.

16   Q.   All right.  And then it was roughly seven

17   months later, in December 2007, the CEO of Trilogy took

18   you on a trip that he paid for; is that right?

19   A.   I don't know which trip.  I've gone on many

20   trips with the CEO of Trilogy.  Which trip was December

21   2007?

22   Q.   Just to be clear, I'm talking about a trip that

23   was not business-related but a personal trip.

24   A.   Again, there probably were more than one of

25   those, so I believe that's probably true.  Which trip is

1   it?  Where did we go?

2        Q.   Perhaps at this point, I should approach the

3   bench to ask for some clarity about where I can go with

4   this.

5        A.   Okay.

6                  (Bench conference.)

7                  MR. BATCHELDER:  I want to be very careful

8   to respect Your Honor's concern.

9                  MS. FITZGERALD:  I think that he's

10  admitted that he's gone on multiple trips with the

11  founder, and some that were not business-related, and

12  that was the point you wanted to make.

13                 THE COURT:  What exactly do you want to

14  ask him?

15                 MR. BATCHELDER:  What I'd like to ask him

16  is that he was taken on a trip paid for by Mr. Liemandt.

17  It was a bachelor party trip, and then that might --

18  that might jog his recollection, and if it doesn't, I

19  can ask him about locations.

20                 MS. FITZGERALD:  Your Honor, he's already

21  said that he was taken on a trip more than once, which

22  is the exact point Mr. Batchelder wanted to make.

23  There's absolutely no reason to use the word bachelor

24  party.

25                 MR. BATCHELDER:  Can I ask him --

1          THE COURT:  You can ask him if

2  Mr. Liemandt paid for vacation trips for him in the

3  past.

4          MR. BATCHELDER:  Okay.

5          THE COURT:  Okay.  You can leave it at

6  that.

7          MR. BATCHELDER:  Thank you.

8          (Bench conference concluded.)

9     Q.   (By Mr. Batchelder) Okay.  And, Mr. Dholakia, I

10  just want to be clear.  I'm talking about vacation

11  trips.

12          And the question is:  Did Mr. Liemandt pay

13  for you to take a personal vacation with him?

14     A.   Again, sir, it's entirely possible, but we went

15  skiing.  We had ski trips together.  We've been to Las

16  Vegas together.  We've been lots of places together.

17          So I -- which, you know, sometimes I would

18  pay for my airfare, and he would pay for the hotels, you

19  know.  So the short answer is, I'm sure we went on a

20  trip together at some point in December of 2007.  So

21  where we went and what we were doing, I don't recall.

22     Q.   But to be clear, Mr. Liemandt actually did pay

23  for you to go on vacation with him at times.

24     A.   That would happen from time to time, yes, sir.

25     Q.   Okay.  All right.  Thank you.

```
 1              MR. BATCHELDER:  I have no further

 2   questions.  Again, I very much appreciate your time.

 3              THE WITNESS:  Thank you, sir.

 4              MS. BROWN:  Just one more question, if I

 5   may.

 6              THE COURT:  All right.

 7                  REDIRECT EXAMINATION

 8   BY MS. BROWN:

 9      Q.   I've just got one quick question for you.

10      A.   Yes, ma'am.

11      Q.   Just because somebody picked up the tab for

12   vacation, would that make you show up here and say

13   something that wasn't true?

14      A.   Oh, gosh, no.  Oh, now I understand the line of

15   questioning.  I was so confused.

16              No, absolutely not under any circumstances

17   would I say something that was even remotely misleading,

18   no, based on -- no.

19      Q.   And you -- you maintained close relations with

20   lots of these people, is that right, that you worked

21   with at Trilogy?

22      A.   Well, my wife, for starters, who I met at

23   Trilogy, half of our wedding party.  My groomsman was

24   Bryan Rollins, who's one of the three guys.  Tom Carter,

25   myself, and Bryan Rollins were the three guys on Pricer
```

1   at the time.

2                So many of the folks in the back of that

3   room, I consider -- continue to consider dear personal

4   friends.

5                Joe Liemandt certainly is one of them.  He

6   gave me my first set of business opportunities as a very

7   young -- young guy coming out of college and has always

8   been terrifically supportive of me and challenged me and

9   helped me develop.

10               So, yeah, we have lots of great

11  relationships as a family to -- in and among people that

12  have left Trilogy and who are still at Trilogy.

13      Q.    Thank you.

14      A.    Yes, ma'am.

15               MS. BROWN:  No further questions.

16               MR. BATCHELDER:  Nothing here, Your Honor.

17  Thank you.

18               THE COURT:  All right.  May this witness

19  be excused?

20               MR. BATCHELDER:  Yes, sir.

21               THE COURT:  All right.  You may step down.

22               THE WITNESS:  Thank you.

23               THE COURT:  Ladies and Gentlemen, it's

24  nearly 5:00 o'clock.  I'm going to go ahead and excuse

25  you at this time until tomorrow.

1          We'll get started at 8:30 in the morning.

2   If you'll be -- be here ready to go about 8:25, it will

3   help us to get started on time.

4          Please travel safely on your way home, and

5   don't talk about the case.  See you tomorrow.

6          LAW CLERK:  All rise for the jury.

7          (Jury out.)

8          THE COURT:  All right.  We'll be in recess

9   until tomorrow morning.  I'm just -- most of y'all know

10  this, but I'm in chambers at 8:00 o'clock in the morning

11  for an 8:30 start in case anything comes up tonight.

12         MS. FITZGERALD:  Your Honor, may I ask one

13  question?

14         THE COURT:  Yes.

15         MS. FITZGERALD:  We, at some point, before

16  the case gets to the jury, would like to make an offer

17  of proof on our reasonable royalty damages model, and we

18  just wanted to flag that for you, so you could find a

19  good time, convenient for us to do it outside the

20  presence of the jury.

21         THE COURT:  Well, we'll probably do it

22  over the lunch hour one day.  I think -- I don't think I

23  have anything tomorrow over the lunch hour, so it would

24  probably be better to do it tomorrow as opposed to

25  Wednesday, okay?

1          MS. FITZGERALD:  Thank you.

2          (Recess.)

3                    CERTIFICATION

4

5

6          I HEREBY CERTIFY that the foregoing is a

7   true and correct transcript from the stenographic notes

8   of the proceedings in the above-entitled matter to the

9   best of my ability.

10

11

12
    /s/_____          May 9, 2011
13  SHELLY HOLMES, CSR
    Deputy Official Court Reporter
14  State of Texas No. 7804
    Expiration Date:  12/31/12
15
    /s/_____          May 9, 2011
16  GLENDA FULLER, CSR
    Deputy Official Court Reporter
17  State of Texas No. 1042
    Expiration Date:  12/31/12
18

19

20

21

22

23

24

25