1               IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3   VERSATA SOFTWARE, INC.,   ) Civil Docket No.
    ET AL                     ) 2:07-CV-00153-CE
4                             ) May 10, 2011
    VS.                       ) 8:30 A.M.
5                             )
    SAP AMERICA, INC., ET AL  )

6

7                  TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CHAD EVERINGHAM
8                 UNITED STATES MAGISTRATE JUDGE

9   APPEARANCES:
    FOR THE PLAINTIFF:          MR. SAM BAXTER
10                              McKool Smith, P.C.
                                104 E. Houston Street
11                              Suite 300
                                Marshall, Texas  75670
12
                                MR. SCOTT L. COLE
13                              MR. STEVEN J. POLLINGER
                                MS. LAURIE L. FITZGERALD
14                              MR. KEVIN M. KNEUPPER
                                MS. LEAH B. BURATTI
15                              McKool Smith, P.C.
                                300 W. 6th Street, Suite 1700
16                              Austin, Texas 78701

17                              MS. ADA BROWN
                                MR. STEVEN CALLAHAN
18                              McKool Smith, P.C.
                                300 Crescent Court, Suite 1500
19                              Dallas, Texas 75201

20  APPEARANCES CONTINUED ON NEST PAGE:

21  COURT REPORTERS:            SHELLY HOLMES, CSR
                                GLENDA FULLER, CSR
22                              Deputy Official Court Reporters
                                100 East Houston, Suite 125
23                              Marshall, TX 75670
                                903/935-3868
24
    (Proceedings recorded by mechanical stenography,
25  transcript produced on CAT system.)

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:        MR. THOMAS M. MELSHEIMER
                               MR. MICHAEL A. BITTNER
 3                             Fish & Richardson, P.C.
                               1717 Main Street, Suite 5000
 4                             Dallas, Texas 75201

 5                             MR. JOHN W. THORNBURGH
                               MR. JUSTIN M. BARNES
 6                             Fish & Richardson, P.C.
                               12390 El Camino Real
 7                             San Diego, California 92130

 8                             MR. JAMES R. BATCHELDER
                               Robes & Gray, LLP
 9                             1900 University Avenue
                               6th Floor
10                             East Palo Alto, California 94303

11                             MR. CHRISTOPHER BUNT
                               Parker Bunt & Ainsworth
12                             100 E. Ferguson, Suite 1114
                               Tyler, Texas 75702
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2                 (Jury out.)

3                 LAW CLERK:  All rise.

4                 THE COURT:  Please be seated.

5                 After -- thank you, Mr. Bunt.

6                 All right.  We're on the record in Versata

7     against SAP, outside the presence of the Jury.

8                 What's the problem?

9                 MR. MELSHEIMER:  Thank you, Your Honor.

10    Sorry to trouble the Court.

11                 Just a -- an objection to one of the

12    Bakewell demonstratives.  So in his report he identifies

13    and says that 16 -- 16 SAP customers responded

14    affirmatively to his survey, and, therefore, 40 percent

15    of the -- of the total.

16                 And now he's -- he's aware that two of

17    those yeses have come back with affidavits saying our

18    yeses don't mean what you say they mean.  So instead of

19    just sort of having to eat that, he's -- he's

20    recalculated his data to say that there were 20

21    affirmative responses, all right, instead of 16 and then

22    he's created -- so he's taken -- he's taken Microsoft

23    and Chevron out of this one here, this -- this top one.

24    He's taken them out and created this new category of or,

25    right, so instead of and, the front -- the top one's

1   and, the bottom one's or.

2                    So we just think it's a new opinion.  You

3   know, their response is, well, the data was in there,

4   he's just remanipulated the data.  Boy, that's a -- you

5   could drive a truck through that if that's the rule.  So

6   we would just ask that this not be allowed as a -- as a

7   new opinion.

8                    THE COURT:  So do you want him to give the

9   opinion that you demonstrated to be incorrect so you can

10  cross-examine with the affidavits that you've obtained

11  from people that shows it's incorrect?

12                   MR. MELSHEIMER:  Yes, sir.

13                   THE COURT:  Okay.  I'm going to overrule

14  your objection.

15                   MR. MELSHEIMER:  You want me to

16  cross-examine him on his changed opinion?

17                   THE COURT:  I'm going to -- she pointed

18  out a -- you can cross-examine him on the fact that he

19  originally gave an opinion and that he's had to

20  alternate it, but I'm going to allow him to give that

21  opinion.

22                   MR. MELSHEIMER:  All right.

23                   THE COURT:  Okay.

24                   LAW CLERK:  All rise.

25                   (Recess.)

```
 1                    (Jury in.)

 2                    LAW CLERK:  All rise.

 3                    THE COURT:  Please be seated.

 4                    Morning, ladies and gentlemen. Continuing

 5   on this morning hearing more evidence in the Plaintiffs'

 6   case-in-chief.

 7                    You may call your next witness.

 8                    MS. FITZGERALD:  The Plaintiff calls

 9   Mr. Christopher Smith.

10                    THE COURT:  Mr. Smith, come around.  If

11   you'll stop somewhere on your way up and take the oath,

12   I'd appreciate it.

13                    THE WITNESS:  I took good notes yesterday.

14                    (Witness sworn.)

15                    MS. FITZGERALD:  May it please the Court.

16                    THE COURT:  Counsel.

17       CHRISTOPHER SMITH, PLAINTIFFS' WITNESS, SWORN

18                      DIRECT EXAMINATION

19   BY MS. FITZGERALD:

20       Q.   Mr. Smith, good morning.

21       A.   Good morning.

22       Q.   Would you introduce yourself to the Jury?

23       A.   My name is Chris Smith.

24       Q.   Where do you live, Mr. Smith?

25       A.   I live in Austin, Texas, with my wife and two
```

1 teenage children.

2    Q.   Who do you work for?

3    A.   I work for Trilogy.

4    Q.   How long have you worked for Trilogy?

5    A.   I've worked for Trilogy since 1996.

6    Q.   I'd like to ask you about a few topics today

7 and most of them relate to testimony that we heard

8 yesterday.

9    First of all, yesterday you saw multiple

10 documents that were internal Trilogy documents that set

11 forth criticisms in Trilogy by its own employees.  Do

12 you remember those?

13    A.   I do, yes.

14    Q.   Did seeing those documents surprise you?

15    A.   Not at all.

16    Q.   Why not?

17    A.   Well, Trilogy has always had a culture where we

18 have advised our employees to give us all sorts of

19 feedback at all times.  And so we solicit that feedback

20 as a way to learn about what's going on at the company.

21    That feedback usually ranges from things

22 like we heard yesterday in respect to market direction,

23 product strategy, customer issues, you know, even

24 integration, all the way to, you know, parking spaces,

25 the number of speed bumps that are placed in the parking

1  garage and the types of coffee we should have in our

2  kitchen.  All that feedback is important to us because

3  we do believe that that helps make the company better.

4      Q.   Okay.  Moving on to the next topic I want to

5  cover --

6               MS. FITZGERALD:  Mr. Diaz, can you put up

7  the customer charts that we looked at yesterday?

8      Q.   (By Ms. Fitzgerald) -- do you remember this

9  chart, Mr. Smith, with the Pricer customers?

10     A.   I do, yes.

11     Q.   So I'd like to ask you some questions about the

12 customer -- a few of the customers that are in bold

13 lettering.  First, just to remind all of us, what does

14 the bold lettering signify?

15     A.   So those would be the customers that were

16 Pricer led.

17     Q.   Okay.  And Pricer led meant?

18     A.   Pricer led would mean sales deals where Pricer

19 was the dominant product sold.

20     Q.   Let's talk first about Raychem which is there

21 in 1997.  Were you personally involved in the Raychem

22 deal?

23     A.   I was, yes.

24     Q.   And why did Raychem purchase Trilogy Software?

25     A.   Raychem purchased Trilogy Software primarily

1  because they needed the flexibility that the software

2  could provide as well as the performance it could

3  provide to distribute to their channel.

4      Q.   Was there a particular piece of software that

5  Raychem purchased Trilogy because of?

6      A.   Absolutely.  That would have been the Pricer

7  product.

8      Q.   What percentage of the overall value of the

9  Raychem deal would you attribute to the Pricer product?

10     A.   I would say a hundred percent.

11     Q.   Let's turn now to SGI.  Is -- is that a

12  shorthand for -- for something else?

13     A.   It is, that would be Silicon Graphics.

14     Q.   Were you involved in the Silicon Graphics deal?

15     A.   I was, yes.

16     Q.   Why did Silicon Graphics purchase software from

17  Trilogy?

18     A.   Silicon Graphics had a very complex sales

19  channel, both direct sales force and distributors and

20  other channel partners and so they really needed the --

21  not only the flexibility of the Pricer application, but

22  they also needed the detach solution because they had

23  all these folks out in the field quoting at the point of

24  sale.

25     Q.   Now, what percentage of the Silicon Graphics

1    deal would you attribute to the Pricer product?

2        A.    That would have been a hundred percent as well.

3        Q.    Norands, I see that that's another company

4    that's here in bold.  Were you part of the Norand deal?

5        A.    I was, yes.

6        Q.    And why did Norand purchase Trilogy Software?

7        A.    So Norand was actually similar to Silicon

8    Graphics.  Again, they -- they make handheld computers

9    for route accounting and so their sales force and

10   systems engineers and distributors were out in the field

11   as well.  They needed the flexibility to price based on

12   the contracts with their customers, as well as having

13   that detach solution so they could be remote in the

14   field.

15       Q.    What percentage of the Norand deal in 1997

16   would you attribute to the Pricer product?

17       A.    That deal would have been a hundred percent as

18   well.

19       Q.    The next Pricer customer I'd like to ask you

20   about is VWR, they're in 1998.  Were you involved in

21   that deal?

22       A.    I was, yes.

23       Q.    And why did VWR buy Pricer?

24       A.    VWR specifically needed Pricer for the

25   flexibility.  Mainly they have a lot of contracts and a

1   lot of complex products and so they needed that

2   flexibility.  They also needed the performance that

3   Pricer could give them so they could quickly get that

4   price out to the end user.

5       Q.    Same question for -- for this one, what

6   percentage of the deal would you attribute to the Pricer

7   product?

8       A.    A hundred percent.

9       Q.    The last customer I want to ask you about is

10  Bay Networks, which also shows up in 1998.  Were you

11  part of the Bay Networks deal?

12      A.    I was.  That's also Nortel Networks.

13      Q.    And why did Bay Networks or Nortel Networks

14  purchase Pricer?

15      A.    They had a very broad distribution channel, so

16  they needed the flexibility of Pricer as well as the

17  performance that could give and deliver those prices to

18  the channel.

19      Q.    And same question, what percentage of that deal

20  would you attribute to the Pricer product?

21      A.    That was a hundred percent Pricer sale.

22      Q.    Now, you've been talking about flexibility and

23  performance and disconnected, are those the same

24  qualities that Mr. Carter was referring to yesterday

25  while he was describing his patented invention?

 1      A.    Yes, they would be.

 2      Q.    Okay.  Let's move to another topic.

 3            MS. FITZGERALD:  Mr. Diaz, will you please

 4   pull up Plaintiffs' Exhibit 338?

 5      Q.    (BY MS. FITZGERALD)  I apologize, this is a bit

 6   of a small spreadsheet, you'll have to squint?

 7      A.    Well, that's why I brought my glasses.

 8      Q.    Okay.  Do you recognize this document?

 9      A.    I do.

10      Q.    What is it?

11      A.    So this document is created off our audited

12   financials.  It shows our top 10 customers and their

13   profitability.  Trilogy keeps track of the revenue

14   expenses for major accounts and so this -- this

15   basically shows the -- the profitability the margin

16   probability of our top 10.

17      Q.    When you say top 10 customers, is that the top

18   10 of every customer of Trilogy or a certain subset?

19      A.    No, no, it -- this is just the top 10 customers

20   that also have Pricer, not necessarily Pricer led but

21   Pricer as a component of it.

22      Q.    What years does this chart cover?

23      A.    So this would cover approximately a 12-year

24   period between FY '96 through FY '08.

25      Q.    Is FY a fiscal year?

1    A.   It would be a fiscal year, yes.

2    Q.   I want to focus your attention on the row

3 that's labeled services margin, it's about a third of

4 the way down; do you see that?

5    A.   I do.

6    Q.   First of all, what is services margin?

7    A.   So the services margin would essentially be the

8 profit margin calculated off our consulting business.

9    Q.   And if you look all the way to the -- the other

10 end of the sheet, you see a column called total and for

11 services margin it says 67 percent.  What does that 67

12 percent represent?

13    A.   So that 67 percent would represent the average

14 of those 12 years for our profit margin on our

15 consulting services.

16    Q.   Next I want to you to skip a couple rows down

17 to where it says direct margin percentage.  Do you see

18 that, it's --

19    A.   I do.

20    Q.   Why don't you tell the Jury what direct margin

21 percentage means?

22    A.   So the direct margin percentage would be our

23 profit margin that we made off of just our license and

24 our maintenance.

25    Q.   Now, if you go all the way to the total column

1  for direct margin percentage, you see 72 percent.  What

2  does that number stand for?

3      A.   So that 72 percent would be the average for

4  that 12-year period for our profit margin on our license

5  and maintenance.

6      Q.   Now, let's say that Trilogy had sold to

7  additional large companies beyond the large companies

8  that were listed in the chart that we just looked at.

9  Would these -- would this 67 percent service margin and

10 72 percent direct margin have stayed the same?

11     A.   Oh, absolutely.

12     Q.   And why is that?

13     A.   Because we -- we focus our business on making

14 sure that we can hit these numbers with our Fortune 500

15 customers, that's our business model.

16     Q.   Do these profit margins take into account

17 relevant sales and administrative expenses?

18     A.   They do, yes.

19     Q.   What about research and development or R&D

20 costs, are they accounted for in these profit margins?

21     A.   They are, yes.

22     Q.   Aside from the types of costs that are used to

23 calculate the company's profit margins that are here in

24 this chart, would Trilogy have incurred any other costs

25 had it gone out and sold Pricer to additional large

1    Fortune 500-type companies?

2        A.    No, we would not.

3        Q.    Are these profit margins of 67 percent for

4    services and 72 percent for license and maintenance

5    typical in the software industry?

6        A.    Well, they would be typical for the software

7    industry for companies that focus on selling to the

8    Fortune 500.  We would expect to see that to be similar.

9        Q.    All right.  I think we can take down this

10   chart.  And I have just one more topic to talk to you

11   about.  Let's switch gears and talk a little bit about

12   other software companies out in the market.

13             Now, as the Chief Operating Officer of

14   Trilogy, are you familiar with the market that Trilogy

15   is selling its pricing software in?

16       A.    I am, yes.

17       Q.    Have you been familiar with that market

18   throughout your time at Trilogy?

19       A.    Yes, I have.

20       Q.    Now, yesterday we heard Mr. Carter testify

21   regarding a number of companies other than Trilogy and

22   SAP who sell software; do you remember that?

23       A.    I do.

24       Q.    Since Mr. Carter left Trilogy in 2006, I want

25   to ask you questions about those same companies, but I

1   want to focus on 2006 to the present since you've still

2   been at the company.  We heard Mr. Carter testify first

3   about a number of companies he called ERP vendors and

4   they were Oracle, PeopleSoft, JD Edwards, Baan, and

5   Siebel.  Would agree with Mr. Carter that those

6   companies are ERP vendors?

7       A.   I would, yes, they are.

8       Q.   And what is ERP vendor?

9       A.   That would be a broader solution for enterprise

10   resource planing.

11       Q.   At any time since 2006, have any of the ERP

12   vendors that I just listed offered pricing software that

13   would meet the needs of a large SAP customer?

14       A.   No, it's our opinion that -- that other ERP

15   providers would -- would not license a -- a small

16   component of their overall solution like pricing to a

17   competitor like SAP.  They'd -- they'd rather just sell

18   their whole enterprise package as opposed to doing that.

19   And so by that definition alone, independent of whether

20   or not they could or not, it wouldn't -- it wouldn't be

21   feasible.

22       Q.   Let's next discuss a company called i2.  At any

23   time since 2006, has i2 offered pricing software that

24   would meet the pricing need of SAP's large customers?

25       A.   No, they would not.  They're more of a demand

1 planning type application.

2     Q.   And what do you mean by that?

3     A.   Well, any -- any -- any pricing that they would

4 actually have as part of their solution, we would

5 consider it to be a lower level because they -- they

6 mainly focus on individual parts, not necessarily the

7 complexity of the parts together.

8     Q.   The next company is Click Commerce.  At any

9 time since 2006, has Click Commerce offered pricing

10 software that would meet the needs of a large SAP

11 customer?  And by needs, I mean pricing needs.

12     A.   Sure.  Click -- Click Commerce is actually more

13 of an auction-based pricing company and so they -- they

14 set an initial price, but then the price changes based

15 on bids and so it's not so much pricing execution as it

16 is just helping you set that base price.

17     Q.   Okay.  What about Comergent same question.  In

18 the -- since 2006 to the present, have they offered any

19 pricing software that could satisfy the pricing needs of

20 one of these large Fortune 500 customers of SAP?

21     A.   Not that we're aware of.  We've not seen them

22 in any of our SAP accounts.

23     Q.   If they offered that type of software, would

24 you expect to see them in an account?

25     A.   Oh, absolutely.

1    Q.   Chrome is the next one, I'm getting towards the

2  end of the list, but at any time since 2006, has Chrome

3  offered pricing software that would meet those pricing

4  needs for a large Fortune 500-type customer?

5    A.   No.  As Mr. Carter noted yesterday, Chrome is

6  more of a supplier of pricing data for the automotive

7  industry, not so much a company that provides pricing

8  functionality, so to speak.

9    Q.   Now, I'll collapse the last two into one

10  question.  Blue Martini, which was the company with the

11  funny name, and Salesforce.com, since 2006 have either

12  of those companies offered pricing software that would

13  meet those complex pricing needs of one of SAP's large

14  customers?

15    A.   No.  No, in the case of Blue Martini, they're

16  more of an application that sits on top of an ERP system

17  to provide website functionality.  They -- they have

18  some low-level pricing functionality, but nothing that

19  we would consider to be a replacement of some of our

20  technology.

21         The sales force, I think was the second

22  one you noted, to the best of our knowledge, they don't

23  actually have any pricing components of their own,

24  they're more of a -- a portal or a place where customers

25  go to buy other people's applications to use within

1  sales force application.

2       Q.   We also heard about two other companies

3  yesterday, I believe on one of the cross-examinations,

4  and they were companies named Firepond and Cybrant.

5  Going all the way back to 2003 when the patent issued,

6  have either of those companies offered pricing software

7  that could meet the pricing needs of a large Fortune 500

8  SAP company?

9       A.   No, they have not.  Again, we -- we've never

10  seen them in either, either of them in any of our SAP

11  accounts.

12       Q.   Are you aware of any company, SAP and Trilogy

13  aside, any other software company out there in the

14  market who offers pricing software that would meet the

15  pricing needs of a large Fortune 500 SAP company or

16  customer?

17       A.   We've not seen any to date.

18       Q.   A couple of last questions.  Yesterday we heard

19  a little bit about the bolt-on or bolt-on software; do

20  you recall that testimony?

21       A.   I do.

22       Q.   What is bolt-on software?

23       A.   So bolt-on software would be, you know, any

24  kind of application or software package that can be used

25  in connection with another application or software

1  package such as SAP.  Those two applications would be

2  linked together through some kind of integration.

3      Q.   Now, when you started with Trilogy back in

4  1996, was there a market for software that could bolt on

5  to SAP pricing software specifically?

6      A.   Oh, absolutely.

7      Q.   Does that market still exist today?

8      A.   Sure does.

9      Q.   Has it existed throughout your entire time at

10 Trilogy?

11     A.   Yes, it has.

12          MS. FITZGERALD:  I'll pass the witness.

13          THE COURT:  Cross-examination.

14          MR. MELSHEIMER:  May it please the Court,

15 Your Honor.

16               CROSS-EXAMINATION

17 BY MR. MELSHEIMER:

18     Q.   Good morning, Mr. Smith.

19     A.   Good morning.

20     Q.   We've not met.  Let's start with some things

21 that I think you and I can agree on.  You started out

22 your testimony talking about Trilogy being a very open

23 company that welcomed internal criticism; is that fair?

24     A.   That's correct.

25     Q.   Now, and you mentioned a couple of examples of

1  criticism of what the coffee was, criticism of how the

2  parking lot was set up; do you remember that?

3      A.   I do.  It's also important feed back.

4      Q.   And that wasn't the kind of criticism we were

5  talking about yesterday, was it, sir?

6      A.   There was a lot of criticism yesterday.

7      Q.   Sir, we weren't talking yesterday about

8  criticism about the coffee or the parking lot, fair?

9      A.   In the sections that she displayed yesterday, I

10  don't recall seeing that, no.

11      Q.   Right.  The criticisms that we talked about

12  yesterday, some of them related to the quality of

13  Trilogy Software, fair?

14      A.   Sure.

15      Q.   Some of the criticisms related to failures of

16  Trilogy to understand how SAP software worked, fair?

17      A.   That's what we heard.

18      Q.   Some of the criticisms related to Trilogy

19  being -- that the Pricer product was priced too high;

20  right?

21      A.   No, we didn't hear that.  Yes.

22      Q.   Okay.  And some of the criticisms related to

23  not satisfying customer expectations in the marketplace?

24      A.   Yes.

25      Q.   We can agree, sir, that all those types of

1  issues are more important to the success of a company

2  than what kind of coffee they have, fair statement?

3      A.    I think they're all related, to be quite

4  honest, but yes, there's definitely a priority of -- of

5  issues and how you address them.

6      Q.    Okay.  So you think that all those issues that

7  I just listed out are related to coffee?

8      A.    I think that you need to address all concerns

9  of employees, not just so that you can be a great

10  company for your customers, but you've also got to build

11  that great company of people that want to be there, that

12  want to help you succeed in making your customer

13  successful, right.  If you don't have great people,

14  you're not going to have a great company.  All right.

15  So --

16      Q.    Mr. Smith --

17      A.    -- you know --

18      Q.    -- I'm sorry.

19      A.    -- you stack rank them certainly, but I don't

20  throw them away.

21      Q.    Did you understand my question?

22      A.    Maybe you should ask it to me one more time.

23      Q.    Okay.  You're not saying that coffee is on the

24  same level of software being bad, software being priced

25  too high, customers being unhappy and the other kinds of

1 criticisms we talked about with Mr. Carter yesterday,

2 fair statement?

3     A.   I wouldn't prioritize them ahead of that, no.

4     Q.   Now, in fact, you understand that the reason

5 why we're here or certainly an important reason why

6 we're here is to determine what's reasonable for damages

7 in this case, right?

8     A.   I do.

9     Q.   And you've actually been here throughout the --

10 the whole trial, haven't you, sir?

11     A.   I have, yes.

12     Q.   You understand that Trilogy is not entitled to

13 lost profits if the reason for their decline in business

14 is related to, for example, their own internal problems,

15 fair?

16     A.   That would be fair.

17     Q.   You understand that Trilogy's not entitled to

18 lost profits if the reason why the sales went down was

19 because customers in '99 and 2000 and following didn't

20 see the same need for the software that they may have

21 seen earlier, fair?

22     A.   That would be fair.

23     Q.   You understand that Trilogy is not entitled to

24 lost profits if customers didn't buy the software in '99

25 and 2000 and 2001 because it was too expensive, if that

1  were true?

2      A.   If that were true, sure.

3      Q.   Right.   If the evidence shows that one of the

4  factors that was causing Trilogy Software to not be

5  purchased in 2000 and 2001 and following years, was --

6  and 2003 and following, was because the price was too

7  high, that's not something that SAP's responsible for,

8  right?

9      A.   That would be correct.   You have to deliver

10 value for that price.

11     Q.   Now, we've seen this chart of the sales going

12 up and then their sales going down, right, you've seen

13 that?

14     A.   I have, yes.

15     Q.   All right.   Now, isn't it true, sir, that the

16 decline in revenue of Pricer had actually been predicted

17 at Trilogy back in 1997?

18     A.   I don't know if I'd agree with that.

19     Q.   All right.

20          MR. MELSHEIMER:  Well let's take a look at

21 the -- the projection of revenue by product category.

22     Q.   (By Mr. Melsheimer)  Yes, sir.  Now, this was a

23 document that we looked at with Mr. Carter, and this

24 shows --

25          MR. MELSHEIMER:  -- first of all, if we go

1    to the first page.

2        Q.    (By Mr. Melsheimer)   This is a slide deck that

3    Mr. Carter -- excuse me, that Mr. Nath prepared in

4    January of 1998, right?

5        A.    That's what it says, yes.

6        Q.    Right.  And if we go back to the chart, what

7    we've got is starting in -- and can we agree, sir,

8    that -- that the Pricer sales, that this is Pricer,

9    these right here; can you see that?

10       A.    I can see that, yes.

11       Q.    Okay.  And as a percentage, revenue percentage

12   by product, it's declining from '97 to '98 to '99, at

13   least that's what this chart shows, correct?

14       A.    It shows it declining as a revenue

15   percentage --

16       Q.    As a --

17       A.    -- by product.

18       Q.    -- percentage by product, that's what it says,

19   right?

20       A.    Correct.

21       Q.    And this was a projection made in the first

22   part of 1998, fair?

23       A.    I believe that to be true.

24       Q.    Now, in 1999, you saw the e-mail from

25   Mr. Thompson --

```
 1                    MR. MELSHEIMER:  Can we pull that up,
 2   Mr. Barnes?  9 -- 957.
 3        Q.   (By Mr. Melsheimer)  In 1999, we saw the --
 4                    MR. MELSHEIMER:  The next page.
 5        Q.   (By Mr. Melsheimer) -- we saw Exhibit 957, this
 6   e-mail from one of the developers, Mr. -- Mr. Thompson,
 7   who concluded that the Trilogy Software is bad, right?
 8        A.   Well, I think that whole thread there shows
 9   a --
10        Q.   Did you --
11        A.   -- lot of things.
12        Q.   -- understand my question?
13        A.   I do.
14        Q.   Okay.  I'm sorry.  And they're going to get to
15   ask you questions --
16        A.   Sure.
17        Q.   -- but my question is:  He concluded that the
18   Trilogy Software was bad, fair statement?
19        A.   That was his opinion, yes.
20        Q.   Okay.  Well, he didn't just say it was his
21   opinion in this e-mail, fair?
22        A.   I haven't read the whole e-mail.
23        Q.   Well, he said:  You can ask any integrator.
24   Now, tell us who -- who an integrator is.
25        A.   I assume that would be anyone from our
```

1   consulting group on to third-party people that would

2   deploy our software.

3       Q.   Integrators are people outside of Trilogy that

4   help install the software at customer sites, fair?

5       A.   Correct.

6       Q.   He says:  Ask any user, right?

7       A.   That's what it says.

8       Q.   A user of the software would be a customer of

9   Trilogy, right?

10      A.   That's what it says.

11      Q.   And then he says:  Ask any customer.  Is there

12   a difference between a customer and a user?

13      A.   I wouldn't think so.

14      Q.   All right.  And then finally he says:  We

15   currently have no referenceable customers in indirect

16   and selling chain.  Now, let's just be clear.  Pricer is

17   part of selling chain, that's what Mr. Carter told us,

18   right?

19      A.   I believe that's what he said yesterday, yes.

20      Q.   And that's true?

21      A.   Apparently he thought so.

22      Q.   No, no.  It's true that Pricer is part of a

23   selling chain?

24      A.   Oh, I'm sorry, yes, that's true.

25      Q.   Sorry.

1      A.    Yeah.

2      Q.    And he says:  We have no referenceable

3  customers in indirect selling chain.  Now, referenceable

4  is not a word that you hear a lot, but referenceable

5  customers means customers that you can send to to give a

6  reference for your product, right?

7      A.    That's how I would define it, yes.

8      Q.    And finally, if we move on to 2000 --

9            MR. MELSHEIMER:  Let's go to Exhibit 860.

10     Q.    (By Mr. Melsheimer) -- this is this customer

11  satisfaction survey that we looked at with Mr. Carter

12  that the company commissioned in 2000, September of

13  2000, correct?

14     A.    That's correct.

15     Q.    Now sir, understand, I'm not fussing at you for

16  commissioning this kind of survey, I actually think it's

17  a pretty good idea and I take it y'all did as well,

18  right?

19     A.    We did do the study, so yes --

20     Q.    To find --

21     A.    -- we -- we like feedback.

22     Q.    -- to find out what your customers think is

23  pretty important?

24     A.    Absolutely.

25     Q.    Because if your customers don't like your

1   product or your service, your business is going to start

2   up here and it's going to go down here, fair?

3        A.   It's a possible outcome.

4        Q.   And what this survey revealed, one of the

5   findings was is --

6              MR. MELSHEIMER:  If we can go to Page 14.

7        Q.   (By Mr. Melsheimer) -- is that 57.5 percent of

8   the people felt like that Trilogy's -- had fallen short

9   of the expectations set of the software, fair?

10       A.   For all of the products in our portfolio, yes.

11       Q.   If you have sales that are up here and you have

12  57 percent of your customers saying you're not meeting

13  my expectations, those sales may well end up down here,

14  fair?

15       A.   They could.

16       Q.   Now, let me take you to -- also sticking in

17  2000, let me take you to a board discussion, a board

18  meeting.  The board of Trilogy met on a regular basis,

19  did it not?

20       A.   I'm not sure what you mean by the board.

21       Q.   Well, did Trilogy have a board of directors of

22  the company?

23       A.   They did, yes.

24       Q.   All right.  Back in 2000?

25       A.   I believe we still had a board then, yes.

1     Q.   Those are the people charged at the highest

2  levels with overseeing the direction of the company and

3  its success or failure, fair?

4     A.   That would be correct.

5     Q.   Let's take a look at Exhibit 608.  This is a

6  board discussion in April of 2000 reviewing some of the

7  financials and other general information about the

8  company, right?

9     A.   That's what it appears to be, yes.

10     Q.   All right.  And it says, most significant

11  driver -- so it says:  Trilogy Software bookings at 8

12  million for the quarter.  Now, that's all the software

13  products of the company, right?

14     A.   I'm not sure by this -- this section, but it

15  could be.

16     Q.   Could be.  I mean, I guess what I'm trying to

17  say is, I -- I mean, I'm not trying to say and I

18  don't -- I don't want you to say this if it's not true,

19  that -- that that's just Pricer.

20     A.   I don't believe that would be just Pricer.

21     Q.   And it says:  Most significant drivers of the

22  shortfall are reduced marketing spend in the past year

23  and the lack of business development resources due to

24  severe attrition.  Do you see that?

25     A.   I do.

1    Q.   Now, let me tell you what I think this is

2  saying.  This is saying that your numbers for the first

3  quarter were 8 million and that was below what you

4  expected, right?

5    A.   I don't know if I'd agree with that.

6    Q.   Okay.  Well, it says:  Most significant drivers

7  of the shortfall.  Doesn't that sound to you like that

8  $8 million number was supposed to be higher or predicted

9  to be higher at one point, fair?

10   A.   That's fair.  We set our goals very high.

11   Q.   Okay.  So I -- I just -- again, I don't want to

12  put words in your mouth or say something that's not in

13  this document, but that's the way I read that document

14  and do you agree with me, sir, that that's a fair

15  reading?

16   A.   I agree that it says that there was a

17  shortfall.

18   Q.   And it says:  The drivers of the shortfall are

19  not SAP, right?

20   A.   It does not say that, no.

21   Q.   It doesn't say the drivers of the shortfall are

22  some feature of SAP's product, right?

23   A.   It doesn't, because that would be -- that's a

24  higher level summary here.

25   Q.   I don't understand your answer, so I'm going to

1   ask you another question.  You're not suggesting, are

2   you, that there's some summary connected with this that

3   puts this shortfall on SAP, are you?

4       A.   No.  What I'm saying is that whatever shortfall

5   is there, there are multiple business units included in

6   that number and they're each going to have their own

7   reason for why they may have hit or not hit their

8   numbers.

9       Q.   Okay.  So it says:  The most significant

10  drivers for the shortfall are reduced marketing

11  spending, right?

12      A.   That's what it says.

13      Q.   And that means you weren't spending enough on

14  marketing, right?  Strike that, that's a bad question.

15           That means that you reduced the spending

16  on marketing and this document's concluding that that

17  caused us to have a shortfall, fair?

18      A.   That's what this says.

19      Q.   All right.  And the lack of business

20  development resources -- now, business development

21  resources is people out there to sell your product; do I

22  have that right.

23      A.   It would actually be people that are hired to

24  help drive our business, they wouldn't be the physical

25  salespeople.

1    Q.    People to develop business?

2    A.    Correct.

3    Q.    You didn't have enough of them because a bunch

4  of them had quit; isn't that what that says?

5    A.    Attrition is always a problem in software

6  companies, especially during this era, that's -- that's

7  why we had the benefits that we had to have to keep high

8  caliber talent.

9    Q.    Mr. Smith, just answer my question.  Isn't it

10  true that attrition means you had people who were

11  quitting?

12    A.    Correct.

13    Q.    And it wasn't moderate attrition, it wasn't

14  modest attrition, it was severe attrition, right?

15    A.    That's what it says.

16    Q.    Okay.

17    A.    I don't know what that means, but it says that.

18    Q.    Well, are you saying that you don't know what

19  this Trilogy document means; is -- is that your

20  testimony?

21    A.    I'm saying I don't know what the definition of

22  severe means --

23    Q.    Okay.

24    A.    -- whether that's one percent or ten percent.

25    Q.    It doesn't sound good, does it?

1    A.   Attrition is never good for software --

2    Q.   Okay.

3    A.   -- companies.

4    Q.   So and then let me ask you about this, license

5    revenue -- well, strike that.

6              Let's go to attrition, I'm sorry.

7    Attrition in recent months has been better, however,

8    still a cause for close monitoring and concern.  So you

9    were having -- you were losing people in -- in the time

10   period of 2000 and that was a -- that was a cause for

11   close monitoring and concern, right?

12   A.   All software companies were losing people in

13   that era.  We were all trying to keep a close eye on our

14   people.

15   Q.   Okay.  Mr. Smith, I -- if you would just focus

16   on answering my question.  I'm not --

17   A.   Sure.

18   Q.   -- asking you about other software companies

19   because other software companies aren't in this court

20   seeking lost profits, Trilogy is, right?

21   A.   I understand.

22   Q.   And you understand that if the reason why

23   Trilogy couldn't make sales was because all their people

24   were quitting, that's not SAP's fault, fair statement?

25   A.   I don't think it says all our people are

1  quitting, but it does say there was severe attrition.

2      Q.   I appreciate that.  The point is if the revenue

3  drop was due to people quitting, that's not SAP's

4  problem, is it, sir?

5      A.   That would be correct.

6      Q.   That was Trilogy's problem, a problem of which

7  they were well aware in 2000, right?

8      A.   Correct.

9      Q.   Now, the other issue, I just want to -- before

10  we leave this document, because we talked about a little

11  about with Mr. Carter, it's spending.  Spending grew by

12  10 million dollars a quarter over quarter.  So I read

13  that as meaning it's 10 million dollars more than the

14  last quarter.  Is that the way you read it?

15     A.   That's the way I would read it, yes.

16     Q.   10 million dollar quarter over quarter driven

17  primarily by increased recruiting costs, which is 3.9

18  million, almost $4 million for recruiting people?

19     A.   That's what it says.

20     Q.   Are those the -- some of the things Mr. Carter

21  talked about, the fancy hotels and the trips to Las

22  Vegas and things of that nature?

23     A.   I wouldn't know what all it included, but

24  it's -- I'm sure there's a lot of recruiters in there as

25  well.

1    Q.   In your recruiting costs of four million were

2  actually not double but quite a bit more than the money

3  that -- quite a bit more than the money for marketing,

4  right?

5    A.   Sure.

6    Q.   And quite a bit more or -- and -- and the

7  amount you spent on marketing, 1.4 million, you've got

8  actually twice as much money allocated to stuff that's

9  just miscellaneous, right?

10   A.   Well, we certainly knew what that was, but it's

11 categorized as that, yes.

12   Q.   All right.  All right, sir.

13             MR. MELSHEIMER:  You -- you can take that

14 down, Mr. Barnes.

15   Q.   (By Mr. Melsheimer)  A few other things I think

16 we can agree on, sir, we agree that this Trilogy didn't

17 have this '350 patent back in 1998 or 1999 or 2000,

18 right?

19   A.   That's correct.

20   Q.   Patent didn't issue till 2003, right?

21   A.   That's correct.

22   Q.   All right.  And you heard Mr. Dholakia

23 yesterday talk about the marketplace and the drop off in

24 the business, right?

25   A.   I did, yes.

1    Q.    He was talking about that happening in '98,

2  '99, and 2000, correct?

3    A.    Correct.

4    Q.    When there was no '350 patent, right?

5    A.    Correct.

6    Q.    Now, let's talk a little bit about this

7  hierarchical access feature.

8              Now, Trilogy -- part of Trilogy's business

9  was to keep track of what was happening in the

10 marketplace, fair statement?

11   A.    We tried, yes.

12   Q.    It's real important to know what all your

13 competitors are doing, what they're saying, the kind of

14 products they're offering, so you can be prepared to

15 compete, right?

16   A.    That's correct.

17   Q.    You have people at Trilogy who were devoted

18 solely to the task of gathering what's called

19 competitive intelligence; isn't that right?

20   A.    We would have those people, yes.

21   Q.    How many people at Trilogy did you have devoted

22 to gathering what's called competitive intelligence?

23   A.    I don't know.  I don't know if I could guess at

24 a number.

25   Q.    I don't want you to guess.  More than a

1  handful, you think?

2      A.    More than a handful probably, yes.

3      Q.    Okay.  Because it's pretty important, isn't

4  it --

5      A.    Certainly.

6      Q.    -- to know what's out there?  When we think of

7  intelligence as being something with the military or

8  something like that, but competitive intelligence is

9  basically finding out what is happening in the

10  marketplace in as much detail as you can possibly find,

11  right?

12      A.    Correct, but you don't only get it from those

13  people.

14      Q.    Right.  You -- exactly.  You get it from

15  third-party sources, correct?

16      A.    We get it from our own people and our own

17  customers, too.

18      Q.    You get it from customers that you're

19  interacting with, right?

20      A.    Sure.

21      Q.    You talk to customers and you say, well, I see

22  you're buying this product or that product, why'd you do

23  that?  What was important to you?  That sort of thing,

24  right?

25      A.    Sometimes.

1    Q.   Right.  And you sometimes interview your own

2    customers to see what can we do better, what can we --

3    what kind of features can we add, right?

4    A.   We always talk to our own customers about our

5    own product, yes.

6    Q.   You would buy reports from companies like the

7    Gartner Group and other consultants to find out what was

8    going on in the software business, right?

9    A.   Which would tell us their view of the world,

10    yes.

11    Q.   And that along with all the other information

12    you would gather is part of this competitive

13    intelligence-type data that you would use -- that

14    Trilogy would use to help run their business, fair?

15    A.   Well, it -- I don't know how much it would

16    actually run the business versus help us with our

17    product strategy.

18    Q.   Well, with respect to this hierarchy access

19    feature, in spite of all that work that you did, it's

20    your testimony that Trilogy did, it's your testimony

21    that Trilogy never heard of hierarchical access, that

22    capability, that small feature, that Trilogy never heard

23    about it until after this lawsuit was filed, right?

24    A.   That's correct.

25    Q.   So this -- this feature that had been put into

1   SAP software, which you're now saying a piece of it, a

2   small capability of it, took your company form up to the

3   highest heights to the lowest lows and you didn't even

4   know about it until after the lawsuit was filed, right?

5        A.   That's correct.

6        Q.   When SAP released the hierarchy access feature

7   along with dozens of other updates, it notified its

8   customers, did it not?  You know that, right?

9        A.   That SAP notified its customers?

10       Q.   Right.

11       A.   I imagine they did.

12       Q.   Right.  Because certainly Trilogy, when it

13  makes changes in the software, adds features, different

14  capabilities, you'll send out some sort of release note

15  or memo that says, hey, there's 15 or 20 things that

16  we've added or changed, right?

17       A.   We would have that in release notes, yes.

18       Q.   And your customers get that?

19       A.   Our maintenance paying customers would get --

20       Q.   Right.

21       A.   -- that, yes.

22       Q.   Okay.  And you would expect that SAP's

23  customers to have gotten that as well?

24       A.   I'm not sure.  I don't know how SAP

25  communicates to their customers.

1      Q.   Now, with respect to this hierarchical access

2   capability, do I have it right, sir, that you're not

3   aware of any potential customer telling Trilogy that we

4   did not pick your software because we're going to choose

5   SAP's instead because of hierarchy access, right?

6      A.   Typically, when you lose sales deals, you don't

7   get notified to that low level detail of why you lost,

8   so that would be correct.

9      Q.   So no customer ever told you we're thinking

10   about going with Versata or Trilogy, but we decided to

11   go with SAP because we really like this hierarchy access

12   feature that's one of hundreds of features within their

13   pricing suite, no one ever told you that?

14      A.   Yeah, I don't know why they would.

15             THE COURT:  Well, if you can answer his

16   question with a yes or no, please, do so, okay?

17      A.   No, they never did.

18      Q.   (By Mr. Melsheimer)  They never did.  You know

19   that's kind of an important question, right, sir?

20      A.   I understand that certain parties believe

21   that's --

22      Q.   Well --

23      A.   -- an important question, yes.

24      Q.   -- sir, that's one of the reasons that we're

25   here taking four days, is in part to try to figure out

1  whether or not that little feature is what caused your

2  business to go to the bottom, that's what we're here to

3  talk about, right?

4      A.   I understand.

5      Q.   Okay.  Now, let's talk about -- okay.  You said

6  a minute ago that -- before the Judge's comment, you

7  said a minute ago that you don't -- you don't know, you

8  don't -- customers don't tell you why they're not doing

9  things, you don't know why you don't get sales; is that

10 what you said?

11     A.   That's what I said, yes.

12     Q.   Right.  That's not entirely true, is it, sir,

13 to be fair?

14     A.   What do you mean?

15     Q.   Well, you're overstating it, aren't you?

16     A.   I don't understand.

17     Q.   All right.  Well, in fact, the Jury, we've seen

18 documents that show that, in fact, Trilogy did know, did

19 know reasons why they weren't getting sales or why they

20 were losing customers; isn't that right, sir?

21     A.   I mean, we -- we certainly have a lot of

22 documents that are trying to figure out why we're losing

23 sales, yes.

24          MR. MELSHEIMER:  Well let's take a look at

25 824.

1    Q.   (By Mr. Melsheimer)   Now, if there's anybody

2  that knows anything about Trilogy in 1998, it's one Joe

3  Liemandt, right?

4    A.   That would be correct.

5    Q.   Founder of the company?

6    A.   Yes, sir.

7    Q.   Smart guy?

8    A.   Yep.

9    Q.   Spent basically 24/7 working at this company

10  during this time period, right?

11    A.   That's correct.

12    Q.   And he was very knowledgeable about what was

13  happening in the marketplace with Trilogy's customers

14  back in April of 1998, right?

15    A.   Yes.

16    Q.   April of '98 is months before SAP introduced

17  this small hierarchy access feature to its pricing

18  component of its ERP software, right, months?

19    A.   Yes.

20    Q.   And Mr. Liemandt tells us or tells the folks at

21  Trilogy that -- a couple things, the Lucent $15 million

22  deal, our arrogance and incompetence caused us to lose

23  this, right?

24    A.   That's what it says.

25    Q.   That's a reason for why they lost -- why you

1    lost the Lucent business because, again, I'm not saying

2    this, but this is what the head man says, said we were

3    arrogant and incompetent, right?

4         A.   That's what it says.

5         Q.   And then it says with respect to Pricer, that

6    the reason why you weren't getting Pricer sales was

7    because it was a poor value, poor value proposition into

8    SAP accounts, right?

9         A.   That's what it says.

10        Q.   Well, and when you say that's what it says,

11   you're not trying to tell the Jury you're disagreeing

12   with us, right?

13        A.   No, that's what Joe said.

14        Q.   And you agree with it?

15        A.   I don't know if I necessarily agree with it,

16   but Joe did say it.

17        Q.   So -- okay.  Poor value proposition, SAP

18   accounts, I believe Mr. Carter agreed with me that poor

19   value proposition means wasn't a good deal, right?

20   Wasn't perceived as a good deal by those customers?

21        A.   Or we weren't -- be able to convince them of

22   that, yes.

23        Q.   And that it was too maintenance technical, not

24   enough business benefits.  I think Mr. Carter told us

25   that, again, there were some -- maybe some technical

1    issues with the software, maintenance was complicated,

2    but in any event, there were not enough business

3    benefits, right?

4         A.    Apparently that's what this says for whatever

5    customers we were trying to sell in that quarter, yes.

6         Q.    And we can agree that back in April of 1998

7    there's no way to pin any of this on anything SAP did,

8    fair?

9         A.    I don't know how to answer that.

10        Q.    Okay.  Well, there's no suggestion by

11   Mr. Liemandt in this exhibit, sir, that any of the

12   problems they're having with Pricer back in 1998, in

13   April, months before -- months before the hierarchy

14   access feature was introduced, there's no suggestion

15   that any of this has anything to do with SAP, fair?

16        A.    I don't see anything in that e-mail, no.

17        Q.    So at least with respect to Mr. Liemandt, the

18   head of the company, he did seem to have a pretty good

19   idea at least as to some customers as to why they

20   weren't buying Pricer, right?

21        A.    He seemed to, yes.

22        Q.    But he's not the only one, is he, sir?

23        A.    The only one, what?

24        Q.    He's not the only one that had a sense of why

25   people weren't buying Pricer?

1          MR. MELSHEIMER:  Can we pull the Snyder

2    e-mail?

3      Q.   (By Mr. Melsheimer)  Scott Snyder was -- he's a

4    pretty important technical guy at Trilogy?

5      A.   He led our development organization, yes.

6      Q.   So a very smart software guy?

7      A.   I would suppose so.

8      Q.   Right.  You're not a software guy, are you?

9      A.   No, I'm not anymore.

10     Q.   I'm not either.  Okay.

11          MR. MELSHEIMER:  So do we have the --

12   Mr. Barnes, do we have that one?

13          VIDEO TECH:  Do you have the exhibit

14   number?

15          MR. MELSHEIMER:  It's easy if you have the

16   numbers.

17     Q.   (By Mr. Melsheimer)  So Mr. Snyder, this is in

18   December of 1998, and this is talking about, again,

19   accounts that we've lost due to SAP integration issues,

20   right?

21     A.   That's what it says.

22     Q.   And there we're talking about the ability for

23   the Pricer product to bolt on or interface with the SAP

24   product, right?

25     A.   I agree.

1    Q.   Certainly the folks at Trilogy accepted

2  responsibility that if you're going to try to sell a

3  product that's going to go with someone else's product,

4  it's -- the company that's selling that smaller product,

5  to make sure that it interfaces, right?

6    A.   I'm sorry.  I don't understand the question.

7    Q.   Well, I'm sorry.  Maybe that was complicated.

8         But I guess my point is, is that SAP

9  integration issues -- if you're selling to SAP customers

10 or you're selling to Oracle customers, right, you've got

11 to make sure that your product will work with their

12 bigger product.  You've got a little bitty product, and

13 you've got to make sure your product works with their

14 big product, fair?

15    A.   That's fair.

16    Q.   And that's what this SAP integration issue is,

17 is you were having problems getting the product to fit

18 with SAP back in December of 1998?

19    A.   That's what Scott's saying.

20    Q.   And that's the reason why you lost some

21 accounts, right, according to Mr. Snyder?

22    A.   According to Mr. Snyder.

23    Q.   Now I want to talk to you a little bit about

24 the market for SAP for -- for -- excuse me -- I want to

25 talk to you a little bit about the market that you had

1  for your products.

2           I think you -- you told us that -- and

3  you've heard this testimony that -- that your product

4  was kind of a bolt-on -- we just talked about that --

5  kind of a bolt-on to SAP's bigger product, right?

6       A.   That's fair.

7       Q.   Now, your -- your market, though, your

8  potential market, though, was beyond simply SAP

9  customers, right?

10      A.   What do you mean?

11      Q.   Well, you sold to lots of different companies,

12  including some companies that did not use SAP, fair?

13      A.   We targeted the Fortune 500, yes.

14      Q.   And the Fortune 500 is not all SAP, right?

15      A.   They're dominantly SAP.

16      Q.   Well, but let's talk about that for a second.

17  Just do some quick math.

18           Fortune 500, how many -- what percentage

19  is SAP, if you know?

20      A.   In what time period?

21      Q.   Well, let's talk about this time period, the

22  time period of '98, '99, 2000, 2001.

23      A.   Sure.

24      Q.   Do you know?

25      A.   Well, what I would say is, they're dominantly

1    an ERP vendor who was making a lot of money off the Y2K

2    coming up, and you have Oracle, who is an up and coming

3    player, and so they weren't quite there with their ERP

4    offering, so I would say SAP was significant.  Probably

5    over 50 percent.

6         Q.   Okay.  Over 50 percent?

7         A.   I think that's fair.

8         Q.   Okay.  Sure.

9         A.   It's probably higher, but that's a conservative

10   good number.

11        Q.   Can we say -- just for the purposes of our

12   little discussion here, let's say 60, just for argument

13   purposes.  Would that be fair?  55?

14        A.   Whatever you'd like to say.

15        Q.   Okay.  Let's just take 60, because really my

16   point is pretty simple.  Even were it as high as 60 --

17   and we're not saying it is, but even were it as high as

18   60 in the Fortune 500, that still leaves several hundred

19   companies that are not SAP.

20             Do I have the math about right?

21        A.   It could be, yes.

22        Q.   You talked about Silicon Graphics in your

23   testimony with Ms. Fitzgerald, right?

24        A.   That's correct.

25        Q.   And Silicon Graphics, you said was a deal that

1   they purchased it because of Pricer, right?

2       A.   That's correct.

3       Q.   Silicon Graphics is an Oracle customer; isn't

4   that right, sir?

5       A.   I believe they were at the time, yes.

6       Q.   So they weren't an SAP customer when you sold

7   them Pricer; they were a customer of Oracle, right?

8       A.   That -- I believe so, yes.

9       Q.   All right.  Sun is a company that you sold

10  Pricer to, right?

11      A.   That's correct.

12      Q.   And Sun is an Oracle customer, right?

13      A.   Well, they're owned by Oracle now, so yes.

14      Q.   Well, that's now, but we're not talking about

15  at this moment, sir.  I'm talking about, when you sold

16  it to them, you knew that Sun ran Oracle when you sold

17  it to them, right?

18      A.   Absolutely.

19      Q.   Okay.  They've since been purchased.

20      A.   They have, yes.

21      Q.   Right.  NCR is a company that was on your chart

22  that you sold Pricer to, right?

23      A.   They were.

24      Q.   NCR runs Oracle, doesn't it, sir?

25      A.   They very well might.  I don't recall.

1    Q.   And the Fortune 500 doesn't include the

2  thousands and thousands of midsized to smaller companies

3  that Mr. Carter testified they were also trying to sell

4  Pricer to, fair?

5    A.   Well, that's fair, yes.

6            MR. MELSHEIMER:  May I have just a moment,

7  Your Honor?

8            THE COURT:  Yes.

9            (Pause.)

10   Q.   (By Mr. Melsheimer) Going back to the

11  integration issues, that some people had difficulty

12  making your Pricer software work with either their

13  Oracle software or their SAP software, do you remember

14  that testimony, sir?

15   A.   Do I remember the testimony from when?

16   Q.   Well, do you remember that issue, that being an

17  issue back in '98, '99, 2000?

18   A.   Integration issues are always part of

19  enterprise software, but yes.

20   Q.   And that was certainly an issue at Trilogy,

21  right?

22   A.   Yes.

23   Q.   Specifically with respect to Pricer, right?

24   A.   Not exclusive to Pricer, but yes.

25   Q.   Okay.  And one thing I've been meaning to ask,

1  so when Trilogy installed Pricer at Trilogy, did you

2  have those same kind of technical issues?

3      A.   Well, what do you mean?  When we install our

4  own product in our own location?

5      Q.   When you used Pricer to run Trilogy's pricing,

6  did you have trouble making it work?

7      A.   I don't understand the question.

8      Q.   Well, maybe ask it this way:  You didn't use

9  Pricer at Trilogy, did you?

10     A.   Did we use our own products on a day-to-day

11 basis?

12     Q.   That's not my question.

13     A.   Okay.

14     Q.   Did you use Pricer to do pricing at Trilogy?

15     A.   No, we didn't.

16     Q.   So you never had to worry about the technical

17 issues of, quote, installing it because you didn't use

18 Pricer at Trilogy to do your pricing, fair?

19     A.   I don't think I agree with that at all.

20     Q.   You didn't use Pricer to do your pricing at

21 Trilogy.  You agree with that, though.

22     A.   Well, I do agree with that.

23     Q.   We heard some testimony about BAPIs.  BAPI is

24 kind of an interface between one software program and

25 another.  Is that a rough approximation of it, sir?

1     A.   It's my understanding.

2     Q.   Now, Trilogy and SAP were competitors, right?

3     A.   Yes.

4     Q.   They competed very hard against each other?

5     A.   In certain spaces.

6     Q.   There's some information -- you heard

7 Mr. Carter talk about some information yesterday that

8 Trilogy shared with SAP, right?

9     A.   I did.

10    Q.   You heard Mr. Carter say that there's some

11 information that Trilogy kept secret from SAP, right?

12    A.   I heard that, yes.

13    Q.   And certainly there's nothing wrong with the

14 concept of not sharing information with a competitor,

15 right?

16    A.   Certainly not.

17    Q.   You said -- now, we heard some testimony

18 yesterday from Mr. Dholakia that SAP didn't create this

19 BAPI for Trilogy.  You heard that?

20    A.   I did hear that, yes.

21    Q.   Do you have any idea of how expensive it would

22 be for SAP to create a BAPI just between SAP software

23 and Trilogy Software?  Do you have any idea of cost

24 associated with that?

25    A.   I do not.

1      Q.    Do you have any idea of how much effort it
2  would require SAP to make that BAPI for Trilogy?
3      A.    I don't.  I wouldn't imagine it would take a
4  lot, because they've done it for others.
5      Q.    But you don't know.
6      A.    No, sir.
7      Q.    Now, this patent, this '350 patent, is not a
8  patent on a BAPI, right?
9      A.    Oh, no.  No, it's not.
10     Q.    It's not a patent that deals with the technical
11 interface between two software programs, right?
12     A.    That's correct.
13     Q.    Now, I heard Mr. Dholakia and I thought I heard
14 Mr. Carter say that the company sort of gave up trying
15 to sell Pricer in about 2000, 2001.  Is that a fair
16 recollection?
17     A.    What I recall I heard is that we stopped trying
18 to sell new customers Pricer, but we had lots of
19 customers still on Pricer that we invested in.
20     Q.    So you didn't -- so starting around 2000 or
21 2001, you stopped selling it for new customers, but you
22 still supported your old customers; is that fair?
23     A.    Yeah.  I don't know if I agree we stopped
24 selling it.  It's still for sale.  But we didn't have a
25 large investment behind it, no.

1    Q.   You weren't actively attempting to sell Pricer

2  from 2001 on to new customers, right?

3    A.   Well, we actively try to sell Pricer even

4  today.

5    Q.   So you would disagree with Mr. Carter or

6  Mr. Dholakia that you basically stopped the business for

7  new customers in about 2001?

8    A.   I -- I would disagree with that.  We stopped

9  the heavy investment in the marketing of it, but the

10  product is still for sale and has been for sale.

11           MR. MELSHEIMER:  Just one moment, Your

12  Honor.

13           (Pause.)

14           MR. MELSHEIMER:  Thank you, Mr. Smith.

15           THE COURT:  Redirect?

16           MS. FITZGERALD:  Just a few questions,

17  Your Honor.

18           REDIRECT EXAMINATION

19  BY MS. FITZGERALD:

20    Q.   Mr. Smith, let's take a look at DX910.

21           MS. FITZGERALD:  And, Mr. Diaz, can you

22  pull up the revenue percentage chart that we looked at

23  earlier with -- there it is.

24    Q.   (By Ms. Fitzgerald) Do you recall being asked

25  about this chart on cross-examination?

 1      A.   I do, yes.

 2      Q.   Now, this says Revenue Percentage By Product.

 3  What is this a revenue percentage of?

 4      A.   Well, as it states, it's a percentage of

 5  revenue by product compared to all the other products

 6  that we have.

 7      Q.   We see the percentage for Pricer falling,

 8  right?  That's the point that was made on

 9  cross-examination?

10      A.   That's correct.

11      Q.   If overall revenue for other products was --

12  was going up, would you expect to see the Pricer

13  percentage go down?

14      A.   I would absolutely expect the revenue

15  percentage to change based on that, yes.

16      Q.   You were also asked about DX957, which is an

17  e-mail from someone named Howard Thompson.  Do you

18  recall that?

19      A.   I do, yes.

20      Q.   Who was Howard Thompson?

21      A.   He was a developer in our development

22  organization.

23      Q.   And when did he write this e-mail?

24      A.   I'd have to look at it again.  I'm sorry.  I

25  don't remember the date.

```
 1        Q.    Do you remember the circumstances under which
 2   he wrote the e-mail?
 3        A.    I do.   There's --
 4        Q.    And it was -- it looks like it was -- well, you
 5   can see the date there for yourself, December 31st,
 6   1998.
 7        A.    Thank you.
 8              I do remember the circumstances of this
 9   particular e-mail, and I think if -- if we saw the whole
10   e-mail, we'd see a little more, too.
11              But there were a set of people at Trilogy
12   like Howard that came to the company with the motive of
13   actually making a significant amount of money in
14   options.
15              And, you know, frankly, in that
16   competitive timeframe, you know, we're competing on
17   getting high -- high-caliber talent, you know, against
18   Microsoft and all of these top-tier companies, and so we
19   have to look pretty attractive.
20              But in order for people to come to us,
21   they also acknowledge they're giving up some of those
22   things, too.   Microsoft has options, real options.
23   We're a private company.   We don't have those.   And so
24   you get other things, maybe higher salary and other
25   benefits and things like that.
```

1              You know, Howard got to the point where he
2    didn't like what he was doing, and he wasn't working on
3    new products, and he kept looking back at all the
4    options from Microsoft and these other companies, and he
5    just wanted to leave.
6         Q.    Thank you.
7              Next, let's look at DX860, which I believe
8    was the customer survey document or the client
9    satisfaction study that you were asked about on
10   cross-examination.
11             MS. FITZGERALD:  And let's turn to the
12   page that ends in 8581, which I believe is Page 33 of
13   the document.
14        Q.    (By Ms. Fitzgerald) So what do you see on this
15   page here?
16        A.    It appears to have some positive comments
17   regarding the consulting staff.
18        Q.    And, you know, I see multiple comments here.
19   These consultants are excellent.  They're great with
20   technical problems.
21             Now, you don't -- you don't disagree with
22   Mr. Melsheimer that there was definitely some negative
23   feedback in this document, do you?
24        A.    Oh, absolutely not.
25        Q.    But was the feedback all bad?

```
 1        A.    No, it was not.  And we did ask our customers
 2   to be very truthful.
 3        Q.    Thank you.
 4              MS. FITZGERALD:  We can take this one
 5   down, Mr. Diaz.
 6        Q.    (By Ms. Fitzgerald) The next document I'd like
 7   you to take a look at is DX824.  This is the e-mail you
 8   were asked about in cross-examination from Mr. Liemandt.
 9              In hindsight, do you believe that
10   Mr. Liemandt was correct in his belief as to why
11   customers weren't buying Pricer back in April 1998?
12        A.    No, not really.
13        Q.    And why is that?
14        A.    You know, just -- this is just the culture of
15   the software industry.  It's a very -- it's very
16   different than manufacturing and some of the other
17   industries.  It's a very motivating, very high-pressure,
18   excel, exceed your goals.
19              And, you know, Joe is, I would say,
20   outstanding at motivating people in that manner.  And
21   so, you know, a lot of the things he says is actually to
22   motivate the people to do better.
23              And, you know, his -- his views on that
24   are a little harsher probably than others, but, you
25   know, he wanted people to excel.  He believed in this
```

1    product, and he thought we could do better.

2        Q.   At the time that Mr. Liemandt wrote this e-mail

3    in 1998, was anyone at Trilogy aware of the fact that

4    SAP was planning or was going in the future to -- or

5    planning to introduce hierarchy access?

6        A.   No, not to my knowledge.  We were not aware of

7    that at all.

8        Q.   I also want to ask you about a customer that's

9    listed in this e-mail.

10               MS. FITZGERALD:  I think we need to blow

11   back out to the entire e-mail.

12       Q.   (By Ms. Fitzgerald) And you can see that under

13   the heading, Top 10 List for End of Year, it says Lucent

14   for 15 million.

15               Now, going back to the -- the customer --

16   and we also see Sun for 15 million.  Did Lucent and Sun

17   become Trilogy customers?

18       A.   Absolutely.

19       Q.   And let's take Lucent.  Do you recall how long

20   Lucent stayed a Trilogy customer?

21       A.   Lucent is still a Trilogy customer.

22       Q.   Still today?

23       A.   Still today.

24       Q.   And you were also asked a couple more questions

25   about the market by Mr. Melsheimer, and I just want to

 1    ask you one general question.

 2              Are you aware of any pricing product in

 3    the market from 2006 until now that has the benefits of

 4    Mr. Carter's invention but doesn't practice his patent?

 5        A.   No.  We're not aware of any product like that.

 6        Q.   Thank you.

 7              MS. FITZGERALD:  I'll pass the witness.

 8              MR. MELSHEIMER:  May we approach briefly,

 9    Your Honor?

10              THE COURT:  Yes.

11              (Bench conference.)

12              MR. MELSHEIMER:  So this witness, in

13    response to the Thompson e-mail, he said if we could see

14    more of the e-mail, and I'm -- and, of course, it's up

15    there redacted at their request.

16              MS. FITZGERALD:  Well, at the time he

17    answered that question, all you could say was the date,

18    the name, and the to and from, and you couldn't see all

19    the complaints that are still clearly in the record.  I

20    think that's what he was referring to.

21              MR. MELSHEIMER:  He said if we could see

22    more of it, we could see, quote, a lot of other things,

23    and I submit that they've waived their objection to

24    that, and I should be able to go --

25              MS. FITZGERALD:  We don't waive our

```
 1   objection.  I believe he was talking about the --
 2                THE COURT:  It's a close question.  I'm
 3   going to stick with it being redacted.
 4                MS. FITZGERALD:  All right.  Thank you.
 5                (Bench conference concluded.)
 6                    RECROSS-EXAMINATION
 7   BY MR. MELSHEIMER:
 8       Q.   Mr. Smith, just a couple of quick questions.
 9                So just so we're all on the same page,
10   860, the survey, does have some positive feedback,
11   right?
12       A.   Yes, it does.
13       Q.   I mean, it's -- it's a hundred pages or more,
14   and some of it's positive, right?
15       A.   Correct.
16       Q.   But the conclusion -- the conclusion is that
17   there needs to be substantial improvement for Trilogy to
18   be successful; isn't that right?
19       A.   That is right, and that's the desired outcome
20   we wanted.
21       Q.   Let's just take a look at Page 124 under
22   Conclusions and Recommendations.
23                Improvements in critical areas of
24   performance will be needed to improve perceptions of
25   Trilogy's competitive standing in the industry and to
```

 1  increase the likelihood that clients will consider

 2  Trilogy for providing future services.

 3          The majority of respondents view Trilogy's

 4  services as about the same or not as good compared to

 5  other firms with which they are familiar.

 6          That's what it says, correct?

 7     A.    That's what it says, correct.

 8     Q.    And with respect to the -- your disagreement

 9  with Mr. Liemandt on Exhibit 957 --

10          MR. MELSHEIMER:  Do you have that,

11  Mr. Barnes?

12     Q.    (By Mr. Melsheimer) Make something clear,

13  that --

14          MR. MELSHEIMER:  Strike that.

15     Q.    (By Mr. Melsheimer) I'm sorry.  You were

16  disagreeing about another Mr. Liemandt e-mail, not this

17  one.  This is the Howard Thompson resignation e-mail.

18  Are you with me?

19          MR. MELSHEIMER:  957.

20     A.    Sorry.  Is that -- was that a question?

21     Q.    (By Mr. Melsheimer) I'm sorry.  Let me -- just

22  let me restate to orient you, sir.

23          957, this is the Howard Thompson e-mail.

24     A.    Yes, sir.

25     Q.    His resignation e-mail.

1     A.    That's correct.

2     Q.    All right.  Now, you've had a chance to look at

3  this before, haven't you?

4     A.    It's been a while.

5     Q.    Right.  But, I mean, let's not -- there's no

6  mystery about this.

7     A.    Okay.

8     Q.    You knew this trial was going to be on, and one

9  of the things you looked at was a lot of e-mails, right?

10    A.    Yes, sir.

11    Q.    And you looked at this e-mail.

12    A.    Yes.

13    Q.    Okay.  So it's not just Mr. Thompson's view --

14 he's not the -- he's not the lone ranger on his views of

15 what's wrong with Trilogy, right?

16    A.    I think every company has people that are like

17 Mr. Thompson.  So, yes, he's not the only one.

18                THE COURT:  Well, I think his question

19 was:  Was he the only one at Trilogy that had shared

20 those views?

21                THE WITNESS:  I'm sorry.

22    A.    He probably was not.

23    Q.    (By Mr. Melsheimer) Did you understand my

24 question?

25    A.    I would just say -- how about if you ask me one

1    more time and I just answer it?  Sorry.

2        Q.   I know you want to suggest that there's other

3    companies out there, too, but this is a case about

4    Trilogy.

5             So I'm asking you, isn't it true that

6    Mr. Thompson was not alone in his negative views about

7    Trilogy's software, about customer issues, about

8    technology, that he was not a lone ranger as to those

9    opinions, right?

10       A.   That would be correct.

11       Q.   In fact, Mr. Liemandt says there's about 50

12   people at Trilogy.  Do you think he's wrong about that?

13       A.   I think Joe's a pretty good gauge.  If he said

14   it, he probably believed it.

15       Q.   Okay.  Not so much about the earlier e-mail

16   when he was talking about what -- why Pricer wasn't

17   selling, but with respect to this one, you think he's

18   about right?

19       A.   That's what he's saying.

20               MR. MELSHEIMER:  Thank you, Mr. Smith.

21               THE COURT:  Redirect?

22               MS. FITZGERALD:  Nothing further.

23               THE COURT:  All right.  You may step down.

24               THE WITNESS:  Thank you.

25               THE COURT:  Who will be your next witness?

1          MR. POLLINGER:  Your Honor, Steve

2    Pollinger here for the Plaintiff, Trilogy.  We would

3    like to call Mr. Neeraj Gupta, our first expert witness.

4          THE COURT:  Okay.

5          (Witness sworn.)

6          NEERAJ GUPTA, PLAINTIFFS' WITNESS, SWORN

7               DIRECT EXAMINATION

8    BY MR. POLLINGER:

9      Q.   Good morning, Mr. Gupta.

10     A.   Good morning.

11     Q.   Could you tell the ladies and gentlemen of the

12   jury a little bit about yourself?

13     A.   Yes.  My name is Neeraj Gupta, and I'm a

14   computer scientist.  I grew up in a small town in

15   California, Hayward, California, and I've lived in

16   Austin, Texas, for the past 16 years.

17          I've been married for 13 years.  I have

18   three small children.  And I've been in the business and

19   technology world for my professional career.

20     Q.   Mr. Gupta, what is your role in this case?

21     A.   I've been retained by Versata as an expert to

22   offer an opinion on two topics.  The first is regarding

23   demand for Mr. Carter's invention, and the second is

24   whether or not SAP's modified software continues to

25   infringe Mr. Carter's patents.

1    Q.   Can you tell us about your education, your

2  degrees?

3    A.   Yes, sir.  I have a bachelor's degree and a

4  master's degree in computer science from MIT.  I'm also

5  a graduate of Harvard Business School Executive

6  Education Program.

7    Q.   Can you tell the jury about your experience in

8  computer programming, when you started, how long you've

9  been doing it for?

10    A.   Yes.  I started computer programming at the age

11  of seven.  That was the first program I wrote.  And I've

12  been programming ever since.  I have been programming

13  professionally for 17 years now, 18 years.

14    Q.   What is your professional experience in

15  computer programming?

16    A.   I started out as a researcher at Xerox and some

17  of its affiliated companies and have been a programmer

18  at Trilogy for quite some time.

19    Q.   This case is about Mr. Carter's invention and

20  its use in Trilogy's Pricer product and in SAP's

21  infringing products.  Do you bring any special expertise

22  to this case?

23    A.   Yes, sir, I do.  As I mentioned, I worked at

24  Trilogy for 13 years, so I'm quite familiar with the

25  technology that we're talking about.  I've been in both

1  technical and business roles around the Pricer product.

2      Q.    Mr. Gupta, do you own any stock in Trilogy?

3      A.    No, sir, I do not.

4      Q.    What do you currently do?

5      A.    I currently run a consulting company.  We focus

6  in consulting in patent litigations such as this one.

7      Q.    Are you involved with any other companies?

8      A.    Yes, sir, I am.  I serve on the board of

9  advisors of three technology companies in Austin, Texas.

10     Q.    What did you review to do your analysis in this

11  case?

12     A.    I've reviewed quite a bit of the evidence.

13  I've reviewed the evidence in the previous determination

14  that SAP infringed Mr. Carter's patents.  I've reviewed

15  deposition testimony.  I've talked to some of the people

16  involved in the case.

17              I've used SAP's found-to-be-infringing

18  software, as well as SAP's software after the change

19  they've made to attempt to avoid the infringement.

20     Q.    Mr. Gupta, does your consulting company charge

21  for your work in this case?

22     A.    Yes, sir, they do.  They charge my rate at $400

23  an hour.

24     Q.    Does your pay or your company's pay depend on

25  your testimony in this case or the outcome of this case?

1      A.    No, sir, it does not.

2      Q.    Before we go into the details of your analysis,

3   let's get an overview of your opinions?

4                    It was determined in 2009 that SAP has

5   infringed Mr. Carter's '350 patent.  That's a given for

6   this case.

7      A.    Yes, sir, that is correct.

8      Q.    For damages, first issue here, owed by SAP to

9   Trilogy for the infringement, what did you do?

10     A.    I determined whether or not customers wanted

11  the invention, whether there was market demand for the

12  invention.

13                   MR. BATCHELDER:  Your Honor, may we

14  approach?

15                   THE COURT:  Pardon me just a second.

16                   (Bench conference.)

17                   MR. BATCHELDER:  His opinions and

18  testimony are confined -- they have to be confined to

19  infringement and design out.  And I think

20  Mr. Pollinger's questions just now is, they're an

21  established infringer, and then he moved on from there

22  to damages.

23                   There's a strong suggestion that the

24  damages that he's talking about are from the prior

25  period.  His testimony has to be confined to only the

1    design out period from May 2010 to today.  It has to be

2    made clear.

3                     MR. POLLINGER:  That's not correct.

4                     THE COURT:  Why is that?  Why does it have

5    to be so confined?

6                     MR. BATCHELDER:  That's what this -- the

7    only infringement issue on the table in this trial is

8    whether the modified software from a year ago infringes.

9    Anything else is about valuation.

10                    MR. POLLINGER:  Well, that's correct, but

11   he gave two opinions in his expert report.

12                    THE COURT:  That's right.

13                    MR. POLLINGER:  One was on whether the

14   design out continues to infringe.  That's from 2010

15   forward.  His other opinion was about the value of the

16   invention both in Trilogy's product and SAP's product.

17   That goes from 2003 forward.

18                    Our other experts have relied upon that in

19   their damages opinion.  He's not given the ultimate

20   number, but he certainly has -- he has set forth in his

21   expert report the -- this analysis of demand for the

22   invention as part of his opinion.  He was deposed on

23   that.

24                    THE COURT:  That's -- I've read his

25   report.  I mean, why -- why can't he give that

1  portion -- I mean, I've excluded the royalty

2  calculation, but the -- to the extent he gave opinion in

3  his report that related to the demand for the invention

4  by virtue of the Pricer product, I think it has some

5  relevance to lost profits.

6              I'm going to overrule your objection.

7              MR. BATCHELDER:  Thank you.

8              (Bench conference concluded.)

9    Q.   (By Mr. Pollinger) You need to raise the mic or

10  maybe turn the volume up on that mic.  Is that possible?

11   A.   Is that better?

12   Q.   Or just get a little closer to the mic.

13   A.   Great.  Sorry.

14              THE COURT:  You're asking the wrong

15  person, Mr. Pollinger.  Ms. Lockhart here is the

16  technical expert.  Let's try it with him --

17              THE WITNESS:  No.  That's okay.  I'm happy

18  to speak closer to the microphone.

19              MR. POLLINGER:  Thank you.

20              Thank you, Ms. Lockhart.

21   Q.   (By Mr. Pollinger) Mr. Gupta, the question I

22  have is, with respect to the infringement that was

23  determined in 2009 for the damages here owed by SAP to

24  Trilogy for the infringement, what did you do?

25   A.   I went to determine whether or not customers

1    wanted the invention, whether or not there was actually

2    market demand for the invention, and in that I

3    determined that there was market demand for the

4    invention.

5        Q.    Now, SAP is suggesting that the infringing

6    software has little value because supposedly no one uses

7    it.  Do you agree?

8        A.    No, sir, I do not.

9              First -- and I want to make it very

10   clear -- that the way these claims are written, use is

11   not required to infringe.  But even with that said, I've

12   seen lots of evidence of use and demand for the

13   product -- for the invention.

14       Q.    Okay.  So as far as our overview goes, that's

15   your first topic:  Demand for the invention.

16             The second topic:  The infringement

17   question in this trial is whether SAP is still

18   infringing after May 2010.  Can you tell us upfront what

19   your opinion is on that?

20       A.    Yes.  SAP continues to infringe.

21       Q.    Let's turn to the details of your analysis.

22             If we could, Mr. Gupta, let's talk about

23   the invention in Mr. Carter's '350 patent.

24       A.    Okay.

25       Q.    We have slides on that from the 2009

1    presentation.  Should we turn to those?

2        A.   Okay.

3              MR. POLLINGER:  If we could, Mr. Diaz, go

4    to presentation one, Slide 1.

5        Q.   (By Mr. Pollinger) Is this here the cover sheet

6    of the '35 patent -- '350 patent on Mr. Carter's

7    invention?

8        A.   Yes, sir, it is.

9        Q.   How far back does Mr. Carter's patent go in the

10   Patent Office?

11       A.   This patent goes back to 1996.

12       Q.   That's what we see here?

13       A.   Yes, sir.

14       Q.   That's when the drawings and the technical

15   specification in his patent was first filed with the

16   Patent Office?

17       A.   Yes, sir, that's correct.

18       Q.   That's why it's called a continuation; is that

19   correct?

20       A.   Yes, sir.

21       Q.   The '350 patent, that's the one patent that's

22   in this case, right?

23       A.   That is correct.  Three claims of that one

24   patent.

25       Q.   Now, the latest filing date at the Patent

1  Office for this patent is 1999?

2      A.   Yes, sir.

3      Q.   But in terms of staking his -- his -- putting

4  his stake in the ground, in terms of the drawings and

5  the specification, the relevant date is 1996; is that

6  right?

7      A.   Yes, sir, that's correct.

8      Q.   Is that called the effective filing date of the

9  Patent Office?

10     A.   Yes, sir, it is.

11     Q.   That 1996 date, how far before is that when SAP

12  added the hierarchical access software to its products?

13     A.   It's just over two years before.

14     Q.   That's the software in SAP's products that was

15  determined to infringe in 2009; is that correct?

16     A.   That is correct.

17     Q.   Now, we see here the patent issued in 2003?

18     A.   Yes.

19     Q.   Is that when liability can first start under

20  the patent?

21     A.   That is when Versata can first seek damages,

22  that's correct.

23     Q.   What do we see here on this next slide from

24  Mr. Carter's '350 patent?

25     A.   On this slide, we see a front page of the

1  patent and listed are the three claims at issue in this

2  matter.  These are the three claims that SAP was found

3  to infringe.

4       Q.   And just for the record, these are Claims 26,

5  28, and 29?

6       A.   Yes, sir, they are.

7       Q.   What do we see on this next slide here?

8       A.   This slide lists the SAP products that were

9  determined to infringe those three claims in 2009.

10      Q.   Could you please, for the record, read those

11  out for us?

12      A.   Yes.  The listing is SAP's R/3 product,

13  Versions 4.6B, 4.6C; Enterprise 47x110; Enterprise

14  47x200; and then also mySAP ERP, Versions 2004, 2005

15  which is also known as 6.0.

16            And then in the CRM family, we see CRM

17  2.0C, 3.0, 3.1, 4.0, 5.0, 6.0, and 7.0; CRM 3 through 4

18  are also sometimes called IPC 3.0 and 4.0, and CRM 6.0

19  is sometimes referred to as CRM 2007.

20      Q.   Mr. Gupta, were all of these products, these

21  infringing products, determined to infringe each of the

22  three claims in this case, 26, 28, and 29?

23      A.   Yes.  SAP was found to directly infringe Claims

24  26, 28, 29; also found to indirectly infringe Claim 29.

25      Q.   Is there a particular part of these infringing

1   products that was determined to infringe the patent in

2   2009?

3       A.    Yes.  It was the computer instructions capable

4   of implementing SAP's hierarchical access execution

5   engine for all of the claims for all of these products.

6               And then for Claim 26, there were

7   additional computer instructions around arranging the

8   hierarchy and storing the pricing information.

9       Q.    How does the nature of the infringement compare

10  in these products?

11      A.    The nature of the infringement is the same.

12      Q.    The jury here will be asked to decide what the

13  damages should be for SAP's infringement by these

14  products.

15      A.    Yes, that's the question.

16              MR. POLLINGER:  If we can go to Slide 5,

17  please.

18      Q.    (By Mr. Pollinger) Mr. Gupta, what is shown on

19  this timeline here?

20      A.    There are quite a few things shown on this

21  timeline.  To the left of the red line, we see the world

22  as it existed before Mr. Carter's invention was filed,

23  and that is specific to the old SAP's R/3 system, which

24  had an issue of too many tables, too many accesses.  And

25  for the jury, we will get into that in detail.

1          The red line represents when Mr. Carter

2     filed for his patent and he solved those issues.

3          And then sometime to the right of that red

4     line, SAP added the now found infringing hierarchical

5     access software into their systems.

6     Q.   And what is the -- the date associated with

7     this red line?

8     A.   That red line is June 17th, 1996.

9     Q.   That's the -- the first filing date for the

10    '350 patent, the one patent at issue in this case?

11    A.   Yes, sir, it is.

12    Q.   Where does Trilogy's Pricer product, based on

13    Mr. Carter's invention, where does it fall with respect

14    to this red line?  Is it on the left, or is it on the

15    right?

16    A.   It's on the left of the red line.  My

17    understanding is the first sale of that Pricer product

18    was sometime in late '95.

19    Q.   And how does that compare to when SAP added the

20    hierarchical access software to its products?

21    A.   It was before SAP added their software.

22    Q.   Almost three years?

23    A.   Yes, sir, about three years.

24    Q.   The 2009 determination was about this

25    hierarchical access software.  In this case, in terms of

1  damages and infringement after May 2010 is also about

2  this hierarchical access.  So let's -- let's talk about

3  that a little bit.

4           Here we have on the screen one of SAP's

5  documents.  It's PX19.  What does this say about SAP's

6  hierarchical access software?

7      A.   Well, this -- this slide is actually talking

8  about the world before SAP released its hierarchical

9  access software.

10          We see that before hierarchical accesses

11  in the SAP system, you would need to create many tables

12  and many accesses to those tables and that that would

13  represent a major drawback when dealing with special

14  data, such as product hierarchies or customer

15  hierarchies.

16     Q.   What does this next slide show from the patent

17  and the SAP document, PX19?

18     A.   From the patent -- this is the background

19  section of the patent.  It shows that Mr. Carter, in his

20  background section and in SAP's manuals, are very

21  similar.  They both describe the old SAP product as

22  requiring a number of tables and a number of accesses.

23     Q.   On the -- oops.  On the left here, where do I

24  see the patent talking about a number of accesses?

25     A.   Oh, I'm sorry.  That's the word queries.  The

1  patent uses the term query to represent access.  They're

2  the same thing.

3      Q.   Mr. Gupta, would it be helpful if I gave you a

4  laser pointer?

5      A.   That would be great.

6           MR. POLLINGER:  Your Honor, could I

7  approach the witness?

8           THE COURT:  Yes.

9           MR. POLLINGER:  If we could go to Slide 9,

10 please.

11     Q.   (By Mr. Pollinger) The next slide here shows

12 another SAP document.  This is PX145.  What does this

13 document say about maintenance and performance?

14     A.   Again, this is describing the SAP system before

15 they added the hierarchical access and you can see in

16 the yellow highlight over here that the old SAP system

17 had the disadvantages of lots of maintenance and reduced

18 system performance, which is what Mr. Carter was talking

19 about with the inflexibility and the slow speed of the

20 SAP system.

21     Q.   What does this slide here show from the patent

22 and that SAP document, PX145?

23     A.   This -- this slide describes the world after

24 Mr. Carter's patent and with SAP's infringing

25 hierarchical accesses as having the same advantages,

1  specifically a speed advantage, because of the patented

2  invention and then also a simplified maintenance because

3  of the patented invention.

4      Q.    Do we have an illustration to describe the

5  problem in SAP's old products before they added the

6  infringing software?

7      A.    Yes.  This was used in the previous

8  determination, and I think it's appropriate.  I know

9  there's a lot of stuff on the slide over here, so bear

10  with me, please.

11              We liken -- I liken the older SAP system

12  to being like fishing, fishing with a pole specifically.

13  And we'll talk about these fish on the screen, but that

14  represents pricing information, how much something

15  costs, what's the discount, how much tax.

16              In Mr. Carter's patent, he teaches people

17  to use hierarchies of groups to find appropriate pricing

18  information, and that's what you see here.  It's one of

19  the figures from the Carter patent.

20              And what's described in the old SAP system

21  and how it would deal with those types of hierarchies,

22  in the old SAP system, you would cast your pole, try to

23  find a fish in one of these many tables.

24              If you could find that pricing

25  information, great.  And if you couldn't, you would reel

1   it in, cast again, and work your way up the hierarchy

2   until you could find the fish you were looking for.

3                I'll depict that with these try, try, try

4   fishing pole icons, and then when you finally have one,

5   you have what you're looking for and you can stop.

6                We won't be talking about fishing too

7   much, but on the bottom right, we see that SAP's system

8   does have a number of tables with which it would fish

9   into, and I'll show -- I have a demonstration of this,

10  Mr. Pollinger, if we could go to that.

11               MR. POLLINGER:  Mr. Diaz, if we could run

12  the animation, please.

13     A.    We're going to show how that fishing analogy

14  now applies into more technical detail in the old SAP

15  system.

16               Mr. Carter's patent teaches two types of

17  hierarchies:  A customer hierarchy and a product

18  hierarchy.  And the old SAP system, there would be

19  tables that represented combinations of information from

20  these types of hierarchies.

21               It would fish in the first table, and if

22  it couldn't find what it was looking for, the pricing

23  information, it would fish in the next table.  Again, if

24  it could not find the pricing information it was looking

25  for, it would fish in the next table, onward and onward

1  and onward.

2            I believe you heard Mr. Carter testify

3  that it would be not uncommon to have hundreds of these

4  tables in pricing systems.  So you can imagine, if

5  you're looking for sophisticated, complicated pricing,

6  the number of different times you have to fish would be

7  large, and this is what causes the system to be slow and

8  hard to maintain.

9       Q.   (By Mr. Pollinger) Okay.  That was the problem

10  in -- in SAP's old products.  Let's now turn to

11  Mr. Carter's solution in the '350 patent.  Do we have an

12  illustration for that?

13      A.   Yes.  Mr. Carter's invention is a lot like

14  fishing with a net, which is far more efficient but

15  different than fishing with a pole.

16      Q.   Do we have an animation on that?

17      A.   I do.

18            MR. POLLINGER:  Could we go to that,

19  please?

20      Q.   (By Mr. Pollinger) And please describe it to

21  us, if you would.

22      A.   Again, here we see the same type of hierarchy,

23  but now using Mr. Carter's invention.  What Mr. Carter

24  teaches everyone to do is to instead fish with a net.

25  And when you go to fish, go pick up all of the fish, all

1    of the pricing information that you might need in

2    calculating the price.

3              Now, in Mr. Carter's invention, you

4    actually do get more fish than you're going to use.

5              So then he also then says sort and order

6    the fish or the pricing information from the least to

7    most specific.

8              Eliminate the pricing information that

9    you're not going to use because it's less restrictive.

10             And finally, apply the pricing information

11   that you are going to use to get the price.

12             We can see that in Mr. Carter's invention,

13   he fishes with the net; he sorts the information; he

14   eliminates what he's not going to use; and then he does

15   apply what he is.  You get to the same answers but in a

16   far more efficient manner.

17             MR. POLLINGER:  Could we go to Slide 19,

18   please, Mr. Diaz?

19        Q.   (By Mr. Pollinger) What is shown here,

20   Mr. Gupta?

21        A.   What we're looking at here is Claim 26 of

22   Mr. Carter's patent.  It's the most detailed of the

23   three claims that are in this case.

24             What I call out on this particular slide

25   are some of the claim words, but then more importantly,

1  just -- just to orient everybody, we're looking at the

2  four specific places where Mr. Carter had his key

3  inventions, the retrieve, sort, eliminate, and apply

4  steps.

5      Q.   What's shown on this next slide here from the

6  patent?

7      A.   We show one of the technical diagrams in

8  Mr. Carter's patent describing and teaching everybody

9  how to do what he's claiming.  And, again, you see the

10 same steps of the retrieve, sort, eliminate, and apply,

11 which are called out in Mr. Carter's teaching diagram.

12           MR. POLLINGER:  If we could go to

13 Slide 22, please.

14     Q.   (By Mr. Pollinger) Okay.  We've talked about

15 the problem in SAP's old product.  We've talked about

16 Mr. Carter's solution.  Now let's turn to SAP's

17 infringing products.

18           Does this document, PX145, say anything

19 about SAP's infringing hierarchical access software?

20     A.   Yes.  It says a lot on this one slide.  We see

21 at the top, or with hierarchical access, SAP now says

22 that you can have a single table with a single access.

23           And on the bottom, it talks about having

24 the same thing where you can solve the problems of the

25 prior SAP system by having that single access to a

1  single table.

2      Q.    Mr. Gupta, do we have some slides from the 2009

3  presentation on infringement illustrating how the

4  infringing hierarchical access software works?

5      A.    Yes, we do.  If you could go to those.

6              MR. POLLINGER:  If we could go to

7  Slide 25, please, Mr. Diaz.

8      Q.    (By Mr. Pollinger) What does this slide here

9  illustrate on how the infringing software works?

10      A.    The next four slides are going to be similar.

11  I want to orient everybody first.

12              What we're looking at here is a screen, an

13  actual screen from the infringing SAP system.  This is

14  the one that was found to infringe in 2009.

15              This first screen shows, on the left-hand

16  side, that, in fact, it has fished with a net.  The

17  system has pulled over five pieces of pricing

18  information or five fish.

19      Q.    What do you show on this next slide here?

20      A.    On this next slide, we show that it's, in fact,

21  sorted them from least to most specific.  And I forgot

22  to point out that this whole time, we're dealing with

23  hierarchical accesses over here.

24      Q.    And this next slide?

25      A.    This is the eliminate step where each of those

1  red dots indicates that the SAP infringing system has

2  eliminated the pricing information that it's not going

3  to use.

4       Q.   And this next slide?

5       A.   This slide shows that it has applied the

6  pricing information that it is going to use.

7       Q.   What specifically in SAP's infringing products

8  provides the ability to do this retrieve, sort,

9  eliminate, and apply shown here?

10      A.   That is the computer instructions for the

11  hierarchical access execution engine.

12      Q.   What does this summary slide here show?

13      A.   This is just a quick summary of what we've been

14  looking at.  The world before the Carter patents -- the

15  Carter invention, we see that the SAP system had too

16  many tables, too many accesses.

17           Mr. Carter solved the problem by fishing

18  with a net.  And then SAP added hierarchical access,

19  which did the same thing.

20      Q.   Okay.  We've covered the infringing products as

21  determined in 2009 on the bottom there.  Let's -- right

22  here on the bottom.  Let's now turn to the modified

23  products from May 2010 forward.

24      A.   Okay.

25      Q.   What did SAP do in 2010 to try to avoid the

1  infringement determination?

2      A.   In May of 2010, SAP released a small patch to

3  their infringing system.

4      Q.   Did that 2010 patch change how their products

5  do this retrieve, sort, eliminate, and apply?

6      A.   No, sir.  That patch did not affect retrieve,

7  sort, eliminate, and apply.

8      Q.   And, again, what software does that retrieve,

9  sort, eliminate, and apply?

10     A.   That's the hierarchical access execution

11  engine.

12     Q.   Did the 2010 patch remove or change any of that

13  software?

14     A.   No, sir.  None of the computer instructions for

15  that hierarchical access were removed or changed.

16     Q.   Is the ability to do this with SAP products

17  still in there after the patch is installed?

18     A.   Yes, sir, it is.

19              MR. POLLINGER:  If we'll go to Slide 4,

20  please.

21     Q.   (By Mr. Pollinger) Here on this screen is a

22  list of the modified products after May 2010.  How does

23  this list -- oh, and let he ask you this first:  What

24  you just told us, that the retrieve, sort, eliminate,

25  apply has not changed with the patch, is that true for

1  all of these modified products of SAP after May 2010?

2      A.   Yes, sir, it is true.

3      Q.   How does this list of modified products compare

4  to a list of infringing products that you read off for

5  us?

6      A.   This is the same list of infringing products

7  with the single exception that we've now added the patch

8  into each of these.

9      Q.   Well, when the patch is installed, what changes

10  in SAP's products?

11      A.   SAP makes a change to one of their editing

12  screens in the product.

13              MR. POLLINGER:  If we'll go to Slide 98.

14      Q.   (By Mr. Pollinger) Does this slide relate to

15  that?

16      A.   Yes, sir.  This is the single editing screen

17  that is affected by a patch.

18      Q.   Can you tell us what the 2010 patch changed

19  here?

20      A.   Yes, sir.  In the 2010 patch, you can no longer

21  put these A's next to the KNVH type customer hierarchy.

22  You can type them in the screen, but you cannot store

23  them in the database.

24      Q.   Can you type that letter A there for other

25  types of customer hierarchies, other than that one type,

1  the KNVH type?

2      A.   Yes, sir.  You can type it in there for every

3  other type of customer hierarchy.  You can type it in

4  there and save it.

5      Q.   If that one type, the KNVH type, of customer

6  hierarchy is used, can you get that letter A in there

7  with other editing tools?

8      A.   Yes, sir.  SAP just disabled this one editing

9  tool.  Other editing tools can be used to put that A in

10  there for the KNVH-type customer hierarchy.

11      Q.   If you have that A in there already for one of

12  those specific types, the KNVH type, you have your A's

13  in there before May 2010, when you install the patch,

14  does the patch pull those A's out of there?

15      A.   No, sir.  The patch leaves all the A's that

16  were already there in there.

17      Q.   Does the 2010 patch block using the infringing

18  software with pricing sequences made before the patch?

19      A.   No, sir.  Every pricing sequence that was in

20  before the patch remains fully functional.

21      Q.   Does the patch change the way the infringing

22  hierarchical access software operates?

23      A.   No, sir.  That hierarchical access engine works

24  exactly the same way.

25           MR. POLLINGER:  If we'll go to Slide 30,

1  please.

2      Q.   (By Mr. Pollinger) What do you show on this

3  slide here?

4      A.   This is very similar to the summary slide we

5  showed last time.  We show that SAP's infringing system

6  worked just like the patented invention.  I'm now

7  showing that the modified system from May 2010 forward

8  works just like their infringing system, which is just

9  like the patent.

10     Q.   Okay.  Let's now turn to damages for the

11 infringement.

12             THE COURT:  Well, before we start on a new

13 subject, Mr. Pollinger, we're going to take our morning

14 recess.

15             Ladies and Gentlemen, take 20 minutes.  Be

16 back ready to come in the courtroom at 10:35.  Remember

17 my prior instructions, and don't talk about the case.

18 Have a nice recess.

19             LAW CLERK:  All rise for the jury.

20             (Jury out.)

21             THE COURT:  All right.  Court's in recess.

22             (Recess.)

23             LAW CLERK:  All rise.

24             (Jury in.)

25             THE COURT:  Please be seated.

1          Continue.

2               MR. POLLINGER:  Thank you, Your Honor.

3     Q.   (By Mr. Pollinger)  Okay.  Mr. Gupta, you've

4  got two issues, let's turn to your first one.  Let's

5  turn now to damages for the infringement.

6               Let's look at demand for the invention in

7  the market.  That goes to the damages issue.  What did

8  you look at here?

9     A.   I looked to see if there was marketplace demand

10 for the patented invention.  I looked at a lot of

11 evidence around that.

12    Q.   Did you look at whether there was demand for

13 the invention in Trilogy's own product, the Pricer

14 product, as well as the -- in the infringing SAP

15 products?

16    A.   Yes, sir.  I looked to see if there was demand

17 for the invention, both in Pricer, Trilogy's product, as

18 well as demand for the invention in SAP's products.

19    Q.   Does Trilogy's own product, the Pricer product,

20 does it embody the invention of the three claims of the

21 '350 patent in this case?

22    A.   Yes, it does.  I did a detailed analysis of the

23 claims at issue in this case, including the Court's

24 constructions and definitions, and have concluded that

25 the Trilogy Pricer product does, in fact, embody all

1   three claims of the Pricer patents.

2       Q.   Why did you look at Trilogy's Pricer product to

3   see if there was demand for Mr. Carter's invention?

4       A.   Trilogy's Pricer product really was the best

5   benchmark that was available for a -- for a variety of

6   reasons.  Firstly, it was the product that sold the

7   patent in the most isolated manner and so we got a

8   really close look at demand and value of the invention.

9            Secondly, there were lots of market

10  transactions for the Pricer product and so we had a lot

11  of information from which to do an analysis.

12           And number three, Trilogy's own strategy

13  was to sell the Pricer product as a bolt-on on top of

14  the SAP pre-existing system, so we get a very good look

15  of the value of the Pricer invention or the Carter

16  invention on top of an SAP system which does not have

17  the invention.

18           MR. POLLINGER:  Mr. Diaz, if you go to

19  Slide 19 in presentation two.

20      Q.   (By Mr. Pollinger)  What -- what do you

21  illustrate here, Mr. Gupta?

22      A.   This is a very simple graphic to reinforce the

23  point I was making on why Pricer is a good benchmark to

24  use.  We see that Trilogy strategy and -- was to sell

25  the Pricer product as a bolt-on to SAP's system.  That

1    Pricer product filled a need in the SAP system that

2    customers had and we can see that the analysis shows

3    that the invention is embodied within the product.

4        Q.   Is that the patent that you show here?

5        A.   Oh, yes, sir, I forgot I had a pointer.

6        Q.   So this is Trilogy's Pricer product?

7        A.   Yes, this is Trilogy's Pricer product.  It's

8    filling a need inside of the old noninfringing R/3

9    system that customers had and specifically it's the

10   invention within the Pricer product which is filling

11   that need.

12       Q.   What's in red is -- is SAP's old product before

13   they added the infringing software?

14       A.   Yes, sir, that's correct.

15       Q.   Well, what do you show on this next slide here?

16       A.   What I show here is what happens to the

17   marketplace after SAP adds the software that's now found

18   to infringe.  They have filled the need in their own

19   system using their own computer instructions and that is

20   to the hierarchical access feature.  We see that they've

21   also filled a need using the very same invention that

22   Mr. Carter had.

23       Q.   Is that a representation of the '350 patent

24   there on -- on SAP's product?

25       A.   Yes, that's what it's supposed to be.

1    Q.   And what do you show on this next slide here?

2    A.   This is just those same two graphics side by

3    side to illustrate that once SAP has filled the market

4    need using the Carter patents, they've all but destroyed

5    the market for a bolt-on product that had the benefits

6    of the Carter invention.

7    Q.   Did you look at Trilogy's sales contracts with

8    respect to demand?

9    A.   Yes, sir, I did.

10    Q.   Did you choose specific ones?

11    A.   Yes.  I looked at almost 80 of the Trilogy

12    sales contracts for which customers bought the Pricer

13    product.  From those I chose the 21 contracts that best

14    isolated the value of Pricer.  We heard, I think,

15    Mr. Dholakia and Mr. Carter and Mr. Smith talk about

16    some of the those companies today.

17    Q.   What did you conclude from those 21 contracts

18    that you chose?

19    A.   Well, I concluded that those contracts were

20    because of the invention.

21    Q.   Did you do a numeric analysis?

22    A.   Yes, sir, I did.  As Mr. Carter testified,

23    these contracts were because of the Carter invention.  I

24    conducted a numerical analysis using the features and

25    functionality that differentiated Pricer in the

1  marketplace, and that analysis shows that 63 percent of

2  the market demand for the Pricer product was due to the

3  claimed combination of features inside of the Carter

4  invention.  And so yes, I agree with Mr. Carter that his

5  invention is what drove those contracts.

6      Q.    Did you analyze whether the market demand for

7  Pricer was due to the invention itself or the computer

8  programming in Pricer?

9      A.    Yes, I did.

10     Q.    And what did you conclude?

11     A.    I concluded that the demand for Pricer was due

12 to the invention.

13     Q.    What was the evidence of demand for the

14 invention that you saw in your analysis?

15     A.    There was quite a bit of evidence for demand

16 for the invention.  You know, one of the strongest

17 pieces of evidence of demand is that once SAP was found

18 to infringe, they, in fact, did not take out the

19 patented technology.  They left -- left it in so the

20 current customers could keep using it.

21          Also, when we look at the -- within the

22 SAP world, we see that before SAP had the patented

23 technology in their system, Versata was able to sell

24 their invention into the SAP marketplace for on average

25 two million dollars per customer contract.

1    Q.   Do SAP's own documents reflect demand for the

2  invention?

3    A.   Yes, there's quite a few documents that do

4  reflect that demand.

5    Q.   Is this one of those at Exhibit PX493?

6    A.   Yes, this is one of them.

7    Q.   And what does this show?

8    A.   I believe this document is from early 1998 and

9  what this shows, it's a SAP document, and it shows that

10  SAP recognizes that Trilogy with its pricing

11  capabilities is the market leader visionary.  It

12  recognizes that SAP believes Trilogy and its product are

13  the best of breed for these kinds of sales systems.

14  This is indicative of demand that SAP is recognizing

15  Trilogy has demand for its products.

16    Q.   When was this time period relative to Trilogy's

17  Pricer product with the invention and SAP adding the

18  infringing software to their products?

19    A.   This was after Trilogy's Pricer product with

20  the invention but before SAP added its infringing

21  products -- infringing capabilities.

22         MR. POLLINGER:  Let's go to Slide 24,

23  please.

24    Q.   (By Mr. Pollinger)  This document from SAP here

25  is Exhibit PX2137.  What does this show?

1    A.   This is a document from one of SAP's customers,

2  Bridgestone Firestone, and it was written in 1998.  It's

3  an e-mail from Bridgestone to SAP explaining to SAP that

4  they have to bolt-on a third party's pricing software to

5  SAP's old system, R/3 is SAP's old system.

6              That pricing software actually was

7  Trilogy's and the reason for doing so is because SAP

8  system had large gaps.  Now, one of those gaps

9  specifically is the flexibility to mix different levels

10  of material and customer groups in a single access.

11  We'll see that those are customer and product

12  hierarchies in the single access we've discussed.

13    Q.   This SAP document here is Exhibit PX259.  What

14  does this show?

15    A.   This is a 1995 e-mail from one of SAP's sales

16  reps that says that this rep's customer wants to do a

17  Trilogy interface unless SAP can provide a useable

18  alternative.  He then goes on to say he would like to

19  avoid Trilogy like the plague, which is indicative of

20  demand from his customer and concern by him as an

21  individual.

22    Q.   Who is wanting to avoid Trilogy like the

23  plague?

24    A.   This would be SAP's sales rep.

25    Q.   What do we see from this SAP document here,

1   PX493?

2      A.   This is from a 1998 SAP strategy document

3   written by SAP where they talk about one of their major

4   objectives being to prevent further penetration by

5   Trilogy into the R/3 customer base.  This indicates to

6   me that that one sales rep's feeling was not unique,

7   that there's broad base demand for this capability

8   within the SAP customers.

9              MR. POLLINGER:  Could we go to Slide 28,

10  please?

11     Q.   (By Mr. Pollinger)  What do we see here from

12  this SAP document, PX270?

13     A.   Yes, I think we've seen this document before.

14  This is a SAP document also written in 1998 where SAP is

15  trying to find out how to address this demand and

16  they're suggesting putting in the pricing functionality

17  which is now found to infringe bundled into the SAP

18  system, specifically doing that to discourage the usage

19  of third-party components.  And so this now suggests

20  they're acting on their aspiration to prevent the

21  penetration by -- by blocking Trilogy and those

22  customers.

23     Q.   Do these SAP documents indicate demand for the

24  invention in SAP's products?

25     A.   Yes, sir, they do.

1    Q.   Do we have an explanation from SAP as to why

2    they added the infringing software to their products?

3    A.   Yes.  Dr. Zencke, SAP's global head of research

4    at the time frame, gave a very specific answer to that

5    question in his deposition.

6    Q.   If you could, would you please read the

7    question and the answer to us from Dr. Zencke's

8    deposition?

9    A.   Yes.

10         The question was:  Okay.  Why did SAP

11   develop this hierarchical access functionality?

12         His answer:  Because there were customers,

13   big customers actually, who said:  You know what, we

14   have to maintain hundreds and thousands of price lists

15   in a regular way, and hundreds of thousands of price

16   lists, and so the manual work to do that job, whatever

17   you can do to make that easier, faster, is of value for

18   us.

19         I think the you in that is what you, SAP,

20   can do and the for us, is for our customers, for the

21   customers.

22   Q.   Mr. Gupta, was Mr. Carter's invention obsolete

23   by the time his '350 patent issued in 2003?

24   A.   No, sir.  In 2003, Mr. Carter's invention had

25   very important capabilities.

1    Q.   Well, with respect to that, let's look at a

2 couple of documents that SAP turned over to us.

3              MR. POLLINGER:  Mr. Diaz, if we could,

4 please, go to PX2120, the first page.

5    Q.   (By Mr. Pollinger)  What is this here,

6 Mr. Gupta?

7    A.   This is a case study commissioned by one of

8 SAP's customers, Andrew Corporation in 2006.

9              MR. POLLINGER:  If we could, please go to

10 Page 14.

11    Q.   (By Mr. Pollinger)  Mr. Gupta, what do we see

12 in that box there where it says truthfulness?

13    A.   Well, this is the SAP customer talking about

14 their CRM implementation and is telling everyone, hey,

15 I'm going to be truthful about this.  I think that's

16 important now.

17              MR. POLLINGER:  Let's go to Page 21.

18    Q.   (By Mr. Pollinger)  If we look three lines

19 down, it says:  Data replication is critical.  What is

20 that?

21    A.   That's -- that's the disconnected usage that

22 Mr. Carter was talking about.  This is using that

23 pricing invention on a laptop or a mobile handheld

24 somewhere, and what he's saying is that it's important

25 to move the data from the home office to here.  Because

1  it's on a handheld, we know that performance is

2  important.  Those are smaller machines and you have to

3  have high performing systems when working away from the

4  home office.

5      Q.   And it's saying this is critical in what year?

6      A.   This is 2006 in which he's saying this is

7  critical.

8      Q.   And what do we see here in this -- this second

9  to last bullet where it says:  No customer hierarchy or

10 product hierarchy was available?

11     A.   Well, in this over here, he's saying it's

12 really important to have those customer and product

13 hierarchies also available on the handheld, just as

14 Mr. Carter's invention taught.

15          MR. POLLINGER:  Mr. Diaz, if we could,

16 please go to Exhibit PX956.

17     Q.   (BY MR. POLLINGER)  This is an e-mail that SAP

18 turned over to us in this case.

19          MR. POLLINGER:  If you could, Mr. Diaz,

20 please blow out the top.

21     Q.   (By Mr. Pollinger)  We see this is an e-mail

22 from 2007.  It is from Wolfgang Nieswand.  Who is

23 Dr. Nieswand?

24     A.   Dr. Nieswand is an executive at SAP.

25     Q.   And -- and he goes by Doctor because he has a

1  Ph.D. in engineering; is that correct?

2      A.   Yes, sir, that's my understanding.

3           MR. POLLINGER:  If we could go down to

4  the -- a little ways to where it says objective.

5      Q.   (By Mr. Pollinger)  It says objective there,

6  and here it says customer needs hierarchical access.

7      A.   Yes, sir, I see that.

8      Q.   And then it says key to their business?

9      A.   Yes, sir.

10     Q.   What is -- what does that indicate?

11     A.   Well, I -- I think the words speak for

12 themselves.  This is a 2007 e-mail from Dr. Nieswand

13 that's -- that's saying that this customer needs

14 hierarchical access, and having that capability is key

15 to their business.  And, in fact, I know some more about

16 this customer, they're -- they're running their systems

17 both on a handheld as well as the home office.

18     Q.   Does this tell us anything about whether

19 hierarchical access was obsolete in 2007?

20     A.   Well, it tells us that it was not obsolete in

21 2007.

22     Q.   Looking at something else here now, do we have

23 any direct answers from SAP's customers as to whether

24 they use the infringing hierarchical access software?

25     A.   Yes, sir, we do.  We have about 40 of those

1    answers from SAP's customers.

2              MR. POLLINGER:  If we can go back to the

3    presentation, please, Mr. Diaz.  Go to Slide 30.

4       Q.   (By Mr. Pollinger)  Does this slide relate to

5    those deposition answers from SAP's customers?

6       A.   Yes, sir, it does.

7       Q.   The three claims that Mr. Carter's patents talk

8    about the capability to price based on customer and

9    product hierarchies.  Do the deposition answers from

10   SAP's customers indicate that they do that with SAP's

11   infringing software?

12      A.   Yes, sir, it indicates that they likely do.

13      Q.   And is there any indication of what percentage

14   of customers answering the deposition questions do that?

15      A.   Yes.  20 percent -- sorry.  50 percent of the

16   customers use hierarchical access, and of those, 14 in

17   that green box most likely use both the customer

18   hierarchy and the product hierarchy.

19      Q.   Could you point out a few of the companies here

20   for us?

21      A.   They're -- they're large household names.  IBM,

22   Shell, Hewlett Packard, Coca-Cola, Procter & Gamble.

23      Q.   Yeah, that -- so that first section there are

24   customers that said we use both customers and product

25   hierarchies; is that right?

1    A.    Those 14 customers say that they use customer

2   hierarchies and product hierarchies and hierarchical

3   access.

4    Q.    Based on your experience, is it common to price

5   based on customer and product hierarchies?

6    A.    Well, absolutely.  As Mr. Carter testified to,

7   a key thinking he had before he produced his invention

8   was he'd like to have the pricing system mimic the real

9   world and priced based on the way people thought about

10  it, who is buying what.  And, you know, we've all seen

11  experiences of these.

12              I think a good one we're used to is truck

13  month in Texas, we're talking about trucks and Texas,

14  both of which are in a hierarchy of a type of product

15  and the information, like the customer, the geography.

16   Q.    So in that example you've got the product

17  hierarchy is the trucks and then the customer hierarchy

18  is the customers in Texas?

19   A.    Yes.  I would say Texas would be in a hierarchy

20  of -- of -- of geography and trucks would be in a

21  hierarchy of products.

22              MR. POLLINGER:  Mr. Diaz, if we could,

23  please go to PX2119.

24   Q.    (By Mr. Pollinger)  This is another SAP e-mail.

25  We see at the top here that this is from 2007, and in

1   the body in the second paragraph where it starts off

2   would, it says there in the second sentence in that

3   first part:  Most implementations use the customer

4   hierarchy and product hierarchy in the pricing to reduce

5   the number of records.

6       A.   Yes, sir, I see that, that's consistent with

7   what I just said.  I think this e-mail was written in

8   2007.  It's real small, but you can see it there.  And

9   the subject is a description of ERP, which is the

10  infringing SAP system requirements, and that most

11  customers would use a customer and a product hierarchy

12  in pricing.

13      Q.   Mr. Gupta, is there anything else in this case

14  that indicates customer demand for Mr. Carter's

15  invention in SAP's products?

16      A.   Yes, there is.  You know, when SAP was first

17  informed by Trilogy that they infringed the -- the

18  Carter patents, SAP didn't just say, oh, now that we

19  know, let's go ahead and take it out because no one uses

20  it.

21           Instead, when they were found to infringe

22  in 2009 and attempted to work around the patents, they

23  made sure that every one of the customers that was

24  continuing to use -- sorry, that was using the

25  infringing capabilities could continue to use it the way

1  they were.  I think that is very indicative of their own

2  customers having demand.

3     Q.   Have you seen any alternative to Trilogy's

4  Pricer product or SAP's infringing products?

5     A.   No, sir, I have not seen any alternative to the

6  Pricer or the SAP infringing products that do not use or

7  practice the claims of Mr. Carter's patent.

8     Q.   Okay.  That was your first topic.  That was

9  demand with respect to damages.  Now, let's turn to your

10  second and last topic.

11          Let's turn to the question of whether SAP

12  is still infringing after they installed that patch in

13  May of 2002 -- excuse me, 2010.  Let's turn to the

14  question of whether SAP's modified products continue to

15  infringe after May 2010.

16     A.   Okay.

17     Q.   To see if there's patent infringement,

18  what do -- what do we have to do?

19     A.   To see if there's patent infringement, we have

20  to look at the claims of the patent and make sure that

21  given the Court's constructions, that each and every

22  element of at least one of those claims is met by the

23  accused product.

24     Q.   Is that applying the Court's claim

25  constructions?

1      A.    Yes, sir, it is.

2      Q.    The Jurors have those in their notebooks?

3      A.    Yes, I believe they do and we'll be going

4  through some of those later on.

5      Q.    Do all the claims -- do all three of the claims

6  have to be met for there to be infringement?

7      A.    No, sir.  If any one of the claims of a patent

8  is infringed, then the patent is infringed.

9      Q.    In 2009 it was determined that SAP infringes

10  the three claims of the '350 patent.  The question now

11  is whether the modified products still infringe those

12  three claims.

13      A.    Okay.

14      Q.    Now, here I've got the poster boards that were

15  used in the 2009 presentation for the three claims.

16  This is Claim 26.  I'll put them out here.  This is

17  Claim 28.  And this is Claim 29.

18            And it's showing that SAP products in 2009

19  infringe all the parts of the claims were checked off.

20  Is -- is our question now whether these checkmarks still

21  apply to SAP's modified products with the patch after

22  May 2010.

23      A.    Yes, sir, that's the -- that's the question

24  I've been asked to -- to look at.

25            MR. POLLINGER:  If we go to Presentation

1    1, Mr. Diaz, please.  Go to Slide 32.

2        Q.   (By Mr. Pollinger)  Here is Claim 26 on the

3    screen.  It's right there as well, on the poster board,

4    from the 2009 determination with -- with all the parts

5    of Claim 26.  What was shown, Mr. Gupta, in 2009 in

6    SAP's infringing products to meet each of the parts of

7    Claim 26?

8        A.   Well, the retrieve, sort, eliminate, and apply

9    steps that we've been talking about were met by the

10   computer instructions which implemented the hierarchical

11   access execution engine.  The computer -- the customer

12   hierarchy, product hierarchy, and storing limitations

13   were met by computer instructions for other parts of the

14   SAP system, and that those computer instructions were on

15   computer media, you know, delivered or downloaded by SAP

16   to its customers.

17       Q.   And that shipping and delivery of a software

18   both on the DVDs and over the internet to the customer

19   computers, was -- was that part of the infringement?

20       A.   Yes, sir.  These claims are infringed when SAP

21   makes the DVDs, sells the DVDs, delivers them to its

22   customers, allowed the download of those instructions to

23   the customer computers or, in fact, uses the software in

24   its own operations, testing, development, training,

25   those kinds of thing.

1  Q. Did we see evidence of that?

2  A. Yes, we saw lots of evidence of that.

3  Q. Did SAP change or remove any of those computer

4 instructions on May 6, 2010 with its patch, the ones

5 that were shown to -- to meet all the parts of Claim 26?

6  A. No, sir.  In the previous determination, the

7 computer instructions that were shown to meet each and

8 every one of these limitations is still in the SAP

9 system.  Nothing was removed or changed.

10    MR. POLLINGER:  Go to Slide 35, please.

11  Q. (By Mr. Pollinger)  What is illustrated here

12 from the 2009 presentation?

13  A. On the right-hand side, we see a graphic

14 depiction of computer instructions.  Source or object

15 code representing the capability to do what the claims

16 require.

17    On the left-hand side, we see DVDs and

18 computers where those computer instructions are put on

19 the DVDs and sent to customers or downloaded by

20 customers on to their computers where, as I mentioned,

21 used within SAP in its own enterprise.  All of these

22 activities happened in the United States.

23  Q. And the computer instructions that were pointed

24 to in the 2009 determination, have any of those been

25 changed by the patent?

1     A.    No, sir, they have not.

2     Q.    What does this tell us about whether SAP's

3  modified products infringe Claim 26 on this poster board

4  from the 2009 presentation?

5     A.    Well, it tells us that they must keep

6  infringing Claim 26 in the exact same manner they

7  infringed in the 2009 determination.

8     Q.    What about Claim 28 here on this center poster

9  board and Claim 29 over here on the Jury's left?

10    A.    Claims 28 and 29 also continue to be infringed

11 in the exact same manner they were found to be infringed

12 in -- in 2009.

13    Q.    So do these checkmarks on these three poster

14 boards in 2009, do they still apply with respect to the

15 modified products with the patch?

16    A.    Yeah, I'm assuming they're all checked off.  I

17 can't see them, Mr. Pollinger, but if they are then,

18 yes.

19    Q.    You can stand up if you'd like.

20    A.    If you need me to, I will.

21    Q.    No, that's okay.

22    A.    Okay.

23    Q.    Well, what, then, is SAP arguing on this -- on

24 this patch?

25    A.    I believe SAP's argument to be that they have

1   now blocked some usage of the infringing capabilities.

2       Q.   Is use required for there to be infringement?

3       A.   No, sir.  As we've discussed, for these claims,

4   use is not required for there to be infringement.

5       Q.   Nonetheless, is the software still used in the

6   U.S.?

7       A.   Yes, sir, there's lots of evidence that it is

8   used in the U.S.

9       Q.   Well, even though use isn't required, did you

10  look at whether these infringing computer instructions

11  that were pointed to in 2009 can still be used in the

12  manner set forth in the three claims?

13      A.   Yes, sir, I did.

14      Q.   And what did you conclude?

15      A.   I concluded that these infringing computer

16  instructions can be put to use in a variety of ways even

17  after the patch.

18      Q.   Let's turn to that.  If we could -- I think you

19  just mentioned that it could continue to be used in the

20  claim matter after -- after the patch in May 2010?

21      A.   Yes, sir, in a variety of ways.

22      Q.   And what were those ways?

23      A.   Well, the first is they can continue to be used

24  with any of the pre-existing pricing information that

25  was already set up by the customers who were using them.

1              Secondly, by using a data editing tool,

2    you can put some A's in the database yourself and keep

3    using it the exact same way it was used before.

4              And thirdly, SAP only turned off one very

5    specific type of customer hierarchy from being set that

6    did not even address all of the other types of customer

7    hierarchies that they have.

8         Q.   Okay.  Let's go over those three ways one at a

9    time.

10             MR. POLLINGER:  If we go to the third

11   presentation, Mr. Diaz, Slide 1, please.

12        Q.   (By Mr. Pollinger)  Let's go over use of

13   pricing sequences made before May 6, 2010.  Here on the

14   screen is an example hierarchical access sequence from

15   the 2009 presentation on infringement.  It was created

16   before the 2010 patch.  Can this be run with the

17   modified products after May 2010?

18        A.   Yes.  If this was already set, this can be run

19   after 2010.

20        Q.   Who set this particular access sequence up?

21        A.   This was set up by one of Versata's experts in

22   the previous determination.

23        Q.   Trilogy's experts?

24        A.   Oh, sorry, yes, Trilogy's experts.

25        Q.   The names are interchangeable for here.  Can

1  you describe what -- what's set up here?

2      A.   Yes.  We see the important three

3  characteristics of Mr. Carter's invention from a set up

4  standpoint over here.  These fields with the 6,000, one

5  and two, represent the KNVH type customer hierarchy,

6  we'll talk more about that later.  These down here

7  group -- main groups represent the product hierarchy,

8  and these A's next to each of those represent that they

9  will be used by the hierarchical access infringing

10  computer instructions.

11      Q.   Can customers continue to use all hierarchical

12  access sequences created before the May 2010 patch?

13      A.   Yes, sir.  Any sequence created before the May

14  2010 patch works exactly the same way.

15      Q.   This particular one here created for the 2009

16  presentation can continue to be used?

17      A.   Absolutely, yes.

18      Q.   What is shown here on SAP's document, Exhibit

19  PX1812?

20      A.   Well, this document is SAP's instructions to

21  their customers about what this patch does and does not

22  do.  And we see that SAP says existing access sequences

23  of the type hierarchical access created before the

24  installation of this note will continue to function as

25  before.  This is what I was talking about by SAP making

1  sure that all their current customers who use this could

2  keep using it.

3      Q.   So, for example, any SAP customers who set up

4  hierarchical accesses with that one type, that KNVH type

5  hierarchy before the patch is installed, can they

6  continue to use those after the patch?

7      A.   Yes, sir, that's what this says.  I've also

8  validated that on our test systems.

9      Q.   Can those customers modify any KNVH customer

10  hierarchy specified for use with existing hierarchical

11  access sequences?

12      A.   Sure.  The customers can keep arranging the

13  hierarchy as much as they would like.  They can make new

14  pricing changes, change discounts, change list prices,

15  change all the pricing information.  None of that has

16  been affected.

17      Q.   Okay.  So you covered the first way, allowing

18  continued use of what was created prior to the patch.

19  Now, let's -- let's look at the second way you

20  mentioned, the -- the other editing tools?

21          MR. POLLINGER:  If we could please go to

22  slide -- just go back one.  Slide 1 here.

23      Q.   (By Mr. Pollinger)  This example sequence again

24  from the 2009 presentation that specified the KNVH-type

25  hierarchy, could this be newly created using only SAP's

1    editing tool after the patch?

2        A.   No, sir.  This could not be newly created using

3    just SAP's editing tools.

4        Q.   You couldn't get the A in there with just SAP's

5    editing tool?

6        A.   Well, to be very specific, SAP's editing tool,

7    you could type this A in there, but you could not save

8    it.  And so if you couldn't save it, you couldn't create

9    a new one.

10        Q.   Were the three claims, 26, 8, and 9, were they

11    read on this editing tool to establish infringement?

12        A.   No, sir.  None of the computer instructions

13    were -- from this editing tool were used with Claims 26,

14    28, and 29.

15        Q.   In SAP's modified products after the patch, if

16    I wanted to create this same sequence here from 2009

17    from scratch or create other new hierarchical access

18    sequences specifying that one specific type, KNVH-type

19    hierarchy, is there a way to get that A in there?

20        A.   Yes, sir, there is.

21        Q.   And -- and how would that be done?

22        A.   It's actually quite simple.  You could use this

23    same SAP editing tool and not put in these three A's and

24    then save those to the SAP database.  And then using a

25    variety of off-the-shelf database tools which all

1   customers have, you can type in these three A's.

2              Once you've done that, you can then view

3   this entire screen in the SAP tool and, in fact, run the

4   hierarchical accesses against the customer hierarchy and

5   the product hierarchy.

6       Q.   Well, when you mention the off-the-shelf

7   editing tool, are you accusing the off-the-shelf editing

8   tool of -- of meeting a part of one of these three

9   claims?

10      A.   No, sir, I'm not.  The editing tools were

11  not -- the claims were not read on the editing tools.

12      Q.   And after you get the A -- if you -- if you get

13  the A in there with this off the shelf editing tool,

14  after that is done, would the sequence when run in SAP's

15  modified products, would it use the hierarchical access

16  engine?

17      A.   Yes, sir, it was.  I -- yes, sir, it would.

18  I've also validated that on the test system by actually

19  making that change with the A myself.

20      Q.   Okay.  That's the second way of continued use

21  with -- with -- in conjunction with another

22  off-the-shelf editing tool.

23              Let's go to the third way, the last way

24  that you've mentioned to us.  You mentioned that new

25  hierarchical access sequences can be created to use

1    other customer hierarchy types even after the 2010

2    patch?

3        A.    Yes, sir, that's correct.

4        Q.    What do you call those other customer

5    hierarchies in your expert report?

6        A.    In my expert report, I refer to those as

7    alternate hierarchies of organizational groups.

8        Q.    Creating those other customer hierarchies for

9    use in a hierarchical access sequence, can that be done

10   with SAP's editing tools alone without an off-the-shelf

11   editing tool?

12       A.    Yes, sir, it can.  It -- they're standard SAP

13   screens to do that.

14       Q.    When you create these other customer

15   hierarchies, would they use the same customer records as

16   shown in the 2009 presentation?

17       A.    Yes, they would use the same customer records.

18       Q.    This slide here from the 2009 presentation

19   shows the Court's definition of purchasing organization

20   in the claims.  Do customers entered in the customer

21   master file meet this definition?

22       A.    Yes, customers in the customer master file meet

23   this definition for purchasing organization.

24       Q.    And these customers in the customer master

25   file, the same ones that were pointed to in 2009?

1      A.    Yes, in the very same ones.

2      Q.    Is a purchasing organization basically a

3  customer?

4      A.    Yes, it's basically a customer.

5      Q.    This slide here from the 2009 presentation

6  shows the Court's definition of organizational groups.

7  Can the customers enter the customer master file be set

8  to be part of organizational groups?

9      A.    Yes, sir, they can.  Consistent with the

10  Court's construction and definition, these customers in

11  the customer master file are members of -- of

12  organizational groups.

13      Q.    Have you prepared some slides for us to

14  illustrate this?

15      A.    Yeah.  Now would be a good time to see some of

16  those.

17      Q.    What is shown on this slide here?

18      A.    We'll see this screen a few times, so let me

19  explain it.  This is the SAP change customer screen,

20  it's the XDO2 SAP transaction, but we're actually

21  setting up information about a customer.  We see

22  highlighted over here where this customer has

23  information being said about its geography, it's in the

24  U.S., it's in Texas, it is in Austin.  This is very same

25  information that will be used to group all of the

1    customers in the U.S. or all the customers in Texas or

2    all the customers in Austin for the purposes of pricing.

3        Q.   What do we see here?

4        A.   We see another example of the same change

5    customer screen, this time what we're setting on the

6    customer is information about how it buys; from which

7    sales organization, from which distribution channel,

8    from which division.  Likewise, the pricing will lump

9    all of the customers who buy from the same sales

10   organizational group from that sales organization group.

11       Q.   And what's here?

12       A.   Again, more fields off the same customer change

13   customer screen.  In fact, SAP has other fields called

14   things like customer groups and price groups and clearly

15   these are used to group customers into things that are

16   customer groups and price groups.

17            MR. POLLINGER:  Go to Slide 11, please.

18       Q.   (By Mr. Pollinger)  What do we see in this

19   slide from PX1811?

20       A.   This is actually a small excerpt from a much,

21   much bigger document.  SAP has tens and even over a

22   hundred fields on the customer information and each of

23   these can be used to group a group of customers that

24   share a characteristic.  For example, five of those

25   fields are called customer group one, customer group

1 two, customer group three, four, and five, and none of

2 these are related to the KNVH type hierarchy which SAP

3 has tried to disable.

4          MR. POLLINGER:  Go to Slide 11, please --

5 excuse me, Slide 8.

6     Q.   (By Mr. Pollinger)  This slide here from the

7 2009 presentation shows Claim 26 with the customer

8 hierarchy part highlighted, the arranging a customer

9 hierarchy part.  Can these examples of other types of

10 customer groups that you've just described be arranged

11 hierarchically?

12    A.   Yes, sir.  I've prepared some slides on that as

13 well.

14    Q.   What do you show here?

15    A.   I show a geographic arrangement of these groups

16 in a hierarchical fashion.  I want to remind everyone

17 that the Court's construction for the term hierarchy is

18 a branching arrangement of two or more levels of data.

19 So I'd like you to keep that definition in mind when we

20 go through these slides.

21          We see here the group that is the U.S. and

22 below that we see the first branch, which is Texas which

23 is within the U.S. and a second branch, which is

24 California, which is also within the United States.

25 Underneath California we see yet another branch which is

1   the U.S., California, and then city code 002 I believe

2   is San Francisco and city code 0 -- 0023 would be Los

3   Angeles.  Don't quote me on this, I might not get my

4   codes right.

5            But in any case, what we do see is

6   consistent with the Court's definition, a branching

7   arrangement of two or more levels of data, each of these

8   present organizational groups.  All the customers in the

9   U.S.; all the customers in Texas; all the customers in

10  California.

11       Q.   So the hierarchy is by country, state, and

12  city?

13       A.   In this example, it is, yes.

14       Q.   What do you show here?

15       A.   This is the same kind of view on the left-hand

16  side, but instead of using the organization -- sorry --

17  instead of using the geographic groups, we're using the

18  sales area groups, the sales organization, the

19  distribution channel I'm buying from a division.  We see

20  the same kind of layout and branching arrangement on the

21  left that we saw earlier and SAP for this particular

22  type of information also shows that arrangement visually

23  and we see very specifically a branching arrangement

24  with two or more levels of these organizational groups.

25       Q.   Can this be done for other customer groups?

1    A.   Yes, sir.  This can be done for any of the

2    fields that we were looking at in the SAP customer

3    master.  So when we saw customer groups one, two, three,

4    four, five, I can show you hierarchies of those as well.

5    I didn't think it was worth using our time with that.

6              MR. POLLINGER:  If we go to Slide 4,

7    please, Mr. Diaz.

8    Q.   (By Mr. Pollinger)  Here again is -- in this

9    slide is -- here again is this slide showing the

10   arranging the customer hierarchy part of Claim 26 along

11   with the Court's definitions.  Are these other customer

12   hierarchies examples, are they hierarchies of

13   organizational groups as specified in this part of the

14   claim applying the Court's definitions?

15   A.   Yes, sir.  I've tried to be clear with that

16   with the pictures, but they do meet both of these

17   constructions.

18   Q.   Did you apply the Court's constructions in all

19   of your infringement analysis?

20   A.   Yes, sir, I'm required to and I did.

21   Q.   Do SAP's modified products have the computer

22   instructions to set up these other customer hierarchies

23   that you described to us?

24   A.   Yes, sir, they do.

25   Q.   Based on your analysis, are these other

1    examples unusual?

2        A.   No, sir, these are very common.

3        Q.   If these other customer hierarchies are used,

4    would this arranging part of Claim 26 still be met?

5        A.   Yes, sir, it would be met.

6             MR. POLLINGER:  Let's go to Slide 12,

7    please.

8        Q.   (By Mr. Pollinger)  Let's look at all the parts

9    of Claim 26.  Would the first two parts, the customer

10   media part, be met if these other types of customer

11   hierarchies are used?

12       A.   Yes, sir, there's no change.

13       Q.   Computer instructions called for are still

14   there?

15       A.   All the computer instructions are still there,

16   they're still on the DVD, they're still downloaded,

17   they're still used with an SAP span across.

18       Q.   Okay.  In that second part, the customer

19   hierarchy part, we just went over that with you, so --

20   so that would still be met?

21       A.   Yes, sir, it would.

22       Q.   The next part, the product hierarchy part, if

23   these other customer hierarchies are used, would that

24   part be met?

25       A.   Yes, sir, there's no change there.

1    Q.    Would the storing part, would that be met?

2    A.    Yes, sir, it would.

3    Q.    Do you have some slides on that?

4    A.    I -- I do.

5    Q.    Is -- is this here, the storing example from

6    the 2009 infringement presentation, using that one

7    specific type of -- of customer hierarchy KNVH?

8    A.    Yes.  For the Jury who has probably never seen

9    this screen before, this is what was shown before to

10   show that SAP stores pricing information in something

11   called conditional records.

12              On the left, and it's customer hierarchy

13   section, this is the one type of customer hierarchy that

14   SAP has tried to effect the KNVH type customer

15   hierarchy.

16   Q.    And if it's set up before 2010, it could still

17   be used after 2010, right?

18   A.    That's correct.  In fact, after 2010 you could

19   still add more information here if you wanted to as

20   well.

21   Q.    What do you show on this next slide?

22   A.    I show the very same screen that was used in

23   the previous determination, using the same types of

24   condition records, but this time we're showing them

25   arranged to be a -- a customer hierarchy.  This

1  information stored via customer hierarchy of --

2       Q.    I'm sorry?

3       A.    -- of Geographic -- a geographic customer

4  hierarchy.

5       Q.    And this next slide?

6       A.    Same screen, same types of condition records,

7  this time using the sales area customer hierarchy.

8       Q.    Can this storing with these other customer

9  hierarchy types, can this be done with customer -- other

10 customer group hierarchies?

11      A.    Yes.  Any of the fields on the customer master

12 can be used to group all customers sharing those

13 characteristics and pricing information is set on this

14 screen and stored for all of those other types of

15 customer hierarchies.

16      Q.    Can SAP's own editing tool in its modified

17 products be used to set these other customer hierarchy

18 types to use the infringing hierarchical access software

19 engine?

20      A.    Yes, sir.

21      Q.    Do you have some slides on that?

22      A.    Yes, I do.

23            MR. POLLINGER:  Go to Slide 17, please.

24      Q.    (By Mr. Pollinger)  What do you show here?

25      A.    Yeah, we've talked about screens like this

1  before.  We show the geographic customer hierarchy with

2  the little A's next to it, meaning that it will be

3  considered hierarchically and this is possible in the

4  modified software.

5      Q.   And how do those A's -- with the modified

6  software with these other customer hierarchy types, how

7  do you get the A's in there?

8      A.   In this example, I type the A into this screen

9  and save it from this screen, which is a SAP screen.

10     Q.   It's strictly using SAP's editing tool?

11     A.   Yes, sir.

12     Q.   What do you show on this next slide here?

13     A.   It's the same type of example, but this time

14  using an example of a sales area customer hierarchy.

15  You get the A's.  You can type the A's.  You can save

16  the A's, and all this happens via SAP's own tool.

17     Q.   No off-the-shelf editing tool?

18     A.   No, sir.

19     Q.   Can this be done for other customer groups as

20  well?

21     A.   This can be done for any hierarchy of customer

22  groups you want to create other than the KNVH-type

23  customer hierarchy using this tool and this tool only.

24              MR. POLLINGER:  If we could, Mr. Diaz,

25  please go to Slide 12.

1    Q.   (By Mr. Pollinger) The remaining parts of Claim

2  26 here, the retrieve, sort, eliminate, determine, apply

3  parts, would these other parts of Claim 26 be met if any

4  of those other types of customer hierarchies are used?

5    A.   All of these would be met if any of those were

6  used with hierarchical access.

7         MR. POLLINGER:  Go to Slide 20, please.

8    Q.   (By Mr. Pollinger) Is this here the example

9  from the 2009 presentation showing running the

10 infringing hierarchical access engine with the KNVH-type

11 customer hierarchy?

12   A.   Yes, sir, it is.  I believe the jury has seen

13 something like this.  The access is hierarchical.  The

14 type of hierarchy in this one is the KNVH-type, and it

15 executes the four types of steps required by the patent:

16 Retrieve, sort, eliminate, and apply.

17   Q.   And then what do you show here on this next

18 slide?

19   A.   This is that same screen but for the geographic

20 hierarchy, hierarchical access, same four steps.

21   Q.   And what do you show here?

22   A.   Same thing but for the sales area hierarchy

23 over here, the hierarchical access, same four steps.

24   Q.   And if we were to use one of the other customer

25 group hierarchies, would the hierarchical access engine

1    go in the same manner in the modified products?

2         A.   Yes, sir, it would.  It does this for all the

3    types of customer hierarchies, including the KNVH

4    customer hierarchy.  None of this has been affected.

5         Q.   With these examples that you've given us, is

6    the hierarchical access engine put to use in the manner

7    set forth in the three claims of the '350 patent?

8         A.   Yes, sir, it is.

9         Q.   Okay.  We've gone through all the parts of

10   Claim 26 now with those other types of customer

11   hierarchies.  If these other types are used, is Claim 29

12   still infringed -- excuse me -- Claim 26 still

13   infringed?

14        A.   I got confused by the question, Mr. Pollinger.

15   Would you mind repeating it?

16        Q.   Yeah.  With respect to what you've shown us on

17   these other customer hierarchies, if they are used, is

18   Claim 26 infringed?

19        A.   Yes.  We've looked at each of the claim

20   limitations of Claim 26.  Each of them continues to be

21   met by using another type of customer hierarchy example.

22   And so, yes, Claim 26 is infringed.

23              MR. POLLINGER:  If we could go to Slide

24   91, please.

25        Q.   (By Mr. Pollinger) Let's look at the next

1  claim, Claim 28.  If these other types of customer

2  hierarchies are --

3           MR. POLLINGER:  It's the presentation one,

4  please.

5    Q.   (By Mr. Pollinger) If these other types of

6  customer hierarchies are used, would Claim 28 be met?

7    A.   Yes, sir, it would.  All of the computer

8  instructions required for Claim 28 are still there, and

9  they meet each of the limitations of Claim 28, the

10  retrieving from a purchasing organization hierarchy, the

11  retrieving from a product hierarchy, and the receiving

12  and determining of a price.  It's met in the same manner

13  it was in 2009.

14    Q.   Let's compare Claim 28 and Claim 26, which we

15  just went over.  Here are the first two parts of Claim

16  28 and 26.  How do they compare?

17    A.   They're the same.

18    Q.   So they're met in the same way?

19    A.   Yes, sir.  They're met in the exact same way as

20  Claim 26.

21    Q.   Here on the left side are the two retrieve

22  parts of Claim 28.  How do they compare to the retrieve

23  part of Claim 26 on the right?

24    A.   They're very similar.  Claim 28 separates the

25  retrieval into two limitations.  Claim 26 puts customer

1  and product hierarchy into one limitation or paragraph.

2  Claim 26 actually requires a few more things to happen.

3     Q.   Here on the left is the last part of Claim 28,

4  the receiving part.  How does it compare to the last

5  part of Claim 26?

6     A.   They are very similar.

7     Q.   What infringes Claim 28?

8     A.   The hierarchical -- sorry.

9          The computer instructions capable of

10  implementing the hierarchical access execution engine

11  infringes Claim 26 -- 28.  Sorry.

12    Q.   Has that been changed in the modified products

13  in 2010?

14    A.   No, sir.  And I don't believe SAP contends that

15  it does.

16    Q.   Is Claim 28 met if these other customer

17  hierarchy types that you described to us are used?

18    A.   Yes, sir.

19    Q.   The same manner as Claim 26?

20    A.   Yes, sir, in the same manner.

21         MR. POLLINGER:  Let's go to presentation

22  three, please, Slide 25, and let's look at the last

23  claim, Claim 29.

24    Q.   (By Mr. Pollinger) Let's look at Claim 29

25  beside Claim 28.

1     A.    Okay.

2     Q.    Would Claim 29 be met if these other types of

3 customer hierarchies are used?

4     A.    Yes, sir, it would.

5     Q.    Could you explain that to us?

6     A.    Yes, sir.  There's, I guess, two important

7 parts of Claim 29.

8              The top part is a little bit different

9 than that of Claim 28.  That requires a computer

10 processor, memory, and those computer instructions we've

11 been talking about in the memory.  This happens when --

12              THE WITNESS:  Sorry.  Thank you.

13     A.    This happens --

14     Q.    (By Mr. Pollinger) This is the first four parts

15 here?

16     A.    Yes.  This is the first four parts.

17              This is what happens when SAP delivers

18 those computer instructions or downloads those computer

19 instructions on to a computer at one of their customers.

20 It has a processor, a memory, and the computer

21 instructions are installed.

22     Q.    And what about the bottom three parts of Claim

23 29 as compared to the bottom three parts of Claim 28?

24     A.    Well, the bottom three parts of Claim 29 are

25 the same as the bottom three parts of Claim 28.  And so

1    Claim 29's bottom three parts are met in exactly the

2    same manner they'd be met for Claim 28 and also

3    Claim 26.

4        Q.    So if the other customer hierarchy types that

5    you described to us, if they are used, is Claim 29

6    infringed?

7        A.    Yes, sir, it is.  Actually, it's not their

8    used; it's if the computer instructions are capable of

9    implementing them.  But yes.

10       Q.    It's the shipping and downloading of the

11   computer instructions for doing that?

12       A.    Yes, sir.

13       Q.    Do the three claims require a particular data

14   setup?

15       A.    No, sir, they do not.

16       Q.    Do they claim a data setup?

17       A.    No, sir.

18       Q.    Okay.  But even under SAP's argument, would the

19   ability to create these other hierarchies with SAP's own

20   tools satisfy the claims?

21       A.    Yes, sir, it would.

22       Q.    So do these three checked-off poster boards

23   here from the 2009 determination, do they apply if these

24   other types of customer hierarchies are used?

25       A.    Yes, sir.  Each of these three claims is

1  infringed by the computer instructions that use the

2  other types of customer hierarchies.

3      Q.    Okay.  We've covered the ways customers can

4  continue to use the infringing software after the patch

5  is installed in 2010.  Let's -- let's wrap up your

6  discussion now.

7      A.    Okay.

8      Q.    In 2009, it was determined -- let's wrap up

9  your infringement analysis.

10             In 2009, it was determined that SAP

11  directly infringes these three claims of the '350 patent

12  and also that SAP indirectly infringes Claim 29 of the

13  patent by way of inducement and contributory

14  infringement.  Has that changed from May 6, 2010, going

15  forward with SAP's modified products?

16     A.    No, sir.

17             MR. POLLINGER:  If we go to the first

18  presentation, Slide 2.

19     Q.    (By Mr. Pollinger) Are all three claims still

20  directly infringed as determined in 2009?

21     A.    Yes, sir, they are.

22     Q.    Is Claim 29 still indirectly infringed as

23  determined in 2009?

24     A.    Yes, sir.

25     Q.    By inducement?

1     A.    Yes, sir.

2     Q.    By contributory infringement?

3     A.    Yes, sir.  There have been no changes with

4  respect to that.

5     Q.    Even if a 2010 patch is deemed to have changed

6  something from the 2009 determination, are the three

7  claims still directly infringed?

8     A.    Yes, sir, in a variety of manners.

9     Q.    Is Claim 29 still also indirectly infringed?

10     A.    Yes, sir.  There have been no changes there.

11     Q.    Is SAP still literally infringing the claims?

12     A.    Yes, sir.

13     Q.    Is this true for all the accused products here,

14  all the modified products?

15     A.    Yes, sir.

16     Q.    What do you base this on?

17     A.    I base this on a variety of evidence, including

18  SAP's technical information regarding their patch.  I

19  base it on reading the source code for the patch.  I

20  base it on installing that patch on to SAP systems after

21  May 2010 and using those systems.

22     Q.    Do you base it upon the 2009 determination?

23     A.    Yes, sir.  I also used the 2009 determination

24  and the evidence therein.

25               I also based part of my opinion on the

1  deposition of Dr. Wolfgang Nieswand, which occurred in

2  London in March, where he confirmed my findings.

3      Q.   Did you also base it on your independent

4  assessment?

5      A.   Yes, sir, I did.

6      Q.   To wrap up, what you have shown us on the

7  damages and the infringement issues, could you just tell

8  us very briefly what you have shown us on the damages

9  and the infringement issues, the two issues that you've

10  given opinions on?

11      A.   Yes.  I've shown that on the -- on the damages

12  and demand side, that Mr. Carter's invention does drive

13  a majority of the demand for the Pricer product and

14  there remains and continues to be a demand in the

15  marketplace for that invention.

16          On the infringement side, I've shown that

17  SAP's products, after May 2010, continue to infringe the

18  Carter patents.

19      Q.   Thank you.

20          MR. POLLINGER:  Your Honor, I pass the

21  witness.

22          THE COURT:  All right.  Cross-examination.

23          MR. BATCHELDER:  Thank you, Your Honor.

24          May we first approach?

25          THE COURT:  Yes.

1          MR. BATCHELDER:  Thank you.

2          (Bench conference.)

3          MR. BATCHELDER:  There's a -- there are

4    couple of things.

5          There was a Motion in Limine about the

6    '400 patent, vis-à-vis the '350 patent, and we would

7    renew our request to be able to introduce into evidence

8    that the '400 patent was part of the last determination,

9    and it was determined not to be infringed.

10          THE COURT:  I'm going to stick with my

11    prior ruling on that.

12          MR. BATCHELDER:  Okay.

13          THE COURT:  Sustaining the objection to

14    that line of questioning.

15          MR. BATCHELDER:  Okay.  And then we would

16    like to make an offer of proof.  And we can do it now or

17    at lunch, whatever Your Honor's preference is, about the

18    need to isolate the value of the '350 patent as compared

19    to the '400.  You ruled against us on that.

20          THE COURT:  I did, and we'll -- we can do

21    that at the lunch break.

22          MR. BATCHELDER:  Thank you, sir.

23          THE COURT:  They've got one to make as

24    well.

25          MR. BATCHELDER:  Yes.  Thank you.

```
 1                    THE COURT:  Do you have an expert report
 2   or something you want to make as your offer?
 3                    MR. BATCHELDER:  I'm sorry?
 4                    THE COURT:  You want to tender your
 5   expert --
 6                    MR. BATCHELDER:  We can do that, yes.
 7                    THE COURT:  Well, however you want to do
 8   is fine with me.
 9                    MR. BATCHELDER:  All right.
10                    THE COURT:  I'd rather not take a bunch of
11   testimony.
12                    MR. BATCHELDER:  Thank you.  No.  I
13   understand.
14                    THE COURT:  You can do it in a summary
15   fashion, okay?
16                    MR. BATCHELDER:  Yes, sir.  Thank you.
17                    THE COURT:  All right.
18                    (Bench conference concluded.)
19                         CROSS-EXAMINATION
20   BY MR. BATCHELDER:
21       Q.   Mr. Gupta, good morning.
22       A.   Good afternoon.
23       Q.   Almost afternoon.
24       A.   Oh, morning.  I was close.  I was getting
25   hungry.
```

1    Q.   I'm there with you.

2         You are here today to render expert

3    testimony, right?

4    A.   Yes, sir.

5    Q.   Objective, impartial expert testimony?

6    A.   Yes, sir.  That's what I've done.

7    Q.   Okay.  One thing, I'm sure you understand, the

8    ladies and gentlemen of the jury will want to consider

9    for all the experts who will testify in this case,

10   because more will come, is whether a given expert may

11   have a certain connection to one party, Trilogy, or

12   another party, SAP, that might make it hard for them to

13   be impartial.

14        Do you think that would be a fair thing

15   for them to think about?

16   A.   That would be fair.

17   Q.   Okay.  So you're being paid for your work in

18   this case, but that's true for all the experts, correct?

19   A.   Yes, sir, I believe so.

20   Q.   All right.  But you do have connections to

21   Trilogy and Versata that no experts on the SAP side has

22   to either party in the case; is that fair?

23   A.   Yes, sir.  I worked at Trilogy for 13 years, as

24   I've explained.

25   Q.   Right.  So you were employed at Trilogy.  You

1  started in 1995; is that right?

2       A.   Yes.

3       Q.   Okay.  And you had several positions there over

4  your 13-year tenure, correct?

5       A.   Yes, sir.

6       Q.   One of them was, you were managing director of

7  Trilogy's intellectual property; is that correct?

8       A.   Yes.

9       Q.   Intellectual property includes patents.

10      A.   Yes, sir.  I have a fair bit of experience in

11  patents.

12      Q.   Yes.  And you had that position starting in

13  2007?

14      A.   Yes, I believe so.

15      Q.   Through 2009 when you left, right?

16      A.   Yes.

17      Q.   Okay.  So this lawsuit was filed in 2007,

18  correct?

19      A.   Yes, sir, it was.

20      Q.   Okay.  So for around a couple of years while

21  this lawsuit was pending, you were working as an

22  employee of Trilogy in connection with managing

23  intellectual property when this patent lawsuit existed;

24  is that fair?

25      A.   Yes.

1    Q.   Okay.  You mentioned, I believe, in your --

2    early on in your direct testimony that you got a

3    graduate degree from Harvard, correct?

4    A.   No, sir.

5    Q.   I'm sorry?

6    A.   No, sir.

7    Q.   Did I misunderstand?  You have some kind of

8    graduate degree; is that right?

9    A.   It was the Executive Education Program.  My

10   graduate degree is from MIT in computer science.

11   Q.   Okay.  So that -- that Harvard degree, can you

12   say again what it was?

13   A.   It's the Executive Education Program.

14   Q.   Okay.  And that -- that -- you got a degree

15   there; is that correct?

16   A.   No, sir.  I don't think I have a degree.

17   Q.   Okay.  But you went to school for some period

18   of time at Harvard?

19   A.   Yes, sir.

20   Q.   Okay.  And that was paid for by Trilogy,

21   correct?

22   A.   Yes, sir.  That was in 2000, I believe.

23   Q.   Okay.  Now, all of the SAP experts, you've read

24   their reports, correct?

25   A.   I've skimmed some of them.  I've read some of

1  them.

2      Q.   Okay.  And you know that they got postgraduate

3  degrees in educational pursuits and certificates,

4  et cetera, but none of those were paid for by SAP; is

5  that fair?

6      A.   I don't know who paid for their degrees, sir.

7      Q.   Okay.  But as far as you know, they're not?

8      A.   I have no basis but now.

9      Q.   Okay.  All right.  It's also fair to say that

10  many of the Trilogy and Versata current and former

11  employees that are directly involved in this suit, you

12  count them as your personal friends; is that fair?

13     A.   Yes, sir.

14     Q.   Okay.  So the first witness from Versata

15  yesterday was Tom Carter, right?

16     A.   Yes, it was.

17     Q.   And the named inventor on the patent that we're

18  here to talk about that you just said has been infringed

19  in a variety of ways by modified software, right?

20     A.   That's correct.

21     Q.   And you consider him to be a close personal

22  friend of yours.

23     A.   Yes, I do.

24     Q.   Okay.  The next witness for Trilogy and Versata

25  was Sameer Dholakia.  Do you remember that?

1    A.    Yes, I do.

2    Q.    Okay.  He also is someone who you consider to

3  be a close personal friend, correct?

4    A.    Yes, sir.

5    Q.    Okay.  The third witness we heard this morning,

6  Mr. Smith, from Trilogy/Versata, also a close personal

7  friend of yours, correct?

8    A.    Yes, he's a friend.

9    Q.    Joe Liemandt.  We've heard a lot about him, as

10  Mr. Melsheimer described him, the big boss at Trilogy.

11  Close personal friend of yours, correct?

12    A.    He's also a friend, yes.

13    Q.    Randall Jacops, who has been sitting in the

14  courtroom, CEO of Versata, also a personal friend of

15  yours, correct?

16    A.    Yes.  I've work with these people for many,

17  many years and developed friendships.

18    Q.    And you don't have any personal friends at SAP,

19  right?

20    A.    None that I'm aware of, sir.

21    Q.    Okay.  Now, since you left the employment of

22  Trilogy/Versata -- and it was June 2009; is that right?

23    A.    Yes.

24    Q.    You mentioned, I believe, on direct that you

25  worked as a consultant in connection with these kinds of

1   lawsuits; is that fair?

2       A.   Yes, sir.

3       Q.   Okay.  And you've worked on seven of them,

4   seven lawsuits, right?

5       A.   I've worked on more than seven lawsuits, sir.

6       Q.   As a consultant, you've worked on seven cases

7   since you left Versata?

8       A.   Yes, that's correct.

9       Q.   Okay.  And in those seven cases, six of those

10  seven, you were working with the McKool Smith law firm,

11  Versata's lawyers in this case, right?

12      A.   Yes, sir, I was.

13      Q.   And the seventh one, you were working for

14  Versata, right, an entity owned by Versata?

15      A.   Yes.

16      Q.   Okay.  So in a hundred percent of those seven

17  lawsuits that you've worked on since leaving

18  Trilogy/Versata, you've worked either with a law firm or

19  with the company itself, right?

20      A.   Yes.  Your math is right.

21      Q.   Okay.  All right.  Let's talk a little bit

22  about your experience as an expert, could we?

23           You've never been designated by a court as

24  an expert, have you?

25      A.   No, sir, I have not.

1    Q.   And you've never testified as an expert before

2  at trial, correct?

3    A.   That's correct.

4    Q.   Now, you rendered some opinions about this

5  modified software and whether you think it infringes.

6  Tomorrow SAP's independent expert, Dr. Ray Mercer, is

7  going to speak to those.  So we're not going to spend

8  too much time today on all that, but I do want to ask

9  you some questions to get some clarity so Dr. Mercer

10  understands what it is you're saying, okay?

11    A.   Okay.

12    Q.   All right.  And I want to see if we can't start

13  off by agreeing on some things.

14              MR. BATCHELDER:  Mr. Barnes, would you

15  please put up the cover sheet of the '350 patent?

16              All right.  And if you could just blow up

17  this section here (indicates).

18    Q.   (By Mr. Batchelder) Okay.  So, first of all, I

19  just want to be clear about something.  There was a

20  related application that was filed in 1996, correct?

21    A.   Yes.

22    Q.   And that application matured into a different

23  patent, not the one we're talking about here, correct?

24    A.   Yes, sir.

25    Q.   Okay.  No damages being sought for that patent,

1  correct?

2      A.   No, sir.

3      Q.   All right.  The application here was filed in

4  1999, correct?

5      A.   Yes.

6      Q.   And the three claims that you were talking

7  about and rendering opinions about in connection with

8  this modified software, 26, 28, and 29, and the other

9  claims of the '350 patent, those were submitted to the

10 Patent Office the first time either on February 19th,

11 1999, or later; is that right?

12     A.   Yes, that's right.

13     Q.   Okay.  Now, the application, once it was filed,

14 do you understand, would have been kept secret, right?

15 It wasn't published, correct?

16     A.   That's -- that's my understanding, yes.

17     Q.   Okay.  And you're not saying that SAP would

18 have known about that application in '96, '97, '98, and

19 '99, right?

20     A.   I've seen no evidence that they have.

21     Q.   Okay.  And there's no claim in this case that

22 any infringement by SAP has been willful in any way,

23 correct?

24     A.   I don't believe there has been.

25     Q.   Okay.  And you realize that kind of claim can

1   be made but hasn't been made here; is that right?

2       A.   Yes, sir.

3       Q.   Okay.  And Versata hasn't made that claim as to

4   the software that existed before of May of last year or

5   after, right?  The modified software, no claim of

6   willfulness, right?

7       A.   I'm sorry.  I didn't follow the question.

8   Could you repeat it?

9       Q.   There was no claim by Versata and is no claim

10  in this case that any SAP infringement has been willful,

11  either before May of 2010 or in connection with his

12  accusations of infringement as to the modified software?

13              MR. POLLINGER:  Can we approach the bench,

14  please, Your Honor?

15              THE COURT:  Yes.

16              (Bench conference.)

17              MR. POLLINGER:  Your Honor, this was

18  referred to already in opening by Mr. Melsheimer, and

19  now it's been repeatedly referred to by Mr. Batchelder.

20              I'd ask that the jury be instructed that

21  they should not draw an inference based upon what claims

22  were not asserted in this case.  They're trying to

23  indicate the unfairly prejudicial impression it's

24  because we chose not to allege willful infringement in

25  this case.

1          THE COURT:  I'm going to overrule that

2  objection.

3          MR. POLLINGER:  Thank you, Your Honor.

4          (Bench conference concluded.)

5     Q.   (By Mr. Batchelder) So we've been talking about

6  willfulness.  I was just asking you about there's no

7  claim of willful infringement either before the

8  modification or after, and that's correct, right?

9     A.   I'm not aware of any.

10    Q.   Okay.  And willful infringement would mean

11 intentional or deliberate, right?

12    A.   Yes, sir.

13    Q.   There's no claim of that here.

14    A.   Again, not that I'm aware of.

15    Q.   Okay.  All right.  And there's no claim that

16 SAP took Trilogy software code, correct?

17    A.   That's correct.

18    Q.   No claim that it took its trade secrets or

19 confidential business information, correct?

20    A.   None that I've seen.

21    Q.   Okay.  All right.  Let's see if we can't agree

22 on a few more things.

23          We've talked about -- you've talked about

24 hierarchical access.  You've talked about customer

25 hierarchies.  You've talked about product hierarchies.

1    Hierarchical access alone, first of all, it can be used

2    for things other than pricing, correct?

3         A.   Yes, sir, it can.

4         Q.   It can be used to draw data from even data

5    structures that aren't hierarchies, right?

6         A.   Yes, sir, it can.

7         Q.   Customer hierarchies can be used outside of

8    pricing, right?

9         A.   Yes, sir.

10        Q.   So can product hierarchies?

11        A.   Yes, sir.

12        Q.   Hierarchy access alone doesn't infringe any of

13   these claims, right?

14        A.   No, sir.

15        Q.   Customer hierarchies alone don't infringe any

16   of these claims, correct?

17        A.   That's correct.

18        Q.   Same with product hierarchies, correct?

19        A.   That's right.

20        Q.   Combining hierarchical access with a product

21   hierarchy alone would not infringe, right?

22        A.   That's correct.

23        Q.   And same with combining hierarchical access

24   with a customer hierarchy.  Would not infringe, correct?

25        A.   Well, all of these questions, as long as the

1 computer instructions were there to do both, they would,

2 but if you're asking about those computer instructions

3 that could just do what you're saying, then no.

4    Q.   That's what I'm asking.  The answer is no,

5 correct?

6    A.   That's correct.

7    Q.   All right.  And one of the reasons you were

8 saying that SAP's modified software, that is, the

9 modifications you were talking about that took place in

10 May 2010, you say they infringe is because there is code

11 that could run on pre-existing access sequences; that

12 is, access sequences that could have existed before May

13 2010 and that would run hierarchical access on both

14 product hierarchy and a customer hierarchy and that data

15 would then be used to determine a given price, right?

16    A.   I was saying the computer instructions that are

17 capable of running on that data setup would be

18 infringing, yes.

19    Q.   Okay.  And true or false.  Other than access

20 sequences created by Versata's experts in this lawsuit,

21 you've never seen that data setup; you've never seen an

22 example of it, correct?

23    A.   I've seen evidence of one.

24    Q.   You've never seen a customer actually having

25 set that kind of thing up, correct?  True or false?

1  A. False.

2  Q. True or false.  You don't know any specific

3 name of a customer that has, in fact, used any of the

4 accused SAP products to generate a given price using

5 data derived from both the running of a hierarchical

6 access on a product hierarchy and the running of a

7 hierarchical access on an organizational hierarchy?

8  A. False.

9    MR. BATCHELDER:  Mr. Barnes, could we

10 please -- could we please put up the sworn testimony of

11 Mr. Gupta on March 23rd starting at Page 62 running

12 through Lines 3 through 9?

13  Q. (By Mr. Batchelder) QUESTION:  Can you name a

14 customer who has used any of the accused SAP products to

15 generate a given price using data derived from both the

16 running of the hierarchical access on product hierarchy

17 and the running of a hierarchical access on an

18 organizational hierarchy.

19    ANSWER:  I don't know any specific name of

20 a customer that, in fact, has done those things.

21    Right?

22  A. That's what I said then, yes.

23  Q. Okay.  You have no opinion as to whether it is

24 any more or less likely that customers would set up and

25 use hierarchical access only for a product hierarchy but

1    not for a customer hierarchy, correct?

2        A.    That's correct.

3        Q.    Okay.

4            MR. BATCHELDER:  Your Honor, I'm about to

5    move into a new topic that's going to take a bit to

6    navigate.  I'm wondering if this might be a convenient

7    time.

8            THE COURT:  Well, let's do seven minutes

9    of it.

10           MR. BATCHELDER:  Okay.  Thank you.

11       Q.    (By Mr. Batchelder) You talked about some

12   questions that Versata sent to 40 of SAP's customers,

13   correct?

14       A.    Yes, sir.

15       Q.    All right.  And you understand that Versata did

16   not ask if the customers were calculating a given price

17   by running hierarchical access on both customer

18   hierarchy and a product hierarchy, correct?

19       A.    No, sir.  I can't agree with that.

20       Q.    Okay.  So you think that is what was asked?

21       A.    It was asked sometimes, yes.

22       Q.    Is it fair to say that Versata asked about

23   using product hierarchies without regard to whether they

24   were used for pricing?

25       A.    Sometimes that was asked, yes.

1    Q.    And it asked about customer hierarchies without

2  regard to whether they were used for pricing, correct?

3    A.    Yes, that was asked.

4    Q.    And it asked about hierarchical access without

5  asking whether it was being run on customer hierarchies

6  or product hierarchies, correct?

7    A.    I can't agree with that.  That was asked

8  sometimes.

9    Q.    To whom was that asked?

10    A.    That was asked to IBM specifically, is one that

11  I recall.

12    Q.    Anybody else?

13    A.    Not that I recall.

14    Q.    Okay.  So the other 39, that wasn't asked,

15  correct?

16    A.    I don't know affirmatively.  I -- in studying

17  for the testimony today, we reviewed the 14 that I had

18  called out previously.  Of those 14, that was at least

19  asked to IBM.  I don't recall what happened in the other

20  26.

21    Q.    And assuming that that question was not asked

22  to those other 39, you don't know why, right?

23    A.    No, sir, I was not involved with that.

24    Q.    All right.

25        MR. BATCHELDER:  Why don't we put up, if

1    you would, Mr. Barnes, PX1708.  These are the questions

2    that were asked to Chevron.

3                    And if we could go to Page 20 to Question

4    44.

5        Q.   (By Mr. Batchelder) All right.  So here's one

6    of the questions you were talking about.

7                    44:  For each U.S. version of SAP's ERP

8    software, has the SAP ERP software ever been used to

9    group any of the company's products into a product

10   hierarchy?

11                   Do you see that?

12       A.   Yes, sir.

13       Q.   And there's no mention of pricing there, is

14   there?

15       A.   No, sir, there's not.

16       Q.   Doesn't say:  Have you done this in connection

17   with pricing or for purposes of pricing or anything like

18   that, right?

19       A.   No, sir.

20       Q.   It just says:  Have you grouped these things --

21   products into product hierarchies, right?

22       A.   Yes.

23       Q.   And they answered yes, okay?

24                   MR. BATCHELDER:  And then could we go down

25   a little bit, Mr. Barnes, to the next question, No. 45?

1    Q.   (By Mr. Batchelder) 45:  For each U.S. version

2    of SAP's ERP software, has the SAP ERP software ever

3    been used to group any of the company's customers into a

4    customer hierarchy?

5            And, again, nothing about pricing in that

6    question, is there?

7    A.   No, sir.

8    Q.   It just asks:  Did you take customers and did

9    you put them into hierarchies, right?

10   A.   Well, specifically -- well, generally, yes.

11   Q.   Yeah.  Okay.

12           And you can answer yes to that even if

13   you're doing it for some reason other than pricing,

14   correct?

15   A.   Yes, you could.

16   Q.   Okay.  And you have a yes answer, right?

17   A.   Chevron said yes.

18   Q.   Uh-huh.

19           MR. BATCHELDER:  And could we turn then,

20   Mr. Barnes, a few questions later to Question 48.

21           Okay.  It's right here (indicates).  Thank

22   you.

23   Q.   (By Mr. Batchelder) So No. 48:  For each U.S.

24   version of SAP's ERP software, has the company ever used

25   hierarchical access to perform pricing?

1           Answer:  Yes.

2           You see that?

3    A.    Yes.

4    Q.    Okay.  Now, here they do ask about pricing, but

5  what they don't ask is whether hierarchical accesses

6  were used to generate a given price by running on both a

7  customer hierarchy and a product hierarchy, right?

8    A.    Yeah.  In this question, yeah.

9    Q.    Okay.  And, again, you don't know why?

10   A.    No.  I was not involved with it, sir.

11   Q.    Okay.  And we've seen three yes answers to

12  these questions, and I believe you said before that when

13  someone answers yes to all three of these, either that

14  it follows logically or that you think it's

15  overwhelmingly likely this means they must use

16  hierarchical access to generate a price by running it on

17  both a customer hierarchy and a product hierarchy, even

18  though that question was never asked.

19   A.    I believe that it is likely.

20   Q.    Uh-huh.

21          Now, Chevron answered these questions yes.

22  We know that they don't generate a given price by

23  running hierarchical access on a product hierarchy and a

24  customer hierarchy, correct?

25   A.    Yes.  And, in fact, that's why I said likely.

1    I'm not suggesting that it's a hundred percent for sure.

2         Q.   Okay.  And for Chevron, we know the answer, and

3    we know the answer is they don't do it, right?

4         A.   Yes, sir.

5         Q.   And they told us that in a sworn affidavit,

6    correct?

7         A.   Yes.  I've read that affidavit.

8              MR. BATCHELDER:  Would you please put up,

9    Mr. Barnes, 2772.

10                  To the next page, please.

11        Q.   (By Mr. Batchelder) So here's the Chevron

12   affidavit.

13             MR. BATCHELDER:  Could you please blow up

14   these few paragraphs?

15        Q.   (By Mr. Batchelder) And the Chevron affiant

16   says:  I've investigated.  Chevron's SAP systems are not

17   configured to reach hierarchical accesses to retrieve

18   condition records from a customer hierarchy.  Chevron's

19   SAP systems are not configured to compute a price based

20   on pricing information retrieved via hierarchical

21   accesses from a customer hierarchy.

22                  Chevron's SAP systems are not considered

23   to compute a price based on pricing information

24   retrieved via hierarchical accesses from both a customer

25   hierarchy and a product hierarchy, correct?

```
 1      A.   Yes.  I've had a chance to study these.
 2  They're talking about one specific type of customer
 3  hierarchy, not all types of customer hierarchies.  So I
 4  don't know if you can draw the full conclusion from
 5  this.
 6      Q.   Uh-huh.
 7              THE COURT:  Mr. Batchelder, we'll break
 8  here for lunch.
 9              MR. BATCHELDER:  Thank you, Your Honor.
10              THE COURT:  Ladies and Gentlemen, take
11  until 1:15, an hour and 15 minutes, for lunch, and
12  remember my prior instructions, and don't talk about the
13  case.
14              LAW CLERK:  All rise for the jury.
15              (Jury out.)
16              THE COURT:  You may step down.
17              Y'all be seated.
18              You can step down.
19              THE WITNESS:  Oh, thank you, sir.
20              THE COURT:  You have an offer to make with
21  respect to the --
22              MS. FITZGERALD:  Yes.  Versata has an
23  offer of proof to make.
24              THE COURT:  -- royalty.
25              MS. FITZGERALD:  Mr. Callahan is going to
```

1  handle that.

2          THE COURT:  Okay.  Mr. Callahan, come on.

3          MR. BAXTER:  Could we be excused, Your

4  Honor?

5          THE COURT:  Yes, absolutely.

6          MR. MELSHEIMER:  May we be excused as

7  well, Your Honor?

8          THE COURT:  Yes.

9          MR. CALLAHAN:  May it please the Court.

10         Steve Callahan on behalf of Versata.  And

11 Versata respectfully makes this offer of proof pursuant

12 to Federal Rule of Evidence 103(a)(2).

13         First, I'll start with the offer of proof

14 with respect to Mr. Weinstein's opinions.  If permitted

15 by the Court to do so, Mr. Weinstein would testify as

16 follows:  Based upon his review of the expert report of

17 Neeraj Gupta, he identified 21 Trilogy licenses for

18 which Pricer was either the primary reason for the

19 license or priced separately.

20         These licenses provided a benchmark for

21 calculating the value of Pricer in isolation, and they

22 will be referred to as the Pricer isolated agreements.

23         Based on actual licensed agreements, he

24 determined that Trilogy license revenue associated with

25 Tier 1 -- and when I refer to Tier 1, I generally refer

1    to Fortune 500 or Global 2000 companies -- associated

2    with Tier 1, Pricer-isolated Trilogy customers has

3    averaged $1.8 million per customer.

4              He also determined that Trilogy license

5    revenue for Pricer isolated agreements involving Tier 2

6    customers -- and when I refer to Tier 2 customers, I

7    refer to smaller general market customers -- has

8    averaged $530,000 per customer.

9              Now, in order to determine -- excuse me --

10   to determine the value of the patented invention for

11   Tier 1 customers, Mr. Weinstein relied on Mr. Gupta's

12   calculation that no less than 63 percent of the value of

13   the Pricer product is attributable to the

14   patent-in-suit, that is, the '350 patent.

15             Now, multiplying average Trilogy license

16   revenue for Pricer-isolated Tier 1 customers of 1.8

17   million times the 63 percent figure associated with

18   Mr. Gupta, yields average revenue attributable to the

19   patent-in-suit of $1.1 million.

20             Now, based on the testimony of the

21   inventor, that is, Mr. Carter, and Mr. Gupta,

22   Mr. Weinstein would testify that he concluded that there

23   was -- minimal effort would be required by SAP to

24   incorporate the invention into its product offerings.

25             Also, SAP's responses to Interrogatory 42,

1  that's Versata Interrogatory 42, indicates that

2  developing hierarchical access involved only 20 to 40

3  developer days for each of R/3 and CRM, thus indicating

4  a de minimus cost.

5         Nonetheless, Mr. Weinstein conservatively

6  adjusted the value of the Pricer product, and that's 1.1

7  million, by 10 percent to account for the difference

8  between a product license and a patent license.

9         Accordingly, he estimated that the value

10  of the '350 patent on a standalone basis is

11  approximately $1 million.  This figure represents the

12  value of the patent based on actual real-world

13  transactions.

14         SAP, to our knowledge, does not challenge

15  this adjustment.  According to the supplemental expert

16  report of Chris Bakewell, average SAP revenue for Tier 1

17  customers between April 22nd, 2003, and April 30th,

18  2011, is $3.3 million.

19         Mr. Weinstein would testify that

20  Mr. Bakewell adjusted this figure upward to $3.99

21  million per customer to account for the change in SAP

22  average yield size for Tier 1 customers between the late

23  1990s and the 2003 and 2011 timeframe.

24         Accordingly, the value of the

25  patent-in-suit is equivalent to 26 percent of revenue;

1   i.e. 1 million divided by the 3.99-million-dollar

2   figure.

3               Now, SAP license revenue has averaged $541

4   per seat for Tier 1 customers.  Accordingly, according

5   to Mr. Weinstein or what he would testify to, the value

6   of the patent-in-suit is approximately $140 on a

7   per-seat basis, and that equals 26 percent of $541.

8               The figure of $140 per seat represents the

9   value created by the patent.  This figure is based on

10  Trilogy's actual license agreements that embody the

11  patent-in-suit and Mr. Gupta's analysis of the specific

12  contribution of the patent-in-suit to license revenues

13  associated with those agreements.

14              Accordingly, $140 represents value created

15  by the patent-in-suit in the form of a patent license.

16              Now, Mr. Weinstein will also testify as to

17  the economics of bilateral monopoly and the Nash

18  Bargaining Solution.  He testified that the Nash

19  Bargaining Solution is a well-accepted principle of

20  economic theory, and it would be -- excuse me --

21  applicable to the hypothetical negotiation between the

22  parties over the distribution of this value.  And the

23  parties, of course, would be Trilogy and SAP.

24              Based on these concepts, and specifically

25  the Nash Bargaining Solution, Mr. Weinstein has

determined that the most likely outcome of the
hypothetical negotiation would involve a 50/50 split of
the benefits; i.e., the reasonable royalty for Tier 1
customers is $70.

Consistent with the Nash Bargaining
Solution, this leaves both Trilogy and SAP better off
than they would have been without reaching a deal to
license the '350 patent.

Using a similar analysis, Mr. Weinstein
has determined that the reasonable royalty for Tier 2
customers would be $20.  This reflects a 50/50 split of
the benefit per SAP seat of $40 for Tier 2 customers.

This benefit $40 was calculated as the
ratio of average Trilogy license revenue per customer
for Pricer-isolated agreements involving Tier 2
customers, 510,000, to average Trilogy license revenue
per customer for Tier 1 customers of $1.8 million, and
that's 28 percent of $70.

Additionally, if allowed to do so,
Mr. Weinstein would testify as to what he examined with
respect to a 2006 settlement agreement between Versata
and Selectica in which Versata licensed the '350 patent
and several additional patents.

In return, Selectica gave Versata a
cross-license and also paid Versata $7.5 million under

1    the agreement.  This license payment amounts to

2    estimated 10.5 percent of licensed revenue.

3              Since SAP sells the infringing software in

4    a bundled fashion, Mr. Weinstein examined the evidence

5    to identify a base within SAP's software comparable to

6    the base of the Selectica pricing software that was

7    accused of infringement and then licensed.

8              Mr. Weinstein found evidence that in the

9    1999 SAP -- excuse me -- that in 1999, SAP considered

10   offering SPE as a standalone pricing product for

11   approximately $1,000 per seat.  Applying the 10.5

12   percent rate calculated under the Selectica agreement to

13   the standalone price contemplated by SAP yields a

14   royalty of $105 per seat.

15             Mr. Weinstein's reasonable royalty damages

16   are calculated by multiplying the number of SAP Tier 1

17   seats, 2.5 million, containing the infringing software

18   times the Tier 1 reasonable royalty rate of $70.  This

19   yields a reasonable royalty damages of approximately 175

20   million for infringement associated with Tier 1 SAP

21   seats.

22             Reasonable royalty damages for Tier 2

23   seats containing the infringing software, 2.5 million --

24   that's 2.5 million seats -- are approximately $50

25   million.  2.5 million seats times a reasonable royalty

1   rate of $20 per seat, total reasonable royalties,

2   assuming no lost profits are awarded, would equal

3   approximately $225 million.

4          The calculations would be the same if lost

5   profits are awarded, except that SAP seats for which

6   lost profits are awarded, would be subtracted from the

7   royalty base before calculating reasonable royalties.

8          That concludes the Weinstein offer of

9   proof.  I will now proceed with the Bakewell offer of

10  proof.

11          THE COURT:  You want to just do it by

12  giving me his expert reports?

13          MR. CALLAHAN:  Oh, as long as SAP agrees

14  that that's sufficient to preserve the record, I'd love

15  to do that, Your Honor, and I think that would save

16  everybody a lot of time.

17          MR. BATCHELDER:  I would delight in that,

18  Your Honor.

19          THE COURT:  Well, that's -- so would I.

20          MR. CALLAHAN:  Apologies.

21          THE COURT:  I mean, you're doing a fine

22  job summarizing his expert report, but --

23          MR. CALLAHAN:  Yes.  We were just under

24  the assumption that this would be one way to do it, but

25  I will -- I can give you the -- all of the expert

1    reports, as well as the Selectica agreement that I

2    referenced.

3                    THE COURT:  Why don't you gather those

4    up --

5                    MR. CALLAHAN:  Yes, sir.

6                    THE COURT:  -- over the lunch hour, and

7    I'll receive them as Court's 1 collectively with the

8    exhibits that you intended to use with the experts

9    related to reasonable royalty.

10                   MR. CALLAHAN:  Yes, sir.

11                   THE COURT:  That will be received as

12   Court's 1 and be your offer of proof --

13                   MR. CALLAHAN:  Excellent.

14                   THE COURT:  -- on the royalty issue, okay?

15                   MR. CALLAHAN:  I appreciate that, Your

16   Honor.

17                   THE COURT:  Appreciate it.

18                   Mr. Batchelder, you have one as well?

19                   MR. BATCHELDER:  Yes, Your Honor.  Thank

20   you.  I can, I think, do this just by referencing the

21   expert report.

22                   The expert report of --

23                   THE COURT:  Is that agreeable?

24                   MR. CALLAHAN:  Yes, Your Honor.

25                   THE COURT:  Okay.  All right.

1          MR. BATCHELDER:  Thank you.

2          The expert report of Dr. Ray Mercer is

3   already Defendants' Exhibit DX2725.  And it states

4   opinions that are based on the fact that the '400 patent

5   has been determined by this Court not to be infringed,

6   and his point was that to properly value the '350

7   patent, you have to isolate the contribution of the '350

8   patent as compared to the '400 patent, and he asserts

9   opinions to that effect in his expert report, DX2725,

10  and we would both elicit testimony from Dr. Mercer on

11  that subject and also would have elicited --

12          THE COURT:  Consistent with his expert

13  report.

14          MR. BATCHELDER:  Yes, sir.

15          THE COURT:  Okay.

16          MR. BATCHELDER:  And we also would have

17  elicited cross-examination testimony from Mr. Gupta on

18  that subject had the Court allowed.

19          THE COURT:  Okay.  On the same -- the same

20  areas that Dr. Mercer had put in his expert report.

21          MR. BATCHELDER:  Yes, sir.

22          THE COURT:  Okay.

23          MR. BATCHELDER:  Thank you.

24          THE COURT:  All right.  If you want to --

25  same thing and gather up his expert report, I'll receive

1    it as Court's 2.

2              MR. BATCHELDER:  It's already a DX, Your

3    Honor.

4              THE COURT:  Okay.  Well, it will be

5    DX2725?

6              MR. BATCHELDER:  That's it, sir.

7              THE COURT:  Okay.  Those portions that are

8    related to the finding of no infringement of the '400

9    patent will be -- you can just submit the exhibit

10   itself, and we'll label it Court's 2, okay?

11             MR. BATCHELDER:  Thank you.

12             MR. POLLINGER:  If I could just --

13   Mr. Batchelder, which expert report is that?

14             MR. BATCHELDER:  This is the rebuttal

15   expert report of Dr. Ray Mercer.

16             MR. POLLINGER:  It's not admitted into

17   evidence, though, is it?

18             MR. BATCHELDER:  It is DX2725.

19             MR. POLLINGER:  I mean, it's got an

20   exhibit sticker on it, but it's not been admitted into

21   evidence.  It's hearsay.

22             MR. BATCHELDER:  Okay.  Well, we can make

23   it a Court exhibit then, Your Honor.

24             THE COURT:  Okay.  Y'all gave us a list

25   yesterday of what had been admitted, I thought, so...

1                    LEGAL ASSISTANT:  It's not admitted.

2                    THE COURT:  Okay.  All right.  Well --

3                    MR. BATCHELDER:  Thank you.

4                    MR. POLLINGER:  We're not --

5                    THE COURT:  It is hearsay.  It's not

6      admitted, but it will be received as Court's 2.

7                    MR. BATCHELDER:  Thank you, Your Honor.

8                    MR. POLLINGER:  Thank you, Your Honor.

9                    (Lunch recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

         I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____          May 10, 2011
SHELLY HOLMES, CSR
Deputy Official Court Reporter
State of Texas No. 7804
Expiration Date:  12/31/12

/s/_____          May 10, 2011
GLENDA FULLER, CSR
Deputy Official Court Reporter
State of Texas No. 1042
Expiration Date:  12/31/12