```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  VERSATA SOFTWARE, INC.,  ) Civil Docket No.
    ET AL                    ) 2:07-CV-00153-CE
 4                           ) May 10, 2011
    VS.                      ) 1:15 P.M.
 5                           )
    SAP AMERICA, INC., ET AL )
 6

 7                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE CHAD EVERINGHAM
 8               UNITED STATES MAGISTRATE JUDGE

 9  APPEARANCES:
    FOR THE PLAINTIFF:       MR. SAM BAXTER
10                           McKool Smith, P.C.
                             104 E. Houston Street
11                           Suite 300
                             Marshall, Texas  75670
12
                             MR. SCOTT L. COLE
13                           MR. STEVEN J. POLLINGER
                             MS. LAURIE L. FITZGERALD
14                           MR. KEVIN M. KNEUPPER
                             MS. LEAH B. BURATTI
15                           McKool Smith, P.C.
                             300 W. 6th Street, Suite 1700
16                           Austin, Texas 78701

17                           MS. ADA BROWN
                             MR. STEVEN CALLAHAN
18                           McKool Smith, P.C.
                             300 Crescent Court, Suite 1500
19                           Dallas, Texas 75201

20  APPEARANCES CONTINUED ON NEST PAGE:

21  COURT REPORTERS:         SHELLY HOLMES, CSR
                             GLENDA FULLER, CSR
22                           Deputy Official Court Reporters
                             100 East Houston, Suite 125
23                           Marshall, TX 75670
                             903/935-3868
24
    (Proceedings recorded by mechanical stenography,
25  transcript produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:        MR. THOMAS M. MELSHEIMER
                               MR. MICHAEL A. BITTNER
 3                             Fish & Richardson, P.C.
                               1717 Main Street, Suite 5000
 4                             Dallas, Texas 75201

 5                             MR. JOHN W. THORNBURGH
                               MR. JUSTIN M. BARNES
 6                             Fish & Richardson, P.C.
                               12390 El Camino Real
 7                             San Diego, California 92130

 8                             MR. JAMES R. BATCHELDER
                               Robes & Gray, LLP
 9                             1900 University Avenue
                               6th Floor
10                             East Palo Alto, California 94303

11                             MR. CHRISTOPHER BUNT
                               Parker Bunt & Ainsworth
12                             100 E. Ferguson, Suite 1114
                               Tyler, Texas 75702
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                LAW CLERK:  All rise.

3                (Jury in.)

4                THE COURT:  Please be seated.

5                Mr. Batchelder?

6                MR. BATCHELDER:  May it please the Court.

7                THE COURT:  Continue.

8     NEERAJ GUPTA, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

9                CONTINUED CROSS EXAMINATION

10    BY MR. BATCHELDER:

11       Q.   Afternoon, Mr. Gupta.

12       A.   Good afternoon this time.

13       Q.   I want to be clear about one thing.  The -- the

14    modified software that you're directing your

15    infringement opinions to, I just want to be clear,

16    there's nothing new about that software that you say

17    renders it infringing that wouldn't have been applicable

18    to the software that existed before the modification,

19    fair?

20       A.   Yes, sir, that is correct.

21       Q.   Okay.

22                MR. BATCHELDER:  Mr. Barnes, could you

23    please put up the '350 patent?  Let's -- let's start at

24    the bottom of Column 20.  All right.  If you'll just

25    blow this up at the very bottom, please.  Thank you.

1    Q.   (By Mr. Batchelder)  So here's Claim 17 and

2  this is what's called a method claim, correct?

3    A.   Yes, sir.

4    Q.   It starts right here, a method, right?

5    A.   Yes, sir.

6    Q.   Okay.

7         MR. BATCHELDER:  And Mr. Barnes now, if

8  you could kick to the next column and let's take it to

9  the beginning of Claim 26, please.  Yeah, it's right

10 down there.

11   Q.   (By Mr. Batchelder)  So this Claim 26 that

12 refers to this -- that Claim 17 we just looked at, that

13 method claim, correct?

14   A.   Yes, sir.

15   Q.   Okay.  So one depends on the other.  26 depends

16 from 17?

17   A.   Yes.

18   Q.   Okay.  All right.  And then we have the same

19 kind of relationship and 26 is one of the asserted

20 claims, correct?

21   A.   Yes, it is.

22   Q.   All right.  And then the same kind of

23 relationship exists with respect to Claim 28.  So first

24 let's look at Claim 27, please.  This is another one of

25 those method claims, correct?

1    A.   Yes, sir, it is.

2    Q.   All right.  And then Claim 28 --

3              MR. BATCHELDER:  Mr. Barnes, please, just

4    the beginning.

5    Q.   (By Mr. Batchelder) -- it says again:  Computer

6    readable storage media, etcetera, etcetera, to implement

7    the method of Claim 27.  So 28 -- or excuse me, Claim,

8    yeah, 28 depends from Claim 27; is that fair?

9    A.   Yes, sir, that's correct.

10   Q.   Okay.

11             MR. BATCHELDER:  Your Honor, may I

12   approach the witness to hand him up a copy of his expert

13   report?

14             THE COURT:  Yes.

15             MR. BATCHELDER:  Thank you.

16   Q.   (By Mr. Batchelder)   I'm going to put up a

17   slide and I just want you to confirm that it was from

18   your report.  I believe if you turn to Page 64 you'll

19   find --

20             MR. BATCHELDER:  And Mr. Barnes, would you

21   put up PX2102, Page 3 screen shot there?

22   Q.   (By Mr. Batchelder)   You see this screen shot

23   on Page 64?

24   A.   Yes, I do.

25   Q.   Okay.  Now, if SAP's product shipped with a

1  pricing procedure that included the access sequence

2  shown in this screen shot and just that sequence were

3  executed, would the method of Claim 17 of the '350

4  patent be performed?

5      A.   Claim 17 is not one of the claims asserted in

6  this case.

7      Q.   Sir, I'm sorry.  Could you just answer my

8  question?  I'm asking you about Claim 17.  Would you

9  like me to repeat the question?

10     A.   No, that's okay.  If this was the only access

11 sequence?

12     Q.   Yes, that were executed.

13     A.   No, the method of Claim 17 would not be

14 performed.

15     Q.   Okay.  And the same is true of the method claim

16 of Claim 27, correct?  That also would not be infringed?

17     A.   Actually, I'd like to revise my previous

18 answer.  I gave you the incorrect answer.

19     Q.   Okay.

20     A.   The method of Claim 17 would be performed.

21          MR. BATCHELDER:  All right.  Mr. Barnes,

22 would you please pull up the witness' sworn testimony

23 from April 13th, Page 130, starting at Line 10 and going

24 through Line 23?  Thank you.

25     Q.   (By Mr. Batchelder)   This is a question:  If

1  SAP's product shipped with a pricing procedure that

2  included the access sequence shown in the screen shot on

3  Page 64 of your report and that code were executed,

4  would the method of Claim 17 of the '350 patent be

5  performed?

6              Answer:  Again, in this hypothetical SAP

7  system you're talking about, is this the only access

8  sequence?

9              Yes.  Method of just Claim 17 to be

10 performed would not be performed if this was the only

11 access sequence.

12             That was your testimony under oath,

13 correct, sir?

14     A.   Yes, sir.

15     Q.   All right.  Let's now turn to your opinions

16 about value.  First of all, it's fair to say that SAP's

17 ERP and CRM products are much larger in scope than

18 Versata's Pricer product; is that fair?

19     A.   No, sir.

20     Q.   Okay.  So you're saying that SAP's ERP products

21 that are used to return virtually all the major

22 functions of a major corporation, that's not a broader

23 scope than just pricing?

24     A.   Oh, in terms of number of features, if that's

25 what you're asking, then yes.

1    Q.   Okay.  So SAP's ERP and CRM products, they are

2  large enterprise management programs with many, many

3  features, fair?

4    A.   Yes, sir, that's correct.

5    Q.   And pricing is just one of those features,

6  correct?

7    A.   Yeah, that is one of the features.

8    Q.   And hierarchical access within pricing is one

9  of many, many features within pricing?

10   A.   Yes, sir, that's one of the capabilities of

11 pricing.

12               MR. BATCHELDER:  Mr. Barnes, would you

13 please put up DX1916?

14   Q.  (By Mr. Batchelder)  All right.  We'll see at

15 the top, this is called SAP ERP solution map and you've

16 seen this document before, haven't you?

17   A.   Yes, I have.

18   Q.   Okay.  And this contains, I know it's a little

19 small print --

20               MR. BATCHELDER:  Maybe, Mr. Barnes, if we

21 could blow up this set of listed modules.  Thank you.

22   Q.  (By Mr. Batchelder)  So is it fair to describe

23 these as modules of functionality within SAP's ERP

24 product?

25   A.   Yes, that would be a fair characterization.

1       Q.   All right.

2              MR. BATCHELDER:  And Mr. Barnes, can you

3   go to the next page, just show there are even some more?

4   Okay.

5       Q.   (By Mr. Batchelder)   So here are some more of

6   those functionality modules?

7       A.   Yes, sir.

8              MR. BATCHELDER:  All right.  And could we

9   go back, Mr. Barnes, to the prior page?

10      Q.   (By Mr. Batchelder)   So sales order management

11  is where price -- where pricing resides within ERP; is

12  that right?

13      A.   Yes, sir.

14      Q.   And sales order management does a lot of other

15  things besides pricing, correct?

16      A.   Yes.

17      Q.   Okay.  Now, have you evaluated the value of

18  hierarchical access functionality as compared to the

19  value of sales order management in its entirety?

20              MR. BATCHELDER:  Keep that up, please,

21  Mr. Barnes.

22      Q.   (By Mr. Batchelder)   Just within this, have

23  you evaluated within all the functionality within sales

24  order management, how valuable is hierarchical access?

25      A.    I believe it's worth about one million dollars

1  to large companies.

2  MR. BATCHELDER:  Mr. Barnes, would you

3  please pull up from the witness' sworn testimony of

4  March 23rd, starting on Page 144, Line 25 through Line 3

5  on the next page?

6  Q.  (By Mr. Batchelder)  Here was my question:

7  Have you evaluated the value of hierarchical access

8  functionality as compared to the value of sales order

9  management in its entirety?

10  Answer:  No, I haven't done that.

11  That was your sworn testimony, right?

12  A.  And I stand by that testimony, I haven't done

13  that.

14  Q.  Okay.  Is the functionality that's associated

15  with the '350 patent the most valuable functionality

16  within the sales order management module of SAP's ERP

17  product?

18  A.  I don't know.  I haven't valued the modules.

19  Q.  Let's talk generally about the relationship

20  between price and value.  You agree generally that when

21  things become cheaper, more people want to buy them; is

22  that fair?

23  A.  Generally, yes.

24  Q.  Uh-huh.  And you think that's generally true of

25  all things, right?

1      A.    Yes, sir.

2      Q.    Including Pricer?

3      A.    Yes, sir.

4      Q.    Okay.  And you agree that it would not be

5  unreasonable for someone to conclude that for Versata to

6  significantly penetrate the market further than it did,

7  it would have needed to lower its price?

8      A.    That could be a reasonable conclusion.

9      Q.    All right.  Let's talk about some of the

10  competitors that were in this market.  Trilogy marketed

11  Pricer for customers who were running Oracle's ERP

12  system, correct?

13      A.    Yes, I understand they did.

14      Q.    And at any point in time is there anything that

15  you're aware of that would have prevented Trilogy from

16  successfully marketing Pricer to customers running

17  Oracle's ERP program as opposed to SAP's?

18      A.    If Trilogy would have attempted that, then no.

19      Q.    In 2003, the year the '350 patent issued,

20  Versata's Pricer product was competing as a product of

21  companies beside SAP, correct?

22      A.    Yes.

23      Q.    It was competing against the installed system

24  of customers who were doing pricing, right?

25      A.    Yes.

1    Q.   It was competing against SAP, correct?

2    A.   Yes.

3    Q.   Competing against Oracle pricing, correct?

4    A.   Yes.

5    Q.   It was competing against the pricing solution

6 of at least a couple of other companies, correct?

7    A.   When you look at the entire market, yes.

8    Q.   You don't know whether any company other than

9 SAP and Trilogy has sold any product that practices any

10 claim of the '350 patent, correct?

11    A.   You said other than SAP and Trilogy?

12    Q.   Yes.

13    A.   Yes, I know of no other product -- company that

14 has sold a product that practices the claims of the

15 '350.

16    Q.   That wasn't quite my question, so let me pose

17 it again and make sure your answer is in line with what

18 I'm asking.

19    A.   Okay.

20    Q.   You don't know whether any company other than

21 SAP and Trilogy has sold any product that practices any

22 claim of the '350 patent, correct?

23    A.   No, sir, I don't.

24    Q.   When SAP releases new versions of its software,

25 many new features are added in a typical release,

1   correct?

2       A.   Yes, sir.

3       Q.   Okay.  And you don't know whether features

4   other than hierarchical access helped close the gap, as

5   you would say, between SAP pricing and Trilogy's Pricer

6   functionality, correct?

7       A.   No, sir, I believe hierarchical access did help

8   close the gap.

9       Q.   Again sir, that wasn't my question.

10      A.   Oh, I'm sorry.

11      Q.   I realize that you've testified that that's

12  your opinion.  My -- my question is different.  I'm

13  asking about other features.

14      A.   Okay.

15      Q.   So let me put it to you again.  You don't know

16  whether features other than hierarchical access helped

17  close the gap between SAP pricing and Pricer

18  functionality, correct?

19      A.   That's correct.

20      Q.   Okay.  In formulating your expert opinion in

21  this matter, you did not conduct any investigation to

22  answer that question, right?

23      A.   That's correct.

24      Q.   You understand that SAP introduced its

25  hierarchical access feature in October of 1998?

1      A.   Yes, that's right.

2      Q.   And you were working at Trilogy at the time,

3  right?

4      A.   Yes, sir, I was.

5      Q.   And then for the next four years, from '98

6  through 2003, you were vice president of product

7  strategy, right?

8      A.   Yes, I was.

9      Q.   You led the long-term technical and product

10  strategy for Pricer, among other products, right?

11      A.   Yes, sir.

12      Q.   So I take it when sales fell off, as shown in

13  that graphic that we've seen with the mountain top

14  falling, you went out and did a thorough investigation

15  as to why, right?

16      A.   No, sir.

17      Q.   Even though you were vice president of product

18  strategy for Pricer?

19      A.   Yes, sir.

20      Q.   Okay.  So you didn't do that investigation

21  then.  Let's talk of what you did in this case.

22  Certainly you read a lot of Trilogy documents, right?

23      A.   Yes, I did.

24      Q.   You interviewed Trilogy employees, correct?

25      A.   Yes, I did.

1    Q.   You've read the transcripts of sworn testimony

2  of many Trilogy employees, correct?

3    A.   Yes, sir.

4    Q.   All right.  And true or false, sir, you're not

5  aware of any communications, whether in documentary form

6  or otherwise, that were created before this lawsuit was

7  filed and that identified hierarchical access in

8  particular as having had an important impact on

9  Trilogy's ability to sell Pricer, true or false?

10   A.   That's true.

11           MR. BATCHELDER:  No further questions at

12  this time, Your Honor.

13           THE COURT:  Redirect, Mr. Pollinger?

14           MR. POLLINGER:  Yes, Your Honor.  Thank

15  you.  Actually could we approach the bench first, Your

16  Honor?

17           THE COURT:  Sure.

18           (Bench conference.)

19           MR. POLLINGER:  Your Honor, there's a

20  motion in limine about not going into discovery disputes

21  and I asked for exception to that with respect to our

22  request for customer discovery and the motion that SAP

23  filed that blocked us from getting discovery.

24  Mr. Batchelder creates questions in the Jury's minds as

25  to why there weren't further inquiries with regard to

1   customers.

2           So I think I should be allowed to go into

3   that motion that they filed to block us from doing

4   further discovery.  As Your Honor probably recalls from

5   the first trial in this case in 2009, we had the same

6   thing occur and Your Honor gave an instruction to the

7   Jury on that point.

8           MR. BATCHELDER:  Your Honor this is a very

9   different situation.  The question that I asked him was

10  for the customers that were subpoenaed, why didn't they

11  ask this question.  That was not the question.

12          THE COURT:  Yeah, that's my recollection,

13  too.  I'm going to deny the request and stick with my

14  prior ruling.

15          MR. POLLINGER:  Thank you.

16          (Bench conference concluded.)

17                REDIRECT EXAMINATION

18  BY MR. POLLINGER:

19     Q.   Mr. Gupta, let me start by asking you whether

20  anything that Mr. Batchelder asked you on

21  cross-examination, if that's affected your opinions in

22  any way?

23     A.   No, sir.

24     Q.   You've given two opinions, one is that there's

25  demand for the invention.  Has Mr. Batchelder's

1 cross-examination changed your opinion on that?

2     A.   No, sir.

3     Q.   And your other opinion is that the modified

4 products after May 2010 continue to infringe.  Has

5 anything Mr. Batchelder asked you on cross-examination

6 changed your opinion on that?

7     A.   No, sir.

8     Q.   Now, in the cross-examination, Mr. Batchelder,

9 I think, was trying to create the suggestion that --

10 that you may be -- you may be partial, you may not be

11 testifying truthfully.  Let me ask you a few questions

12 on that.

13         Do you have any financial interest in the

14 outcome of this case?

15     A.   No, sir.

16     Q.   Your prior work for either Trilogy or for our

17 law firm, is that keeping you from testifying

18 truthfully?

19     A.   No, sir.

20     Q.   Is that keeping you from giving honest

21 opinions?

22     A.   No, sir.

23     Q.   Now, I know you don't want to go into this,

24 but -- but I feel I have to, given what Mr. Batchelder

25 asked you.  Over the lunch break -- and what Mr.

1   Batchelder said in your -- his cross-examination of you,

2   he said that we will hear tomorrow from the impartial

3   expert of SAP, Dr. Mercer.  So I want to ask you a few

4   questions on that.

5            Now, in his deposition -- did you review

6   Dr. Mercer's deposition?

7       A.   Yes, sir, I reviewed it many times.

8       Q.   In his -- in his deposition did Dr. Mercer

9   testify that he had previously worked for SAP?

10      A.   Yes, sir, he has.

11      Q.   And did Dr. Mercer, in his expert report, did

12  he submit a listing of all the cases he's worked on in

13  the last five years?

14      A.   Yes, sir.

15      Q.   And in that list, did he list that he

16  previously in the last five years worked for

17  Mr. Melsheimer's firm, Fish & Richardson, three times?

18      A.   Yes, sir, three times.

19      Q.   And did he also list that in the last five

20  years he worked for Mr. Batchelder's former law firm, he

21  just recently switched law firms, his former law firm,

22  Howrey, five times?

23      A.   Yes, sir, that was five times.

24      Q.   Now, I'm not suggesting there's anything wrong

25  with Dr. Mercer doing that, but -- but Mr. Batchelder

1   asked those questions, I felt we needed to go into that

2   a little bit.

3           On this -- this filing date of 1996, I

4   want to cover it one more time for the -- for the '350

5   patent, Mr. Patent's -- Mr. -- Mr. Carter's patents.

6   That 1996 effective filing date, is that when all the

7   technical detail for the patent in the drawings, in the

8   specification, all the technical description, is that

9   when that was all filed with the Patent Office?

10      A.   That was in 1996, sir.

11      Q.   And that was two years before SAP added the

12  infringing hierarchical access software to their

13  products?

14      A.   Yes.

15      Q.   Now, Mr. -- now, we've heard this a few times,

16  this issue of willful infringement.  We heard it from

17  Mr. Melsheimer during opening.  We hear it from

18  Mr. Batchelder several times on cross-examination, so

19  I'd like to ask you about that a little bit.

20          There's two issues in the case that you've

21  given opinion on; the one is with respect to demand that

22  goes to damages.  The request for damages here is one

23  for lost profits.  Mr. Gupta, does whether or not

24  there's been willful infringement, does that go to how

25  much lost profit damages should be awarded?

1        A.    No, sir.

2        Q.    And the second question you gave an opinion on

3   is whether SAP is continuing to infringe after May 2010.

4   Does this question of willful infringement go to that

5   question?

6        A.    No, sir.

7        Q.    Now, do you understand that if there is a claim

8   for willful infringement, it's not -- not mandatory, but

9   if there is one, then the Plaintiff can ask for a

10  tripling, up to a tripling, of actual damages?

11       A.    Yes, sir, that is my understanding.

12       Q.    Now, is Trilogy asking for a tripling of actual

13  damages in this case?

14       A.    No, sir.

15       Q.    Now, there were a lot of questions on

16  cross-examination about these depositions on written

17  questions to the customers.  See if they're using the

18  hierarchical access.  See if they're using it in the

19  claimed way.  I want to ask you some questions about

20  that.

21            There was one that you mentioned, you said

22  that -- I believe you said conclusively answers a

23  question as to whether they're using it in the way

24  claimed by -- by these three claims?

25       A.    Yes, sir, that would be the IDM answers.

1      Q.   Well, let's take a look at that one.

2                MR. POLLINGER:  If we could, Mr. Diaz,

3  pull up PX7 -- excuse me, 1714, 1714.

4      Q.   (By Mr. Pollinger)  This was from June 25,

5  19 -- excuse me, June 25, 2009.

6                MR. POLLINGER:  And if we can go to the

7  next page, Page 3.

8      Q.   (By Mr. Pollinger)  And we see the company is

9  listed there in the middle, IBM, International Business

10 Machines, in the middle there?

11     A.   Yes, I see that.

12     Q.   So this is the answer from IBM as to whether

13 they're using hierarchical access in a particular way?

14     A.   Well, this is their answer to the depositions.

15               MR. POLLINGER:  If we go to Page 5,

16 please, and look at Question No. 12.

17     Q.   (By Mr. Pollinger)  And here I'll read the

18 question to you.  IBM was asked this question:  As part

19 of its use of SAP R/3, version 4.6C and version 4.7, has

20 the company used the hierarchical access feature within

21 the pricing functionality for both product and customer

22 hierarchies, as hierarchical accesses are defined by SAP

23 in the certain help page.

24               MR. POLLINGER:  If we go to the next page,

25 we have the answer.

1    Q.   (By Mr. Pollinger)   What was IBM's answer?

2    A.   Yes.

3    Q.   And what does that tell us about whether IBM

4  uses the infringing software in the way claimed in these

5  three claims?

6    A.   Although use is not required to infringe, this

7  shows us that IBM does use the software in the claimed

8  manner.

9              MR. POLLINGER:  If we could go to my third

10  presentation, please, Slide 30.  Excuse me, a second

11  presentation, please.  Thank you.

12    Q.   (By Mr. Pollinger)  And what I want to ask you

13  is about -- I think you testified with respect to this

14  slide that 14 SAP customers -- 14 of the -- the -- of

15  the 40 testified in their answers to the -- to the

16  depositions on written questions that they used the

17  software in the claimed manner or at least it was

18  likely.  Could you explain that to us again with --

19    A.   Yes.  There were 40 responses to these

20  depositions.  14 of those respondents said they used

21  customer hierarchies, product hierarchies, and

22  hierarchical access.  From that I concluded that it's

23  likely all 14 of these used the software in the claimed

24  manner.

25    Q.   Now, the -- the argument that I think

1   Mr. Batchelder is alluding to is that, well, the claims

2   require you have to have both a customer and a product

3   hierarchy.  Your pricing has to depend both on the

4   product, whether it's a truck or a car and what model,

5   and also has to depend upon who the customer is, whether

6   you're in Texas or -- or New York or wherever.

7            What I'd like to do is pull up PX219

8   and -- and see what SAP itself says in its own

9   documents.  This is an e-mail from SAP in 2007, we

10  looked on this already on -- on direct, I just want to

11  cover it with you again.  From 2007, if we look at the

12  first sentence there, first paragraph.  Is this --

13           MR. POLLINGER:  Yes, excuse me.  2119.  I

14  read that off wrong.  2119, the first paragraph.

15      Q.   (By Mr. Pollinger)  Here's what SAP is writing

16  in the e-mail, and again, this goes to the question of

17  whether it's common or uncommon to use customer and

18  product hierarchies together.

19           Could you read to us what -- what SAP

20  wrote here in this e-mail?

21      A.   Yes, sir.  It says most implementations use the

22  customer hierarchy and product hierarchy in the pricing

23  to reduce the number of records.

24           MR. POLLINGER:  If we go back to my second

25  presentation, Slide 30.

1    Q.   (By Mr. Pollinger)  Mr. Batchelder showed you

2    the answer from -- from Chevron, and I think the answer

3    was no.  Is Chevron anywhere here on this top list of

4    14?

5    A.   No, sir.  Chevron is not on the top list of 14.

6    Q.   And is that top list of 14, is that where you

7    came up with the 35 percent figure as to the likely

8    customers that use hierarchical access in the claim

9    manner?

10   A.   Yes, sir.  14 of 40 is 35 percent.

11   Q.   Now Mr. Gupta, there was a question of you

12   regarding Page 64 of your expert report.

13   A.   Yes, sir.

14   Q.   And then there was some prior deposition

15   testimony --

16   A.   Yes, sir.

17   Q.   -- from you and there -- there seemed to be a

18   little confusion going back and forth on that.  Can

19   you -- can you explain that to us?

20   A.   Thank you for asking, Mr. Pollinger, because I

21   was myself a little confused.  Claim 17 is not one that

22   I have researched specifically for this matter.  I was

23   correct when I first said that companies that do just

24   this hypothetical access sequence would not, would not

25   implement -- would not practice the method of Claim 17.

1    That's consistent with what I said on my deposition.

2        Q.    And why is that?

3        A.    I looked at this screen one more time.  It

4    doesn't say product hierarchy anywhere.  To practice the

5    method of Claim 17, you'd have to have a product

6    hierarchy.  When I glanced over at the screen one more

7    time, I misread where it said customer hierarchy for

8    product hierarchy and that's why I changed my answer.

9        Q.    That confusion over this, does that change

10   anything that you explained to us earlier on your direct

11   testimony regarding continued infringement by the

12   modified software?

13       A.    No, sir.  Claim 17 is not at issue.

14       Q.    If the access sequence had a product hierarchy

15   in there with a customer hierarchy and the access

16   sequence were executed, what -- what would be the

17   situation then?

18       A.    If this access sequence from Page 64 also had a

19   product hierarchy and there were the A's, then a user of

20   that system would be infringing Claim 17.  But once

21   again, Claim 17 is not at issue.

22       Q.    Because they're using both the product and the

23   customer hierarchies?

24       A.    Yes, sir.

25       Q.    And what has the evidence indicated to you, is

```
 1   it -- is it common or uncommon to use the two together,
 2   the product and the customer hierarchies?
 3       A.    There's lots of evidence that show that it's
 4   common to use both customer and product hierarchies
 5   together on pricing.
 6              MR. POLLINGER:  No further questions, Your
 7   Honor.
 8              THE COURT:  Recross.
 9              MR. BATCHELDER:  Thank you, Your Honor.
10                   RECROSS-EXAMINATION
11   BY MR. BATCHELDER:
12       Q.   Mr. Gupta, you became Trilogy vice president of
13   product strategy in roughly June 1998, correct?
14       A.    Yes, roughly that time.
15       Q.    Okay.
16              MR. BATCHELDER:  Can we put up, please,
17   DX909, the redacted version of it, please?  Can we go to
18   the top?  See, I'm just --
19              One moment, Your Honor.  I've got to get
20   my copy.
21       Q.   (By Mr. Batchelder)  So at the very top, we
22   have from Neeraj Gupta, that's you, correct?
23       A.    Yes.
24       Q.    You're writing to Joe Liemandt, that's the big
25   boss at Trilogy, correct?
```

1    A.   He was a CEO.

2    Q.   Right.  And you say here:  I've inserted my

3  comments into this doc, right?

4    A.   Yes.

5    Q.   So he sent you a document and then you did sort

6  of a redline or editing function on top of it; is that

7  fair?

8    A.   Do you mind if I just read a little bit on

9  this?  I don't know the context of this.

10   Q.   Take your time.

11   A.   Thank you.  Yes, this indicates to me that he

12 sent me a document and I commented on it.

13   Q.   Okay.  And you say:  I've copied the comments

14 here and you sign it Goop, right?

15   A.   Yes, sir.

16        MR. BATCHELDER:  Mr. Barnes, can you turn

17 to, looks like it's like the sixth page of this exhibit,

18 but it's actually on the bottom, there's a Page No. 1.

19 And blow up this top piece.  You know what, I'm sorry.

20 Could we just go back to the -- to the cover.  I just

21 want to show what it's about.  Sorry about that, but

22 it's --

23   Q.   (By Mr. Batchelder)  The subject is regarding

24 Siebel, right?

25   A.   Yes, that's what it says.

1       Q.    And that was a competitor of Trilogy's,

2   correct?

3       A.    In '98, I think they were not a competitor per

4   se.  They didn't have the same configuration of pricing,

5   but they were selling software in the enterprise space.

6       Q.    Okay.

7               MR. BATCHELDER:   All right.  Mr. Barnes,

8   I apologize, let's go back to -- to that Page 6 and

9   let's go to this top paragraph up here.

10      Q.    (By Mr. Batchelder)   So you're saying they

11  weren't a competitor.  You say there's been a lot of

12  debate on this topic.  Time for debate is over.  We need

13  to put together a team whose entire mission is to

14  inflect damage on Siebel, that's what Mr. Liemandt, the

15  big boss said, right, that's correct?

16      A.    Yes, I believe that's Joe that wrote this doc.

17      Q.    Yeah, he wrote that.  And then --

18              MR. BATCHELDER:  Could you go to the next

19  page, please, Mr. Barnes?

20      Q.    (By Mr. Batchelder)   So there's a table here,

21  things we need to know, why, and how, correct?

22      A.    Yes.

23      Q.    Who is their prospect base, that's who's Siebel

24  trying to sell to, that's what that means, right?

25      A.    Yes.

1      Q.   And then you write a comment over in the

2   right-hand margin.

3                    MR. BATCHELDER:  Can you pull that up,

4   please?

5                    MR. POLLINGER:  Which exhibit is this,

6   please?  Your Honor, can I approach the bench?

7                    THE COURT:  Yes.

8                    MR. POLLINGER:  Will you take it off the

9   screen?

10                    THE COURT:  Yes.

11                    (Bench conference.)

12                    MR. POLLINGER:  Your Honor, this exhibit

13   DX909 is in evidence.  We probably shouldn't have let it

14   in, but it's in, but I object to the line of questioning

15   that he's about to do.  I think what he's trying to do

16   is -- is create an impression that there were securities

17   violations and that there was corporate espionage or

18   suggestions of both of those and there's no relevance to

19   his testimony in this case whatsoever.  It's clearly

20   just trying to create a prejudicial impression and

21   unfair prejudice.

22                    MR. BATCHELDER:  I'm sorry.  This document

23   has been redacted by parties' stipulation.  We took out

24   these things that are in black here.  The rest is in,

25   it's in evidence.

1              MR. POLLINGER:  We're not seeking to take

2    it out, I'm just seeking to disqualify this questioning

3    under 403.

4              THE COURT:  Let me see the document.

5              MR. BATCHELDER:  This has my marking on

6    it.

7              MR. MELSHEIMER:  You want me to hold back?

8              MR. POLLINGER:  I can tell you the two

9    parts.  There's one part that talks about: A, if we go

10   out and raise some money in the -- in the capital

11   markets we can use it but we can use it to -- to create

12   new companies, and there's also suggestion that A, we

13   could hire or send our people to go work for their

14   company and bring information back to ours.  It just is

15   not relevant.  It's unfairly prejudicial.

16             THE COURT:  It's in evidence.  I'll let

17   you go that far and ask him what was written on the

18   document.

19             MR. BATCHELDER:  Thank you, sir.

20             (Bench conference concluded.)

21             MR. BATCHELDER:  Put that back up, please,

22   Mr. Barnes.

23        Q.   (By Mr. Batchelder)   Okay.  So we're on this,

24   things we need to know, why, and how.  Who is our

25   prospect base?  Meaning who is Siebel trying to pitch

1   their products to, correct?

2       A.   I don't know.  I don't recall this now.  I've

3   looked at -- I see the whole thing to get better

4   context, but I'll take your -- if that's what it says,

5   I'll believe you on it.

6       Q.   Okay.  And -- and over here in the right-hand

7   margin we have one of your comments.  You say:  Can we

8   use converted MBA prospects as moles; i.e., people who

9   have committed to Trilogy that still interview with

10  Siebel to get some data?  Could be dangerous.

11           That was your comment, right?

12      A.   Yes, sounds like I thought that was a bad idea.

13      Q.   So moles, by that you meant spies?

14      A.   No, sir.

15      Q.   You were proposing here, you said it would be

16  dangerous, but you asked the big boss at Trilogy, could

17  we take people that are already committed to come work

18  with us and have them go interview at Siebel, get

19  information from Siebel, and then bring it back to

20  Trilogy?

21      A.   I now understand the context of this document.

22  This was -- Joe oftentimes had brainstorming sessions

23  around novel different business ideas.  This one we

24  actually never did.  I did write this.

25      Q.   Okay.  And you did write that comment right

1   there, right?

2        A.   Yes, I also wrote that it was a bad idea.

3        Q.   You said it was dangerous, but you proposed it?

4        A.   There's a lot of things this document proposed

5   that I thought were not necessarily the right way to go.

6   This was a brain -- this was a brainstorming.

7        Q.   I see.  All right.  Last thing, I just want to

8   come back to the dates on the patent to make sure the

9   ladies and gentlemen of the Jury are clear on this.

10  This patent, the '350 patent, it issued in April 2003,

11  correct?

12       A.   Yes.

13       Q.   And by definition there could be no

14  infringement prior to that date, correct?

15       A.   Yes.

16       Q.   And April 2003 is two years after this downward

17  fall of Pricer that we've seen, correct?

18       A.   Sure.

19       Q.   Thank you.

20            MR. BATCHELDER:  Thank you, Mr. Gupta.

21            THE COURT:  Redirect?

22            MR. POLLINGER:  Yes, Your Honor, very

23  briefly.

24                    REDIRECT EXAMINATION

25  BY MR. POLLINGER:

1    Q.   Mr. Gupta, the -- the reference to moles, did

2  anything like that ever happen?

3    A.   No, sir.

4    Q.   Mr. Gupta, anything that happened on recross

5  here, did any of that change your opinion on either

6  demand for the invention or continued infringement by

7  the modified products?

8    A.   No, sir.

9    Q.   If SAP had pooled the infringing Oracle access

10 software from its product after the infringement --

11 after 2003 or in 2003 when the patent issued, could

12 Trilogy have continued to sell its Trilogy Pricer

13 product?

14   A.   Absolutely.  It would have actually been

15 easier, I think.

16           MR. POLLINGER:  No further questions.

17           THE COURT:  Recross?

18           MR. BATCHELDER:  Thank you, Your Honor.

19 Very brief.

20           Please put back up DX909.

21              RECROSS EXAMINATION

22 BY MR. BATCHELDER:

23   Q.   Mr. Pollinger just asked another question about

24 that entry about the moles and I just want to look at

25 that line one more time.

1            Within this document, again, things we

2    need to know, why, and how, and this table, you were

3    commenting over here but this is written by Joe

4    Liemandt, the CEO, right?

5        A.   Yes, I believe it was.

6        Q.   Okay.  In that same line that you commented on

7    about the prospect base of Siebel, he writes:  Need to

8    stop them from buying Siebel, slow down cycle, FUD, cost

9    pressure.  Do you see that?

10       A.   Yes, sir.

11       Q.   And by FUD do you understand that to refer to

12   fear, uncertainty and depth?

13       A.   Yes, sir.

14            MR. BATCHELDER:  No further questions.

15            MR. POLLINGER:  No further questions, Your

16   Honor.

17            THE COURT:  Okay.  You may step down.

18            THE WITNESS:  Thank you.

19            Call your next witness.

20            MS. FITZGERALD:  The Plaintiff calls Mr.

21   Patrick Nichols.

22            THE COURT:  Come around, Mr. Nichols.

23            (Witness sworn.)

24   PATRICK NICHOLS, PLAINTIFFS' WITNESS, SWORN,

25            DIRECT EXAMINATION

```
 1    BY MS. FITZGERALD:

 2        Q.    Good afternoon, Mr. Nichols.

 3        A.    Good afternoon.

 4        Q.    Would you please introduce yourself for the

 5   Jury?

 6        A.    My name is Patrick Nichols.

 7        Q.    Mr. Nichols, why are you here today?

 8        A.    I'm here to testify on a topic known as patent

 9   marking.

10        Q.    Well, we're going to get to that topic in just

11   a minute, but first let me ask you just a little

12   background information.  Where do you live?

13        A.    I live in Austin, Texas.

14        Q.    Who do you live with?

15        A.    My wife and my newborn baby girl.

16        Q.    Congratulations.

17        A.    Thank you.

18        Q.    Who's your employer?

19        A.    I work for a company named WinZip.

20        Q.    What is the business of WinZip?

21        A.    WinZip is the world's leader in compression

22   software.  It's actually the most downloaded application

23   on the internet today.

24        Q.    What is your position at WinZip?

25        A.    I'm the president of WinZip.
```

1    Q.    Given that you work for WinZip, what is your

2  connection to Trilogy?

3    A.    I -- I worked at Trilogy for about 12 and a

4  half years prior to working for WinZip.

5    Q.    When did you start at WinZip?

6    A.    Around November of 2009.

7    Q.    Why did you leave Trilogy to go to WinZip?

8    A.    Opportunity to do new things.  I guess to -- to

9  be the big boss, as the term has been used today.

10    Q.    Given that you no longer work for Trilogy and

11  you're the big boss at WinZip, why is it that you're

12  here to testify today?

13    A.    I'm the individual during this period of time

14  that had the most experience related to the topic known

15  as patent marking.

16    Q.    Would you please describe at a high level what

17  your job responsibilities were when you were at Trilogy?

18    A.    I had a lot of different jobs with my career at

19  Trilogy, but when I left the organization, I was the

20  general manager of the business unit.

21    Q.    Now, let's get right to the topic that you

22  mentioned earlier that you're here about today, patent

23  marking.  Can you tell us based on your experience at

24  Trilogy, what you understand patent marking to be?

25    A.    Generally speaking, patent marking is as simple

1 as being sure that any product that has a patentable

2 technology in it or as it embodies a patent has a mark

3 of that patent number on the product itself as it's

4 being produced.

5    Q.   Now, software --

6             THE COURT:  Excuse me just a second.  Try

7 to talk into your microphone a little bit more.  Thank

8 you.

9             THE WITNESS:  Sure.

10            THE COURT:  Go ahead.

11   Q.   (By Ms. Fitzgerald)  Now, software is a little

12 bit intangible, so let's start with something that's

13 more concrete and give an example.  I'll take something

14 that you and I are both familiar with, let's say baby

15 strollers.  Say you're Fisher-Price or a stroller

16 manufacturer and they're churning out strollers in your

17 factory and you have a patent on the wheel, how would a

18 manufacturer stamp the stroller wheel with the patent?

19   A.   Generally speaking, we're talking about a

20 plastic or rubber wheel.  The manufacturer probably has

21 a manufacturing plant that produces those wheels.  A

22 part of the process in that plant would be to have the

23 wheel actually stamped, something that would leave an

24 impression or a mark on the wheel itself that would

25 include the patent number.

1    Q.   Now, say Fisher-Price or a hypothetical

2  stroller manufacturer takes that wheel and puts it into

3  the single stroller, the double stroller, the jogging

4  stroller models, would you expect the way that that

5  wheel is marked with a patent to change depending on the

6  stroller model?

7    A.   No.  And in fact, it would be the same

8  regardless of where the wheel was going after it was

9  produced, whether it's in a single stroller, a double

10 stroller or anywhere else.  It would simply have the

11 same manufacturing process and would carry the mark with

12 it wherever it went.

13   Q.   Now, we're here to talk about software today,

14 so let's move from strollers to software.  Are you

15 familiar with the '350 patent that you've heard a lot

16 about during the trial?

17   A.   Yes, I am.

18   Q.   And I know you're not a lawyer, but based on

19 your time at Trilogy and your understanding, why do you

20 understand that patent marking and specifically marking

21 with the '350 patent is something we're talking about

22 today?

23   A.   Again, I'm not a lawyer, but generally

24 speaking, patent marking is important because it helps

25 to set the time frame for which damages can be claimed

1  in an infringement case.

2      Q.   When did the '350 patent issue?

3      A.   In April of 2003.

4      Q.   When did Versata file this lawsuit?

5      A.   In 2007.

6      Q.   Correct me if I'm wrong, but does patent

7  marking relate to the time period between April 2007

8  and -- or sorry, April 2003 and April 2007, for -- for

9  purposes of your testimony?

10     A.   Yes.

11     Q.   Were you continuously employed by Trilogy

12  during that time?

13     A.   Yes, I was.

14     Q.   Are you familiar with the Trilogy products that

15  embody the '350 patent, I don't -- you know, over the

16  course of the time at your -- the course of the time

17  that you were at the company?

18     A.   Yes, I am.

19     Q.   Now, embody is sort of a legal sounding word.

20  What do you mean when you say a product embodied the

21  patent?

22     A.   Simply speaking, that the product itself

23  contained the technology that was covered by the patent.

24     Q.   Now, over time how many products, how many

25  different Trilogy products embodied the '350 patent?

1    A.   A lot.  Many.  Probably more than I can list.

2    Q.   What, if anything, did those products have in

3  common?

4    A.   They all had the -- the core Pricer technology

5  that we've heard a lot of testimony about in the last

6  days.

7    Q.   How would that relate back to our stroller

8  example?

9    A.   To -- to make it simple, the -- the Pricer

10  technology would be like the wheel.  It's the piece of

11  technology that -- that carried the patent and the

12  patent mark with it no matter where it went.

13    Q.   Between April 2003 and April 2007, how many of

14  those multiple embodying products did Trilogy deliver to

15  its customers?

16    A.   Not many, and, in fact, the core Pricer

17  technology was largely delivered just within a few core

18  products, SC Pricer, Java Pricer, and MCC Pricer.

19    Q.   Now, you've given us some product names.  Was

20  this core Pricer module or core patented technology, was

21  it ever delivered to a customer without using one of

22  those official product names?

23    A.   Sometimes.

24    Q.   And how would that come about?

25    A.   We would sometimes create custom builds for

1    customers.

2         Q.    And what do you mean by a custom build?

3         A.    When a customer has a specific problem that our

4    company was tasked to solve, our consultants would write

5    a -- a small program, something very specific to that

6    customer, and that may include one of our core products

7    and by including it, that -- that became the custom

8    build with a core product.

9         Q.    Did Trilogy continuously and substantially mark

10   all of its products that embodied the '350 patent with

11   the patent number between April 2003 and April 2007?

12        A.    Yes, we did.

13        Q.    We'll go into the details about how that

14   happened in -- in just a minute, but first at a very

15   high level, what did Trilogy use to mark its products?

16        A.    Like all companies who produce products, we

17   built a manufacturing plant for software.  We called

18   that manufacturing plant the Trilogy build system, also

19   sometimes referred to as TBS.

20        Q.    What exactly is a build system?

21        A.    It's a complex set of computer programs that

22   take all the different source code or programs that

23   developers write that make up the products and then

24   it -- it builds them and creates a program that a

25   computer can run and that becomes the actual end

1    product.

2        Q.    When was the Trilogy build system put into

3    place?

4        A.    About 2001.

5        Q.    When the '350 patent issued in April 2003, were

6    all of the products that embodied it being built by the

7    Trilogy build system?

8        A.    Yes, they were.

9        Q.    And once the Trilogy build system was put into

10   place, was it possible to take one of those embodying

11   products and deliver it to a customer without going

12   through the build system?

13       A.    No, it was not possible.

14       Q.    Why not?

15       A.    By company policy and the Trilogy build system

16   had some internal technologies that would disallow

17   anything.

18       Q.    Between the time the patent issued in 2003 and

19   April 2007 when the lawsuit was filed, did that company

20   policy change in any way or at any time?

21       A.    No, it did not.

22       Q.    What if Trilogy employees wanted to build a

23   product for -- not for a customer but for their own

24   internal use, could that be done?

25       A.    Yes, it could be.  We sometimes refer to those

1    as internal builds.

2        Q.    And why would a developer or an employee create

3    internal builds?

4        A.    They would use internal builds to do their day

5    to day work, part of development or testing or -- or

6    product management just to very quickly do a small,

7    quick build and then finish their work and move on to

8    the next task.

9        Q.    Would a developer in internal builds differ in

10   any way in any way from a build that went out to a

11   customer?

12       A.    They could actually differ in quite a few ways.

13   Developers could have their own settings, things that

14   would make creating the build of a product go very

15   quickly and they were very local to that developer

16   and -- and not a part of the build system they -- those

17   settings operated outside the build system.

18       Q.    What are some examples of the settings that

19   could be different in an internal build?

20       A.    Well, first and foremost when you see an

21   internal build, it's got big red lettering that says

22   this is an internal build and if you're not a Trilogy

23   employee, please leave now.  There are also a number of

24   different, I'll call them, legal notices that were a

25   part of the master build system that were not a part of

1    the local developer settings in that they would not

2    necessarily comply with all of the builds that would be

3    produced for an end customer.

4         Q.   Now, would it ever be possible to take one of

5    these internal builds and give it outside of the company

6    to a customer?

7         A.   No, it would not.

8         Q.   We've heard this word build and it's -- it's a

9    product, builds?

10        A.   Yes.  Sorry, I couldn't -- build, fulfillment,

11   offering, product release, release, all these words

12   could mean the same thing.

13        Q.   Let's talk about the '350 patent specifically.

14   Early -- earlier you told us that there were different

15   products that embodied the patent over time.  When

16   Trilogy delivered one of those products to a customer

17   using the Trilogy build system, how did this -- the

18   build system know that the products needed to be marked

19   with a specific patent number?

20        A.   As I said earlier, the -- the build system is a

21   complex piece of technology.  It actually relied on a

22   collection of information that was sometimes stored in a

23   database and the database is just a -- a collection of

24   more information.  Some of the information that was

25   contained in that database was the relationship between

1   the products and their trademarks, the names, the

2   products and their copyrights, and the products and --

3   and the embodying patents that they represented.

4       Q.   How did the Trilogy build system know that the

5   Pricer embodying technology needed to be marked with the

6   '350 patent specifically?

7       A.   The '350 patent information was associated with

8   a set of products by our build management team.

9       Q.   And how did that association come to be?

10      A.   Typically speaking, our -- our legal department

11  would inform our development organization who would then

12  update the information by having the build management

13  team put that information into the Trilogy build system.

14      Q.   Let's take a look at Plaintiffs' Exhibit 1444.

15           MS. FITZGERALD:  And if you can blow up

16  the very top portion.  Thank you.

17      Q.   (By Ms. Fitzgerald)  who is this e-mail from?

18      A.   Alex Devine.

19      Q.   Is this an internal Trilogy e-mail?

20      A.   Yes, it is.

21      Q.   And the date of the e-mail I see is Thursday,

22  September 25th, 2003; do you see that?

23      A.   Yes, I do.

24      Q.   And who is Mr. Devine e-mailing to?

25      A.   He's e-mailing the group of individuals known

1    as the build managers.

2         Q.    And who are the build managers?

3         A.    They were the group responsible for producing

4    and maintaining the Trilogy build system.

5         Q.    And what is Mr. Devine telling the build

6    managers?

7         A.    In this e-mail he is indicating to the build

8    managers that new patents will need to be added to the

9    TBS or Trilogy build system legal database.

10        Q.    Now, it looks like there's a -- a document

11   attached to this e-mail, so let's go ahead and take a --

12   and look at that.

13              MS. FITZGERALD:  And Mr. Diaz, can you go

14   to the fourth page of the document ending in 576?

15        Q.    (By Ms. Fitzgerald)  Now, this is a chart or a

16   spreadsheet.  What is this?

17        A.    This looks like the attached spreadsheet that

18   our -- our legal team would prepare for our development

19   organization to provide them the information to

20   associate things like patent numbers to our products.

21        Q.    Now, if you go about five lines down, we see a

22   group of products, I see SC Pricer, SC Pricer Manager,

23   SC Pricer Methods, and then you see some other

24   information.  You see some years and then some patent

25   numbers.  What does this signify?

1     A.    This is indicating to the build managers that

2  they need to associate the patents which appear in the

3  third column with the products groups that appear in the

4  first column.  And in this case, things like SC Pricer

5  being associated with, amongst other things, the '350

6  patent.

7     Q.    And moving down the document, we see a product

8  named SC Pricing Analysis.  And again, we see some

9  patent numbers there and is one of those the '350

10 patent?

11    A.    Yes, it is.

12    Q.    And what does this signify?

13    A.    Same thing, that the SC Pricing Analysis

14 product will be associated with the '350 patent within

15 the Trilogy build system.

16    Q.    Now, you've reviewed this document closely

17 before, haven't you?

18    A.    Yes, I have.

19    Q.    Are all of the Trilogy products that embody the

20 '350 patent at any time listed in this spreadsheet?

21    A.    This document was created in 2003, so any

22 future products, obviously, aren't represented in this

23 spreadsheet and there are some set of products from the

24 past that are not in this spreadsheet at this time

25 because they haven't been moved to the Trilogy build

1    system.  Simply because they're not being sent to

2    customers at this time.

3        Q.   Now, does that mean that the older products

4    that aren't being sent to customers at the time -- does

5    that mean they're not for sale?

6        A.   No, it does not.

7        Q.   So they're still for sale?

8        A.   Yes, they are.

9        Q.   Now, the future patents are the -- sorry, the

10   future products, the ones that hadn't been developed at

11   this time, they're not in the spreadsheet, so how do you

12   know that they were marked with the '350 patent?

13       A.   We had a matter of company policy that as new

14   products were developed, they'd go through the same

15   process that existing products did to ensure that new

16   patents were associated with them if they embodied those

17   patents.  But more often than not, our -- our new

18   products were being built on the shoulders of some of

19   our older technology.

20               So as developers or product managers

21   created new products, if they included another piece of

22   our core technology, in this case, you know, SC Pricer

23   as an example, it automatically would receive that

24   patent mark because the Trilogy build system would

25   enforce that patent mark because it already knew the

1  relationship between the patent and the product.

2      Q.   Now, you told us earlier that there was

3  custom-builds that sometimes went out and didn't have a

4  product name.  How would the Trilogy build system know

5  to mark a custom-build since it didn't have a product

6  and necessarily wasn't sold under one of these names?

7      A.   In the same way I just described.  A

8  custom-build that would be going to a customer, if it

9  were to include that core Pricer technology as an

10  example, the core Pricer technology was already

11  associated with the patent.

12             So the custom-build, if it was being

13  delivered to a customer and it included an embodying

14  product of a patent automatically would receive a mark.

15             Going back to that stroller example, if

16  you're putting a stroller wheel even on something new,

17  the stroller wheel would still have the mark on it.

18      Q.   Let's talk next about how exactly the Trilogy

19  build system would mark a product.

20             First, how would a product get from the

21  build system to the customer?

22      A.   Generally speaking, transferred over the

23  internet.

24      Q.   All right.  Let's take a look at -- so there

25  was an exhibit produced in this case called Plaintiffs'

1  Exhibit 1952.  Are you familiar with that exhibit?

2      A.    Yes, I am.

3      Q.    And what form is that exhibit in?

4      A.    That exhibit is a hard drive.

5      Q.    Well, are there more than one file -- is there

6  more than one file on the hard drive?

7      A.    Yes, there are.  There are a huge number of

8  files on the hard drive.

9      Q.    And what are those files?

10     A.    The files represent -- at the time, Trilogy had

11 scoured its organization to find as many builds of our

12 products, both internal builds and custom-deliverable

13 builds, as we could to provide them to SAP as a part of

14 the process for this lawsuit.

15     Q.    Now, does the Trilogy build system store an

16 identical copy of each build that goes out to a

17 customer?

18     A.    No, it doesn't.  The Trilogy build system is

19 the manufacturing plant, and so it wasn't designed to

20 keep copies of everything it produced, because we knew

21 we could always produce a build again when we need

22 today.

23     Q.    You just told us that the hard drive we're

24 about to take a look at had some of these external

25 customer-builds on it.  If the Trilogy build system

1  doesn't store them, how did Trilogy have one to show in

2  court today?

3      A.    Just at the time that we were going through

4  collecting all the builds, there happened to be some

5  customer builds in our organization either waiting to be

6  delivered or that had been just delivered to a customer,

7  but it was happenstance at that time.

8      Q.    Why doesn't the Trilogy or why didn't the

9  Trilogy build system keep an identical copy of every

10 build that went out to a customer?

11     A.    Well, as I said, it was designed to be the

12 manufacturing plant, so it could create new builds and

13 simply -- it wasn't needed as part of the business

14 process, to maintain a copy, the same way companies like

15 Boeing or Ford don't keep copies of every car they

16 produce or every plane they build.

17     Q.    So I'd like to show you one file of the

18 multiple files that were on PX1952.

19            MS. FITZGERALD:  I think, Ms. Lockhart, we

20 need to switch over to the counsel table computer.

21            Hopefully, this will work.

22            Mr. Diaz, can you go to the setup that's

23 our shortcut?

24            And I'll say for the record that this is

25 within the fulfillments folder and then folder 2005 and

1  then the setup folder within that folder.

2      Q.   (By Ms. Fitzgerald) Are you familiar with this

3  setup file, Mr. Nichols?

4      A.   Yes, I am.

5      Q.   What is this?

6      A.   This is the installer of a program, and what we

7  can see from this screen is it's the installation of MCC

8  2.6 offering or the Multichannel Commerce 2.6 offering.

9      Q.   And we see some red lettering on this screen.

10  What does that signify?

11      A.   The red lettering makes this very clear this is

12  an internal build for Trilogy internal use only, and you

13  can see the comment I was making a remark about earlier

14  that if you're not a Trilogy employee, please leave now.

15      Q.   Now, why was Trilogy so worried about people

16  who weren't Trilogy employees seeing these internal

17  builds so that it would put up this big red warning?

18      A.   For two reasons, actually.

19           The first is, this is an internal build.

20  It means that it did not go through the same set of

21  processes that an external or customer-deliverable

22  would.  It was meant just for internal purposes.

23           The second is -- is, when it doesn't go

24  through that process, it doesn't receive all the same

25  legal notices, copyrights and trademark names and patent

1    numbers.  It receives anything that the developer may

2    have set up just to speed up doing their job.

3                    MS. FITZGERALD:  Now, let's click to the

4    third screen, Mr. Diaz.  Stop there.  Yes.

5        Q.   (By Ms. Fitzgerald) At the top, this screen

6    says:  Please read the following legal notices before

7    proceeding.  What is this an example of?

8                    And I realize this is an internal build,

9    but if you can -- is this similar to what a customer

10   would see?

11       A.   Similar.  This screen, we would typically refer

12   to as the legal notices screen.

13       Q.   And what is on this screen?

14       A.   A set of legal notices; in this case, the

15   copyright year; I see a set of trademark names.

16                   MS. FITZGERALD:  Mr. Diaz, if you could

17   scroll down.

18       Q.   (By Ms. Fitzgerald) And we see a lot of product

19   names there.  Those are the trademarks?

20       A.   Yes.

21       Q.   And then what's at the bottom?

22       A.   In this case, a listing of patent numbers.

23       Q.   And do you see the '350 patent on this screen?

24       A.   Yes, I do.

25       Q.   So this is an example of an internal build that

1 has the '350 patent marked on it?

2    A.   Yes.

3    Q.   Now, some internal builds that are on the hard

4 drive -- are there some that don't have the '350 patent?

5    A.   Yes.

6    Q.   And why is that?

7    A.   They're simply just internal builds.  They're

8 going off of A developer settings, and they're not to be

9 delivered or taken outside of Trilogy.

10         MS. FITZGERALD:  Now, let's click

11 forward -- I think it's about four more screens.  Stop

12 there.

13    Q.   (By Ms. Fitzgerald) What does this screen say?

14    A.   This is a summary screen indicating where will

15 the software be installed, which folder or location, as

16 well as which features or products will be installed.

17         MS. FITZGERALD:  Mr. Diaz, if we can go

18 back to the desktop and click on the other setup folder

19 that's there.  We're going to take a look at one more of

20 the files that was on PX1952.  This one is Folder 1141.

21    Q.   (By Ms. Fitzgerald) What is this, Mr. Nichols,

22 or what is it an example of?

23    A.   This is just another example of an installation

24 of Trilogy's Selling Chain Software.

25    Q.   And what do we see here on the first screen?

1    A.    First and foremost, I can tell that this is

2   a -- a build that could be delivered to a customer

3   because it does not have the big red letters that says

4   internal build only.

5                MS. FITZGERALD:  Let's click next to the

6   next screen, please.

7    Q.    (By Ms. Fitzgerald) What do you see here?

8    A.    This is a combination of the release notes, as

9   well as the legal notices.

10               MS. FITZGERALD:  Mr. Diaz, if you'd please

11  scroll down.

12   Q.    (By Ms. Fitzgerald) Are these the similar legal

13  notices to what we saw on the last example?

14   A.    Yes, they are.

15   Q.    And are those the trademark names again right

16  there?

17   A.    Yes, they are.

18   Q.    Now, if a trademark name of a product appears

19  here, is that product necessarily in this build?

20   A.    No.   This is just a listing of the trademark

21  names.  You would have to go to the summary page to see

22  what products are being installed with this build.

23               MS. FITZGERALD:  Let's keep scrolling

24  down, Mr. Diaz, please.

25   Q.    (By Ms. Fitzgerald) And there -- what's there

1  at the bottom?

2       A.   This is a listing of the patents.

3       Q.   I think we have to move all the way over to see

4  them all, but do you see the '350 listed?

5       A.   Yes, I do, there on the end.

6       Q.   Okay.

7            MS. FITZGERALD:  I think we can switch

8  back to the regular projector screen.

9       Q.   (By Ms. Fitzgerald) All right.  Let's close

10 these example builds and switch to a little bit of a

11 different topic.

12           I understand that from time to time

13 Trilogy entered into contracts with resellers where the

14 resellers would take a Trilogy product and would then

15 resell it along with their own product offering.

16           Are you familiar with those reseller

17 contracts?

18      A.   Yes, I am.

19      Q.   Now, in the instance of a reseller contract,

20 how would Trilogy make sure that those resellers

21 properly marked the Trilogy product when they resold it?

22      A.   The resellers in this example are just like our

23 end customers.  They would only receive a distributable

24 build or our end-customer build from the Trilogy build

25 system, which means they were already receiving a marked

1  version of the product.

2      Q.   Now, Mr. Nichols, it's also my understanding

3  that Trilogy has had some customers over time that have

4  used Trilogy software to power their websites.  Are you

5  familiar with that?

6      A.   Yes, I am.

7      Q.   Now, in the case where a Trilogy customer is

8  powering its website with embodying technology, how is

9  that embodying product marked?

10     A.   In much the same way.  If it's -- if the

11 software is being used to power a website, it was

12 installed in the same way, which we just saw

13 demonstrated, so the installer would show the legal

14 notices file, and it would leave a copy of that legal

15 notices file on the computer it was installed on.

16     Q.   Now, going back to the e-mail from Alex Devine,

17 the build managers, that we looked at earlier.  Are you

18 aware of any instances where the build managers at

19 Trilogy failed to enter a product -- or a patent into

20 the Trilogy build system database after being instructed

21 to do so?

22     A.   No.  They were very good at their jobs.

23     Q.   Did Trilogy have any procedures in place to

24 check them and to make sure that the Trilogy build

25 system was indeed properly marking its products?

1    A.    Yes, we did.  We had ad hoc or spot audits that

2    were done just to ensure compliance and be sure that all

3    information was appropriate.

4    Q.    Is the Trilogy build system still operating

5    today?

6    A.    No.  The Trilogy build system was taken off

7    line in 2009.

8    Q.    Why?

9    A.    As our organization continued to grow and

10   technologies continued to evolve, we found the need to,

11   again, grow and evolve the manufacturing plant for our

12   software, and we created the Versata build system or

13   VBS.

14   Q.    Now, in collecting evidence for this case and

15   the builds that were put together on to PX1952, was

16   Trilogy able to find an example build from every year

17   between 2003 to 2007 that showed marking with the '350

18   patent?

19   A.    No, we were not.

20   Q.    And why not?

21   A.    Again, we built a manufacturing plant for

22   software.  It was not designed to keep historical copies

23   of the things we delivered to our customers.  We knew we

24   could always go and build the software again if we

25   needed to.

```
 1      Q.   Now, I know I asked you this before, but just
 2  one last question to summarize.  Did Trilogy, at all
 3  times between April 2003 and April 2007, substantially
 4  and continuously mark the products that embody the '350
 5  patent with the patent number?
 6      A.   Yes, we did.
 7           MS. FITZGERALD:  I'll pass the witness.
 8           THE COURT:  Cross-examination.
 9           MR. BATCHELDER:  Thank you, Your Honor.
10                   CROSS-EXAMINATION
11  BY MR. BATCHELDER:
12      Q.   Mr. Nichols, my wife and I have three children
13  of our own, so a hearty congratulations on your baby
14  daughter.
15      A.   Thank you.
16      Q.   You were talking about patent marking, right?
17      A.   Yes.
18      Q.   And that's -- it's generally a legal concept.
19      A.   Generally speaking.
20      Q.   And there's actually a -- there's a
21  one-paragraph statute in the patent code that addresses
22  marking, correct?
23      A.   I'm not a lawyer.  I don't know all the
24  statutes and where the code exists.
25      Q.   Have you ever read that one paragraph?
```

1      A.    No, I have not.

2      Q.    Okay.  I want to just make sure that I

3 understand your understanding as to some of the related

4 concepts, okay?

5      A.    Okay.

6      Q.    All right.  First of all, there's sort of a

7 fairness principle built into patent law and damages

8 that has to do with this marking issue; that is, the

9 damages clock can't start to run until you've provided

10 fair notice to people of your patent rights, correct?

11     A.    Okay.

12     Q.    Is that your understanding?

13     A.    Generally, yes.

14     Q.    Okay.  And there are a couple of ways to do

15 that.  One would be to pick up the phone or write a

16 letter to a company and say:  You know what?  I've got

17 this patent, the '350 patent, and I think you're

18 infringing.

19            That could start the damages clock

20 running, correct?

21     A.    I don't actually know all the legal conditions

22 that start the damages clock running.

23     Q.    Okay.  Will you take my word for that one?

24     A.    Yes.

25     Q.    Okay.  But that one Trilogy didn't do, right?

1  They didn't pick up the phone, they didn't write a

2  letter to SAP saying:  We've got this '350 patent.  We

3  think they're infringing.  Instead, they just filed a

4  lawsuit, right?

5      A.   Can you repeat the question?  I'm not sure

6  which part to answer.

7      Q.   Yes.  Before this lawsuit was filed, Trilogy

8  never picked up the phone or wrote to SAP and said:

9  We've got this '350 patent that we think you're

10 infringing, correct?

11     A.   Correct.  No, we did not.

12     Q.   Just filed a lawsuit, right?

13     A.   That's my understanding, yes.

14     Q.   Okay.  So if you don't do that, if you don't

15 pick up the phone, if you don't write a letter, the

16 other way you could stop a damages clock running earlier

17 than filing a lawsuit would be to mark products with

18 your patent consistently and continuously, right?

19     A.   Again, I don't know all the legal nuances of

20 when the clock started.  My understanding of the patent

21 marking was, once we receive a patent, that within a

22 reasonable period of time of receiving it, that we

23 should continuously and substantially mark the products

24 that embody that patent.  I have no real knowledge of

25 the damages clock and so forth.

1      Q.    Maybe we should put up that statute and make

2    sure that your -- your understanding is consistent with

3    mine.

4              MR. BATCHELDER:  Can I have the ELMO,

5    please?

6              COURTROOM DEPUTY:  Yes, sir.

7              MR. BATCHELDER:  That doesn't work very

8    well.

9              Okay.  Blow up that top part, Mr. Barnes.

10   Oh, I've got to do it.  I'm not capable of that, so I'm

11   just going to scoot it down just a little.

12             Oh, that's great.  Thank you very much.

13     Q.    (By Mr. Batchelder) Okay.  So, first of all,

14   it's an important question when the marking began,

15   because it's your understanding that the damages clock

16   can't start to run until that marking does begin; is

17   that fair?

18     A.    That's my understanding, yes.

19     Q.    Okay.  And it says so right here in the

20   statute, that it -- down here:  Damages may be recovered

21   only for infringement occurring after such notice.

22   Right here (indicates), correct?

23     A.    Yes, I see that.

24     Q.    Okay.  Now, in this case, Trilogy is looking

25   for damages and the clock is starting to run as soon as

1  the patent issued, right, in April 2003?

2      A.   That's my understanding, yes.

3      Q.   But the patent -- or excuse me -- but Trilogy

4  didn't start to mark until six months later, right, even

5  according to -- to Trilogy, correct?  In September; is

6  that fair?

7      A.   I think it was about five months, but yes.

8      Q.   Okay.  So it's Trilogy's position that it

9  started to mark in September, but it's still asking this

10  jury to award damages for the time period between the

11  issuance of the patent and September; is that right?

12     A.   That's my understanding, yes.

13     Q.   Okay.  All right.  So in terms of when that

14  marking really did begin, I've looked at that exhibit

15  that you talked about, that PX1952, and you'll agree

16  with me, won't you, that there are a variety of builds

17  in there that were from 2003, correct?

18     A.   There were a lot of builds on that hard drive,

19  yes.

20     Q.   Okay.  And 2004, 2005, correct?

21     A.   Yes.

22     Q.   Okay.  And there were many builds from after

23  the patent issued in April 2003 and in 2004 and up until

24  November 22nd, 2005 -- there were many builds where

25  there was build material, there were a legal notice

1   file, and there was a -- a splash screen, and they

2   listed Pricer, and they listed the '400 patent but not

3   the '350; is that true?

4        A.   Can you be more specific?  I actually don't

5   know which splash screens you're talking about.

6        Q.   Okay.  Well, it might be useful -- what I did

7   was, I took every build that I could find out of that

8   exhibit that you referenced, that 1952 -- is that the

9   name of it -- yes, 1952, PX1952, and I printed out for

10  each build material's folder the corresponding splash

11  screen and legal notices filed.

12              So I'm going to -- with the Court's

13  permission, I'm going to hand up to you those notebooks;

14  is that fair?

15              MR. BATCHELDER:  Your Honor, permission?

16              THE COURT:  Yes.

17              MR. BATCHELDER:  Thank you, sir.

18       Q.   (By Mr. Batchelder) I've done my best to pull

19  out these builds, and it might be useful to take an

20  example or two.  You'll see I've given you three

21  notebooks.  Two of them have a yellow spine.  Do you see

22  that?

23       A.   Yes.

24       Q.   And then the third has a green spine.  Do you

25  see that?

1    A.   Yes, I do.

2    Q.   Okay.  So what I've done -- it might be useful

3  to just take the fatter of the two with the yellow spine

4  and just for -- as an example, and I've printed out the

5  build materials, and you can see the very first one

6  starts with the build materials, right?

7             And it lists SC Pricer in there, does it

8  not?  It's under A.

9    A.   Yes, I see this.

10   Q.   Okay.  And then if you turn to B, you've got

11 the splash screen that was in that same folder of the

12 build material, and if you turn there to the splash

13 screen, you'll see that the '400 patent is marked,

14 right?

15   A.   I believe that the splash screen you're

16 referring to, you're starting on Page 2 of the splash

17 screen and not Page 1.

18   Q.   Yes.

19   A.   So we would need to see Page 1 to determine if

20 this is an internal build.  And based on my review of --

21 of this particular hard drive and recognizing the build

22 we're referring to here, this is an internal build.

23   Q.   And whether or not it's an internal build --

24 I'm going to get to that point in a few minutes, but for

25 now I just want you to confirm, the '400 patent is on

1    that splash screen, correct?

2         A.    It's on a splash screen, yes.

3         Q.    Okay.  And the '400 patent being marked there

4    reflects to you that this is a product that embodies

5    Pricer, correct?

6         A.    No.  As I said before, I'm familiar with this

7    particular piece of evidence, it does not reflect that.

8         Q.    The '400 patent is the patent that issued from

9    the original patent application filed in 1996 that we've

10   been talking about, correct?

11        A.    The '400 patent?

12        Q.    Yes.

13        A.    I'm -- I believe we've been talking about the

14   '350 patent so far.

15        Q.    There was an application filed in 1996.

16        A.    Yes.

17        Q.    It matured into the '400 patent that's not at

18   issue here, but then a related application was filed

19   that turned into the '350 patent that is at issue here.

20        A.    Okay.

21        Q.    All right.  So does the '400 patent being

22   marked here tell you that this is a Pricer-embodying

23   product?

24        A.    No.  Again, I'm familiar with this piece of

25   evidence, and I'm familiar with this particular build of

1  MCC 2.3 originating in 2003, and I can confirm it was an

2  internal build.

3           So the patent numbers here mean nothing,

4  because they're just individual developer settings, not

5  the master build system.

6      Q.   All right.  I tell you what, I've printed out

7  all the builds I could find within your Trilogy build

8  system, internal or otherwise, and tried to dedupe them,

9  and I found -- these are the numbers that I've come up

10  with.  And I'm going to come back to the patent statute

11  in a minute.

12          So the '350 patent issues here April 22nd.

13  Versata filed suit here -- excuse me -- April 2007,

14  correct?

15     A.   Yes.

16     Q.   And between April 22nd, 2003, forward, up until

17  this date, that is, November 21st, 2005, how many builds

18  were in your Trilogy build system that embodied Pricer?

19     A.   Do you mean how many builds were on the hard

20  drive that embodied Pricer?

21     Q.   Yes.

22     A.   I don't know.  A large number.

23     Q.   It was a large number.

24     A.   (Nods head.)

25     Q.   Okay.  And by my count, for these, that large

1    number we were just talking about, there are none of

2    them that are marked with the '350 patent, correct?

3        A.   I believe that going back that far to 2003,

4    2004, and 2005, most of the builds we could find were

5    internal builds only.  And so the legal notices filed

6    were not anything that would be delivered to a customer.

7        Q.   That didn't quite answer my question, sir, so

8    let me ask it again.

9        A.   I misunderstood.  I'm sorry.

10       Q.   For all of these builds that were in the

11   Trilogy build system that embodied Pricer between April

12   22nd, 2003, all the way up until November 21st, 2005,

13   you said there were many of them that embodied Pricer.

14   True or false.  None of them were marked with the '350

15   patent.

16       A.   True.

17       Q.   Okay.  And then starting on November 22nd,

18   2005, up until the date that the patent issued on April

19   20th, 2007, again, there were many builds, correct?

20       A.   Did you say when the patent was issued in 2007?

21       Q.   I'm sorry.  When Versata filed suit.  Let me

22   ask the question again.

23       A.   Oh, sorry.

24       Q.   So starting on November 22nd, 2005, up until

25   Versata filed suit on April 20th, 2007, and you look on

1    that hard drive, again, there are many Pricer-embodying

2    builds there, correct?

3        A.    Yes.

4        Q.    And all of them are marked with the '350

5    patent, correct?

6        A.    Correct.

7        Q.    Okay.  So none for this period (indicates),

8    right?

9        A.    None of the internal builds.

10       Q.    And all for this period (indicates), right?

11       A.    And all of the external builds, correct.

12       Q.    Okay.  Now, let's come back to the internal

13   versus external for a minute.

14       A.    Okay.

15       Q.    So what you've been calling an external

16   build -- I mean, you understand that Trilogy bears the

17   burden of proof on this marking question, correct?

18       A.    That's my understanding, yes.

19       Q.    Okay.  And for the products that you shipped to

20   customers, Trilogy could have -- in order to satisfy its

21   burden of proof, if it had actually done the marking, it

22   could have kept a copy of a legal notice file or splash

23   screen to come into court to prove that it had done so

24   in this time period, correct?

25       A.    Correct.

1   Q.   And it did not set up its system to save those

2   pieces of paper; is that right?

3   A.   Correct.

4   Q.   Okay.  Now, as to whether an internal build or

5   external build really matters, the bottom line is a

6   build is something Trilogy makes, right?

7   A.   It is -- an internal build is a tool that's

8   used by Trilogy.  An external build is something that we

9   make for delivery to a customer.

10   Q.   I want to make sure you're answering my

11   question, sir.

12   A.   Okay.

13   Q.   An internal build is still a build, and it's

14   something that Trilogy makes; is that fair?

15   A.   I would say we make but not for sale.

16   Q.   Okay.  Okay.  And what the patent statute

17   says -- and I realize that you haven't read it, so --

18   and you're not a lawyer, so I'm not blaming you or

19   criticizing you in any way, but the patent statute says

20   that the marking obligation pertains to any patented

21   article -- let me just use my laser pointer.

22         Any patented article, do you see that?

23   A.   I see that after the first line, yes.

24   Q.   Yeah.  And it's making, offering for sale, or

25   selling, right?

```
 1      A.   I see that, yes.
 2      Q.   There's that word "or", which means that any of
 3 these three things would trigger the marking obligation
 4 for a patented article, and certainly, a
 5 Pricer-embodying build, internal or external, is a
 6 patented article that Trilogy has made, true?
 7      A.   Can you repeat the question?
 8      Q.   A Pricer-embodying build, internal or external,
 9 is a patented article that Trilogy has made, true?
10      A.   It's not a finished product.  So when it's an
11 internal build, it's not completely built.  It's just a
12 tool, a part of the process, prior to the product
13 actually being built.
14      Q.   It's something Trilogy has made, right?
15      A.   Again, it's a -- it's something Trilogy has
16 made, yes, but it's not a complete build.
17      Q.   Thank you.
18      A.   Okay.
19           MR. BATCHELDER:  Pass the witness, Your
20 Honor.
21           THE COURT:  Redirect?
22           MS. FITZGERALD:  Yes, Your Honor.
23           Just a moment.  I'm going to borrow the
24 statute.
25           THE COURT:  Okay.
```

1                  <u>REDIRECT EXAMINATION</u>

2  <u>BY MS. FITZGERALD:</u>

3     Q.   Just a few questions, Mr. Nichols.

4     A.   Okay.

5     Q.   First of all, I want to show you the statute

6  that Mr. Batchelder just showed you.

7          Now, in this statute which Mr. Batchelder

8  showed you applies to marking, do you see -- can you

9  read after where it says:  Patentees and persons making,

10  offering for sale, or selling within the United States

11  any patented article for or under them or imported any

12  patent article into the United States -- can you read

13  the rest of that sentence?

14     A.   May give notice to the public that the same is

15  patented either by fixing thereon the word patent or the

16  abbreviation pat., together with the number of the

17  patent or when, from the character of the article, this

18  cannot be done, by fixing to --

19     Q.   I think we got the sentence?

20          The key words that I wanted to focus you

21  in on there were:  May give notice to the public.

22          Now, did the internal builds that we

23  looked at that didn't have the '350 patent, did those

24  ever go to the public?

25     A.   No.  They say very explicitly in that big red

1   text that they are for internal use only, and if you're

2   not a Trilogy employee, you may not be using them.

3        Q.   Now, did any product -- did Trilogy ever send

4   any product out to the public that embodied the '350

5   patent that was not marked with the patent number?

6        A.   No, we did not.

7        Q.   I want to also take a look at Mr. Batchelder's

8   demonstrative slide, this one here (indicates).  Do you

9   recall looking at this just a moment ago?

10       A.   Yes, I do.

11       Q.   When did Mr. Devine send his e-mail out to the

12  build managers?

13       A.   In September of 2003.

14       Q.   And as far as you know, after Alex Devine sent

15  that e-mail in September of 2003, were all copies that

16  went out to the customers products that embodied the

17  '350 patent marked with the patent number?

18       A.   Yes, all external copies delivered to

19  customers.

20       Q.   Now, those 10 TBS builds that were in 2003, how

21  many of those were internal builds?

22       A.   All of them.

23       Q.   How about the 12 in 2004?

24       A.   All of them.

25       Q.   And the 11 in the next time period?

```
 1        A.    Also all of them.

 2                   MS. FITZGERALD:  No further questions.

 3                   THE COURT:  Additional cross?

 4                   MR. BATCHELDER:  Thank you, Your Honor.

 5   Very briefly.

 6                   Could I have the ELMO again, please?

 7                   RECROSS-EXAMINATION

 8   BY MR. BATCHELDER:

 9        Q.    Mr. Nichols, based on your understanding of the

10   law, if the ladies and gentlemen of the jury conclude,

11   as a result of the fact that all of these builds

12   contained no '350 marking, that is, all the ones prior

13   to November 22nd, 2005, and every one after November

14   22nd, 2005, does, as a result of that fact and the fact

15   that Trilogy could have, but chose not to, save copies

16   of the paper that would have reflected any marking on

17   products that were sold to customers, if they conclude

18   from that, that Trilogy has not satisfied its marking

19   obligation, it is your understanding, is it not, that no

20   damages should be awarded prior to the filing of this

21   lawsuit?

22        A.    Can you help me?  It sounded like there were

23   two or three questions in there.  Each of them had kind

24   of an affirmation of a fact.  Can you break the question

25   down a little bit for me, please?
```

1    Q.   I'll make it even simpler.

2    A.   Okay.

3    Q.   If the ladies and gentlemen of the jury

4 conclude, as a result of the evidence we've been talking

5 about, that Trilogy has not carried its burden of

6 proving marking in this case, it is your understanding

7 of the law that damages should not be awarded for the

8 time period prior to the filing of the lawsuit, correct?

9    A.   That's my understanding, yes.

10    Q.   Okay.

11         MR. BATCHELDER:  No further questions.

12         THE COURT:  Anything else?

13         MS. FITZGERALD:  One more question.

14             REDIRECT EXAMINATION

15 BY MS. FITZGERALD:

16    Q.   Mr. Nichols, for the jury to conclude that

17 Trilogy didn't mark prior to November 2005, would they

18 have to conclude that you're not telling the truth?

19    A.   Yes, they would.

20    Q.   I actually didn't tell the truth.  I have two

21 questions.

22         My second question is:  Are you telling

23 the truth in everything that you've testified to today?

24    A.   Yes, I am.

25         MS. FITZGERALD:  Pass the witness.

1              MR. BATCHELDER:  Nothing further, Your

2    Honor.

3              THE COURT:  You may step down.

4              May this witness be excused?

5              MR. BATCHELDER:  Yes, sir.

6              THE COURT:  Okay.  Who will be your next

7    witness?

8              MS. FITZGERALD:  Plaintiff calls

9    Christopher Bakewell.

10             THE COURT:  Okay.

11             MS. FITZGERALD:  But first, may we

12   approach?

13             THE COURT:  Yes.

14             Why don't you go ahead and administer the

15   oath.

16             (Witness sworn.)

17             (Bench conference.)

18             MS. FITZGERALD:  Before we get too far off

19   Mr. Nichols -- before we get too far off Mr. Nichols, I

20   just wanted to point out that we'd like to request an

21   instruction to the jury at some point that the meaning

22   of the statute, the making, selling, and all of that,

23   are legal determinations and that you'll instruct them

24   on the law.

25             THE COURT:  Well --

```
 1              MS. FITZGERALD:  Maybe in the jury
 2  instructions.
 3              MR. MELSHEIMER:  I think you've already
 4  told them that.
 5              THE COURT:  I'll give them such
 6  instructions that I find to be necessary at the time I
 7  instruct them before I submit it to them.
 8              MS. FITZGERALD:  Okay.
 9              THE COURT:  But both of y'all asked him
10  questions about the statute.
11              MS. FITZGERALD:  Just making the record.
12              THE COURT:  I understand.  All right.
13              (Bench conference concluded.)
14      CHRISTOPHER BAKEWELL, PLAINTIFFS' WITNESS, SWORN
15                      DIRECT EXAMINATION
16  BY MS. FITZGERALD:
17      Q.  Good afternoon, Mr. Bakewell.
18      A.  Good afternoon.
19      Q.  Would you please introduce yourself to the
20  jury.
21      A.  Hi.  Good afternoon.  My name is Chris
22  Bakewell.
23      Q.  Mr. Bakewell, where do you live?
24      A.  I live just outside of Houston in Sugarland,
25  Texas.
```

1    Q.   Now, I understand that along with Mr. Weinstein

2   and Mr. Gupta -- Mr. Gupta, we've heard from;

3   Mr. Weinstein, we haven't heard from yet -- you're one

4   of Versata's expert witnesses in this case; is that

5   right?

6    A.   That's true.

7    Q.   Now, what exactly are you here to testify about

8   today?

9    A.   Well, I'm here to talk about two issues.  First

10   of all, to talk about SAP's customers and how to break

11   them into two groups or break them into segments.  And

12   then I'm also here to talk about demand for the patented

13   invention as looking at SAP's customers.

14    Q.   Now, our time is limited here today, so I'm

15   going to quickly move to those topics, but first would

16   you briefly summarize your educational background.

17    A.   Sure.  I have a bachelor's degree in business

18   from Bradley University in Peoria, Illinois, and a

19   master's degree in -- it's an MBA, actually, in finance

20   from the University of Maryland at College Park.

21    Q.   Do you have any professional certifications?

22    A.   I do.  I am an accredited senior appraiser and

23   a certified licensing professional.

24    Q.   How does someone become an accredited senior

25   appraiser?

1    A.    Well, one of the criteria is that it takes

2  10,000 hours of full-time experience in valuing assets.

3  And the types of assets that I specialize in valuing are

4  patents, trademarks, copyrights, and trade secrets.  And

5  then there's a series of examinations that need to be

6  passed as well and a review of my work.

7    Q.    How do you become a certified licensing

8  professional?

9    A.    Well, that's an award or a designation that's

10 awarded by the Licensing Executive Society that deals

11 with licensing of intellectual property rights, and it's

12 a recognition of my accomplishments in the field.

13   Q.    Now, since earning your MBA, what have you done

14 with your career?

15   A.    Well, I split my career roughly half and half

16 between consulting, management consulting, and working

17 in industry where I was a manager and executive with

18 financial responsibilities.  And then my consulting

19 practice, I focus on assisting companies in managing and

20 licensing and valuing intellectual property rights.

21   Q.    Who do you currently work for?

22   A.    I work for a firm called Duff & Phelps.

23   Q.    What is Duff & Phelps?

24   A.    Duff & Phelps is a financial consulting firm.

25 It's one of the largest in the world.  We have over a

1  thousand employees.  We focus on all types of valuation

2  and financial advisory services.

3      Q.   Do you have a particular area of expertise

4  within Duff & Phelps?

5      A.   I do.  My area of expertise is the valuation of

6  intellectual property rights.

7      Q.   Now, have you been published in the area of

8  intellectual property valuation?

9      A.   I have, several times.  I have a chapter in a

10  textbook that was just published, geez, about six months

11  ago or so and some other articles that have been

12  published.

13      Q.   Now, you told us also you are a certified

14  licensing professional.  Have you been published in the

15  area of licensing?

16      A.   Yes, I have.

17      Q.   Do you feel that you have the necessary

18  expertise and experience, both in your consulting

19  practice and in the industry, to offer the opinions that

20  you're about to give today?

21      A.   Yes, I do.

22      Q.   Now, the first thing you told us you're going

23  to testify about was your segmenting or dividing up of

24  SAP customers.

25      A.   That's right.

1    Q.   Now, how exactly did you divide up SAP's

2  customers?

3    A.   Well, I broke them up into two groups, what I

4  call Tier 1 and Tier 2.  We've heard some witnesses

5  before me, Mr. Carter, Mr. Dholakia, Mr. Gupta.  They

6  all talked about large customers in the Fortune 500.  I

7  actually used two indices, the Fortune 500 and the

8  Global 2000 to differentiate large customers from small

9  customers.

10    Q.   In your experience as a consultant and in

11  working out in the field, is it common, in your opinion,

12  for companies to look at their customers as large and

13  small?

14    A.   Absolutely.  It's very common.

15    Q.   Why is that?

16    A.   Well, large and small companies have different

17  needs.  Obviously, smaller companies are less

18  complicated than larger companies, and selling to them

19  is different.

20         Between the two, the selling efforts

21  require an entirely different process.  In fact, we've

22  heard both companies here focus on serving large

23  customers.  And so it's totally appropriate to segment

24  the market in that way.

25    Q.   Now, as I understand it, Tier 1 is large.

1    A.    Right.

2    Q.    Tier 2 is -- is smaller.

3    A.    Smaller.

4    Q.    When you were deciding which SAP customers to

5  classify or segment into Tier 1, what criteria did you

6  use?

7    A.    Well, I used the two indices I referred to

8  earlier, the Global 2000 and the Fortune 500.  And I

9  looked at SAP's customers.  If there's a group here, I

10  matched them up against a group that would be here

11  (indicates).

12            The -- the ones that matched the -- the

13  list, the Fortune 500 or Global 2000, I considered to be

14  Tier 1, and the ones that didn't, that were smaller,

15  were Tier 2.

16    Q.    Now, I've heard a lot about the Fortune 500.

17  Is that published by Fortune magazine?

18    A.    That's published by Fortune magazine, and the

19  Global 2000 is published by Forbes magazine each year.

20    Q.    How does the Fortune 500 differ from the Global

21  2000?

22    A.    The Fortune 500 focuses on U.S. customers.

23  Examples would be IBM and General Motors.  I think I

24  said U.S. customers.  I meant U.S. companies.

25            The Global 2000 has more of an

1   international focus.  Types of companies you'd find on

2   there would be international companies that aren't

3   necessarily based in the United States.  Examples might

4   be Toyota, Schlumberger.  SAP would be one.

5           Those are the differences between the two

6   lists.

7       Q.   Now, I take it that after you decided who

8   in Tier 1, the rest of the SAP customers you looked at

9   were Tier 2?

10      A.   That's exactly right.

11      Q.   Now, when you were segmenting SAP's customers

12  into these two categories, did you look at all SAP

13  customers they've ever had, or did you look at just a

14  subset of SAP customers?

15      A.   No.  Only the subset that has purchased the

16  infringing software during the damages period.

17      Q.   Let's move on to the second topic you said you

18  were here to testify about here today, which was demands

19  for SAP's -- certain functionality in its products?

20      A.   That's right.  Demand and usage.

21      Q.   Now, does SAP keep track of which of its

22  customers request or use a specific functionality of its

23  products?

24      A.   No, it doesn't.

25      Q.   Does SAP, as far as you know, formally track

1   which of its customers use hierarchical access?

2       A.   No, it doesn't.

3       Q.   How do you know that?

4       A.   Well, from a bunch of information:  SAP's

5   witnesses, discovery requests and responses.  That's

6   something called interrogatories, which are formal

7   questions that are served on SAP.  There's a long list

8   of that type of information.

9       Q.   I think you prepared a series of slides on this

10  topic.

11      A.   I have.

12      Q.   Why don't we take a look at the first one.

13              MS. FITZGERALD:  Mr. Diaz?  There you go.

14      Q.   (By Ms. Fitzgerald) The topic of the slide

15  says:  Deposition of SAP's corporate representative,

16  Gerald Schehl.  What's a corporate representative?

17      A.   A corporate representative is somebody who's

18  speaking on behalf of, or even more properly viewed, as

19  I understand the law, they're actually speaking as the

20  company.

21              So this would be as if SAP were speaking

22  and answering the questions that Versata was asking or

23  Trilogy was asking during a deposition.

24      Q.   Now, it looks like Mr. Schehl was asked:  Does

25  SAP have information or data on how many customers in

1   the U.S. have utilized the pricing functionality?

2                    And what was his response?

3        A.   His response was:  No, we do not really.  We're

4   not able to track that accurately.  And he went on to

5   say:  What we do know is, if a customer opens a ticket

6   or a message for a particular component, we track that.

7        Q.   And then I see:  By ticket, you mean a problem,

8   reporting a problem?

9                    And then he said:  Correct.

10       A.   He said:  Correct.  That's right.

11       Q.   What does that testimony mean to you?

12       A.   Well, he's saying that they don't track that

13   type of information or usage in the ordinary course of

14   business.  Only they might track it when there's a call

15   to the help center.  That's, I think, what opening a

16   ticket means, when there's a problem.

17       Q.   And then there's another question that he was

18   asked in his deposition.  Does SAP have any information

19   as to which U.S. customers activate certain

20   functionality at implementation; for example, the

21   pricing functionality.

22                    And what did he say in response to that

23   question?

24       A.   He says:  No.  Unless the customer is opening a

25   ticket, we do not really know what the customer really

1    implements in terms of business scenarios.

2        Q.    And is this consistent with what you just told

3    us about his testimony at the top half of the slide?

4        A.    It's the same concept, the same idea, yes.

5                 MS. FITZGERALD:  And for the record, I'll

6    state this is the -- Mr. Schehl's deposition from

7    January 21st, 2009, at Page 55 and 56.

8        Q.    (By Ms. Fitzgerald) Let's move on to the next

9    slide you prepared, Mr. Bakewell.  This is a deposition

10   of SAP's Hasso Plattner.  Who is Mr. Plattner?

11       A.    He's their chairman.  He's SAP's big boss.

12       Q.    Mr. Plattner was asked:  If a customer has

13   turned on the CRM module, will SAP know if they're

14   using, for example, the pricing functionality within

15   CRM?

16                 What did he say?

17       A.    He said:  Not necessarily.

18       Q.    And then what else was he asked?

19       A.    He was asked:  Well, what does that depend on?

20                 And he said they would use it.  We would

21   know if there's a bug.  And there is a bug report; then

22   there's a written event.  But under normal

23   circumstances, customers do not report on this small

24   granularity or functionality.

25       Q.    And what do you take away from this testimony

1  by SAP's big boss?

2      A.   Well, this is consistent with what I was saying

3  earlier, that SAP does not track usage, other than when

4  there's a written event in the form of a ticket being

5  opened.

6            MS. FITZGERALD:  And this was from

7  Mr. Plattner's deposition on May 5th, 2009, at Page 22

8  and 23.

9      Q.   (By Ms. Fitzgerald) Let's move on to the last

10  slide you prepared on this topic.  This says:

11  Deposition of SAP's Robert Girvan.  Who is Mr. Girvan?

12     A.   He's an account executive or a salesperson for

13  SAP.

14     Q.   Looks like he was asked whether there was a

15  standard form that SAP's account executives used to

16  record functionalities that customers or potential

17  customers are interested in or requesting, and he said

18  no.

19     A.   He said no.

20     Q.   And then what else was he asked?

21     A.   Well, in the middle, he was asked if SAP

22  license agreements with its customers specified a

23  functionality, such as a shopping cart or check status

24  that are being licensed to the customer.

25            He said:  I don't recall any contracts

1    that I've been involved with being that specific.

2                 And then the last question is:  How does

3    SAP know which particular product features customers are

4    actually using?

5                 He said:  I don't think they do.  I don't

6    know.

7        Q.    So what does this testimony that Mr. Girvan

8    gave about what account executives might record or

9    whether -- what's in SAP license agreements, or what SAP

10   knows, what does this specific testimony mean to you?

11       A.    Well, it's consistent with what I was saying

12   before, and that is that SAP does not track usage.  This

13   type of information is not kept within their business.

14   We've asked several times, numerous times over the last

15   couple of years, and this has consistently been the

16   response.

17                MS. FITZGERALD:  And this was the

18   deposition of Robert Girvan from March 3rd, 2009, at

19   Pages 22, 23, 28, and 42.

20                Thank you, Mr. Diaz.

21       Q.    (By Ms. Fitzgerald) So SAP doesn't track this

22   information about which of its customers use

23   functionalities within the course of its -- normal

24   course of its business.

25                Did Trilogy do anything to go out and try

1  to figure out for its own which SAP customers use

2  hierarchical access?

3      A.   It did.

4      Q.   And what did Trilogy do?

5      A.   Well, ultimately, by agreement between the

6  parties, Trilogy was able to do something called serve

7  depositions on written questions -- we heard Mr. Gupta

8  talk a bit about these earlier -- on 50 of SAP's

9  customers.

10     Q.   And how many of those customers responded?

11     A.   40.

12     Q.   Now, out of the questions in those surveys,

13 were there any particular questions that were especially

14 significant for your purpose?

15     A.   There were three.  Mr. Gupta talked about

16 these.

17              The first is:  Do you use customer

18 hierarchies -- or excuse me -- do you use hierarchical

19 access?

20              The second would be:  Do you use customer

21 hierarchies?

22              And the third would be:  Do you use

23 product hierarchies?

24     Q.   And why did you find those questions to be

25 particularly significant?

1      A.    Well, as Mr. Gupta testified, by answering yes

2  to all three of those questions, it's more likely than

3  not, in his view, that they're using the software that

4  is implicated in the '350 patent, in other words.

5      Q.    Now, in addition to these 40 responses that --

6  that Trilogy got back to its survey, did you review

7  anything else that came in during the discovery process

8  from any of those 40 customers?

9      A.    Well, subsequent to the survey process, the

10  depositions on written questions, two of SAP's customers

11  responded back some six months afterwards with the

12  affidavits that we heard Mr. Gupta talk about with

13  different answers essentially.

14      Q.    Okay.  Now, you prepared a series of slides

15  where you are setting forth your findings based on your

16  review of those affidavits and the surveys.

17      A.    Yes, ma'am.

18      Q.    And let's take a look at number -- the first

19  slide.  Why don't you explain to me what -- or it looks

20  like, actually, on the 20 affirmative responses, it

21  looks a lot like the slide we saw earlier with

22  Mr. Gupta.

23      A.    This is like Mr. Gupta's slide, except there's

24  a pie chart added to the right side to further explain

25  some of the percentages that he gave.

1          There were 20 affirmative responses, so 20

2     questions where there were -- 20 responses where there

3     were yeses answered to questions out of the 40.  So

4     that's 50 percent.

5          And of those, 14 percent or 14 customers

6     answered yes to all three questions; six answered yes to

7     hierarchical access, and then they either said yes to

8     customer hierarchies or product hierarchies.  And that

9     represents 15 percent of the responses.

10     Q.   Let's move on to the next slide.  Here we see

11     just the green and the blue boxes, and we see two

12     companies' names grayed out.  What's on -- what does

13     this slide represent?

14     A.   Sure.  Remember, earlier I spoke about Tier 1

15     and Tier 2, the Tier 1 being the larger customers and

16     Tier 2 being the smaller.  The two that are grayed out

17     are the Tier 2 customers.  Those are smaller.  And the

18     remainder are larger.

19          So it says at the top, 90 percent of the

20     20 affirmative responses are Tier 1 customers.  That is

21     the combination of all the ones that are not grayed out

22     on this slide as a percentage of the 20.

23     Q.   What is --

24     A.   Or excuse me as a percentage of the 20, that's

25     right.

1    Q.   What is significant to you about these results?

2    A.    Well, this confirms what we've been hearing

3 over the past couple of days, that both companies --

4 well, this -- this really particularly confirms that

5 SAP's customers that utilized the -- or the infringing

6 feature, the infringing software, are large companies.

7 They're Tier 1 companies.

8              And that's consistent with what we've been

9 hearing for the last couple of days, the focus on larger

10 Fortune 500, Global 2000 types of companies.

11    Q.   Now, only the 14 companies in the green box are

12 the ones who are -- fall into that more likely than not

13 category that Mr. Gupta testified to, correct?

14    A.   That's correct.

15    Q.   Why did you find that it was significant enough

16 that the customers in the blue box had answered that

17 they used hierarchical access and customer or product

18 hierarchies to where you put them on the slide?

19    A.    Well, there's a couple of reasons.

20              First of all, remember, SAP is infringing

21 by offering the software with the functionality, the

22 three aspects that we're talking about here.

23              The second is that there's two in that

24 area that changed their answers.  They moved them from

25 answers that would qualify as being in the green area to

1    the blue area, and then they fall into a category with

2    the remainder of the others in that box.  There's four

3    others who had similar types of answers.

4        Q.   Let's look at your last slide.  What is

5    represented here?

6        A.   So now we're focusing on only the green area,

7    the ones who answered yes to all three questions.

8             If you take a look at those as a

9    percentage, only 2 of the 14 fall off, only 2 are Tier 2

10   customers.  The remaining 12 are Tier 1.

11            So the conclusion is, 86 percent of the

12   customers who use hierarchical access customer

13   hierarchies and product hierarchies are Tier 1 large

14   customers.

15       Q.   And why is that significant to this case?

16       A.   Well, it shows the focus of SAP's business and

17   particularly the interest of its downstream users in the

18   infringing functionality.  It's large companies that are

19   interested in and use the functionality for the most

20   part, although there are some smaller ones that do as

21   well.  But it's essentially a -- it's something that is

22   focused on larger Tier 1 customers.

23       Q.   Now, what, if anything, do the results of your

24   review of the survey and the affidavits tell --

25   affidavits tell us about demand for the patented

1    invention?

2       A.   Well, it confirms demand and usage.  It's

3    consistent with what Mr. Gupta spoke about earlier

4    today, that's for sure.

5             MS. FITZGERALD:  Thank you, Mr. Diaz.

6       Q.   (By Ms. Fitzgerald) Let's move away from the 40

7    customers of SAP who answered the survey and go back to

8    talking about all -- all the large and small customers

9    that use -- that use the infringing software that you

10   divided into Tier 1 and -- sorry, excuse me -- that have

11   licensed the infringing software --

12      A.   Right.

13      Q.   -- and that you divided into Tier 1 and Tier 2?

14      A.   Okay.

15            THE COURT:  Before we get into that, we're

16   going to take an afternoon recess.

17            MS. FITZGERALD:  Sounds good.

18            THE COURT:  Ladies and Gentlemen, be ready

19   to come back into the courtroom at 3:25, just over 20

20   minutes.  Remember my prior instructions, and don't talk

21   about the case.

22            LAW CLERK:  All rise for the jury.

23            (Jury out.)

24            THE COURT:  All right.  Be in recess.

25            You may want to slow down your questions,

1   okay?

2              (Recess.)

3              LAW CLERK:  All rise.

4              (Jury in.)

5              THE COURT:  Please be seated.

6              MS. FITZGERALD:  May it please the Court.

7              THE COURT:  Please.

8       Q.   (By Ms. Fitzgerald) Mr. Bakewell, going back to

9   the surveys, how many of the 40 customers who responded

10  to Trilogy's depositions on written questions were in

11  Tier 1?

12      A.   24.

13      Q.   Out of those 24, 12 of those Tier 1 customers

14  fell into the blue box, which is the customers who

15  answered yes, yes, yes.

16      A.   They fell into the green box.

17      Q.   Oh, excuse me, the green box.

18      A.   Right.

19      Q.   And those were the -- the 12 customers who were

20  in Tier 1 who Mr. Gupta testified were in his more

21  likely than not category?

22      A.   That's right, the majority were.  85 percent

23  were.

24      Q.   So we had 12 customers in that -- in the green

25  box out of the --

1      A.    That's right.

2      Q.    -- out of the 24 Tier 1 customers who answered

3  the surveys.  So that was 50 percent of the Tier 1

4  customers who responded to the survey fell into

5  Mr. Gupta's more likely than not category.  Did I do the

6  math right?

7      A.    That's exactly right.

8      Q.    Now, we had another six Tier 1 customers who

9  fell into the blue box?

10     A.    Right.

11     Q.    And how did those customers answer the survey?

12     A.    They answered yes to they use hierarchical

13  accesses, and they answered yes to either or the

14  questions, do they use product hierarchies or customer

15  hierarchies.  So they answered yes to two of the three

16  questions and they all answered yes to the question do

17  they use hierarchical access.

18     Q.    And so those six out of six Tier 1 customers

19  out of the 24 SAP customers who answered the survey,

20  correct me if I'm wrong, but I think that 25 percent of

21  the Tier 1 customers who answered the survey fell into

22  that category?

23     A.    Right.  Six times four is 24, so that's 25

24  percent.

25     Q.    So altogether 75 percent of the Tier 1

1  customers who answered the deposition on written

2  questions to SAP customers used hierarchical access and

3  a customer or a product hierarchy and some of them used

4  both?

5      A.   I think that's right.  I think you have the

6  math correct.

7      Q.   Now, you told us earlier that the Fortune 500

8  was the 500 largest U.S. companies ranked by revenue; is

9  that right?

10     A.   That's right.  There's a couple of adjustments

11 but it's largely by revenues, correct.

12     Q.   Now, over the damages period of 2003 to 2011,

13 how many of SAP's customers who licensed the infringing

14 software fell into Tier 1?

15     A.   480.

16     Q.   Over the 2003 to 2011 damages period, how many

17 of SAP's U.S. customers who licensed the infringing

18 software fell into Tier 2?

19     A.   880.

20     Q.   And again, you're going to have to check my

21 math --

22     A.   Okay.

23     Q.   -- but when I add those up, I get that during

24 the 2003 to 2011 damages period, 1,360 SAP U.S.

25 customers licensed the infringing software; is that

1    correct?

2        A.   Yes, that is.

3                  MS. FITZGERALD:  I'll pass the witness.

4                  MR. MELSHEIMER:  Your Honor, might I clean

5    up a little bit?

6                  THE COURT:  Yes.

7                  MR. MELSHEIMER:  Can I move this?

8                  THE COURT:  Sure.

9                     CROSS-EXAMINATION

10   BY MR. MELSHEIMER:

11       Q.   Can you see that, sir?

12       A.   I can.

13       Q.   Pretty well?

14       A.   Let's see how big you write.

15       Q.   Okay.  How clearly I write.  Okay.  Good

16   afternoon, sir.

17       A.   Good afternoon.

18       Q.   We just met out in the audience there, didn't

19   we, sir?

20       A.   Yes, we did.

21       Q.   All right.  Let's see if there's some things

22   that we can agree on, all right?

23       A.   Yes, sir.

24       Q.   You are sometimes called upon to be a damages

25   expert in a patent lawsuit like this, right?

```
 1        A.    Yes, sir.
 2        Q.    And you've -- in other cases you've given
 3   opinions about reasonable royalty as being the
 4   appropriate damages for patent infringement?
 5        A.    Yes, sir, that's correct.
 6        Q.    And you're not offering that opinion in this
 7   case, right?
 8        A.    No, sir.
 9        Q.    And you understand that Mr. Wagner, Mike
10   Wagner, you see him out there in the -- in the audience,
11   sir, the --
12        A.    I do.
13        Q.    -- third row, right?  You know him, don't you?
14        A.    I sure do.
15        Q.    Bright guy?
16        A.    Absolutely.
17        Q.    Smart guy?
18        A.    Very smart.
19        Q.    Well respected?
20        A.    I think that's true.
21        Q.    And he is going to be providing for SAP the
22   reasonable royalty analysis for the infringement that
23   was determined in this case, right?
24        A.    That's up to you, but I presume that's true.
25        Q.    Well, you know that's what he's -- at least
```

1   that's what we're planning to do, right?

2      A.   Yes.

3      Q.   You're not here to offer any criticism or

4   scrutiny of what Mr. Wagner's work is, right?

5      A.   Not unless I'm called upon to do so, but I

6   don't anticipate doing that.

7      Q.   Well, you haven't -- you know the experts in

8   the case exchange reports, they give reports to the

9   parties to --

10     A.   Yes, sir, I know how the process works.

11     Q.   Written opinions, right?  And you haven't

12  graded his paper, so to speak, have you, sir?

13     A.   No.  No, sir.

14     Q.   And you haven't been asked to do that either?

15     A.   I have not.

16     Q.   And as far as you know, the only witness in the

17  case that's going to talk about a reasonable royalty is

18  Mr. Wagner, fair?

19     A.   That's what I understand, yes, sir.

20     Q.   You'd agree with me, sir, that a customer's

21  use, the extent of a customer's use of an infringing

22  product is a material consideration in determining the

23  fair amount of damages in a case, correct?

24     A.   I think that in general terms, I -- I would

25  agree with that, yes.

1    Q.    In a lost profits case, which is what the

2    Plaintiff is seeking here, it's important to know which

3    SAP customers have never had any interest in the

4    patented invention because those customers might not

5    be -- might not be considered good potential Trilogy

6    customers; is that a fair statement?

7    A.    I think that that's fair.  It's sort of a

8    blooper and a hit the line, but it's fair.

9    Q.    Okay.  All right.  Well, baseball.  Okay.

10   Well, I --

11   A.    Correct.

12   Q.    -- want to -- I want to make a lay up here at

13   some point with you.

14   A.    Okay.

15   Q.    I'm going to switch -- I'm going to switch

16   sports.  So you'd agree with me, though, tell me if this

17   is -- if I've got this right, that --

18   A.    Sure.

19   Q.    -- from the lost profits analysis, the issue

20   that this -- for lost profits is is to determine how

21   much profit Trilogy would have made but for, but for the

22   determined patent infringement, right?

23   A.    I agree with that, yes.

24   Q.    So if the reason why Trilogy didn't make sales

25   is unrelated to the patent infringement, are you with

1   me?

2        A.   I'm following you, yes, sir.

3        Q.   They don't get lost profits for those sales,

4   right?

5        A.   I think in general terms that's true, yes.

6        Q.   Okay.  Now, you didn't do anything particular

7   in your analysis to distinguish between customers that

8   have used the patented feature in SAP software and

9   customers who have not, fair?

10       A.   I disagree.

11       Q.   Okay.  So let me ask that again.  You didn't do

12   anything -- you personally did not conduct any

13   investigation to determine the customers that have used

14   the patented features versus ones that didn't, fair?

15       A.   No, that's foul.

16       Q.   Okay.  So you think you did do that?

17       A.   That's a component of the analysis that's an

18   indication of the information that I shared with the

19   Jury earlier, yes.

20       Q.   Okay.  So that's -- that's the survey you're

21   talking about?

22       A.   Yes, sir.

23       Q.   Are you referring to anything else in that

24   answer but the survey?

25       A.   That's what I have in mind right now.

1    Q.   Okay.  Well, let's just be clear, though, you

2  didn't do that survey?

3    A.   I don't think I'd agree with that.

4    Q.   Okay.  Well, did you formulate the questions

5  that went into the -- into the depositions?

6    A.   I had some input into it, yes, sir.

7    Q.   Oh, you did?

8    A.   I did.

9    Q.   Okay.  Well, you know, I didn't know that, so

10  thank you for sharing that.  So you actually helped put

11  together the questions that were asked of those SAP

12  customers?

13    A.   I participated in the process, yes.

14    Q.   Okay.  Well now, I want to make sure that we're

15  not -- that you're not saying something different.  You

16  helped come up with the questions that Trilogy asked

17  SAP's customers?

18    A.   Yes, sir.

19    Q.   Okay.  And you understood that that exercise

20  was to try to determine how many of SAP's customers were

21  making use of the patented invention, correct?

22    A.   Yes, sir, that's right.

23    Q.   Now, you understand that -- can you read that,

24  sir?

25    A.   I can.

1    Q.   Does it say hierarchy access?

2    A.   It does.

3    Q.   Right.  It's not supposed to be an eye test, so

4  tell me if you can't SEE when I get down farther, but

5  you understand --

6    A.   The problem I'm having these days is when

7  things are close to my face, not far --

8    Q.   Oh.

9    A.   -- away.

10    Q.   Me, too.  But this is a term that's been used

11  in the trial to describe in a broad way the -- the

12  category of -- of features that's been accused or that's

13  been determined to infringe in the SAP software, right?

14    A.   I think that's true.

15    Q.   But that's not the patent, right?

16    A.   It depends if it's being referred to

17  colloquially or if you're hearing a technical expert

18  speak about it.  Sometimes you here hierarchy access and

19  it's being referred to in synonymous terms with the

20  patent and --

21    Q.   Well, this --

22    A.   -- sometimes not.  Sometimes it's part of it.

23  As I understand it, I'm not a technical person, but

24  that's my understanding.

25    Q.   Did you hear Mr. Carter -- were you here for

1  Mr. Carter's testimony?

2       A.   I was.

3       Q.   Did you hear him testify that these words are

4  not in his patent?

5       A.   Oh, indeed.  He said that, absolutely.

6       Q.   So this is not -- hierarchy access itself is

7  not the patented invention, fair?

8       A.   Again, I think that colloquially, if I said

9  that word correctly, sometimes it is synonymous with the

10  patented invention.  But when you're speaking

11  specifically and -- and technically, I understand that

12  there's -- there's other considerations.  So it depends

13  upon in which context.

14       Q.   Well, this is a patent case, right?

15       A.   Of course.

16       Q.   And this patent is pretty technical, right?

17       A.   Fairly.

18       Q.   And you're not a technical expert?

19       A.   No, sir.

20       Q.   And you've not been called upon to opine about

21  any technical issues in the case, correct?

22       A.   I have not.

23       Q.   You wouldn't be qualified to do that, fair?

24       A.   Not now, that's -- that's true.

25       Q.   And -- but you do -- but -- but it is important

1   for you to understand when you were helping formulate

2   this survey that Trilogy sent out, you -- you needed to

3   understand what to ask, right?

4        A.   I think that that's true and to the extent that

5   there was help required from technical experts, that

6   would be a wise thing to do as well and I did that.

7        Q.   So is it your understanding of the patent, sir,

8   that to the infringement that was determined, that's all

9   I'm talking about is the infringement that was

10  determined that the Jury is here to evaluate the damages

11  on, that there are three components of it; one is using

12  hierarchy access, right?

13       A.   No, sir.  The patent, as I understand it, is

14  making those three elements available, that SA -- SAP

15  makes those elements available in its software and that

16  in and of itself constitutes infringement.

17       Q.   Okay.  You know what, you made a good -- you

18  made a good clarification.  Your survey was not -- was

19  focused on determining use, correct?

20       A.   That was the idea behind it, yes, sir.

21       Q.   You understand --

22       A.   Use and demand.

23       Q.   -- and as -- as we told the Jury in the opening

24  statements, that it's the mere capability of doing these

25  things that was determined to infringe, right?

1    A.   That's when SAP infringes, when it provides

2   that capability, that's my understanding, yes, sir.

3    Q.   Right.  So it's the capability of doing that,

4   whether or not it's actually done, fair?

5    A.   I think I can agree -- agree with that, yes.

6    Q.   But you went further in doing that survey

7   because you wanted to find out for customers that had

8   this capability --

9    A.   That were provided the --

10    Q.   -- how many --

11    A.   -- capability, yes.

12    Q.   -- how many of them are using it?

13    A.   I think that's --

14    Q.   Do I have that right?

15    A.   -- I think that I can agree with that, yes.

16    Q.   Okay.  And just let me finish here.  It's the

17   provision of these three things that can be used to

18   determine a price, it's that capability that was

19   determined to infringe, correct?

20    A.   When SAP provides that in its software, that's

21   infringement, that's what I understand.

22    Q.   But you have to be doing these three things to

23   determine a price, correct?  That's the capability

24   you're focused on, correct?

25    A.   I think that that's true, yes.

1    Q.    In other words if you used --

2    A.    Not doing, but providing.

3    Q.    Right.  If you're -- if you're providing

4  hierarchical access to find pricing information just

5  using a product category, just that capability, not

6  infringing; that's your understanding, correct?

7    A.    If you only provide that capability, I would

8  understand that's not infringing.  Again, I'm not a

9  technical expert, but that's my understanding.

10   Q.    Understood.  And I'm not trying to -- I just

11 want to -- I want to understand your survey and the

12 input that you provided.  Do you understand -- is it

13 your -- am I correct to say if you use hierarchical

14 access to get information from a customer hierarchy to

15 determine a price, but you don't -- you don't have the

16 capability to get product hierarchy pricing, that that

17 wouldn't be infringing, right?

18   A.    For -- in terms of providing the capability --

19   Q.    Yes, sir.

20   A.    -- I can agree with that.

21   Q.    And that's all I'm ever saying, by the way.

22   A.    Okay.

23   Q.    I'm not trying to slip in anything different

24 here.  We're talking about the capabilities.  I think

25 you and I can agree that the '350 patent doesn't require

1  that anyone have actually done it to be infringing,

2  true?

3      A.   For SAP to infringe, that's true.

4      Q.   Correct.

5      A.   Yes, sir.

6      Q.   It's just the capability that was determined to

7  infringe, right?

8      A.   That's right.

9      Q.   So just -- and, again, I'm not trying to --

10 sometimes these concepts are hard to -- hard to keep in

11 my head.

12           You looked at use, putting aside

13 capability, you looked at use whether anyone was

14 actually using it to help determine whether or not it

15 was valuable, right?

16     A.   I looked at that in order to determine usage

17 and demand and I think that that goes to value, but

18 the -- the focus was usage and demand.

19     Q.   Okay.  So if I do it like this, hierarchical

20 access, plus product, plus customer, and if we agree

21 that we're talking about capability here, you got to

22 have all three of these capabilities to infringe the

23 patent, right?

24     A.   That's been determined --

25     Q.   Right.

1    A.    -- that SAP has.

2    Q.    And to -- to see whether or not this capability

3 is being used --

4    A.    By downstream customers.

5    Q.    -- right, that's the survey you did?

6    A.    That's the focus of that analysis, yes, sir.

7    Q.    To determine who was doing this?

8    A.    Yes.

9    Q.    As opposed to the capability?

10    A.    As opposed to infringement, which is already

11 determined.

12    Q.    That someone else did that?

13    A.    SAP did.

14    Q.    No, no.  Someone else determined that, you

15 didn't do that analysis, right?

16    A.    That's true.

17    Q.    Okay.  Now, you went out and asked some --

18 you -- you provided input to Trilogy on these questions,

19 true?

20    A.    That's true.  I provided input.

21    Q.    Did -- was any of your input rejected?

22    A.    I don't believe so.  I think that there was

23 a -- a discussion.

24    Q.    Do you feel like you got a chance to make sure

25 the questions got asked in the right way?

1      A.    I believe so.

2      Q.    Okay.  Now, your -- you yourself don't hold

3   yourself out as an expert in surveys; is that fair?

4      A.    I've -- I've done surveys from time to time.

5   Most of the work that I do relates to intellectual

6   property valuation, though --

7      Q.    Okay.

8      A.    -- I'd agree with that.

9      Q.    So I want to make sure, I -- because I looked

10  on your website, I read your report.  I don't see you

11  bragging about your expertise in surveys.

12          Is it fair to say that your focus of your

13  practice, your professional practice, has been valuation

14  of intellectual property, certainly in the last five to

15  10 years?

16     A.    I think that's true.

17     Q.    But was there a statistician or a survey expert

18  working with you in putting together the survey?

19     A.    Yes, sir, I did work with an economist from

20  within my firm who has an expertise in statistics.  I

21  worked together with her to make sure that the sample

22  that we drew was stratified and would be representative

23  of the population in a statistically meaningful way.  So

24  the answer to that is yes.

25     Q.    Did she understand what it took to infringe the

1  patent?

2      A.    Well, we had discussions with technical experts

3  and attorneys to make sure that that was accurately

4  reflected -- reflected in our work.

5      Q.    Okay.  But she's not a technologist; is that a

6  fair statement?

7      A.    No, the technologist would have been another

8  person.

9      Q.    Okay.  Now, let me take a look at the

10  questions -- let's pull -- let's pull up some of the

11  example of the questions.  So you gave questions to

12  about -- that ain't -- that is not it.  You gave

13  questions to, what, 50 customers?

14      A.    They were served upon 50 customers --

15      Q.    And 40 --

16      A.    -- in a --

17      Q.    -- responded?

18      A.    -- in a legal process and 40 responded within

19  the time frame that was provided.

20      Q.    Now, there were a whole bunch of questions

21  asked, right?

22      A.    That's true.

23      Q.    Let's just focus on the ones that are relevant

24  to these issues, sir.  And do you -- can you see that

25  okay?

1    A.   I can see the whole thing.  You'll have to

2  point out the language you're talking about.

3    Q.   Yeah.  So let me just figure it out.  You might

4  be able to see it right there --

5    A.   It's on my --

6    Q.   -- if you --

7    A.   -- monitor, yes, sir.

8    Q.   -- okay -- if that's easier for you.  So

9  Question No. 44, this is asking -- this is -- this is

10  Chevron, right?

11            MR. MELSHEIMER:  Can we go back,

12  Mr. Barnes, and just so we're clear who it is?

13    Q.   (By Mr. Melsheimer)  You see that, it's a

14  gentleman from Chevron?

15    A.   Yes.

16    Q.   All right.  Let's go to the questions that he

17  was asked.  All right.  Question 44:  For each version

18  of SAP's software, has the SAP software ever been used

19  to group any of the company's products into a product

20  hierarchy?

21            So that would be this element right here,

22  product hierarchy, right?

23    A.   That's one of the three, yes.

24    Q.   All right.  Let's go to the next one.  Question

25  45:  For each U.S. version of SAP's ERP software, has

1  the software ever been used to group any of the

2  company's customers into a customer hierarchy?  That's

3  right here.

4       A.   Yes, sir.

5       Q.   That's three, right?  And then number -- let's

6  go to the next one.

7            MR. MELSHEIMER:  That's not the one that I

8  want.

9       Q.   (By Mr. Melsheimer)  Question:  For each

10  version of SAP's ERP software, has the company ever used

11  hierarchical accesses to perform pricing; are you with

12  me?

13      A.   I'm with you.

14      Q.   Is that what it says?

15      A.   Indeed.

16      Q.   Okay.  Now, that doesn't say -- that's not a

17  question that answers these three elements, is it, sir?

18      A.   That's one of the three elements.  It's not all

19  three.

20      Q.   Okay.  And there's -- just to short circuit

21  this, there's not a question, there's not a question in

22  this survey that you helped draft that says did you use

23  hierarchical access to determine a price using both a

24  product and a customer hierarchy in one question?  You

25  didn't ask that?

1     A.    I disagree with that.  Mr. Gupta explained to

2   the Jury that we did ask that at least of one customer

3   and that's IBM.

4     Q.    Okay.  Well, let's -- for the other 50, let's

5   leave --

6     A.    49.

7     Q.    -- IBM aside, for the other 49, did you ask the

8   question I just stated?

9     A.    It's possible, but I think the original pattern

10  was to ask those three questions and then if the answers

11  were yes, it was more likely than not.  So there's at

12  least one that I'm aware of, there may be others.  But

13  the majority followed the pattern that I just described.

14    Q.    The majority followed the pattern of asking

15  these three things separately, but not asking if you do

16  all three of them together, correct?

17    A.    That's true.

18    Q.    Doing all three of them together, the

19  capability of doing all three of them together, is what

20  was determined to infringe, true?

21    A.    Providing the capability, that's right.

22    Q.    That -- and you didn't ask, except for maybe

23  IBM and we'll talk about that later, but except for --

24  for those 49 customers, you didn't ask -- or Trilogy, I

25  don't want to put this on you, by the way, this was

1    Trilogy's survey, right, this wasn't yours, right?

2         A.    It was part of a formal process deposition on

3    written questions that were served by Trilogy and its

4    attorneys.

5         Q.    Yeah, you gave input, but you weren't there

6    actually asking the questions, right?

7         A.    No, these were depositions.  Attorneys ask

8    questions at depositions.

9         Q.    You weren't there helping the attorneys ask the

10   questions?

11        A.    No.

12        Q.    You didn't go to any of these depositions

13   because, in fact, they were done on what's called

14   written questions, they were submitted on -- in writing

15   and the company sent a representative to answer them,

16   right, in writing, basically?

17        A.    In writing or verbally, that's true.

18        Q.    Got it.  Did you suggest to the Trilogy

19   folks -- listen to my question, did you suggest to them

20   that they ask a question that included all three of

21   these components?  In other words, did you suggest to

22   them that they ask a question, did you use hierarchy

23   access to determine a price using both information about

24   the product and information about the customer?  Did you

25   suggest that question be asked?

1    A.   I suggested that the concept be asked and

2  whether it was in -- took three questions to ask that

3  one question or two, that's something I relied upon a

4  technical expert for.

5    Q.   I want to make sure I understand your answer.

6    A.   Yes, sir.

7    Q.   Okay.  So listen to my question.  Did you

8  suggest to the Trilogy folks that they ask a question

9  that said to all these customers:  Did you use

10 hierarchical access to determine a price using both a

11 product and a customer hierarchy?

12   A.   Is that your question?  My question would have

13 been more general to capture that and then I would have

14 relied upon a technical expert to break it down.

15   Q.   Was there any reason why they couldn't have

16 asked the question that I just asked?

17   A.   Well, they did, at least on one occasion, but

18 otherwise I -- I -- I don't know.  You'd have to ask a

19 technical person.

20   Q.   Except for IBM, is there a reason why they

21 couldn't -- that you know of, that they couldn't have

22 asked the question I just asked?

23   A.   I don't know one way or another.  I'd have to

24 consult with a technical expert.

25   Q.   All right.  Let's make it -- let's take a

1  simple example.  Before you came to court -- and I'm not

2  trying to get into your personal life, by the way.

3  Before you came to court today, did you brush your

4  teeth?

5       A.    Yes, sir, I did.

6       Q.    Did you drive in a car this morning to get

7  here?

8       A.    I did.

9       Q.    And you're here, so you came to court, right?

10       A.    Yes.

11       Q.    Now, I'm no survey expert and I think, fair to

12  say, you're not one either, right?

13       A.    I think that I'm -- I'm an expert in

14  statistics, but I don't do surveys all the time, that's

15  correct.

16       Q.    And you've heard the notion -- or tell me if

17  you've ever heard this statement, you can prove anything

18  with statistics?

19       A.    I've heard that said from time to time, sure.

20       Q.    And that's not a compliment, is it, sir?

21       A.    Probably not.

22       Q.    Why, it means that you can twist and take data,

23  not -- I don't mean you, by the way, but it means

24  someone could twist and take data statistically to prove

25  any point that they were trying to prove that, for

1  example, a point that they thought helped them or helped

2  their position, that's what that statement means, right?

3      A.   I think that's right.

4      Q.   Okay.  We've established that this morning you

5  brushed your teeth, you drove in a car, and you came to

6  court, and you've answered yes to each of these

7  questions, right?

8      A.   That's right.

9      Q.   That doesn't mean, though, that while you were

10  driving to court in the car, you were brushing your

11  teeth, fair?

12      A.   That's fair.

13      Q.   That would be dangerous, wouldn't it?

14      A.   It could be.

15      Q.   And it would be misleading to take your yes

16  answers to these three questions and conclude that that

17  meant that you did all three of these things at once;

18  right?

19      A.   Well, it depends upon the context.  If I was

20  asked did you brush your teeth driving your car and come

21  to court while I was in my car on my way to court, then

22  that's a different context.  But otherwise I'd agree

23  with you.

24      Q.   Sometimes it's hard to tell because you're

25  giving me a little bit of a -- of a qualification.  So I

1    want to make sure I get your answer right.

2              You got three elements here just like we

3    have three elements for the infringement, right?  The

4    capability of three things, we've got three things here

5    as well, right.

6        A.   I understand your analogy, yes.

7        Q.   You -- it would be misleading to say that

8    because you answered yes to these three questions, that

9    that meant that you had brushed your teeth while driving

10   your car on the way to court, fair?

11       A.   In the proper context.  If you asked me at a

12   stop light, it does.  But if you ask me while I'm here,

13   I can agree with you.

14       Q.   Okay.  So I think we're on the same page, but

15   just in case we're not --

16       A.   Okay.

17       Q.   -- we're not at a stop light, we're here in

18   court.

19       A.   Okay.

20       Q.   Okay.  I'm here; you're there.  And if you

21   answered yes to all three of those questions and I were

22   to come in and say that proves that Mr. Bakewell brushed

23   his teeth while driving a car or while coming to court,

24   you would swear under oath that that was misleading,

25   wouldn't you?

1    A.   I think in that context I can agree.  Now that

2  you've provided the context, I agree with you.

3    Q.   It'd be misleading?

4    A.   Yes.  In that context, yes, sir.

5    Q.   All right.  Now, the questions that were

6  submitted were only to -- sent to SAP customers, right?

7    A.   That's true.

8    Q.   There were no depositions or surveys made, that

9  you're aware of, to Oracle customers, right?

10    A.   It's possible.  That wasn't the intent, though,

11  the intent was SAP customers.  They could be customers

12  of both, but the intent was to serve it on SAP

13  customers.

14    Q.   There wasn't -- there wasn't a survey done,

15  that you're aware of, that was targeting Oracle

16  customers only?

17    A.   I agree.

18    Q.   There wasn't a survey, that you're aware of,

19  that targeted Siebel customers?

20    A.   I agree.

21    Q.   There wasn't a survey that you're aware of that

22  was sent to customers that used any other ERP vendor

23  other than SAP, right?

24    A.   I agree.

25    Q.   You didn't ask -- and again, I don't mean --

1    again, I'm not putting all this on you because I know

2    you just gave the -- gave the input --

3         A.    Sure.

4         Q.    -- but Trilogy didn't ask any Oracle customer,

5    for example, why they didn't purchase Pricer from

6    Trilogy, right?

7         A.    Not to my knowledge.

8         Q.    And you know that you didn't do any kind of a

9    survey of SAP customers -- strike that.

10               You didn't do any -- you've never seen any

11   documents in this case evidencing that a single SAP

12   customer purchased SAP's product because of this

13   hierarchy access feature?

14        A.    Maybe not due to that feature alone, but I

15   think that I have seen circumstantial evidence that

16   there were decisions where it was a contributing factor.

17        Q.    You haven't seen a single document in this case

18   proving that any customer bought SAP software because of

19   hierarchy access?

20        A.    Right, not for that reason alone.

21        Q.    Right.  And, in fact, that kind of makes sense,

22   doesn't it, because isn't it the case that this SAP ERP

23   software is a comprehensive menu of all kinds of things,

24   right?

25        A.    Absolutely true.  I agree with that.

1        Q.   It's thousands and thousands and thousands of

2   features and functionality, right?

3        A.   It's certainly thousands of features, yes, sir.

4        Q.   It can do logistics, right?

5        A.   That's a different module than we're talking

6   about, but SAP has the capability to do that just the --

7   the infringing products don't generally do logistics.

8        Q.   Right, and I'm -- I'm talking -- that's --

9   that's -- that's the point I'm trying to make, sir.

10  There's a lost features and functionality within SAP

11  that have nothing to do with pricing?

12       A.   I agree with that.

13       Q.   And there are features and functionality within

14  pricing that have nothing to do with this, right?

15       A.   Other than being part of pricing, I think

16  that's true.

17       Q.   Right.  I mean, they may be -- the capability

18  may be there, but this isn't the only way to do pricing

19  in SAP, is it?

20       A.   Oh, no.

21       Q.   There are dozens?  Hundreds?  Tens, what, of

22  ways of doing pricing within SAP that don't involve

23  hierarchy access?

24       A.   I think that it would be more accurate, as I

25  understand it, to say several or tens, it's that --

1    Q.    Okay.

2    A.    -- type.

3    Q.    10 and I -- I want your --

4    A.    Several, something like this.

5    Q.    Okay.  Maybe up to 10?

6    A.    I don't know, but it -- it's not a huge number,

7  as I understand it.

8    Q.    And --

9    A.    There are alternatives.

10    Q.    -- pricing is just one small component of what

11  SAP software can provide if you buy the whole big suite

12  of products, right?

13    A.    Absolutely, that's true.

14    Q.    Now, I want to go back to this.  You filed a

15  report on March 11th in this case, correct?

16    A.    Yes, sir.

17    Q.    And in that report, you discuss some of the

18  same things you discussed today about the deposition

19  questions that were posed to SAP's customers, right?

20    A.    Yes, sir.

21    Q.    And based on those answers, you grouped

22  together 16 of those customers in -- in a -- in a

23  category that had answered affirmatively, right?

24    A.    That's true.

25    Q.    So let's -- let's see the demonstrative.

1            MR. MELSHEIMER:  Can -- can we have their

2   demonstratives that they put up on -- right.

3        Q.   (By Mr. Melsheimer)  So originally in your

4   report, sir, the one you submitted in writing back in

5   March, all right, you actually had Microsoft and Chevron

6   up here in this category?

7        A.   Yes, sir.

8        Q.   And when you're getting ready for your

9   testimony today, you knew that you couldn't come to

10  court and say that they were in this category, right?

11       A.   I think after the outcome of certain

12  discussions, I think that that's true, discussions

13  between parties.

14       Q.   Well, now I -- so let's -- let's -- let's be

15  careful.  I'm not trying to ask you about anything that

16  has -- that's not supposed to be asked, but let me say

17  this:  You know that these -- these -- the affidavits

18  from Microsoft and Chevron where they say we don't do

19  these things, those were available in 2009, right?

20       A.   That's true.  That's my understanding.

21       Q.   Did they just not give those to you?  Did the

22  lawyers not give you those affidavits?

23       A.   I can't agree with that.

24       Q.   Okay.  Well, I'm trying to figure out -- so --

25  but when you -- so are you telling the Jury that when

1   you -- when you did your report in March of this year,

2   that you had access to the Microsoft and Chevron sworn

3   statements where they said that they do not use

4   hierarchical access in the three ways that we've been

5   talking about during your testimony?  Were you -- did

6   you know about them?

7        A.   I did know about them, yes, sir.

8        Q.   But you -- you went ahead AND included them up

9   here --

10               MS. FITZGERALD:  Your Honor, may we

11   approach?

12               THE COURT:  Yes.

13               (Bench conference.)

14               MS. FITZGERALD:  This -- Mr. Melsheimer,

15   around the time of March 6th, we didn't have the court

16   order which, you know, initially he granted our motion

17   to strike and you excluded those two affidavits from

18   this proceeding.  It was just days ago, I believe, just

19   a few days ago that you said that they were at -- coming

20   in after all.  They were obtained by SAP after the

21   finding of infringement, they didn't exist at the time

22   that -- of the first termination of infringement and

23   then it's something that we didn't believe was coming in

24   in this proceeding.

25               Mr. Bakewell corrected his opinion to be

1    consistent with the Court's ruling.  Now, he's getting

2    beaten up over it.

3                    THE COURT:  I hadn't ruled by March the

4    9th, had I?

5                    MS. FITZGERALD:  Not by March 9th and so

6    at that time --

7                    MR. MELSHEIMER:  But -- but -- but, Your

8    Honor, okay, that's not the point.  The point is that he

9    had these things available.  He could have considered

10   them when he did his report and whether or not they were

11   coming into evidence, that's a totally different point.

12                    THE COURT:  I agree.  Overrule the

13   objection.

14                    (Bench conference concluded.)

15       Q.   (By Mr. Melsheimer)  Mr. Bakewell, you in

16   your -- in your report in March 11th, you actually had

17   Microsoft and Chevron put up in this category as if they

18   had answered -- as if they had answered in a way that

19   would allow you to suggest that they do all three of

20   these infringing capabilities, right?

21       A.   Because they did initially and they changed

22   their answer.

23       Q.   Well, it's funny you say that, they changed

24   their answers?

25       A.   Yes, sir.

1    Q.   Okay.  Now, they didn't go back and say the

2  answer that I gave is wrong, did they?

3    A.   That, again, depends upon context.  I would say

4  that they did.

5    Q.   All right.  Well, let's take a look at one of

6  them.  Let's take a look at the Chev -- the Microsoft

7  affidavit.

8              MR. MELSHEIMER:  All right.  Let's keep

9  going.

10    Q.   (By Mr. Melsheimer)  Microsoft SAP systems are

11  not configured to compute a price based on pricing

12  information retrieved via hierarchical access from both

13  a customer hierarchy and a product hierarchy, right?

14    A.   Yes, sir.

15    Q.   That's these three things?

16    A.   Yes.

17    Q.   That question wasn't asked, was it?

18    A.   Not altogether in one question, no, sir.

19    Q.   So when you're suggesting, as you just did in

20  direct examination, you just did it again, you're

21  suggesting they changed their answer, they actually gave

22  more information because this question wasn't asked,

23  correct?

24    A.   I think that's fair.

25    Q.   All right.  All right.  Just a few last things,

1  Mr. Bakewell.

2      A.   Okay.

3      Q.   You heard Mr. Carter testify yesterday that

4  Trilogy stopped trying to make sales of Pricer to

5  non-SAP customers?

6      A.   I think that he said that, yes.

7      Q.   Okay.  Did you know that Trilogy had just given

8  up at some point in 2000, 2001, trying to make sales to

9  Oracle customers?

10     A.   I don't know that that's consistent with my

11 understanding, that they had just given up.  I think

12 there's other witnesses who testified differently.

13     Q.   All right.  So are you saying -- so let's just

14 be clear on this.  You -- you know Mr. Carter said that

15 because you've been sitting out here listening to all

16 the testimony --

17     A.   Yes, sir --

18     Q.   -- right?

19     A.   -- I agree.

20     Q.   And one of the reasons you're here every day is

21 to listen pretty closely in case you have to refer to

22 something in your testimony?

23     A.   That's absolutely true.

24     Q.   And you know he said that?

25     A.   He did say that, yes, sir.

1    Q.   And you're saying, well, maybe that's not right

2  because you heard some other witnesses contradict

3  Mr. Carter, fair?

4    A.   That's fair.

5    Q.   You also heard Mr. Carter testify -- well, let

6  me say this, Mr. Carter knew a lot about Pricer and who

7  it was sold to, didn't he?

8    A.   While he was with the company, I suppose he

9  did, yes.

10   Q.   Well, you know he did.  He was with the company

11 from the early, early part of the company until 2006.

12 There's no supposing about that, you know that?

13   A.   That's true.

14   Q.   All right.

15   A.   Correct.

16   Q.   And Mr. Carter also testified that Pricer could

17 benefit any company, large or small, that sold things,

18 right?

19   A.   I think he said something to that effect, yes,

20 sir.

21   Q.   All right.  And so your breakdown of Tier 1 and

22 Tier 2, I want to be clear about this.  Tier 1 is the

23 real big companies, the Fortune 500 companies, and Tier

24 2 is everybody else?

25   A.   Fortune 500 and Global 2000.  It's broken up

1    into large and small.

2        Q.    So Tier 2 could still be pretty big, right?

3        A.    It's just not on the list.  I think ultimately

4    that's the determination, but they can be -- there's

5    some companies that are larger than others within Tier

6    2.

7        Q.    But Tier 1 and Tier 2, that breakdown that you

8    did, that's just something you made up, right?

9        A.    No, sir.  That's a standard way to break down

10   an industry by size.  I've done it before in the past,

11   and I've seen others do it.

12       Q.    That's not something that Trilogy did in their

13   business, was it?

14       A.    You know, I disagree with that.  I think that I

15   heard witnesses talk over the last couple of days a

16   whole bunch about how they looked at large customers and

17   small customers, and they used generally the term

18   Fortune 500 customers.  And I took more of analytical

19   view on how it's done in the business world.

20       Q.    Was Tier -- were the words Tier 1 and Tier 2 in

21   the Trilogy documents that you looked at?

22       A.    Oh, no, sir.  Those are my terms.

23       Q.    Those are terms you're applying to the facts --

24       A.    That's what I applied to my analysis, yes, sir.

25       Q.    -- right?

1              And Mr. Carter told us that Pricer could

2    be sold to anyone that sold things, whether they were a

3    big company, whether they were a small company, right?

4         A.   I remember when he said something like that,

5    yes, sir.

6         Q.   And it could be -- it could -- I apologize.

7              It could be sold to any company, big or

8    small, that ran SAP or Oracle or PeopleSoft or Siebel or

9    any other ERP software, fair?

10        A.   Subject to -- we heard testimony about BAPIs or

11   APIs.  That's subject to having the interface.  I think

12   that that's a possibility.

13        Q.   Sir, I didn't ask you about the interface.  I

14   want to make sure I've -- I've -- I've got the question

15   right.

16        A.   Okay.

17        Q.   You heard Mr. Carter say that they would try to

18   sell Pricer to anybody, big or small, right?

19        A.   I think that he said something to that effect,

20   yes, sir.

21        Q.   And you also heard him say that they were open

22   and willing and trying to sell to Oracle customers,

23   Seibel customers, PeopleSoft customers, a whole variety

24   of ERP vendors besides just SAP.  Do I have that right?

25        A.   I think I remember the testimony you're

1  referring to.

2      Q.   And you have to rely on the testimony that you

3  hear because, of course, you weren't around when any of

4  this stuff was happening, right?

5      A.   The collective testimony, I should rely upon

6  and the evidence, yes, sir.

7              MR. MELSHEIMER:  May we have a moment,

8  Your Honor?

9              THE COURT:  Yes.

10             (Pause.)

11             MR. MELSHEIMER:  Thank you, Mr. Bakewell.

12  Appreciate it.

13             THE WITNESS:  Thank you.

14             THE COURT:  Redirect?

15             MS. FITZGERALD:  Yes, Your Honor.

16                  REDIRECT EXAMINATION

17  BY MS. FITZGERALD:

18     Q.   Mr. Bakewell, I believe we saw an analogy or a

19  drawing here from Mr. Melsheimer where he --

20             MS. FITZGERALD:  There we go.

21             MR. MELSHEIMER:  You got it?

22             MS. FITZGERALD:  I got it.

23     Q.   (By Ms. Fitzgerald) He talked about brushing

24  teeth, driving a car, and going to court.  Do you

25  remember this?

1    A.    I do.

2    Q.    Now, I think the point that Mr. Melsheimer was

3 trying to make was that if you answered yes to all three

4 of these questions, it would be unusual because it's

5 unusual for people to brush their teeth while driving

6 their car to court.

7         Do you remember that point?

8    A.    I think so.  And I told him that if I saw

9 somebody at a stop light, and I had seen them in court

10 yesterday, and they had a toothbrush in their hand, then

11 I would disagree with him.

12    Q.    Right.

13    A.    It all depends upon context.

14    Q.    Right.  But the point he was trying to make is,

15 it's generally unusual for somebody to be doing those

16 three things at once.

17    A.    Of course.

18         MS. FITZGERALD:  Mr. Diaz, can we look at

19 PX19?  Let's go forward.  Can we keep going forward in

20 the document?  One more page.

21         MR. COLE:  Second paragraph.

22         MS. FITZGERALD:  Oh, second paragraph.

23 Sorry.  I can't see very well.  Let's blow up that

24 second paragraph.

25    Q.    (By Ms. Fitzgerald) The paragraph says:

1    Without hierarchy access, you would need to create a

2    condition table for every combination and assign all

3    accesses to this table in a hierarchy within an access

4    sequence.

5              This would not only take a great deal of

6    time, but it would also reduce system performance and

7    force the system to use rigidly fixed sequence of

8    accesses.

9              MS. FITZGERALD:  One more down.

10             THE COURT:  You may want to slow down a

11   little bit when you're reading.

12             MS. FITZGERALD:  Sorry.

13        Q.   (By Ms. Fitzgerald) We've got a -- the

14   paragraph after that -- or the sentence says:  This

15   represents a major drawback, especially for hierarchical

16   data, such as that representing a product hierarchy or a

17   customer hierarchy.

18             Do you see that?

19        A.   I do.

20        Q.   Now, I know you're not a technical expert, but

21   based on what you read just there and what you've

22   observed as you've been sitting in on this trial, would

23   you say that it's unusual to -- or would it be unusual

24   for a SAP customer who has their infringing software to

25   use hierarchical access with a customer and a product

1  hierarchy?

2          MR. MELSHEIMER:  Objection, Your Honor.

3  This is outside of the scope of his report and his

4  expertise.

5          THE COURT:  Overruled.

6      A.   Well, this provides the context for the

7  questions that were asked, and I think that the fact

8  that it's a major drawback, and it's referred to in a

9  document like this provides context for those three

10 questions.

11     Q.   (By Ms. Fitzgerald) Now, do you think that

12 Mr. Melsheimer's example of brushing teeth, driving car,

13 and court is a fair analogy to the surveys that Trilogy

14 performed?

15     A.   No.  It's a foul, but I think that if you apply

16 the proper context, it still can be utilized.

17     Q.   Now, the surveys that Trilogy sent out to SAP

18 customers, were those sent out and completed prior to or

19 after SAP was determined to infringe Trilogy's patent?

20     A.   Those were some six months, maybe nine months

21 after the infringement determination.

22     Q.   No.  I think maybe we got crossed.

23     A.   Oh, I'm sorry.

24     Q.   The surveys, the surveys that we sent out, were

25 those before or after?

1    A.   Oh, the surveys.  The 50 questions -- or the 50

2    depositions on written questions were before there was a

3    determination of an infringement.

4    Q.   And you anticipated my next question, which

5    was, the two customer affidavits that we heard you

6    testify about where you testified that two of SAP's

7    customers had clarified or charged their answers to the

8    survey, were those affidavits obtained before or after

9    the determination that SAP infringed Trilogy's patent?

10   A.   That was my prior answer.  They were obtained

11   six to nine months after the determination, unlike the

12   original 50, if that answers your question.

13   Q.   So the two customers who submitted those

14   affidavits before the determination of infringement,

15   they answered the survey.

16   A.   Right.

17   Q.   And after the determination of infringement,

18   they submitted these affidavits where they changed their

19   answers.

20   A.   Yes, ma'am.

21   Q.   And who sent out the surveys, Trilogy or SAP?

22   A.   Trilogy sent out the surveys.

23   Q.   And who went out and obtained the affidavits,

24   Trilogy or SAP?

25   A.   SAP.

1    Q.   Was Trilogy at all involved in obtaining those

2  affidavits?

3    A.   No, not those two.

4         MS. FITZGERALD:  I'll pass the witness.

5              RECROSS-EXAMINATION

6  BY MR. MELSHEIMER:

7    Q.   Mr. Bakewell?

8    A.   Yes, sir.

9    Q.   If you had asked the question on the survey, do

10 you do all three of these things at once to determine a

11 price, we wouldn't have to be here arguing about it,

12 right?

13   A.   I disagree.

14   Q.   If you'd asked -- if you'd asked in this survey

15 or the depositions all three of these questions, you

16 would have an answer at least to that question, right?

17 Listen to my question.

18   A.   To that specific question?

19   Q.   Yes.

20   A.   Of course.

21   Q.   And the -- you understand there's no dispute in

22 this case that SAP put in hierarchy access back in

23 October of 1998, right?

24   A.   Yes.  SAP infringes.

25   Q.   And there's no dispute in this case that

1   there's been a determination of infringement.

2       A.   Yes, sir.

3       Q.   But it's -- the determination of infringement

4   is limited to the capability of doing these three things

5   at once.  We agreed on that, right?

6       A.   That's what -- that's what the infringement is,

7   yes, sir, as I understand it.

8       Q.   So just -- just saying hierarchy access or

9   product hierarchy or customer hierarchy, that doesn't

10  really tell us anything specific about the infringement

11  that was determined, true?

12      A.   For customer and product hierarchies, I can

13  agree with you.  For hierarchy access, as I explained

14  earlier, sometimes I've seen the infringement generally

15  referred to in those terms.

16      Q.   You can use hierarchy access to do things other

17  that pricing, right?

18      A.   That's true, absolutely.

19      Q.   You can use a product hierarchy to do something

20  other than pricing, right?

21      A.   Yes, sir.

22      Q.   You can use a customer hierarchy to get

23  information other than pricing, right?

24      A.   I totally agree.

25      Q.   Now, you talked about these affidavits, and you

1  said, well, they were after the determination, right?

2      A.   That's what I said, yes, sir.

3      Q.   But they weren't after you filed your written

4  report, were they?

5      A.   No, sir.

6      Q.   In fact, they're about a year-and-a-half before

7  you filed your written report; isn't that right?

8      A.   That's true.

9              MR. MELSHEIMER:  Thank you.

10             MS. FITZGERALD:  No questions.

11             THE COURT:  Anything additional?

12             Okay.  You may step down.

13             Who will be your next witness?

14             MR. COLE:  Your Honor -- excuse me --

15  Plaintiffs call Roy Weinstein.

16             THE COURT:  Okay.

17             (Witness sworn.)

18             MR. COLE:  May it please the Court.

19             THE COURT:  Mr. Cole.

20        ROY WEINSTEIN, PLAINTIFFS' WITNESS, SWORN

21                   DIRECT EXAMINATION

22  BY MR. COLE:

23      Q.   Good afternoon, Mr. Weinstein.  Could you

24  introduce yourself, please.

25      A.   Sure.  My name is Roy Weinstein.

1    Q.   And what do you do for a living?

2    A.   I'm an economist.

3    Q.   All right.  Let's -- let's jump real quickly

4 and ask you, what was your assignment in this case?

5    A.   My assignment was to calculate profits lost by

6 Trilogy as a result of infringement by SAP.

7    Q.   Okay.  And I take it you've been hired by

8 Trilogy?

9    A.   Counsel for Trilogy retained me, yes, sir.

10    Q.   That would be us.

11    A.   Indeed.

12    Q.   Okay.  All right.  Let me -- to avoid surprise,

13 let's go ahead and jump to the conclusion, and then

14 we'll talk about how we got there.

15           MR. COLE:  Mr. Diaz, if you could put up

16 Slide 2 from Mr. Weinstein's deck.

17    Q.   (By Mr. Cole) It's a pretty simple slide.  Can

18 you tell us what your conclusion is about lost profits

19 in this case?

20    A.   Yes, sir.  Based on the work that I did, I

21 concluded that lost profits experienced by Trilogy as a

22 consequence of SAP's infringement amount to

23 approximately $285.5 million.

24    Q.   Okay.  And over what period of time did those

25 losses accrue?

 1    A.   Roughly, April 2003 through roughly April 2011.

 2    Q.   Okay.  So about eight years?

 3    A.   Correct.

 4    Q.   And so how much -- how does that work out on a

 5 per-year basis?  How much in lost profits per year?

 6    A.   Well, if you divide --

 7    Q.   Sorry to give you a math problem.  35-ish

 8 million?  Does that sound about right?  Now, you better

 9 not rely on me.

10    A.   About $35 million a year, that's correct, over

11 eight years.

12    Q.   All right.  And I take it you calculated that

13 on a customer-by-customer basis; in other words, lost

14 sales means lost customers; is that fair?

15    A.   I did.  And actually, the number of customers

16 which I concluded were lost as a result of infringement

17 was 93.

18    Q.   Okay.

19    A.   Ninety-three customers over that eight-year

20 period, which comes to, oh, about 11 -- 11 to 12

21 customers per year.

22    Q.   Okay.  And we just heard Mr. Bakewell testify

23 that SAP made infringing sales during this damage period

24 to 1,360 customers.  Is that consistent with your

25 understanding?

1      A.   Yes.  He just said that.

2      Q.   Okay.  And -- and, again, so what years is --

3  93 out of that total, those are the only ones you're

4  claiming?

5      A.   Correct.

6      Q.   All right.  And about how much in profit --

7  we'll build up the numbers as we go through the

8  analysis, but how much in profit for each customer did

9  Trilogy lose?

10     A.   Well, that -- that would come to about $3

11 million in profit for each of the 93 customers; $3

12 million per customer.

13     Q.   Okay.  All right.  Let's -- let's jump back a

14 little bit.

15          If you could tell us, what's your

16 educational background, and I want to kind of get your

17 qualifications in front of the jury to do the work that

18 you were hired to do here.

19          So where did you go to school, and what

20 did you study?

21     A.   I received a Bachelor of Business

22 Administration degree with honors in economics from City

23 College, New York.  And from there, I received a Master

24 of Arts degree also in economics from the University of

25 Chicago.

1    Q.    Okay.  And when did you get out of the

2  University of Chicago?

3    A.    1967.

4    Q.    All right.  The year I was born.  That's a good

5  year.  I won't ask you that again.

6            What did you do after you got out of

7  Chicago?

8    A.    I immediately went to work, actually, when I

9  left Chicago, for another economic and consulting firm

10  back on the east coast.  The name of that first was

11  NERA, National Economic Research Associates.  So I began

12  with them really in 1969.

13    Q.    Okay.  And just at a high level, what kinds of

14  things have you done in your career since you got out of

15  school until today?

16    A.    Well, I've been doing this for more than 40

17  years now, and so over that time, I've done all kinds of

18  different -- different interesting engagements, but

19  generally I've done work in the area of antitrust

20  economics, the valuation of intellectual property and

21  the calculation of patent damages, sports economics, and

22  basically engagements that require the collection,

23  tabulation, and analysis of various types of economic,

24  statistical, and financial data.

25    Q.    Is it fair to say, since you got out of school,

1  you've done real-world economic work as opposed to

2  academics?  Is that fair?

3      A.  Correct.  Occasionally, I write academic-type

4  articles, but that -- that's only on occasion, and what

5  I've been doing for the past four decades involves

6  real-world problems with real companies.

7      Q.  And you mentioned that briefly.  Have you had

8  some of your research -- economic research articles

9  published in peer-reviewed publications?

10     A.  Yes, I have.  I've written articles about the

11 calculation of damages in patent cases, among other

12 things, and at least one of them was published in a

13 peer-reviewed article.

14     Q.  Do you have -- okay.  And have you ever been

15 appointed as an expert by a court in -- in any cases in

16 the past?

17     A.  Actually, I have.  I've been appointed by -- by

18 a judge as -- as the Court's expert on -- on one

19 occasion involving a case, and most recently back in

20 2009, I was -- I was appointed by the presiding judge of

21 Los Angeles Superior Court, which is the largest state

22 court system in the country, to calculate the economic

23 impact of layoffs on the court system, on the city of

24 LA, and the county of Los Angeles, State of California.

25 And that -- that assignment was given to me by the

1 presiding judge.

2     Q.    Okay.  All right.  Well, let's move on to your

3 work in this case in particular.  Now, I want to ask

4 you, I guess, as a starting matter, what kinds of things

5 did you do in order to prepare to formulate the opinion

6 that you're offering here today?  What kind of research

7 and analysis did you do?

8     A.    Well, I began by trying to familiarize myself

9 with the issues.  I looked at the complaint in the case

10 and the patent.

11             I reviewed documents that were submitted

12 by counsel for -- for both parties, by SAP and by

13 Trilogy.  I looked at depositions.  I looked at lots of

14 documents, internal documents.  I reviewed expert

15 reports of the other experts.

16             I also gathered a certain amount of

17 financial information on my own, publicly available

18 information that I was able to acquire.  And from time

19 to time, I consulted some of the economics books behind

20 my desk.

21             And I also interviewed or spoke with a

22 number of individuals in connection with my work,

23 Mr. Carter, Mr. Gupta, Mr. Bakewell, Chris Smith.  There

24 might have been some others as well, but those four come

25 to mind.

1    Q.   Okay.  Did you also study some of Pricer

2  contracts that it -- that Trilogy sold in the

3  marketplace during the time period we've been

4  discussing?

5    A.   Yes, I did.  I looked at a fair number of

6  Trilogy license agreements with various entities that

7  included license rights to Pricer.

8    Q.   Did you do all this by yourself?

9    A.   No, I didn't.  I had the help of my staff and

10  my firm, Micronomics.  And so from time to time, they

11  assisted me in going through these documents.  The

12  documents were quite voluminous.  There are really tens

13  of thousands of documents just in the case, apart from

14  materials that I looked at on my own.

15    Q.   Okay.  And you mentioned Micronomics.  That's

16  the company you work for now?

17    A.   Yes.  It's the company I co-founded back in

18  1988.

19    Q.   Okay.  And how big are y'all?

20    A.   We have about 20 people in our Los Angeles

21  office.

22    Q.   Okay.  All right.  I take it -- it sounds like

23  it was a fair amount of work.

24    A.   It was indeed.

25    Q.   And you're not doing this out of the goodness

1  of your heart.  I take it we retained you on a basis to

2  compensate you for your time and the time of your team;

3  is that right?

4      A.    Correct.

5      Q.    And what do you charge -- what does -- what

6  does your company charge for the time of the team

7  members that worked on this?

8      A.    The company charges $750 per hour for my time,

9  and members of my staff are charged at rates that vary

10 from $160 an hour to, oh, perhaps as much as $400 an

11 hour, depending upon training and experience and how

12 long they've been with me and the nature of what they

13 do.

14     Q.    Okay.

15     A.    And that's all charged by Micronomics.

16     Q.    Gotcha.

17            All right.  Well, let's move on and go

18 straight to the lost profits now.

19            I take it you have formed an opinion after

20 all the work and research you've done in this case,

21 correct?

22     A.    Correct.  I have.

23     Q.    And have you formed an opinion, first of all,

24 about whether Trilogy suffered any lost profits?

25     A.    Yes, sir, I have.

1     Q.    And what's that opinion?

2     A.    I've concluded that -- that Trilogy did indeed

3  experience lost profits as a result of the infringement

4  by SAP of the '350 patent.

5     Q.    Okay.  And we've heard, in fact, in cross just

6  a few minutes ago, about the concept that what happened

7  to Trilogy but for -- what would have happened to

8  Trilogy but for the infringement.  Is that the standard

9  you applied?

10    A.    Yes.  And actually, the but-for standard is

11 a -- is a common standard that people like me use in

12 these kinds of engagements; that is, the assignment that

13 we're asked to undertake involves the need to analyze

14 what would be different if something had not happened.

15             In this case, my assignment was to try and

16 decide what profits Trilogy would have experienced but

17 for infringement by SAP.

18    Q.    Okay.  Now, let's look -- look at the

19 methodology you used to come to your conclusion.  And is

20 there a legally appropriate framework for a lost profits

21 analysis?

22    A.    There is.

23    Q.    Okay.

24             MR. COLE:  If we could have Slide 3,

25 Mr. Diaz?

1    Q.   (By Mr. Cole) What do we have here?

2    A.   Well, what you have here is -- is a case called

3    the Panduit case.  It's actually shown on the lower

4    right-hand side of this slide, because there's another

5    case on there that has nothing to do with it, but...

6            And the Panduit case was a patent case,

7    and in it, ultimately, were set out a number of factors

8    that individuals, such as myself, were supposed to

9    examine in connection with claims for lost profits

10   associated with patent infringement.

11           So those are called the Panduit factors,

12   and they come from that Panduit case.

13   Q.   Okay.  And did you apply the Panduit case in

14   coming to your conclusions?

15   A.   I did.

16   Q.   All right.  Is that a generally acceptable

17   framework in calculating lost profits in a patent case?

18   A.   In my experience, it is, yes, sir.

19   Q.   All right.

20           MR. COLE:  If we could have Slide 4,

21   Mr. Diaz.

22   Q.   (By Mr. Cole) And substantively, I think there

23   are four elements in the Panduit factors that you're

24   required to prove in order to establish lost profits.

25   And maybe if you could tell us just real quickly what

1  the four are, and then we'll go over them in -- in some

2  detail.

3      A.   Right.  You've shown the case again on the

4  right side of the screen.  And on the left side, coming

5  from within the case are the four Panduit factors that

6  are set out in that case that we're supposed to examine.

7           And those -- those are as follows:  First

8  is the demand for the patented product; that is, did

9  customers want the patented product?

10           Second is the extent to which there are

11  non-infringing alternatives.  And in the Panduit case,

12  it's referred to absence of non-infringing alternatives.

13           Third is the ability of the firm that

14  holds the patent to actually make the sales that are

15  claimed as lost profits.  So the manufacturing and

16  marketing capacity of the firm that holds the patent --

17  in this case, that would be Trilogy -- to make the

18  sales.

19           And the final Panduit factor has to do

20  with the calculation of -- of lost profits and what that

21  amount of profit would actually be.

22      Q.   Okay.  Well, let's start at number one, the

23  demand for the patented product.  Was there demand for

24  Trilogy's patented product?

25      A.   Yes, sir, there was.

1      Q.   Was there demand for SAP's infringing product

2  that practiced the patent?

3      A.   I believe so, yes, sir.

4      Q.   All right.  Well, let's -- let's break this up,

5  and I want to talk about this in two different

6  timeframes, because there's been a lot of testimony

7  about the early -- the mid-'90s and then the 2003

8  timeframe.

9              Let's -- let's start in 1996.

10             MR. COLE:  If we could have Slide 16,

11  Mr. Diaz.

12     Q.   (By Mr. Cole) And we've seen this slide quite a

13  bit, and I believe this is the Trilogy sales history for

14  Pricer customers; is that correct?

15     A.   Yes, sir.

16     Q.   All right.  And what is this -- what is this

17  sales experience --

18             MR. COLE:  Well, scratch that.

19     Q.   (By Mr. Cole) You mention that you looked at

20  some Trilogy contracts; is that right?

21     A.   I did.

22     Q.   And there's a number of contracts here or

23  customers here that are listed in bold.  What does that

24  signify?

25     A.   Those are Trilogy agreements with entities

1    where the -- the purpose of entering into that agreement

2    with Trilogy was the availability of Pricer.  So those

3    are called Pricer-isolated agreements in the context of

4    this engagement.

5        Q.   Okay.  And between 1995 and 1998, am I right

6    that there were 21 Pricer-isolated agreements?

7        A.   There were.  Twelve of those were -- were what

8    are called Tier 1 or the larger customers and nine were

9    with Tier 2.

10       Q.   Okay.  A total of 21?

11       A.   Yes, sir.

12       Q.   All right.  And between 1995 and 1998,

13   including everybody, about how many Pricer customers did

14   Trilogy win during that period of time?  Approximation

15   is fine.  Is it about 50 to 60?

16       A.   Oh, you mean all -- all total?

17       Q.   All total.

18       A.   I think, actually, the number is larger than

19   that.  Certainly in excess of that.

20       Q.   Okay.  Well, you see here that in -- the Pricer

21   sales dropped dramatically, and then by 2003, there are

22   no new Pricer customers that year; is that right?

23       A.   Correct.

24       Q.   Now, SAP has suggested, I think, throughout the

25   trial that by 2003, Trilogy would have no ability to

1    sell Pricer anymore, because it was dead.

2                    Do you agree with that?

3        A.    I don't.

4        Q.    Okay.  And do you consider the evidence of

5    Trilogy sales of Pricer from '95 to '98 as relevant in

6    showing demand?

7        A.    Absolutely relevant, yes.

8        Q.    Okay.  And why do you think that's so?

9        A.    Well, the '95 -- or the '96 to '98 period is

10   the only period here that is completely free of

11   inclusion by SAP of the technology that Trilogy

12   developed.

13                   And so what I begin with is looking at the

14   experience of Trilogy between 1996 and 1998 to see how

15   Trilogy performed with respect to the Pricer product

16   before SAP began offering that -- that software

17   technology.

18       Q.    Okay.  We've heard the word exclusive a lot.

19   Is that -- is that a good way to put it, that Pricer was

20   an exclusive from '95 to '98?

21       A.    Well, it was, because Trilogy was the only

22   entity that -- that offered that capability during

23   that -- that period, between 1996 and 1998.

24       Q.    Okay.  And starting in October of 1998, was

25   Trilogy still the only company to offer its invention in

1   a product?

2       A.   No.  Beginning -- beginning in October of 1998,

3   the functionality that ultimately was patented by

4   Trilogy was -- was offered by SAP as well.

5       Q.   Okay.  Well, let's fast-forward to 2003.

6   This -- that's the beginning of the damage period,

7   right?

8       A.   Right.  I don't calculate any damages in

9   connection with my work here prior to April 2003 when

10  Trilogy's patent issued.  That's when I start the damage

11  calculation.

12      Q.   Okay.  And in 2003, the patent issued, right?

13      A.   Yes, sir.

14      Q.   And let me ask you this:  What does the patent

15  do for you in terms of exclusivity?

16      A.   Well, under -- under patent law, a

17  patent-holder is entitled to exclusive use of that

18  patent, and no one else can use that patent without the

19  right or access to the patent granted by the

20  patent-holder.

21           So what it means to someone like me as an

22  economist is that the patent-holder has a monopoly on

23  whatever technology is covered by the patent, and no one

24  else can use it without permission, basically.

25      Q.   Now, in the real world in 2003, did Trilogy

1  have that exclusive in the real market that actually

2  unfolded?

3      A.   Well, it was supposed to with the patent, but

4  in actuality, SAP was infringing without permission

5  beginning in April of 2003.

6      Q.   Okay.  Now, in the but-for world that we have

7  to deal with -- in the but-for world, does Trilogy get

8  an exclusive because of its patent, or does Trilogy have

9  to live with a world where SAP was selling its

10  technology?

11     A.   No.  In the but-for world, which is where we

12  are now, what happens is that SAP can no longer offer

13  Trilogy's patented technology.

14          And so any entities, customers of SAP who

15  had access to Trilogy's patented technology could no

16  longer have that access from SAP.  That access would

17  have to be removed, because Trilogy, with a patent, has

18  the exclusive right to that access.

19     Q.   And that's true, isn't it, even if a customer

20  bought in 2000 or '99.  When Trilogy's patent issued,

21  Trilogy could get its exclusive, couldn't it?

22     A.   Correct.

23     Q.   Now, given that in the but-for world, you have

24  to frame the analysis with Trilogy having an exclusive,

25  what's the best real-world data to let you know what

1    would happen when Trilogy had an exclusive right on that

2    invention?

3        A.    The best real-world data is to go back to the

4    period when Trilogy, in fact, had an exclusive, namely,

5    1996 to 1998, and examine Trilogy's performance during

6    that period.  Because, once again, beginning in 2003,

7    when Trilogy has the patent, it would, again, have a

8    right to an exclusive.

9        Q.    Now, when Trilogy was making these sales in --

10   in the period where it had an exclusive, was it making a

11   little bit of money or a lot of money?

12       A.    It was doing -- it was doing very well.

13       Q.    Okay.

14       A.    It was making a lot of money.

15       Q.    In terms of total revenue, how much money did

16   Trilogy earn in total revenue -- that's license fees,

17   maintenance, and consulting services -- for just the 21

18   Pricer-isolated contracts that we see here from '96 to

19   '98?

20       A.    Well, over the whole period, it was -- it was

21   about $135 million.  That goes a little longer than that

22   period, but that was Trilogy's revenue just from

23   Pricer-isolated contracts.

24                   During the period, '96 to '98, Trilogy was

25   obtaining license revenue, license agreements from

1    Tier 1 customers equal to about $1.8 million per

2    customer.

3         Q.   Okay.  And you mentioned that some of that

4    revenue would have come in later --

5         A.   Correct.

6         Q.   -- but am I correct that all of those sales

7    were made in a three-year window?

8         A.   Correct.  So even though the revenue came in

9    later, the sales that produced ultimately $135 million

10   in revenue were made in 1996 through '98.

11        Q.   Okay.  Now, those were sales to Trilogy

12   customers; is that correct?

13        A.   Correct.

14        Q.   Is there any relationship between Trilogy

15   customers and SAP customers on the other hand?

16        A.   Well, there is.  Some of those Trilogy

17   customers, in the language that we've heard for the last

18   couple of days, bolted on to SAP, and so there was a

19   relationship there.

20             MR. MELSHEIMER:  Your Honor, may we

21   approach the bench to hear an objection?

22             THE COURT:  Yes.

23             (Bench conference.)

24             MR. MELSHEIMER:  Judge, there's nothing in

25   his report about any sort of a bolt-on market.  He's now

1    offering this opinion.  I anticipated -- I thought he

2    might try to say this.

3              His market in the report that he described

4    was basically the -- the ERP market, and now he's trying

5    to suggest that there's some market for bolt-on for SAP

6    and -- the objection is, it's not included in his

7    report.

8              MR. COLE:  The market he defined was Tier

9    1 SAP customers' pricing needs.  So that's either met

10   inside of SAP or bolted on by the way he defined his

11   market.  In other words, the pool of customers for whom

12   we could claim a lost profit, a lost sale, is only SAP

13   customers.  That's all -- that's the only point we're

14   making.

15             MR. MELSHEIMER:  So it's -- it's -- well,

16   here's what he says, Your Honor.  He talks about the

17   sales configuration market, and, you know, the SS -- the

18   SCE and SPE market, and he's talking about -- he's

19   talking about a broader market than a bolt-on for SAP

20   products.

21             THE COURT:  I'm going to let him -- I'm

22   going to overrule your objection.

23             MR. MELSHEIMER:  Okay.

24             (Bench conference concluded.)

25     Q.   (By Mr. Cole) Okay.  I'd like to talk a little

1   bit more about the relationship between SAP customers

2   and the Trilogy invention here.

3              MR. COLE:  Mr. Diaz, if we could have

4   PX1996.  We'll go to Page 1 here first.  Just -- if you

5   could blow up the first three paragraphs there just to

6   give us some context with the -- with the e-mail.

7        Q.   (By Mr. Cole) I'll tell you, this is an e-mail

8   in September of 1997.  This is inside of Trilogy and the

9   subject is Sapphire, which was one of the SAP customer

10  conferences.  And I just want to point you to the middle

11  paragraph.  If you could tell us what that's saying.

12       A.   You want me to read it?

13       Q.   Sure.

14       A.   It says:  I need the names of companies you

15  remember who were really excited about the software,

16  enough so that if I called them right now and asked them

17  if I could quote them about how great Pricer is, they

18  will be willing to do it.

19       Q.   All right.

20             MR. COLE:  Now let's move to the second

21  page, Mr. Diaz.  And I'm looking at the second big

22  paragraph.

23       Q.   (By Mr. Cole) Okay.  If you could take a moment

24  to look at that and tell us what -- what this is talking

25  about.

1    A.   Well, it's talking about demand for the Pricer

2    product on the part of Sapphire attendees.  That would

3    be the -- the SAP Conference.  And it says 33 percent of

4    the people surveyed expressed need for disconnected

5    pricing.

6    Q.   And is disconnected pricing one of the

7    advantages of Mr. Carter's invention?

8    A.   It is.

9    Q.   All right.

10   A.   And over 60 percent of those surveyed need to

11   add sophistication to their current pricing

12   structures --

13   Q.   Right.

14   A.   -- but are limited by their current pricing

15   system; 91 percent said they needed to implement a

16   pricing system that is easier to maintain than their

17   current system.

18   Q.   Okay.  And I think we saw at the beginning,

19   this was in April -- or excuse me -- September of '97.

20   Is that before SAP introduced hierarchical access?

21   A.   Yes, sir.

22   Q.   And what does this tell you about the demand or

23   the need for Mr. Carter's invention among 2500 SAP

24   customers?

25   A.   Well, this is a description of some of the

1  attributes of Trilogy's product that were clearly in

2  demand on the part of these conference attendees, SAP's

3  customers or potential customers.

4      Q.   Okay.

5           MR. COLE:   Let's move back to Slide 16,

6  Mr. Diaz.

7      Q.   (By Mr. Cole) So I want to move now -- that

8  was -- all of that evidence we just talked about was in

9  1996 to 1998.  And I want to move now to the damage

10 period; in other words, the period we're actually

11 claiming damages on once the patent issued, okay?

12     A.   Sure.

13     Q.   So 2003 -- I think we just mentioned this a

14 minute ago, but did SAP sell a substantial volume of the

15 infringing software?

16     A.   Yes.  We know that there were 480 SAP

17 customers, Tier 1 customers, larger customers, and then

18 I think the number was 860 smaller SAP customers.  So in

19 total, there were more than 1300 SAP U.S. customers with

20 access to the infringing software.

21     Q.   Okay.  I'm not going to ask you what -- why all

22 those individual SAP customers bought SAP, but does the

23 fact that the product that included the infringing

24 feature was sold to a large number of customers, does

25 that support your conclusion that there is demand for

1  the patented product?

2       A.   Clearly, yes, it does.

3       Q.   Okay.  Now, I'd like to also look at another

4  document here.

5              MR. COLE:  Mr. Diaz, if we could go to

6  PX2099.

7       Q.   (By Mr. Cole) And we've looked at this earlier

8  today; is that right?

9       A.   I believe so, yes.

10      Q.   And do you recall the date for this document?

11 This is an internal SAP document.

12      A.   My recollection, it was around 2008.

13      Q.   Okay.  So that's after this lawsuit was on

14 file.

15      A.   Correct.

16      Q.   All right.

17             MR. COLE:  If we could go down, Mr. Diaz,

18 towards the bottom, there's a -- maybe the bottom fifth

19 or so of the document.

20      Q.   (By Mr. Cole) Okay.  It's a little hard to

21 read, so I want to -- if you could point here to

22 integrated pricing engine.  Can you kind of read that

23 section of this chart?

24      A.   On the left?

25      Q.   Right.

1     A.   It says:  Integrated pricing engine, price

2  administration, maintenance, mass changes,

3  hierarchy-based price maintenance.

4     Q.   Okay.  So that's talking about some

5  functionality?

6     A.   It is.

7     Q.   All right.  And then if you see over to the

8  very far right, do you see the two phrases there:  Very

9  high and must have?

10     A.   Yes.

11     Q.   Okay.  Are those associated with this

12  integrated pricing engine, including hierarchy-based

13  price maintenance?

14     A.   Right.  That refers to the -- sort of the need

15  associated with the functionality that's set forth on

16  the left.

17     Q.   Okay.  Again, this is 2008?

18     A.   Correct.

19     Q.   All right.  Now, there's a legend in there that

20  tells you what it means for something to be very high

21  and a must have.

22     A.   Right, the back of the document.

23             MR. COLE:  If we could go to the last

24  page, Mr. Diaz.

25             Okay.  If you could blow up the top part

1  that says need.

2       Q.   (By Mr. Cole) Okay.  Now, very high, that was

3  one thing we just saw, right?

4       A.   Right.

5       Q.   What does -- what does it mean for the need to

6  be very high?

7       A.   It means more than 75 percent of customers,

8  companies in that segment need the functionality.

9       Q.   Okay.  And that was applicable to that

10 hierarchy-based pricing?

11      A.   Correct.  That -- it was on the same line,

12 that's correct.

13      Q.   All right.

14           MR. COLE:  And, Mr. Diaz, if you could

15 scroll down, there's also -- we also see the must have

16 and what that means.

17      Q.   (By Mr. Cole) And that's under the -- the title

18 of this group of phrases is value, right?

19      A.   Right.

20           MR. COLE:  And if you could scroll over, I

21 guess, a little bit.

22      Q.   (By Mr. Cole) What does must have mean?

23      A.   Must have refers to the condition where the

24 functionality is an absolute must.  Customer is not

25 willing to negotiate.  Functionality is strongly

1    desired.

2        Q.    Thank you very much.

3                MR. COLE:   We can pull that down,

4    Mr. Diaz.   Thank you.

5        Q.    (By Mr. Cole) All right.   Did you also review

6    the results of the depositions on written questions that

7    was covered with Mr. Bakewell in some detail?

8        A.    I did.

9        Q.    And how does that affect your view about the

10   presence of demand for the patented product and the

11   patented invention?

12       A.    My takeaway from those depositions on written

13   questions is that a significant number of SAP customers

14   actually used the patented functionality.

15       Q.    All right.   Let me -- let me ask one final

16   question on the question of demand for the patented

17   features in the damage period, 2003 to 2011, and let me

18   ask you -- and I'm going to refer here to Mr. Gupta's

19   testimony earlier today about SAP's changed product.

20               Now, have you heard Mr. Gupta's testimony?

21       A.    I did.

22       Q.    And what was his conclusion about whether, even

23   after they were found to infringe, SAP made a change

24   that actually took infringing functionality out?

25       A.    Yeah.   My understanding of his testimony is

1  that the infringing functionality remained even after

2  the infringement finding.

3      Q.   Okay.  And what does that tell you about the

4  demand for the patented product and the demand for the

5  patented invention?

6      A.   Well, as an economist, it tells me that there

7  must be a demand for the patented product and invention.

8  If there was no demand, SAP would readily remove it

9  after a finding of infringement.

10             THE COURT:  All right.  Let's break there

11  for the evening, Mr. Cole.

12             MR. COLE:  Thank you, Your Honor.

13             THE COURT:  Ladies and Gentlemen, I'm

14  going to excuse you for the evening.  Please travel

15  safely on your way home, and don't talk about the case.

16             See you tomorrow.  We'll start right at

17  8:30.

18             LAW CLERK:  All rise.

19             (Jury out.)

20             THE COURT:  All right.  Court's in recess.

21  I'll see y'all in the morning.

22             (Court adjourned.)

23

24

25

1                        <u>CERTIFICATION</u>

2

3

4            I HEREBY CERTIFY that the foregoing is a

5   true and correct transcript from the stenographic notes

6   of the proceedings in the above-entitled matter to the

7   best of my ability.

8

9

10
    /s/_____          May 10, 2011
11  SHELLY HOLMES, CSR
    Deputy Official Court Reporter
12  State of Texas No. 7804
    Expiration Date:  12/31/12
13
    /s/_____          May 10, 2011
14  GLENDA FULLER, CSR
    Deputy Official Court Reporter
15  State of Texas No. 1042
    Expiration Date:  12/31/12
16

17

18

19

20

21

22

23

24

25