```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   VERSATA SOFTWARE, INC.,  ) Civil Docket No.
     ET AL                    ) 2:07-CV-00153-CE
 4                            ) May 11, 2011
     VS.                      ) 8:30 A.M.
 5                            )
     SAP AMERICA, INC., ET AL )
 6

 7                 TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE CHAD EVERINGHAM
 8               UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:
     FOR THE PLAINTIFF:        MR. SAM BAXTER
10                             McKool Smith, P.C.
                               104 E. Houston Street
11                             Suite 300
                               Marshall, Texas  75670
12
                               MR. SCOTT L. COLE
13                             MR. STEVEN J. POLLINGER
                               MS. LAURIE L. FITZGERALD
14                             MR. KEVIN M. KNEUPPER
                               MS. LEAH B. BURATTI
15                             McKool Smith, P.C.
                               300 W. 6th Street, Suite 1700
16                             Austin, Texas 78701

17                             MS. ADA BROWN
                               MR. STEVEN CALLAHAN
18                             McKool Smith, P.C.
                               300 Crescent Court, Suite 1500
19                             Dallas, Texas 75201

20   APPEARANCES CONTINUED ON NEST PAGE:

21   COURT REPORTERS:          SHELLY HOLMES, CSR
                               GLENDA FULLER, CSR
22                             Deputy Official Court Reporters
                               100 East Houston, Suite 125
23                             Marshall, TX 75670
                               903/935-3868
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          MR. THOMAS M. MELSHEIMER
                           MR. MICHAEL A. BITTNER
                           Fish & Richardson, P.C.
                           1717 Main Street, Suite 5000
                           Dallas, Texas 75201

                           MR. JOHN W. THORNBURGH
                           MR. JUSTIN M. BARNES
                           Fish & Richardson, P.C.
                           12390 El Camino Real
                           San Diego, California 92130

                           MR. JAMES R. BATCHELDER
                           Robes & Gray, LLP
                           1900 University Avenue
                           6th Floor
                           East Palo Alto, California 94303

                           MR. CHRISTOPHER BUNT
                           Parker Bunt & Ainsworth
                           100 E. Ferguson, Suite 1114
                           Tyler, Texas 75702

P R O C E E D I N G S

1

2          LAW CLERK:  All rise.

3          (Jury in.)

4          THE COURT:  Please be seated.

5          Morning, ladies and gentlemen.  I hope you

6  had a nice evening.  Mr. Cole.

7          MR. COLE:  Yes, Your Honor.

8          THE COURT:  Why don't you reorient us to

9  where we left off yesterday morning with Mr. Weinstein.

10          MR. COLE:  I will, Your Honor.

11          THE COURT:  Counsel, good morning.

12          MR. MELSHEIMER:  Good morning, Your Honor.

13          THE WITNESS:  Good morning, sir.

14  ROY WEINSTEIN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

15          DIRECT CONTINUED EXAMINATION CONTINUED

16  BY MR. COLE:

17     Q.   Good morning, Mr. Weinstein.

18     A.   Good morning.

19     Q.   Let's reorient ourselves a little bit.  We were

20  talking, I think, about damages and lost profits and we

21  have up here the Panduit case.  Can you just remind us

22  what -- what Panduit is?

23     A.   Yes, Panduit is a -- is a prior legal case that

24  set forth the criteria that someone like myself is is --

25  is supposed to look at in doing a lost profits

1  calculation in a patent infringement matter.

2      Q.   And your conclusion again about lost profits

3  here was -- was what?

4      A.   I concluded that lost profits due Trilogy as a

5  consequence of SAP's infringement of the '350 patent

6  amount to approximately $285 million.

7      Q.   And --

8      A.   Roughly three million dollars per customer.

9      Q.   And how many customers?

10     A.   That was based on 93 lost customers.

11     Q.   Okay.  All right.  I think we had left off

12  yesterday, we were -- we had been talking about the --

13  the first prong on Panduit, the demand prong, and I just

14  want to conclude with that and then we'll move to the

15  second one.

16          In conclusion, can you tell me whether or

17  not after your review of all the evidence in this case,

18  it's your opinion that there is demand for the patented

19  product and the patented invention?

20     A.   Yes, sir.

21     Q.   And is that true during the damages period?

22     A.   It is, yes, sir.

23     Q.   Was it also true back during the period when

24  Trilogy had this technology on an exclusive basis?

25     A.   Correct.  It was -- it was also true during the

1  1996 to 1998 period, which is the basis for my

2  calculation of 93 lost customers.

3      Q.   Okay.  All right.  The second factor is absence

4  of noninfringing alternatives.  Can you tell us what

5  that means?

6      A.   Yes.  That means that one of the things that I

7  am to consider is -- is the extent to which there are

8  alternatives available in the market that would serve as

9  adequate substitutes for, in this case, Trilogy's

10 patented technology.

11     Q.   Okay.  Did you examine that issue?

12     A.   I did.

13     Q.   And did you review the evidence available?

14     A.   I did.

15     Q.   And what was your conclusion about whether

16 there were acceptable noninfringing alternatives to the

17 patented technology in the relevant period of time?

18     A.   I concluded that there were no acceptable,

19 commercially acceptable noninfringing alternatives to

20 Trilogy's patent during the damage period.

21     Q.   Okay.  And of the lost customers you're

22 claiming, what is the pool of customers from which

23 you're claiming Trilogy lost sales?

24     A.   The -- the pool of customers includes 480

25 Tier 1 SAP customers who had the infringing technology,

1 and an additional 880 Tier 2, that is smaller SAP

2 customers, who also had the infringing technology.  So

3 the entire pool available here for lost customer sales

4 is a total of about 1,360 of which, based on my

5 computation, 93 customers would have gone to Trilogy but

6 for the infringement.

7     Q.   And of the 93 you believe would have gone to

8 Trilogy, are those Tier 1 or Tier 2 or both?

9     A.   Those are Tier 1 customers.

10     Q.   Okay.  So you limited your lost profit claim

11 and lost customer claim to only the Tier 1 market?

12     A.   Yes, I did.  Only the larger customers are

13 included, though I recognize that there was significant

14 opportunity to Trilogy as well associated with smaller

15 SAP customers.

16     Q.   Okay.  And what are the alternatives to a

17 Tier 1 or a large SAP customer for pricing; in other

18 words, where can they get their pricing needs met?  Can

19 they do that within SAP?

20     A.   Well, if -- if the infringing technology is no

21 longer available to SAP, as would have been the case

22 beginning April 2003, then the only place that those SAP

23 customers can turn for this technology is to Trilogy.

24     Q.   Well, after SAP was found to infringe, did -- I

25 think we heard Mr. Gupta describe that they made some

1 changes to their product?

2     A.    Yes.  I understood his testimony to be that SAP

3 made -- made a patch or did some sort of change to

4 the -- to the -- to the product, yes.

5     Q.    And what was Mr. Gupta's testimony about

6 whether or not the modification they made actually

7 avoids the patent?

8     A.    I understood his testimony to be that SAP

9 continues to infringe after that modification.

10     Q.    And -- and that was made in what year?

11     A.    That was made in, I guess, 2009, 2010.

12     Q.    2010?

13     A.    Yeah.

14     Q.    And what does that tell you about the available

15 acceptable noninfringing alternatives to SAP to this

16 patent as late as last year?

17     A.    Well, it tells me that SAP didn't have an

18 acceptable noninfringing alternative.  I mean, one of

19 the things SAP could have done is gone back to the

20 functionality it had prior to inserting Trilogy's

21 functionality in roughly October 1998.  As I understand

22 Mr. Gupta's testimony, that's what SAP did.

23           It -- it made a patch to Trilogy's

24 functionality instead.  And so what that tells me is

25 that there was no commercially acceptable noninfringing

alternative available to SAP as of 2010.

Q.   Okay.  And did you hear Mr. Carter and
Mr. Smith's discussions and Mr. Gupta's discussion about
other products that were on the market generally and
whether those would be acceptable to bolt-on to a SAP
product?

A.   I did.

Q.   Okay.  And is that consistent with your views?

A.   It -- it is.  I mean, I understood their
testimony to -- to support a conclusion, again, that
there were no acceptable commercially acceptable
noninfringing alternatives here.

Q.   Okay.  And do you believe the second Panduit
factor is met in this case?

A.   I do.

Q.   All right.  Let's move to the third Panduit
factor, which is manufacturing and marketing capacity,
and can you tell us what that means?

A.   Yes.  In this case I've -- I've concluded that
Trilogy would have made 93 additional sales but for
SAP's infringement.  Manufacturing and marketing
capacity refers to the need for the patent-holder to be
able to support those sales, that is to be able to
produce the product and -- and market it and bring it to
market successfully.  So there -- there needs to be

1  those capabilities in place.

2      Q.   Had Trilogy in the past successfully

3  manufactured and marketed Pricer?

4      A.   Yes.  We know that in -- in the 1996 to 1998

5  period, Trilogy had successfully manufactured and

6  marketed its Pricer product to 21 -- 21 customers, pure

7  Pricer isolated sales, and had sold Pricer to a total of

8  roughly close to 80 customers in total.  And so what

9  that means is that in the past, Trilogy had the

10  manufacturing and marketing capacity available to -- to

11  make those additional sales.  It had done it before, and

12  I concluded it could have done it again.

13      Q.   All right.  In -- in your opinion, in the

14  but-for world here, in other words, the world where

15  Trilogy's patent comes out in 2003, they can exclude

16  everybody else from the marketplace and can go and

17  compete on an exclusive basis, in that world you are

18  assuming that Trilogy would have been able to do more,

19  make more sales, achieve greater success than they had

20  actually in the real world when they had an exclusive?

21      A.   No.  What I -- what I'm -- what I'm concluding

22  here is that Trilogy could have ramped up and made these

23  additional sales beginning in, roughly, April 2003 at

24  the same pace at which it ramped up and made actual

25  sales when it had an exclusive beginning in 1996.

1   And -- and the -- the figures that I calculate, which

2   feed into my total of 93 sales, involve a ramp-up of

3   roughly, I think, six sales in the first year, 11 in the

4   second, 12 in the third, and 12 sales per year out

5   through the end of April of 2011.

6       Q.   Now, are you assuming that it would have been

7   free to Trilogy to make those additional sales or did

8   you include costs to lower the profits?

9       A.   No.   In calculating lost profits, what I did is

10  first calculate the sales revenue and then subtract

11  costs associated with making those sales and those --

12  those costs that I subtracted include direct costs of

13  making those sales, plus costs associated with research

14  and development efforts, plus costs associated with --

15  with what's called SG&A, selling, general and

16  administrative expenses.

17              So I first calculate what the sales

18  revenues would be and then subtract out these

19  additional -- these -- these additional costs that would

20  have been incurred in -- in order to come up with lost

21  profits.

22              MR. COLE:  Mr. Diaz, if we could have

23  Slide 14.

24      Q.   (By Mr. Cole)  I -- I think you -- you

25  mentioned several times that -- how you calculated the

1  number of lost customers per year and can you tell us
2  what this slide shows here?
3      A.   Yes.   This is Trilogy's actual experience, that
4  is, that is this is the number of Pricer -- new Pricer
5  customers it had in 1996, '97, and '98; in other words,
6  eight new customers in '96, 11 in 1997, and 12 in 1998.
7  And I base my calculation on that actual experience that
8  Trilogy had during the period when it had an exclusive,
9  prior to the time that SAP incorporated Trilogy's
10  functionality.
11      Q.   Okay.
12          MR. COLE:   And Mr. Diaz, if we could have
13  Slide 17, please.
14      Q.   (By Mr. Cole)  I just want to make something
15  clear here.  Now, in -- in this -- this slide we've seen
16  a lot.  There are a lot more than eight, 11, and 12
17  customers that Trilogy actually sold in total here and
18  I'm -- I'm just trying to find out why did you only say
19  Trilogy made eight, 11, and 12 sales in the -- during
20  the actual years?
21      A.   Well, these are -- these are Pricer customers
22  and so I'm focusing on -- on new Pricer customer sales,
23  new customer -- Pricer customer sales during that
24  period.
25      Q.   And -- well, let me -- let me -- let me ask you

1  this:  Are you -- are the new sales you were looking at

2  in your lost profits' analysis all of the sales Trilogy

3  made in that period or just the Tier 1 sales?

4      A.   No, these are the Tier 1, the larger customers.

5      Q.   And the slide we have up here, the -- the list

6  of all customers, that's Tier 1 and Tier 2?

7      A.   Right.  You can see there there are some --

8  some smaller entities there as well.  And even though

9  Trilogy sold to those smaller entities, I'm -- I'm

10  limiting this computation to the larger Pricer

11  customers.

12      Q.   Okay.  So if we see here it looks like '96,

13  there were 16 new customers; '97, there were 18; and

14  '98, there were 25, but you took fewer than that as your

15  basis for comparison; is that fair?

16      A.   I did.  I did.

17      Q.   Okay.

18              MR. COLE:  All right.  If we can go back

19  to the one we were on before, Mr. Diaz.

20      Q.   (By Mr. Cole)  Okay.  So that's where the

21  eight, 11, and 12 come from?

22      A.   Correct.

23              MR. COLE:  All right.  Now, if we could go

24  to the next slide, please?

25      Q.   (By Mr. Cole)  And you can see here the date

 1  has changed, now we're at 2003, right?

 2      A.    Right.

 3      Q.    And this is -- this is your analysis of the

 4  but-for world, correct?

 5      A.    Correct.  Correct.  And so what I've -- what

 6  I've done now is estimate the actual number of customers

 7  that Trilogy would have obtained during the infringement

 8  period beginning in April 2003, and you can see that

 9  I've held constant that number 12 throughout the period

10  after 2005, despite the fact that Trilogy's sales

11  revenues had been increasing during the 1996 period.

12      Q.    And why did you do that?

13      A.    That -- that was an effort to be overly

14  conservative here.  So I assume that after getting 12

15  new customers in 2005, Trilogy would have continued

16  to -- to obtain an additional 12 new customers each year

17  during the infringement period.

18      Q.    Okay.

19              MR. COLE:  If -- if we could go back,

20  Mr. Diaz, to the original one.

21      Q.    (By Mr. Cole)  If you see in '96, we had eight

22  new customers in '96?

23              MR. COLE:  And then if we can go back to

24  the damage period.

25      Q.    (By Mr. Cole)  But we only have six in 2003,

 1  why did you start at a lower number in 2003 than the

 2  actual '96 experience?

 3      A.    That's because the first infringement occurs in

 4  April of 2003 and I didn't want to calculate any damages

 5  prior to the date of first infringement.  And so what I

 6  did is I prorated the eight customers from the first

 7  year down to reflect the fact that 2003 is a partial

 8  year.

 9      Q.    Okay.  And just so we have it in the record, if

10  you could tell us the -- the number of lost customers in

11  your analysis per year from 2003 to 2010?

12      A.    Just give me one second.

13      Q.    Sure.

14      A.    In -- in 2003, it's six lost customers.  2004,

15  it's 11.  2005, 12 lost customers.  26, 12 lost

16  customers.  2007, 12 lost customers.  2008, 12 lost

17  customers.  2009, 12 lost customers.  2010, 12 lost

18  customers.  And then there's one additional number which

19  would make this total equal 93 for a partial year in

20  2011.

21      Q.    You think it's four?

22      A.    Yeah.  The -- the number shown the -- through

23  2010 is 89.  And then for the partial year of 2011,

24  there's an additional four customers, which takes us

25  through the end of April of this year.

1    Q.   Okay.  Now, at the time SAP made the change to

2    its product that Mr. Gupta discussed, how many lost

3    sales happened after that change; in other words, how

4    many lost sales after the modified product began to be

5    sales --

6    A.   And what's -- what's the date of that?

7    Q.   That was May of 2010.

8    A.   Well, you -- you would prorate that -- prorate

9    that back.  So we know there were four in 2011, and

10   roughly seven after May in 2010.  So that would be

11   roughly 11 customers subsequent to that change.

12   Q.   Okay.  So 11 of the lost sales occurred after

13   the modified product?

14   A.   Correct.

15   Q.   All right.  Now, these lost customers, do they

16   include only the Pricer led deals or do they include the

17   other Trilogy customers that bought Pricer along with,

18   for example, configuration or some of the other Trilogy

19   Software we -- we heard about today?

20   A.   Well, these are the -- these are the number of

21   customers which I believe Trilogy would have sold to but

22   for SAP's infringement, and it's based on Trilogy's

23   actual experience with sales of Pricer to its -- to its

24   customers.

25   Q.   Okay.  For example, Hewlett Packard and IBM

1  bought Trilogy's Pricer product, but we didn't have

2  those as an isolated deal because they also bought other

3  product?

4      A.    Correct.  Correct.

5      Q.    Okay.  And do you believe it's appropriate

6  to -- to find there to be lost sales of customers like

7  that who liked other Trilogy Software in addition to

8  Pricer?

9      A.    Sure.  Sure, but I -- I -- I limited my

10  computation as -- as set forth here.

11      Q.    Okay.  Well, let me ask you this:  Did you also

12  run another calculation just to determine what the

13  numbers would look like if you only limited yourself to

14  the Pricer isolated deals that we saw in 1995 through

15  1998?

16      A.    I did.

17      Q.    And can you just briefly give us what those

18  numbers would be in terms of lost customers from 2003 to

19  2011?

20      A.    Right.  If -- if you limit if -- if you limited

21  this calculation to Pricer-led deals that Trilogy

22  actually made between 1996 and 1998, the total number of

23  lost customers would be 36 lost customers instead of 93.

24      Q.    Okay.  And how does that ramp up year to year?

25      A.    It ramps up, it begins with one lost customer

1  in the first year, three in the second, five in the

2  third, and then five lost customers for each of the

3  years out through 2010, and then prorated for the period

4  through May of 2011.  I think that's a final number of

5  two lost customers during that period.

6      Q.    Okay.  And so the -- the -- again, to match the

7  last thing we just talked about, for the period of time

8  after the -- the modified product, would that be about

9  five lost customers?

10     A.    Correct.  Right.  It would be three lost

11  customers, three lost Pricer-led customers in 2010 plus

12  another two in 2011.

13     Q.    Now, in your analysis -- well, let me -- let me

14  back up.  Which one do you think is the appropriate way

15  to measure lost profits here?

16     A.    I believe that the 93 lost customers is the

17  appropriate method.  Remember, that's 93 lost customers

18  relative to more than 1300 SAP customers that had the

19  infringing technology.  So that's -- that's less than

20  10 percent of the available customers that had

21  infringing functionality from SAP.  So I think that's a

22  fairly conservative approach.

23     Q.    In your work, did you -- are you counting value

24  in your lost profits that would be attributable to

25  Trilogy's configuration software or commission software

1  or other software?

2      A.    No.   This is -- the value here is based on the

3  value of the Pricer product.

4      Q.    And let's talk now a little bit about how --

5  how you quantified the amount of lost profits in -- in

6  dollar terms.

7               MR. COLE:   Mr. Diaz, if we could go to

8  Page -- excuse me, Slide 7.

9      Q.    (By Mr. Cole)   Okay.   Let's -- if you could

10  just take us through this slide, if you would, please.

11      A.    Sure.   Line one in this slide is the number of

12  lost customers that I calculated.   That's the 93 lost

13  customers that -- that I've been describing.

14               Line two is Trilogy's average license

15  revenue per customer associated with 12 Pricer-isolated

16  sales that Trilogy actually made between 1996 and 1998.

17  That's Trilogy's actual licensed revenue during the

18  period that it had an exclusive for its 12

19  Pricer-isolated Tier 1 customers; that is, larger

20  Trilogy customers.   And so when I -- and that number is

21  approximately 1.8 million on average per customer.

22               Line three reflects the calculation of

23  revenues that one obtains by multiplying the 93 lost

24  customers times the average revenue per customer, and

25  that's lost license revenue of approximately $169

1  million.

2      Q.   Okay.  Just for the record, the number is

3  169,494,980; is that right?

4      A.   Correct.

5      Q.   Okay.  All right.  We now added some more

6  information here.  Could you fill in the -- the new

7  stuff?

8      A.   Right.  In -- in calculating lost profits, it's

9  not appropriate to limit one's self to the revenues that

10  would be obtained.  One has to subtract the costs

11  associated with attaining those revenues to get from

12  revenue to profit.  And so what I did is I went to

13  audited Trilogy financial statements for its 10 largest

14  customers over a 12-year period, that includes both the

15  damage period and prior to the damage period, and found

16  that Trilogy's profit margin was approximately 72

17  percent for -- for those largest customers.

18          And so what I did is take 72 percent times

19  the 169 million in order to calculate profits associated

20  with license revenue that would have been obtained from

21  these 93 customers and that number is approximately

22  122.5 million dollars.  That's the profit that Trilogy

23  would have made had it sold licenses to Pricer to 93

24  customers.

25      Q.   Now, the -- the figure you use here for a

1 profit margin is 72 percent. Is that -- are you

2 confident that's the correct number?

3     A.    I am.

4     Q.    And I understand that SAP's expert disagrees

5 with that; is that right?

6     A.    He seems to, yes.

7     Q.    Okay.  Just let -- have you reviewed his --

8 his -- his profit calculations?

9     A.    I have.

10     Q.    And do you agree with them?

11     A.    I don't.

12     Q.    Okay.  All right.  Let's continue on this

13 slide.  I think we have some more information to fill

14 in, or maybe we got the next -- I'm sorry, next slide.

15 Okay.

16                MR. COLE:  Oh, wait.  Sorry, Mr. Diaz,

17 let's try Slide 8.  Okay.  Yeah, never mind.

18     Q.    (By Mr. Cole)  All right.  So we have at the

19 top here lost profits from licenses, is that the 122.5

20 million that you -- that we just went over?

21     A.    Right.  That's -- that's the number that I -- I

22 just described that's carried over.  That's the lost

23 profits from licensing.

24     Q.    Okay.  Now, we have another line item here that

25 says lost profits from maintenance.  What is

1  maintenance?

2      A.   Well, maintenance refers to an additional

3  revenue stream that's available to Trilogy when it --

4  when it entered -- enters into license agreements with

5  its customers.  So when Trilogy does a license deal of

6  the Pricer product, it also obtains maintenance revenue

7  over time associated with maintaining the ability of

8  the -- of the customer to use that product.

9      Q.   Okay.  And how did -- how was maintenance

10  calculated by Trilogy to -- when it sold to its

11  customers?

12      A.   Well, what I did is I examined Trilogy's actual

13  business records and I found that on average,

14  maintenance revenues amounted to somewhere between 15

15  and 18 percent of Trilogy's license revenue.  In other

16  words, for every hundred dollars of license revenue that

17  Trilogy contracted to receive, over time it would also

18  receive somewhere between 15 and 18 dollars each year

19  in -- in maintenance revenue.

20      Q.   Okay.

21      A.   And so the point here is that Trilogy also

22  derives profits from maintenance when it enters into

23  license agreements.

24      Q.   Okay.  If Trilogy is unable to make a sale -- a

25  license sale, does it also lose maintenance revenue?

1    A.    Right.  If it doesn't get the license sale,
2  then it doesn't get the maintenance revenue or the
3  profits on that maintenance revenue.
4    Q.    In -- in -- in your examination of the record,
5  did historically Trilogy get maintenance revenue when it
6  was able to win Pricer customers?
7    A.    It did.  It did, absolutely.
8    Q.    Okay.  And you mentioned it would -- if the
9  figure ran between 15 and 18 percent per year of the
10  license amount?
11    A.    Correct.
12    Q.    And what figure did you use?
13    A.    So what I did is I took the low end of that, I
14  took 15 percent of the license revenue that I calculated
15  and assumed that Trilogy would get that revenue for six
16  years associated with each license agreement and that
17  allowed me to calculate what it -- what its maintenance
18  revenue would have been had it made those additional 93
19  sales.
20          And then the final step was to subtract
21  out the cost associated with that maintenance revenue,
22  and once again, I went to Trilogy's audited financials,
23  determined that those costs were roughly 72 percent of
24  revenues -- excuse me, determined -- determined that
25  those costs were roughly 28 percent of revenues, that

1    the margin was 72 percent.  So I subtracted out the cost

2    and when you -- when you do the math the same way that

3    was done for licenses, the lost profits from maintenance

4    revenue are about 67.6 million dollars.

5        Q.    Okay.  Now, you mentioned that you assumed it

6    would be for six years.  Were you in the court when

7    Mr. Carter talked about how often a typical customer

8    would continue to pay maintenance for Pricer?

9        A.    I was.

10       Q.    And he -- what was his answer, do you recall?

11       A.    I -- I don't recall specifically, but my -- my

12   review of the records was that maintenance went on for

13   at least seven years, typically.

14       Q.    Okay.  And how many --

15       A.    Not -- not all the time, but it varied, but at

16   least seven years and I used six years.

17       Q.    Okay.  And are you consist -- are you

18   comfortable that that -- that -- that a six-year typical

19   maintenance window is consistent with the evidence?

20       A.    It is.

21       Q.    Okay.  All right.  I think we have one more

22   element of your lost profit calculation.  It says lost

23   profits from consulting.  Can you tell us what that is?

24       A.    Yes.  Once again when Trilogy enters into

25   license agreements, it also typically obtains consulting

revenue associated with services that it provides its

licensees in connection with the -- the Trilogy product.

And so what I did here was examine the historic record

of Trilogy with respect to consulting revenues that it

obtained and basically what I found is that sometimes

the consulting revenues would actually exceed the

license revenues.

Sometimes the consulting revenues

associated with the license were as much as 125 percent

of what the license revenue was.  Sometimes they were

less than the license revenue.

The -- the median consulting revenue,

which means median is one form of average, that the

median consulting revenue relative to license revenue

was about 86 percent, meaning that half the time

consulting revenue was less than 86 percent of license

revenue and half the time it was greater than that.  So

I used 86 percent of license revenue to calculate what

consulting revenues would have been had Trilogy actually

entered into these licenses.

The -- the final step here was to, once

again, allow for costs associated with providing that

consulting service.  In this instance, the margins were

about 67 percent instead of 72 percent.  And so I

subtracted out costs as appropriate, did the math, and

lost profits from consulting are about 95 million

dollars.

Q.   Okay.  And I think you mentioned when you

calculated the lost profits from licenses, you -- the

basis was the average Pricer-isolated license revenue in

Tier 1; is that right?

A.   Correct.

Q.   Now, the -- the maintenance and consulting

revenues, those appear to be dependent upon the license

revenue; in other words, they flow directly from that?

A.   They do.

Q.   As a result of that, are you -- are you

comfortable that the lost maintenance revenue and lost

consulting revenue is limited to the isolated Pricer

value as opposed to other products that Trilogy sells?

A.   No.  It's definitely limited to the Pricer

value, to the Pricer product.

Q.   Okay.

MR. COLE:  Mr. Diaz, I think there's maybe

one more to total it.

Q.   (By Mr. Cole)  Okay.  I think we've seen that

number before, but just for the record, if you could

tell us in your opinion what the total lost profits are?

A.   Yeah.  The final step is to add up lost profits

from licenses, from maintenance and consulting and the

1   sum of those three elements is 285.5 million dollars,

2   and that comes to about $3 million per customer.  That

3   is, there are 93 lost customers, $285 million in lost

4   profits, that means that the profit associated with each

5   lost customer is about $3 million.

6       Q.   Okay.  Now, let me ask you about something that

7   you may be asked about in cross.  You used the same

8   revenue figure that was experienced by Trilogy in the

9   exclusive period for the losses in the damages period,

10  right?  In other words, 1.8 million?

11      A.   I did.

12      Q.   And why do -- do you feel that's appropriate?

13      A.   Absolutely it's appropriate.

14      Q.   Now --

15      A.   Actually it's -- it's conservative, but yes.

16      Q.   I -- I think you may hear SAP contend that if

17  you're going to make more sales, in other words, 93

18  additional sales, you would have to lower the price.

19  Let me ask you this:  In the way you approach lost

20  profits, do you agree with that criticism that you

21  should have lowered the price to make these additional

22  sales?

23      A.   No, I don't agree with that, given the way I've

24  done this.

25      Q.   Okay.  Tell us how you did it -- how -- how

1  your approach controls for the fact that if you want to

2  make a ton of new sales, you're going to have to lower

3  the price at some point and -- and tell me why you used

4  an average rather than some kind of declining scale.

5    A.    The 1.8 million figure that I used reflects

6  Trilogy's actual license fee revenue associated with its

7  actual real world customers when it had an exclusive

8  between 1996 and 1998.  So that number reflects what the

9  market was willing to pay Trilogy for its Pricer

10  functionality.

11              In -- in the -- in the damage period, we

12  know that Trilogy had available to it a -- a base of

13  more than 1,300 SAP customers who had access to the

14  infringing functionality.  My lost profits computation

15  is limited to only 93 customers, less than -- less than

16  10 percent.

17              And so what I've done here is -- is

18  allowed for the possibility that some of those SAP

19  customers would not have been willing to pay 1.8 million

20  for Trilogy's functionality; that is, they -- they drop

21  out of -- of the computation.  Had Trilogy -- had I used

22  a lower price, I probably would have had additional lost

23  sales to allow for the fact that other things equal, the

24  lower the price, the greater the sales.

25              Here, I've basically not included any

1    sales that Trilogy would have made to those remaining

2    SAP customers, a little short of 1,300 customers, on --

3    on the theory that they might not have been willing to

4    pay 1.8 million.  So I've allowed for the fact that

5    other things equal, you make fewer sales at higher

6    prices.

7        Q.   Okay.  And the market that -- the market from

8    which you're claiming lost sales is -- is what,

9    precisely?

10       A.   It's -- it's the market that includes SAP

11   customers, the 1,360 SAP customers who had -- who had --

12       Q.   Well, let -- let --

13       A.   -- the infringing --

14       Q.   -- me stop you there.

15       A.   -- technology.  Yes, sir?

16       Q.   I -- I probably asked a bad question.

17            Of all the 93 customers that you're

18   claiming we lost, what do they -- what -- what

19   characteristics do they have in common?

20       A.   They -- they -- they want to have the -- the

21   Trilogy Pricer product and they had access to it at SAP.

22       Q.   Okay.  And are all -- all the 1,360 customers

23   you mentioned, did all of those actually buy SAP

24   software?

25       A.   They did.

1    Q.   Okay.  And within that 1,360, how many of those

2    are Tier 1 SAP customers, the Fortune 500-type

3    companies?

4    A.   There were 480 Tier 1 -- Tier 1 SAP customers,

5    of which 435 were available to Trilogy in the sense that

6    Trilogy had not sold or had not licensed those

7    customers.

8    Q.   So there were 480 SAP Tier 1 customers total,

9    but Trilogy had actually sold Pricer in the exclusive

10   period to --

11   A.   55.

12   Q.   -- 55 of those?

13   A.   Yes, sir.

14   Q.   Okay.  And you're saying Trilogy would have

15   been able to make an additional 93 sales --

16   A.   Correct.

17   Q.   -- to those type of customers?

18   A.   Correct.

19   Q.   And the period of time when it won the 55

20   customers, is that longer or shorter than the damage

21   period?

22   A.   That's shorter than the damage period.

23   Q.   Okay.  And so the damage period is about eight

24   years?

25   A.   Correct.

1    Q.    And so you're saying over an eight-year period

2  they'd have been able to make 93 additional sales to

3  Tier 1 customers?

4    A.    That's correct.

5    Q.    And in the past they had made 55, about,

6  some -- something like that?

7    A.    Yes.

8    Q.    Okay.  And so you removed -- anybody that

9  Trilogy had actually sold to in the past, you pulled

10 those out of the available pool?

11   A.    Right, because I assumed that those -- those

12 customers already had a license from Trilogy and so

13 those wouldn't be potential new customers, but there are

14 still 435 Tier 1 SAP customers that are available to

15 Trilogy.

16   Q.    And so we know, all of those 435 customers have

17 SAP software, right?

18   A.    We do.

19   Q.    And they're in Tier 1?

20   A.    They are.

21   Q.    Okay.  And their -- in order to meet their

22 pricing needs, is it fair to say they have two options,

23 either SAP or something to bolt-on top of SAP?

24   A.    Yes.  They -- they were at SAP and so now they

25 would need something to bolt-on; in this case Trilogy

1  had that product.

2      Q.    And if there was some product in the market

3  like an Oracle pricing functionality that I think the

4  evidence has showed nobody would ever bolt-on top of

5  SAP, would that be an acceptable or a viable alternative

6  for these 435 Tier 1 SAP customers?

7      A.    I don't believe so, no.

8      Q.    Now, Let me ask you one more thing.  In -- have

9  you seen evidence in this case of the rate at which

10 Trilogy was winning deals before the impact of SAP came

11 around?

12     A.    Yes, sir, I have.

13     Q.    And what was -- what -- what is that evidence?

14     A.    The evidence that I've seen indicates that

15 Trilogy was converting on roughly 35 percent of its

16 prospects; in other words, for roughly 1 in 3 times it

17 went out and tried to do a sale, it would convert 35

18 percent success rate.

19     Q.    And did you claim 35 percent of those 435 as

20 lost sales?

21     A.    No.  If I had used 35 percent, it would have

22 been more like something north of a hundred -- 140 or so

23 lost sales would be a 35 percent conversion rate, and --

24 and my number is -- is only 93, which would be something

25 in the 20 percent range.

1    Q.    Okay.  And so the evidence you've seen, Trilogy

2    was winning deals at a 35 percent clip at a 1.8 million

3    dollar price?

4    A.    Correct.

5    Q.    Is that -- how -- how does that impact your

6    view that Trilogy would not have had to lower its price

7    to make the 93 sales you believe they would have made?

8    A.    I think my -- my -- my analysis here is

9    consistent with that.

10              MR. COLE:  Thank you very much,

11   Mr. Weinstein.  I'll pass the witness.

12              MR. MELSHEIMER:  May we approach briefly,

13   Your Honor?

14              THE COURT:  Yes.

15              (Bench conference.)

16              MR. MELSHEIMER:  Your Honor, I just would

17   like to renew our Daubert motion on the lost profits

18   issues that we raised, motion to strike this witness for

19   the reasons outlined in our Daubert briefing that the

20   Court has previously denied, but I wanted to renew it at

21   this time.

22              THE COURT:  Okay.  I'll stick with my

23   prior ruling.

24              MR. MELSHEIMER:  I thought you might.

25              THE COURT:  Okay.

1          MR. MELSHEIMER:  Thank you.

2          (Bench conference concluded.)

3          THE COURT:  Mr. Melsheimer,

4    cross-examination.

5          MR. MELSHEIMER:  May it please the Court.

6               CROSS-EXAMINATION

7    BY MR. MELSHEIMER:

8     Q.    Good morning.

9     A.    Good morning.

10    Q.    Mr. Weinstein, you understand that SAP was

11   determined to infringe three claims of the '350 patent?

12    A.    That's my understanding, yes, sir.

13    Q.    That's three claims out of 31?

14    A.    I don't have the number of claims in mind, but

15   I know there's been a finding of infringement.

16    Q.    And you understand that it's -- it hasn't been

17   determined that SAP's infringement was deliberate or

18   willful, you know that, right?

19    A.    As far as I know, that's true.

20    Q.    And that means if it's not willful, that means

21   it's not intentional; you get that, right?

22    A.    That -- that -- I'm not an attorney, but I

23   understand that, yes, sir.

24    Q.    You know that SAP didn't even know about the

25   '350 patent until 5 years after it was issued, right?

1    You know that?

2        A.    I don't know that one way or another.

3        Q.    That was 10 years after it was filed, if they

4    found out about it?

5        A.    That would be -- that would be roughly true --

6        Q.    That's the math?

7        A.    -- yes, sir.

8        Q.    Now sir, I want to see if we can't agree on

9    just a couple things.  Have you ever heard the -- the

10   statement that a patent is not a license to succeed.

11   Have you ever heard that?

12       A.    You know, I haven't heard that statement, but

13   I'm comfortable with it.

14       Q.    All right.  You agree with it?

15       A.    I'm comfortable with it.

16       Q.    Because what it means is that just because you

17   have a patent on something, whether it's a small thing

18   or it's a big thing, that doesn't guarantee you success,

19   fair statement?

20       A.    Fair statement.

21       Q.    What you get with a patent is you get the

22   ability to exclude people for practicing whatever your

23   patent covers, correct?

24       A.    Correct.

25       Q.    But you don't get the ability to guarantee your

1  own business success using that patent, fair?

2      A.   Fair.

3      Q.   All right.  Well, with that in mind, I want to

4  talk a little bit about some issues of timing, and I'd

5  like to go through sort of a chronology with you.  Are

6  you with me?

7      A.   So far.

8      Q.   All right.  So is it true, sir, that as early

9  as March of 1998, Trilogy was immersed in a very

10 competitive environment for its product?

11     A.   I assume that there's always competition to

12 some extent, although there's not a competition when you

13 have a patent to the patented technology.

14     Q.   Well, it's interesting you'd say that, because

15 in 1998 Trilogy didn't have a patent, didn't have this

16 '350 patent, correct?

17     A.   Correct.

18     Q.   All right.  So we're talking about 1998, no

19 patent, and you'd agree with me that Trilogy was

20 immersed in a very competitive environment, right?

21     A.   I'm -- I'm fine with that.

22     Q.   So for example, if you look at Defendants'

23 Exhibit 909, we saw this with Mr. Gupta, this was an

24 e-mail that Mr. Liemandt sent to Mr. Gupta about Siebel

25 or Siebel, right?

1    A.    Yes.

2    Q.    That was a competitor of Trilogy's in the

3 software business at that time, correct?

4    A.    As far as I know, yes, sir.

5    Q.    And let's take a look at the little graph that

6 Mr. Liemandt created.  And he's the -- he's the CEO of

7 the company, right?

8    A.    Yes, sir.

9    Q.    And he's evaluating the different facts of

10 Siebel and he -- he asks who's their proposed prospect

11 base?  And he says, needs to slow them down -- sorry,

12 need to stop them from buying Siebel.  Slow down the

13 cycle, FUD, cost pressure; did I read that right.

14    A.    You did.

15    Q.    Now, you've been involved in a lot of cases

16 that involved anticompetitive conduct, haven't you, sir?

17    A.    I have.

18    Q.    And you know what FUD means?

19    A.    I do.

20    Q.    FUD means fear, uncertainty, and doubt, right?

21    A.    It does.

22    Q.    And it's a common term that is sometimes used

23 to describe anticompetitive behavior to hurt or damage a

24 competitor, fair?

25    A.    Fair.

    Q.   And that's what Mr. Liemandt was proposing to
do to Siebel back in 1998, because he found himself in a
very competitive environment, correct?

    A.   That -- that's fair.

    Q.   And indeed, it's more than just that.

         MR. MELSHEIMER:  If you'd pull this back a
little bit.

    Q.   (By Mr. Melsheimer)  If you go down to the next
bracket, who are people who have left Siebel in the
past, and he says lots of people don't like Siebel,
could be useful to build up network of Siebel haters who
can provide information for us.  Use the valley against
them.  This network can feed the negative hype.  Do you
see that?

    A.   I do.

    Q.   Is that consistent with a very competitive
marketplace with respect to Siebel and Trilogy back in
1998?

    A.   Yes.  It's consistent with the competition
between Siebel and Trilogy, yes.

    Q.   And, in fact, Mr. Liemandt proposes or suggests
that they go over the line.

         MR. MELSHEIMER:  Do you have that,
Mr. Barnes?

         Pardon me, Your Honor.

1    Q.   (By Mr. Melsheimer)  Well, in any event,

2  Mr. Weinstein, maybe I can find that, but in any event,

3  it wasn't just Trilogy that was competing against

4  Siebel, other companies were competing against Trilogy

5  as well back in 1998, correct?

6    A.   I assume that's true, yes, sir.

7    Q.   And, in fact, Trilogy was trying to do a lot to

8  attempt to --

9              MR. MELSHEIMER:  Let's go back to this

10  slide for just a minute.  It's Bates number 1087.

11    Q.   (By Mr. Melsheimer)  It talks about the

12  marketing message they want to deliver back in 1998 to

13  Siebel, and it's Bates number 1087 at the bottom.  It's

14  Page -- Page 1.

15              MS. SKINNER:  Next to the last line.

16    Q.   (By Mr. Melsheimer)  Marketing message, this is

17  going to be a frontal comparison oriented campaign.

18  Like the old Oracle campaigns.  Hard hitting,

19  aggressive, willing to go over the line.

20              So they were willing to go over the line

21  back in 1998, correct?

22    A.   I see that.

23    Q.   And that is the market, that is the

24  characteristic of a very, very competitive marketplace;

25  isn't that right?

1     A.    It can be.

2     Q.    All right.  Now, SAP added this hierarchical

3  access pricing feature back in 1998; is that correct?

4     A.    That's my understanding.

5     Q.    The '350 patent doesn't issue until 2003?

6     A.    Correct.

7     Q.    And even though Versata had other patents

8  between 1998 and 2003, there's been no determination of

9  infringement as to any of those, correct?

10    A.    Correct.

11    Q.    So there's been no patent infringement

12 determined with respect to anything SAP did between 1998

13 and 2003, do I have that right?

14    A.    You do, sir.

15    Q.    You also know that there's been no

16 determination that SAP took any trade secrets or

17 confidential information when they added hierarchical

18 access in 1998, right?

19    A.    As far as I know, that's correct.

20    Q.    There's been no determination that SAP misused

21 any confidential information belonging to Trilogy when

22 it added hierarchical access in 1998, correct?

23    A.    That's as far as I know, that's true.

24    Q.    No determination that SAP took any of Trilogy's

25 software code, right?

1     A.    Correct.

2     Q.    Because you know that SAP wrote its own code,

3 right?

4     A.    Yes.

5     Q.    They did their own work, right?

6     A.    As far as I know.

7     Q.    So what was happening between SAP and Versata

8 between 1998 and 2003 has never been determined to be

9 anything other than one thing; isn't that right?

10     A.    I'm sorry?

11     Q.    It hasn't been determined to be anything other

12 than fair competition; isn't that right?

13     A.    As -- as far as I know, that's -- that's

14 correct.

15     Q.    All right.  Now, we're supposed to look at, as

16 I understand it, what would have happened in the absence

17 of SAP's infringement starting in April of 2003, right?

18     A.    That's fair.

19     Q.    Another way of saying that is but for.  So but

20 for the infringement in April 2003, what would have

21 happened, right?

22     A.    Correct.

23     Q.    To figure that out, let's take a look at what

24 was happening between 1998 and 2003 to see what the

25 landscape would look like when we start in 2003.  Is

1  that a fair way to do it?

2      A.    Well, you can do that.

3      Q.    Well, in fact, you did that, you did that in

4  calculating damages, because when you say the kind of

5  sales that Trilogy would have made and the prices they

6  would have gotten, you actually look at the 1998, 1999

7  time frame; isn't that right?

8      A.    Well, I -- I make my calculations based on the

9  actual experience 1996 to 1998.

10     Q.    So you go back before there was any patent

11 infringement and you look at what was going on in '96

12 and '97 and '98, fair statement?

13     A.    I do that.

14     Q.    All right.  So let's take a look at what was

15 happening in at -- in at least the end of that time

16 frame you looked at.  In 1998, Trilogy attempted to sell

17 Pricer to 40 SAP and Oracle customers, but all but one

18 wasn't interested; isn't that right?

19     A.    I think I remember a document while I've been

20 sitting here in that -- in that regard.

21     Q.    Well, let's take a look at Exhibit 514.  And

22 we've seen this before and this is a Trilogy document

23 that I believe Mr. Dholakia talked about, but it says:

24 The SC Pricer team has met with over 40 SAP and Oracle

25 companies.  Only one of these companies has subsequently

1  purchased the software, right?

2     A.   That's what it says, yes.

3     Q.   Now, help me with some math.  You said that

4  you'd heard that Trilogy's success rate was 35 percent,

5  right?

6     A.   I saw that, yes.

7     Q.   Right.  Did you see that their success rate was

8  actually 2.5 percent?

9     A.   I -- I did, yes.

10     Q.   Okay.  Have you done the math on this?  Is one

11  out of 40 a success rate of 2.5 percent?

12     A.   It is.

13     Q.   All right.  And it says in this document that

14  Pricer had failed to reach the mainstream, right?

15     A.   That says that, yes, sir.

16     Q.   SC Pricer has failed to reach acceptance of the

17  mainstream after eight months of working the market?

18     A.   That's what it --

19     Q.   Right?

20     A.   -- says, yes, sir.

21     Q.   It turns out, doesn't it, Mr. Weinstein, that

22  Trilogy had made some bad assumptions about the

23  marketplace, right?

24     A.   Well, it -- it -- it had not assumed that SAP

25  had its functionality, that's true.

1    Q.   Well, now let's talk about that for a second.

2  Back in 1998, this was not Trilogy's functionality, true

3  or false?

4    A.   Well, Trilogy didn't have its patent yet, so

5  that's --

6    Q.   They didn't --

7    A.   -- true.

8    Q.   -- own it?

9    A.   Excuse me?

10    Q.   They didn't own that functionality in 1998?

11    A.   That's true.

12    Q.   And in 1998 they couldn't prevent anybody in

13  the world from doing it, true statement?

14    A.   As far as I know, that's correct.

15    Q.   All right.  So it's -- there's no patent in

16  1998 and there's nothing but fair competition going on.

17  But let me ask you this:  Assumptions -- if you make bad

18  assumptions, you're going to end up potentially with bad

19  conclusions, fair?

20    A.   Fair enough.

21    Q.   Fair to say, and I'm not fussing at you, but

22  you've made some assumptions here, right?

23    A.   I have.

24    Q.   Right.  And if your assumptions turn out to be

25  incorrect, your conclusions could be incorrect, fair?

1      A.    That's fair.

2      Q.    That's true with any expert, right?

3      A.    You know, I won't speak for everybody, but

4 that's certainly true, yes.

5      Q.    Makes sense?

6      A.    It makes sense to me.

7      Q.    And we know that Trilogy made some bad

8 assumptions?

9              MR. MELSHEIMER:  Let's go to Page 3 of

10 Exhibit 514.

11      Q.    (By Mr. Melsheimer)  Back in 1998 they

12 concluded that the Pricer team inaccurately assumed that

13 the majority of SAP customers needed enhanced price

14 execution capabilities.  The market has indicated

15 otherwise, right?

16      A.    I see that.

17      Q.    So they thought one thing, but the truth turned

18 out to be something else, right?

19      A.    Well, that's not -- no, that's not right, sir.

20      Q.    All right.

21      A.    That's incorrect.

22      Q.    Well, they -- let me put it to you this way:

23 They assumed that the majority of SAP customers needed

24 enhanced price capabilities and what this document

25 concludes is, is that the market has indicated

1    otherwise.  That's what it says, right?

2        A.    That's what -- that's what it says.

3        Q.    Now, in addition, prior to 2003, prior to the

4    issuance of the patent, some of Trilogy's own employees

5    realized that a hundred thousand dollar price would be a

6    better price, a more reasonable price, a more sensible

7    price than the $1.8 million price tag they were trying

8    to charge, right?

9        A.    I think I recall that, yes.

10       Q.    And that's this same exhibit, 514.  If the

11   product cost $100,000, the Pricer sales team believed

12   that the conversion rate would increase 20-fold.  So if

13   it was $100,000, they might be able to sell a lot more,

14   right?

15       A.    Fair enough.

16       Q.    And other folks actually suggested that the

17   price that they needed to sell the software at was not a

18   million eight, was not 100,00, but was in fact $50,000;

19   you've seen that as well, haven't you?

20       A.    I have.

21       Q.    That's exhibit DX811 at Page 3.  Let's take a

22   look at that.  Value proposition.  We went in with a

23   single price point with a value proposition of easier

24   maintenance, better performance, greater flexibility.

25   Not compelling at 1 million, right?

1    A.    That's what it says.

2    Q.    Though it was at 50?

3    A.    That's what it says.

4    Q.    That is a basic economic principle, isn't it,

5    Mr. Weinstein, that sometimes people will not pay a

6    hundred dollars for something but if it's $10 they might

7    buy it?

8    A.    That's fair.

9    Q.    That is the standard economic principle of

10   demand, the demand curve, right?

11   A.    It is.

12   Q.    Demand curves, they slope downward like this,

13   right?

14   A.    They slope downward.

15   Q.    Generally, and they can have different, I don't

16   want to overgeneralize, but the point is the more

17   expensive something is, the less of it people buy, it's

18   a general proposition, right?

19   A.    Yes, it is.  That's correct.

20   Q.    Now, you assumed in your analysis that every

21   customer would pay 1.8 million, right?

22   A.    Well, I assumed that the 93 customers would pay

23   1.8 million.  I also assumed that there were more than

24   1,200 customers who were available who were not

25   willing -- who would not have been willing to pay that

much.  So I allowed for that downward sloping demand

curve.

Q.    Make sure I understand your answer.  For every

of those 93 customers that you claim would have bought

Pricer, in your calculation you have them paying a

million eight, true or false?

A.    True.

Q.    Now, can we agree that back in the late '90s

and early 2000s that the Trilogy customers that they

were getting thought the product was too expensive,

right?

A.    You know, I don't know that that's true for all

Trilogy customers.  I -- I wouldn't be surprised if it's

true for some.

MR. MELSHEIMER:  DX Exhibit 859, Page 111.

Q.    (By Mr. Melsheimer)  This was this customer

satisfaction survey that Trilogy commissioned back in

2000.  You've seen it, right?

A.    I have.

Q.    Did you look at it in forming your opinions in

this case?

A.    You know, I don't recall if I saw it before

the --

Q.    All right.

A.    -- trial or not.

1    Q.    Well, it says here one of the conclusions they

2    reached was that it was very -- that customers felt like

3    Trilogy was very expensive and they hadn't delivered,

4    right?

5    A.    That's what it says.

6    Q.    And there were a number of comments offered,

7    they oversold the software; very expensive; very

8    expensive; not getting value for the money that we

9    spend; we paid too much for quality out of the box; We

10   spent millions and we're still trying to implement.

11            Here's a good one, the consultants are

12   great.  The product has some issues.  They're expensive.

13   With all the problems they bring talent and expertise

14   you can't get from others.  That's positive.  But what's

15   the last one?

16   A.    You want me to read it?

17   Q.    Please.

18   A.    Extremely overpriced for the level and skills

19   of the consultants.

20   Q.    In addition to being very expensive, Trilogy's

21   customers expressed dissatisfaction to the tune that

22   57.5 percent of the customers thought that the product

23   did not meet their expectations, right?

24   A.    I recall seeing that, yes, sir.

25   Q.    Let's just be clear about that number, and I

1  want to compare it to some of your numbers.

2        That number is an not estimate, is it?

3    A.    Well, we'd have to go back and look at it, sir.

4    Q.    That number is not a projection is it, sir?

5    A.    You know what?  We'd have to go back and look

6  at it.

7    Q.    That number is based on work that was actually

8  done by a consulting firm back in 2000 to go out and

9  interview and collect data about actual customers.  You

10 know that, don't you?

11   A.    I do recall that, yes, sir.

12   Q.    Now, that's different from what you did in this

13 case, right?

14   A.    In what sense?

15   Q.    Well, you didn't go out and do any of your own

16 work and research in the marketplace.  You looked at

17 Trilogy's documents and SAP's documents, fair?

18   A.    Well, I looked at Trilogy's actual experience

19 and SAP's actual experience, that's true.

20   Q.    You didn't go out and do your own homework in

21 the marketplace like that survey company did, fair?

22   A.    No, that's not fair.

23   Q.    Okay.

24   A.    I relied on actual marketplace results, which

25 is a stronger place to go than a survey.

1    Q.   That wasn't my question, sir.  You didn't go

2  out -- make it simple.  You didn't go out and do your

3  own survey, right?

4    A.   I -- I surveyed Trilogy and SAP's actual

5  results, yes, sir, I did.

6    Q.   You didn't go out and conduct your own

7  independent market research outside the Trilogy and SAP

8  documents, fair?

9    A.   That's true.

10    Q.   Sir, did you know -- so we had all these

11  customer issues, these customer complaints, too,

12  expensive, overpriced, not good value.  You've also seen

13  documents -- we'll talk about these -- where there were

14  problems with software, right?

15    A.   I've seen some, yes, sir.

16    Q.   And, in fact, it turns out that the folks at

17  Trilogy weren't even using Pricer in their own company.

18  Did you know that?

19    A.   I don't think I knew that till the trial.

20    Q.   Yeah.  That just came out in the trial that the

21  product that they're trying to get nearly $300 million

22  in damages from SAP, they weren't even using it in their

23  own company; isn't that right, sir?

24    A.   As far as I know, that's true.

25    Q.   Let's talk about lost customers.

1          Now, it turns out that the dissatisfaction

2    that customers had with Trilogy actually led to some

3    people canceling agreements prior to 2003.  You've seen

4    that, haven't you?

5        A.   You know, I don't -- I don't recall that, but I

6    would accept that as a possibility.

7        Q.   Well, let's take a look at Defendants' Exhibit

8    497.

9             Thomas & Betts.  This is from a Trilogy

10   document, 497 at Page 42 at the bottom.  This is a

11   client that Trilogy had that said -- boy, if you can

12   read that, I won't ask you a single other question.

13       A.   Can I take a shot?

14            [Laughter]

15       Q.   (By Mr. Melsheimer) Let me take that back.

16            THE COURT:  Give it your best shot.

17            [Laughter]

18       A.   Thomas & Betts say they will not pay this

19   maintenance.  It will take legal action to collect.

20       Q.   (By Mr. Melsheimer) All right.  Well, I'm going

21   to stick at it, sir.  I'm going to stick at it.

22            But the fact is, what it says is that they

23   wouldn't pay the maintenance, and Trilogy was going to

24   have to sue them to get it, right?

25       A.   That's what it says, yes, sir.

1     Q.   And you don't dispute that Versata lost a

2 15-million-dollar deal to Lucent in 1998 due to what the

3 president of Trilogy called Trilogy's arrogance and

4 incompetence.

5           You've seen that, haven't you?

6     A.   You know, I don't recall it, but I accept it.

7     Q.   All right.  Well, let's take a look at it.  I

8 appreciate you accepting it.  I want to make sure that

9 you appreciate that I'm -- I'm using their own documents

10 here.

11           So Lucent, 15-million-dollar deal.  Our

12 arrogance and incompetence caused us to lose this.

13           That's Exhibit 824, all right?

14     A.   I see that, yes, sir.

15     Q.   And there are other examples of companies

16 pulling out of or canceling their business relationship

17 with Trilogy that we don't even -- we don't need to go

18 into all of them, do we, sir?

19     A.   That's up to you, sir.

20     Q.   All right.  Now, you understood that because of

21 all these problems that Trilogy was having, that some

22 people at Trilogy had concluded that Pricer was dead

23 even before the patent issued in 2003; isn't that right?

24     A.   I recall that.

25     Q.   Take a look at Defendants' Exhibit 3105 at Page

3.  This is an e-mail chain from some people within
Trilogy.

My understanding of the problem is that
while Trilogy pricing is a nice-to-have feature, it very
rarely drives the sale on its own.

Do you see that?

A.   I do.

Q.   What that means is, is that the people who were
buying from Trilogy, many other software products they
sold, right?  It wasn't just this one.

A.   Correct.

Q.   That when people were coming to Trilogy to
purchase something, at least from this gentleman's
perspective, Mr. Buerkle, who was a long-time Trilogy
employee, that it was a nice-to-have feature that rarely
drives the sale, meaning that people don't -- don't buy
anything from us just because of Trilogy -- just because
of Pricer, correct?  That's what that means.

A.   It says that rarely occurs, yes, sir.

Q.   And then he says that:  Face it.  For as cool
as we all know pricing to be, if there isn't a steady
pipeline of sales, it's dead, right?

A.   That's what it says.

Q.   And this was way back in 2000, three years
before the patent, right?

1    A.   Correct.

2    Q.   Now, as a result of all these issues, Trilogy's

3 revenues started to drop well before the patent issued

4 in 2003, correct?

5    A.   Well, Trilogy's revenues dropped during that

6 period, yes, sir.

7    Q.   All right.  In fact, you say this in your

8 report, that in 2001, there were layoffs at Trilogy and

9 that the layoffs occurred during a period of revenue

10 decline.  Do I have that right?

11    A.   You do.

12    Q.   Now, all this is happening as we're talking

13 about the notion that some people at Trilogy thought

14 Pricer was overpriced, the lack of customer satisfaction

15 to the extent of them canceling or refusing to pay, the

16 drop in Pricer revenue, and Versata employees saying

17 that Pricer might be dead, all that occurred before

18 2003, right?

19    A.   Correct.

20    Q.   And there's no infringement before 2003, right?

21    A.   Also correct.

22    Q.   Now, you understand that if -- that it's SAP's

23 view in this case, why we're here, is that the dropoff

24 in sales of Pricer was due to Trilogy's own actions,

25 their own decisions, their own issues, changes in the

1    overall marketplace -- they have nothing to -- that

2    we're not faulting them for -- and that that's what

3    caused the dropoff in Pricer sales, not anything SAP

4    did.

5              You understand that's the -- that's the

6    issue we're joining here, right?

7    A.    Well, I understand that to be the essence of

8    SAP's position, yes, sir.

9    Q.    All right.  But -- we're going to talk about

10   that in a minute, but whatever is going on in the

11   problems, the dropoff of sales, the issues with Pricer,

12   the technology issues, the changes in the marketplace,

13   all that happened before 2003, that cannot be the basis

14   for any damages in this case.

15             You know that, right?

16   A.    Correct.

17   Q.    Let's talk a little bit about what happened

18   when Trilogy got the patent in 2003.

19             Now, is it -- you know that since Trilogy

20   was issued the '350 patent in April that it hasn't sold

21   Pricer to a single new customer.

22             You know that, don't you?

23   A.    As far as I know, that's true, yes, sir.

24   Q.    I mean, you checked that out, didn't you?

25   A.    I did.

1    Q.   I mean, you looked because if there had been a

2  new sale of Pricer since the patent issued, you would

3  have come in and told the jury about it, right?

4    A.   Well, I don't know how it would have fit, but,

5  yes, I did check that out.  And as far as I know, there

6  are new sales.

7    Q.   And Trilogy -- and you know this, too -- that

8  Trilogy is not aware any of document indicating that the

9  failure to sell Pricer after April of 2003 was in any

10  way related to SAP's hierarchical access pricing

11  capability, right?

12    A.   You know, I can't speak to that.  Certainly,

13  my -- my expert report and conclusions are that

14  Trilogy's lost sales are attributable to SAP's

15  infringement.

16    Q.   Well, that's your opinion, right?  I'm asking

17  you about the documents from Trilogy's side.

18                Isn't it true, sir, that Mr. Smith, that

19  gentleman right there at the table, that he has

20  testified that no prospect that ever considered

21  purchasing Trilogy's software has ever said to Trilogy:

22  We didn't go with Trilogy, because we're going to use

23  SAP's hierarchical access instead?

24                And he said:  I don't believe I've ever

25  seen any documentation like that, no.

1    Do you recall looking at that?

2    A.    If he said it, I would have seen it, yes, sir.

3    Q.    Now, in your analysis, this but-for analysis

4    of -- starts in April of 2003.  We look at the world

5    starting in April 2003 after Trilogy got the patent.

6    And we look at what would have happened if there -- if

7    SAP hadn't added this feature to its product, right?

8    A.    Correct.

9    Q.    So we sort of assume -- assume something away

10   in a sense, because we know SAP had added the feature

11   five years earlier, right?

12   A.    Correct.

13   Q.    But we don't assume away, we don't assume away

14   all the issues that Trilogy faced in the preceding year,

15   correct?  We don't just erase those, do we?

16   A.    We don't.

17   Q.    We don't just erase all the issues that

18   customers raised about the price of the software, right?

19   A.    Correct.

20   Q.    We don't just erase all the complaints that the

21   customers had about the technology, right?

22   A.    Also true.

23   Q.    We don't erase all these concerns that were

24   percolating, whatever you want to say, within Trilogy

25   prior to 2003 that we've gone on in some detail with

1  this jury since Monday, right?

2      A.   Correct.

3      Q.   And we don't assume away all the competition in

4  the marketplace that grew up between 1998 and 2003.  We

5  don't just assume that away, do we, sir?

6      A.   We do not.

7      Q.   And you know that something else we don't

8  assume away is, we don't assume away technological

9  changes that may have occurred between 1998 and 2003,

10 right?

11     A.   That's true.

12     Q.   Because it's possible, and you've seen this

13 happen, where changes in the technology in the

14 marketplace can affect the value of someone's invention,

15 right?

16     A.   Correct.

17     Q.   You might have a real good invention that's

18 worth something in one year, and five years later, it's

19 not worth much of anything.  You've seen that happen,

20 haven't you?

21     A.   That can happen.

22     Q.   All right.  Let's talk about these Panduit

23 factors.

24              You recognize that these Panduit factors

25 are the legal standard for the recovery of lost profits,

1 right?

2     A.   I do.

3     Q.   And is it your view that in order for Trilogy

4 to get lost profits, they have to satisfy one way or

5 another each of those factors?

6     A.   As far as I know, that's required.

7     Q.   If they fail to prove even one of those

8 factors, they're not entitled to lost profits, right?

9     A.   Well, you know, I can't speak to that.  I'm

10 here as an economist.

11     Q.   Well, let's put it this way:  There's four

12 factors.  You're not suggesting, well, if you only meet

13 three, you reduce the damages by 25 percent, right?

14 You're not saying that.

15     A.   I haven't said that, no, sir.

16     Q.   Okay.  And the fact is that if -- if you

17 can't -- if the jury -- if Trilogy can't prove that the

18 reason why its sales dropped off was because of SAP's

19 determined infringement, they don't get any lost

20 profits, right?

21     A.   You know, I don't think I put it quite that

22 way.

23     Q.   Let me -- okay.  Let me rephrase it.

24            You understand that Trilogy has the burden

25 of proof in this case, right?

1    A.    As far as I know, that's true.

2    Q.    Well, now, why -- I mean, there's no doubt in

3 your mind about that, right?

4    A.    Well, sir, you know, I'm here as an economist,

5 not as an attorney.  As far as I know, that's true.

6    Q.    As far as you know, they bear the burden of

7 proving lost profits and satisfying the Panduit factors,

8 correct?

9    A.    As far as I know, that's true.

10    Q.    And if they can't satisfy that, they're not

11 entitled to lost profits as far as you know?

12    A.    As far as I know.

13    Q.    Because you're not offering any other theory of

14 damages in front of this jury, correct?

15    A.    That's true.

16    Q.    You know that Mr. Wagner is offering the notion

17 that Trilogy should receive a reasonable royalty,

18 correct?

19    A.    Correct.

20    Q.    That's different from lost profits, right?

21    A.    It is.

22    Q.    You don't have to prove in a reasonable

23 royalty, for example, that you lost business, right?

24    A.    There are different -- different approaches to

25 the two computations, yes, sir.

1    Q.   Listen to my question.

2          You don't have to prove for -- to get a

3 reasonable royalty that you lost a dime's worth of

4 business; isn't that right?

5    A.   Well, that might be relevant to the royalty

6 computation, so...

7    Q.   Might be relevant, but you don't have to prove

8 it.

9    A.   It could be relevant, that's correct, but you

10 don't have to prove it.

11    Q.   And you're not doing that analysis.

12    A.   A royalty analysis?

13    Q.   Correct.

14    A.   I am not.

15    Q.   All right.  Let's take a look at Panduit Factor

16 No. 1.  To satisfy this first one, I think you said that

17 Trilogy must show that there was a demand for the

18 patented feature, right?

19    A.   Correct.

20    Q.   Now, you rely in your report on a couple of

21 things to prove that.

22          Mr. Weinstein, let me hand you --

23          MR. MELSHEIMER:  May I approach, Your

24 Honor?

25          THE COURT:  Yes.

1    Q.   (By Mr. Melsheimer) Now, in your report --

2    A.   Sir?

3    Q.   Take a look at paragraph -- I'm sorry.  You --

4    A.   Sir, with due respect, I think you gave

5 something you didn't intend to.

6    Q.   Okay.  Let's see.

7    A.   It's your cross-examination.

8    Q.   It's a list of my questions?

9    A.   It is.

10          [Laughter]

11    Q.   (By Mr. Melsheimer) Why don't we slow things

12 down.  You give me your answers in advance, and I'll

13 make the trade with you, sir.

14         All right.  Can you turn to Page --

15 Paragraphs 182 and 183 of your report in Defendants'

16 Exhibit 2630?

17    A.   Okay, sir.  I have it.

18    Q.   Now, 182 and 183 deal with your findings about

19 the demand for the patented feature, correct?

20    A.   Yes, that's true.

21    Q.   And let's just be clear.  You don't dispute

22 that this feature, this pricing feature, is not the

23 basis of demand for SAP's products, right?

24    A.   That's true.

25    Q.   Right.

1    A.    I agree with that.

2    Q.    It is not the basis -- put it another way.

3  This hierarchical access feature, this one way of doing

4  pricing out of a dozen ways, that is not the reason why

5  people buy SAP's big suite of software, correct?

6    A.    Yes, sir, that's correct.

7    Q.    And you also agree, wouldn't you, that your

8  lost profits calculation doesn't have anything to do

9  with whether any customers actually configured the

10  software in a way that infringes the patent, right?

11    A.    That's correct.

12    Q.    The patent here is just a capability.  I know

13  that's a strange concept, but it's the capability of

14  doing something in the software whether or not a

15  customer actually ever does it, right?

16    A.    Yes, sir.

17    Q.    So it's a little bit like -- do you ever use

18  Word, Microsoft Word?

19    A.    I do.

20    Q.    Do you ever notice on those fonts, the

21  different fonts you can use, there are hundreds of

22  fonts, Helvetica, Graphic, New Times Roman, all that

23  stuff, right?

24    A.    Correct.

25    Q.    And do you use all hundred of those?

1    A.    I do not.

2    Q.    And, in fact, you've got the capability of

3 using all of them, right?

4    A.    I do.

5    Q.    Because they're in the code, but you may not --

6 you may not have used one or more of them even one time

7 in your many, many years of using the software program,

8 right?

9    A.    Correct, but I'm happy to have the capability.

10    Q.    You like to have it in there.

11    A.    Correct.

12    Q.    You're not going to give me an opinion, though,

13 of how much you'd be willing to pay for Helvetica 20?

14    A.    I'm not.

15    Q.    Okay.  Or old world gothic?

16    A.    Correct.

17    Q.    All right.  So that stuff that Mr. Bakewell

18 testified to with respect to that survey, that so-called

19 survey from the depositions, that didn't actually matter

20 to any of your conclusions, because your lost profits

21 conclusions don't hinge on whether anyone actually ever

22 used the software feature at SAP.

23         Do I have that right?

24    A.    Well, the specific calculations don't, but I

25 certainly had those survey results in mind when I did

them.

Q.   But whether the surveys had said 10 percent or 40 percent or a hundred percent, you don't use that survey to calculate the $280-something million you say are owed in lost profits.

Do I have that right?

A.   I have the survey results in mind, but it doesn't enter specifically into the computation, that's true.

Q.   Meaning, if the survey had been totally different, say -- let's say the survey showed that 1 percent of people use the feature, you'd still have the same number, wouldn't you?

A.   Well, if it said 1 percent, I might have thought about my number, but it didn't say 1 percent.

Q.   Right.  And you -- consistent with your testimony about this feature not being the basis for customer demand, you can't point to any hard evidence that proves that SAP adding this feature increased sales or increased demands for SAP products; isn't that right?

A.   That's not right, sir.

Q.   Let me ask it again.

Have SAP's revenues or profits -- you can't -- you don't know if SAP's revenues or profits have increased as a result of the infringement of the

1　'350 patent.  You don't know.

2　　A.　I haven't measured that, that's true.

3　　Q.　You don't know, right?

4　　A.　You know, I don't agree with that.

5　　Q.　All right.

6　　　　　MR. MELSHEIMER:  Can we have the clip,

7　Mr. Barnes?

8　　　　　(Video playing.)

9　　　　　QUESTION:  My question is:  Have SAP's

10　revenues or profits increased as a result of its

11　infringement of the '350 patent?

12　　　　　ANSWER:  I -- I don't know.

13　　　　　(End of video clip.)

14　　Q.　(By Mr. Melsheimer) All right.  You told us in

15　your deposition that you didn't know, correct?

16　　A.　Correct.

17　　Q.　All right.  Now, let's talk about

18　non-infringing alternatives, because I'm -- I'm -- if I

19　start to speak quickly, it's because I've been told I'm

20　running out of time, sir.  So I'm going to try to go as

21　quickly as I can.

22　　　　　Now, non-infringing alternatives are -- is

23　an important component of the -- your lost profits

24　analysis, right?

25　　A.　It is, yes.

1    Q.   If I -- make sure I understand it.  If

2    customers could have chosen other products other than

3    SAP's product that was determined to infringe, if they

4    could have gone elsewhere for their needs, then that may

5    mean that Trilogy wouldn't have gotten those sales.

6              Do I have that right?

7    A.   That's true.

8    Q.   And it's important to really understand that,

9    because that's part of this but-for world.  Because

10   if -- if Trilogy wouldn't have made these sales, even if

11   SAP hadn't added the feature, then they don't get lost

12   profits, right?

13   A.   That's fair.

14   Q.   You understand that Trilogy bears the burden of

15   proving that there weren't other non-infringing

16   alternatives, correct?

17   A.   As far as I know, yes, sir.

18   Q.   But in this case, you didn't -- you personally

19   did not analyze this -- the existence of non-infringing

20   alternatives.  You did not evaluate other products that

21   customers could have bought to perform the pricing;

22   isn't that right?

23   A.   I assumed there were no acceptable --

24   commercially acceptable non-infringing alternatives,

25   that is true, yes, sir.

1    Q.   You assumed it -- now, make sure I understand.

2  Assume means you just took it as a fact, right?

3    A.   I took it based on other information that was

4  available to me, yes, sir.

5    Q.   You didn't do the work to -- you didn't do a

6  work -- you did not do the work to determine if there

7  were commercially acceptable pricing solutions that did

8  not practice the claims of the '350 patent; isn't that

9  right?

10    A.   Well, I did the work that I've described in

11  this case, and that includes looking at that issue.

12    Q.   You remember your deposition, Mr. Weinstein --

13    A.   I do.

14    Q.   -- in this case?

15    A.   I do.

16          MR. MELSHEIMER:  Let's take a look at a

17  clip, 66, 15 to 22.

18          (Video playing.)

19          QUESTION:  In those two paragraphs, I

20  don't see an analysis of whether, in the infringement

21  period, companies, other than Trilogy or SAP, offered

22  commercially acceptable pricing solutions that did not

23  practice the asserted claims of the '350 patent.

24          Have you done such an analysis?

25          ANSWER:  I have not.

1          (End of video clip.)

2      Q.   (By Mr. Melsheimer) And, in fact, sir, you

3  relied -- and you don't believe that Mr. Gupta has done

4  such an analysis either, or certainly you didn't think

5  that when you did your report in this case, correct?

6      A.   Well, I'm aware of his -- of his testimony.

7  That much is true.

8      Q.   But when you did your report, you understood

9  that Mr. Gupta had not rendered opinions in his report

10  about whether or not there were acceptable

11  non-infringing alternatives, correct?

12      A.   I think his opinions were -- that I recall were

13  limited to the question of whether SAP's patch in 2010

14  was a non-infringing.

15      Q.   But that's not the only issue, correct?

16      A.   Correct.

17      Q.   You have to look at what else was out there in

18  the marketplace.  And let's do that.

19              You know this company, Gartner, sir?

20      A.   I do.

21      Q.   You've heard about them?

22      A.   I do.

23      Q.   They're very knowledgeable about the

24  marketplace?

25      A.   They are.

1     Q.    Well, let's see what Gartner is saying about

2   the marketplace in 2002, a year before the patent

3   issues.

4                 And this is Exhibit 1596.  And we've seen

5   this before, sir, and this is a -- this is a sales

6   configuration and pricing quadrant, and it talks about

7   the different companies that are involved in this

8   market, product and pricing -- some companies provide

9   product and pricing configuration; some companies

10  provide pricing configuration only.  And then here's all

11  the competitors in that marketplace, right?

12    A.    Yes, I see that.

13    Q.    And there are many, many other companies, other

14  than SAP, in this marketplace, correct?

15    A.    There are.

16    Q.    You've got companies like -- and let's just

17  take the 1s -- well, the 1s or the 2s, because the 1s

18  provide pricing configuration, and the 2s just provide

19  pricing.  But you've got Siebel.  We know Siebel is out

20  there competing, right?

21    A.    We do, yes, sir.

22    Q.    And we actually know that Siebel was such a big

23  deal to Trilogy that back in 1998, Mr. Liemandt wrote

24  that e-mail saying:  We've got to do everything we can

25  to hurt them, right?

1    A.    We saw that, yes, sir.

2    Q.    We know that other companies are out there

3 competing.  You've got Oracle, right?

4    A.    I see.

5    Q.    You got SAP, to be sure.

6    A.    I see that.

7    Q.    You got Trilogy.  And then you've got maybe a

8 dozen other companies; isn't that right?

9    A.    Correct.

10    Q.    Now, sir, you have done this lost profit

11 analysis before, haven't you?

12    A.    I have.

13    Q.    You've done it in other lawsuits.

14    A.    Correct.

15    Q.    And in a lawsuit a few years back, you swore

16 under oath that the presence --

17          MR. MELSHEIMER:  Leave that up, please,

18 sir.

19    Q.    (By Mr. Melsheimer) -- that the presence of

20 multiple non-infringing alternatives creates a real

21 doubt as to whether the -- the patentee, the person that

22 had the patent, could make sales but for the

23 infringement.

24    A.    I agree with that.

25    Q.    You have previously sworn under oath that if

1  there are other people in the marketplace that are
2  selling a product that companies could buy instead of
3  SAP's product, that that means that the patentee,
4  Trilogy in this case, that they wouldn't have gotten
5  those sales, they wouldn't have lost the sales, because
6  the -- sorry -- they wouldn't have gotten the sales
7  because the sales would have gone to all these other
8  companies in the marketplace, right?
9      A.    Well, there's one part of your question that's
10 technically not right, but, generally, the presence of
11 non-infringing alternatives will impact the lost profits
12 computation.  I do agree with that.
13     Q.    Because -- and, again, you don't -- it is an
14 economic point, but I just want to make sure it's real
15 clear.  It's because, if there's other substitutes out
16 there, if you can go to -- if Chile's closes, but you
17 can go to Applebee's or you can go somewhere else, those
18 are other alternatives, right?  That's what we're
19 talking about.
20     A.    That's correct.
21     Q.    I want to talk real briefly about this issue --
22 I'm going to skip No. 3, sir, Panduit Factor No. 3.
23 We're going to talk about No. 4, the amount of profit.
24 Just a couple of real quick questions about that.
25              Profits are not the same as revenue.  I

think you said that in your direct examination, right?

    A.    That's true.

    Q.    Profits are whatever is left over after cost, right?

    A.    Correct.

    Q.    And you're saying that you came up with this 72 percent profit margin that basically says, for every 1.8-million-dollar sale, that Trilogy is going to get to keep 72 percent of that.

    A.    That would be the profit, yes, sir.

    Q.    You base that not on looking at all the financial data at Trilogy for all their customers, right?

    A.    That's true.

    Q.    You based it on just looking at the expense experience and the profitability experience with their top 10 customers, right?

    A.    Correct.

    Q.    And the reason why you did that or the basis for your doing that or the source of you doing that is this gentleman right here (indicates); isn't that right?

    A.    I spoke with him about that, yes, sir.

    Q.    Mr. Smith is the one that directed you to that chart that showed the top -- the revenue experience and the profitability experience for Trilogy's top 10

1  customers, right?

2      A.   Yes, sir.

3      Q.   That's not something that you sat down and

4  said:  Okay.  When I do this report independently,

5  here's what I want to know.  You went to Mr. Smith, and

6  he directed you to this top 10, correct?

7      A.   No, that's not correct.

8      Q.   Well, he directed you to the top 10, didn't he?

9      A.   Yeah.  But first I told him what I wanted to

10  know.

11      Q.   All right.  You told him to take out all the

12  other Trilogy customers besides the top 10?

13      A.   You know, I didn't -- I didn't put it that way,

14  no, sir.

15      Q.   Right.  You didn't tell him to take out all the

16  other Trilogy customers other than the top 10.

17      A.   No.  What I -- what I told him is, I wanted

18  cost experience that would be relevant to the

19  computation I did, which involved lost -- lost -- lost

20  sales, lost customers.

21      Q.   So you told him:  I'm doing a lost sales -- a

22  lost profits calculation.  Can you give me the

23  information that would be relevant to that?

24      A.   In so many words, yes, sir.

25      Q.   All right.  And you -- you chose that top 10

1  instead of their whole customer base based on the

2  conversation with Mr. Smith, right?

3      A.    Ultimately, that's correct.

4      Q.    All right.

5          MR. MELSHEIMER:  May I have a moment, Your

6  Honor?

7          THE COURT:  Yes.

8          (Pause.)

9          MR. MELSHEIMER:  I'm eight minutes over,

10  Mr. Weinstein.

11     Q.    (By Mr. Melsheimer) All right.  Just a couple

12  of questions.  I just want to talk about -- and again,

13  you used -- we talked about this earlier.  We used 1.8

14  million, even though there were documents showing,

15  within Trilogy, that they concluded way back in 1998,

16  1999, that a price point of 50 or a hundred thousand

17  dollars might be more appropriate, right?

18     A.    Yes.  We've been through this.

19     Q.    All right.  Now, just a couple of things about

20  Trilogy today or Versata today, because I don't want the

21  jury to be left with a wrong impression.

22          Versata is not out of business, right?

23     A.    Correct.

24     Q.    They're a big business.  They have a

25  substantial amount of business, right?

1    A.    As far as I know, yes, sir.

2    Q.    They have offices in Austin, right?

3    A.    Yes, sir.

4    Q.    India?

5    A.    So I've heard, yes.

6    Q.    They do a lot of their software development in

7    India?

8    A.    As far as I know.

9    Q.    And they do some work in China?

10   A.    Also true.

11   Q.    And they are still out there selling products

12   in the software market as we sit here today.

13   A.    Correct.

14   Q.    All right.

15             MR. MELSHEIMER:  Thank you, Mr. Weinstein.

16             THE COURT:  Redirect?

17             MR. COLE:  Yes, Your Honor.

18             Mr. Diaz, can you put Slide 16 up?

19                  REDIRECT EXAMINATION

20   BY MR. COLE:

21   Q.    Mr. Weinstein, I think one of the points

22   Mr. Melsheimer made was that starting in 2003, when the

23   patent issued, that Trilogy had not made a single new

24   sale of Pricer since then.

25             Do you recall that?

1     A.    I do.

2     Q.    And I think the implication was, clearly, once

3  we had our patent, we should have been able to start

4  making sales again.  Is that how you took it?

5     A.    I took it at face value.

6     Q.    Okay.  Well, let me ask you this:  From the

7  period of 2003 until today, has SAP ever stopped selling

8  its infringing product?

9     A.    No.

10    Q.    How many customers has it sold the infringing

11 product to during that period?

12    A.    1,360.

13    Q.    And does the fact that SAP is selling the

14 infringing product to the same customer base Trilogy had

15 targeted, did that affect potentially Trilogy's ability

16 to sell?

17    A.    Of course, since they're competitors.  If SAP

18 is giving it away and including it in its software

19 packages, it affects Trilogy's ability to sell.

20    Q.    And there was a discussion about demand curves.

21 If you're a Tier 1 customer and you already have SAP,

22 you have SAP software, and you have the infringing

23 features for no additional charge, what does the -- what

24 does the law of economics say about what you'd be

25 willing to pay Trilogy for that same technology on top

1  of it?

2    A.   Well, if you -- if you already have it, you're

3  not prepared to pay for it again.

4    Q.   And I think there was also a lot of discussion

5  about this period here where the sales started to drop

6  off, and I think Mr. Melsheimer showed you a bunch of

7  the same e-mails we've seen previously.

8             Do you recall those?

9    A.   I do.

10    Q.   And he mentioned that the market then was

11  highly competitive, right?

12    A.   He did.

13    Q.   Was the market highly competitive in 1995,

14  1996, and 1997?

15    A.   Sure.  It's the same thing.  There's

16  competition throughout the period, including the period

17  during which Trilogy actually made the sales of

18  Pricer-isolated contracts that I used as the basis for

19  my comp -- computations.

20    Q.   So Trilogy wasn't selling Pricer in a market

21  in -- here in the early '90s when there was nobody else

22  around, were they?

23    A.   Correct.

24    Q.   And was there competition in '98?

25    A.   There was.

1    Q.   And was there competition all the way till

2   today --

3    A.   Correct.

4    Q.   -- in some form or fashion?

5    A.   Correct.

6    Q.   There's also been a lot of discussion about --

7   I don't think Mr. Melsheimer asked you about this, but

8   there's been a lot of discussion about integration

9   difficulties Trilogy was having with SAP.

10          Do you recall that testimony?

11   A.   I do.

12   Q.   Was integration with SAP easy in 95, '96, and

13  '97?

14   A.   No.  You'd have the same kind of difficulties

15  and complications during the period that Trilogy

16  successfully sold Pricer as you would subsequent

17  thereto.

18   Q.   In doing causation analysis like this, have you

19  ever heard the term background noise?

20   A.   I have.

21   Q.   And what does that mean?

22   A.   That means there are other things going on

23  simultaneously in the background.

24   Q.   Okay.  And if the background noise is

25  consistent, does that indicate a causal relationship?

1    A.   Well, the -- the background noise is going on

2 during the early period, and it's going on during the

3 infringement period.  The only thing that's different is

4 that during the infringement period, SAP is selling

5 Trilogy's product.

6    Q.   Okay.  And let me shift gears briefly and

7 address one point that he made.

8         Now, he noted, of course, that the patent

9 didn't issue until here (indicates), and so this is fair

10 competition; is that right?

11    A.   Yes.

12    Q.   Okay.  And I think what he means by that is,

13 it's non-infringing because the patent hadn't issued.

14    A.   Correct.

15    Q.   Does that mean Trilogy didn't own their

16 software product?

17    A.   No.

18    Q.   Does that mean Trilogy didn't own the ideas and

19 the work Mr. Carter had done?

20    A.   Correct.

21    Q.   Does that make it public property --

22    A.   No.

23    Q.   -- that anyone can take?

24    A.   No.  Trilogy still has it.

25    Q.   Okay.  I mean, Trilogy couldn't sue them at

1   that point for patent infringement, though, could they?

2       A.   Correct.

3       Q.   All right.

4               MR. COLE:   Your Honor, can we approach

5   briefly?

6               (Bench conference.)

7               MR. COLE:   One of the criticisms

8   Mr. Melsheimer levied is that he did not do -- go out

9   beyond the Trilogy and SAP documents to do research.

10  This brings up the subject of our attempt to subpoena

11  SAP customer documents to assess the extent of use and

12  demand for the product.

13              We believe that's opened the door to

14  discuss the fact that we tried to do that but were

15  blocked by SAP and limited to the depositions on written

16  questions.

17              MR. MELSHEIMER:   Your Honor, it's the same

18  kind of research that --

19              THE COURT:   Go with my prior ruling.

20              MR. MELSHEIMER:   Okay.

21              THE COURT:   Proceed.

22              (Bench conference concluded.)

23      Q.   (By Mr. Cole) Let me address one other topic,

24  different topic now?

25              Mr. Melsheimer made the point that Trilogy

1  doesn't use Pricer to sell its own products and that

2  that must mean it's not very valuable.

3              Do you recall that?

4      A.   I do.

5      Q.   Now, the contracts you looked at, were those

6  contract -- did those contracts have the prices set by a

7  computer system, or were they individually negotiated

8  deals?

9      A.   As far as I know, they were individually

10  negotiated.

11     Q.   I mean, I know you're not a technologist, but

12  does it make sense to use a computerized price execution

13  system to set a price that's negotiated individually by

14  two companies over a period of months?

15     A.   Well, I assume not.

16     Q.   All right.  Next topic.

17             One of the documents he showed you was

18  discussing some problems with Lucent.  And I think the

19  document said that our arrogance and incompetence had

20  caused us problems.

21             Do you remember that?

22     A.   I do.

23             MR. COLE:  Could we have Slide 16,

24  Mr. Diaz?

25     Q.   (By Mr. Cole) Now, that customer was Lucent.

1    Do you see Lucent here in 1997, four from the top?

2        A.    I do.

3        Q.    So Trilogy actually won Lucent as a customer.

4        A.    It had Lucent as a customer, yes.

5        Q.    And did you recall Mr. Smith's testimony

6    yesterday that Lucent is a customer of Trilogy's today?

7        A.    Correct.  I do.

8        Q.    And Mr. Melsheimer correctly pointed out that

9    we are not contending that customers that SAP won in the

10   damage period bought SAP specifically because of

11   hierarchical access as distinct from the other things in

12   their product; is that right?

13       A.    Yes, sir.

14       Q.    Now, is it your contention that the lost sales

15   Trilogy had would never have bought SAP; they would have

16   bought Trilogy instead of SAP?

17       A.    No.

18       Q.    Okay.  What's your contention?

19       A.    I assumed that many of those customers would

20   have purchased SAP product as well.

21       Q.    Okay.  We've heard the term bolt-on?

22       A.    Yeah.  Trilogy -- Trilogy -- the Trilogy Pricer

23   product would have been bolted on to SAP.

24       Q.    Okay.  Final point.  Mr. Melsheimer discussed

25   some technology -- the fact that there were technology

changes and that the value of technology fluctuates over time. And I think that's a fair characterization, isn't it?

A. Yes, sir.

Q. No reason to disagree with that?

A. Correct.

Q. Did something happen in 2010, a year ago from today, that would tell you -- tell you about the value of hierarchical access today, more than 15 years after Mr. Carter invented it?

A. The fact that SAP has -- has left it in, even after an infringement finding, that tells me that it's still valuable to SAP's customers.

Q. Thank you, Mr. Weinstein.

MR. COLE: Pass the witness.

THE COURT: Recross?

MR. MELSHEIMER: Briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. MELSHEIMER:

Q. Mr. Weinstein, you know that Dr. Mercer is going to testify today to the jury that, in fact, the feature has been disabled. You know that, don't you?

A. As far as I know.

Q. And you're not a technical expert who can evaluate that one way or another, correct?

1    A.    Correct.  I'm not.

2    Q.    And the fact that something is still in a

3 product -- let's go back to my Word analysis, Microsoft

4 Word.  The fact that gothic -- old English gothic is

5 still one of the fonts in there, that doesn't mean that

6 Microsoft has decided that that has tremendous value,

7 does it?

8    A.    I can't speak for Microsoft --

9    Q.    Okay.

10    A.    -- but that's a possibility, yes, sir.

11    Q.    Okay.  All right.  And this is a software

12 feature or a software program that has literally tens of

13 thousands of features, correct?

14    A.    We're talking about SAP?

15    Q.    SAP.  I'm sorry.  I'm switching on you to SAP.

16    A.    Yes, sir.

17    Q.    Now, with respect to this Lucent question, I

18 don't want there to be any confusion about it, so let's

19 pull up 824.

20            No one's disputing that Lucent bought some

21 product from Trilogy, but in addition to that, sir, no

22 one is disputing, are they, that as of April 1998 (sic),

23 the quarter preceding that, before this patent had

24 issued, that they lost a 15-million-dollar deal with

25 Lucent, right?  That's what that says.

1      A.   Well, it says that, and then it says it should

2  be able to recover in the fourth quarter.

3      Q.   All right.

4      A.   I'm not sure what all that means, because they

5  do have Lucent as a customer.

6      Q.   But we know that Mr. Liemandt felt like, at

7  least in '98, that they bet big on Pricer and failed to

8  deliver.

9      A.   That's what it says.

10     Q.   Now, let's talk about this -- this concept

11  of -- I'm sorry.  I think I just said the patent issued

12  in 1998, and you didn't correct me, but you know that it

13  didn't issue until 2003, right?

14     A.   We know all that.  And if that's what you said

15  and I didn't correct you, then I didn't.

16     Q.   All right.  All right.  I got to watch myself.

17          Mr. Weinstein, it's important for the jury

18  to appreciate this point about Panduit.  When we're

19  talking about this notion that -- you say that Trilogy

20  had decided to focus on selling the Pricer product as a

21  bolt-on to SAP, correct?

22     A.   Yes, sir.

23     Q.   And your point is, well, gee, if SAP is putting

24  it in there for free, no one's going to buy it.

25     A.   Correct.

1    Q.   The facts are a little bit different, though,

2  sir, because isn't it true that Mr. Carter, the

3  inventor -- I believe he's still back in the

4  courtroom -- testified that they were trying to sell --

5  trying to sell Pricer to all customers, not just SAP

6  customers, right?

7    A.   Sure.

8    Q.   They were trying to sell to Oracle customers,

9  right?

10   A.   Yes, sir.

11   Q.   They were trying to sell to other customers

12 that used other kinds of software, correct?

13   A.   Also true.

14   Q.   So in April of 2003, when they got their patent

15 and SAP had this infringing feature in it, Trilogy could

16 have gone out and sold Pricer to any of those other

17 companies, and they couldn't sell a one, right?

18   A.   That's true.

19   Q.   And Mr. Carter told you they were trying,

20 right?

21   A.   At some time period, they were trying, yes,

22 sir.

23   Q.   And those other companies, those other

24 potential customers were out there for the taking if

25 Trilogy could convince them that it was -- that their

1 product was a good value, worked well, and it was

2 something good for their business, right?

3     A.    True.

4     Q.    One final question.  On these 93 lost

5 customers, just so there's no confusion, you don't know

6 who any of those people are, right?

7     A.    I haven't identified them, that's correct.

8     Q.    So when we're talking about 93 companies or 17

9 or 20, we don't know who any of those people are, any of

10 those companies.

11     A.    Yeah, but they're -- they're -- they're

12 customers that come from that 1,360 that had access to

13 Trilogy's product --

14     Q.    They're --

15     A.    -- due to SAP's infringement.

16     Q.    They're customers that came from that list, but

17 you haven't identified even -- any of them as an actual

18 named customer for your 93, true?

19     A.    Yes, sir, that's true.

20             MR. MELSHEIMER:  Thank you, Mr. Weinstein.

21             THE COURT:  Anything else?

22             MR. COLE:  Briefly, Your Honor.

23             Mr. Diaz, could you find PX1950, Page 12?

24                 REDIRECT EXAMINATION

25 BY MR. COLE:

1    Q.   I want to talk to you briefly about the -- the

2  rest of the market that Mr. Melsheimer said Trilogy

3  could have sold to but didn't.

4           This is a SAP document.  It's a PowerPoint

5  put together by SAP's Chief Financial Officer in 2010, I

6  believe.  Can you tell us what this shows?

7    A.   Yes.  It shows that 76 percent of the

8  Global/500 companies are SAP customers.

9    Q.   And Global/500 is the biggest of the big

10  companies in the world?

11    A.   Correct.

12    Q.   Now, I mean, obviously, there's 25 percent that

13  aren't, but what does that tell you about the

14  availability of the market for the super large companies

15  that don't have SAP and therefore don't have the

16  Trilogy's invention for free?

17    A.   Well, basically, it says that SAP had

18  three-fourths of the market.  So if -- if that part of

19  the market is -- is denied Trilogy because SAP has its

20  infringing technology, Trilogy is at a significant --

21  very significant disadvantage in terms of its ability to

22  sell.

23    Q.   Okay.  And SAP had a very substantial market

24  share of the Fortune 500 and Global 2000 type companies

25  as well, right?

1      A.   Correct.

2              MR. COLE:   Thank you, Mr. Diaz.

3      Q.   (By Mr. Cole) Last question on Lucent.  Lucent

4  was one of the top 10 customers in the spreadsheet you

5  looked at to determine profit margins.

6      A.   It was.

7      Q.   I don't expect you to have this memorized, but

8  would it surprise you if they paid Trilogy about $90

9  million in total during the period of time?

10     A.   I don't have it memorized, but it wouldn't

11  surprise me because it was one of Trilogy's biggest

12  customers.

13     Q.   Okay.  Thank you.

14             THE COURT:   Anything else?

15             MR. MELSHEIMER:   Briefly.  Briefly, Your

16  Honor.  I can take a hint there.

17                 May it please the Court.

18                 RECROSS-EXAMINATION

19  BY MR. MELSHEIMER:

20     Q.   Mr. Weinstein, that number of a -- 76 percent

21  of a Fortune 500 in 2010, you don't know if that was 76

22  percent back in 2003 or 2004 or 2005, right?

23     A.   Not specifically, no, sir.

24     Q.   You don't know if it's been steady or grown

25  over the years, right?

1      A.    That's true.

2      Q.    But let's just take that 24 percent.  That 24

3  percent of those companies, 24 percent of 500 is, what,

4  about a little over a hundred?

5      A.    Correct.

6      Q.    A hundred possible prospects, and Trilogy could

7  not make a sale to even one of them; isn't that right?

8      A.    That's true.

9      Q.    Thank you.

10              MR. MELSHEIMER:  Thank you, Mr. Weinstein.

11              Thank you, Your Honor.

12              MR. COLE:  Nothing further, Your Honor.

13              THE COURT:  All right.  Counsel approach.

14              (Bench conference.)

15              THE COURT:  Do you have any additional

16  witnesses?

17              MR. COLE:  We have a deposition to play.

18  I need to talk to Mr. Baxter about one thing before --

19  about that.

20              THE COURT:  Okay.  Well -- all right.

21              MR. MELSHEIMER:  We will have a motion,

22  obviously, Your Honor.

23              THE COURT:  No.  I understand.  I just --

24  all right.  Well, I'm going to go ahead and break them

25  for the morning.

1          MR. COLE:  Okay.

2          THE COURT:  I didn't realize you had

3  deposition clips.

4          MR. COLE:  It's about 10 minutes.

5          MR. MELSHEIMER:  Did you want to keep

6  going?

7          (Bench conference concluded.)

8          THE COURT:  All right.  Ladies and

9  Gentlemen, I'm going to excuse you for the morning

10 recess at this time.

11         Take about 20 minutes.  Be back ready to

12 come in the courtroom at about 10:35.  Have a nice

13 recess.

14         LAW CLERK:  All rise for the jury.

15         (Jury out.)

16         THE COURT:  Mr. Weinstein, you may step

17 down.

18         THE WITNESS:  Thank you, sir.

19         THE COURT:  Y'all have a seat.

20         For purposes of the record, my

21 understanding, that Court's 1 was tendered yesterday; is

22 that correct?

23         All right.  It's received as Court's 1.

24         Can we get a stipulation that after the

25 deposition excerpts are played, that any motions can be

1    deferred until the noon hour so I don't have to break

2    the jury again?

3                    MR. BAXTER:  Yes, Your Honor.

4                    THE COURT:  Mr. Melsheimer?

5                    MR. MELSHEIMER:  So stipulated.

6                    THE COURT:  Okay.  It will be deemed

7    timely made if it's made over the lunch hour.

8                    Court's in recess.

9                    LAW CLERK:  All rise.

10                   (Recess.)

11                   LAW CLERK:  All rise.

12                   (Jury in.)

13                   THE COURT:  Please be seated.

14                   All right.  Who will be your next witness?

15                   MS. FITZGERALD:  Versata calls Barbara

16   Althoff-Simon by way of her May 8th, 2009 deposition

17   testimony.  Ms. Althoff-Simon is a SAP employee who

18   works in SAP's maintenance and support organization.

19                   THE COURT:  All right.  Thank you.  Get

20   the lights.

21                   (Video playing.)

22                   QUESTION:  Good morning.  Would you please

23   introduce yourself?

24                   ANSWER:  All right.  My name is Barbara

25   Althoff-Simon.  I'm working for SAP AG.  My background

1  is mathematics.  I jointed SAP in 1986, and since then

2  working for SAP in various roles.

3            QUESTION:  Is it possible to sell, on a

4  stand-alone basis, only the pricing functionality

5  contained in sales and -- sales and distribution?

6            ANSWER:  I'm not aware of any situation

7  where we -- where a customer can use it this way.

8            QUESTION:  So technically, it is

9  impossible to sell only the pricing functionality in

10  sales and distribution?

11            ANSWER:  I mean, the -- the pricing

12  functionality itself is only part of a process.  So a

13  stand-alone, I have no idea how it -- to use it, just

14  the pricing.

15            QUESTION:  So before SAP begins developing

16  a new feature in one of its products, does it check to

17  see if there's any patents in place that might cover

18  that feature?

19            ANSWER:  No.

20            (Video clip ends.)

21            THE COURT:  Does that conclude the offer?

22            MS. FITZGERALD:  Yes, it does.

23            THE COURT:  Okay.  Who will be your next

24  witness?

25            MS. FITZGERALD:  Versata calls Melissa

1  McNally by way of her July 31st, 2009, deposition.

2  Ms. McNally is an SAP employee and she's employed by SAP

3  as a client partner.

4            THE COURT:  All right.

5            (Video clip played.)

6            QUESTION:  Good morning, Ms. McNally.

7  Could you please introduce yourself?

8            ANSWER:  My name is Melissa Lynn McNally.

9  I work for SAP America.

10            QUESTION:  Okay.  So from -- from your

11  personal experience, at least half of the customers

12  you've worked with have had customer hierarchies in

13  their SAP system?

14            ANSWER:  Yes.

15            QUESTION:  And so again, from your

16  personal experience, how common is it for customers to

17  have product hierarchies set up in their SAP systems?

18            ANSWER:  They -- they do, all of them,

19  pretty much.

20            QUESTION:  Okay.  So Colgate did have a

21  form of a customer hierarchy, as you just described, it

22  just wasn't the default SAP customer hierarchy?

23            ANSWER:  That's correct.  It -- it was --

24  that was more complex than they needed, so we kept it a

25  very simple parent-child relationship and built a Z

1  table to do it.

2          QUESTION:  Okay.  Other than Colgate, can

3  you -- can you recall the names of any other SAP

4  customers that you've worked with that didn't have a

5  customer hierarchy?

6          ANSWER:  You know, first of all, from the

7  hands-on consulting, which is what I would be speaking

8  to because that's -- that's what I would know, I don't

9  recall anybody that didn't have a customer hierarchy of

10  some kind.  The question is whether they used SAP or

11  not.  And quite honestly, I don't remember that from all

12  the customers.

13          (Videoclip ends.)

14          MS. FITZGERALD:  That concludes the offer.

15          THE COURT:  All right.  Who's your next

16  witness?

17          MS. FITZGERALD:  Versata now calls

18  Mr. Wolfgang Nieswand.  Mr. Nieswand is employed by SAP

19  and he is a software developer.

20          (Videoclip played.)

21          QUESTION:  What is the smallest module

22  you're aware of within SAP ERP 2005 that would include

23  the code for product hierarchies, customer hierarchies,

24  and access sequences?

25          ANSWER:  From the technical perspective?

1          QUESTION:  Yes.

2          ANSWER:  ERP.

3          QUESTION:  The whole thing?

4          ANSWER:  Yep.

5          QUESTION:  So if less than 1 percent of

6     the ERP code relates to pricing, what's the smallest

7     unit of pricing code or the module or whatever you want

8     to call it, that will do pricing, product hierarchies,

9     customer hierarchies and access sequences?

10          ANSWER:  No, once again, I think that

11    smallest module you cannot identify.  It's spread among

12    the system.  So if you run pricing, it does not make

13    sense only to run pricing in the sales, but you also

14    need to bill at some point in time.  So where's the

15    border?

16          QUESTION:  So it's your testimony, then,

17    that it's impossible or impractical to identify the

18    smallest unit of code within ERP 2005 that's capable of

19    performing pricing, using product hierarchies, customer

20    hierarchies, and access sequences?

21          ANSWER:  In that general sense, if you

22    want to execute the -- the business process using

23    pricing, I think that's almost impossible, yes.

24          QUESTION:  One thing we discussed a little

25    bit in your last deposition is you were involved in the

1  development of the SPE, the sales pricing engine,

2  correct?

3           ANSWER:  Correct.

4           QUESTION:  And the SPE eventually became

5  the pricing code or pricing functionality that's in CRM

6  and IPC, correct?

7           ANSWER:  I would phrase it, once again,

8  differently.  So SPE became part of the so-called

9  Internet Pricing Configurator, or the IPC, and that --

10  that's a component was embedded in the CRM solution.

11           QUESTION:  You talked a little bit about

12  how it would be possible to use R/3 2.2 in various ways.

13  Do you recall that testimony earlier today?

14           ANSWER:  Yes.

15           QUESTION:  I believe you've explained that

16  it was possible to use R/3 2.2 to do pricing, correct?

17           ANSWER:  Yes.

18           QUESTION:  There -- there was product

19  hierarchy functionality in R/3 2.2; isn't that right?

20           ANSWER:  Functionality for the creation or

21  for the maintenance of product hierarchies was existing

22  at that point in time.

23           QUESTION:  And what about with respect to

24  customer hierarchies?

25           ANSWER:  Same thing.

1          QUESTION:  The same statement as --

2          ANSWER:  Same statement as for product

3    hierarchies.  So the functionality was existing at that

4    point in time and is still existing.

5          QUESTION:  With respect to the products

6    that are accused in this case, the current products --

7          ANSWER:  Okay.

8          QUESTION:  -- is it possible to use those

9    products without utilizing the pricing functionality?

10         ANSWER:  Yes.

11         QUESTION:  Is it possible to use those

12   products without creating product hierarchies?

13         ANSWER:  Yes.

14         QUESTION:  Is it possible to use those

15   products without creating customer hierarchies?

16         ANSWER:  Yes.

17         QUESTION:  Is it possible to use those

18   products without using hierarchical access sequences?

19         ANSWER:  Yes.

20         (Videoclip ends.)

21         MS. FITZGERALD:  That concludes the offer

22   for Mr. Nieswand.

23         THE COURT:  Okay.  Who is your next

24   witness?

25         MS. FITZGERALD:  Versata calls Dr. Andrei

Hagiu, as its next witness, also by deposition.

Dr. Hagiu was retained by SAP to act as an expert

witness for SAP in this case.

(Videoclip played.)

QUESTION:  Good morning.  Please state your name.

ANSWER:  Andrei Hagiu.

QUESTION:  And what do you do for a living, Dr. Hagiu?

ANSWER:  I teach at Harvard Business School.

QUESTION:  Okay.  What do you teach?

ANSWER:  Business strategy.

QUESTION:  And you have been hired by SAP as an expert witness in this lawsuit, right?

ANSWER:  Correct.

QUESTION:  Okay.  What was your assignment?

ANSWER:  My assignment was to prepare an expert report pertaining to the -- the nature of competition and -- of the -- in the enterprise software industry as relates to the case at hand.

QUESTION:  Is it easy or hard for large companies to implement an ERP system like SAP's?

ANSWER:  Can you define what you mean by

1  easy?

2         QUESTION:  Sure.  Fast and cheap?

3         ANSWER:  Then the answer is no.

4         QUESTION:  You know for a fact, don't you,

5  that a large company that wants to implement a SAP ERP

6  system will typically spend months, if not years, and

7  millions, if not hundreds of millions of dollars, doing

8  that?

9         ANSWER:  Yes, I do.

10         QUESTION:  Is SAP CRM software module a

11  single functioning unit or is it a compilation of

12  discrete pieces of functionality that could be sold

13  separately if SAP chose to do that?

14         ANSWER:  I think it is neither.  Precisely

15  because SAP is selling a software platform, some CRM

16  functionalities are essential to the customers and to

17  third-party application developers.  The value -- the

18  value of SAP's products, and in particular of its

19  platform, resides in integration across these different

20  platform modules and different products that others --

21  that the customers and third-party developers can use.

22  I don't think you can -- I don't think one can

23  characterize CRM as a stand-alone product.  It has a

24  more complex relationship with the other products and

25  the SAP -- and with the SAP platform.  Because some of

those modules cut across different products.

QUESTION: So is it your opinion that CRM is a single-functioning unit that -- that may interact with other aspects, but a single-functioning unit in itself or is it your view that CRM is comprised of a bunch of specific pieces of functionality that if SAP chose to do it, that they could sell individually to customers?

ANSWER: Again, I think the choice is too binary. I don't think it would be feasible. It would be neither technologically nor from a business standpoint, I don't see how SAP could sell different fractions of the CRM module.

QUESTION: You'll agree with me, won't you, that ERP enterprise software is characterized by very high switching costs?

ANSWER: Correct.

QUESTION: And you'll agree with me, won't you, that it's not unusual for a large company to spend over a hundred million dollars implementing an ERP system, right?

ANSWER: Correct.

QUESTION: It can take months or even years to do that, right?

ANSWER: Correct.

1             QUESTION:  And if you're a manufacturing

2     company like Procter & Gamble, it is an incentive for

3     you to buy SAP's enterprise software if more of your

4     suppliers and customers also use SAP, right?

5             ANSWER:  To some extent, yes, that's true.

6             QUESTION:  It makes doing business easier

7     if the buyers and the sellers and the distributors are

8     on the same general software platform?

9             ANSWER:  Yes.

10            QUESTION:  And from SAP's standpoint, it

11    has an incentive to get more people on its platform so

12    that it can increase the direct network effects of its

13    software, right?

14            ANSWER:  Sure.

15            QUESTION:  Paragraph 81 at the very -- at

16    the bottom of Page 33, you write that:  Versata's

17    pricing technology would have been an ideal product to

18    create a partnership and obtain better SAP integration.

19            Do you stand behind that statement?

20            ANSWER:  Yes.

21            (End of video clip.)

22            MS. FITZGERALD:  That concludes the offer.

23            THE COURT:  Okay.  All right.  Who will be

24    your next witness?

25            MS. FITZGERALD:  Versata rests.  No

further witnesses.

THE COURT:  Okay.  All right.  Ladies and gentlemen, you've heard all of the evidence in the Plaintiffs' case-in-chief and we're going to now start hearing evidence in the Defendants' case-in-chief.

So Mr. Melsheimer, call your first witness.

MR. MELSHEIMER:  May it please the Court, Your Honor, and pursuant to the -- to the previous stipulation, we call Dr. Stephen Becker as an expert witness.

THE COURT:  Okay.  Dr. Becker come around, please.

(Witness sworn.)

MR. MELSHEIMER:  May it please the Court.

THE COURT:  Mr. Melsheimer.

STEPHEN BECKER, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MELSHEIMER:

Q.   Dr. Becker, please state your name for the Jury.

A.   My name is Stephen Becker.

Q.   Dr. Becker, what were you asked to look at in this lawsuit?

A.   I was asked to review the opinions of Versata's

1   experts, conduct my own analysis, and reach conclusions

2   about whether those expert opinions that they've offered

3   as they relate to damages are reasonable.

4       Q.   We'll get into more detail later, but is it

5   fair to say that you were looking at the Trilogy or

6   Versata experts to see if their analysis from a -- the

7   standpoint of your expertise, which we'll get to in a

8   minute, was reasonable?

9       A.   Yes.

10      Q.   So let me give you a chance to talk about

11  yourself a little bit, Dr. Becker.  What do you do for a

12  living?

13      A.   I am a professional economist.  I own a

14  consulting firm in Austin called Applied Economics.

15      Q.   Tell the Jury about your educational

16  background.

17      A.   Well, I started out first with an undergraduate

18  degree in computer science and engineering, thought I

19  was going to be a software engineer and got a degree

20  in -- in that and did it for a while.  And then I went

21  back to school in Austin and got a Master's degree, an

22  MBA in Finance, from U.T. Austin.  And since I grew up

23  in Austin, born and raised there, I kind of wanted to

24  stick around, so I came back for graduate school again

25  and got a Ph.D. in Public Policy from U.T. Austin.

1    Q.    What was the focus of your studies for your
2  Ph.D. in public policy?
3    A.    I studied particularly a field called
4  econometrics.
5    Q.    What is econometrics?
6    A.    Econometrics is the practice or the -- the
7  field of taking the -- kind of the -- essentially the
8  tool kit that economists have, sort of the hammers and
9  saws and screwdrivers that economists use and applying
10  those to real world problems to answer important
11  questions about what's going on in the -- in the economy
12  or in the world.
13    Q.    When did you get your Ph.D. from the University
14  of Texas?
15    A.    1998.
16    Q.    Did you write a thesis for that Ph.D.?
17    A.    I did.
18    Q.    What was your thesis about?
19    A.    My thesis looked at the question, one of these
20  real world problems I looked at was whether spending
21  more money and providing more resources on public
22  education, particularly elementary and secondary
23  education, whether that would provide better outcomes,
24  better student outcomes.
25    Q.    What did you find out?

1    A.   I found out that if intelligently spent, that

2    those resources would provide better outcomes.

3    Q.   In doing your thesis for your Ph.D., did you

4    come across some statistical information that you found

5    to be misleading or not giving the -- the correct

6    impression?

7    A.   Yes, I did.

8    Q.   Tell the Jury about that.

9    A.   Well, really the -- the motivation to do this

10   study was the fact that economists and policymakers for

11   several decades have been looking at data, looking at

12   this question, and many, many of them were coming to the

13   conclusion that spending -- or essentially that money

14   doesn't matter when it comes to getting better student

15   outcomes.

16   Q.   And what did you conclude?

17   A.   Well, I concluded two things.  One, that it

18   does matter; and more importantly I concluded through my

19   research, that it was the statistics that were causing

20   them -- the misleading statistics that were causing them

21   to reach that conclusion, not what was really going on

22   in the classroom.

23   Q.   How were the statistics misleading that you

24   studied?

25   A.   Well, it turned out that most researchers were

using data that was far too broad and too generalized to

answer this question about whether if you give a teacher

more resources, can that teacher provide a better

outcome for the students in his or her classroom.

Q.   Did you write up your results?

A.   Yes.

Q.   Was it published?

A.   Yes, it was -- I published my dissertation --

Q.   Now, did --

A.   -- like all dissertations.

Q.   -- did the results of that -- of that

dissertation square with your -- your common sense and

experience?

A.   They did.  The --

Q.   How so?

A.   I grew up in a house full of teachers; both my

mother and father were school teachers, and both of my

sisters are involved in education.  So in our house, I

think everybody understood that if you give a teacher

more resources, they can get a better result.  So that's

what really had motivated me to go do this study.

Q.   What did you do after you got your Ph.D. from

the University of Texas in 1998?

A.   I formed Applied Economics, the firm that I

currently have.

1    Q.   Have you ever testified before as an expert in

2  a lawsuit?

3    A.   Yes.

4    Q.   How many times?

5    A.   I've been retained as an expert in over a

6  hundred lawsuits.

7    Q.   Have you ever testified in connection with a

8  patent case?

9    A.   Yes.

10   Q.   How many?

11   A.   More than two dozen.

12   Q.   Have you ever testified here in Marshall,

13  Texas?

14   A.   Yes.  This is, I believe, my fifth time in this

15  courtroom.

16   Q.   All right.  How about elsewhere in the Eastern

17  District?

18   A.   I've testified in Tyler and in Texarkana a

19  number of times.

20   Q.   Have you been accepted as an expert by the

21  Court in all those cases?

22   A.   Yes.

23   Q.   And what has been just the general subject

24  matter of the expert testimony you've provided, just in

25  a general way?

1    A.   Well, in, as you indicated in a prior question,

2 over two dozen of those cases were patent infringement

3 cases, and my subject matter in all of those was the

4 damages part of the case, either reasonable royalty or

5 lost profits.

6    Q.   Have you ever worked as an expert, an economic

7 expert, in a case involving software?

8    A.   Yes.

9    Q.   How many?

10   A.   Oh, at least a half a dozen.

11   Q.   Do you have any particular professional or

12 educational expertise in software?

13   A.   Yes.

14   Q.   What's that experience?

15   A.   Well, I -- as I indicated earlier, I have an

16 undergraduate degree in computer science and

17 engineering.  I conducted my research in school on

18 software engineering and first job out of school was as

19 a software engineer for Schlumberger, the oil field

20 services company.

21           After that -- after I left Schlumberger, I

22 formed a small software company of my own and spent many

23 years writing software.

24   Q.   Now, when you were in school or in your

25 professional life, have you received any honors or

1  awards?

2      A.    Yes.

3      Q.    This -- this is no time to be modest, so go

4  ahead.

5      A.    Well, when I was an undergraduate, I was at the

6  University of Pennsylvania, something known as a

7  Benjamin Franklin Scholar.  There are a handful of

8  students that are invited to be Benjamin Franklin

9  Scholars each year and I was a Ben Franklin Scholar for

10  all four years that I was there.

11            The last two years at the University of

12  Pennsylvania, I received the award for the top

13  engineering student in my junior year and top

14  engineering student in my senior year that the faculty

15  votes on within each department.

16      Q.    Are you -- are you a member of any professional

17  organizations or societies?

18      A.    Yes.  I'm a member of the American Economic

19  Association, the American Finance Association, and the

20  Licensing Executive Society.

21      Q.    What do you like to do for fun?

22      A.    Well, when I'm not working or driving my

23  teenage kids around, I like to fish and spent about 10,

24  12 years singing in a gospel choir.

25      Q.    Now, Mr. -- or Dr. Becker, you're a married

1  man?

2      A.    Yes.

3      Q.    Been married for 17 years?

4      A.    Yes.

5      Q.    Got two teenage daughters or sons?

6      A.    Daughter and a son.

7      Q.    Daughter and a son, all right.

8            Now Dr. Becker, I want to go back to what

9  you were asked to do in this case and I believe you told

10 us that your work involved determining whether the

11 Trilogy experts were being reasonable in their analysis

12 and their conclusions, right?

13     A.    Yes.

14     Q.    Now, I take it to come to -- to -- to be able

15 to evaluate that, you had to do some work?

16     A.    Yes.

17     Q.    What did you have to do and what did you go

18 about doing?

19     A.    Well, the first thing I did was to read the

20 Versata expert reports that each of their experts filed

21 and read their depositions.  In the case of

22 Mr. Weinstein, I attended his deposition and that gave

23 me an understanding of what they had done and what their

24 opinions were.

25            I also read hundreds, if not thousands, of

documents in this case and analyzed a substantial amount

of data and also conducted some independent research of

my own.

Q.    Why did you do all that?

A.    Well, I wanted to see whether the facts and

assumptions that Trilogy's experts were using as the

basis for the damage claim that they're making here were

reasonable.

Q.    Did you charge for your time, sir?

A.    Yes.

Q.    Now, can you tell the Jury how many hours you

spent doing all the things you did to get ready for your

testimony here today?

A.    I honestly stopped counting at about 200 hours.

I've personally spent over 200 hours on the case.

Q.    All right.  Now, looking at what you looked at,

looking at the Versata expert reports, looking at the

documents that have been produced by the parties, the

testimony that's been taken in the case, and some

independent work that you did on your own, did that put

you in a position to determine whether the Versata

position in the case as advocated by their experts was

reasonable?

A.    Yes, I think it did.

Q.    What did you conclude?

1    A.    I conclude that the lost profits claim that

2 they're making here that I heard Mr. Weinstein explain

3 just before me is not reasonable.

4    Q.    Why do you -- are there -- is it -- is it -- is

5 it unreasonable in two different ways?

6    A.    Yes, it is.

7    Q.    What's the first way it's unreasonable?

8    A.    Well, it's unreasonable because it is not

9 consistent with the facts in the case as I sort of see

10 them on the -- in the record that I reviewed.

11    Q.    And is it unreasonable in the sense of whether

12 they're entitled to lost profits?

13    A.    Yes.  It -- as -- as we heard the discussion

14 earlier, lost profits is a particular form of recovery

15 in a patent case, and you essentially have to be

16 eligible for it.  The Plaintiff has, as I understand the

17 law, has to prove certain things, and based on my

18 analysis, I concluded that they -- those conditions for

19 receiving lost profits have not been met.

20    Q.    Dr. Becker, did you help us prepare some slides

21 over the evening to help guide us through your -- your

22 testimony?

23    A.    Yes, I did.

24    Q.    All right.  Let's take a look at Slide 2.  Now,

25 this was your assignment to review and examine the

1  expert opinions of Versata, review the evidence and

2  determine if they were reasonable, correct?

3      A.    Yes.

4      Q.    Did you do all that?

5      A.    I did do all that.

6      Q.    All right.  Now, we're going to skip to your

7  conclusion, which is Slide 8.  And after you reviewed

8  their expert opinions, reviewed the evidence and

9  conducted analysis, you concluded that Versata lost

10  profits opinions are unreasonable; is that right?

11      A.    That's correct.

12      Q.    So let's talk about that in a little more

13  detail.  I want to make sure that we're both on the same

14  page.  Are they unreasonable in the sense of they --

15  they're not entitled to lost profits, in your view based

16  on the evidence?

17      A.    That's one primary reason.

18      Q.    And is the calculation of how they did it, how

19  Mr. Weinstein did it, do you take any issues with that?

20      A.    Yes, I do.

21      Q.    Okay.  So we'll talk about that a little bit

22  later.  But let's first talk about these Panduit factors

23  that we heard something about from Mr. Weinstein.

24              Dr. Becker, Slide 9, is this the Panduit

25  factors that you understood Mr. Weinstein considered and

1  that, in fact, you considered?

2      A.   Yes.

3      Q.   All right.  So what are these factors?

4      A.   Well, first one, demand for the patented

5  product, you've got to prove that.

6              They need to prove that there were no

7  acceptable alternatives to the patented feature.

8              Third, that they had the manufacturing and

9  marketing capability to exploit the demand.  That means

10  they would -- would have been able to sell the product.

11             And fourth, you have to be able to

12  reasonably determine how much profit they would have

13  made if you meet the first three conditions.

14     Q.   We're going to go through these, Dr. Becker,

15  but just at a fundamental level, what -- what

16  fundamental question are these factors trying to answer?

17     A.    Well, this set of four factors, if you sort of

18  boil them down, really what it's asking is if in 2003

19  SAP's product, its ERP system, had not had this feature,

20  would Trilogy have reasonably made sales of Pricer to

21  anybody.

22     Q.   All right.  Now, let's take a look at these

23  first two Panduit factors; demand for the patented

24  product and no acceptable -- acceptable substitutes.

25  Does it make sense to sort of consider those together?

1    A.    I think it does.

2    Q.    Tell the Jury why you say that.

3    A.    Well, demand for a product depends in

4  significant part on the price of the product.  And so

5  what a consumer would consider as an alternative, say

6  no, I don't think I'll buy that, I'll buy something

7  else, is wrapped up with the price of the product as

8  well.

9           So you can't really evaluate whether

10  there's demand for something unless you are also

11  thinking about what they would switch to if you gave

12  them -- sort of made an offer to them of buying a

13  particular product.

14    Q.    Did you and I talk about an example that might,

15  you know, illustrate this circumstance --

16    A.    Yes.

17    Q.    -- that maybe some of the Jurors might be

18  familiar with?

19    A.    Yeah.  Yeah, I think a -- a good example in

20  terms of this concept of demand depends on more than

21  just, you know, somebody being willing to buy it.

22           Flat screen TVs today, you could go get a

23  flat screen TV at Walmart for $300.  If that same TV was

24  offered today, exact same, say a 36-inch TV for $3,000,

25  I think most consumers would find plenty of

1    alternatives, right there on the rack or maybe at

2    another store, but the demand for the $3,000 flat screen

3    TV is going to depend on its price and the alternatives.

4        Q.    Now, in other words are you saying that today

5    you might have demand for a flat screen TV at $300, but

6    maybe not at three or five or $10,000, correct?

7        A.    Correct.

8        Q.    Was there a time, just to take this example,

9    where there was demand for a flat screen TV at five or

10   $10,000?

11       A.    Sure.

12       Q.    Tell us about that.

13       A.    Well, when flat screen TVs first came out, you

14   know, they were something new and different and the

15   early adopters, the people who really, really wanted to

16   have a flat screen TV and had special needs for it or

17   just, you know, were one of those people, like I've got

18   some friends like that who really want to have the

19   latest gadget, there were people who would buy a $3,000

20   flat screen TV.  But over time the market has evolved

21   such that I don't think you would find any, in a given

22   size range, at that price that they were five or 10

23   years ago.

24       Q.    Well, if somebody that was selling an early

25   flat screen TV for three or $5,000 showed up today and

1  with the same kind of features and functions and said I

2  want to sell my flat screen TV for three or $5,000, what

3  would happen?

4      A.   They wouldn't sell any.

5      Q.   Would it be -- but what if the guy came back to

6  you and said, well, wait a minute.  I sold a lot of

7  these televisions when they first came out for three or

8  four or $5,000 that must mean I can sell them for three

9  or four or $5,000 today?

10      A.   Well, I think they find in the marketplace the

11  market would say no, that's -- you can't do that.  What

12  you sold it for three to five years ago, particularly if

13  the market has moved -- has evolved, what you sold it

14  for before was not relevant.  You have to look at the

15  point in time that you're assessing the question about

16  demand and alternatives.

17      Q.   Do markets change over time?

18      A.   Absolutely.

19      Q.   Does technology change?

20      A.   Yes.

21      Q.   Does that affect a demand for a product

22  patented or not?

23      A.   Yes.

24      Q.   Now, did you study the question of whether in

25  2003 to 2010, and that's the -- that's the so-called

damages period in the case; is that right, sir?

A.   Yes.

Q.   Did you study whether there was demand for the patented feature here such that there were no acceptable alternatives?

A.   Yes.

Q.   All right.  Now, can you summarize for the Jury, and let's take a look at your -- at your next slide, please, sir.  Let's actually go to -- all right.  Well, let's actually go to 10 for just a second.  Slide 10.

Okay.  This is actually a summary of your opinions that we're going to get to in a minute, but -- so you're saying they're not eligible and even if they were be eligible they're overstated and that's some of the detail we're going to get into --

A.   Yes.

Q.   -- does that make sense?  All right.  So let's go to Slide 11.  And what does this say?

A.   Well, these -- this summarizes some of the key thing that I -- excuse me -- find important to this question about whether in 2003 to 2010 anybody would have bought the Trilogy product if it was offered, particularly if it was offered at the prices from back in 1998.

1    Q.    Do you need some water, Dr. Becker?

2    A.    I've got some.

3    Q.    Okay.  So the first bullet point there, no

4    evidence that anyone purchased from SAP because of the

5    patented feature.  Why is that important?

6    A.    Well, that's one of the -- you know, as an

7    economist we look at -- at -- go around looking for

8    evidence of people having demand for things.  And if

9    this feature were important, I would expect out of the

10   thousands of customers -- excuse me -- that SAP has,

11   that this might have been the basis for at least

12   somebody saying that's why I'm going to buy SAP.  And

13   there's no evidence that I've found anywhere in the case

14   that anybody ever purchased SAP because of the feature.

15   Q.    Did Mr. Weinstein find any such evidence?

16   A.    No.

17   Q.    So let's take a look at your -- let me ask you

18   this:  Did you find any Trilogy documents suggesting

19   that people purchased SAP because of this particular

20   feature?

21   A.    No.

22   Q.    Did you find any SAP documents proving that

23   customers bought SAP because of this particular feature?

24   A.    No.

25   Q.    Now, let's look at your next bullet point.  65

1  percent plus of SAP customers never used any element of

2  the patented feature, despite having access to it at no

3  additional cost.

4         What is that referring to?

5     A.    That's referring to this so-called survey that

6  Mr. Bakewell talked about.

7     Q.    All right.  Well, let's talk about that.  So I

8  thought -- I thought that survey, I thought they were

9  trying to use that to show that -- that people did use

10  it.  You're saying that it -- you're saying it suggests

11  that 65 percent didn't use it?

12    A.    Yes, that's -- the survey results would show

13  that at -- at a bare minimum 65 percent are not using it

14  despite having it sort of sitting there in front of

15  them.

16    Q.    And why do you say that?  Why do you say that

17  65 percent just from that survey do not use the specific

18  pricing functionality?

19    A.    Well, there was a bunch of discussion earlier

20  and yesterday about what a yes on that survey meant, but

21  the one thing I think -- I don't think there's any

22  disagreement about is that when a company said no, we're

23  not using hierarchical access or any of the customer or

24  product hierarchies, that meant that that company was

25  not using the feature in any way.  And 65 percent of the

1  customers out of the group that responded said no.

2      Q.    That was 26 out of 40?

3      A.    Yes.

4      Q.    All right.  So what about the 14 customers who

5  answered yes?  Were you here the other day for the

6  testimony of Mr. Bakewell?

7      A.    Yes.

8      Q.    Have you reviewed the deposition questions, the

9  so-called survey?

10     A.    Yes.

11     Q.    Can you conclude that -- from the answers and

12 the questions, that customers who answered yes were, in

13 fact, using the specific pricing functionality that's at

14 issue?

15     A.    No, I can't.

16     Q.    Why not?

17     A.    Well, because of the way the question was

18 asked.  They never asked the actual question that would

19 get an answer that would tell us definitively whether

20 anybody was, in fact, doing -- using the capability that

21 was found to infringe, namely, all of those steps

22 combined.

23     Q.    Okay.  And you remember we went through this --

24     A.    Yes.

25     Q.    -- with Mr. Bakewell?

1              And you've got to have all three of these

2    components?

3         A.    Yes.

4         Q.    So if you're just using a product hierarchy in

5    some way, you understand that's not infringing the

6    patent.

7         A.    Correct.

8         Q.    If you're using a customer hierarchy in some

9    way, you're not infringing.

10        A.    That's correct.

11        Q.    If you're using hierarchies, you're not

12   infringing.

13        A.    That's correct.

14        Q.    You have to do all three together to get a

15   price.

16        A.    Correct.

17        Q.    What would have been the right way to ask the

18   question in your opinion?

19        A.    Well, it would have been simple to ask the

20   obvious question:  Are you doing these three things

21   together to generate a price?

22        Q.    Did you hear Mr. Bakewell explain why that

23   question wasn't asked?

24        A.    I heard him answer the question, but I didn't

25   hear an explanation for why the question wasn't asked.

1     Q.    So let me just kind of run through this survey

2   with you, the deposition.  We're calling it a survey.

3   Is it actually -- is it actually a survey?  It's a

4   series of depositions, right?

5     A.    It was a series of depositions.

6     Q.    Okay.

7     A.    I wouldn't call it a survey.

8     Q.    All right.  So -- but from that data that the

9   jury's heard, just taking it at face value, it

10  indicates --

11    A.    Here's a better one.

12    Q.    You have a better one?  Okay.  Thank you.

13          Start out by concluding that 65 percent,

14  there's no use.

15    A.    Yes.

16    Q.    And that's just because you look at the noes,

17  and if you assume no is no, we don't use it as the

18  appropriate questions, it's no use, right?

19    A.    That's correct.

20    Q.    Now, that leaves, by my count, 35 percent left.

21  What can you say about those people, based on this --

22  based on the questions?

23    A.    I'm not --

24    Q.    Can you say anything?

25    A.    No.  We -- we certainly can't say that they

1  are, in fact, using the infringing capability.

2      Q.   All right.  I want to talk a little bit

3  about -- so to get back to your point here, 65

4  percent -- and you say plus, because we know it's at

5  least 65 percent, and with respect to this 35 percent,

6  it's a don't know based on the answers to the questions.

7      A.   That's correct.

8      Q.   Okay.  So 65 percent plus, maybe -- maybe a

9  whole lot more than that, have never used the feature.

10 What does that -- in the way that it's infringing use.

11 What does that tell you about the demand for the

12 patented invention?

13     A.   Well, as an economist, it tells me a tremendous

14 amount about it.

15     Q.   Tell the jury what that is.

16     A.   If -- if someone has available to them a

17 feature that did not -- they didn't have to pay any

18 extra money for it, so it's just sitting there in front

19 of them, available every day they turn on their system

20 to use it, and for three, four, five, six, as many as, I

21 think -- you know, back to 2003, it could have been more

22 than seven years of that being there -- if they never

23 used it, that tells me that the demand for that -- you

24 certainly wouldn't conclude that any one of those people

25 would run out and pay money for it if they had never

used it when it was provided to them at no additional

cost.

Q.   And we had this -- I had this conversation with

Mr. Bakewell.  I want to make sure that you and I are

communicating to the jury.

The use is not what's the infringing part

of it, correct?

A.   Absolutely.

Q.   It's the capability to do it that's the

infringement, right?

A.   Right.

Q.   Why is use important, though, in valuing the

feature?

A.   Well, in term -- determining the value to the

customer, and in particular in this lost profits

question, remember the fundamental question.

We're sort of imagining a world where

SAP's system doesn't have the feature in it, and

sometime during that 2003 to 2010 period, the Trilogy

sales person comes knocking on the door and says:  I

have this system, Pricer, for $1.8 million.  Would you

like to buy it?

If we know, we have the benefit of

hindsight in knowing that for those seven, eight-year

period, people had it at no additional cost and never

1  used it, to conclude that they would answer yes to the

2  proposal to pay $1.8 million for it is just economically

3  irrational.

4      Q.   Is that the same thing as saying it doesn't

5  make any sense?

6      A.   It makes no sense.

7      Q.   Okay.  What about this third bullet point, sir?

8  When you say, by 2003, numerous players in the pricing

9  configuration market, what does that mean?

10      A.   Well, that's going to competition and

11  alternatives.  If in this world, this 2003 to 2010 or

12  2003 to present, we imagine that SAP doesn't have the

13  feature, and we set aside all the people that kind of

14  have already told us by their behavior that they have no

15  interest in the feature, the question is, would they

16  have somewhere else to go, some alternative, if they

17  really wanted complex pricing capabilities that were not

18  provided by their -- not the sort of base part of the

19  pricing at SAP.

20      Q.   Well, let's talk about the marketing in a

21  minute.  But let's talk about the technology changes

22  between 1998 and 2003.

23              Are you with me?

24      A.   Yes.

25      Q.   Okay.  So what changed technology-wise that

1   you're aware of in that -- in that time period?

2      A.   The biggest change is that computers -- big

3   computers, corporate computers, and in particular,

4   laptops and communication speeds all got tremendously

5   faster, tremendously more capable.

6      Q.   Do we have a chart that illustrates that point,

7   sir?

8      A.   Yes.

9      Q.   Explain to the jury what the blue line is and

10  what the gold line is.

11     A.   The blue line is -- this is something that I

12  prepared, went out and found out what an IBM ThinkPad --

13  it's now a Lenovo laptop -- would have had in terms of

14  hard drive capacity and processing speed back in 1998.

15  And we looked at models all the way up through 2005.

16          The blue line is showing the increase in

17  the capacity of the hard drive, and the gold line is

18  showing the increase in the speed of the processor.

19     Q.   Okay.  What -- what impact does this

20  technological change, the incredible increase in

21  computer size -- what -- what -- and speed, what does

22  that have to do with the ability of Trilogy to make

23  sales of its Pricer product?

24     A.   It -- it makes this value proposition that they

25  had, really that they came up with in 1995, '96, in that

1   market of providing speed, flexibility, and

2   disconnectedness with this Pricer product, this trend in

3   the market makes those features or those -- those value

4   propositions less attractive, less important.

5       Q.   Why do you say that?

6       A.   Well, I think Mr. Carter used the analogy of

7   having to go to the grocery store.  Back in '95, '96,

8   '97, the computers were slow enough, and you didn't have

9   much storage space on your laptop, so you'd have to go

10  to the store and get one thing at the grocery store and

11  bring it home and go to the store again and bring it

12  home, and his invention provided a way to sort of bring

13  more groceries home at once.

14          Today, or certainly even by 2003, you

15  could put the whole grocery store on the laptop.  So the

16  importance of saving those trips to the store is vastly

17  diminished, if not gone all together.

18      Q.   Now, what about -- we've heard some testimony

19  about the internet, the growth of the internet between

20  '98 and 2003 and really up to the present.  Does the --

21  does the development of the internet have any impact on

22  what's going on in the marketplace?

23      A.   Absolutely.

24      Q.   Tell the jury why that is.

25      A.   Well, back, again, to the -- to what -- how

1  much would this sales pitch resonate with customers in

2  the 2003 to 2010 time period?

3           And we've heard that one of the things

4  they were sort of selling is the ability to put your

5  pricing system on a laptop, because you were

6  disconnected, couldn't communicate with the home office

7  out at a sales site.

8           With the internet, we're pretty much

9  connected all the time.  And certainly today with --

10  laptops can stay connected to other computers through

11  the internet.  So the value of being able to function in

12  a disconnected way is greatly diminished.

13  Q.   Let's talk about competition in the

14  marketplace.  What was happening in the competition of

15  the marketplace in 2002 and then looking at after

16  Trilogy's patent was issued in 2003?

17           First, what are we -- what are we

18  displaying for the jury here, an excerpt from

19  Exhibit 1596.  Tell us what's going on here.

20  A.   This is a graph from this Gartner research.

21  Gartner tracks this -- this market, the sales and

22  pricing configuration market.  They put out a report

23  every year.

24           This is 2002 where we see Trilogy, along

25  with a large number of other companies, providing price

1 configuration systems, as well as other things that go

2 with that, like sales configuration.

3          MR. MELSHEIMER:  May I approach the

4 witness, Your Honor, and hand him a laser pointer?

5          THE COURT:  Yes.

6     Q.   (By Mr. Melsheimer) Dr. Becker, is Trilogy on

7 this chart?

8     A.   Yes.  Trilogy is right there (indicates).

9     Q.   Who else is on the chart?

10    A.   Well, we've got SAP, Siebel, Oracle, a company

11 called Firepond, J.D. Edwards, Click Commerce, iBaan, a

12 lot of different companies.

13    Q.   Does -- does -- is the Gartner Group a

14 reputable group for market analysis and valuation?

15    A.   Yes.

16    Q.   Do they put companies in these boxes that have

17 no business being in there?

18    A.   No.

19    Q.   Okay.  So they put competitors.

20    A.   Yes.

21    Q.   And so this is -- and just so we're clear, we

22 know it's for sales configuration, which includes

23 product and pricing configuration --

24    A.   Yeah.

25    Q.   -- or sometimes it's pricing configuration

1  only, right?

2      A.   Yes.

3      Q.   And Pricer is a pricing product, correct?

4      A.   Yes.

5      Q.   Now, what had happened just a year later -- so

6  I want you -- I want the jury's attention to be focused

7  on Trilogy there.  What had happened just a year later

8  to the marketplace?

9      A.   If we look at this same report in February of

10 2003, we have many of the same companies.  Trilogy is

11 not on there anymore.  And in the actual Gartner report,

12 it says that Trilogy had changed its strategy and had

13 basically exited this market space.

14     Q.   Now, we -- we -- we heard some testimony about

15 the problems Trilogy was having selling Pricer, and we

16 heard some testimony that they had, in fact, abandoned

17 the market for Pricer.

18               Do you recall that?

19     A.   I was here for that.

20     Q.   Who said that?

21     A.   Mr. Carter.

22     Q.   Now, the patent was issued in April of 2003; is

23 that right?

24     A.   Yes.

25     Q.   Now, this report is done as of what date?

1 A. February 2003.

2 Q. So as of February 2003, where is Trilogy in the

3 marketplace for pricing and configuration software?

4 A. They've -- they're not in the market.

5 Q. Let's just be clear.  Here they are in 2002

6 right in the middle there, and by 2003, Gartner doesn't

7 even list them.

8 A. That's correct.

9 Q. Before this patent's ever issued, right?

10 A. Yes.

11 Q. Now, are the companies that are in this

12 competition, the companies that are in the marketplace

13 for pricing -- there has been some testimony that, well,

14 these companies were no good; they weren't really able

15 to do the -- the pricing that companies need.

16  You heard that from some of the Trilogy

17 witnesses, didn't you?

18 A. Yes.

19 Q. All right.  Did you look behind some of this

20 data to determine if, in fact, the competitors on here

21 were providing complex pricing?

22 A. Yes.

23 Q. Do you have a slide that illustrates what you

24 found?

25 A. Yes.

1    Q.   Let's take a look at that.  What -- what is
2  shown on our first slide?
3    A.   Well, the first one here is -- basically what I
4  did is, I went and looked for customer quotes or
5  anything that would tell me what particular customers
6  these folks were selling to and whether there was any
7  evidence that they were doing complex pricing with
8  these -- with the offerings of these companies.
9              We see here i2, DCM.  This says that it
10 allows Toshiba to easily author and publish parts and
11 material descriptions online, manage pricing details to
12 ensure they only see appropriate pricing levels and keep
13 catalog content updated in realtime.
14              If you go to the next one, this --
15   Q.   This is this -- I wanted to ask you about this
16 one, because this is the funniest name, Blue Martini.
17   A.   Yeah.  I don't know who came up with that name,
18 but they --
19   Q.   All right.  Blue Martini, what are they doing?
20   A.   Well, we can see that they're providing the
21 ability to handle complex pricing.  The customer quote
22 there was:  In addition to providing better service
23 across all business units, we wanted something that
24 would manage and streamline our vast product catalog,
25 complex pricing structures, and tens of thousands of

1 promotions.

2                    So the very same sorts of complex things

3 that Fortune 500 companies are having to deal with, Blue

4 Martini is providing that to this particular customer.

5     Q.    What about Comergent Technologies?

6     A.    Comergent, we see that they're also doing --

7 providing access to product information, realtime

8 pricing and availability for Maytag through the

9 e-commerce side of Maytag.

10                    MR. MELSHEIMER:  And just for the record,

11 this is all from DX3010.

12     Q.    (By Mr. Melsheimer) What about iBaan?

13     A.    Well, iBaan and their customer relationship

14 management system is providing Hitachi advanced

15 functionality, including more tightly integrated

16 configuration, quote building, accurate, fast, and

17 repeatable proposal generations, integrated pricing that

18 supports specific pricing rules, and hierarchical

19 discount approvals and forecasting updates -- upsides to

20 help shorten preparation time for executive level

21 meetings.

22                    MR. MELSHEIMER:  I want to focus on this.

23 Can you highlight this phrase (indicates)?

24                    You know what?  I don't think you can

25 because this is in PowerPoint, isn't it?  I apologize,

1  Mr. Barnes.

2      Q.    (BY MR. MELSHEIMER) So let's look at this for a

3  second.  It supports specific pricing rules, territory,

4  customer, special promotions.  So there's a customer

5  hierarchy, right?

6      A.    Yes.

7      Q.    Pricing rules, territory.

8      A.    Yes.

9      Q.    I believe we heard some example about a

10 customer buying a truck in Texas.

11     A.    Yes.

12     Q.    So you had a territory of Texas, a customer

13 buying a truck.

14               Special promotions, you might be having a

15 sales on something --

16     A.    Yes.

17     Q.    -- right?

18               Volume, that just means, you know, if you

19 buy a hundred, it might be cheaper than buying ten --

20     A.    Yes.

21     Q.    -- right?

22               Okay.  So these are -- are these precisely

23 the kind of pricing issues that Mr. Carter described as

24 something Pricer -- was a need in the market Pricer was

25 meant to satisfy?

1    A.    Yes.

2    Q.    And by --

3              MR. MELSHEIMER:  Can we go back one -- can

4    we go back to the original slide?

5    Q.    (By Mr. Melsheimer) And by --

6              MR. MELSHEIMER:  One more.  Now you're

7    going forward on me.  It's back to the original slide.

8    Right.  Exactly.

9    Q.    (By Mr. Melsheimer) The original slide, by

10   February 2003, two months before this patent issues,

11   they're not even listed by the folks at Gartner as being

12   a player in this market.

13   A.    That's correct.

14   Q.    Have you heard any suggestion from any witness,

15   Trilogy or otherwise, that Gartner is either unreliable

16   or doesn't do their homework with respect to this

17   analysis?

18   A.    No.

19   Q.    Now, in addition to other companies that could

20   provide pricing software, were you in the courtroom when

21   Mr. Dholakia talked about Trilogy having to compete

22   against the option that any customer had of simply

23   customizing their SAP installation?

24   A.    Yes.

25   Q.    All right.  What did he say about that?

1    A.   He said that SAP customers -- one of the

2  options that they have, that even back in '98, Trilogy

3  understood that it was competing against, was the

4  customer simply going out and hiring -- either doing it

5  themselves or hiring consultants to provide a customized

6  solution on top of their SAP system.

7            There's a whole sort of business out there

8  in the economy of people that do nothing but provide

9  customizations to SAP systems.

10           So that's an option available to all of

11  SAP's customers that I heard Mr. Dholakia say they

12  understood back in '98 was something they were having to

13  compete against.

14   Q.   What's the significance of the fact that back

15  in '98 and '99 and 2000, up to -- up to February 2002,

16  what's the significance of all this competition out

17  there in the pricing software network?

18   A.   Well, one, it is something that we have to

19  consider in the lost profits question about whether it's

20  reasonable to conclude that if Trilogy shows up in April

21  of 2003 with a 1.8-million-dollar product, anybody is --

22  given the market conditions at that time, is anybody

23  going to say:  Yeah, I think I'll buy that?

24   Q.   So one of the things that Trilogy would have to

25  do in April of 2003 -- and, again, this is -- this

1    but-for imaginary analysis that Mr. Weinstein did,

2    right?

3        A.   Yes.

4        Q.   They'd have to call the people at Gartner and

5    say:  You know what?  We're going to get back into this

6    box.

7        A.   Right.

8        Q.   And they'd be in that box with about a dozen or

9    more other companies, right?

10       A.   Yes.

11       Q.   And they'd be in that box with SAP customers

12   who simply chose to customize their solution to do

13   pricing in a different way.

14       A.   Yes.

15       Q.   Now, I want to talk about -- we talked about

16   Gartner.  I want to talk about Trilogy.

17             Is there any evidence that you've seen in

18   the case and in your review and analysis that Trilogy --

19   again, before they came to court, that Trilogy

20   understood the market conditions and the economic facts

21   they were facing?

22       A.   Yes.

23       Q.   All right.  Let's review some of those

24   documents.

25             First, let's look at Defendants'

1  Exhibit 811.

2              MR. MELSHEIMER:  May I have one moment,

3  Your Honor?

4              THE COURT:  Yes.

5              (Pause.)

6              MR. MELSHEIMER:  May I -- may I approach

7  the witness, Your Honor?

8              THE COURT:  Yes.

9      Q.   (By Mr. Melsheimer) What is it about Exhibit

10  DX811, sir, that informs your analysis that Trilogy knew

11  exactly what was happening in the marketplace between

12  1998 and 2003?

13     A.    Well, this is in September of 1998.  If we look

14  on the third page of this document where you've got it

15  highlighted there, this tells me that they understood

16  that the value proposition, which is just kind of

17  business jargon for how good was the pitch they were

18  making, how likely was it to be accepted, that the value

19  proposition they had was one that had worked, but they

20  understood that it had a very limited appeal.

21     Q.    All right.

22             MR. MELSHEIMER:  Let's go to the next

23  page, the Jeff Wolf e-mail.

24     Q.    (By Mr. Melsheimer) This is an e-mail from

25  Mr. Wolf at Trilogy to Mr. Dholakia.  We heard him

1 testify.

2     A.   Right.  And this one, I -- I think, is pretty

3 significant, because I heard Mr. Weinstein explain that

4 his lost profits model is premised on them entering the

5 market in 2003 as a bolt-on, not positioned as a full

6 suite of capability, that they were going to just bolt

7 on to SAP.

8             And Mr. Wolf here is giving, back in '98,

9 his impression of what the bolt-on value proposition.

10 It says -- My under --

11             THE WITNESS:  If you highlight there.

12     A.   My understanding was that we were trying to

13 sell a bolt-on Pricer solution to existing SAP

14 customers.

15             That's exactly what -- the question we had

16 before us in 2003 is.  What's the attractiveness of

17 bolt-on --

18             It says:  Although there was a lot of

19 interest in this, we learned the hard way that only a

20 few of these companies were willing to pay more than

21 50,000 for this type of functionality.

22     Q.   (By Mr. Melsheimer) And then he talks about

23 they may be able to close a larger number of deals of

24 $500,000.  Would that be with other types of Trilogy

25 software besides Pricer?

1    A.   Well, I think they were clearly trying to avoid

2  having to go all the way down to that 50,000-dollar

3  price point.

4    Q.   At this time, they were a million eight?

5    A.   Yes.

6    Q.   Okay.  And they were having difficulties.

7    A.   Yes.

8    Q.   All right.  Now, let's take a look at one more

9  piece of this e-mail.

10        MR. MELSHEIMER:  Well, actually, let's go

11  to another one.  Let's go to Exhibit 810, Mr. Barnes.

12    Q.   (By Mr. Melsheimer) Now, this is also an e-mail

13  from Mr. Dholakia -- Dholakia (pronouncing) to

14  Mr. Liemandt.

15        Now, you don't see this on a lot of

16  evidence, but it says:  This mail is time critical.

17  Please read and send back comments.

18        So this was a time-sensitive document,

19  right?

20    A.   Yes.

21    Q.   All right.  And is there anything in here that

22  tells you back in -- even a year earlier, back in 1997,

23  what was happening in the marketplace and what Trilogy

24  knew about it?

25    A.   Yeah.  The second -- well, the second full

1  paragraph after that time critical, it starts:  The

2  common thread --

3          THE WITNESS:  If you can highlight that.

4  Right there, that whole -- whole paragraph.

5      A.   So this is the common -- sort of the common

6  thread in the market.  The common thread amongst these

7  companies is, one, that they can do all their pricing in

8  SAP.  And this is a statement about the market before

9  SAP added the hierarchical access functionality.

10          They do want easier maintenance of the

11  data, but they don't have a lot of money to spend on it

12  to make it easier because it's not critical.  The pain

13  ain't big enough.

14      Q.   (By Mr. Melsheimer) Meaning that it's -- the

15  problem that they would be solving is not big enough to

16  pay a bunch of money for it?

17      A.   Yes.

18      Q.   All right.  Now, let's take a look at

19  Exhibit -- Exhibit 514.  We've seen this a couple of

20  times, Dr. Becker.

21          What -- what is it about Exhibit 514, back

22  in 1998, that tells us about what Trilogy understood

23  about demand for their product back in 1998?

24      A.   This document tells us that they -- they had

25  experienced some demand.  And, in fact, if you -- in the

1  middle of the paragraph right above that where it says:

2  Trilogy has been successful at strategically selling the

3  software --

4                THE WITNESS:  Above that.

5     A.    -- to early adopters, because they customize

6  the package and the value proposition for each and every

7  client.  So they did make some sales.

8            The second paragraph tells us what they --

9  their view of what it's going to take to go beyond those

10 early adopters.

11    Q.    (By Mr. Melsheimer) So these are the people,

12 your neighbors or people that you might see at church,

13 who have just got to have the newest, fanciest thing

14 first, and they might pay that extra money for a flat

15 screen TV as opposed to waiting until the price goes

16 down.

17    A.    This is more than just the flat screen TV; this

18 is the custom-built flat screen TV.

19    Q.    So Trilogy has been successful at strategically

20 selling the software to early adopters, because Trilogy

21 customized the package.

22            So it's a fancy version of it?

23    A.    Yes.

24    Q.    And what are the challenges about going

25 mainstream?

1      A.    What they recognized was that their value

2   proposition was going to be very challenging in going

3   beyond those early adopters and that they had -- after

4   eight months of working on the segment, they'd failed to

5   reach acceptance of the mainstream, meaning the

6   customers beyond the early adopters.

7      Q.    What did they say about their success rate?

8      A.    Well, their success rate -- what I read this to

9   say is that their success rate, beyond the early

10  adopters, was about 1 in 40.

11     Q.    All right.  Now, were you here for Mr. Carter's

12  testimony about the possibility and the prospect of

13  selling Trilogy to -- selling Pricer to thousands of

14  other customers who did not run SAP?

15     A.    Yes.

16     Q.    Do you recall he said that?

17     A.    Yes.

18     Q.    What -- what conclusions do you draw from --

19  from that testimony?

20     A.    Again, they -- they lead me to the conclusion

21  that by 2003, this proposition or the -- the pitch of

22  Pricer at $1.8 million was something that just wasn't

23  going to be successful in the marketplace.

24              Otherwise, Trilogy wouldn't have

25  essentially stopped trying to sell it to the thousands

1    of companies that were not affected by SAP's having the

2    feature and the product.

3        Q.    So we might do a little timeline.

4                From 1998 to 2003, what did you find in

5    the marketplace that Trilogy knew about its Pricer

6    product?

7        A.    I found that -- that the evidence says they

8    knew that the value proposition they had in '96 to '98

9    was limited, challenging.

10       Q.    The price is too high?

11       A.    Yes.

12       Q.    Was there a big demand or a small demand?

13       A.    The evidence that I've seen suggests that

14   certainly the demand at $1.8 million was very small.

15       Q.    And what about their success rate in calling on

16   customers during that timeframe?

17       A.    1 in 40.

18       Q.    Now, what about, though, after 2000 -- starting

19   in April of 2003?  The patent issues.  Is Trilogy in the

20   money, able to make a bunch of sales?

21       A.    Not based on any evidence that I've seen.

22       Q.    Have you seen that they've sold a single new --

23   to a single new Pricer customer since April of 2003?

24       A.    No.

25       Q.    Were they --

1    A.    They haven't.

2    Q.    Now, what does that fact -- what does that fact

3    tell you about the reasonableness of Mr. Weinstein's

4    assumption that starting in April of 2003, they could

5    have made six sales that year, eleven or twelve the next

6    year, and then twelve sales all the way through to 2010?

7    What does that tell you about that assumption?

8    A.    It tells me that that's unreasonable and

9    completely unrealistic.

10   Q.    And how do you reconcile that assumption with

11   Mr. Carter's testimony that there were thousands of

12   customers that were not using SAP that they could sell

13   to?

14   A.    You can't -- well, you can't reconcile

15   Mr. Weinstein's position to -- to what Mr. Carter said.

16   Q.    Based on this evidence, can you conclude that

17   Trilogy would have made even one more sale if SAP did

18   not have the specific pricing feature starting in April

19   of 2003?

20   A.    I don't think it's reasonable to conclude that

21   they would, not with the -- with the -- essentially the

22   pitch that Mr. Weinstein has assumed they would be in

23   the market with.

24   Q.    Now, do they get to -- starting in April 2003,

25   do they get to change everything that's happened before?

1    A.    No.

2    Q.    Do they get to put all those companies we saw

3   in that quadrant -- do they get to tell them to get out

4   of business?

5    A.    No.

6    Q.    Do they get to magically fix in 2003 all the

7   technical and integration problems they were having with

8   their software?

9    A.    No.  They have to deal with all that.

10    Q.    Do they get to magically erase all the customer

11  complaints and problems they were having?

12    A.    No.

13    Q.    So as a result of your analysis and study of

14  the evidence, do you conclude that Versata or Trilogy

15  has satisfied either Panduit Factor 1 and 2 for the

16  purposes of determining lost profits?

17    A.    I don't think they have.  I don't believe you

18  can reasonably conclude that they would have made any

19  sales.  Therefore, they haven't satisfied those two

20  factors.

21    Q.    All right.  Let's talk about -- let's talk

22  about Mr. Weinstein's calculations.

23           So the first subject of your testimony was

24  whether they were even eligible for lost profits.

25  That's this issue about whether or not there's demand

1  for the patented feature, and if SAP wasn't offering

2  that feature starting in April 2003, a bunch of people

3  would have flocked to Trilogy and bought their product,

4  right?

5      A.    Right.

6      Q.    That's this demand for the patented invention

7  and then looking at the acceptable non-infringing

8  alternatives, right?

9      A.    Right.

10     Q.    So let's show we're on the same page.  Was

11 there demand for the patented invention?

12     A.    Not in 2003.

13     Q.    Well, but I thought that the Trilogy people

14 said that -- that back in -- back in the mid-'90s and

15 late '90s, they were just blowing and going, making all

16 these sales, and they have that chart that they keep

17 showing that shows them going off the cliff.

18            Doesn't that prove that there was demand

19 for that patented invention?

20     A.    Well, again, it's like our flat screen TV

21 analogy.  The fact that people were willing to buy it in

22 '95, '96, given how -- given laptop speeds and given

23 that -- this sort of state of technology back then and

24 that they were providing this highly customized solution

25 doesn't tell us anything about the market for -- you

1  know, would you sell a 3,000-dollar flat screen TV

2  today?  No.

3      Q.    What about the presence of other alternatives

4  to Trilogy in 2003?

5      A.    Well, the -- the other piece of evidence that I

6  find very significant is that, you know, that cliff

7  dropping off and that whole period of time to the right

8  of that, you've got a substantial part of the market --

9  I think Mr. Carter said thousands of companies -- out

10  there unaffected by SAP's including the feature, and

11  demand from those companies dropped to zero as well.

12              So it kind of tells you what's going on in

13  the market with the reaction to the pitch for this

14  product.

15      Q.    Is any of that SAP's fault?

16      A.    No.

17      Q.    Now, let's look at Mr. -- Mr. Weinstein's

18  opinions.  You, obviously, have some opinions and some

19  analysis that the numbers he did come up with are

20  exaggerated.

21      A.    Yeah.  I believe the 285-million-dollar number

22  is just -- can't be supported at all.

23      Q.    Does this chart summarize why?

24      A.    Yes.

25      Q.    Why don't you go through it with us.

1    A.   First is his price and volume assumptions are

2    unreasonable, so basically what we've been talking

3    about, that to assume that you could take the price

4    value proposition from 1995, '96, '97, '98, and just

5    sort of pick it up and dust it off and show up in 2003

6    with the same sales pitch and expect it to work, I think

7    is unreasonable, given what happened in the market.

8            Second, his profit margin assumptions of

9    72-percent margins on hundreds of millions of dollars of

10   sales are just completely unreasonable.

11   Q.   Now, let's -- I want to talk about that, that

12   profit margin thing, because I talked a little bit about

13   that with -- with Mr. Weinstein.

14           So the -- the 72-percent profit margin --

15   that means for every dollar in revenue, you get

16   72 cents.

17   A.   Yes.

18   Q.   What criticisms can you offer the jury about

19   why that's an unrealistic or unreasonable approach?

20   A.   Well, that's just completely inconsistent with

21   their actual financial performance.

22           I heard Mr. Weinstein say that that was

23   from audited financial statements.  I can tell you, I've

24   seen their audited financial statements, I've seen lots

25   of financial documents from Trilogy, and their level of

1    profitability in any of these years has never even

2    remotely approached that.

3        Q.    For the whole company, they've never even come

4    close to 72 percent?

5        A.    Never.

6        Q.    Now, let me ask you this:  Have you heard the

7    term cherry picking?

8        A.    Yes.

9        Q.    What does that mean?

10       A.    Well, that's to go select the particularly ripe

11   fruit that you want to make a point.

12       Q.    Does it sound like cherry picking to you to

13   pick 10 customers and use that as a profit margin for

14   all the Pricer sales?

15       A.    Yes.  In particular given how large these 10

16   customers are.  I mean, they're -- they're nowhere close

17   to being representative of customers that even if you

18   accept Mr. Weinstein's model are going to pay $1.8

19   million.

20             I think we heard one of them, they said

21   they'd spent $90 million with Trilogy.

22       Q.    Let's take a look at Defendants' Exhibit --

23   Plaintiffs' Exhibit 1308.  Are these some audited or

24   consolidated financial statements that you looked at

25   from Trilogy from 1998, 1997, and 1996?

1    A.    Yes.

2    Q.    Okay.

3    A.    These are the actual Ernst & Young audited

4  financial statements for '96 to '98, the same years that

5  is Mr. Weinstein says he's picking up his actual

6  performance.

7              MR. MELSHEIMER:  Mr. Barnes, can you go to

8  the Bates-numbered page 872, Trilogy 872?

9              There it is.  Thank you.

10    Q.    (By Mr. Melsheimer) What are we seeing here --

11  and, again, is this a document you created?

12    A.    No.  This is the audited financial statements

13  that Ernst & Young provided.

14    Q.    Dr. Becker, that document that Mr. Weinstein

15  relied on, was that something that -- as you understood

16  it, that was kept in the ordinary course of the

17  company's business or that it was -- or was it something

18  that was created for the purposes of this litigation?

19    A.    I don't see any evidence that it could have

20  been kept in the ordinary course of business because it

21  covers such a broad time period, and it's just these

22  selected customers.  I haven't seen any explanation as

23  to why it was created or when.

24    Q.    Did you hear that Mr. Smith helped him put it

25  together?

1    A.    Yes.

2    Q.    Okay.  Let's take a look at -- this is the

3    actual financial statements that the company operates

4    under.

5              What is this telling us about -- and

6    there's a lot of numbers up here, and I know it's

7    getting close to lunch, but you say that Mr. Weinstein's

8    profit margin analysis is exaggerated and unreasonable.

9              I want you, Dr. Becker, to help the jury

10   understand why you think that and take us through this

11   to explain it.

12   A.    Okay.  Let's just use '98 as an example,

13   because that was one of the years in Mr. Weinstein's

14   sort of baseline as you would call it.  I picked that

15   year, because the number is right around a hundred, so I

16   can do the math in my head.  Their revenue, license

17   fees, content revenue, service fees, and maintenance.

18              So these are, with the exception of

19   content, the same things that Mr. Weinstein says they

20   would have sold in this but-for world:  Licenses for

21   1.8, plus consulting and maintenance revenue on top to

22   get it to 5 million a customer.

23              So they -- they actually did take in a

24   hundred million dollars in 1998.  His analysis purports

25   to take into account the cost of the service fees,

research and development, and selling and general and
administrative.

We can see here what happens if you take
those costs actually into account. There's $98 million
of cost against the hundred million in revenue. What
actually generated even operating profit is 6.5 million.
So, basically, 6 percent, not 72 percent.

Q. Okay. Now, is that comparing apples to
oranges, in terms of what Mr. Weinstein did?

A. No. I mean, in terms of the -- the categories,
what he purported to be measuring was the profitability
of license, consulting, and maintenance, after deducting
cost of service, research and development, and selling
and general administrative, and somehow he gets to 72
percent when, if you look at the audited financial
statements, they're only making 6 percent.

Q. And, again, he takes revenues minus expenses
and gets to income in -- in the rough way that he did,
right?

A. Right. In -- in the way he did it, but just
for these top 10 -- you know, their 10 biggest
customers.

Q. Well, but I thought that Mr. Weinstein or maybe
some other witness said, you know, it's just a question
of just print out some more of this software, and you

don't really have that much cost in printing it out or
putting it on a disk and load it up, and you're good to
go.

A.   Well, if this were Microsoft or the kind of
software like Quicken that you might buy at the store --
in the business, we call that shrink-wrap software.

In the shrink-wrap software business, if
you've got a hundred copies and you want to sell the
101st copy, it may be the case that you could get
margins -- you know, drop 70 cents out of every dollar
to the bottom line, because you really are just printing
one more box, making one more copy of the disk.

With this kind of software, particularly
with what Trilogy was doing, they spend an enormous
amount of money just to land the deal, every deal, and
then once they have the deal in hand, it's sort of like
getting a big fish in the boat then the troubles really
start.  Then they had to spend a bunch of money to
actually get the thing on the -- on the stringer.

Q.   And is -- does Mr. Weinstein just assume that
starting in 2003, poof, April 2003, there's -- they're
going to be able to make all these sales and not have
all these associated expenses?

A.   Well, he said -- he's taken into account
selling costs, but there's a tremendously long pipeline

1  in this business to sell.

2  So if April 2003 they start selling, one

3  is, it seems to me, that to be reasonable, you have to

4  assume they'd have to spend some time and money getting

5  the product up to speed so that it would be attractive

6  in that market, that it's going to dust off the 2000 --

7  the 1998 product.

8  But even just the selling cycle being six

9  months or longer, we heard Mr. Carter, I think, say

10 he -- he builds in no delay whatsoever.

11 Q.  Is that reasonable?

12 A.  No.

13 Q.  Is that fair?

14 A.  No.

15 Q.  I want to talk about how Mr. Weinstein got to

16 these 93 customers.

17 THE COURT:  Well, let's -- Mr. Melsheimer,

18 we're going to break for lunch, and we'll pick up there

19 after lunch.

20 MR. MELSHEIMER:  All right.

21 THE COURT:  Ladies and Gentlemen, take an

22 hour and 15 minutes for lunch.  Enjoy your lunch recess.

23 Don't talk about the case.

24 Y'all are excused.

25 LAW CLERK:  All rise for the jury.

1        (Jury out.)

2              THE COURT:  You may step down.

3              THE WITNESS:  Okay.

4              THE COURT:  Folks out in the audience, if

5   any of you has a Blackberry, turn it off when you're in

6   the courtroom.  That will help us a great deal.  We're

7   experiencing some feedback to the mikes.  And I think

8   we've got it under control, but that may be contributing

9   to it.

10             Also, I think we're going to ask the CSOs

11  to come in over the lunch break and see if we can't turn

12  off the -- the mikes that are on the counsel table, shut

13  them off altogether.  That's also attributing to it.

14             But y'all are excused.  If you want to go

15  ahead and come back at 1:00 o'clock to present your

16  motions.

17             MR. MELSHEIMER:  That would be fine, Your

18  Honor.

19             Might I also just put on the record as a

20  housekeeping matter something right now?  I will be very

21  brief --

22             THE COURT:  Yes.

23             MR. MELSHEIMER:  -- which is we would

24  renew and proffer into evidence Dr. Becker's reliance on

25  the account executive interviews and the other data that

1  was excluded by the Court as relevant to use and thus

2  relevant to valuation.

3           And if he were to be allowed to testify,

4  he would describe what is -- what is in our briefing

5  opposing that motion and talk about the interviews that

6  he did showing that -- that -- and his conclusion

7  reflected the lack of use.

8           THE COURT:  All right.  I'll -- if you'll

9  have someone just get me a copy of your oppositions to

10 the motions, and I'll receive those as Court's 3.

11          MR. MELSHEIMER:  Thank you, Your Honor.

12          THE COURT:  Okay.  All right.  I'll see

13 y'all at 1:00 o'clock for presentation of JMOLs.

14          (Lunch recess.)

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10
     /s/_____          May 11, 2011
11   SHELLY HOLMES, CSR
     Deputy Official Court Reporter
12   State of Texas No. 7804
     Expiration Date:  12/31/12
13
     /s/_____          May 11, 2011
14   GLENDA FULLER, CSR
     Deputy Official Court Reporter
15   State of Texas No. 1042
     Expiration Date:  12/31/12
16

17

18

19

20

21

22

23

24

25