IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

VERSATA SOFTWARE, INC.,    ) Civil Docket No.
ET AL                      ) 2:07-CV-00153-CE
                           ) May11, 2011
VS.                        ) 1:00 P.M.
                           )
SAP AMERICA, INC., ET AL   )

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHAD EVERINGHAM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          MR. SAM BAXTER
                            McKool Smith, P.C.
                            104 E. Houston Street
                            Suite 300
                            Marshall, Texas  75670

                            MR. SCOTT L. COLE
                            MR. STEVEN J. POLLINGER
                            MS. LAURIE L. FITZGERALD
                            MR. KEVIN M. KNEUPPER
                            MS. LEAH B. BURATTI
                            McKool Smith, P.C.
                            300 W. 6th Street, Suite 1700
                            Austin, Texas 78701

                            MS. ADA BROWN
                            MR. STEVEN CALLAHAN
                            McKool Smith, P.C.
                            300 Crescent Court, Suite 1500
                            Dallas, Texas 75201

APPEARANCES CONTINUED ON NEST PAGE:

COURT REPORTERS:            SHELLY HOLMES, CSR
                            GLENDA FULLER, CSR
                            Deputy Official Court Reporters
                            100 East Houston, Suite 125
                            Marshall, TX 75670
                            903/935-3868

(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          MR. THOMAS M. MELSHEIMER
                           MR. MICHAEL A. BITTNER
                           Fish & Richardson, P.C.
                           1717 Main Street, Suite 5000
                           Dallas, Texas 75201

                           MR. JOHN W. THORNBURGH
                           MR. JUSTIN M. BARNES
                           Fish & Richardson, P.C.
                           12390 El Camino Real
                           San Diego, California 92130

                           MR. JAMES R. BATCHELDER
                           Robes & Gray, LLP
                           1900 University Avenue
                           6th Floor
                           East Palo Alto, California 94303

                           MR. CHRISTOPHER BUNT
                           Parker Bunt & Ainsworth
                           100 E. Ferguson, Suite 1114
                           Tyler, Texas 75702

<u>P R O C E E D I N G S</u>

1

2    (Jury out.)

3    LAW CLERK:  All rise.

4    THE COURT:  Please be seated.

5    Good afternoon.

6    MR. BARNES:  Good afternoon.

7    THE COURT:  Present your motion.

8    MR. BARNES:  Yes.  So, Your Honor, we're

9  e-filing this as we speak.  Our JMOL motions, we have

10 five main points.

11    First being lost profits.  Under the four

12 Panduit factors, we believe none of the four factors

13 have been met.

14    On Panduit factor number one we believe

15 that there is no evidence of demand for the patented

16 product or the patented feature, as admitted by

17 Mr. Weinstein.

18    Factor 2, believe that there are --

19 there's no proof of absence of commercially acceptable

20 noninfringing alternatives.

21    Factor 3, we believe that there is

22 insufficient evidence of availability to market and sell

23 the -- the Pricer product.

24    And on Factor 4, we believe that there is

25 impermissible speculation in calculating the damages

1 provided by Versata.

2 Also with regard to lost profits, but not

3 any of the Panduit factors specifically, we believe that

4 there is insufficient evidence of competition between

5 the parties, as evidenced by Mr. Carter's admission

6 regarding Versata stopping its sales of the Pricer

7 product before the patent issued.

8 Similarly, we believe that there's no

9 but-for causation in that there is insufficient overlap

10 in the marketplace and insufficient overlap in the

11 features between the SAP product and the Pricer product

12 and we believe it's undisputed that there is a

13 multi-supplier market and because of that there is

14 insufficient evidence to support but-for causation.

15 Along the same lines, we believe that

16 there's no evidence of a cognizable harm for lost

17 profits and that there's no evidence of any usage of the

18 patented feature, nor is there any indication that

19 anyone picked or chose the SAP product as it related to

20 the patented invention.

21 And finally with regard to lost profits,

22 there's no evidence of apportionment of those lost

23 profits between the '400 and '350 patent.

24 With regard to noninfringement, we believe

25 that there was incomplete infringement analysis under

the recent TiVo case.  We believe that there is

insufficient evidence of direct infringement, inducement

infringement, and contributory infringement.

The third point is we believe that there's

no damages prior to the service of the complaint in this

case; in other words, there was a lack of marking.

Fourth argument is we believe that there

is no evidence of reasonable royalty damages.

And last, we would renew all of the issues

raised in our judgment as a matter of law in new trial

motions from the previously trial.

THE COURT:  Okay.

MR. BARNES:  Do you have any questions as

it relates to any of those issues?  I'd be happy to

answer them.

THE COURT:  I do not.  Any response?

MR. COLE:  Yes, Your Honor.

MR. BITTNER:  I have copies for the Court,

if you'd like.

THE COURT:  Okay.  Thank you.

MR. COLE:  May it please the Court, Your

Honor.

I'll respond to the damages ones and we'll

have someone else address the infringement JMOL.

With regard to lost profits, the Panduit

factor one, we believe there is substantial evidence of

demand, both in terms of the Pricer product sold during

the late nineties at the only period of time when it was

at -- sold on an exclusive basis, as evidence of demand

for the -- both the patented product and the patented

invention.

In addition to that, the evidence showed

that SAP has sold the infringing product to over 1,300

customers during the damages period.  We presented

evidence of a customer survey or depositions on written

questions of SAP customers showing that 35 percent of

them use all three elements and another 15 percent,

adding to 50 percent, use two of the three elements and

evidence demand for the patented invention.

We further presented evidence that SAP,

even after being found guilty of infringement, declined

to stop infringing as further evidence of demand of the

patented features as late as 2010.

The second Panduit factor, acceptable

noninfringing alternatives.  We presented substantial

evidence from the testimony of Tom Carter, Chris Smith

and Neeraj Gupta that there were no acceptable

noninfringing alternatives in the marketplace; in

particular, no alternatives that would be suitable to

meet the needs of Tier 1 SAP customers which form the

totality of the pool from which we claim lost sales.

With regard to capacity, we presented substantial evidence from Tom Carter as well as Roy Weinstein that Trilogy had the capacity to make the lost sales claim.

Regarding quantification, Mr. Weinstein proved up the amount of lost profits on a per customer basis and testified that the amounts claimed were all isolated to the value of Pricer as distinct from any other product sold by Trilogy.  And all of the maintenance and consulting revenues depend from the license revenue, which was isolated to the patented invention.

With regard to but-for causation, the evidence shows that our claim is limited to the loss of only 93 of the 1,360 total infringing sales during the period of time.  The evidence further shows we segmented the market and that -- and that therefore the ability to make sales in the targeted market was substantially proved by additional evidence.

And finally, the evidence shows that our lost -- our 93 lost sales represent a lower win rate than the evidence shows, specifically the evidence showed that Trilogy had a 35 percent win rate before the impact of SAP's infringement and that a 35 percent win

rate on SAP's 435 Tier 1 customers that were not Trilogy

customers would be lower than the historical win rate.

And that is additional evidence of but for causation.

Thank you, Your Honor.

THE COURT:  Okay.  Are you going to

address the royalty --

MR. COLE:  Oh.

THE COURT:  -- issue?

MR. COLE:  We -- pursuant to our offer of

proof, we -- we intended to present a royalty analysis.

The Court excluded that.  We did not present a royalty

analysis, although, SAP has told the Jury and indicated

that they will produce a royalty analysis and we reserve

the right to cross-examine if and when they do that.

THE COURT:  Well, are you opposing their

motion for judgment as a matter of law on that point?

MR. COLE:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  Let's hear about

noninfringement.

MR. POLLINGER:  Yes, Your Honor.

Trilogy opposes SAP's motion for JMOL

regarding the infringement by way of the modified

products.

The 2009 infringement verdict is binding

on this trial regarding the modified products.  All the

claim elements have been shown to be met by the -- the

modified products.  The May 2010 change that's at issue,

the patch, does not avoid infringement under any

possible -- under all possible evidentiary standards for

this trial regarding the modified products.  Their

motion is -- is not warranted.

First -- first standard is -- is taking

the 2009 infringement verdict as a given, which is --

which is a must on this trial and comparing it to what

they've changed.  It does not avoid the infringement

verdict.  The TiVo standard he mentions, this is not a

contempt hearing, but if the TiVo standard were to

apply, we have met the TiVo standard.

And he furthermore -- starting from

scratch, we have proven that all the claim elements are

met with respect to the modified products.  We've done

that to establish a literal infringement, direct

infringement of all three claims, and indirect

infringement of Claim 29 by contributory infringement as

well as inducement.

THE COURT:  All right.  All right.  I'll

overrule the motions.  Yes, ma'am?

MS. FITZGERALD:  I was going to respond to

the marking.

THE COURT:  Okay.  Well, I think the

1  evidence is sufficient to support the submission of the

2  issue to the Jury.

3                    MS. FITZGERALD:  Thank you.

4                    THE COURT:  Get them in there in five

5  minutes.

6                    LAW CLERK:  All rise.

7                    (Recess.)

8                    (Jury in.)

9                    LAW CLERK:  All rise.

10                    THE COURT:  Please be seated.

11                    Afternoon, ladies and gentlemen.

12                    Mr. Melsheimer, you may proceed with your

13  examination of Dr. Becker.

14                    MR. MELSHEIMER:  May it please the Court.

15                    DIRECT EXAMINATION CONTINUED

16  BY MR. MELSHEIMER:

17      Q.   Dr. Becker, welcome back.

18      A.   Hello.

19      Q.   So let me finish up your examination with just

20  a couple of questions, all right?  So I've drawn on here

21  a -- a chart that has SAP in one box, and by that I mean

22  customers that were using SAP software.

23      A.   Yes.

24      Q.   All right.  And then on this other box I have

25  Oracle and others, meaning companies, businesses that

1　were using either Oracle to run their enterprises or

2　some other competitor software.  Are you with me?

3　　　A.　Yes.

4　　　Q.　And I've written up here April 2003 and after

5　because we know the patent issued in April 2003 and

6　after.  We know the patent issued in April 2003; the

7　damage period is 2003 to the -- to the present, correct?

8　　　A.　Yes.

9　　　Q.　Now, the fact that there wasn't a single sale

10　to any of these Oracle or other customers in that other

11　box, the fact that there wasn't a single sale of Pricer

12　by Trilogy, what does that tell you about

13　Mr. Weinstein's theory that if SAP had removed the

14　feature in April of 2003, that is to say, if the feature

15　wasn't in SAP software after Trilogy got the patent,

16　that Trilogy would have been able to sell a bunch of

17　customers Pricer after April 2003?

18　　　A.　It tells me that that's unreasonable.

19　　　Q.　Why do you say that?

20　　　A.　Well, that -- just the simple fact of demand.

21　If there were demand for this product from April 2003

22　forward, at least someone in that Oracle and others box

23　would have purchased it.  We've heard testimony that it

24　was -- would solve the same problems for all of those

25　customers as it would for the customers in the SAP box

1  and nobody was buying it.

2      Q.    Now, you heard Mr. Weinstein admit today and

3  Mr. Gupta admit yesterday that not a single customer has

4  ever told Trilogy that the reason they weren't buying

5  Pricer was because SAP had implemented this patented

6  feature.  Do you recall this testimony.

7      A.    Yes, I do.

8      Q.    What does that testimony tell you about the

9  reasonableness of Trilogy's claim here?

10     A.    It tells me that it's not reasonable.

11     Q.    Why?  Tell the Jury why.

12     A.    Well, it's a similar issue, that if -- if the

13 patented feature were causing SAP customers to not buy

14 from Trilogy during the 2003 to 2010 period, you would

15 expect with the very large number of customers that

16 there are, that someone would say in the sales

17 interaction, hey, this is why we're not -- we're not

18 buying it.  SAP has this feature; we're going to get it

19 from them.

20     Q.    All right.  Finally Dr. Becker, you heard

21 Mr. Gupta testify yesterday that after all the Trilogy

22 documents and transcripts that he reviewed, he's not

23 aware of a single communication, written or otherwise,

24 that occurred before this lawsuit was filed in which it

25 was suggested that SAP's adoption of hierarchical access

1   had affected in any way Trilogy's ability to sell

2   Pricer; do you recall that?

3       A.   Yes, I do.

4       Q.   What does that tell you and tell it to the

5   Jury, please, sir.

6       A.   That tells me that Mr. Weinstein's theory that

7   customers would, starting in April 2003, essentially

8   respond to this sales message of Trilogy, that that's

9   just not reasonable and it's inconsistent with that

10  fact.

11      Q.   How is it inconsistent?

12      A.   Well, if -- again, if there were -- if the

13  inclusion of the feature in SAP's product were causing

14  this causal link, were causing people to not buy from

15  Trilogy during the infringement period, I would expect

16  reasonably that you would see something somewhere,

17  either from a customer or internal people who are

18  assessing what's going on in the market, some document,

19  some piece of evidence that says we're losing sales

20  because of SAP having this feature.

21              MR. MELSHEIMER:  Thank you, Doctor Becker.

22              Your Honor, we tender Dr. Becker for

23  cross-examination.

24              THE COURT:  All right.

25              Mr. Baxter?

MR. BAXTER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BAXTER:

Q.   Dr. Becker, my name is Sam Baxter.  I don't think we have met before, have we, sir?

A.   We have once in your office.  You were kind enough to lend me an office.

Q.   Oh, that's right.  Didn't charge you rent either and I should have, if I'd known you were coming.

A.   I think maybe now you're regretting being so hospitable.

Q.   I do.  I do.  I'll never let it happen again.

A.   All right.  I'll forget the code to your front door.

Q.   We're changing it tonight.

A.   All right.

Q.   Let me see if I understand a few things, Dr. Becker.  I started to say since you and I are both U.T. graduates, we had a lot in common until I found out you had honors and all kinds of degrees and I'm still worried about them yanking mine.

         But let me see if I understand this, when we look at lost profits, do we just look at the product and not at the company?

A.   I -- I think in my experience you look at the

product that is asserted as being something that the
sales of which were lost.

Q.   And it's the profit on that product that this
Jury needs to determine, not the profit of a company; is
that right?

A.   Yes.

Q.   Now, these software companies traditionally
have large margins, don't they?

A.   Some do.

Q.   Well, your client, for example, makes at least
50 percent on every sale they make, don't they?

A.   I'd need to see at what level on the income
statement, but certainly there's a margin level that
would be that high.

Q.   Sometimes it's a lot higher than that, isn't
it?

A.   It can be in the industry.

Q.   Okay.  So having a profit rate of 70 percent is
not unusual, is it?

A.   Not at the margin, no.

Q.   Okay.  The information that you went over with
Mr. Melsheimer about what the company's -- company's
overall profit was doesn't apply here, does it?

A.   I think it would.

Q.   Well, that's not what the Jury is going to be

1   asked to determine, is it?

2     A.   The Jury needs to determine the profitability

3   of the Pricer product, I agree with that.

4     Q.   Okay.  And not the company?

5     A.   I agree with that.

6     Q.   Now, when you look at the profit of the

7   company, that doesn't tell you a whole lot about the

8   profit of a particular product, does it?

9     A.   Not necessarily.

10     Q.   Okay.  In fact, the company may be on a -- a

11   spree where they're doing lots of R&D and spending lots

12   of money on a product that may come to fruition in the

13   future that makes them lots of money, but doesn't show

14   up this year, say 1998; is that right?

15     A.   I agree.

16     Q.   Okay.  So when you looked at Trilogy's profit

17   for 1998, that doesn't have anything to do with the

18   profit of Pricer, does it?

19     A.   I would disagree with that.

20     Q.   Okay.  The profit of Pricer is not the profit

21   of the company, is it, Doctor?

22     A.   Correct.

23     Q.   Okay.  That's two different things?

24     A.   Yes.

25     Q.   And one could be high and the other could be

1 low, couldn't it?

2     A.    Correct.

3     Q.    Either way?

4     A.    Yes.

5     Q.    Okay.  So once again, the profit that Trilogy

6 made in 1998 on a company-wide basis doesn't reflect

7 what the profit over the Pricer product is it, does it?

8     A.    Not necessarily.

9     Q.    Okay.  Now, you had your example of flat screen

10 TVs.

11     A.    Yes.

12     Q.    And I think what you said was, well, when flat

13 screen TVs come out, people want them, they're new, but

14 all of a sudden the price falls; is that right?

15     A.    Yes.

16     Q.    Let's assume for a moment, just for a moment,

17 that Sony comes out with the very first flat screen TV,

18 okay?

19     A.    Yes.

20     Q.    And everybody wants it, the price is up, things

21 are going good and then LG comes out with one and lowers

22 the price.

23     A.    I'm with you.

24     Q.    Okay.  Price goes down, doesn't it?

25     A.    Yes.

1    Q.   Then Sony comes to court or gets a

2  determination that LG infringes their patent and they

3  can't make that LG screen anymore.  There's just one.

4  Does the price stay down or can it go back up?

5    A.   It could go back up, but not necessarily.

6    Q.   Well, if you've only got one in the market that

7  really works, that's a good thing to have, isn't it?

8    A.   Yes.

9    Q.   Now, we know in this case, do we not, that

10 these folks over here infringed Trilogy's patents, don't

11 we?

12   A.   We do.

13   Q.   And we know that the product that they put in

14 their solution, their pricing product, absolutely

15 infringes the patent of Trilogy, doesn't it?

16   A.   I understand that, yes.

17   Q.   Okay.  Now, one thing we can find out is that

18 once they found that out, they could just stop making

19 it, couldn't they?

20   A.   Yes, they could.

21   Q.   Didn't do that, did they?

22   A.   Well, I -- I disagree.

23   Q.   Well, they get sued in 2007, they didn't stop

24 then, did they?

25   A.   That's correct, they didn't stop then.

1    Q.   They didn't stop in 2008?

2    A.   Correct.

3    Q.   Didn't stop in 2009, did they?

4    A.   Correct.

5    Q.   Didn't stop in 2010, did they?

6    A.   My understanding is they did in May.

7    Q.   Well, what they did is they wrote a letter to

8 their customers that said:  If you bought our product

9 before May the 6th of 2010, keep right on infringing,

10 didn't they?

11    A.   I'm not sure what that said.  I'm not sure I'll

12 take that characterization.

13    Q.   Well, let me say it again.  They wrote a letter

14 to their customers that said:  If you bought our pricing

15 product prior to May the 6th of 2010, keep right on

16 doing it, didn't they?

17    A.   I'd have to see the document to understand

18 what -- exactly what they said.

19    Q.   You've not looked at the documents they sent

20 out to their customers?

21    A.   Yes, I have.

22           MR. BAXTER:  Okay.  Have you got PX1812,

23 Mr. Diaz?

24    Q.   (By Mr. Baxter)  Is this the note they sent

25 out, Dr. Becker?

1    A.    Yes.

2              MR. BAXTER:  Blow up the top up there for

3    me, Mr. Diaz.

4    Q.    (By Mr. Baxter)  This and the related SAP note

5    implements a change to the functionality of the

6    hierarchical access feature for customer hierarchies for

7    use in pricing; is that what we're talking about?

8    A.    Application of these notes is required, but

9    only for customers who obtain their initial license for

10   SAP after May the 6th, 2010.

11   Q.    Now, does that mean that if you got it before

12   May the 6th of 2010, keep right on going?

13   A.    Yes, sir, it does.

14   Q.    Okay.  Isn't that what I said to begin with?

15   A.    Well, I thought you were saying that they --

16   they told them to continue to infringe.

17   Q.    Well, they are infringing, aren't they?

18   A.    Well, the sale, the original sale of it was

19   found to infringe.

20   Q.    Okay.  The product that they sold that

21   infringes, they told their customers to keep on using,

22   didn't they?

23             MR. MELSHEIMER:  Excuse me, Mr. Baxter.

24   May we have a brief sidebar, Your Honor?

25             THE COURT:  Yes.

```
 1                    (Bench conference.)

 2                    MR. MELSHEIMER:  So, Your Honor, this is

 3  the problem that I raised at the last pretrial, which is

 4  this:  It's not legally accurate nor is it fair for him

 5  to say that we, quote, told our customers to keep on

 6  infringing, because there was a damage award at that

 7  time, and that -- and just like there's going to be now,

 8  and that damage award is going to license those

 9  customers that use product licenses on our products.  So

10  whatever the damages are, that is going to license these

11  customers.

12                    And so it's not fair of him to suggest,

13  well, you just let them keep doing -- keep on

14  infringing.  It makes it sound like we're lawless, and

15  that's not a fair characterization, and it's not

16  consistent with the law of what we're here doing in this

17  trial.

18                    THE COURT:  Okay.  Response?

19                    MR. BAXTER:  It's exactly what they said,

20  Your Honor.  Here they say they don't owe any money.

21  It's exactly what this trial is about.  They don't own a

22  dime.

23                    MR. MELSHEIMER:  We owe 3 million.

24                    THE COURT:  Well, I think it's fair

25  cross-examination.  You can develop it on redirect.
```

1           MR. MELSHEIMER:  Let me just ask you --

2      okay.  So I can ask him -- I'm not asking for an

3      advisory opinion, but I can ask him questions about what

4      his understanding would be if there was a payment of a

5      reasonable royalty that would license a previous user.

6                THE COURT:  Yeah, absolutely.

7                MR. MELSHEIMER:  Okay.  Thank you.

8                (Bench conference concluded.)

9      Q.   (By Mr. Baxter)  Did I get it right,

10     Dr. Becker?

11     A.   Yes.

12     Q.   Okay.  So for customers that already have it,

13     SAP said keep going?

14     A.   Yes.

15     Q.   Now, does that indicate to you that SAP didn't

16     want to take it out?

17     A.   No, not necessarily.

18     Q.   Did it indicate to you that for old customers

19     they didn't want to modify it?

20     A.   Not necessarily.

21     Q.   They didn't, did they?

22     A.   They didn't.

23     Q.   They had that choice, didn't they?

24     A.   They could have, yes.

25     Q.   They said, oh, for you new customers, we're

```
 1    going to try to give you this tool that works around it,
 2    maybe it does, maybe it doesn't; but for you old
 3    customers, the 1,380 of you that's already bought it, no
 4    change?
 5        A.   Well --
 6        Q.   Is that right?
 7        A.   -- I disagree with the first part of your
 8    question.
 9        Q.   Well, you disagree that they said no change?
10        A.   Well no, I disagree that they -- with your --
11    the statement that they were going to give them a tool
12    to work around the change.
13        Q.   They didn't give them a tool to work around it?
14        A.   Well, they -- they said that you're going to
15    have to apply these notes to do it, you -- so that you
16    can't do the hierarchical access function.
17        Q.   Well, you don't know what those notes say at
18    all, do you, Doctor?
19        A.   I -- I have reviewed them.
20        Q.   Okay.  Did -- did you study what it did?
21        A.   I left that to the technical expert.
22        Q.   Okay.  So you don't know?
23        A.   I don't know.
24        Q.   Just like I said?
25        A.   Okay.
```

1    Q.    All right.  So maybe the notes do it, maybe the

2    note -- Jury is going to find and tell us?

3    A.    Yes.

4    Q.    But at least we know that for the ones for the

5    big install base -- in fact, what is that number?

6    A.    1,386.

7    Q.    How many since May the 6th of 2010?

8    A.    I don't know.

9    Q.    So one or two or 10 or what?

10   A.    Oh, how many customers were --

11   Q.    Yeah.

12   A.    -- sold since then?

13   Q.    Right.

14   A.    I -- I'm sure it's probably in the hundreds.

15   Q.    Okay.  So for a hundred, we may give you a

16   tool, it may change it, it may not, but for the vast

17   majority, for 95 percent, don't change it; is that

18   right?

19   A.    You don't have to change it.

20   Q.    Okay.  Well, they told them don't change it,

21   didn't they?

22   A.    They said it's not required.

23   Q.    All right.  And they apparently had the option

24   to try it change it, didn't they, for all their old

25   customers?

1     A.    I would assume that they could have tried.

2     Q.    And they chose -- well, they could have just

3 said use the tool, didn't they?

4     A.    Yes.

5     Q.    No difference between an old customer on May

6 the 5th and one on May the 7th as far as the program's

7 concerned, is there?

8     A.    No.

9     Q.    So they just drew the line in the sand, but for

10 the vast majority they said don't use the tool?

11     A.    Again, they said it wasn't required.

12     Q.    Okay.  They didn't want their customers to have

13 to do it, did they?

14     A.    I -- that might be a reasonable inference.

15     Q.    All right.  Now, I want to talk to you a little

16 bit about the market and whether or not this product is

17 valuable.  That -- by the way, the fact that they told

18 their customers, the 1,380 plus, don't change it, that

19 didn't give you an indication that they think it's

20 valuable and they don't want to meddle with it?

21     A.    No.

22     Q.    Okay.  Did, in fact, SAP think the pricing

23 function was important?

24     A.    I certainly thought pricing was important.

25     Q.    Did they think their program was important?

1    A.    Yes.

2    Q.    Did they go out and want to sell it?

3    A.    Yes.

4    Q.    Okay.  It's not some trivial program, is it?

5    A.    SAP's ERP system, no, not at all.

6    Q.    No, the pricing part of it?

7    A.    Oh, pricing within --

8    Q.    Yes.

9    A.    -- SAP?

10   Q.    Right.

11   A.    That's an important part of SAP.

12   Q.    Pricing is very important to these large

13   companies, isn't it?

14   A.    Yes.

15   Q.    You've been here the whole trial and you heard

16   our witnesses explain what the problem was prior to

17   Trilogy coming up with a way to solve the pricing

18   problem for these big companies, didn't you?

19   A.    I have.

20   Q.    And you don't disagree with any of that, do

21   you?

22   A.    I don't disagree with the characterization of

23   the -- the situation back in '95.

24   Q.    And you've seen all the documents where SAP is

25   very concerned that Trilogy is ahead of them, one step

1  ahead always, haven't you?

2      A.    I have seen those documents, yes.

3      Q.    And SAP was very concerned they get a product

4  out into the market, didn't they?

5      A.    Yes.

6      Q.    And they wanted to stop Trilogy from having

7  their product bolted on to their ERP product; is that

8  right?

9      A.    Yeah, I agree that they viewed Trilogy as a

10  competitor back in those early years.

11      Q.    And they wanted to stop them, didn't they?

12      A.    Yes, like any competitor.

13      Q.    Okay.  And they, in fact, made it incredibly

14  difficult for them to bolt on, didn't they?

15      A.    I'm not sure about incredibly difficult.  They

16  certainly didn't do their work for them.

17      Q.    And they told some customers, if you deal with

18  Trilogy, we're not going to deal with you, didn't they?

19      A.    I'm not aware of that.

20      Q.    Okay.  Well, if they did that, would that be

21  some indication that they thought the product was

22  important and they wanted to get one out, but they just

23  couldn't get it out the door yet?

24      A.    That certainly would be an indication that they

25  were trying to compete with Trilogy.

1    Q.   And they also tried to freeze the market very

2 early to keep people from buying Trilogy, didn't they?

3    A.   I'm not sure what you're referring to.

4    Q.   Well, you've seen all those documents in '97

5 FPB where they said, look, we need to get an

6 announcement out even though we don't have a product.

7 Even though we may be a year or two away from getting a

8 product out, let's tell everybody we got one and it's

9 coming so they won't buy Trilogy's?

10    A.   I'm aware of those documents.

11    Q.   And that's what they did, didn't they?

12    A.   Yes, I'm aware that they did make some

13 announcements before they actually came out with the

14 product.

15    Q.   Well, they did it years before, didn't they?

16    A.   I'd need to see the document to know when.

17    Q.   Okay.  You know they were doing that in '97 and

18 they couldn't get a product out until October of '98,

19 didn't you?

20    A.   Yes.

21    Q.   And they did it for the sole reason of keeping

22 people from buying Trilogy, didn't they?

23    A.   I don't think you could say it was the sole

24 reason.

25    Q.   Well, name another reason.

1     A.   Well, just the announcement to their customer

2 base of a product release a pending product release, is

3 something that you do to enhance your situation against

4 all your competitors.

5     Q.   They didn't have a product, Doctor.

6     A.   They had --

7     Q.   They had no product.  It wasn't like we're

8 fixing to get the cellophane wrapped up on it and ship

9 it, they didn't have it written yet, did they?

10     A.   They didn't have the new release written yet.

11     Q.   They didn't have a release that they eventually

12 put out that infringes our patent written yet, did they?

13     A.   Oh, that -- yes, that's correct, they didn't.

14     Q.   So in 1997, when they said it's coming down the

15 track, they hadn't even built the engine yet, had they?

16     A.   I would agree with your characterization given

17 the circumstance.

18     Q.   So the only reason we can think of is they

19 needed to freeze the market, they needed to freeze

20 Trilogy out until they could finally get something out

21 in the marketplace; isn't that right?

22     A.   I wouldn't agree that that's the only reason.

23     Q.   What was the other reason you had?

24     A.   They are like all companies announcing a

25 product before it comes out in order to get their

1  customers ready and pointed in their direction.

2      Q.   How many companies do you know announce a

3  product, but they haven't built it or designed it yet?

4      A.   There are many companies who telegraph to the

5  market what they're intending to do in future releases.

6      Q.   It's not a future release, they've got no

7  release at all.

8      A.   They had one coming.

9      Q.   Which they hadn't made yet?

10     A.   They hadn't made it yet, that's correct.

11     Q.   In '98 --

12          MR. BAXTER:  Can I see Defendants' 3183,

13  Mr. Diaz?

14     Q.   (By Mr. Baxter)  Have you seen this document

15  before, Doctor?

16     A.   I'd need to blow it up.

17          MR. BAXTER:  Okay.  Blow up the date up

18  here, Mr. Diaz, if we can.

19     Q.   (By Mr. Baxter)  This is 2/6/2008; do you see

20  that?  And the --

21     A.   Yes.

22     Q.   -- attachment has pricing solution road map?

23     A.   Yes.

24     Q.   You see that?

25     A.   Yes.

1           MR. BAXTER:  Go down where it says all in

2    that next paragraph, Mr. Diaz.

3        Q.   (By Mr. Baxter)  It says all, I have set a

4    meeting to discuss the areas of opportunity for our

5    pricing solution.

6        A.   Yes.

7        Q.   The objective of the meeting is to come up with

8    a prioritized list of functionality that should be

9    supported in future releases?

10       A.   Yes.

11       Q.   And it's got an attachment?

12           MR. BAXTER:  Can you go to the next page,

13   Mr. Diaz?  Well, keep going.  There we go.  Now, go down

14   to about the bottom third, it's --

15       Q.   (By Mr. Baxter)  By the way, it says pricing

16   management at the top, doesn't it?

17       A.   Correct.

18       Q.   And about two-thirds down, see where it says

19   integrated pricing engine?

20       A.   I do see that.

21       Q.   And out to the right it's got need and value,

22   doesn't it?

23       A.   Yes.

24       Q.   What's the need for the integrated pricing

25   engine?

1    A.    Very high.

2    Q.    And what is the value?

3    A.    Must have.

4    Q.    All right.  Do they tell you at the back of the

5    document what those mean?

6    A.    Yes.

7         MR. BAXTER:  Can we go to the very last

8    page, Mr. Diaz, and find out what it means.

9    Q.    (By Mr. Baxter)  What does very high mean?

10   A.    More than 75 percent of customers/companies in

11   the market segment need the functionality.

12   Q.    Is that what SAP thought about their pricing

13   solution?

14   A.    Yes.

15   Q.    Okay.  What about the value, what is must have?

16   A.    Functionality is an absolute must; customer is

17   not willing to negotiate.

18   Q.    And that means that the customer, if they're

19   going to get a pricing solution, that has to have the

20   feature, doesn't it?

21   A.    Yes.

22   Q.    Okay.  And that's what they thought about their

23   pricing solution in 2008?

24   A.    Yes.

25   Q.    So they thought that companies had to have it,

1  that the need was very high; is that right?

2      A.    Yes.

3      Q.    Okay.  You don't disagree with that, do you?

4      A.    No, I don't.

5      Q.    Okay.  I want to talk, if I can, just a little

6  while, Doctor, about the competition in the 2003 time

7  frame to 2010.

8      A.    All right.

9      Q.    Now --

10                 MR. KNEUPPER:  I'm just going to fix your

11  podium for you, sir.

12                 MR. BAXTER:  Oh, am I broken?  I'm sorry.

13  I have color-coded myself yellow, Doctor.  You can't

14  even turn a computer on.

15                 MR. MELSHEIMER:  This is the last time.

16                 MR. BAXTER:  Thanks.

17                 MR. MELSHEIMER:  You like it like that.

18                 MR. BAXTER:  I like it.  There we go.

19  Mr. Diaz saved me.

20      Q.    (By Mr. Baxter)  All right.  Doctor, let me

21  talk to you, you had a list in your report, did you not,

22  it's something you pulled out and had little blurbs

23  about them in your report, I want to talk to you about

24  those --

25      A.    All right.

1    Q.   Okay.  The very first one is Chrome; do you

2  remember that?

3    A.   Yes.

4    Q.   And you said that Chrome was an alternative in

5  the pricing solution market; is that right?

6    A.   They -- I said that they have a product in that

7  space.

8    Q.   Okay.  What does Chrome do?

9    A.   Chrome -- I don't have the specifics of what

10 they do.  I think they provide some pricing engines in

11 the automotive sector.

12   Q.   They only turn out an MSRP, don't they?

13   A.   They -- I wouldn't disagree with that.

14   Q.   Okay.  Well, is that the same as this pricing

15 solution, turning out an MSRP?  Is that the same as the

16 Pricer product or the product that infringes that SAP

17 has in its product?

18   A.   It doesn't provide all the same functionality.

19   Q.   It doesn't preserve any of the same

20 functionalities, does it, Doctor?

21   A.   It provides a price quote, but beyond that, I

22 don't know what the similarities are.

23   Q.   Well, the truth is you don't know anything

24 about Chrome, do you?

25   A.   Not -- not anything beyond what Gartner

1  characterized them as.

2      Q.   Well, Gartner had it on that chart, but wasn't

3  it your obligation to see if that really was some

4  alternative in the market?

5      A.   I would agree with that.

6      Q.   And you didn't?

7      A.   I went and looked at whether they were

8  providing pricing.

9      Q.   And did you find out that all they provided

10  was -- was an MSRP?

11      A.   Yes.

12      Q.   And you still said that was a noninfringing

13  alternative to their product and to ours?

14      A.   I don't believe I said that.

15      Q.   You did in your report, didn't you?

16      A.   I said that they present -- provided

17  alternative pricing solutions in the market.

18      Q.   It won't do anything that Pricer does or the

19  product that infringes that SAP has, does it, Doctor?

20      A.   I agree, it won't do all of the same things.

21      Q.   It won't do any of them, will it?

22      A.   I -- I disagree.

23      Q.   Well, if it wants to know what the MSRP for a

24  Ford in Midland, Texas, is and one in Bangladesh, will

25  it tell you that?

1    A.    I don't know.

2    Q.    The truth is that's no competitive product at

3 all, is it?

4    A.    I don't know.

5    Q.    All right.  Salesforce.com, do you know about

6 that?

7    A.    Yes.

8    Q.    Okay.  They don't even have a pricing solution,

9 do they?

10    A.    They provide a platform where vendors can

11 provide any -- a broad array of pricing solutions.

12    Q.    What happens is it provides some sort of

13 customer contact list and if you've got something you

14 can plug it in, but it didn't do pricing by itself at

15 all, does it?

16    A.    Salesforce.com's platform itself doesn't

17 provide pricing.

18    Q.    So it's not a competition if -- if IBM came to

19 Salesforce.com and said, hey, we'd like to have some

20 sort of pricing solution so that we could have our

21 salesman tell you the price no matter where they are,

22 that doesn't work, does it?

23    A.    I disagree.

24    Q.    It won't tell you the price of anything, will

25 it?

1    A.    Through Salesforce.com's platform you can get

2 that.

3    Q.    Not with Salesforce.com code you can't, can

4 you, Doctor?

5    A.    Not with their code, no.

6    Q.    You have to have something else, don't you?

7    A.    Right.  They sell plug-ins.

8    Q.    That's not the same thing, is it?

9    A.    Well, that's actually what I believe Trilogy is

10 asserting that they would have been providing in this

11 time period.

12    Q.    No, they would have had plug-in that would have

13 figured up the price.  This is -- won't do that top,

14 side or bottom, will it?

15    A.    They do provide a platform that provides

16 plug-ins that do pricing.

17    Q.    They don't have a plug-in, do they?

18    A.    The Salesforce.com itself does not have a

19 pricing.

20    Q.    Okay.  It's the plug-in that does the pricing,

21 isn't it?

22    A.    Yes.

23    Q.    So you could take the Trilogy plug-in and it

24 would work, but Salesforce.com doesn't do anything, does

25 it?

1    A.    Salesforce.com itself does not, no.

2    Q.    So that's not a competitive product, is it?

3    A.    I believe it is.

4    Q.    Well, Doctor, you would have to go out and buy

5  a whole new pricing engine and plug it in, wouldn't you?

6    A.    That's the whole point, is that they provide a

7  vehicle to get pricing engines from any number of

8  suppliers.

9    Q.    So you've got to go buy a real pricing engine

10 to plug into their deal, is that it?

11   A.    Absolutely.

12   Q.    You want to maintain that's a competitive

13 product?

14   A.    Yes.

15   Q.    Okay.  PeopleSoft.  PeopleSoft doesn't exist

16 anymore, does it?

17   A.    No.

18   Q.    Okay.  Bought by Oracle, wasn't it?

19   A.    Yes.

20   Q.    And it was just an HR system, wasn't it?

21   A.    Yes.

22   Q.    It didn't have a pricing system, did it?

23   A.    I honestly don't know.

24   Q.    Okay.  Well, in your report and a while ago on

25 the chart, you told the jury that was a viable

1  alternative; You want to take it back now?

2      A.   No.  It's what Gartner characterized them as

3  providing in the market.

4      Q.   But you don't know?

5      A.   I don't know the specifics of their offering.

6      Q.   Well, you don't know, in fact you agree it

7  doesn't even have a pricing system, does it?

8      A.   I don't know.

9      Q.   Okay.  iBaan, they don't sell a stand-alone

10 pricing system, do they?

11     A.   They don't.

12     Q.   Now, they don't exist anymore either, do they?

13     A.   That's correct.

14     Q.   Okay.  Don't even have their own website, do

15 they?

16     A.   That's correct.

17     Q.   You can't pull it out and it won't stand alone,

18 will it?

19     A.   Correct.

20     Q.   Okay.  JD Edwards, they don't exist anymore

21 either, do they?

22     A.   I don't believe they do.

23     Q.   Who has them?

24     A.   I'm not sure.

25     Q.   Oracle, isn't it?

1    A.    That's right.

2    Q.    Okay.  No website, no JD Edwards anymore, is

3    there?

4    A.    Correct.

5    Q.    Okay.  And they never were a plug-in system,

6    were they?

7    A.    No, they weren't.

8    Q.    Okay.  Not now?

9    A.    Correct.

10    Q.    Okay.  Oracle is the same way, isn't it, no

11    plug-in system, you either buy the whole Oracle suite or

12    you get nothing?

13    A.    That's correct.

14    Q.    All right.  Blue Martini, it doesn't exist

15    anymore either, does it?

16    A.    I believe that's right.

17    Q.    It got bought by somebody, didn't it?

18    A.    Yes.

19    Q.    Won't even have a website, will it?

20    A.    Correct.

21    Q.    Now, what Blue Martini was is that it was a

22    shopping cart, wasn't it?

23    A.    That was their basic functionality.

24    Q.    It still is, isn't it?

25    A.    Yes.

        Q.   And if you're a mom and pop grocery store, it
might could give you a price, but if you were a big IBM
and you wanted to use Blue Martini, you know what Blue
Martini did, it said, well, what's the price, didn't it?

        A.   It interfaced with the back-end system.

        Q.   It didn't have its own pricing engine, did it?

        A.   I don't know that it did.

        Q.   Okay.  You want to still say that was a
competition?

        A.   They were in the space.

        Q.   They weren't in the Pricer space, though, were
they?

        A.   They weren't providing exactly the
functionality that Pricer was.

        Q.   Well, none of the functionality that Pricer
had?

        A.   Some of it.

        Q.   Okay.  Comergent, it doesn't exist either, does
it?

        A.   That's correct.

        Q.   Now, that was an auction site, wasn't it?

        A.   That was their basic functionality, yes.

        Q.   And they basically started with a price, which
might have been a dollar, and then if somebody bidded
up, the price changed, but it wasn't a pricing engine,

1  was it?

2      A.    That's correct.

3      Q.    You want to say that was competition?

4      A.    Not direct.

5      Q.    How about indirect?

6      A.    Well, it was providing functionality in the

7  pricing space.

8      Q.    Not that any big company could use, could it?

9      A.    Not necessarily.

10     Q.    Well, not -- not necessarily?  It could or it

11 couldn't?

12     A.    Well, a company may want to use that form of

13 pricing and they could go to Comergent for it.

14     Q.    You think IBM has an auction on its product?

15     A.    I don't think IBM does, no.

16     Q.    Do you know of any big company that does it

17 that way besides eBay?

18     A.    I know that there's a number of auction sites

19 on the web, but I can't name anyone.

20     Q.    Ford, Nissan, they don't quite do auction work,

21 do they?

22     A.    No.

23     Q.    None of these big companies do that, do they?

24     A.    No.

25     Q.    It wasn't competition, was it, Doctor?

1    A.    Not directly, no.

2    Q.    Or indirectly?

3    A.    I would agree with that.

4    Q.    Okay.  Click Commerce, you want to say that's

5  competition?

6    A.    I say what I've said with respect to the other

7  ones, that Gartner, the Gartner Group, said that they

8  were in the pricing space at that time.

9    Q.    And that's all you know, isn't it?

10   A.    Well, I'd have to look at the materials in my

11 report to see what companies were using them, but

12 similar situation.

13   Q.    They're a shopping cart, aren't they?

14   A.    Yes.

15   Q.    That's not a Pricer engine, is it?

16   A.    Not of the form that Pricer had.

17   Q.    Doesn't compete, does it?

18   A.    Can't say that it didn't provide some

19 competition.

20   Q.    You think that IBM was buying Click Commerce to

21 get its pricing out to its customers using Click

22 Commerce?

23   A.    I don't think IBM was, no.

24   Q.    Do you think anybody was?

25   A.    Some people were.

1    Q.    You think somebody was buying it to set the

2    prices, to tell people what the prices were?

3    A.    To provide some of their pricing functionality.

4    Q.    Anybody you can name?

5    A.    Let me see if I can name somebody.  Nissan was

6    using them.

7    Q.    Nissan used us, sir.

8    A.    Well, it's -- Nissan was using Click Commerce

9    in 2002.

10    Q.    Not for pricing it wasn't.

11    A.    That's not what their information systems

12    person said.

13    Q.    You want to tell me that you're going to take

14    the oath and swear that Nissan prices their vehicles and

15    puts their prices out on Click?

16    A.    Oh, not their -- not there retail vehicles, no.

17    Q.    Okay.  Anything?

18    A.    Well, the -- the director of information

19    systems for the Nissan Forklift Corporation said that

20    they were using Click Commerce.

21    Q.    I'm sorry, forklift?

22    A.    Their forklift division.

23    Q.    Using it for what?

24    A.    They're enabling dealers to access availability

25    and pricing for the -- for their trucks, parts and

related equipment.

Q.   And that's not a pricing engine, is it?

A.   It's part of one.

Q.   That's a catalog, isn't it?

A.   It's, I'm sorry, what?

Q.   A catalog?

A.   It -- I -- looks like that would include that functionality, yes.

Q.   Siebel, that once again was the full-service deal, it wasn't a plug-in, was it?

A.   Correct.

Q.   They only had basic pricing, didn't they?  As a matter of fact, at one time Siebel's plan was to go -- try to go buy Trilogy's product so they'd have a pricing engine, wasn't it?

A.   Yes, I recall seeing that.

Q.   i2.  Now, prior to 2001, i2 didn't have any pricing, did it?

A.   I don't know what they had before or after 2001 -- before 2001.

Q.   Okay.  And in 2002, they only had basic pricing that couldn't even run on a laptop, didn't they?

A.   I don't know one way or the other.

Q.   And here's how i2 works, its real function is something called price optimization, so that if you ask

1 that program what price should I charge, it might tell

2 you, but it doesn't do the pricing function that Pricer

3 or their product does, does it?

4     A.    I understand that, yes.

5     Q.    Okay.  And you agree with that?

6     A.    Yes.

7     Q.    And those are the ones that you pulled out and

8 made special mention in your report that that was the

9 competition?

10     A.    Yes.

11     Q.    Still want to stand by that?

12     A.    I'll stand by the statement that they were in

13 the pricing configuration space.

14     Q.    And by that you mean they -- if they could

15 display one price, they were competition?

16     A.    They were in that market, yes.

17     Q.    All right.  Now, I want to talk to you about

18 profit margins, if I can just a moment, sir.  I notice

19 that you sent me over some slides that you were going to

20 use and then you didn't do it.  You had a slide about

21 the actual profits of Pricer; do you remember that?

22     A.    I remember -- I know that we had slides that we

23 didn't use.  You'd have to show me which one.

24     Q.    Well, this one.

25     A.    Oh, yeah.

1          MR. BAXTER:  Can you get that one up,

2    Mr. Diaz?

3        A.    That's not Pricer.

4        Q.    (By Mr. Baxter)  That's services, isn't it, for

5    Pricer?

6        A.    It's not for Pricer, no.

7        Q.    Okay.  It's for what?

8        A.    It is for -- my understanding is that the light

9    blue bars are the margins that Mr. Weinstein used and

10   that those are for Trilogy's top 10 customers.  And the

11   darker blue bars are the profits, services profits from

12   a detailed document that provides fiscal '99

13   profitability.

14       Q.    Well, I want to talk to you about that, because

15   you went all over your report on this, didn't you?

16       A.    Yes.

17       Q.    Okay.  Where did you get that document?

18       A.    It was in the production.

19       Q.    You remember what kind of document it is?

20       A.    It was a spreadsheet.  I don't remember exactly

21   which document it was.

22       Q.    Who prepared it?

23       A.    I assume it came from Trilogy.  I don't know

24   who.

25       Q.    And it's a document you used to look at the

same companies that Mr. Weinstein looked at, except you

got a different profit analysis, didn't you?

    A.    Yes.

    Q.    One that today you wouldn't share with the

Jury, right?

    A.    I wouldn't say I wouldn't share.  We didn't.

    Q.    Okay.  For example, you showed that for HP, we

had a negative 2 percent profit; is that right?

    A.    On the consulting services, yes.

    Q.    Okay.  And on NCR, a negative 24 and Prudential

a negative 22; is that right?

    A.    Correct.

    Q.    Now, with these figure you used, did it come

off this spreadsheet; does that look familiar?

    A.    Yes.

    Q.    Who prepared that?

    A.    I don't know who did.  It was in the

production.

    Q.    Was it an accountant?

    A.    I don't know.

    Q.    Did you rely on it?

    A.    I did.

    Q.    Relied on it enough to write all about it in

your report?

    A.    Yes.

1    Q.    All about it to make a slide?

2    A.    Yes.

3    Q.    Okay.

4          MR. BAXTER:  Can you get that up for me,

5    Mr. Diaz?

6    Q.    (By Mr. Baxter)  Did you think it was accurate?

7    A.    I had no reason to believe it wasn't.

8    Q.    Did you examine the document for its accuracy?

9    A.    I examined the document and reviewed it.  I

10   certainly didn't audit it.

11   Q.    Are you a CPA, sir?

12   A.    No.

13   Q.    Do you know how to provide these sheets,

14   prepare them?  Do you know how to prepare these sheets

15   and read them?

16   A.    I have prepared materials like this before.

17   Q.    Any red flags pop up when you started looking

18   at this document?

19   A.    No.

20   Q.    No?  None?

21   A.    None -- none initially.

22   Q.    Well, how about now?

23   A.    Well, I mean, I'm wondering what your concern

24   is with it, but --

25   Q.    Okay.  Well, we're going to -- I'm going to

1    ask.  Okay.  The first thing we find out is just for

2    services, right?

3        A.    Absolutely.

4        Q.    And that's about what, one-third of Trilogy's

5    revenue?

6        A.    Yes.

7        Q.    Okay.  So when you prepared the chart that

8    showed negative stuff, you left out two-thirds, right?

9        A.    I agree that it's left out, but it was clearly

10   noted that we were talking about services.

11       Q.    All right.  Okay.  Let me -- let me look at a

12   couple of them.  Can you look at Lucent --

13            MR. BAXTER:  There you go, look at that

14   one, Mr. Diaz.

15       Q.    (By Mr. Baxter)  Lucent is one of the ones

16   you've got on the chart, isn't it?

17       A.    I disagree that what you've got there is the

18   one I have on the chart.

19       Q.    Well, you -- you added three of them up all

20   together?

21       A.    There's -- there's other Lucents on this

22   spreadsheet.

23       Q.    Well, I want to look at just this one.  We can

24   look at the rest of them.  Can we look at this one?

25            MR. BAXTER:  But I want -- I need to get

1  the whole thing blown up, Mr. Diaz, if you can, all the

2  way across.  Can you do that?  All right.  There you go.

3  You can blow it up even bigger, can't you?  Close

4  enough.

5     Q.   (By Mr. Baxter)  Here's one of the things I

6  noticed.  For Lucent, for example, you showed revenue of

7  $240,000, right?

8     A.   I wouldn't suggest that I showed revenue.  This

9  was Trilogy's document.

10     Q.   What you relied on, what you used, what you

11  wanted the Jury to believe was net profit, that's where

12  you got it from, right here on this chart, wasn't it?

13     A.   Yes.

14     Q.   And it shows a revenue of $240,000, doesn't it?

15     A.   Correct.

16     Q.   What was the profit?

17     A.   As of this date, 100 percent.

18     Q.   So let me see if I understand this right.  You

19  relied on a document prepared by someone you have no

20  earthly idea what their credentials are, right?

21     A.   Yes.

22     Q.   And it showed a service profit of 100 percent?

23     A.   Correct.

24     Q.   Now, you're in the service industry, aren't

25  you, Dr. Becker?

1    A.    Yes.

2    Q.    Have you ever seen a service industry that has

3  the profit of a 100 percent?  That basically means they

4  have no expenses, doesn't it?

5    A.    That's correct.

6    Q.    Now, if you're servicing a software program,

7  that means you've got to send people out to fiddle with

8  it, don't you?

9    A.    Correct.

10   Q.    And generally those people don't do it on their

11 vacation, do they?

12   A.    That's correct.

13   Q.    They generally charge, don't they?

14   A.    They do.

15   Q.    So for this Lucent portion of the contract, how

16 much did the service people charge to generate $240,000

17 worth of income?

18   A.    As of the date of this, it looks like they

19 hadn't charged anything.

20   Q.    Well, date of this, this covers 15 months,

21 doesn't it?

22   A.    Correct.

23   Q.    So you want the Jury to believe that you relied

24 on a document and found it to be accurate that showed

25 income of $240,000 and expenses of zero?

1    A.    Yes.

2    Q.    And you believe that?

3    A.    When you look at the document as a whole, yes.

4    Q.    All right.  So you want to tell me that the

5  service people went out -- how many hours did they work?

6    A.    So far this reflects 200 -- 374 hours.

7    Q.    374 hours and they did it for nothing?

8    A.    I don't think Trilogy did it for nothing.  Just

9  from an accounting standpoint it hasn't hit the books

10  yet.

11    Q.    No, no.  Doctor, in 15 months you want to tell

12  me it hadn't hit the books, they'd paid these people,

13  the work's been done, they've written the checks, paid

14  the Social Security and the income tax and you're saying

15  it hadn't hit the books?

16    A.    I -- We don't know what they billed.

17    Q.    Well, it could be that this is just wrong,

18  isn't it, and unreliable?

19    A.    It could be.

20    Q.    Okay.  But you relied on it?

21    A.    I did.

22    Q.    Okay.  But you didn't figure that out that it

23  was wrong?

24    A.    I -- I don't think that we know that it's

25  wrong.

1    Q.   Well, we know they didn't do it for free, don't

2  we?

3    A.   That's correct.

4    Q.   We know it's over 15 months and that's a long

5  time to wait for the paycheck if you're a service guy,

6  isn't it?

7    A.   Well, actually that's not true the 240,000

8  could have been something that was booked on the last

9  day of September and it -- this isn't necessarily hours

10  that were worked over those 15 months.

11    Q.   Okay.  Well, look at the one, two, three, four,

12  five, six, seven above it.  Are those 100 percent

13  profit, too?

14    A.   Yes, they are.

15    Q.   It shows no expenses for people actually

16  working on those projects, doesn't it?

17    A.   Correct.

18    Q.   You want to tell me those were all done the

19  last day, too, Doctor?

20    A.   They didn't have to be the last day, but

21  they -- I agree, they don't show any expenses.

22    Q.   Well, do you not find it odd that the first

23  eight entries show something that is a physical and

24  actual impossibility?

25    A.   I don't find it odd at all.

1      Q.    You don't?

2      A.    No, not the way this document is sorted.

3      Q.    Well, the document wasn't sorted to show net

4 profit, was it?

5      A.    It was sorted by profit margin from the highest

6 to the lowest.

7      Q.    And it shows for all of these people -- well,

8 it's not just seven, there's eight more, isn't it, shows

9 a hundred percent profit, no expenses whatsoever, right?

10      A.    That's correct.

11      Q.    And you trust it?

12      A.    I take it as an indication that it calls into

13 question Mr. Weinstein's profit margin.

14      Q.    Well, it calls into question the ability of

15 whoever did this to do it, didn't it?

16      A.    No, I disagree.

17      Q.    And it calls into question your reliance on

18 this document, doesn't it, Doctor?

19      A.    I don't think so.

20      Q.    All right.  Let's look at another one.  See the

21 one that says unidentified total?  What do you think

22 that is?

23      A.    Those -- I take that to mean those are

24 customers that in their billing system or project

25 management system, they don't have identified.

1    Q.   A million nine and they can't identify them?

2    A.   Yes.

3    Q.   Is that what you're telling me?

4    A.   Yes.

5    Q.   That's what you took it to mean?

6    A.   Yes.

7    Q.   And you relied on it?

8    A.   Yes.

9    Q.   92 percent profit for folks we don't even know

10 their names?

11   A.   Correct.

12   Q.   And that's what you relied on?

13   A.   Yes.

14   Q.   You ever seen that before in some sort of

15 spreadsheet that was accurate for financial information?

16   A.   Yes.

17   Q.   Unidentified folk?

18   A.   Yes.

19   Q.   Okay.  Let's get over toward the back.  Now,

20 there's a whole bunch of these that show zero profit,

21 isn't it?  Page after page and then a bunch that are

22 negative; is that right?

23   A.   Correct.

24   Q.   Do you believe that to be true?

25   A.   I believe that the document reflects whatever

1  they were booking here.

2      Q.    That's not what I asked you, sir.  Do you

3  believe it to be accurate and true?

4      A.    I have no basis to disagree with this document.

5      Q.    Other than it doesn't make any financial sense,

6  does it?

7      A.    I -- I think the document makes perfect

8  financial sense.

9      Q.    Okay.  Let's look at HP, if you would for me,

10  Doctor, okay?  It shows revenue of $5 million, doesn't

11  it?

12      A.    Correct.

13      Q.    And it shows that we had a negative 2 percent

14  profit; is that right?

15      A.    Yes.

16      Q.    You believe that to be true?

17      A.    No reason to doubt it.

18      Q.    And you -- you think that's true and that's

19  what you depended on?

20      A.    Yes.

21      Q.    Did you look at the real numbers for HP, for

22  example, Doctor, the audited numbers?  What are audited

23  numbers, by the way?

24      A.    Audited numbers are ones where an outside

25  accounting firm has come in and verified the accuracy of

1  the numbers.

2     Q.   Did you look at the real numbers, the audited

3  numbers, of how much money HP had actually paid over

4  this time period and what the profit really was?

5     A.   Their audited financial statements don't show

6  that level of detail.

7     Q.   Did you look at the chart prepared by

8  Mr. Weinstein that used nothing but audited numbers?

9     A.   I looked at the charts prepared by

10  Mr. Weinstein.  I can't take your representation that

11  it's audited numbers.

12     Q.   Well, he said they were, didn't he?

13     A.   He did say they were.

14     Q.   And he'd know, wouldn't he?

15     A.   I don't know what his basis for saying that

16  was.

17     Q.   All right.  What was the service revenue for HP

18  for '96 to 2008 --

19     A.   From --

20     Q.   -- do you know?

21     A.   I'd need to look.

22     Q.   Okay.  Will you look for me?

23     A.   (Complies.)

24     Q.   Let me cut through this fence, was it $22

25  million, Doctor?

1      A.    Services revenue?

2      Q.    Yes, sir.

3      A.    Yes, 22.4 million.

4      Q.    And what was the total amount that HP paid over

5  the same time period?

6      A.    66 million.

7      Q.    $66 million?

8      A.    If my eyes are working.

9      Q.    All right.  And they showed a profit of 41

10  million dollars?

11      A.    Yes.

12      Q.    And these are audited numbers?

13      A.    I can't agree with that.

14      Q.    You don't know?

15      A.    I -- I don't know.

16      Q.    Okay.  Well then, you have no basis to

17  disagree, do you?

18      A.    No.

19      Q.    Okay.  So you don't disagree, you just go I

20  don't know?

21      A.    I would say that they are inconsistent with the

22  audited financials that I have seen.

23      Q.    Have you seen audited financials of what the

24  expenses were it took to get at $66 million worth of

25  revenue from HP?

1    A.   Not HP specifically.

2    Q.   Okay.  Let's look at IBM.  Where is IBM on this

3 chart; do you know?  They make any money on IBM?

4    A.   I don't know whether they're up or down from

5 here.

6    Q.   All right.  Look on Page 2 of this.

7    MR. BAXTER:  Mr. Diaz, if you'll look at

8 IBM, please.

9    Q.   (By Mr. Baxter) It shows a 16-percent ratio,

10 doesn't it?

11    A.   Yes.

12    Q.   Is that right?

13    A.   I see them, yes.

14    Q.   Okay.  Did you look at the audited financial

15 numbers of what the real numbers for IBM were?

16    A.   Again, I've seen the top 10 sheet numbers for

17 them.

18    Q.   $79 million, wasn't it?

19    A.   Yes.

20    Q.   With a profit of 60 million or 77 percent?

21    A.   That's what the document says.

22    Q.   Using audited financial numbers, wasn't it?

23    A.   Again, I understand the representation that

24 they were.

25    Q.   Well, you have no way to disagree with it, do

1  you, Doctor?

2      A.   Only the inconsistency between those and the

3  overall financial statements.

4      Q.   Okay.  You have no way to disagree, do you?

5  You're just guessing now, aren't you?

6      A.   No, I'm not guessing about that.

7      Q.   Okay.  Well, we're guessing that you didn't

8  look to see that the numbers were accurate, did you,

9  Doctor?

10     A.   I compared those to the -- those sheets to the

11  audited financial sheets.

12     Q.   Did you compare what IBM's revenue was?

13     A.   No.  We don't have that in the audited

14  financials.

15     Q.   Okay.  If you looked overall at the top 10,

16  Doctor, you'd find revenue of $778 million, wouldn't

17  you?

18     A.   That's correct.

19     Q.   And you would have profitability of 72 percent,

20  wouldn't you?

21     A.   That's what the document says.

22     Q.   As opposed to your document that we know now

23  doesn't make any sense, don't we?

24     A.   Well, I agree that that other document shows

25  numbers radically different.

1    Q.   Okay.  Now, Doctor, do you think it makes any

2  difference what the lost profits is if, say, somebody

3  suggests hiring a mole?

4    A.   I don't think that would have an impact on lost

5  profits.

6    Q.   Well, I was wondering, because SAP's lawyer

7  yesterday, apparently, wanted to come after Mr. Gupta

8  because he had the bad idea, and then abandoned, of

9  hiring a mole.

10          Did you think that had anything to do with

11  the lost profits?

12    A.   It didn't impact anything in my calculations.

13    Q.   Would that be a bad fact if they had, in fact,

14  hired a mole?

15    A.   I think it would be.

16    Q.   Would be?  Something that SAP would never do,

17  would it?

18    A.   I don't know one way or the other.

19    Q.   If they did, that would be a bad fact?

20    A.   In a general sense, yes, but it wouldn't have

21  impact on the lost profits calculation.

22         MR. BAXTER:  Thank you, Doctor.  I

23  appreciate your time, sir.

24         THE COURT:  Redirect?

25         MR. MELSHEIMER:  Yes, Your Honor.

1          May it please the Court.

2          <u>REDIRECT EXAMINATION</u>

3    <u>BY MR. MELSHEIMER:</u>

4       Q.   Dr. Becker, so that document that you were

5    examined about that Mr. Baxter at the very end said it

6    was your document; was that your document?

7       A.   No, sir.

8       Q.   Where did you get that document?

9       A.   From Trilogy.

10      Q.   And did you present the conclusions that that

11   document reached, whatever they may be, to the jury?

12      A.   No, sir.

13      Q.   So did you take that as criticism of something

14   you didn't say?

15      A.   Apparently, it is.

16      Q.   Okay.  But in any event, those numbers, those

17   figures are not something that you had anything to do

18   with creating, right?

19      A.   Correct.

20      Q.   And they're not something that SAP had anything

21   to do with creating?

22      A.   Correct.

23      Q.   All right.  Now, let me ask you a few other

24   things.

25               So you were asked a bit about this notion

1  of freezing the market, right?

2      A.   Yes.

3      Q.   This idea that if you announce something early,

4  that that's bad, right?

5      A.   Yes.

6      Q.   Okay.  Do you have one of those iPads?

7      A.   I certainly do.

8      Q.   All right.  Do you remember that the -- that

9  Apple announced those -- that the second iPad was coming

10 out months and months before the -- the -- before it

11 actually came out?

12     A.   Yes.

13     Q.   Do you remember when the first iPad came out,

14 that there were months and months of announcements

15 before they actually showed up in the stores?

16     A.   Yes.

17     Q.   I mean, do a lot companies, software and

18 otherwise, announce they're going to have products

19 before they're actually on the market?

20     A.    In fact, I think most do.  Kind of the -- the

21 exception would be surprising the market with your

22 product.

23              MR. MELSHEIMER:  May I have the ELMO,

24 please, ma'am?

25              COURTROOM DEPUTY:  Yes, sir.

1    Q.   (By Mr. Melsheimer) Do you know the phrase

2 sauce for the goose?

3    A.   Yes.

4    Q.   What does that mean?

5    A.   Well, it's having -- sort of have your cake and

6 eat it, too, or what's good for the goose is good for

7 the gander, if I take that to be the meaning you're

8 putting on.

9    Q.   Well, sir, we're showing on the ELMO -- and I

10 was going to try to get my pointer, which I've lost,

11 apparently. We're showing on the ELMO Exhibit 15 --

12          MR. MELSHEIMER:  Thank you,

13 Mr. Batchelder.

14    Q.   (By Mr. Melsheimer) We're showing on the ELMO

15 1523, Exhibit 1523, which is an article from PC Week.

16          Am I reading it right when I say:  The SAP

17 application bridge is available now and is included in

18 the 5,000 cost of SC Pricer; Trilogy is working on

19 similar sets of APIs for application from Oracle and

20 Baan.  What's that last part?

21    A.   No release date has been set.

22    Q.   Do you think that was done to freeze the

23 market?

24    A.   I think it was done for the reasons that all

25 companies announce things, is to let their customers

1  know it's coming.

2     Q.    You went through that Gartner chart with

3  Mr. Baxter.

4     A.    Yes.

5     Q.    Now, let's just be clear what that was.  That's

6  not something you prepared, is it?

7     A.    No.

8     Q.    Who prepared that?

9     A.    Gartner Group.

10    Q.    Have you ever heard testimony from Trilogy's

11 people that that is a reliable and reputable company in

12 the marketing field?

13    A.    Yes.

14    Q.    That they -- lots of companies pay big money to

15 Gartner to get those surveys and studies, right?

16    A.    They do.

17    Q.    All right.  And you remember Siebel being on

18 that chart?

19    A.    Yes.

20    Q.    Now, Siebel the same company that the jury saw

21 Mr. Liemandt and Mr. Gupta exchanging an e-mail about

22 where they were talking about having aggressive strategy

23 to compete with Siebel?

24    A.    Yes.

25    Q.    The notion that they would go over the line?

1      A.   Yes.

2      Q.   The notion that they would use fear,

3 uncertainty, and doubt to compete against Siebel?

4      A.   Yes.

5      Q.   Maybe hire away their people?

6      A.   Yes.

7      Q.   Okay.  Does that sound like two companies are

8 competing?

9      A.   Absolutely.

10      Q.   Now, you were asked a couple of questions about

11 this letter that SAP wrote to its customers in May of

12 2010.  Are you with me?

13      A.   Yes.

14      Q.   And Mr. Baxter characterized that as a "keep

15 infringing."

16      A.   Yes.

17      Q.   Is that the way you read that letter?

18      A.   Not at all.

19      Q.   All right.  Tell the jury how you read that

20 letter.

21      A.   I read that letter to say -- to tell SAP's

22 customers that for any customer after May of 2010 that

23 they were going to be getting a system that was not

24 capable of doing the hierarchical access.

25      Q.   And as far as the people that had the system

1  before May of 2010, isn't that what we're here to pay

2  for?

3      A.    Yes, it is.

4      Q.    So does it make any sense to present a

5  reasonable royalty to pay for nothing and then tell your

6  customers you're going to come rip it out?

7      A.    No, not a bit.

8      Q.    Would a reasonable company ever do that?

9      A.    No.

10     Q.    Isn't that why we're here today, to value

11 the -- that capability within the SAP software for those

12 customers that have it prior to May 2010?

13     A.    Yes.

14     Q.    And if you get a new -- if you're a brand new

15 SAP customer after that date of May of 2010, do you get

16 this -- do you get this capability in your software?

17     A.    No, you don't.

18     Q.    Does that sound like responsible corporate

19 action?

20     A.    Yes.

21     Q.    Is that what you'd expect a company to do, to

22 try to do the right thing?

23     A.    It's what I would expect them to do, yes.

24     Q.    And putting aside whether it is or isn't,

25 that's what we're here to do today is value the prior

1  use of the patented invention, correct?

2     A.   Yes.

3     Q.   And they -- and all the witnesses are being

4  asked this question, and let me ask you:  Is there -- is

5  there any dispute on this side of the world, this side

6  of the table, that SAP acknowledges that we have had

7  that capability that infringes three claims of

8  Mr. Carter's patent, that we've had that in our product

9  since April of 2000 -- we've had it since 1998, and it's

10  been infringing since April of 2003?

11     A.   No dispute.

12     Q.   Any dispute about that anywhere that you're

13  aware of in this courtroom during this trial?

14     A.   Not a bit.

15     Q.   All right.  Now, you were shown a spreadsheet.

16         MR. MELSHEIMER:  Do you have that, Mr. --

17  Mr. Barnes, that spreadsheet of the different pricing

18  solutions?

19     Q.   (By Mr. Melsheimer) Okay.  So let me ask you.

20  Mr. Baster asked -- Mr. Baxter asked you some questions

21  about that, and I think there was --

22         MR. BAXTER:  It's not the first time,

23  Counsel.

24             [Laughter]

25         MR. MELSHEIMER:  That's pretty funny.

1                    [Laughter]

2          Q.    (By Mr. Melsheimer) He asked you some questions

3     about pricing.  There were some references to pricing on

4     here.  Do you see that?

5          A.    Yes.

6          Q.    All right.  I'm not -- integrated pricing

7     engine, price administration, maintenance, mass changes,

8     hierarchy-based price maintenance.

9                    Now, this is in 2008, right?

10         A.    Yes.

11         Q.    Now, are -- are you -- do you know if this

12    describes anything to do with the precise patented

13    capability that's at issue in this case?

14         A.    No.

15         Q.    I mean, these are just terms that use

16    hierarchy-based price maintenance, right?

17         A.    Correct.

18         Q.    We don't know, I mean, if hierarchy-based price

19    maintenance is, in fact, the limited three things that

20    all the witnesses have agreed infringe the patent?

21         A.    Correct.  We don't.

22         Q.    And it's -- is it -- is it accurate or

23    misleading to take these words, like hierarchy and

24    pricing engine, and just equate those with the patent?

25         A.    That would be misleading in my mind.

1      Q.   Now, finally, you were asked a little bit about

2   the profit margins in the case.

3               Now, Mr. Baxter asked you that -- well,

4   isn't it the price of the -- of the -- isn't it the

5   profits associated with this product?

6               Now, why is the profit of the whole

7   company relevant to evaluate the reasonableness of

8   Mr. Weinstein's assessment of the alleged 72-percent

9   profit margin?

10     A.   Well, for one thing, if -- it's kind of a

11  sanity check that if the suggestion is that 93 sales of

12  one product that's a small part of the company -- not

13  necessarily a small part, but a part of the company --

14  is generating some amount of profit and the entire

15  company is generating a vastly smaller amount of profit,

16  it raises a big red flag in my mind that there's

17  something overstated about the suggestion of

18  profitability for the narrow thing.

19     Q.   It's sort of a -- you called it a sanity check.

20  It's kind of a reality check, isn't it?

21     A.   Yes.

22     Q.   All right.  Let's take a look, finally, at a

23  chart that Mr. Weinstein prepared.

24               MR. MELSHEIMER:  May I have the ELMO,

25  please, ma'am?

1          COURTROOM DEPUTY:  Yes, sir.

2     Q.   (By Mr. Melsheimer)  All right.  So I can't

3 remember -- do you remember if Mr. Weinstein showed

4 this?

5     A.   He showed something like that.  I think he had

6 a graph with a line with dots on it, but essentially he

7 had that same thing.

8     Q.   Did Mr. Weinstein produce some slides that he

9 gave to us before he testified that he didn't end up

10 using?

11     A.   Yes, he did.

12     Q.   Okay.  And you produced some slides that you

13 didn't end up using.

14     A.   That's correct.

15     Q.   All right.  So let's -- let's talk about this.

16 What is -- what is reflected on the top here, Trilogy's

17 Actual Experience?

18     A.   Can you zoom it a little bit?  You're cutting

19 it off on the screen.

20     Q.   Okay.  Let's see here.

21     A.   Other way.  There we go.

22     Q.   Okay.  What's -- what's the top part of this?

23     A.   This is the actual experience that

24 Mr. Weinstein says he used as the -- essentially the --

25 kind of the go by, his template for their performance,

1  '96, '97, '98, new customers.

2      Q.   So he went with this go by, this period where

3  there was no patent infringement and no determination of

4  any wrongdoing by anyone, right?

5      A.   Correct.

6      Q.   And he used that to apply as kind of the rate

7  or the projection as to what would happen after they got

8  the patent?

9      A.   Yes.

10     Q.   Now, did you do kind of a reality check on this

11  to help the jury understand some of the unreasonableness

12  in what Mr. Weinstein is projecting?

13     A.   Yes, I did.

14     Q.   So tell me what you did.

15     A.   Well, first, we start with the -- the lower

16  half, Lost Pricer Customers.  I went to Mr. Weinstein's

17  model that adds up to 285 million, and if we look at the

18  profit he says come from just these first three years,

19  it's, I believe, $102 million.

20     Q.   So in three years, starting from scratch,

21  they're going to make $102 million in spite of all the

22  difficulties that we've talked about that they were

23  having and -- in their company during that time period

24  and afterwards, right?

25     A.   Yes, from these sales.

1    Q.   And what is -- what actually happened in

2  Trilogy's actual experience for that -- for the '96,

3  '97, '98 timeframe upon which these numbers are based?

4    A.   The Trilogy actual experience for the whole

5  company, which would include those 8, 11, and 12

6  customers, was $13 million profit, when you add the

7  three years together, at the same level that

8  Mr. Weinstein is saying, kind of an operating profit

9  level.

10    Q.   So when they decide to start selling Pricer

11  again, which they had abandoned, in spite of all the

12  competition and all the other things going on, it would

13  have made 102 million in his world, and in the real

14  world, when they were in their heyday, when they were in

15  their heyday of selling this product, the profits -- the

16  total company profits were 13 million?

17    A.   That's correct.

18    Q.   All right.

19          MR. MELSHEIMER:  Nothing further, Mr. --

20  Dr. Becker.  Thank you.

21          THE COURT:  Additional cross-examination?

22          MR. BAXTER:  Yes, Your Honor, please.

23          Can you get up 3183, again, Mr. Diaz?

24                RECROSS-EXAMINATION

25  BY MR. BAXTER:

1    Q.    Well, Dr. Becker, let's just see how unfair I

2 was.  Mr. Melsheimer said that:  Well, look at this

3 document.  You just can't pick out this one little piece

4 here.

5              Isn't that what he said?  And you agreed.

6    A.    Yes.

7              MR. BAXTER:  Go back to the first page,

8 Mr. Diaz.

9    Q.    (By Mr. Baxter) Let me read it to you again,

10 Doctor, and let's see if it's talking about the

11 infringing product.

12              I've set this meeting to discuss the areas

13 of opportunity for our pricing solution.

14              Does that sound like the infringing

15 product?

16    A.    It sounds like the product that was found to

17 contain the infringing functionality.

18    Q.    This objective of the meeting is to come up

19 with a prioritized list of functionality that should be

20 supported in our future releases.

21    A.    Yes.

22    Q.    And that's the product that infringes, isn't

23 it?

24    A.    Well, I would disagree.  It's the product that

25 was found to contain the infringing functionality.

1    Q.    Well, do you know how to release it without the
2  infringing portions?
3    A.    No.  It's part of -- it has to be part of it.
4    Q.    So what this was talking about was the pricing
5  product that infringed, and what it said was:  And
6  particularly when it came to hierarchy access, it's
7  something that the customer has said we had to have, and
8  don't try to sell it to us without it.
9    A.    That category of functionality that has the
10  must have, I agree.
11    Q.    Was that unfair?
12    A.    Not with respect to the whole category --
13    Q.    Okay.
14    A.    -- but I don't think you can say within the
15  category.
16    Q.    All right.  Now, Doctor, I want to go back to
17  your flat screen TV.  I went through your list of
18  competitors, and we couldn't really find one, could we?
19    A.    Not on that that was a direct competitor, no.
20    Q.    So back to my flat screen TV.  If I've got the
21  patent on the flat screen TV and somebody comes and uses
22  my technology and competes with me, and then they've got
23  to quit, and I got the only one, I've got a pretty good
24  product, don't I?
25    A.    You do.

1    Q.   And if you're infringing, you're supposed to
2  quit, aren't you?
3    A.   Yes.
4    Q.   These folks are supposed to quit, aren't they?
5    A.   Yes.
6    Q.   And they hadn't.
7    A.   In 2003, they hadn't.
8    Q.   Or '4?
9    A.   Not until May of --
10   Q.   Or '5?
11   A.   Correct.
12   Q.   Or '6?
13   A.   Yes.
14   Q.   Or '7?
15   A.   Yes.
16   Q.   Or '8?
17   A.   Yes.
18   Q.   Or '9?
19   A.   Yes.
20   Q.   And we're up to '10, aren't we?
21   A.   Yes.
22   Q.   And they never quit, did they?
23   A.   That's correct.
24          MR. BAXTER:  Thank you, Doctor.
25          MR. MELSHEIMER:  Nothing further of

1 Dr. Becker, Your Honor.

2         THE COURT:  Dr. Becker, you may step down.

3         Call your next witness.

4         MR. MELSHEIMER:  Yes, Your Honor.  We're

5 going -- SAP is going to call Mr. Jack Childs.

6         THE COURT:  Okay.  Mr. Childs?

7         Right there is fine.  Thank you.

8         (Witness sworn.)

9         THE COURT:  Come around, Mr. Childs.  If

10 you don't mind, try to speak into the microphone and

11 keep your voice up.

12         THE WITNESS:  Sure.

13         THE COURT:  Thank you.

14      JACK CHILDS, DEFENDANTS' WITNESS, SWORN

15           DIRECT EXAMINATION

16 BY MR. MELSHEIMER:

17    Q.  Good afternoon, Mr. Childs.

18    A.  Hi.

19    Q.  Introduce yourself to the jury.

20    A.  I am Jack Childs.  Good afternoon.

21    Q.  Where do you work, sir?

22    A.  I work for SAP.

23    Q.  What is your current title or position?

24    A.  Global vice president of product strategy.

25    Q.  What does the global vice president of product

1  strategy do?

2      A.    We look at customer demand.  We look at what's

3  going on in the market.  We look at our research and our

4  innovation and set the path of where our product will go

5  in the future.

6      Q.    All right.  Before we go into a little more

7  detail about that, sir, I want the jury to learn a

8  little bit about you.

9              Where were you born?

10     A.    Thomaston, Georgia.

11     Q.    Where is that?

12     A.    It's just about an hour south of Atlanta,

13  Georgia.

14     Q.    All right.  Did you grow up there?

15     A.    Yes, I did.

16     Q.    Did you go to college?

17     A.    Yes, I did.

18     Q.    Where did you go to college?

19     A.    Duke University.

20     Q.    Did you get a degree from Duke?

21     A.    Yes, I did.

22     Q.    In what subject?

23     A.    Chemistry.

24     Q.    All right.  Were you finished with your

25  education at that point?

1    A.    No.  No.  I went on to Georgia Tech at that
2    point.
3    Q.    When did you go to Georgia Tech?
4    A.    Right after Duke, I went on to Georgia Tech.
5    Q.    Did you get one degree from Georgia Tech or
6    more than one?
7    A.    Two.
8    Q.    All right.  What were your degrees from Georgia
9    Tech in?
10   A.    Bachelor's in chemical engineering and then a
11   master's in chemical engineering as well.
12   Q.    All right.  Did you go to work after you got
13   your last degree from Georgia Tech?
14   A.    Yes, I did.
15   Q.    Who did you go to work for?
16   A.    Yes.  Exxon.
17   Q.    What did you do for them?
18   A.    I was a process control engineer.
19   Q.    What does that mean?
20   A.    We would actually go in and design the
21   automation and the controls for reactors and
22   distillation towers for Exxon.
23   Q.    How long did you work for them?
24   A.    Until '82.
25   Q.    Did you then go to work eventually for GM?

1    A.    Yes, I did.

2    Q.    What did you do for General Motors?

3    A.    I actually developed and ran their engineering

4    systems for Chevy and Pontiac.

5    Q.    All right.  Tell the jury what that means.

6    A.    So the design of the car, all the parts, even

7    the manufacturing and assembly, we would -- the tools

8    that did that were -- whether it be graphic systems

9    or -- or other engineering systems, we would actually

10   develop the code to run those systems and then operate

11   them for the engineers.

12   Q.    At some point, did you join SAP?

13   A.    Yes, I did.

14   Q.    When?

15   A.    That would be 1995.

16   Q.    All right.  Just a little bit about yourself

17   personally, sir.

18                Are you married?

19   A.    Yes, I am.

20   Q.    How long have you been married?

21   A.    25 years.

22   Q.    Do you have any children?

23   A.    Yeah.  Two.

24   Q.    Daughters?

25   A.    Yeah, they are.

 1     Q.    Have they followed you into the engineering

 2 business?

 3     A.    No, I'm afraid not.

 4     Q.    What are they up to?

 5     A.    One's finishing her degree.  The other is --

 6 has just finished a fashion institute and wants to be a

 7 fashion designer.

 8     Q.    All right, sir.  Why did you join SAP in 1995?

 9     A.    I was asked to come over to build the

10 automotive business for SAP.

11     Q.    Was that based on your previous experience --

12     A.    Yes.

13     Q.    -- working at GM?

14     A.    Absolutely, yeah.

15     Q.    What was your first job in that role at SAP?

16     A.    Delphi Automotive was implementing software,

17 and I went in to go help make that project work well and

18 implement it for them -- or with them.

19     Q.    Did you end up then implementing the SAP

20 software at many other companies?

21     A.    Yes, many.

22     Q.    How long did you have that role?

23     A.    Until about 2001.

24     Q.    All right.  Now, how would you describe SAP

25 software to the ladies and gentlemen of the jury?

1    A.   It is hard to describe, because it does so many

2    things, but I usually think in terms of big

3    organizations that need to work together and structure

4    their work together is what we do in our software.

5              So it could be anywhere from HR to finance

6    to sales to logistics to procurement to maintenance and

7    to plan even.  So wide gamut.

8    Q.   Can you give the jury an example of a company

9    that SAP runs that maybe they've heard of?

10   A.   Sure.  A good example, I think, would be

11   Disney, one of those projects I worked on.  They ran

12   their resorts for many years on SAP, so -- to supply --

13   get the supplies, procure things to go into the resorts,

14   HR for the employees, finance.  All the elements that

15   would -- that would support the resorts, we did.

16             And then we actually took that model and

17   used it for the rest of Disney.  Disney's got almost 700

18   companies in the overall corporation, everywhere from

19   ESPN to ABC, a big red boat, you know.  So quite a few

20   different companies.

21             So we took what they had done and used it

22   and put it in really across the globe, 160 countries

23   into those close to 700 companies.

24   Q.   Can you give the jury another kind of business,

25   maybe a manufacturing business, that uses SAP software?

1    A.    Sure.   Another one I worked on was

2  Harley-Davidson.   We started with them looking at how

3  they -- they built the -- the bikes and -- in the

4  manufacturing side and helped them with scheduling and

5  eventually moved into the commercial side of the

6  business for finance, HR, marketing, things like that.

7    Q.    Now, let's talk about other types of

8  organizations, like cities.  Can SAP help run cities?

9    A.    Oh, you bet.  You bet.  Lots of cities.

10    Q.    Does SAP run cities here in Texas?

11    A.    Yeah, close -- I mean, Houston, 23,000

12  employees there had a 3-billion-dollar budget.  We

13  helped manage all their budgets and finance and helped

14  with the scheduling of those employees and the tasks

15  they do.

16    Q.    Now, how about the federal government?  Does

17  SAP do any work with the federal government?

18    A.    Yeah, quite a bit.  Quite a bit.

19    Q.    What's an example of some federal government

20  work the SAP software helps run?

21    A.    We've got some big ones right now with the Navy

22  and the Army, so really massive projects.

23    Q.    How -- how does -- how does the Navy or the

24  Army use SAP to help manage their work?

25    A.    Sure.  Sure.  Navy is a perfect example of

1  this, where we started by their budgeting.  So the goal

2  is to run all their finance and budgets off of SAP.

3  They're at about 50 percent so far.  It takes a while to

4  roll this out.

5            But more importantly, in the logistics

6  side, providing supplies to either U.S. depos or even to

7  the battlefield.  It is -- are the big projects that are

8  going on now.  So we would supply everything from jeeps

9  to medical supplies to the battlefield.

10      Q.   Let me ask you about charities or churches.

11  Can those types of organizations use SAP?

12      A.   Oh, sure, absolutely.

13      Q.   Tell the jury some examples of that.

14      A.   You know, we've got examples like Doctors

15  Without Borders, the Red Cross.  There are several of

16  those kind of nonprofit organizations that do it.

17      Q.   What about -- what about religious groups?

18      A.   Yeah.  There are quite a few churches and

19  organizations, even here in the state.  The Baptist

20  Convention for Texas, they run parts of SAP.

21      Q.   What about colleges or universities?  Do they

22  run SAP?

23      A.   Yeah, they do.

24      Q.   How could SAP software help a college or

25  university?

1    A.    So if you take ones like -- you know, we've got

2  Wake Forest, Duke, Purdue.  All of them use it basically

3  to do their finances and payroll and HR for people.

4            In addition, at Purdue, they even use it

5  to do the scheduling for the classes.

6    Q.    Sounds like SAP is very comprehensive.  Are

7  there -- are there some ways of measuring or describing

8  the size of the software that can give the jury some

9  sense of how many different things it can do?

10   A.    It's a tough description to make it accurate,

11  but we use an example, just the number of screens users

12  could see if you looked at this huge solution, it's like

13  150,000 screens that have been developed.

14   Q.    All right.  And is each screen by itself just

15  one feature or function, or can it be more?

16   A.    It does vary.  You know, if you're doing a W-2,

17  you consider that just one -- one function or feature.

18  But many of the screens go up to, you know, a dozen or

19  so, as far as the features that could be on a single

20  screen.

21   Q.    How many kinds of business organizations can --

22  overall can SAP help work with?

23   A.    We divided up into about 25 different

24  industries, everywhere from banking to insurance to

25  automotive to public sector, just quite a big variety.

```
 1      Q.    Does SAP ever look to improve its software or
 2   add features?
 3      A.    All the time.
 4      Q.    Why do you do that?
 5      A.    Everywhere from responding to customer needs --
 6   I mean, we -- we listen to the customer quite a bit --
 7   to bringing in things we've done in research or the
 8   innovation where we think we can help a company run
 9   better.  We bring that in.
10      Q.    When you add a new feature, do you generally
11   think it will add value?
12      A.    Oh, yes, absolutely.
13      Q.    Do you always get that right?
14      A.    No.  No, we don't.  But we've got a pretty good
15   track record.  So we do pretty well with that.  After a
16   while, you learn the market.
17      Q.    Now, back to your role, how long did you have
18   that job of helping companies implement SAP software?
19      A.    Probably about six or seven years.
20      Q.    How many customers did you personally spend
21   time with over that time period?
22      A.    Probably between 80 and a hundred.
23      Q.    Did your role change at some point?
24      A.    Yes.  Yes, it did.
25      Q.    When was that?
```

1    A.    In 2003.

2    Q.    What happened in 2003?

3    A.    We created a group called Value Engineering.

4    Q.    What is that group?

5    A.    We build business cases for customers.

6    Q.    What is it a business case?

7    A.    We would look at the performance within a

8    company and look for where they could have better

9    improvement in their performance and -- and try to

10   quantify how much it was worth to them.

11   Q.    Would it be a -- is it fair to say that a

12   business case is to help evaluate a potential customer

13   as to whether or not they should buy SAP or not?

14   A.    Yes, absolutely.

15   Q.    So what's the procedure?  How do you go about

16   building a business case for a particular customer?

17   A.    Well, we start out by looking at their

18   performance, and of course, they've got their own ideas

19   on where they want to start.  But we'll come in with

20   that performance view and actually try to define exactly

21   what they're going to do to improve the business, and

22   then with them, they'll decide how much that's worth to

23   them, as far as how much they can save.

24   Q.    So in that process, would you work with

25   potential customers?

1      A.    Oh, yeah, all the time.

2      Q.    And this Value Engineering Group, was it a big

3   group or a small group?

4      A.    It started small, just one or two of us, and

5   then it grew into 250 people, globally anyway.

6      Q.    Were you the leader of that group?

7      A.    Yes, I was.

8      Q.    Now, so how long did you work as head of the

9   Value Engineering Group, from about 2003 until when?

10     A.    Until January of this last year when I moved

11  into this new job.

12     Q.    I want to ask you about the business cases that

13  you were personally involved in.  So how many -- how

14  many of those business cases do you think you were

15  personally involved in?

16     A.    Probably at least a hundred.

17     Q.    And in respect to those hundred business cases,

18  I want to ask you about the role of SAP's pricing

19  features in those business cases.

20            In other words, how often did pricing,

21  just as a general topic, come up?  Are you -- are you

22  with me?

23     A.    Yeah.  Yeah.

24     Q.    Was pricing functionality ever a driver of any

25  of the business cases that you worked with when you were

1  head of the Value Engineering Group?

2      A.    Actually, no, it did not.

3      Q.    Now, are you saying that pricing wasn't part of

4  any of those business cases?

5      A.    No.  No.

6      Q.    Tell the jury what you are saying.

7      A.    What I'm saying is, typically, getting down to

8  pricing features, never made a business case, actually.

9      Q.    So let me ask you, then, would you agree that

10 pricing is important to business?

11     A.    Oh, absolutely, yes.

12     Q.    And you're not -- you're not suggesting

13 otherwise.

14     A.    Oh, no, not at all.

15     Q.    Well, then tell the jury how it is that in

16 these hundred or so cases that you did, the specific

17 pricing features did not play a role in these business

18 cases.

19     A.    I'd probably give it to three factors that

20 drive this.

21     Q.    What's the -- what's the first factor?

22     A.    A lot of times it just wasn't in scope or the

23 company didn't do any kind of intense pricing.

24     Q.    All right.  So what would be a company like

25 that that didn't really do -- or -- or a business

organization that didn't do intense pricing?

A.   Yeah.  You know, you do find that if you talk even with the service industry, that they would have their rates, but they wouldn't have any kind of intense variability in their prices.

Q.   All right.  Now, what about -- what's another reason why pricing wouldn't -- wouldn't typically come up?

A.   It came back to that scope.  So if like at Disney, where you're doing really a big project like that, you'd never get down to that kind of detail in building a business case.  You were much more interested in, how do you combine multiple organizations together or something of that nature.

Q.   Now, is there a final reason why pricing didn't come up in these business cases?  Is it -- is it just that some companies are happy with what they're doing?

A.   Absolutely.  You know, it was the issue of they didn't see a way to improve the way they were doing pricing, and they were happy with the way they were doing it today.

Q.   How long has SAP been offering pricing features and functionality in its software?

A.   A long time, almost since the inception, I mean, from '72.  So almost 40 years.

1     Q.   We talked about improvements a few minutes ago,

2     Mr. Childs.  Have the pricing features and

3     functionalities of SAP been improved from time to time?

4     A.   Yes, they have.

5     Q.   Have you added any new pricing capabilities

6     from time to time?

7     A.   Sure.

8     Q.   Were you at SAP in 1998 when this hierarchical

9     access feature that we've been discussing was added to

10     the software?

11     A.   Yes, I was.

12     Q.   Remind the jury, what were you doing at SAP in

13     1998?

14     A.   I actually was at Eli Lilly installing a big

15     product of theirs at the time.

16     Q.   Did any of the work that you were doing at Eli

17     Lilly involve pricing?

18     A.   We did have the sales.  We were putting in

19     sales for Eli Lilly at that time, yes.

20     Q.   Was there any sort of announcement in the

21     company that you heard when this particular pricing

22     capability was added?

23     A.   Nothing, no.

24     Q.   Were you briefed on it at all?

25     A.   No.

1    Q.    Did you get any training on it?

2    A.    No.

3    Q.    Has there ever been a feature or function that

4  was added to the software that got company wide

5  attention?

6    A.    Oh, sure, sure.

7    Q.    Such as what?

8    A.    Around that exact same time, we were looking at

9  websites and portals, and we were actually releasing

10 our -- our portal edition at that time.

11   Q.    All right.  Now, Mr. Childs, I'm almost

12 finished.

13         You have been here throughout the entire

14 trial; is that correct?

15   A.    Yes.  Yes.

16   Q.    And you're what's -- what's -- you're here kind

17 of as the face of SAP --

18   A.    Right.  Right.

19   Q.    -- all right?

20         Are you comfortable doing that?

21   A.    I guess so.  I guess so.

22   Q.    All right.  Now, you've seen some documents

23 dealing with the discussions between SAP and Trilogy --

24   A.    Yeah.

25   Q.    -- in the late 1990s.  Have you seen those?

1    A.   I have.  I have.

2    Q.   You've also seen some documents, some internal

3 SAP documents, dealing with the decision to add this

4 feature in 1998?

5    A.   Yes, I have.

6    Q.   Were you involved in any of those discussions?

7    A.   No, I was not.

8    Q.   Before this case, had you ever heard about any

9 of those particular details?

10    A.   No, I had not.

11    Q.   Can you, of your own personal knowledge, add

12 anything to the documents about those -- about those

13 things other than the words on the page?

14    A.   No, I don't think I could.

15    Q.   All right.  If I might have one moment,

16 Mr. Childs?

17    A.   Okay.

18          (Pause.)

19          MR. MELSHEIMER:  Your Honor, I tender the

20 witness for cross-examination.

21          THE COURT:  Cross-examination?

22          MR. BAXTER:  Thank you, Your Honor.

23               CROSS-EXAMINATION

24 BY MR. BAXTER:

25    Q.   Mr. Childs, we've been hanging around this

courtroom a few days.  I don't think we've met.  I'm Sam
Baxter.

    A.    Hi.

    Q.    We're glad to have you in Marshall, sir.

    A.    Thank you.

    Q.    You know, one of the things that I noticed that
your counsel was amused about was whether or not Trilogy
used its own software for pricing.  Did you hear all
that today?

    A.    Yes, I did.

    Q.    I'm at least glad to know that SAP uses its own
pricing product for its own pricing.  Isn't that right?

    A.    We do use our sales system, and we do put our
prices into the system, yes.

    Q.    But you don't use your product for pricing, do
you?

    A.    We do our pricing on a negotiated basis.

    Q.    You don't use your software to do it, do you?

    A.    No, we don't.

    Q.    You use somebody else's software to do it,
don't you?

    A.    No, we don't.

    Q.    Whose software do you use?

    A.    We -- we do it on our own basis.

    Q.    You don't use your product to do it, do you?

1    A.   No.

2    Q.   Okay.  So do you find it unusual that a company

3 doesn't use its own product?

4    A.   Not necessarily, no.

5    Q.   Okay.  Now, the other thing you heard, I think

6 yesterday particularly, was about moles.  And were you

7 here when they cross-examined Mr. Gupta about his idea

8 about trying get a mole?

9    A.   Yeah, I was.

10    Q.   And then said it was a really bad idea?

11    A.   Yeah.  Yeah.

12    Q.   I take it, Mr. Childs, since the document that

13 we looked at had nothing to do with this case, didn't

14 have to do with the pricing, that it was simply to try

15 to somehow smear Mr. Gupta.  Is that how you took it?

16 Wanted the jury to think, oh, he's a bad guy; don't

17 believe anything he says?

18             MR. MELSHEIMER:  Your Honor, I'm just

19 going to object.  It's an argumentative question.

20             THE COURT:  Overruled.

21    Q.   (By Mr. Baxter) Is that how you took it,

22 Mr. Childs?

23    A.   No, I didn't, actually.

24    Q.   How did you take it, sir?

25    A.   I thought they were just trying to get to the

facts.

Q.   Well, the fact that he thought about having a mole, did you think that had anything to do with this case?

A.   I didn't see any specifics there were -- would contribute to infringement.

Q.   It was just trying to impugn his character, wasn't it?

A.   I don't believe so.

Q.   Okay.  SAP wouldn't do anything like that, would they?

A.   I don't think so.

MR. BAXTER:  If I can, Mr. Diaz, can I get PX237 up, please, sir?

Q.   (By Mr. Baxter) I want to show you the bottom half of an e-mail and read it to you, see if you've seen this before, Mr. Childs.  It's addressed to a Robert at SAP.

I am a new Global AE in Atlanta focusing on manufacturing and distribution accounts.  Up until a week ago, I was a Director of National Accounts at Trilogy Development Group.

Trilogy provides mission-critical software that automates the product configuration/quotation process for Fortune 500 manufacturing firms, Hewlett

Packard, IBM, Boeing, Alcatel, and many others use
Trilogy software exclusively to re-engineer their order
fulfillment process.

         Trilogy is now moving into the so-called
Selling Chain (see Forbes 6/3/96 cover story) which
includes proposal generation, et cetera, and I'm aware
of at least one sales situation in which Trilogy and SAP
are competing.

         I am happy to lend my expertise in product
configuration and/or Trilogy as needed.  I can be
reached at such and such a phone number.  Thanks, Jay.

         So, apparently, you went out and hired a
Trilogy employee, right?

     A.    It looks like it, yeah.

     Q.    And now he wants to give confidential
information to SAP, right?

     A.    I see that he had offered his expertise.

     Q.    I'm assuming, given the ethics that you've just
espoused, you either fired him or at least refused to
talk to him, didn't you?  You would expect that,
wouldn't you?

     A.    I would expect I would not need that kind of
expertise.

     Q.    See what the e-mail really says, Mr. Childs,
and it's from -- it's from Mr. John Zmolek.  Do you know

who he is?

    A.   Never heard of him.

    Q.   He's one of your VPs.

           Jay, I'm responsible for managing R/3 CTO functionality for SAP.

           R/3 is the product that we are attaching to, right?

    A.   Yeah.  The big ERP.

    Q.   Right.  Within the discrete industrial ICOE.  I would be very interested to get your perspective on SAP America's positioning against standalone sales configurations as realized in the white paper product configurations within ERP (designed to position against Oracle and Trilogy).

           I also have the PowerPoint outline of an upgrade of the CTO baseline white paper, which is more oriented towards, Baan, Triton, and SFA.

           Would be interested to get your perspective on these approaches and on the CTO discrete marketing generally.  Would like to get together, if possible, 7/22 in Foster City.  Let me know if this works for you.

           So, apparently, not only did you buy a mole, you dug him up and talked to him, didn't you, Mr. Childs?

1    A.    I don't believe so.

2    Q.    It said he wants to meet with him and talk to

3  him, and he's going to give him information about

4  Trilogy, doesn't it?

5    A.    It looks like he's asking him to review the

6  white paper.

7    Q.    And talk to him about Trilogy, which that's

8  what he asked to do, isn't it?

9    A.    I couldn't agree with that statement.

10    Q.    Okay.  I guess we'll let the jury decide what

11  that means.

12          Now, we also went through yesterday, I

13  think, some e-mails that were self critical of Trilogy.

14  Do you remember seeing this?

15    A.    I do.  I do.

16    Q.    Now, has SAP -- does SAP have the same kind of

17  process where you ask your employees to tell you what's

18  wrong with the company so you can fix it?

19    A.    We do have a survey for that, yes.

20    Q.    Anything wrong with that?

21    A.    No.  No.

22    Q.    You expect to get honesty?

23    A.    Absolutely.

24    Q.    Do you expect to get criticism?

25    A.    Yes.  Yes.

```
 1      Q.   Does that mean you're a bad company?

 2      A.   No.

 3      Q.   Does it mean that you're terrible in the

 4 marketplace and can't sell anything?

 5      A.   No.

 6      Q.   It's normal business, isn't it?

 7      A.   For a survey?  Yes, it is.

 8      Q.   And, in fact, SAP makes mistakes, doesn't it?

 9      A.   Oh, sure.

10      Q.   Lots of mistakes.

11      A.   Is that a question?

12      Q.   Yes, sir.

13      A.   Oh, yeah.  I can't attest to that, I don't

14 think.

15           MR. BAXTER:  Let me get, if I can, please,

16 Mr. Diaz, PX158.

17      Q.   (By Mr. Baxter) This is an e-mail dated

18 December the 3rd, 2001.  It contains information about a

19 Hasso Plattner.  Who was that?

20      A.   He was one of the founders of the company.

21      Q.   Was he a CEO, or what title did he have?

22      A.   In 2001, I think he still was the CEO.  He may

23 have been chairman at that point.

24      Q.   He's -- he's the really big boss?

25      A.   He's the really big boss.
```

1    Q.   E-mail says:  Yesterday afternoon, Hasso

2  Plattner called our North American CEO, Chris

3  Richardson.  Chris was traveling.  Our North American

4  CIO, Steve Little took the call.  Expressed his personal

5  embarrassment over the performance of his organization.

6            He said we've got the commitment we've

7  requested.  Peter Zencke on the SAP Executive Board will

8  sure follow through.  Took the opportunity to reiterate

9  our need and our concerns.  Hasso agreed that SAP needs

10  to fix its software and organizational disconnects.

11            Is that right?

12    A.   That's what it reads, yes.

13    Q.   So, apparently, the big boss had to call the

14  boss at North America and say:  Gosh, we're really

15  sorry.  We're been messing up really bad.  We're going

16  to try to fix it.  Is that what he said?

17    A.   You could -- you could imply that, yes.

18    Q.   Well, can you imply something good out of it?

19    A.   I think he wanted to fix a few things.

20    Q.   Well, when he said he's embarrassed, did you

21  think that was good?

22    A.   No, I don't.

23    Q.   Did you think, when he said that there were

24  organizational and software disconnects, that was good?

25    A.   No, it's not.

1    Q.   Looks like they messed up, apologized and wants

2  to move on.

3    A.   Okay.

4    Q.   Does it make SAP a bad company?

5    A.   No, I don't think so.

6    Q.   Okay.  It does mean you make mistakes, and you

7  self criticize, and you try to fix it, doesn't it?

8    A.   Absolutely.

9    Q.   Does it have anything to do with whether or not

10  you put out a product that people can use?

11    A.   There may be some connection, but, no, I don't

12  think it's that strong of a correlation here.

13    Q.   All right.

14        MR. BAXTER:  Let me get PX163 up,

15  Mr. Diaz.

16    Q.   (By Mr. Baxter) It's an article from the Wall

17  Street Journal about SAP.

18        MR. BAXTER:  Let me go to the second page,

19  if you can, Mr. Diaz.

20    Q.   (By Mr. Baxter) It says:  Delivery snags.

21        MR. BAXTER:  If you go to that first

22  paragraph.

23    Q.   (By Mr. Baxter) This is in the Wall Street

24  Journal about your company.

25            For one thing, industrial strength

1    engineering isn't what it used to be.  Corporations are

2    rethinking the return on spending millions of dollars on

3    hard-to-use enterprise resource planning applications --

4    that's your software, right?

5        A.    We -- that's what we do, yes.

6        Q.    -- widely viewed as corporate plumbing.  Even

7    among ERP systems, R/3 is notoriously complex.

8                     Is that your program?

9        A.    R/3 is what we -- is the name of our product.

10       Q.    There's something wrong when you spend $1

11   million dollars on software and $5 million on getting it

12   to work, said Thomas Curran, who started as a software

13   company after quitting as an assistant to Mr. Zencke.

14                   You see that?

15       A.    I do.

16       Q.    You had those problems, didn't you?

17       A.    As far as what -- what's the problem you're --

18       Q.    Well, the problem is, you sold it for a million

19   dollars, and then they had to pay you $5 million to fix

20   it.

21       A.    That's not what that says, but --

22       Q.    Okay.  Well, it says:  There's something wrong

23   when you spend a million dollars on software and $5

24   million getting it to work.

25                   Isn't that what it says?

1    A.    Yes, it does.

2    Q.    And that, apparently, was a problem at SAP,

3  wasn't it?  I mean, the guy next to Mr. Zencke quit over

4  it, didn't he?

5    A.    That's what this says, yes.

6    Q.    Okay.  It didn't help last year when Hershey

7  Foods and Whirlpool experienced delivery problems after

8  switching on systems built around R/3.  It helped even

9  less that SAP officials responded by saying that the

10  customer themselves are often to blame.

11            Is that what you did at Hershey and

12  Whirlpool?

13    A.    That's what this article says.

14    Q.    Do you remember that?

15    A.    I do, actually, yes.

16    Q.    Okay.  I guess it happened in December.  That's

17  not a good time for Hershey to have problems, is it?

18    A.    No.  No.

19    Q.    All right.  Do you remember yesterday there was

20  all sorts of criticism about whether or not we were able

21  to retain employees at Trilogy?

22    A.    Yes.  Yes, I do.

23    Q.    And that these lawyers -- your lawyers over

24  here were making much about it?  Do you remember that?

25    A.    I do.  I do.

1          MR. BAXTER:  Go to the page -- next to the

2     last page, Mr. Diaz, where it says:  Tempted employees,

3     that first paragraph.

4          Q.   (By Mr. Baxter) While scrambling to catch up on

5     e-commerce -- talking about SAP -- SAP has also found

6     itself out of sync with U.S. employees tantalized by

7     stock options and internet shares.  In the last 18

8     months, all but a handful of SAP America's top

9     executives have departed.

10          Do you see that?

11          A.   Yes, I do.

12          Q.   Is that a problem at SAP?

13          A.   It appears to be when this was written.

14          Q.   Okay.  Did that make -- somehow do you find

15     that to make your company less valuable?

16          A.   You never want to lose good people.

17          Q.   Okay.

18          MR. BAXTER:  Down toward the last

19     paragraph of that section, Mr. Diaz.

20          Q.   (By Mr. Baxter) By November of 1999, SAP

21     America had lost its chief executive, president, top

22     Latin American executive, chief information officer, and

23     a slew of regional U.S. sales and development directors.

24     The parent company's global accounts chief and chief

25     executive in Japan, Britain, and Brazil also jumped

1  ship.

2          Do you see that?

3      A.   I do.  I do.

4      Q.   Retaining employees can sometimes be a problem,

5  isn't it?

6      A.   Yes, it can be.

7      Q.   Does that mean that a product doesn't work?

8      A.   No.

9      Q.   Okay.

10          MR. BAXTER:  If you can go to PX704,

11  Mr. Diaz, middle paragraph here, right here where the --

12  above that.  Right there.

13      Q.   (By Mr. Baxter) This is from CNN Money.

14          As recently as two years ago, SAP was

15  plugging its application set as a one-size-fits-all

16  solution, scornfully dismissing the wares of just about

17  every other software-maker.

18          Is that true?

19      A.   I'm not sure what it means, actually.

20      Q.   Well, it means that you didn't want anybody

21  else plugging into your software, didn't it?

22      A.   I'm not sure I see that in there, but --

23      Q.   Let's read the next sentence there.

24          Customers weren't thrilled.  Getting the

25  software working proved hugely expensive, and SAP often

1 made connecting non-SAP products unnecessarily

2 difficult.

3           Do you see that?

4     A.    I do see that.

5     Q.    So that means what SAP was doing was trying to

6 make sure nobody could plug in like Trilogy; is that

7 right?

8     A.    Whoever wrote that thought that.

9     Q.    Okay.  Then it says that the chastened, co-CEO,

10 Hasso Plattner -- is this the same guy that was

11 embarrassed and had to apologize --

12    A.    Yeah.

13    Q.    -- a few documents ago?

14    A.    Yeah.

15    Q.    -- now concedes no one will ever standardize

16 solely on SAP.  The future will be cooperation between

17 different software applications.

18    A.    Yes, sir.

19    Q.    Not the tack he took with Trilogy, though, was

20 it?  And not the tack that SAP took, because they wanted

21 to get Trilogy out of the market, didn't they?

22    A.    I wasn't there to -- to be able to really weigh

23 in on that.

24    Q.    Well -- well, let me ask you this, Mr. Childs:

25 You're the face of SAP, as Mr. Melsheimer said, right?

```
 1      A.    Yes.  Yes.
 2      Q.    You're the corporate representative.  And so --
 3 and I mean no offense, sir, but what SAP has sent to
 4 this courtroom is someone that didn't work on the
 5 pricing product, right?
 6      A.    That's correct.
 7      Q.    Wasn't involved in any of the e-mail chains.
 8      A.    That's correct.
 9      Q.    Wasn't involved with Pricer.
10      A.    That's correct.
11      Q.    And doesn't know anything about hierarchical
12 access, do you?
13      A.    Not technically, no.
14      Q.    Well, in fact, until you had your deposition
15 taken, you had never heard of it, had you?
16      A.    That's correct.
17      Q.    So you don't understand it, know anything about
18 it, do you?
19      A.    No.
20      Q.    So what SAP did, is they basically sent someone
21 that doesn't know anything about this case here to
22 answer the questions about it.
23      A.    I don't think so, no.
24      Q.    Okay.
25      A.    I can't agree with it.
```

1     Q.    Well, do you know about hierarchical access?

2  Do you know how it works?

3     A.    I know the basics of it.

4     Q.    Do you know why you had to do it?

5     A.    I do.

6     Q.    Why was that?

7     A.    Primarily, for -- I mean, we've been doing it

8  for 28 -- 38 years, so we've -- we've done access to

9  customer masters and product masters for a long time.

10          You're talking very specific, though, on

11  this hierarchical access where you add all three of

12  these together.

13     Q.    Yes, sir.  How long have you been doing that?

14     A.    How long have we been doing that?

15     Q.    Uh-huh.

16     A.    It appears we put it in 1998.

17     Q.    You never worked on that, did you?

18     A.    No, I did not.

19     Q.    Don't know anything about it?

20     A.    No, I don't.  I don't.

21          MR. BAXTER:  Mr. Diaz, can you -- can you

22  get up the slide that Mr. Pollinger used yesterday,

23  PX19?

24     Q.    (By Mr. Baxter) Now, this comes out of your

25  manual, Mr. Childs.  Can you read that?

1    A.   Yes, I can.

2    Q.   And it says:  Without hierarchy access, you

3  would need to create a condition table for every

4  combination and assign all accesses to this table in a

5  hierarchy within an access sequence.

6              This would not only take a great deal of

7  time but would also reduce system performance and force

8  the system to use a rigidly fixed sequence of accesses.

9  This represents a major drawback, especially for

10  hierarchical data such as that representing a product

11  hierarchy or a customer hierarchy.

12              Do you see that?

13    A.   Yes, I do.

14    Q.   Now, this is what SAP said when it started

15  touting its new product, that the way we've been doing

16  it before was very slow, and it consumed a lot of

17  resources, and it didn't work very well; isn't that

18  right?

19    A.   That's correct.

20    Q.   And that's why you had to change, isn't it?

21    A.   It was certainly one reason.

22    Q.   Well, what's the other reason?

23    A.   It -- it was certainly -- you had -- you could

24  still do it the other way.

25    Q.   It just was slow, and it didn't work.  Other

1  than that, it was fine?

2      A.   Well, it didn't say it didn't work; it just

3  said it was slow.

4      Q.   Slow, and nobody wanted it, right?

5      A.   A lot of people use it.

6      Q.   Well, when Trilogy comes out with its product,

7  it's now a horse and buggy to an automobile, isn't it?

8      A.   I can't agree with that.

9      Q.   Well, it was certainly SAP's engineers's

10  opinion that they had better change, hadn't they?

11     A.   They wanted to make an improvement, yes.

12     Q.   Well, they wanted to change it totally and go a

13  different direction, didn't they?

14     A.   I don't know the answer.

15              MR. BAXTER:  Let me look at Page 9 of that

16  same slide set, if you would, Mr. Diaz.

17     Q.   (By Mr. Baxter) The slide says, and if I can

18  read it to you:  It requires lots of maintenance and

19  reduces efficiency, doesn't it?

20     A.   Yes, it does.

21     Q.   That's not good if you're in the computer

22  world, is it?

23     A.   No.

24     Q.   So if you're going to stay in pricing, you had

25  to change, didn't you?

1    A.    It was a good feature to add.

2    Q.    Well, it wasn't just a feature; it changed the

3 whole way you did pricing, didn't it?

4    A.    I don't believe it did.

5    Q.    It went from doing it the old-fashioned way to

6 a new way, didn't it?

7    A.    That --

8    Q.    And it made it faster, and it didn't use as

9 much resources, did it?

10    A.    The hierarchy access was faster, yes,

11 absolutely.

12    Q.    And SAP touted that in its manual, didn't it?

13 We just saw it.

14    A.    I would say they certainly recognized the fact,

15 yes.

16    Q.    Well, I think what they said is, without it,

17 you're at a significant disadvantage, aren't you?

18    A.    It's slower, yes.

19    Q.    And use a lot of resources you don't want to

20 use.

21    A.    Yes.

22    Q.    And, therefore, it couldn't compete, could it?

23    A.    I wouldn't agree with that.

24    Q.    Okay.  If you're in the computer world and one

25 product goes fast and doesn't use much resources, and

1 the other product goes slow and uses a lot of resources,

2 which one do you think the business people at a company

3 want to buy?

4     A.    Well, they're going to go fast.

5     Q.    So it couldn't compete, could it?  If it's slow

6 and uses lots of resources, it can't compete, can it?

7     A.    I'll agree with you.

8     Q.    You will?

9     A.    Yeah, I'll agree with you on that.

10    Q.    Thank you.  Thank you.

11    A.    On that feature.

12    Q.    Okay.

13          MR. BAXTER:  Now, let me look, if I can,

14 Mr. Diaz, at PX1081.

15    Q.    (By Mr. Baxter) This is an e-mail from Bernhard

16 Neumann.  Who is he, please, Mr. Childs?

17    A.    He's a development manager in Waldorf.

18    Q.    Okay.  Is he high up the food chain?

19    A.    He's a vice president, I believe.

20    Q.    Sent 4/15/97.  Do you see that?

21    A.    Yes, I do.

22    Q.    And he says:  Trilogy/ASUG/SC Pricer so far

23 haven't won a BMW.  And you heard that Trilogy, in fact,

24 was offering a BMW to raffle if you'd come look at their

25 demonstration of their product, right?

1    A.    Yes.

2    Q.    Anything wrong with that?

3    A.    No.

4    Q.    Okay.  Sort of -- the same sort of things you

5  guys do?

6    A.    Sure.

7    Q.    Okay.  And he's writing to a Peter Lorenz.  Who

8  is that?

9    A.    He's also a development manager, a little bit

10  higher in the staff.

11              MR. BAXTER:  Go down to the second

12  paragraph, if you would, please, Mr. Diaz.

13    Q.    (By Mr. Baxter) And Mr. Neumann says, so far he

14  hadn't won the BMW, and he's disappointed, isn't he?

15    A.    Yes.

16    Q.    But I received a special demonstration of the

17  SAP Pricer from Tom Carter and Mike Green from Trilogy.

18              You've seen Mr. Carter here, haven't you,

19  the inventor?

20    A.    Yes, I have.

21    Q.    Looks good.  Very easy user

22  interface/visualization of conditions/sequence of the

23  application of the condition types, organizational

24  units.

25              And then it says you can get encrypted; is

1 that right?

2    A.    Yes, it does.

3    Q.    Since this is Tom's baby (we talked about it

4 over a beer in Foster City more than a year ago, and

5 back then he had already inquired whether we'd be

6 interested in the matter, I referred him to Wilifred and

7 also informed Wilifred about it) he conducts most of the

8 demonstrations himself.

9                Attracted by the raffles.  The attendance

10 numbers to the demos were very good.  Trilogy now has

11 300 employees and is hiring another 70 university

12 graduates and 30 people from industry.

13                Sounds like a company on the grow with a

14 good product, doesn't it?

15    A.    They were hiring, yes.

16    Q.    And certainly, Mr. Neumann thought it was a

17 good product, didn't he?

18    A.    He felt good about it.

19    Q.    Okay.

20                MR. BAXTER:  Well, go down to the next

21 paragraph.

22    Q.    (By Mr. Baxter) It says:  Tom is only waiting

23 (according to his own words) that we bring our CFG

24 engine together with his Pricer.  As soon as we have our

25 API, he has offered to send a few of his developers to

Foster City to bring the products together.

Then he says:  Well, if I didn't know that we were already working on a price engine, and this engine, as a result of this, could become quite unattractive (modulo price), this would certainly be a useful procedure in order to use the Trilogy market as an SFA vendor.

What does that paragraph mean?

A.    That there would be the potential to use Trilogy as an SFA vendor.

Q.    What is an SFA vendor?

A.    Sales force automation.

Q.    Okay.  So he says:  If I didn't know we were already working on something, I might consider it, but I'm going to try to work on something that will make them get out of the business.

Is that what he's saying?

A.    I do not see out of the business, but I see that we're already working on something, yeah.

Q.    All right.  This result -- this could become quite unattractive.

What does that mean?

A.    That Trilogy might be unattractive to them at that engine.

Q.    Okay.

1    A.   Yeah.

2    Q.   Then he says:  I believe SAP missed this ASUG

3 event with respect to price engine and SFA interface

4 announcement.

5           Do you see that?

6    A.   (No response.)

7    Q.   And what Mr. Neumann wanted to do was announce

8 it in April of 1997 that he had a price engine coming,

9 even though he didn't have one, didn't he?

10    A.   I can't see that totally in there, but I -- I

11 would -- I would take your word for it.

12    Q.   Okay.  And he didn't get to do it, and he was

13 disappointed, and he's hoping he can do it in the fall;

14 isn't that right?

15    A.   I think I would -- I can see where you would

16 say that, yeah.

17          MR. BAXTER:  Let's look at PX1089,

18 Mr. Diaz?

19    Q.   (By Mr. Baxter) Same cast of characters.

20 Another e-mail dated May of 1997 from Mr. Neumann, the

21 people up the food chain, and he says:  Hello, Wilifred.

22 I would like to summarize again my response suggestions

23 to your question.  How can the SCE team support

24 development of the price engine, right?

25    A.   Yes.

1   Q.   So Mr. Neumann, who is, apparently, in charge

2   of getting the price engine out, is looking for help,

3   right?

4   A.   Yes.

5   Q.   And somebody's offered to help him, and he has

6   a suggestion for him, doesn't he?

7   A.   I think so, yeah.

8   Q.   What's the suggestion?  Read that to me,

9   Mr. Childs.

10  A.   So I'd like to summarize, again, my response

11  suggestions to your question.

12  Q.   No.  Do you see where it says:

13  Suggestion/response?

14  A.   Oh, okay.  There.  Now, I can, yeah.

15  Q.   Read that.

16  A.   We could enter into negotiations with Trilogy

17  in order to purchase their code for the SC Pricer

18  (Trilogy may continue to use it) and in order to then

19  enhance it where necessary or --

20  Q.   So in May of 1997, Mr. Neumann, who saw Pricer

21  work at the trade show, and he's in charge, he's now so

22  far behind, and the Pricer -- or Trilogy Pricer engine

23  looks so good, he suggested that SAP buy it; isn't that

24  right?

25  A.   I can't agree with part of that, but...

1    Q.   Well, do you agree with the part that he says:

2  I recommend that you go buy it?

3    A.   That was one of his options, yes.

4    Q.   Okay.  That wasn't an option you took, was it?

5    A.   I don't think so, no.

6    Q.   But certainly you didn't have any problem with

7  how Trilogy worked and, in fact, thought it was a good

8  project; it was good enough that SAP ought to go buy it

9  and use it as their own, right?

10   A.   That was what Bernhard thought, yeah.

11   Q.   Okay.

12             MR. BAXTER:  Let's look at PX150,

13 Mr. Diaz.

14   Q.   (By Mr. Baxter) This is an e-mail once again in

15 May of 1997 by Mr. Neumann, and this has to do with --

16 about sales conditions at Whirlpool; isn't that right?

17             And he says:  Yes.  Please tell Whirlpool

18 to check their timelines.

19             And what that means is:  Tell Whirlpool

20 we're going to come out with something, so don't go buy

21 it from Trilogy.  Isn't that what that means?

22   A.   I can't read that in there.  That's a pretty

23 big implication, I think.

24   Q.   Well, if the testimony is that Trilogy is at

25 Whirlpool trying to sell them product and SAP knows it,

1    he's telling his sales rep out there:  Go tell Whirlpool

2    we're going to come out with something.  Just hold your

3    horses, and we'll get it out to you one of these days,

4    but don't buy somebody else's.

5                    Isn't that what that means?

6        A.   He was trying to encourage them that we could

7    provide something, yes.

8        Q.   And then he says:  We plan to have an SAP

9    pricing engine reusing the SAP -- SAP master data, just

10   like Trilogy's SC Pricer, but as an SAP product, as an

11   additional SFA component.

12                   Do you see that?

13       A.   Yeah.  Yes, sir.

14       Q.   So, apparently, Mr. Neumann was so impressed

15   with Trilogy, he wanted a product just like Trilogy's,

16   didn't he?

17       A.   Looks like he wanted very close to it, yeah.

18       Q.   Well, as a matter of fact, it turns out, not

19   only did he get close, he got it, didn't he?  Because he

20   used their patent to build the engine, didn't he?

21       A.   I can't agree with that.

22       Q.   You disagree that you've been found to infringe

23   the '350 patent?

24       A.   Oh, no, no.  There's certainly the infringement

25   on the '350, absolutely.

1    Q.   Well, that's what he did, didn't he?  He built

2    it just like Trilogy's, didn't he?

3    A.   That was one feature in it, yes.

4    Q.   That was the main feature, wasn't it?

5    A.   I can't agree with that.

6    Q.   It's the pricing feature, right?  It's what

7    pricing does.  It gives you a price, right?

8    A.   Sure.

9    Q.   Okay.

10   A.   I mean, there's pricing, yes.

11             THE COURT:  Mr. Baxter, we're going to

12   recess for our afternoon break.

13             MR. BAXTER:  Thank you, Your Honor.

14             THE COURT:  Ladies and Gentlemen, take 20

15   minutes.  We'll start back at 3:35.  Have a nice recess.

16             LAW CLERK:  All rise for the jury.

17             (Jury out.)

18             THE COURT:  Court's in recess.

19             (Recess.)

20             LAW CLERK:  All rise.

21             (Jury in.)

22             THE COURT:  Please be seated.

23             Continue.

24             MR. BAXTER:  Thank you, Your Honor.  May

25   it please the Court.

1          Mr. Diaz, could I get a PX1134, please?

2     Q.   (BY MR. BAXTER)  Mr. Childs, I now want to move

3 us, if I can, sir, forward to August of 1997.

4     A.   Okay.

5     Q.   Same Mr. Neumann and he's writing to

6 Mr. Savage, maybe others, and he's got the second bullet

7 point that says:  I would like to make you aware of some

8 recent opinions from Paul Wahl, who is he?

9     A.   He was the CEO of America at the time for SAP.

10    Q.   About the fact that more and more SAP America

11 salespeople are recommending our prospects -- our

12 prospects/customers to use Trilogy's configurator and

13 pricing engine.  Please call me about it.  Signed,

14 Bernhard Neumann.  Do you see that, sir?

15    A.   Yes, I do.

16    Q.   Do you take it from that that SAP was unhappy

17 that its salespeople were recommending our product?

18    A.   I -- I don't see that, no.  I see Bernhard

19 basically asking to have the discussion with John

20 Savage.

21    Q.   Did you think he was happy about that, sir?

22    A.   I'm not sure I -- I would know.  I would guess

23 not.

24    Q.   So he didn't want his salespeople recommending

25 Trilogy.  He didn't want Trilogy to have an easy

1  connect, but he did want a product just like Trilogy.

2  So we got the worst of all possible worlds.  We can't

3  work with you, but you use our stuff; is that right?

4      A.    I can't agree with that, no.

5      Q.    What part don't you agree with?

6      A.    The first part of that, yeah.

7      Q.    That you didn't want us to connect up?

8      A.    The combination of -- of all that, I think,

9  together.

10     Q.    Well, do you agree, sir, that SAP didn't want

11  Trilogy connecting into its product?

12     A.    I don't see that in any of this.

13     Q.    Irrespective of what you see so far, do you

14  have the opinion, sir, that SAP did not want us

15  connecting in?

16     A.    I don't think Bernhard did.

17     Q.    Okay.  And he was -- he was speaking -- I mean,

18  he's high up the food chain, he's speaking for SAP,

19  isn't he?

20     A.    I don't -- I don't -- I don't know.

21     Q.    Okay.  How about the second half, you wanted a

22  product just like ours and, in fact, it was so much like

23  ours, you used our technology.  Now, that's true, isn't

24  it?

25     A.    I don't see that in that letter.

1   Q. I'm just asking you.  Irrespective of the

2 documents --

3   A. Yeah.

4   Q. -- we know that's true, isn't it?

5   A. We had similar features we wanted it to do.

6   Q. You used our technology, didn't you?

7   A. Yeah, I think we've concluded that this was in

8 1997, too, right?

9   Q. Yes.  Next one, PX1088.  This is from

10 Mr. Neumann to Mr. Zencke who I think we've figured out

11 was one of the early founders of SAP?

12   A. That's correct.

13   Q. All right.  Hello Peter, I forward you a bunch

14 of e-mails to you and Peter Lorenz in which you can

15 clearly see that Trilogy is raking in the cash among the

16 SAP customers.  With their SAP price, Whirlpool,

17 Bridgestone and we will likely emphasize all of this at

18 the Sapphire.  Do you see that?

19   A. Yes, I do.

20   Q. I admit that we had a longer lead time with

21 SCE, but there is no way around our own SPE anymore.

22 SPE's pricing, isn't it?

23   A. That's -- yes.

24   Q. In the context of the SCE, at time reference is

25 made to the pricing functionality, but very timidly.

1 What does that mean, sir?

2     A.   I'm not sure what he's trying to say there,

3 actually.

4     Q.   You think he's trying to say that we're out

5 there hinting around that we're going to have this

6 product, but we don't say it loudly or strongly enough

7 to scare people off?

8     A.   I couldn't conclude that, I don't think.

9     Q.   Okay.  Well, here we have to watch it that the

10 customers don't invest too much and then no longer

11 convert.  It bothers me that Trilogy is always one step

12 ahead.  Was it the opinion at SAP that we, in fact, were

13 one step, maybe many steps ahead?  Certainly in the

14 pricing area we were, weren't we?

15     A.   Certainly it was Bernhard's opinion of that,

16 yes.

17     Q.   And it bothered him, didn't it?

18     A.   He has a lot of discussions about it, yes.

19             MR. BAXTER:  If you would go to PX12,

20 Mr. Diaz.

21     Q.   (By Mr. Baxter)  This is from Georgia Murray;

22 do you know who that is?  She's in America?

23     A.   I don't recall the name, actually.

24     Q.   All right.  This one is dated now in 1998.  And

25 she's talking about Trilogy's product in number four.

1    She says:  Trilogy's primary positioning in the market

2    today is ease of use versus pricing in R/3 and the SPE

3    is not positioned today to address this.  Do you see

4    that?

5         A.   Yes, I do.

6         Q.   So apparently in 1998 in March, SAP once again

7    recognizes that Trilogy is a step ahead or two and that

8    you really can't compete with them, can you?

9         A.   I see that it's about ease of use.

10        Q.   Okay.  And that R/3, that's your product,

11   right?

12        A.   Yes, it is.

13        Q.   And SPE is not in a position today to address

14   this.  Does that mean it can't compete?

15        A.   With the ease of use, that's the way I read it,

16   yes.

17        Q.   Okay.  Well, you want the product to be easy to

18   use, don't you?

19        A.   Yes, you do.

20        Q.   And apparently you couldn't compete with

21   Trilogy on that feature, could you?

22        A.   I don't read that into this.

23        Q.   Okay.

24             MR. BAXTER:  PX1074, Mr. Diaz.

25        Q.   (By Mr. Baxter)  This is from Tina Reinhart and

1  it's about Bay Networks and I think we discussed a while

2  ago about whether or not SEP was trying to keep Trilogy

3  from working with its customers.

4              This one says:  A brief note for your

5  information.  It was not clear to Bernhard and myself

6  what device has been made for weeks -- what advance has

7  been made for weeks at Bay Network.  However, we from

8  the SFA team cannot enter into a partnership in the

9  development with Bay if they use Trilogy at the same

10  time.  I do not, capitalized, want to give Trilogy the

11  opportunity to develop the integration for the SAP SFA

12  system for a customer already in advance.  Do you see

13  that?

14      A.    I do.

15      Q.    So apparently the plan at SAP was, you go tell

16  the customer that if you're going to use Trilogy, you

17  can forget us, we're not going to do business with you.

18  Is that what it says?

19      A.    I see that it says you cannot enter into a

20  partnership in the development.

21      Q.    Isn't that what that means, Mr. Childs?

22      A.    No, it does not.

23      Q.    All right.  Let me read again.  I don't want --

24  I do not, capitalized, want to give Trilogy the

25  opportunity to develop the integration for the SAP SFA

1  system for a customer already in advance.  Isn't that

2  what it says?

3     A.   Yes, it does.

4     Q.   Then it says:  I would appreciate it if you

5  could call the customer and let them know that for the

6  customer reserve board it's not possible to work

7  together if they use Trilogy for some pieces?

8     A.   I -- I can't see that on the screen, actually.

9             MR. BAXTER:  Go down, Mr. Diaz.  First

10  paragraph right in the middle.

11     Q.   (By Mr. Baxter)  I would appreciate it if you

12  could call the customer.  Now, that's Bay Networks,

13  isn't it?

14     A.   Yes, it is.

15     Q.   And let him know that for the customer review

16  board it is not possible to work together if they use

17  Trilogy for some pieces.  You see that?

18     A.   Yes, I do.

19     Q.   Now, is that an instruction to call the

20  customer and say, boys, you want to use Trilogy, that's

21  fine, but we're not going to work with you?  Isn't that

22  what it says?

23     A.   For some pieces, yes.  Yeah.

24     Q.   So once again, we've got the worst of all

25  possible worlds.  You don't want us plugging in.  You

1 tell our future customers, don't use them or we won't do

2 business with you and you still infringe our product.

3 Does it get any worse than that in the business field?

4     A.   I didn't read that into this.

5     Q.   Well, you read in they don't want to work with

6 them if they use Trilogy, did you not?

7     A.   I did for development, yes.

8     Q.   We know that you infringed, right, that you got

9 our technology and used it, right?

10     A.   We didn't use your technology, but we

11 infringed, yes.

12     Q.   Well, isn't that the same thing?

13     A.   I don't know that it is.

14     Q.   Well, what's your understanding of

15 infringement, Mr. Childs?

16     A.   Well, your patent is what you've asked for in

17 this patent with these three elements together.

18     Q.   And you use it?

19     A.   That's -- that's not necessarily technology,

20 that's a concept, but yes.  I would agree we infringe on

21 that concept, yes.

22     Q.   So you infringe our intellectual property?

23     A.   Not at this time, though.  This is 1998.

24     Q.   I understand.

25     A.   Okay.

1    Q.   When the patent comes out, you infringe our

2  technology, don't you?

3    A.   In 2003, yes.

4    Q.   Yes, sir.  You don't want them using our

5  product, do you?

6    A.   It looks like we don't want to develop an

7  interface for Bay Systems or Bay Networks.

8    Q.   And you tell your customers, if you work with

9  Trilogy, we're not going to work with you, right?

10   A.   For that interface, that's correct.

11   Q.   Okay.  Now, you've heard a lot about the

12  Gartner Group.  Let me look you -- get you to look at

13  PX92.  This has to do with freezing the marketplace.  It

14  says:  On March the 19th --

15             MR. BAXTER:  Go down to where it says

16  event facts, Mr. Diaz, if you would, please.

17   Q.   (By Mr. Baxter) -- on March the 19th, 1998, SAP

18  announced release of its SAP sales force automation SFA

19  solution for the fourth quarter of '98, right?

20   A.   Yes.

21   Q.   So far in the TES marketplace, SA -- SAP has

22  preannounced product functionality without releasing it

23  to the general market.  This can cause a marketplace to

24  freeze.

25   A.   Mr. Baxter, I can't see that.

1    Q.    I'm sorry.

2              MR. BAXTER:  Go down here where it says

3    body, Mr. Diaz.

4    Q.    (By Mr. Baxter)  I apologize, Mr. Childs.

5    A.    That's -- that's right.

6    Q.    You want me to start that over?

7    A.    Yeah, please.

8    Q.    So far in the TES marketplace, what is that?

9    A.    That's that -- the overall pricing that we're

10   talking about right here.

11   Q.    SAP has preannounced product functionality

12   without releasing it to the general market.  This can

13   cause a marketplace to freeze as current SAP customers

14   decide to take a wait-for-SAP attitude.  This

15   announcement is one of many SAP has made in the last 18

16   months to provide its user with mobile sales

17   functionality.

18              As SAP clients have been requesting mobile

19   sales functionality from SAP, the benefit of seamless

20   integration of TES functionality with R/3 master data

21   would appear enticing.  However, the integration is

22   irrelevant if the deployed applications do not meet the

23   needs of the sales organization as functionally superior

24   applications are available today from any vendors

25   including Trilogy.  Do you see that?

1    A.   Yes, I do.

2            MR. BAXTER:  And then down at the bottom

3    line, Mr. Diaz.

4    Q.   (By Mr. Baxter)  It says right in the middle,

5    TES vendors with good functionality, for example,

6    Trilogy, have successfully integrated their solutions

7    with R/3 at production sites; do you see that?

8    A.   Yes, I do.

9    Q.   Okay.  So apparently Gartner at least believed

10   that when you announced in March of 1998 that you wanted

11   to freeze the market but we know that in March of 1998

12   you didn't have a product, did you?

13   A.   It -- I'm not -- it wasn't -- it was released

14   later that year, yes, that -- that's correct.

15   Q.   You didn't have a product in March of 1998, did

16   you?

17   A.   That's correct.

18   Q.   Okay.  But you wanted the market to wait for

19   your product and not buy Trilogy's, didn't you?

20   A.   Sure.

21   Q.   Okay.

22           MR. BAXTER:  Now, if you'll go to PX1138,

23   Mr. Diaz.

24   Q.   (By Mr. Baxter)  SAP had some opinions about

25   Trilogy, though, didn't it?

1    A.   In some of the documents it does look like

2  there have been some opinions formed, yes.

3              MR. BAXTER:  Go to Page 6 of this one,

4  Mr. Diaz, the one that's got the chart on the back.

5    Q.   (By Mr. Baxter)  And this is SAP's committee

6  talking about Trilogy, right?

7    A.   I didn't see the context of the original

8  document, but --

9    Q.   Okay.  Well, look at the chart here and tell me

10  if you can tell what the context is.  It's talking about

11  Trilogy in the pricing field, isn't it?

12    A.   I believe so, yes.

13    Q.   Okay.  And it says we're a market leader,

14  right?

15    A.   Yes, it does.

16    Q.   We're a visionary?

17    A.   Uh-huh.

18    Q.   Product well mark -- marketed, breadth of

19  offering, considered best of breed for SCS, right?

20    A.   Yes.

21    Q.   Presence and tight integration with R/3

22  customer, right?  So apparently people at SAP understood

23  that Trilogy was the market leader, they had been

24  visionary about how the product worked, and they were

25  the best of breed; is that right?

1    A.    That's how this reads, absolutely.

2    Q.    You don't disagree with that, do you,

3  Mr. Childs?

4    A.    No, I think that's exactly what it says.

5    Q.    And that's exactly right, too, isn't it?

6    A.    I -- I don't really know.

7    Q.    Well, the people that wrote it at SAP, the

8  people in the pricing field seemed to understand that,

9  didn't they?

10    A.    They certainly had -- had interest in the --

11  the way it -- it performed.

12            MR. BAXTER:  Go to the next page, if you

13  could, please, Mr. Diaz, and then over where it says

14  nonrevenue objectives.

15    Q.    (By Mr. Baxter)  See right there in the middle

16  under the years 1998, 1999, and 2000?  These are the

17  nonrevenue objectives of your company, Mr. Childs.

18  Become dominant supplier of sales configuration system

19  within three years.  Become best of breed for sales

20  configuration systems; and lastly but not leastly,

21  prevent further penetration by Trilogy of R/3 customer

22  base.  Do you see that?

23    A.    Yes, I do.

24    Q.    And so one of the real objectives, one of the

25  business objectives of SAP was to keep us out of the

1  market and any more penetration with your customers;

2  isn't that right?

3      A.   That's what this document says, yes.

4      Q.   Now, I believe I keep hearing your lawyer talk

5  about fair competition.

6      A.   Yeah.

7      Q.   Now, fair competition would be let somebody

8  develop their product that doesn't use anybody else's

9  technology and get out in the marketplace and compete

10  against somebody that has their own technology.  Now,

11  that's fair competition, isn't it?

12      A.   That's one, yes.

13      Q.   Well, can you think of another?

14      A.   Dozens.

15      Q.   Okay.  Well, certainly that's sort of the way

16  you would expect to do things, isn't it?  They've got an

17  idea, you get a different idea.  They've got a product,

18  you get a different product, and you get out there and

19  compete in the marketplace to see which one's the best,

20  right?

21      A.   Yes.

22      Q.   But that's not what you did, is it?

23      A.   I would disagree with that.

24      Q.   Well, we know now that you used our technology,

25  right?

1      A.    In 1998?   There was no technology patent at

2  that point.

3      Q.    You used the technology that was in the Patent

4  Office that eventually came out and it's exactly the

5  same thing and you use it, don't you?

6      A.    We have the same feature, yes, we do.

7      Q.    Okay.   Well, you infringed the patent, didn't

8  you?

9      A.    In 2003.

10     Q.    Yes, sir.

11     A.    But not in 1998 --

12     Q.    I understand.

13     A.    -- when this was written.

14     Q.    I understand.   But it's the same, the

15  technology didn't change, did it?   Between 1998 and 2003

16  it didn't change, it was the same thing?

17     A.    Oh, sure.

18     Q.    Okay.

19     A.    Sure.

20     Q.    So you used somebody else's technology, you

21  told customers don't do business with them and you tried

22  to make it difficult to plug in; is that -- is that what

23  you did?

24     A.    No, sir, we did not.

25     Q.    Okay.   Now, originally you were going to charge

1 for Pricer, were you not?

2     A.   I -- I don't know.

3         MR. BAXTER:  You can go to PX95, Mr. Diaz.

4     Q.  (By Mr. Baxter)  This is a document that is all

5 about what you're going to charge for Pricer, is it not?

6 There was a -- whole committees that are meeting about

7 this, right?

8     A.  I'm just reading it real quickly here.

9     Q.  Okay.  Well, I'm going to show you the second

10 page.  Before we get to that, this is dated April of

11 1999, is it not?

12     A.  Yes, it is.

13     Q.  Okay.  And it says under background:  It is

14 clear of becoming confirmed in discussion with Trilogy

15 that of the partnership products to come out of Austria,

16 and Austria was the code name for some joint venture

17 between Trilogy and SAP, the product combination that

18 has the most capability to impact the market is an SCE,

19 CIM combined product offering this capacity to front

20 load seamlessly a global supply chain managed by R/3,

21 right?

22     A.  Yes.

23     Q.  This also has to do with pricing, does it not?

24     A.  I believe it does.

25     Q.  Okay.  So you were still talking to them as

1  late as '99, right?

2     A.    It appears we were.

3     Q.    You even had a code word called Austria, didn't

4  you?

5     A.    I'm not aware that that's -- I -- I don't know

6  the code name.

7              MR. BAXTER:  Okay.  Go to the second page,

8  if you would, please, Mr. Diaz.  Go to the top.

9     Q.    (By Mr. Baxter)  And it says:  I learned in

10  conversation with Naren that Trilogy's list prices per

11  seat are as follows.  And for Pricer it's $5,000 a seat.

12  And then you decide or they're deciding at that time

13  that maybe the best thing to do is to charge the

14  customer a thousand Euros, which I have no idea what

15  that is except I know it's a lot more than a thousand

16  dollars, for a seat with SAP's product, right?

17     A.    Yeah, back then it was less, but yeah.

18     Q.    Okay.

19     A.    Yeah, now it's not.

20     Q.    So the original plan was to charge for Pricer

21  and then you decided you would give it away, right?

22  You'd put it in R/3 and not charge any more for it;

23  isn't that right?

24     A.    We did not charge for it, that's correct.

25     Q.    So you went from I'm going to charge people for

1  it, oh, wait, I think I'll just give it away for free.

2  Now, is it hard for a company that's out there selling a

3  product to compete against free?

4       A.   I would say so.

5       Q.   And if Trilogy's salesperson calls on a

6  potential customer that has SAP and says, look, I want

7  to sell it to you for a million or two million or

8  500,000 or whatever it is and they go, huh, got it for

9  free, thanks a lot, that's not a good day for the

10  salesman, is it?

11       A.   No.

12       Q.   And it's strictly not a good day when it turns

13  out to be his own technology, does it?

14       A.   If it were, yes.

15       Q.   Now, I think you told Mr. Melsheimer that

16  pricing was still important to SAP; is that correct?

17       A.   Yes, it is.

18       Q.   And you still want to have pricing in your

19  product, right?

20       A.   Yes.

21       Q.   And you don't want to take it out?

22       A.   No, we don't.

23       Q.   All right.  Now, I asked your expert a while

24  ago about document 3183.  Let me ask you about it, sir.

25       A.   Okay.

1   Q.   And this is the one where we're going to have

2   in 2008 the pricing meeting.  Apparently SAP still has

3   committees that deal with pricing; is that right?

4   A.   This was a pricing road map, yes.

5   Q.   I've set this meeting up to discuss the areas

6   of opportunity for our pricing solution; is that right?

7   A.   Yes, that's correct.

8   Q.   Okay.  Next page.  This is what we looked at a

9   while ago.  Let me get your take on it, having had

10  Dr. Becker's.  See where it says integrated pricing

11  engine?

12  A.   Yes, I do.

13  Q.   And it says that the need is very high?

14  A.   It's on that line below that under master data,

15  yes, it's not on integrated pricing engine, but yes.

16  Q.   All right.  And it says must have, right?

17  A.   Yes, it does on master data.  Yes.

18  Q.   Well, but it's talking about the entire pricing

19  strategy, is it not, the pricing engine?

20  A.   I don't know.  I can't tell from the way it's

21  written.

22  Q.   And then we found out that if you look at the

23  codes for that, what it means, we found out that very

24  high means that 75 percent of the customers or companies

25  in the market segment need the functionality.  Do you

1    remember that?

2        A.    Yes, I do.

3        Q.    And must have means the functionality is an

4    absolute must; do you see that?

5        A.    Yes, I do.

6        Q.    So apparently SAP believes and has always

7    believed they need pricing in your R/3 product.  You

8    need pricing that is fast and accurate and flexible; is

9    that right?

10        A.    Yes.

11        Q.    And that it's a must have and it's very

12    important to customers?

13        A.    Absolutely.

14        Q.    And you stand by that, don't you?

15        A.    Sure.

16              MR. BAXTER:  If I can go to PX2105, if I

17    could, please, Mr. Diaz.

18        Q.    (By Mr. Baxter)  And the same is true back in

19    2003 where you say:  Standardization of interfaces in

20    the marketplace.  And it says:  Many tools are now days

21    available for rule based pricing and configuration.

22    These functions are rather a must have.  Do you see

23    that?

24        A.    Is that what's in yellow there?

25        Q.    Yes, sir.

1     A.    Okay.  Yes, I do.

2     Q.    Okay.  Now, look at one more document, PX493.

3           MR. BAXTER:  Look at Page 9, if we could,

4     please, Mr. Diaz.  You want to blow up the chart at the

5     top?

6     Q.    (By Mr. Baxter)  And this has to do with target

7     markets for a pricing engine.  Do you see that?

8     A.    Yes, I do.

9     Q.    Okay.  And it's a little hard to read.  I had

10    somebody write them out for me.  I'm going to read you

11    the categories at the top.

12    A.    Okay.

13    Q.    A&D, Automotive, Consumer Products, Financial

14    Services, Healthcare, HR, High Tech, Oil & Gas, Process,

15    Public Sector, Retail, Telecommunications, Utilities.

16    And across all of those industries the sales pricing

17    engine gets a check mark, does it not?

18    A.    Yes, it does.

19    Q.    Because it affects all of those industries,

20    doesn't it?

21    A.    It can be used in every -- in every one of

22    those industries.

23    Q.    Now, my understanding, Mr. Childs, is that you

24    told all of your old customers before May the 6th of

25    last year that they had to make no changes in the way

1  they used your pricing engine; is that right?

2      A.    The release note was for customers after May

3  2010.

4      Q.    So everybody, that's -- how many is that?  How

5  many thousands is that?

6      A.    I think we were talking about 1,300, right.

7      Q.    Okay.  1,300, you told them just keep right on

8  going?

9      A.    I believe we certainly said there -- that note

10 did not have a change for them to make.

11     Q.    Does that mean keep on doing what you're doing,

12 keep on using that pricing engine even though it's an

13 infringing technology?

14     A.    I would believe so.

15     Q.    Okay.  You didn't want to take it out, did you?

16     A.    We did not take it out in that -- that way, no.

17     Q.    You didn't want to take it out either, did you?

18     A.    I don't know if we wanted to or not.

19     Q.    Well, you wanted --

20     A.    It's a practice for us not to remove things

21 from -- from customers for sure.

22     Q.    Even though it infringes?

23     A.    No, that wouldn't -- I don't think that was --

24 I think we've already discussed that today.

25     Q.    My question was:  You said it was a practice

1  not to take it out of a customer's product.  And I asked

2  you:  Even though it does infringe, you don't want to

3  take it out?

4      A.   I can't really put a proper -- an opinion.

5  That's a legal point, I think.

6      Q.   No, it's a business decision, sir.  You either

7  leave it in and continue to infringe or you take it out,

8  one or the other.  That's easy.  You decided you didn't

9  want to take it out, did you?

10     A.   We did not take it out for those guys.

11     Q.   Because it was a valuable piece of software,

12  was it not?

13     A.   I can't deduce that, no.

14     Q.   You wanted to have that capability for your

15  clients, did you not?

16     A.   We did not take it out.

17             MR. BAXTER:  Thank you, Mr. Childs.  I

18  appreciate your time, sir.  That's all I have, Your

19  Honor.

20             THE COURT:  Redirect?

21             MR. MELSHEIMER:  Yes, briefly, Your Honor.

22  Thank you.  May it please the Court.

23                REDIRECT EXAMINATION

24  BY MR. MELSHEIMER:

25     Q.   Mr. Childs, is it your understanding that the

1  Jury here will decide a -- whether or not a reasonable

2  royalty is appropriate for the customers who have

3  already purchased the SAP software that contains the

4  capability that we've talked about throughout the trial?

5      A.   That's correct.  That's why we're here.

6      Q.   Okay.  Now, I want to ask you a few things

7  about what Mr. Baxter asked you about.  First of all,

8  when you have experience with customers where you don't

9  get a deal, you don't sell a deal, do -- are you just

10 totally in the dark as to why not?

11     A.   No, we're not.

12     Q.   What do you mean by that?

13     A.   Well, we -- when we lose a deal, we'll go to a

14 customer and ask them why we lost a deal.

15     Q.   And do they tell you why?

16     A.   Most times they do.

17     Q.   And so you've heard the testimony that -- from

18 Trilogy's witnesses that they had no idea why they

19 weren't getting sales of Pricer after about 2000 or so.

20 Do you -- do you remember that?

21     A.   Yes, I do.

22     Q.   Is that consistent -- is not knowing that sort

23 of thing consistent with your experience?

24     A.   Not at all.

25     Q.   Did you hear anyone testify that customers were

1    telling Trilogy, you know, we're not going to buy from

2    you because we're getting this for -- for free from SAP?

3    You ever hear that at all --

4         A.    No, I did not.

5         Q.    -- in the trial?

6         A.    No, I didn't.

7         Q.    Now, I want to talk to you a little bit about

8    the conversations that SAP had with Trilogy back in the

9    late '90s and Mr. Baxter referred to a document that had

10   a -- what he called a code word, project Austria?

11        A.    Yes.

12        Q.    Was -- was that supposed to be something

13   sinister, do you think?

14        A.    I don't think so.

15        Q.    In fact, wasn't that the internal code at SAP

16   to describe the possible partnership discussions that

17   SAP was having with Trilogy?

18        A.    Yes, exactly.

19        Q.    Does, in fact, SAP sometimes partner with

20   third-party vendors?

21        A.    Yes, they do.

22        Q.    Do they sometimes engage in relationships where

23   they will sell or resell products from another company?

24        A.    Sure.  Yes, we do.

25        Q.    Does SAP sometimes encourage other companies to

1  sell products on their own that go with SAP?

2      A.    Yes, we do.

3      Q.    Can you think of an example of that in the

4  pricing area?

5      A.    None come to mind really.

6      Q.    How about Vendavo?

7      A.    Oh, well that's a good point, yeah.  Vendavo is

8  a --

9      Q.    Okay.

10     A.    -- good one, yeah.

11     Q.    Now, what is Vendavo?

12     A.    It's that pricing optimization Mr. Baxter

13  talked about earlier.

14     Q.    And is that pretty important to customers?

15     A.    Yeah, it's a very important factor.

16     Q.    And that's something that SAP allows Vendavo to

17  sell on top of SAP?

18     A.    That's correct.

19     Q.    All right.  Now, I also want to ask you about

20  Plaintiffs' Exhibit 150.  This -- you were shown this in

21  your cross-examination.  And this is one of those

22  e-mails from -- from Mr. Bernhard Neumann and I think

23  there was a focus on this couple of sentences here.

24              We plan to have -- we plan to have SAP

25  pricing engine -- let me just skip this for just a

1    second.  It's just like Trilogy's SC Pricer but as an

2    SAP product, triple exclamation point; do you see that?

3        A.    Yes, I do.

4        Q.    Now, what's this phrase right here?

5        A.    That we would be reusing our master data.

6        Q.    What does that mean?

7        A.    It'd mean we'd be using our standard product to

8    do this.

9        Q.    Reusing our own products in our own invention?

10       A.    Yeah.

11       Q.    Now, with respect to all the documents that

12   Mr. Baxter asked you about in 1997 or 1998 or 1999, he

13   suggested you copied Trilogy and put Pricer in your

14   product and all that; do you remember all those

15   questions?

16       A.    Yeah.  Yes, I do.

17       Q.    Was there any patent that protected or allowed

18   Trilogy to own that technology during that time period?

19       A.    No, there was not.

20       Q.    Was it free for anyone to develop and use

21   independently on their own?

22       A.    Absolutely.

23       Q.    And is that what SAP did?

24       A.    Yes, they did.

25       Q.    Now, there was also some questions about this

1    mole, question about Mr. Gupta and whether or not there

2    was someone trying to smear Mr. Gupta and I'll tell you,

3    no one is trying to smear anyone, but let me ask it to

4    you this way.  That document was in the context of

5    competition between Siebel and Trilogy, correct?

6        A.    That's correct.

7        Q.    And so was it your understanding in that

8    conversation that Mr. Liemandt was having with Mr. Gupta

9    that he wouldn't be talking about moles or -- or FUD,

10   fear, uncertainty or doubt, unless you were strongly

11   competing with someone, right?

12       A.    That's correct.

13       Q.    Now, was that anything like the documents

14   Mr. Baxter showed you where you had some -- some SAP

15   people saying, you know, I know something about Trilogy

16   and you might be interested in it?

17       A.    Not at all.

18       Q.    Now, was anything about those documents, those

19   e-mails, did anything describe something that was a

20   trade secret or confidential information that someone

21   was offering to disclose to SAP?

22       A.    Wasn't even brought up.

23       Q.    Now, and then with respect to all this question

24   about whether a company is successful or not or whether

25   a company has problems or not, now, sir, there's only

one company in this lawsuit that is trying to make the
other company pay it 280 million dollars in lost
profits, right?

    A.   That's right.

    Q.   Now, we're not asking Trilogy for money in this
case, right?

    A.   No, that's correct.

    Q.   They're asking us for lost profit damages?

    A.   That's correct.

    Q.   And is it your understanding from what you've
heard, that the way they conducted their business
including other reasons why they may have lost sales, is
relevant for the Jury to consider?

    A.   Yes, it is.

    Q.   And that's not smearing anyone, is it?

    A.   No.  No, it isn't.

    Q.   And you're not hiding the fact that sometimes
people at SAP have criticisms of the company?

    A.   Not at all.  Not at all.

    Q.   Now, you're under oath.  Have you ever had any
criticisms of SAP?

    A.   Well, maybe a few.

    Q.   Okay.

    A.   Yeah.

    Q.   So it's not -- there's nothing unusual about

1    that, is there, sir?

2        A.    No.  No, there's not.

3        Q.    But can employee attrition, integration issues,

4    bad software, high prices, can all those things affect a

5    company's ability to make sales?

6        A.    Yes, they can.

7        Q.    Can the fact that Trilogy's customers were not

8    receptive and not complimentary of their product, that

9    we saw some documents indicating that 57 percent were

10   unsatisfied, can -- would that affect SAP's ability to

11   sell products?

12       A.    It would improve ours.

13       Q.    It would improve yours, but --

14       A.    In this -- if we have that bad of a rating, it

15   would hurt us badly.

16       Q.    So it's certainly relevant to the issues of

17   whether or not a company could make sales from scratch

18   in 2003 through the date of this trial, right?

19       A.    Yes, it does.

20             MR. MELSHEIMER:  One moment, Your Honor.

21   May it please the Court, just one moment.

22             (Pause.)

23             MR. MELSHEIMER:  I have no further

24   questions of Mr. Childs.

25             THE COURT:  Additional cross?

MR. BAXTER:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION CONTINUED

BY MR. BAXTER:

Q.    Mr. Childs, do you remember when Ms. Fitzgerald took your deposition?

A.    Yes, I do.

Q.    Remember her asking you about if you knew why you lost a particular sale?

A.    Don't recall.

Q.    Let me read it to you.

A.    Okay.

Q.    When SAP loses a sale, I know you told me that you don't always know who you lost to, when SAP loses a sale, does it always know why it lost?

Answer, no.

A.    Not always, that's correct.

Q.    Are you aware of the reasons why SAP has lost any particular deal?

Not with direct knowledge, but no, not with direct knowledge.

Isn't that what you said at your deposition?

A.    I did say that not always I would know that, that's correct.

Q.    Now, have you been involved in any Pricer

1  deals?

2     A.   No, I have not.

3     Q.   Are you out selling R/3?

4     A.   I have supported sales for many years, but not

5  right now, no.

6     Q.   You're not the guy, you're not the contact guy

7  that goes out and tries to sell R/3, are you?

8     A.   No, I'm not.

9     Q.   So you don't know if anybody says I want

10 pricing or not, do you?

11    A.   Not recently, no.

12    Q.   Well, not since 1997, have you?

13    A.   Not since January, yes.

14    Q.   And so about Pricer, you have absolutely no

15 idea if people are asking your salesman about pricing,

16 what it does, how fast it works, what its functionality

17 is, or whether or not they want it or want to use it, do

18 you?

19    A.   Currently I do not.

20    Q.   Now, Mr. Melsheimer asked you about if people

21 were trying to sell bad software, that wasn't a good

22 fact and you agreed, didn't you?

23    A.   Yes, I did.

24    Q.   Are you now saying that Trilogy had bad

25 software?

1    A.    I never said that, no.

2    Q.    Okay.  So when he asked you about bad software,

3 that was just a slip of his little tongue?

4    A.    I don't know.

5    Q.    Well, you didn't mean it, though, did you?

6    A.    About selling.

7    Q.    That Trilogy was selling bad software, the same

8 software that you agreed --

9    A.    Yes.

10    Q.    -- a while ago was the best of breed?

11    A.    No, I've never said that.  No.

12    Q.    Okay.  Thank you, Mr. Childs.

13            MR. BAXTER:  That's all I have.

14            THE COURT:  Redirect?

15            MR. MELSHEIMER:  Briefly, Your Honor.

16            Can we pull up Defendants' Exhibit 957.

17         REDIRECT EXAMINATION CONTINUED

18 BY MR. MELSHEIMER:

19    Q.    Mr. Childs, just so you'll know where I'm

20 getting that word bad software.

21            MR. MELSHEIMER:  Let's go down to the

22 second page.

23    Q.    (By Mr. Melsheimer)  You remember this exhibit

24 from one of Trilogy's developers?

25    A.    Yes, I do.

Q.   All right.  Now, I don't want to put words in

his mouth, but what does he say right up there?

A.   Trilogy Software is bad.  Ask any integrator.

Ask any user.  Ask any customer.

MR. MELSHEIMER:  No further questions.

RECROSS EXAMINATION CONTINUED

BY MR. BAXTER:

Q.   So how come it was, Mr. Childs, you had such a

hard time competing with Trilogy if that software was so

bad?

A.   I -- I don't know.

Q.   You wanted to keep them out of the marketplace,

your salesmen are recommending that people use SAP, you

wanted to put -- I mean, Trilogy, you wanted to put a

stop to that.  You didn't want them plugging in and you

used their technology.  You still want to say their

technology was bad?

A.   I didn't say that.

Q.   Thank you.

A.   Well, your guy did.

Q.   Thank you.

MR. MELSHEIMER:  Nothing further, Your

Honor.

THE WITNESS:  Thank you.

THE COURT:  You may step down.  Call your

1  next witness.

2           MR. MELSHEIMER: Sorry, Your Honor, for

3  the brief delay. We're going to call doctor Ray Mercer.

4           THE COURT: All right.

5           MR. MELSHEIMER: My colleague,

6  Mr. Batchelder, will be examining Dr. Mercer.

7           THE COURT: Dr. Mercer, stop right there

8  and let Ms. Lockhart administer the oath.

9           (Witness sworn.)

10          MR. BATCHELDER: May it please the Court.

11          THE COURT: Mr. Batchelder.

12    MELVIN RAY MERCER, DEFENDANTS' WITNESS, SWORN

13             DIRECT EXAMINATION

14 BY MR. BATCHELDER:

15    Q. Dr. Mercer, good afternoon.

16    A. Good afternoon, Mr. Batchelder.

17    Q. Would you please introduce yourself to the Jury

18  and tell them a little bit about your background?

19    A. Yes. My name is Melvin Ray Mercer. I'm 64

20  years old. I grew up in the oil fields of West Texas,

21  came from a place called Seminole, Texas.

22          My father was a manual laborer, he was a

23  pipeliner, put lines in the grounds and covered them up,

24  but he thought -- and education was important and so he

25  encouraged me to go to college.

1    I worked in the oil fields to get my

2 Bachelor's degree in a similar sort of way.  Things have

3 gone very well for me over time.

4    Have two beautiful daughters and three

5 wonderful grandchildren.

6    Q.    Describe your education for us, please, sir.

7    A.    In 1968 I received a Bachelor's degree in

8 Electrical Engineering at Texas Tech up in Lubbock,

9 Texas.  1971, I received a Master's degree at Stanford

10 University out in California.  And in 1980, I received a

11 Ph.D. at the University of Texas at Austin.

12    Q.    Thank you.  Tell us a bit about your work

13 experience.

14    A.    I have a total of 42 years of work experience.

15 About a third of that is doing work in industry.  Worked

16 for a company called GTE Sylvania, but you would know

17 them now as Verizon, they -- and a -- moved to Verizon.

18 I worked for Hewlett Packard in Hewlett Packard

19 Laboratories, I think you probably heard that name

20 before here.

21    And eventually I went to a place called

22 Bell Telephone Laboratories.  It doesn't exist anymore,

23 but it was a very well-known place.  It's the place, for

24 example, that the transistor was -- was invented and

25 also the laser.  And now sort of its successor is AT&T.

1     Q.   Sir, have you done any teaching?

2     A.   Yes.  You can probably guess from the fact that

3  I brought books up and I'm the first person to do that,

4  that I must be a teacher; otherwise I wouldn't bring any

5  books.

6               So in fact, I spent 13 years teaching at

7  the University of Texas at Austin as a professor.  That

8  was from 1982 until 1995.  And in 1995 I left the

9  University of Texas at Austin and went to Texas A&M

10  University and taught there for 10 years.

11     Q.   Sir, are you telling us that you've taught both

12  Longhorns and Aggies?

13     A.   It's an absolutely true fact and the Longhorns

14  when I left, many of them said they thought I was a

15  traitor.  And the Aggies when I got there thought maybe

16  I was a spy.  But before it was all over, it seemed to

17  have worked out pretty well because 10 years later I

18  retired and the Board of Regents was nice enough to name

19  me a Professor Emeritus, which is an honorary position.

20  Doesn't mean any money, but it's just a nice title.

21               MR. BATCHELDER:  Go to the first slide,

22  please.

23     Q.   (By Mr. Batchelder)   Would you please explain

24  to us what you've been asked to do in this case?

25     A.   Yes.  I come here as an technical expert and

1  not to tell you so much about dollars like, let's say, a

2  damages expert, but just to give you some -- some things

3  that you can think of from a technical point of view

4  that may be useful to you as you make your

5  determination.

6      Q.   Okay.  So this first point is tutorial; what do

7  you mean by that?

8      A.   Well, before I start talking about things, I

9  think it's good to have a little background; I'll keep

10 that as short as I can.  But the things that I think 1

11 be useful to you, I'll do that first.

12     Q.   What is this Topic No. 2?

13     A.   The second one has to do with the claims of the

14 '350 patent and how valuable that is from a technical

15 point of view to Pricer's Trilogy product, which you've

16 heard about quite a bit, I think, here already.

17     Q.   No. 3?

18     A.   No. 3 is the claims of the '350 patent and

19 their value to SAP and in particular to the accused

20 products, R/3, ERP, and CRM.

21     Q.   And No. 4?

22     A.   No. 4 has to do with something we're going to

23 called the design out.  That's the way that SAP changed

24 its product so as to terminate the -- the processes that

25 were found to infringe back in 2009.

1  Q.   Have you testified in court as an expert

2  before, sir?

3  A.   Yes, I have.  The first time I was asked to

4  testify was in 1984 when I was at the University of

5  Texas at Austin.  The State Attorney General's Office

6  called me and let me testify.  And in the last 11 years.

7  I've testified in court about a dozen times.

8  Q.   Are you an inventor on any patents yourself?

9  A.   I am.  I'm an inventor on patents.

10  Q.   Are you being paid to work in this case?

11  A.   Yes, I am.  I'm being paid to do this work at

12  $650 per hour.

13  Q.   Is your pay tied in any way to the outcome?

14  A.   No.  I just get paid for the hours that I work.

15  Q.   All right.  Now, yesterday Mr. Gupta testified

16  as an expert on behalf of Trilogy.  You're aware of

17  that?

18  A.   Yes.  I was here when he testified.

19  Q.   All right.  And he said that he had been

20  employed by Trilogy for a number of years, has some

21  personal friends there that paid for some of his

22  schooling.  Do you have any connections like that with

23  SAP?

24  A.   No, I don't have connections like that.  I

25  never worked for SAP.  They never sent me to school.  I

1 did my schooling on my own.

2           And I did one time, though, do another

3 case for SAP a couple years ago, a completely different

4 case, but doing the same sort of thing I'm doing here

5 today.

6     Q.    All right.  Why don't we step through just the

7 conclusion.  We're going to get to the tutorial in a

8 minute, but let me just ask you to state your conclusion

9 as to Topic No. 2, the '350 claims value to Trilogy's

10 Pricer.

11     A.    Yes.  My conclusion is, based on technical

12 objective criteria, the things that you can understand,

13 numbers that you know where they came from, that

14 actually the value of those claims is not great at all

15 compared to -- with respect to the Pricer product.

16     Q.    And for No. 3, the '350 claims value to SAP's

17 ERP and CRM, please summarize your conclusion.

18     A.    Similar sort of thing.  Looking now at

19 technical issues, objective things where you can see

20 numbers and you can see why that come to -- that leads

21 me to the conclusion that the '350 claims don't have

22 much value to SAP's accused products.

23     Q.    Okay.  And would you please summarize No. 4,

24 non-infringement of SAP's design out.

25     A.    Yes.  It's -- after -- after carefully studying

1  this issue, I've concluded that the design out, in fact,

2  did eliminate all infringement as of May 2010 by SAP --

3      Q.    All right.

4      A.    -- of the '510 patent --

5      Q.    Thank you, sir.

6      A.    -- '350 patent.

7      Q.    Let's circle back then to your tutorial, and

8  let me put up your first slide.

9              What is this?

10     A.    This is sort of trying to, in a simple way, get

11 to exactly what is the '350 invention and what kind of

12 things have to happen to infringe it.

13             And so I tried to do this in a pictorial

14 way, and so if we think about these circles as

15 representing all kinds of products that might be

16 built -- and in particular, let's look first at this

17 green circle, customer hierarchy.

18             So all the systems that use customer

19 hierarchy would fall inside this circle; all those that

20 didn't would fall outside this circle.

21             In a similar way, this blue circle would

22 be the product hierarchy, and so all the systems that

23 use product hierarchy would fall inside the circle, and

24 more interestingly, those that fall in both would

25 actually have both a customer hierarchy and a product

1 hierarchy.

2 But even in that situation, according to

3 the claims of the '350 patent, those systems would not

4 necessarily infringe, because there's one other thing

5 that has to happen, and that's that red circle up there.

6 There's this very specific kind of

7 hierarchical access that's claimed in the '350 patent,

8 and so now if we look at all the systems that use that

9 kind of hierarchical access, there are a total of eight

10 kind of intersections, but only this little area right

11 here, which is in the center of all three of those

12 circles, are the set of systems that infringe.

13 And I think as we go through, it's just

14 nice to have a picture to refer to from time to time in

15 terms of what it really means to infringe the '350

16 patent.

17 Q.  And, sir, would I be clear then that you have

18 to be in this darkest area, and you have to do all these

19 things or have the capability to do all those things in

20 connection with generating a single price; is that fair?

21 A.  That's absolutely true.  And the Court has

22 found that the infringement is a capability to infringe.

23 So you're absolutely correct on that, too.

24 Q.  Okay.  And let's back up for just a minute.

25 This '350 patent is generally about using

1 computers for pricing, right?

2     A.   That's exactly right.  It's -- it's basically

3 the idea -- it's one of many patents where you can --

4 where you can use a computer to determine a price per

5 product.

6     Q.   All right.  Now, did Trilogy invent

7 computerized pricing?

8     A.   No.  Trilogy didn't invent that, and Mr. Carter

9 didn't claim that either.

10     Q.   Right.  And there have been many companies for

11 many years pricing on computers before Trilogy came

12 along.

13     A.   Far, far back, decades at the very least.

14     Q.   Including SAP.

15     A.   Including SAP.

16     Q.   Okay.  You mentioned here hierarchies.  There's

17 been quite a bit of talk about them today, but I'm not

18 sure it's been really defined very well.  Can you

19 explain what a hierarchy is?

20     A.   Yes.  As you have probably heard, the Court is

21 good enough to construe certain claims for -- claim

22 terms for us.  And one of those terms was hierarchy.

23           So if we go to the next slide, we can see

24 exactly what the Court has defined and what we all adopt

25 as the meaning for hierarchy in this particular case.

And the Court has told us that hierarchy is a branching
arrangement of at least two levels of data.

So those are the words. And then, again,
I wanted to show you a picture to give you an idea of
about what a hierarchy might be. So if they're a
collection of things, they might show up in this box,
and we would call that box maybe the parent box.

And then this is the branching that we're
talking about right here going down to what we would
call two children, a child on the left and a child on
the right.

The reason that this term branching came
about is because it refers to the branches on a tree.
So often these hierarchies are said to have leaves, and
sometimes we look at the very beginning, and we call
that the root. So those kinds of terms, obviously, come
from trees.

Q.   All right. And this is an example where you
flesh it out a bit; is that right?

A.   Yes, because if you remember, those two circles
were about customer hierarchies and about product
hierarchies, so I wanted to show you a very simple set
of examples.

First, with respect to customers, suppose
we talk about governmental customers. Those would be

1  the parents.  But certain kinds might be police

2  departments, and another type might be schools.

3            Again, we have parent, children, and I

4  want to stress that with a hierarchy, it's interesting

5  in the sense that there's only one parent for each child

6  in the same sense that only one leaf always is tied to

7  one branch.

8            Now, with respect to product hierarchy,

9  it's a very similar thing, except now inside the boxes,

10 we're talking about products like cars, with children

11 like compacts and full size.  These things would be

12 called two-level hierarchies.

13           That's the -- what the Court said was the

14 smallest that you could have, but you could have

15 multiple levels, too.  You can have something down here

16 like red full-size cars and black full-size cars.  They

17 would be children if they had only one parent, namely,

18 the full-size cars.

19     Q.   All right.  So there are product hierarchies;

20 there are customer hierarchies.  Those kinds of things,

21 do they have uses outside of pricing?

22     A.   Oh, yes.  They have very broad usage, not just

23 in pricing, but in much of what we would call computer

24 engineering and electrical engineering.

25     Q.   Okay.  And many years back, did SAP's computer

1  systems have these kinds of hierarchies in them for all

2  kinds of uses?

3      A.   Yes.  SAP was using hierarchies to -- for

4  pricing kinds of things, both customer hierarchies and

5  product hierarchies long before the '350 patent, way

6  back, as a matter of fact -- at least I show some

7  documents from 1994.

8      Q.   Okay.  So you pointed out what a hierarchy is

9  and have given us an example.  Are there things with

10  boxes and lines connecting to them that are not

11  hierarchies?

12      A.   Yes, of course.  You can have a hierarchy, and

13  then there can be something that would not match with

14  what the Court said was its construction, and I can show

15  you an example of that as well.

16      Q.   I'll put that up in a minute.  I'm going to

17  make a friend of the court reporter right now,

18  Dr. Mercer.  If I can ask you to slow down just a little

19  bit.

20      A.   Well, it's always very exciting for me to be

21  with the ladies and gentlemen of the jury, so my

22  apologies to the court reporter.

23      Q.   All right.  So what do you depict here, sir?

24      A.   Now, this is a case of something that's not a

25  hierarchy, and the reason it's not a hierarchy, because

1 if we look at this child here, it has two parents.

2 That's not allowed with respect to a hierarchy, and it's

3 a real problem with respect to Pricer and the '350

4 patent because we know that there's this idea of

5 inheritance.

6 And as a matter of fact, in order to find

7 the price of this child, we might look up to its

8 parents, and since there are two separate parents, there

9 could be two separate prices. Mom could be saying

10 charge $5, dad could be saying charge 15, and the poor

11 child has a very big problem, because there's not a

12 unique rule about what price to assign.

13 So that's the reason that we need for

14 these -- these products to be represented in

15 hierarchies, and we need for -- for these organizations

16 to be represented in hierarchies.

17 And when we find something like this where

18 we find a child with two parents, that's not a

19 hierarchy, and that will be important, and later on

20 toward the end of my presentation, you'll see why.

21 Q. You talked a little bit about, I think before,

22 branches from a tree in real life. Let's pretend this

23 is a leaf. Does one leaf descend from two different

24 branches at once?

25 A. I would say that's about as rare as a four-leaf

clover.  It doesn't happen very often, if at all.

Q.   All right.  We talked a little about times.
You put together a timeline?

A.   Yes.  We were talking about -- actually, we
were talking about the idea that SAP was doing pricing
and using hierarchies a long time ago, back in 1994.

And to get a relative idea about time, in
1995 was the introduction of Pricer; 1999 was the filing
date for the '350 patent; and 2003 was when the '350
patent actually was issued and became effective.

Q.   All right.  So back in this time period, '94,
SAP was pricing using customer hierarchies and product
hierarchies; is that fair?

A.   That's correct.

Q.   And, again, no one's accusing SAP of infringing
for doing so, correct?

A.   No.  They weren't accusing -- no.  There's
no -- you can't possibly accuse infringement here,
because this idea came before the actual idea in the
patent.

So the rules in the -- in the Patent
Office say, if you've got the idea first, no one else
can come in and take it away from you.  So this is
something that actually would be called prior art if it
was accused, but it's not.

1    Q.   Okay.  So back in -- back in the day, in '94

2    and earlier for SAP, when they had product hierarchies

3    and customer hierarchies used for non-pricing and

4    pricing -- let's say and pricing -- was the date on

5    those hierarchies assessed for generating a price?

6    A.   Of course.  You always have to go into the

7    hierarchy in order to find out what the price will be.

8    And that means that you have to do some sort of

9    accessing into those hierarchies to find out what those

10   prices will be.

11   Q.   All right.  And do you have a name for the kind

12   of accesses that SAP was doing in that '94 timeframe and

13   earlier?

14   A.   Right.  You can do all kinds of accesses, but

15   the kind that is most important is what we will call

16   classical access.  This was a type of hierarchical

17   access, also, but it's not the type of hierarchical

18   access that is claimed in the '350, the difference being

19   that in this particular case, when we make multiple

20   passes into the -- to the database, one pass for each

21   level.

22            So when we were at the parent, we would go

23   up and get a price.  When we're at the child, we'd go in

24   and get another child.  And if we had a blue car, we'd

25   have to go and get a third price.

1          The kind of thing that's claimed in the

2   '350 patent is where we go, if you remember the net, and

3   we get all those prices from all those levels at the

4   same time.

5          So classical, one level at a time, can't

6   possibly infringe.  Hierarchical might infringe,

7   depending on whether or not you're talking about also

8   using product hierarchies and customer hierarchies.

9      Q.   Can you still do these same kind of classical

10  accesses of customer hierarchies and product hierarchies

11  today --

12     A.   Sure.

13     Q.   -- toward the far right by using SAP?

14     A.   Sure.  SAP could do this any time they want,

15  because while the '350 patent gives a right to exclude

16  doing things, it can't exclude doing things that are

17  outside the limits of the claim.

18          So another way of saying that is, if you

19  think about those circles, it can exclude anyone from

20  getting inside that intersection, that small

21  intersection we were talking about, but that's the only

22  thing it can exclude.  And these kinds of accesses would

23  not fall inside that little intersection.

24     Q.   All right.  So why don't we get in then to the

25  meat of your opinions now.  And you've got one here

1   about '350 claims value to Trilogy's Pricer; is that

2   right?

3      A.   Yes, correct.

4      Q.   All right.  Now, you heard Mr. Gupta, I

5   believe, say yesterday on the stand -- I think he came

6   up with a number.  He said 63 percent of the value of

7   Pricer is attributable to the '350 patent.  Did you hear

8   him say that?

9      A.   That's the number I remember.

10      Q.   What's your reaction?

11      A.   My reaction is that it's important when you

12   give a number to give an explanation about why -- where

13   that number came from so that you as ladies and

14   gentlemen of the jury can look at underlying assumptions

15   and see whether you agree with them or not.

16           And unfortunately, that number just sort

17   of came out of thin air.  We don't have any exact idea

18   about what it was that Mr. Gupta was thinking about when

19   he gave us this number.  He just gave us the number

20   63 percent.

21      Q.   Now, have you come up with a short list of your

22   criticisms of Mr. Gupta's analysis?

23      A.   Sure.  I've tried to do some things that we

24   should think about that might -- might show some errors

25   in how that 63 percent might have come about.

1    Q.   All right.  What's this first one?

2    A.   The first is the idea of unclaimed features.

3 And the unclaimed features, what we're really talking

4 about here is, I think Mr. Gupta was thinking all of

5 those circles, all three of those circles had value.

6            As a matter of fact, if you read in his

7 expert report, you'll see that's exactly what happened.

8 He said, if it's inside any one of these circles, wow,

9 that's valuable.  That's valuable with respect to the

10 '350 patent.

11           But that's not the way it works.  It has

12 to be inside all three of those circles, in that little

13 bitty part.  And so those unclaimed features, I think,

14 are one reason that Mr. Gupta's number got inflated up

15 to 63 percent.

16    Q.   Okay.  And No. 2, Values, ingredients, not

17 combination.  What do you mean by that?

18    A.   Well, again, that's a very similar sort of

19 idea.  Here the idea is that we're looking at the parts

20 that go together to make something up rather than the

21 value of all of them together.

22           So the way I think about it is, if I'm a

23 very, very brilliant chef, and I go out, and I get some

24 pretty common things, you know, milk and eggs and stuff

25 like that and put them together, well, anybody can put

1   milk and eggs together, but if I put those things

2   together in just the right way as a brilliant chef, I

3   might make something like a very good chocolate cake.  I

4   mean, that's what I would like.

5              And so it's not the ingredients; it's that

6   combination.  It's the idea that the chef had about how

7   to make a good cake.  And I believe that what happened

8   is, unfortunately, Mr. Gupta focused on the ingredients,

9   not on the combination.

10     Q.   All right.  And this third point:  Understates

11  technology changes over time, what's your point there?

12     A.   Well, the point here is -- and I think all --

13  everyone in this -- in this room realizes that

14  technology, especially electronics technology, changes

15  very rapidly.  And that has a significant impact on

16  these kinds of value issues.

17             And so as a matter of fact, as time goes

18  on, technology become -- allows us to do things that are

19  much more powerful.  I think the example you've already

20  heard is that a laptop, let's say, back in 1990 wasn't

21  nearly as powerful as, say, a laptop in 2003.  We'll

22  talk about that in more detail a little later.

23     Q.   All right.  So let's drill down a little more

24  into unclaimed features.  What's your point here?

25     A.   Okay.  So the point really is that if you want

1     to know what an invention is, you have to look at the

2     claims.  There are three claims that are asserted in

3     this case, and one of them is Claim 39 -- I'm sorry --

4     Claim 29.

5            And Claim 29, as the Court indicated to

6     you, has a set of limitations, and if some -- some

7     particular accused product meets every one of these

8     limitations, then that's part of the '350 claim.

9            But on the other hand, what Mr. Gupta

10    was -- was studying was things like performance,

11    flexibility, and disconnected operation.  If you look in

12    these claims, you don't find out -- you don't find the

13    word performance.  You don't find the word flexibility.

14    You don't find the word disconnected operation.

15           And as a matter of fact, you really don't

16    find those ideas.  You may find underlying capabilities

17    that could lead to that, but that's sort of like

18    measuring indirectly from these things right here when

19    you can actually go and measure directly from the

20    claims, and I think that's, again, a big mistake.

21      Q.   All right.  So let's drill down into your Point

22    No. 2, values, ingredients, not combination.

23      A.   Yeah.  Well, that's the point where we were

24    talking about the things being put together.  So here we

25    have flour, and here we have milk, and maybe here we

have eggs, but in the very, very middle, that's the
recipe.

          And so the point is that this little
intersection here is much, much smaller than say all the
stuff that's colored here.  And so if we put a number,
like 63 percent, on this great big set of colored stuff,
that doesn't mean that the claim or the invention is
63 percent; it's just this little bitty part in the
middle, which eventually we'll see may go to zero.

     Q.   All right.  And now No. 3:  Understates
technology changes over time.

     A.   Yeah.  That's the idea that, for example, if
you run a processor today, you'll probably be running it
about, let's say, 60 or 70 times as fast as you were,
say, about seven or eight years ago.  There's a picture
to show this.

     Q.   All right.

     A.   And so if we start -- and let's suppose that
when we were -- people were first thinking about the
Pricer problem, that they had a problem.  And let's
suppose that its size was something on the order of two
or three, but they only had electronic products that had
the power of one, if you will.

          Well, that's kind of a serious problem,
because you don't have enough power.  But as time goes

on, the power of the products goes up and up and up so
that by, let's say, 2004, you -- the power is like 60 --
64 times as great.  And now problems that are a size
three are not -- the solution of problems that are a
size three just really is not that important.

So technology really changes the way
values apply in what are called algorithms like what
we're talking about in the '350 patent.

Q.  All right.  And what about the internet?  Have
there been any changes in time from here to here in
terms of the internet?

A.  Sure.  There's been some discussion of that,
also, and I think if you -- if you think back, let's
say, into this 1995 timeframe, maybe you had a telephone
modem at home, and you plugged it in, and you sat and
you waited and waited and waited for something to
happen, because about 60,000 bits could flow to you.
That's the maximum that could happen.

But today you probably plug it into your
telephone DSL line or something like that, and instead
of 60,000 bits a second, you get 3 million bits a
second.

And so the point is that the information
flows much, much faster.  And so for that reason, for
example, it's probably not necessary for a salesman to

carry all this information around in his computer.  He
can just plug into the internet and get exactly the
information he needs from a centralized database just as
easily, let's say, at a later time.

THE COURT:  You need to slow down your
answers.

THE WITNESS:  Okay.  Fair enough.

THE COURT:  She's working hard.

THE WITNESS:  Sorry about that.  I'll try
to -- I'll try to speak slower.

THE COURT:  Well, it doesn't have to be
that slow, but it needs to be slower.

THE WITNESS:  Thank you, Your Honor.

Q.   (By Mr. Batchelder) So, Dr. Mercer, if you
would -- I understand this point, and I understand your
point about the internet.  Can you explain to the jury
why that matters to this topic that is the value of the
'350 patent over time?

A.   Sure.  If you have a problem, and you have two
solutions, and one is a very good solution, then when
you're right on the bleeding edge of being able to solve
the problem, that may be very, very important.

But as time goes along, you're no longer
living on the bleeding edge.  You've got plenty of
capability to solve the problem, and therefore, a

1  sophisticated solution or a less sophisticated solution

2  may not be very differentiated in terms of their value.

3      Q.   All right.  Why don't we move on to your next

4  topic:  The '350 claims value to SAP's ERP and CRM

5  products.

6      A.   Okay.

7      Q.   So what is this first line?

8      A.   Well, this is just a slide of -- if you were to

9  bring up the ERP system, what you'd see is something

10  which has a whole bunch of folders, not really terribly

11  different than what you might see if you opened up, say,

12  Microsoft and started looking, except that it --

13  honestly, it's quite a bit more complicated.

14           But at any rate, at the first level, there

15  are things like Office and cross-applications, and

16  here's one that's kind of interesting, because it's

17  Logistics, and when we look for the '350 invention,

18  we'll find it down inside that folder, but not the next

19  folder or not the next folder after that but many, many

20  folders deep.

21           And so the point here is:  I think you've

22  already heard that the number of windows or the number

23  of solutions that are available with a product like ERP

24  is enormous, maybe a hundred thousand or something on

25  that order.

1    Q.   All right.  So we're going to take this

2  Logistics folder, which is one of many here, and we're

3  going to blow that up in the next one; is that right?

4    A.   Right.  So that was 1 of 8, and let's just say

5  there are 20 here.

6    Q.   So this is Logistics up at the top?

7    A.   This is Logistics up at the top.  And then

8  there are sub -- sub kinds of things that you can do in

9  ERP under that.  And, obviously, those other seven that

10 we didn't open have another 20 for each of them.

11         So we're talking about something on the

12 order of maybe 160 kinds of things, but we're still not

13 anywhere down to where we're talking about the '350

14 patent.

15   Q.   Okay.

16   A.   So in order to save time for the jury, we're

17 going to go -- we're going to cut right to the chase.

18         Here is hierarchical access.  That's at

19 the very bottom.  And inside hierarchical access, not

20 everything infringes, just this little circle right here

21 (indicates).  So this is the part that represents the

22 value of the ERP product inside hierarchical access.

23   Q.   All right.  Now, just let me -- let me just go

24 back, and then I'll go up again.

25         So you're saying this circle is

1  hierarchical access -- or the intersection of those

2  three circles that you were talking about before, and

3  that's within hierarchical access in general?

4      A.   Exactly, which is one kind of pricing.

5      Q.   All right.  And then blow it out a little.  And

6  what have you done here?

7      A.   Well, there are some other kinds of pricing of

8  which hierarchical is one part.  So we sort of jump one

9  step further.  We've gone one level of folders further.

10  And as you notice, that circle got smaller as a part of

11  the total system.  It's gotten smaller.  But that's not

12  the top of ERP either.

13          Now, we have what are called basic

14  functions of which special pricing is one of those, and

15  we show three of those things, like condition records,

16  prices in sales documents, and special processing

17  functions and --

18      Q.   Now, can you see this little dot over here

19  (indicates)?

20      A.   Now, I'm really proud to say that the guy who

21  sells my lenses does a good job.  I can still see it.

22  So we will -- it will be kind of a test how long you can

23  stay with that circle.

24      Q.   All right.  Should we go one more level?

25      A.   Please.

 1          Now we're up to that sales and

 2   distribution folder, which is as deep as we ever got

 3   going the other way.  And, again, we have folders inside

 4   of folders inside of folders inside of folders.

 5          And you might want to ask me about the

 6   circle again.  I'll just ask you about it.  Can you see

 7   that circle?  Whether you can see it or not, you can

 8   tell it's a very small part of the whole ERP system, and

 9   we're not to all of the capabilities of the ERP yet.

10   Q.   Should we go again?

11   A.   Yes.

12   Q.   All right.  What have you done now?

13   A.   Well, we're at least now up to Logistics.  The

14   circle has completely disappeared, and we're still not

15   to the top of ERP.  There are folders and capabilities

16   inside of capabilities.

17          And somewhere deep down inside there,

18   there is the capability of the '350 patent, but it's a

19   small part of the whole picture as we see it there.

20   Q.   And, Doctor, you said Logistics, that was one

21   of those eight folders we started with, right?

22   A.   That's exactly right.  So we have ever step.

23   Q.   All right.

24   A.   And now we finally got to enterprise resource

25   planning, which you've been hearing called ERP.  And if

1   you remember, there were really eight of these, but just

2   for simplicity, we drew three. And inside these eight

3   or three, there are these 20 that we saw and inside and

4   inside and inside and inside, and someplace deep down

5   inside there, there's still that little circle which

6   represents the contribution of the '350 patent to the

7   whole ERP tool.

8            But it's a small part. It's not 63

9   percent, if you look at it from this objective criteria.

10     Q. Now, and to be clear, the 63 percent wasn't

11   pointed at SAP at all; that was pointed at Pricer.

12     A. Yeah, that's true.

13     Q. Okay. All right. And is there another layer

14   to this?

15     A. Yeah. There's another layer, because it turns

16   out that if you go to SAP, you not only could buy this

17   particular tool, but you could buy another one that's --

18   that's accused, which is CRM, customer relations

19   management, and other tools that really aren't at issue

20   in this case.

21     Q. All right. So on this subject of the value of

22   the patented pricing technique to SAP's products, I

23   understand that you've had some criticisms of

24   Mr. Gupta's analysis. Have you done anything on your

25   own to analyze that question?

     A.   Yes.  There are several ways I've -- I've
looked at this, in addition to the one that you've just
seen.

               MR. BATCHELDER:  Can you take down the
animation?  Thank you.

     Q.   (By Mr. Batchelder) So what have you looked at,
sir?

     A.   Well, one of the things that's kind of
interesting is, if you have a tool, and if that tool is
down inside there, one might ask of those 1100 or 1300
customers, how many are actually using that tool?

               Because if not very many are using that
tool, its value is probably not very great.  If many of
them are using the tool, then its value probably is much
greater.  So it's very interesting to know just how many
people are really using this.

               MR. BATCHELDER:  Mr. Barnes, can you take
down this one, please, and let's get back to the main
slide there.  Oh, I am.  Okay.  Thank you.

     Q.   (By Mr. Batchelder) All right.  So this is
PX1714.  What are we looking at here, sir?

     A.   I think this is one of the last things, I
believe, that Mr. Gupta presented yesterday.  This, I
believe, is Question 12 to a company called IBM, which
was part of a survey.

```
 1      Q.   Okay.  And let me just read it here.  It says:
 2   As part of its use of SAP R/3, has the company used the
 3   hierarchical access feature within the pricing
 4   functionality for both product and customer hierarchies
 5   as hierarchical access are defined, et cetera,
 6   et cetera.
 7      A.   Yes.
 8      Q.   That was the question that was asked, right?
 9      A.   Yes.
10      Q.   Was that the right question?
11      A.   No.  I don't think that's the right question,
12   and I think the conclusion that Mr. Gupta drew was the
13   wrong conclusion, too.
14           I think our argument here is:  Is the
15   number of users, zero, which is what I would maintain,
16   or is the number of users 1 out of 1300, which, I think,
17   Mr. Gupta says he has shown as a proof here, but I don't
18   think this is really that kind of proof.  And the reason
19   is, the question is not the right question to ask.
20      Q.   All right.  So let me just put this up on the
21   ELMO, if I could.  What should he have asked?
22      A.   Well, he should have asked a more exact
23   question.  If you remember, in order to infringe, we
24   have to do three things, and we have to do them all
25   together.
```

1          We have to do a special kind of

2    hierarchical access; we have to access into a product

3    hierarchy; we have to access into a customer hierarchy;

4    and we have to do that to get a single price.

5          So to fix this question up so it really

6    generated the right answer, we have to edit it a little

7    bit to include the fact that those things have to be

8    done all at the same time, and they have to result in

9    the generation of a single price that was derived from

10   all those three things, those -- all three pieces of --

11   of information.

12   Q.   All right.  And I'm going to embarrass myself

13   by putting my own handwriting on this document.

14   A.   Well, for what it's worth, being a university

15   professor, my handwriting is even worse, so you won't be

16   that embarrassed.

17   Q.   Give me one moment, please.

18          This is the change you were just

19   describing?

20   A.   Yes.  We could change the question to:  As part

21   of its use of SAP R/3, has the company -- here we're

22   talking about IBM -- used the hierarchical access

23   feature within the pricing functionality for both

24   products and customer hierarchies together at the same

25   time to generate a -- and I would actually put there

1 single price just to be really, really clear about it,

2 because I think if you want something that's proof in a

3 court of law, you want to not question at all for

4 hierarchical access.

5     Q.   All right.  And if you don't ask that question,

6 do you get into that intersection of those three circles

7 that you were pointing out before?

8     A.   Then I think there's an ambiguity in the

9 answer, and they might have been talking about the

10 intersection, or they might have been talking about I

11 did products in 2002; I did customers in 2005; I did

12 hierarchical access in 2008; oh, yes, I did those

13 things.  And that question is ambiguous with respect to

14 whether those things are all done at the same time or

15 not.

16     Q.   Let me be real clear.  Let's say -- put aside

17 my handwriting, but as the question really was posed to

18 IBM, let's say that one year, IBM generated a given

19 price by running hierarchical access on a customer

20 hierarchy.

21     A.   Correct.

22     Q.   And then a year, it generated a given price by

23 running hierarchical access on a product hierarchy.

24     A.   Correct.

25     Q.   Would the answer to this question have been

1 yes?

2    A.   I think IBM would certainly be inclined to

3 answer that question yes, but that certainly wouldn't be

4 saying that they had in any way utilized the

5 capabilities of the '350 patent.

6    Q.   Okay.  All right.  So that's IBM.

7    A.   One more thing about IBM, if you don't mind.

8    Q.   Oh, yes, please.

9         THE WITNESS:  No.  Let's just keep on

10 going.  Let's talk about the day of this question.

11        MR. BATCHELDER:  Yes, please.

12        THE WITNESS:  If you could go back to

13 Question No. 8, I believe, which was the fourth question

14 before Question No. 12.

15        MR. BATCHELDER:  Let's see.  Do we have

16 that?  Do you have Question 8?  Is that the next thing?

17 Oh, here it is.  I'm sorry.  Good.

18    A.   Okay.  So, obviously, this questionnaire had

19 multiple questions.  8 came before 12, so it set a

20 context.

21         And notice the date, January the 1st,

22 2001.  Between January the 1st, 2001, and the present,

23 that's the wrong time interval, because I'm sure you've

24 heard 50 times now that infringement could not occur

25 until 2003.

1    And so if IBM had even done all those

2 three things all at the same time, and they had done it

3 on January the 2nd, 2001, they could answer yes to that,

4 and they still wouldn't be infringing.

5    They just were -- I hate to say this, but

6 the people who made this survey were sloppy.  They got

7 the wrong date in here, and as a result, the answers

8 that you get, that yes, so to speak, doesn't guarantee

9 infringement at all.  In fact, it's meaningless.

10   Q.   All right.  So I understand that's IBM, and

11 there were 39 other companies that received questions

12 from Versata in this case, right?

13   A.   Yes, there were.

14        MR. BATCHELDER:  Let's take a look at

15 those.

16   Q.   (By Mr. Batchelder) So putting aside the red

17 markings for a minute, were these three bullets those

18 questions?

19   A.   Yeah.  I think maybe there's a little bit of an

20 explanation that's due.  And the other 39, there was

21 kind of a standard questionnaire, and all the 39 were

22 asked the same question.

23        IBM was a little fussy and they wanted

24 theirs to be recast a little differently.  And so the

25 IBM questions were slightly different.  They're still

1  targeted toward the same issues, but the other 39 use

2  these particular questions.

3     Q.   All right.  So the first one is for each U.S.

4  version of SAP's R/3 software, has the SAP R/3 software

5  ever been used to group any of the company's products

6  into a product hierarchy?

7               Do you see that one?

8     A.   I do see that.

9     Q.   Does that say anything about pricing?

10    A.   No, it doesn't say anything about pricing at

11  all.

12    Q.   And again, you can use product hierarchies for

13  anything under the sun, right?

14    A.   You certainly can.

15    Q.   All right.  The next one:  For each U.S.

16  version of SAP's R/3 software, has SAP R/3 software ever

17  been used to group any of company's customers into

18  customer hierarchy?

19               Do you see that?

20    A.   I do say that.

21    Q.   Does that say anything about pricing?

22    A.   No, it doesn't say anything about pricing.

23    Q.   All right.  And then the third one, again,

24  putting aside the red:  For each -- for each U.S.

25  version of SAP's R/3 software, has the company ever used

1  hierarchical access?

2          And it does say to perform pricing, right?

3      A.    It got the pricing there, but it missed two

4  other things.

5      Q.    What are those?

6      A.    Those are the ones that are above:  The

7  customer hierarchy and the product hierarchy.

8          And so the correction you can see there

9  is, I would suggest to receive pricing data from both a

10  product hierarchy and a customer hierarchy to calculate

11  a single price.  That would have been the appropriate

12  question.

13          But that was not the question that was

14  asked, and as a result, the data, again, is rather

15  meaningless.

16      Q.    All right.  So let's bring this back and apply

17  this to your three circles.

18      A.    Yes.

19      Q.    What's your point?

20      A.    And so the point is that a customer could say:

21  Yes, one time I used customer hierarchy.  Didn't happen

22  to use hierarchical access then.  Another time I did

23  hierarchical access, but not with customer hierarchy.

24  And a third time, I did product hierarchy, and we'd get

25  yes, yes, yes.

1          But this time, if you notice, the

2    intersection here is null.  There is no intersection,

3    and therefore, there's no infringement of the '350

4    patent.  There was no use of the capability of the '350

5    patent.

6         Q.   All right.

7              MR. BATCHELDER:  Your Honor, I'm about to

8    transition.  Should we stop now, or should we keep

9    going?

10             THE COURT:  Keep going.

11             MR. BATCHELDER:  All right.

12        Q.   (By Mr. Batchelder) Now, Mr. Gupta addressing

13   these surveys generally, he generally originally

14   addressed these in his report, did he not?

15        A.   Yes, he did.

16        Q.   And here he's got 14 companies; is that right?

17        A.   Yes, but let me explain that this is not from

18   Mr. Gupta's report; this is what you saw yesterday.

19        Q.   Yes.

20        A.   And there are 14 customers up here that

21   Mr. Gupta put up in what he thought was infringing

22   yesterday.  But in his original report, that's not the

23   case.  There were 16 in his original report.

24        Q.   So that's here (indicates).

25             THE WITNESS:  If you could go back for

1  just a minute, please.

2      Q.   (By Mr. Batchelder) That's the 16 you're

3  referring to right there from his report?

4      A.   This is the 16 right here.  And in Mr. Gupta's

5  report, he says:  Of the 40 customers that responded, 16

6  acknowledged using hierarchical access, as well as

7  customer and product hierarchies.

8              THE WITNESS:  But if we could, let's go

9  back.

10      Q.   (By Mr. Batchelder) Yes.  Will do.

11      A.   The point is that at that time, Microsoft and

12  Chevron were up here in those that said yes, and

13  Mr. Gupta said:  Ah, those are examples of infringement.

14  So now we have 16 that are infringing.

15              Yesterday he told you there were only 14.

16  So he took it down to 35 percent.  He took two of them

17  out of here.  But actually, he took two of them out of

18  here not because he was such a nice guy, but because

19  there was new information that came into the case.

20              MR. BATCHELDER:  Can I have the ELMO,

21  please?

22      Q.   (By Mr. Batchelder) So you're saying that

23  Microsoft and Chevron used to be up here (indicates)?

24      A.   Yes, they did.

25      Q.   And that he moved them down here (indicates)?

1      A.    Yes, he did.

2      Q.    And why did he do that?

3      A.    He did that because there are two declarations

4 from those companies.  And both of -- and the

5 declarations say:  Yes, we said yes with respect to each

6 of those three things.  No, we never used all three of

7 them together.

8           Now, in his 30(b)(6) deposition, Mr. Gupta

9 actually said he thought it was more likely than not

10 that Chevron, in fact, did all three together.  But when

11 we asked Chevron direct on, they'd give us a declaration

12 saying:  No, we never did it together.

13     Q.    All right.

14     A.    A similar sort of thing is true for Microsoft.

15     Q.    Okay.  And so to be clear, though, Chevron and

16 Microsoft answered yes to the three separate circle

17 questions we were just looking at, just like all these

18 others did?

19     A.    Yes, they did.

20     Q.    So if they move down, what happens to the rest

21 of them?

22     A.    I think it's perfectly reasonable to expect

23 that those others would move down.

24           But maybe more importantly, since we're

25 talking about, you know, $200 million or something like

1  that, I think the thing is, that's -- if that's what --

2  if that's what these people are trying to prove, they

3  need to prove it properly, and I don't think they've

4  done that.

5            And so I think they have the burden of

6  proof.  I don't think they met the burden of proof, and

7  therefore, I think the answer up in that green box there

8  is not 14, but zero.

9     Q.   All right.  Now, let's move on to SAP and its

10  customers.

11            Did SAP invite its customers to speak up

12  if they were using hierarchical access even in

13  connection with customer hierarchies?

14     A.   Most definitely, they did.

15     Q.   All right.

16            MR. BATCHELDER:  Let's take down the ELMO

17  and put up the slide.

18     Q.   (By Mr. Batchelder) So what is this, sir.

19            MR. BATCHELDER:  This is -- I'm sorry.

20  For the record, it's DX2566.

21     A.   You've actually seen this particular document

22  even earlier today in a different format.  But in May of

23  2010, SAP did what we call the design out.  And when

24  they did, they issued these notes to their customers

25  saying:  The way your system is going to work is going

1  to change.

2          And then they said:  If -- if the way that

3  change happens bothers you, let us know, because we want

4  to be helpful to you.

5          And so they say:  If you're already

6  actively using or planning to use this functionality, we

7  request that you contact us, and then they tell the

8  mechanism by which the contact occurs.

9          And as a matter of fact, that gentleman,

10 Dr. Nieswand, is the person who would have been

11 contacted if anybody had ever seen this and actually

12 done the contacting.

13 Q.  (By Mr. Batchelder) So you were talking

14 earlier, I think, about the fact that this is a

15 capability patent, not a use patent.

16 A.  That's correct.

17 Q.  So why are we talking about use?

18 A.  Well, the point here is, if the customers want

19 to use it, then, obviously, they want to use the

20 capability.

21          SAP is saying:  If you want to use it, you

22 really can't do it this way, because we don't want to

23 infringe the '350 patent anymore, so come see us, and

24 we'll try to help you find a better way, what's called a

25 non-infringing way of doing this.

1    Q.   Have you looked at SAP's products running on a

2  computer?

3    A.   Yes, I have.

4    Q.   And what did you conclude from that?

5    A.   Well, if I actually try to configure one of

6  these access sequences in such a way that we would be

7  infringing, that it would infringe the '350 patent, then

8  when I try to store that into the computer, a red dot

9  comes up with an exclamation point, and that is a

10 message, and it says:  Go look at this note, and SAP

11 will help you, if that's what you want to do.

12   Q.   All right.  And when you looked at SAP's

13 accused products running on a computer, how prominent

14 was even the hierarchical access feature alone, putting

15 aside the intersection of your three circles?

16   A.   Not -- not really noticeable at all.  There's

17 not -- there's no advertisement of that particular

18 capability at all.

19   Q.   All right.  What does that tell you?

20   A.   Says to me it's not very important.

21   Q.   Okay.  Have you looked at books?

22   A.   Yes, I have.  One of the things that I did is,

23 I looked on -- on amazon.com, and I tried to pick out

24 four books which describe to people how you would use

25 SAP -- SAP capabilities.

1       Now, there are lots of books on

2 amazon.com.  This probably is my favorite:  SAP for

3 Dummies.  But at any rate, there are lots of books, but

4 these are the ones that seem like to me that would have

5 the highest probability of talking about how I could use

6 the capabilities of the '350 patent.

7       So I looked through all these books to

8 find if there was any discussion in any of these,

9 because I thought, if it's important, people are going

10 to want to be talking about it.

11    Q.   And what did you find?

12    A.   I found nothing.  I mean, there was nothing

13 about that capability in any of these books.  There was

14 information about parts, like hierarchical access, but

15 there were parts about product hierarchies; there were

16 parts about customer hierarchies; but there was nothing

17 about using all those capabilities together, which you

18 have to do to infringe the '350 patent.

19    Q.   All right.

20        MR. BATCHELDER:  And for the record, those

21 books are Exhibit Nos. DX2584, 2585, 2586, and 2587.

22    Q.   (By Mr. Batchelder) So you looked at users and

23 the extent to which they're using the intersection of

24 those circles.  You've looked in these books.  What's

25 your bottom line?

1    A.    The bottom line is, if there's a patent and

2   it's a capability to do something, and if we can't find

3   even -- if Trilogy can't put forward even one customer

4   who's trying to use that capability, then in my

5   estimation, that capability is not very significant at

6   all.  It's not -- it's not worth a lot of money when you

7   get right down to it.

8    Q.    All right.

9    A.    And it's a simple objective thing.  You can

10  compare zero with 1300 or so and see how important it

11  really is.

12   Q.    All right.  What's this big tree doing here?

13   A.    Well, this is just another pictorial way of

14  showing the idea.  Let's suppose that we think about

15  this tree as being the product ERP, and so maybe this

16  tree has about, let's say, 100,000 leaves.

17           So one of those leaves in there would

18  correspond to the ability associated with the '350

19  patent, and the other ones would not.  That leaf might

20  be a very nice leaf, and I congratulate Mr. Carter on

21  coming up with a good idea, but the point is, as a part

22  of a total thing the size of this tree, unfortunately,

23  one leaf is just not a very significant part of a tree.

24  One leaf does not make a significant part of a tree.

25   Q.    All right.

1          THE COURT:  Mr. Batchelder?

2          MR. BATCHELDER:  Yes, sir.

3          THE COURT:  We'll break here for the

4  evening.

5          MR. BATCHELDER:  Thank you, Your Honor.

6          THE COURT:  All right.  Ladies and

7  Gentlemen, have a nice evening.  Travel safely on the

8  way home.  We'll start again at 8:30 in the morning.

9  Remember my prior instructions, and don't talk about the

10  case.

11          LAW CLERK:  All rise for the jury.

12          (Jury out.)

13          THE COURT:  All right.  Court's in recess.

14  See y'all at 8:30 in the morning.

15          (Court adjourned.)

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____          May 11, 2011
SHELLY HOLMES, CSR
Deputy Official Court Reporter
State of Texas No. 7804
Expiration Date:  12/31/12

/s/_____          May 11, 2011
GLENDA FULLER, CSR
Deputy Official Court Reporter
State of Texas No. 1042
Expiration Date:  12/31/12