```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   VERSATA SOFTWARE, INC.,  ) Civil Docket No.
     ET AL                    ) 2:07-CV-00153-CE
 4                            ) May 12, 2011
     VS.                      ) 8:30 A.M.
 5                            )
     SAP AMERICA, INC., ET AL )
 6

 7              TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE CHAD EVERINGHAM
 8              UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:
     FOR THE PLAINTIFF:        MR. SAM BAXTER
10                             McKool Smith, P.C.
                               104 E. Houston Street
11                             Suite 300
                               Marshall, Texas  75670
12
                               MR. SCOTT L. COLE
13                             MR. STEVEN J. POLLINGER
                               MS. LAURIE L. FITZGERALD
14                             MR. KEVIN M. KNEUPPER
                               MS. LEAH B. BURATTI
15                             McKool Smith, P.C.
                               300 W. 6th Street, Suite 1700
16                             Austin, Texas 78701

17                             MS. ADA BROWN
                               MR. STEVEN CALLAHAN
18                             McKool Smith, P.C.
                               300 Crescent Court, Suite 1500
19                             Dallas, Texas 75201

20   APPEARANCES CONTINUED ON NEST PAGE:

21   COURT REPORTERS:          SHELLY HOLMES, CSR
                               GLENDA FULLER, CSR
22                             Deputy Official Court Reporters
                               100 East Houston, Suite 125
23                             Marshall, TX 75670
                               903/935-3868
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:        MR. THOMAS M. MELSHEIMER
                               MR. MICHAEL A. BITTNER
 3                             Fish & Richardson, P.C.
                               1717 Main Street, Suite 5000
 4                             Dallas, Texas 75201

 5                             MR. JOHN W. THORNBURGH
                               MR. JUSTIN M. BARNES
 6                             Fish & Richardson, P.C.
                               12390 El Camino Real
 7                             San Diego, California 92130

 8                             MR. JAMES R. BATCHELDER
                               Robes & Gray, LLP
 9                             1900 University Avenue
                               6th Floor
10                             East Palo Alto, California 94303

11                             MR. CHRISTOPHER BUNT
                               Parker Bunt & Ainsworth
12                             100 E. Ferguson, Suite 1114
                               Tyler, Texas 75702

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2              (Jury out.)

3              LAW CLERK:  All rise.

4              THE COURT:  Please be seated.

5              Before we bring the Jury in, I've got some

6  exhibit issues.

7              MR. MOORE:  Your Honor, just one issue --

8  Your Honor, just one issue.  Two exhibits disclosed last

9  night by Plaintiffs, these are screen shots, and these

10  are 2160 and 2161.

11             THE COURT:  Okay.

12             MR. MOORE:  These are some of the same

13  screen shots that Your Honor excluded last Friday as not

14  being disclosed in their expert report and they're now

15  seeking to use these.

16             THE COURT:  Okay.

17             MR. BUDWIN:  Thank you, Your Honor.  Josh

18  Budwin.

19             THE COURT:  Disclose them late twice, does

20  it make it better?

21             MR. BUDWIN:  Well, Your Honor, the

22  position with respect to these exhibits is they were

23  used in Mr. Mercer's deposition.  We're seeking to use

24  them for impeachment only and not move them into

25  evidence.  As we've seen, counsel has used several

```
1   exhibits over the last few days.

2              They haven't actually disclosed to us in

3   advance as impeachment exhibits, we saw the marking

4   statute, as an example, and the -- an article that they

5   showed in court yesterday.

6              But the -- the main point is these were

7   deposition exhibits to Mr. Mercer's deposition and we

8   seek to use them for impeachment purposes only, not to

9   create --

10             THE COURT:  When was the deposition taken?

11             MR. BUDWIN:  April 18th, 2011, Your Honor.

12             MR. POLLINGER:  It was two weeks after we

13   got his expert report.

14             THE COURT:  All right.  How are you

15   prejudiced by them?

16             MR. MOORE:  Your Honor, I think the -- I

17   think the ruling was designed to exclude these from the

18   Jury's view, so it's essentially allowing that...

19             THE COURT:  I'm going to stick with my

20   prior ruling.  Sustain the objections.

21             Anything else?

22             MR. MOORE:  No, Your Honor.

23             MR. BUDWIN:  No, Your Honor.

24             (Recess.)

25             (Jury in.)
```

1              LAW CLERK:  All rise.

2              THE COURT:  Please be seated.

3              Morning, ladies and gentlemen.  I'll tell

4    you about where I think we are in the case.  We've got a

5    little bit more evidence to hear this morning and then I

6    will -- the Court and its staff have been working on the

7    final instructions to give to you at the end of the

8    evidence and you'll hear arguments and those

9    instructions after lunch sometime, probably about two

10   o'clock, so then the case will be in your hands

11   midafternoon.  So that's generally where we are in the

12   schedule.

13              You may proceed.

14              MR. BATCHELDER:  Thank you, Your Honor.

15   May it please the Court.

16              THE COURT:  Mr. Batchelder.

17              DIRECT EXAMINATION CONTINUED

18   BY MR. BATCHELDER:

19       Q.    Dr. Mercer, good morning.

20       A.    Good morning Mr. Batchelder.

21       Q.    Let's pick up where we left off.  You were on

22   your -- just starting your fourth and final opinion, as

23   you reference here, noninfringement of SAP's design out.

24   And I want to be very clear about something at the

25   outset.  Is SAP encouraging its customers to continue

1  infringing in some way?

2      A.   Of course not.  No, they are not.

3      Q.   All right.  What is your opinion about whether

4  the design out infringes?

5      A.   It is my opinion that the design out renders

6  the SAP product not capable of infringement.

7      Q.   And in your understanding, why was the design

8  out done?

9      A.   The design out was done because the -- it had

10 been determined in 2009 that there was an infringement

11 and it was necessary for SAP to do something to

12 alleviate or fix up that problem.

13     Q.   All right.  Let's be clear about something

14 else.  So was SAP determined in that 2009 determination

15 to have intersected these three circles; that is, to

16 calculate a given price for an hierarchical access on

17 both a customer hierarchy and a product hierarchy?

18     A.   No, they were not.

19     Q.   And was -- were any of SAP's customers

20 determined to have done that?

21     A.   No, they were not.

22     Q.   And what have you been told the determination

23 was as to SAP's products?

24             MR. BATCHELDER:  Will you go to the next

25 slide, please, Mr. Barnes?

1      A.    According to the Court, they were determined to

2   be capable of infringing.

3      Q.    (By Mr. Batchelder)   Meaning that each of

4   these component functionalities was --

5                    THE COURT:  Excuse me just a second.

6                    MR. POLLINGER:  Objection, Your Honor.

7   Can we approach the bench?

8                    THE COURT:  Yes.

9                    (Bench conference.)

10                   MR. POLLINGER:  Your Honor, Dr. Mercer

11  just told the Jury what you, the Court, supposedly said

12  was determined to -- to be infringement.  He said Your

13  Honor ruled, essentially your JMOLs, that they were

14  found to infringe because they're capable of infringing.

15  That is not correct.  There's no such thing as capable

16  infringing.

17                   What Your Honor said is they infringe

18  because the software has the capabilities required by

19  the claims.  I ask that Your Honor not Mr. Batchelder

20  instruct the Jury.

21                   THE COURT:  If he doesn't clean it up

22  sufficiently, then I'll tell him.

23                   MR. POLLINGER:  Thank you.

24                   MR. BATCHELDER:  Thank you.

25                   (Bench conference concluded.)

1    Q.    (By Mr. Batchelder)   All right.  So to be

2    clear, Dr. Mercer, you were told that the determination

3    was that SAP's product -- products, sold products,

4    infringed because the software was capable of being used

5    such that hierarchical access could be run on both the

6    customer hierarchy and a product hierarchy to calculate

7    a given price; is that fair?

8         A.    That's my understanding.

9         Q.    All right.  Now, here we're looking at three

10   pieces of functionality within SAP's products?

11        A.    Yes.

12        Q.    How many pieces of functionality do those

13   products contain?

14        A.    In -- in total I think I testified yesterday

15   something on the order of 10,000 to 100,000 different

16   kinds of functionality.

17        Q.    How many combinations are possible?

18        A.    Well, the combinations are virtually

19   impossible.  The number of combinations are more stars

20   than you could see in the sky.

21        Q.    All right.

22              MR. BATCHELDER:  Let's turn to

23   infringement generally.

24        Q.    (By Mr. Batchelder)   When a patent claim -- in

25   your understanding, when a given paragraph is not found

1   to be practiced, is there infringement?

2       A.   Would you repeat the question, please?

3       Q.   If a given paragraph or otherwise known as

4   limitations within a patent claim is not found to be

5   practiced by an accused product, is there infringement,

6   your understanding?

7       A.   No, my understanding is if even one of those

8   limitations is not met, then there is no infringement.

9       Q.   So here we've got in Claim 29, which is one of

10  the asserted claims, right?

11      A.   Yes.

12      Q.   We've got this language purchasing

13  organization, and what is that?

14      A.   The purchasing organization is one of those

15  kinds of organizations that might be represented in a

16  hierarchy, so it's one of those three parts of

17  infringement.

18      Q.   So that's just another name for customer; is

19  that right?

20      A.   It's also another name for customer

21  organization.

22      Q.   Okay.  And what did you conclude with respect

23  to design out?

24      A.   The design out actually rendered a situation

25  where the combination of hierarchical access with a

1  customer hierarchy is no longer allowed by the SAP

2  product.

3      Q.   All right.  And that's true for Claim 29; is

4  that right?

5      A.   Yes, it is.

6      Q.   And what about the two other asserted claims,

7  26 and 28?

8      A.   It's also true there are similar limitations in

9  those claims and similar -- and similarly those things

10 can no longer be met with the design out by the accused

11 product.

12     Q.   Now, you heard Mr. Gupta come in here and argue

13 that the design out still infringes, right?

14     A.   I did hear that.

15     Q.   Do you agree?

16     A.   No.

17     Q.   All right.  Let's step through his argument.

18 So the first one, he said engine versus editor.  Talk

19 about why you believe that argument was flawed.

20     A.   Well, to me that argument is flawed because the

21 engine cannot infringe unless the editor sets things up

22 in such a way that it could infringe.

23           A simple analogy would be if you have an

24 engine in a car but you completely disable the ignition,

25 then the engine can't do anything.  That editor is sort

1    of like the ignition and when you preclude the

2    infringement using the editor, then the engine cannot

3    infringe and so there is no infringement.

4        Q.   All right.  Let's step to number two,

5    pre-existing access sequences.  Is there or is there

6    not, in your opinion, any proof that's been presented

7    here that any customer has ever used pre-existing access

8    sequence that intersects your three circles to calculate

9    a given price?

10       A.   It's my opinion that there is no -- no evidence

11   whatever that's been introduced that that's ever

12   happened.

13       Q.   And could Mr. Gupta name even one customer who

14   had done that?

15       A.   No, he could not.  He attempted to use IBM, but

16   we talked about that quite a bit yesterday.

17       Q.   And have you seen any evidence that any

18   customer's ever done that?

19       A.   No, I have not.  As a matter of fact, it's been

20   to the -- the opposite.

21       Q.   Did SAP ask its customers to speak about this

22   situation?

23       A.   Yes.

24       Q.   So here with respect to just two of the

25   circles, the hierarchical access circle and the customer

1    hierarchy circle, SAP asked customers if you're already

2    actively using or planning to use this functionality, we

3    request that you contact us.  We looked at this

4    yesterday, right?

5        A.   Yes, I remember that.

6        Q.   And did any customers respond yes, we are?

7        A.   No, not a single one.

8        Q.   Let me ask you to consider a hypothetical.

9    Let's say that in 1998 you're Ford Motor Company and you

10   sell a truck.  And that four years later, five years

11   later someone files a patent and gets a patent issued on

12   a small feature on the radio.  And years after that,

13   they assert that that Ford truck infringes that feature

14   on the radio patent and it's determined that -- that, in

15   fact, it does infringe.

16               In your understanding, would Ford need to

17   go and track down its customers and take those trucks

18   back or rip the radio out?

19       A.   My understanding is that that would not be

20   necessary.

21       Q.   And what is your understanding of how that

22   would be handled?

23       A.   My understanding is that the --

24               MR. POLLINGER:  Objection, Your Honor.

25               THE COURT:  What's the objection?

1           MR. POLLINGER:  It's not in his expert

2    report.

3           THE COURT:  Overruled.

4       Q.   (By Mr. Batchelder)   Please proceed, sir.

5       A.   My understanding is that if that infringement

6    occurred, then there should be a trial, damages

7    should -- should be determined by a Jury, and those

8    damages should be paid by Ford to the individual who had

9    the intellectual property.

10      Q.   The intellectual property on that small feature

11   in the radio in that truck?

12      A.   Correct.

13      Q.   A fair value?

14      A.   Correct.

15      Q.   Is that what SAP is seeking to do here?

16      A.   I believe that's what this proceeding is about,

17   yes.

18      Q.   All right.  Let's move on to Mr. Gupta's third

19   argument.  Third-party tools.  What is your criticism of

20   this argument here?

21      A.   Well, my understanding is that for infringement

22   to occur, it has to be the situation that SAP does that

23   and here we're talking about third-party tools.  SAP's

24   not responsible for what a third party does.  They're

25   responsible for what they do.

1       Q.    All right.  And number four, alternate

2   hierarchies.  You made a list of your criticism of

3   Mr. Gupta's so-called alternate hierarchies theory?

4       A.    Yes, I did.

5       Q.    All right.  The first one existed before, not

6   determined to infringe.  Now, let me ask you this:  When

7   it was determined in 2009 that SAP's old products

8   infringed, what was the customer hierarchy that was

9   accused?

10      A.    Well, there -- there -- there was one

11  customer -- customer hierarchy and that's the one that

12  was accessed by an access sequence called KNVH.  That's

13  the only thing that was discussed, as I understand it,

14  in that determination.

15      Q.    Is there any other customer hierarchy in SAP's

16  system?

17      A.    No, I don't believe there is.

18      Q.    Is there anything else called a customer

19  hierarchy in SAP's system?

20      A.    No, I don't believe there is.

21      Q.    At the time of that 2009 determination, did

22  Mr. Gupta's so-called alternate customer hierarchies

23  exist then, too?

24      A.    They did exist, but they were never discussed

25  in that particular event.

1    Q.    And they were not accused of infringement in

2    that determination?

3    A.    No, they were not.

4    Q.    All right.  Well, to address your -- your

5    points here about not hierarchies and not customers,

6    let's turn to the next slide.  So here not hierarchies,

7    what's your point here?

8    A.    Well, here we see something that's actually an

9    example of a customer's address, but a customer's

10   address is not stored using a data structure called the

11   hierarchy, and therefore, it's not a hierarchy and that

12   actually holds for all the other examples that Mr. Gupta

13   cited.

14   Q.    And this is one of his examples, an address of

15   a customer?

16   A.    The address of a customer, but that's not a

17   hierarchy that's not stored as a hierarchy by SAP.

18   Q.    All right.  Let's go to the next one.  This is

19   not customers, and what's your point here?

20   A.    Well here, if you remember, we're talking about

21   customers and customer hierarchies, but Mr. Gupta is

22   accusing a selling unit or a sales organization.

23   There's a difference in a seller and a customer.

24             Those are two ends of a transaction.  They

25   are very different.  A customer is not a seller and a

1  seller is not a customer.  So that's not an appropriate

2  accusation either.

3      Q.   Would a hierarchy of selling units be a

4  customer hierarchy?

5      A.   No, it would not.

6      Q.   All right.  Let me ask you to summarize now,

7  Dr. Mercer, the opinions that you've rendered here.

8  Please summarize your first opinion.

9      A.   Yes.  Yesterday we talked about what I think

10 are objective criteria that a Jury might use and at

11 least it's my opinion that Trilogy inflates the value of

12 the '350 claims to their Pricer product.

13     Q.   And your second opinion, sir?

14     A.   Again, yesterday we talked about this, and it's

15 my opinion, for the reasons that I cited, that Trilogy

16 inflates the value of the '350 claims to SAP's product.

17     Q.   Before we move to your next one, I just want to

18 put back up your tree and just make clear.  When you

19 talked about a given leaf being analogous to something

20 here, were you saying it was analogous to Trilogy's

21 Pricer product or computerized product or pricing in

22 general?

23     A.   No, that was -- that was not the analogy.  The

24 analogy was that the tree represents all of the

25 capabilities of SAP.  The individual leaf represents

1 that infringing aspect, which is the intersection of

2 those three things that we've talked about.

3    Q.   So the intersection to calculate a given price?

4    A.   That's correct.

5    Q.   All right.  Now, let's move on to your last

6 opinion, sir.  Would you summarize this, please?

7    A.   Okay.  So the last point is it's my opinion

8 that SAP after the design out does not infringe the

9 claims, the asserted claims of the '350 patent.

10    Q.   All right.  And again, is SAP encouraging its

11 customers to continue infringing in any way through this

12 design out now?

13    A.   No, I don't believe they are at all.

14    Q.   Thank you, sir.

15         MR. BATCHELDER:  Your Honor, I tender the

16 witness.

17         THE COURT:  Cross-examination.

18         MR. POLLINGER:  Yes, Your Honor.  Thank

19 you.

20              CROSS-EXAMINATION

21 BY MR. POLLINGER:

22    Q.   Good morning, Dr. Mercer.

23    A.   Good morning, Mr. Pollinger.

24    Q.   We've met once before, right?

25    A.   We did in East Palo Alto.  I believe the date

1  was April the 18th of this year.

2      Q.   Was three days after my birthday.

3      A.   Congratulations and happy -- belated happy

4  birthday.

5      Q.   That -- that was at SAP's lawyers' offices for

6  your deposition, correct?

7      A.   Some of those offices, as I understand it, yes.

8      Q.   And I took your deposition?

9      A.   Yes, you did.

10     Q.   Now Dr. Mercer, you have served as an expert

11  witness in a lot of lawsuits, fair to say?

12     A.   That's a fair statement, yes.

13     Q.   How many lawsuits?

14     A.   Have I served in?

15     Q.   Yes.  How many lawsuits have you served as

16  an -- as an expert, approximately?

17     A.   Well.  I testified that in the last eight years

18  I had actually testified at trial about a dozen times,

19  but I certainly also testified at my deposition that

20  overall, since 1984, I've served in many more.

21     Q.   Approximately how many times have you been

22  deposed with respect to your expert work?

23     A.   Again, I -- I don't have an exact recollection,

24  but my guess is that I would have answered something on

25  the order of 60 times, but that's just my guess.  I

1   don't have a specific recollection of my testimony

2   because I don't have a specific recollection of the

3   number of times I've testified.

4       Q.   Over the last five years, all of your income

5   has come from expert witness work, right?

6       A.   Certainly the vast majority.  Not all, but the

7   vast majority has, yes.

8       Q.   Over 95 percent?

9       A.   I think that's a fair statement, yes.

10      Q.   In this case you're getting paid $650 per hour,

11  right?

12      A.   That's true, yes.

13      Q.   Now Dr. Mercer, before I took your deposition

14  on April 18, you submitted an expert report with regards

15  to your opinions in this case, correct?

16      A.   Yes, I did.

17      Q.   That was April 6th?

18      A.   I believe that that's correct.  I believe the

19  date on it is April the 6th.

20      Q.   And to that date, April 6th, you had not done a

21  formal study of the software sold by Trilogy, right?

22      A.   I would say I had not done a formal study of

23  the software sold by Trilogy.  I think that's right.  I

24  had -- I had certainly investigated --

25      Q.   Thank you.

1          THE COURT:  If you can answer yes --

2          THE WITNESS:  Sure.

3          THE COURT:  -- or no --

4          THE WITNESS:  The answer to that --

5          THE COURT:  -- it will move a lot quicker.

6          THE WITNESS:  Yes.

7     Q.   (By Mr. Pollinger)  Dr. Mercer, yesterday you

8  talked a lot about customer use with Mr. Batchelder,

9  right?

10     A.   Yes, I did.

11     Q.   Mr. Batchelder pointed out to you a few times

12  that use is not required for there to be infringement,

13  right?

14     A.   Yes, he did.

15     Q.   Both Mr. Melsheimer and Mr. Batchelder have

16  acknowledged that only capability is required for

17  infringement, right?

18     A.   Yes, they have.

19     Q.   Trilogy is asking for lost profits damages from

20  2003 forward, right?

21     A.   Yes, I think that's true.

22     Q.   That's when the patent issued, right?

23     A.   That's my understanding.

24     Q.   Infringement was determined in 2009, right?

25     A.   That's also my understanding.

1    Q.    And that's a given for this case here, right?

2    A.    I think that -- I don't think there's been any

3 question that that's -- that's a given for this case.

4    Q.    So that's right?

5    A.    That's right.

6    Q.    The question is whether that infringement that

7 was determined in 2009 caused Trilogy to lose sales,

8 right?

9    A.    That's certainly the issue that I've heard

10 discussed here quite a bit.

11    Q.    That's the lost profits request, right?

12    A.    That's what I understand.

13    Q.    That doesn't require customer use, does it?

14    A.    I would -- I would accept your representation

15 of that, though I believe that's a legal opinion and so

16 I would leave that to the lawyers to make that

17 determination.

18    Q.    Trilogy hasn't sued SAP's customers for

19 infringement, right?

20    A.    Not to my knowledge.

21    Q.    Trilogy has sued SAP, right?

22    A.    That I'm aware of.

23    Q.    The question is whether SAP's providing the

24 infringing capability in its software products caused

25 Trilogy to lose sales, correct?

1    A.   Certainly seems like that from the proceedings.

2    Q.   Now, yesterday you criticized Mr. Gupta's

3 demand in valuation analysis, right?

4    A.   Yes, I did.

5    Q.   And now you summarized that again a few minutes

6 ago, correct?  At least you wrapped up the conclusion?

7    A.   I -- I -- yes, there's one line that was there

8 about that.

9    Q.   But now in your expert report in this case, you

10 didn't set out to provide a specific valuation of the

11 '350 claimed invention at issue in this case, did you?

12    A.   No, because I'm not a damages expert.  I'm a

13 technical expert.

14    Q.   In fact, you acknowledge that in your

15 deposition on Page 35, Lines 16 through 24?

16    A.   I did and also at my testimony yesterday I

17 acknowledged that before the Jury.

18    Q.   Instead you told us yesterday that the value of

19 Mr. Carter's invention is, quote, little bitty, right?

20    A.   I don't remember the exact words, but I

21 wouldn't take issue with that if --

22    Q.   You -- you used those words, little bitty,

23 right?

24    A.   I don't -- again, I -- I'm not saying I did,

25 I'm not saying I didn't.  I just don't remember one way

1 or the other.

2           MR. POLLINGER:  Mr. Diaz, could we have

3 Page 174 of yesterday's transcript, Lines 12 through 13?

4 Can we blow out little bitty?

5     Q.   (By Mr. Pollinger)  You see, you said little

6 bitty, correct?

7     A.   That could very well be, though --

8     Q.   Yes or no.  Did you say little bitty yesterday?

9     A.   Well, I think your question had to do with --

10 with little bitty in a different context, but there is

11 no doubt that those words little bitty are -- are

12 record -- on the record here from what I said.

13     Q.   Well, let's be clear here.  You drew the three

14 circles, you showed the small circle, you showed it

15 really small, you said, boy, look at that little circle,

16 really small, and you said, it's little bitty?

17     A.   Well, it wasn't a circle, but it was the

18 intersection of three circles and I think I said that

19 was little bitty.

20     Q.   You said it was a little bitty part?

21     A.   Yes.

22     Q.   You also told us that it may go to zero, right?

23     A.   Yes, I did.

24     Q.   You told us it was small, right?

25     A.   Yes.

1      MR. POLLINGER:  If we go off 174 of

2  yesterday's transcript from your deposition -- from your

3  trial testimony yesterday afternoon, 1 -- Page 177,

4  please, Lines 3 through 10, 3 through 9.

5      Q.   (By Mr. Pollinger)  You said the value was

6  small, gets smaller.  You said it's little bitty and you

7  said it may go to zero.  You told us all those things

8  about the value of Mr. Carter's invention, correct?

9      A.   Yes, I did.

10     Q.   In your expert report, though, Dr. Mercer, you

11  did no specific quantitative analysis, but yesterday you

12  told us a small region, a very small little dot and you

13  said, oh, the invention has little bitty value, right?

14     A.   That's true, but little bitty is not

15  quantitative.  Quantitative means a number and I don't

16  believe I ever testified to a number either yesterday or

17  in my report.

18     Q.   You said it was little bitty, right?

19     A.   I did say that.

20     Q.   But you did no specific valuation in your

21  expert report, correct?

22     A.   That's true.

23     Q.   Now, could you hold up for the jury your

24  favorite yellow book from yesterday?

25     A.   (Complies.)

1    Q.   But you did do a study of that book, correct?

2    A.   I did a study of all four, yes.

3    Q.   Now, Dr. Mercer, I'd like to make sure we're in

4  agreement on the timeline for this case.  Trilogy's

5  Pricer product with Mr. Carter's invention came out in

6  1995, correct?

7    A.   That's what I understand, yes.

8    Q.   It was -- it was being sold in 1995, right?

9    A.   That's what I heard testified to here earlier.

10   Q.   And Trilogy's Pricer product embodies

11 Mr. Carter's invention in the '350 patent, right?

12   A.   I think Mr. Carter said that.

13   Q.   You don't dispute that, do you?

14   A.   Not at all.

15   Q.   Now, the effective filing date for Mr. Carter's

16 '350 patent is 1996, right?

17   A.   That particular word I -- is -- is a legal

18 word.  I -- I know that the -- it's what I call the

19 priority date and it also may be the effective filing

20 date.  I'm not sure.  But the term I've always used is

21 priority date, but I'm not a lawyer.  That's just the

22 term I've always used.

23   Q.   Okay.  Fair enough.  The priority date is 1996,

24 correct?

25   A.   I would agree with that.

1    Q.    And the continuation filing date is 1999,
2    right?
3    A.    Yes, I agree with that.
4    Q.    Now, SAP added the hierarchical access software
5    at issue here to its products in October 1998, correct?
6    A.    I think that's -- that's in evidence here, yes.
7    Q.    And the damages issue goes from 2003 when the
8    patent issued forward, right?
9    A.    That's what I understand.
10   Q.    Trilogy is not asking for damages prior to
11   2003, are they?
12   A.    Not to my knowledge.
13   Q.    Mr. Carter (sic), the claims in a patent must
14   claim a novel structure or a novel method, right?
15   A.    You started with Mr. Carter.
16   Q.    I'm sorry.  Thank you.  I apologize.
17         Dr. Mercer, the claims in a patent must
18   claim a novel structure or a novel method, right?
19   A.    I -- I think that's true.
20   Q.    Now, that novel structure or method often
21   provides benefits, right?
22   A.    I would agree with that.
23   Q.    And claims usually don't simply claim benefits,
24   right?
25   A.    I can't really -- I would say I've seen a lot

1  of claims that don't have the word benefit in them, but

2  I don't think I've ever done a survey of that or

3  anything of that.  I certainly wouldn't take issue with

4  what you say.

5      Q.   Now, Mr. Carter's invention provided a speed

6  advantage, correct?

7      A.   Actually, I think that Mr. Carter intended to

8  have a speed advantage, and I think there's a very high

9  probability that there was a speed advantage, but I

10 don't think there's actually any evidence that it's a

11 speed advantage.  But I wouldn't question that it could

12 have the potential to do that under certain

13 circumstances, yes.

14     Q.   Have the potential?

15     A.   It could have the potential to do that.

16          MR. POLLINGER:  Mr. Diaz, if we could have

17 Slide 32.

18     Q.   (By Mr. Pollinger) This is from Mr. Carter's

19 patent.  It says right in there, Column 11:  Speed

20 advantage in the present invention.  You don't dispute

21 this in the patent, do you?

22     A.   Well, I always like, whenever we look at a

23 segment, to look at the entirety at least of the

24 sentence to have a context for what's being said.

25     Q.   You don't dispute it, right?

1    A.    I don't dispute that the word speed advantage

2  in the present invention is there.

3    Q.    And --

4    A.    I just don't know what the context is in terms

5  of that entire sentence.

6    Q.    The patent here -- Mr. Carter's patent that was

7  issued by the U.S. Patent Office, it says right there:

8  The speed advantage in the present invention.

9              It says that, right?

10    A.    That's a sentence fragment.

11    Q.    And then in this patent that the U.S. Patent

12  Office issued, later on, it says:  Another advantage of

13  the present invention simplifies creation and

14  maintenance.  The patent says that, right?

15    A.    Well, actually, what it says, if we read the

16  entirety of the sentence is:  Another advantage of the

17  present invention is that the invention greatly

18  simplifies creation and maintenance of the invention's

19  pricing data, and I would agree with that.

20    Q.    Thank you.

21              MR. POLLINGER:  If we could go to Slide 4.

22    Q.    (By Mr. Pollinger) Now, Dr. Mercer, there was

23  demand for Trilogy's Pricer product with Mr. Carter's

24  invention in it, right?

25    A.    (No response.)

1     Q.    Just if you could answer my question, sir.

2     A.    Would you repeat the question?

3     Q.    Yes.

4     A.    I just want to be sure I understand it.

5     Q.    If you could just answer my question.

6            Dr. Mercer, there was demand for Trilogy's

7     Pricer product with Mr. Carter's invention, right?

8     A.    I believe he sold multiple copies of it, so,

9     yeah, that means there's demand.

10    Q.    In fact, in 1997, after Trilogy came out with

11    this Pricer product with Mr. Carter's invention, SAP's

12    salespeople were actually recommending to use Trilogy's

13    configurator and price -- pricing engine.

14           That's what this says.  This e-mail from

15    SAP, it says that, right?

16    A.    Yes, it does.

17           MR. POLLINGER:  And if we could go to the

18    next slide, please.  Actually, go to the Slide 3,

19    please.

20    Q.    (By Mr. Pollinger) And, in fact, in 1997, when

21    Trilogy's Pricer product was on the market, before SAP

22    added the hierarchical access software that was

23    determined to infringe in 2009, SAP's people were

24    saying:  We could enter into negotiations with Trilogy

25    in order to purchase their code for the SC Pricer.

1          It says that, right?

2     A.    Well, the words that you show me are definitely

3 there on the screen, and I assume that if all these

4 pieces fit together -- and I'll accept your

5 representation of that -- then we can see who it was

6 from and who it was to up a little higher in this

7 display.

8     Q.    Let's dig a little deeper, Dr. Mercer, into the

9 timeline again.  Just to get ourselves oriented quickly,

10 Trilogy's Pricer product with Mr. Carter's product came

11 out in 1995, right?

12     A.    Okay.  So you characterize the invention as an

13 invention in 1995?

14     Q.    No.  I said Trilogy's Pricer product --

15     A.    Oh.

16     Q.    -- came --

17     A.    The Pricer --

18     Q.    Trilogy's Pricer product that embodies

19 Mr. Carter's invention, that product came out in the

20 market in 1995, correct?

21     A.    Yes, it does.

22     Q.    Okay.  Second point in the timeline --

23     A.    It did.

24     Q.    You used the term priority date.  The priority

25 date for Mr. Carter's patent is 1996, right?

1    A.   Yes, I -- that's true.

2    Q.   That's when he first filed with the Patent

3 Office the drawings and written description in his

4 patent, right?

5    A.   Yes, that's true.

6    Q.   Now, we've seen after that, SAP salespeople

7 were actually recommending Trilogy's Pricer product.

8 Well, let's look at what then happened.  Let's dig a

9 little deeper.  Let's look if we can find demand for the

10 invention.

11          Now, this will take a little time, but

12 bear with me -- bear with me, if you could.  I think

13 this is pretty interesting.

14          MR. POLLINGER:  If we could please go to

15 PX2159.

16    Q.   (By Mr. Pollinger) And this here is an SAP

17 e-mail that SAP turned over to us in this case, and if

18 you look at the top, we can see the date there, March

19 25th, 1998.  It's about, what, six, seven months before

20 hierarchical access was added to SAP's products?

21    A.   Yeah.  SAP added that later in 1998.  I

22 don't -- I haven't calculated the number of months.

23    Q.   And if we look here in the subject line, it

24 says:  Pricing discussion with BFS.

25          Do you see that?

1    A.   I do see that.

2    Q.   Do you know what BFS stands for?

3    A.   No.

4    Q.   It stands for Bridgestone Firestone, right?

5    A.   That seems reasonable.  No argument.

6    Q.   And we see this e-mail here that SAP -- it's

7 going to Manfred Hirn, and it's going to Wilifred

8 Merkel.  And here it says:  Wilifred, please find

9 attached two doc files.

10          That means two document files, right?

11    A.   I think doc is a short form of document, yes.

12    Q.   And at the end, it says:  For preparation for

13 discussion with BFS visitors.

14          Do you see that?

15    A.   I do.

16    Q.   So it looks like Bridgestone Firestone is going

17 to be visiting SAP in Germany, right?

18    A.   It seems like a logical conclusion, yes.

19    Q.   In fact, if we go to the next page, I think we

20 can confirm that.

21          MR. POLLINGER:  If we could go to the top.

22    Q.   (By Mr. Pollinger) It says:  Expectations from

23 Germany trip scheduled for April 1 and April 2, right?

24    A.   Yes.

25    Q.   And then it says here, Item A:  BFS needs to

1  understand what pricing functionality SAP is developing.

2               You see that?

3     A.   I do.

4     Q.   It looks like SAP is developing some new

5  pricing functionality, right?

6     A.   I think that's a logical conclusion.

7     Q.   This was about six, seven months before they

8  added the hierarchical access software.  This is April.

9  They added it in October.

10    A.   Just to -- just to be very clear about the word

11 developing, it is true that SAP was developing, but it's

12 important to understand that when you have a big,

13 complex product, sometimes that -- those parts are

14 development and then design verification.

15              And so when they're saying generally

16 developing, I agree with that.

17    Q.   Now, if we look at the next point here, the

18 bullet point, it says:  Decision on SAP pricing or

19 Trilogy pricing October 15, 1998.

20              So is it fair to say, Dr. Mercer -- it

21 looks like Bridgestone Firestone is trying to decide

22 between whether to go with SAP's pricing or Trilogy's

23 pricing, right?

24    A.   It certainly looks like to me that that's a

25 choice, and that's the date by which they'd like to

1    decide.

2        Q.    Well, let's go to the next document that was

3    attached to that SAP e-mail.

4                MR. POLLINGER:  It's PX218, Mr. Diaz.  Oh,

5    excuse me.  I called that out wrong.  2118.

6        Q.    (By Mr. Pollinger) This next document you'll

7    see where that was attached to the SAP e-mail, this

8    is --

9                MR. POLLINGER:  If we could go to the top.

10       Q.    (By Mr. Pollinger) BFS definition of pricing.

11   And that's Bridgestone's definition of pricing.

12               If we just look in the first line there,

13   it says:  The BFS requirement.  And we'll see this

14   shows:  BFS requirement for pricing.  And we see here

15   that Bridgestone states in this first line:  Pricing is

16   a marriage of customer and material rules.

17               That's there, right?

18       A.    Pricing is a marriage of customer and material

19   with rules.

20       Q.    Thank you.  Customer and materials with rules.

21       A.    Yes.

22       Q.    And -- and material, that often refers to --

23   it's another word for products, correct?

24       A.    Could very well be.

25       Q.    And if we look over here, it says:  Hierarchy

1   is very important.

2               Do you see that?  You see that there:

3   Hierarchy is very important?

4       A.   It says:  Hierarchy is very important as the

5   more specific rules always overrule the general rules.

6       Q.   And if we look down here, it says:  Customer

7   hierarchy.  Do you see that, Section 1.1?

8       A.   Yes.

9               MR. POLLINGER:  And if we could blow up

10  and see the picture.

11      Q.   (By Mr. Pollinger) And it shows a picture of a

12  customer hierarchy, right?

13      A.   I think from this context, that's very logical

14  to assume.

15      Q.   And if we go to the next page, it shows a

16  picture of a material hierarchy.  It says so right up

17  here (indicates).

18               Do you see that?

19      A.   It says material group at the very top and

20  material hierarchy, yes.

21      Q.   It's another word for product hierarchy,

22  correct?

23      A.   I think in this particular case, it's probably

24  logical to assume that material and product mean the

25  same thing.  We can't say absolutely, but I -- I

1  wouldn't take issue with it.

2      Q.   Now, if we go to the bottom of this page here,

3  there's a bolded sentence here, the last one I'd like to

4  point out to you.  And at the end, it says -- the very

5  end here, it says:  Customer and product are linked.

6               Do you see that?

7      A.   It says:  The following matrix clarifies the

8  progression from the most specific to the least specific

9  as customer and product are linked.

10     Q.   It says:  Customer and product are linked,

11  right?

12     A.   That's the last part of the sentence.

13     Q.   Okay.

14          MR. POLLINGER:  Let's go to the next

15  document over this decision.  This is Exhibit PX657,

16  please.  If you could pull it up, please, Mr. Diaz.

17     Q.   (By Mr. Pollinger) This is still the decision

18  that Bridgestone is trying to make where they're trying

19  to decide whether to go with Trilogy's Pricer product or

20  go with SAP's product.

21          We see at the top here, it's from

22  Bridgestone Firestone Business 2000.  Is Bridgestone

23  Firestone, is that a big company, Dr. Mercer?

24     A.   I've certainly heard of them.

25     Q.   Well, you see here -- the date here April 4,

1  1998.

2      A.    I do see the date.

3      Q.    Still about six months before SAP added

4  hierarchical access to its products, right?

5      A.    Certainly about that amount of time before SAP

6  rolled out that particular capability.

7      Q.    And here we see Kash Maki.  Do you see that

8  he's copied on this?

9      A.    I do.

10     Q.    And then if you we look here, it talks about

11  the Walldorf pricing trip review and notes.

12             Do you see that in the subject line?

13     A.    Yes, I do.

14     Q.    And Walldorf, that's referring to Walldorf

15  Germany?

16     A.    That's correct.

17     Q.    And if we look down here, there's a description

18  of this memo.

19             First sentence:  This memo will document

20  the findings of our initial scoping trip with SAP in

21  Walldorf to share requirements for pricing in Phase II.

22             You see that?

23     A.    I do.

24     Q.    And here it says:  Overview, the trip to

25  Walldorf.  Let's talk about the trip to Walldorf?

1          Then if we could, let's please go to Page

2    3 of this document.  See where it discusses pricing

3    engine there?

4               MR. POLLINGER:  If we can blow that

5    pricing engine part up.  Let's see the -- there.  That's

6    good.

7       A.   I do see pricing engine.

8       Q.   (By Mr. Pollinger) Okay.  And let me read this

9    to you.  Prior to our trip, we had heard that 4.0C

10   pricing solution -- that's SAP's product, right?

11      A.   That's my understanding, yes.

12      Q.   -- would be componentized and then it would --

13   and that it involved the development of a pricing

14   engine.

15               You see that?

16      A.   That's what the words say.

17      Q.   SAP is developing a new pricing engine, right?

18      A.   Either is developing, or depending on how we

19   use that word developing, had actually developed and now

20   was checking it out to make sure it worked well before

21   they gave it to customers, yes.

22      Q.   So it's possible it was already developed.  Is

23   that what you're saying?

24      A.   That's my point, yes.

25      Q.   Okay.  Well, let's check.  Don't take my word

1  for it.

2          4.0C is, however, not componentized,

3  working rather with standard condition type used in

4  earlier versions.

5          Now, that's what you refer to in your

6  expert report as classical access, the old type, right?

7     A.   I don't know what they mean by not

8  componentized, but I would say standard conditioning

9  technique does mean classical access, yes.

10    Q.   That's the old type, right?

11    A.   Yes.

12    Q.   And that's not accused of infringement in this

13  case, right?

14    A.   No.

15    Q.   Then if we read the bolded sentence -- and we

16  didn't bold this.  This was done by Bridgestone.  This

17  is not true, and the approach to pricing has not

18  changed.

19          And then the prior sentence said:  Our

20  assumption with the engine was that like Trilogy, SAP

21  would use the engine to allow logic as a standard tool

22  in determining applicability.

23          Do you see that?

24    A.   I do.

25    Q.   Let's read down here what it says.

1          This came as a surprise to us since the

2     addition of the engine wouldn't have done much to close

3     the gap between SAP and Trilogy pricing.

4               Do you see that?

5      A.   I do.

6      Q.   Let's go to the last page of this document.

7               MR. POLLINGER:  Let's blow out the top,

8     please.

9      Q.   (By Mr. Pollinger) It says:  Phase II

10    requirements.  Wilifred Merkel -- he's at SAP --

11    indicated that changes must be seen by SAP to have broad

12    application, however to preserve the integrity of the

13    system and to justify the development.

14              So what SAP is saying here, they're not

15    going to do the development.  They're not going to make

16    a new pricing engine unless it's got broad application,

17    unless they can justify that it's got broad application.

18    That's what this is saying here, right, Dr. Mercer?

19     A.   Well, I think you have to -- I have actually

20    read the entirety of this document, so I think you need

21    to know --

22              THE COURT:  Can you answer it yes or no?

23    If you can't, just say I can't answer it.

24              THE WITNESS:  No, I can't answer it just

25    yes or no.

```
 1                    THE COURT:  Let's move on.

 2                    THE WITNESS:  I'd have to give an

 3   application to answer that.

 4                    THE COURT:  All right.  The time to

 5   explain is when the SAP lawyers ask you on

 6   re-examination, okay?

 7                    THE WITNESS:  Thank you.

 8        Q.   (By Mr. Pollinger) You'll get a chance to

 9   explain it.

10            Let's look at what's happening back in

11   Germany now at this time.  So we're still in April 1998,

12   six months before they came out with hierarchical access

13   in their products.

14                    MR. POLLINGER:  Let's go to PX2137,

15   please, Mr. Diaz.

16        Q.   (By Mr. Pollinger) Let's see what's happening

17   in Germany at SAP's headquarters.

18                    MR. POLLINGER:  Go to the top.

19        Q.   (By Mr. Pollinger) We see the date is -- of

20   this e-mail here, this SAP e-mail, is August 4, 1998.

21   So now we're two months away before SAP comes out with

22   hierarchical access software.

23            We see the same names here, Manfred Hirn,

24   Wilifred Merkel.  And what do we see here?  Review of

25   pricing functionality.
```

1          Do you see that there?

2     A.   I do.

3     Q.   And here it says:  Hi, Wilifred and Manfred.

4 Can you kindly follow up to clarify some of BFS --

5 that's Bridgestone's -- Bridgestone's concerns and

6 advise me where next actions can be taken at your site,

7 namely, next meeting in October.

8          Do you see that?

9     A.   I do.

10    Q.   And that's where they added hierarchical access

11 to their products, right?

12    A.   I believe that in October of 1998 is when that

13 was rolled out, yes.

14    Q.   Okay.  And if we go down a little bit in this

15 e-mail string, we'll see a letter from -- a reference to

16 the letter from Bridgestone.  This is Kash.  We saw

17 Kash's name earlier from Bridgestone on an e-mail.

18    A.   Yeah, I remember that.

19    Q.   Kash's letter on our review of the 4.5 pricing

20 functionality is attached.

21          Do you see that?

22    A.   Yes.

23    Q.   Okay.  Let's -- let's turn to that letter from

24 Bridgestone Firestone.  It's in the form of a memo.

25 It's --

1          MR. POLLINGER:  It's on Page 3, Mr. Diaz,

2   please.

3      Q.   (By Mr. Pollinger) You see on the top,

4   Bridgestone Firestone Business 2000.  You see those same

5   names here, Dr. Manfred Hirn, SAP Walldorf.  That's

6   Walldorf, Germany.  It's from Kashiwa.  That's short --

7   that's the short name he goes by, Kash.  Does that sound

8   fair?

9      A.   I have to accept your representation for that.

10  I can't say one way or the other.

11     Q.   And here it's talking about enhanced pricing

12  functionality.  Do you see that?

13     A.   Yes.

14     Q.   Okay.

15          MR. POLLINGER:  And if we go down to the

16  third paragraph of this memo.  Blow this out.

17     Q.   (By Mr. Pollinger) And you look -- read there

18  right at the start.  It says:  After careful assessment

19  of the information in your memo -- this is to SAP --

20  however, we have concluded that we will have to bolt on

21  a third party's pricing software to the R/3 platform for

22  our immediate implementation of the SD module that will

23  start early next year.

24          And the bolt-on third-party pricing

25  software they used was Trilogy's Pricer product with

1   Mr. Carter's invention.  Do you see that?

2        A.   Let's see.  I -- I see the part about S --

3   about SD and third party.  Can you just direct me to the

4   point about it's Pricer?

5        Q.   Well, let's take the context that we start off

6   with.  This was -- I went through multiple exhibits, and

7   the context was Bridgestone Firestone trying to decide

8   between going with Trilogy's Pricer product or SAP's

9   Pricer product.

10                  Remember that?

11       A.   I remember that.

12       Q.   And now it says they're going to a third

13  party -- they're going to use a third-party pricing

14  software.

15       A.   It certainly says that.

16       Q.   And you're not disputing with me when I

17  represent to you that they went with Trilogy's Pricer

18  product, are you?

19       A.   I'm not disputing that they went with Trilogy's

20  Pricer product, but your previous question interjected

21  something else, which was that this involved the -- the

22  '350 invention.  That's why I was asking questions.

23       Q.   Well, you're not disputing that Mr. -- that

24  Trilogy's Pricer product embodied Mr. Carter's invention

25  of the '350 patent.  We already covered that.

1    A.    I'm certainly not questioning that.   The point

2  is that SC Pricer had a lot of other things that

3  Bridgestone might want, not just the '350 invention.

4  And in looking at this document, that's really what's

5  going on.

6    Q.    Okay.   Now let's see what happened.   Two months

7  later -- this was -- this was in August of 1990.   Two

8  months later, SAP added the hierarchical access software

9  that was determined to infringe in 2009, right?

10    A.    Yes.   SAP added the -- the software.   They

11  rolled it out, and in -- in 2000 -- in 1998, yes.

12             MR. POLLINGER:   And if we go to Slide 34,

13  Mr. Diaz.

14    Q.    (By Mr. Pollinger) And Dr. Zencke told us why.

15  Customers -- big customers asked for it, right?

16    A.    There's no doubt that big customers asked for

17  it, but let's be clear.   They didn't say right there

18  that that's Bridgestone Firestone.   That just says big

19  customers.

20    Q.    You're not disputing that Bridgestone is a big

21  customer, are you?

22    A.    Not at all.   But I'm disputing the link between

23  what you've shown before and that word big customers.

24  You haven't established that as a matter of evidence as

25  I understand it.

1    Q.   Dr. Mercer, if I represent to you that after

2  SAP added the hierarchical access software to its

3  products, that Trilogy later lost the Bridgestone

4  account, would you accept that?

5    A.   I will accept that representation, of course.

6    Q.   There was demand for Mr. Carter's invention,

7  wasn't there?

8    A.   I think I've already testified yes to that.

9    Q.   Well, you testified the value was little bitty,

10  may go to zero, and it was small.  And you showed us a

11  little teeny circle, right?  Intersection of three

12  circles.

13    A.   Yes, I did that.

14    Q.   Now, Dr. Mercer, are you saying to us that

15  Mr. Carter's invention was obsolete when the '350 patent

16  issued in 2003?

17    A.   I don't remember using the word obsolete.

18    Q.   Now, you talked about how computers have gotten

19  so much faster that there really isn't a need anymore

20  for Mr. Carter's invention.  Is that what you were

21  suggesting?

22    A.   I don't remember testifying to that either, but

23  I did testify that computer capabilities have increased

24  by about a factor of four every three years, yes.

25    Q.   I think we can agree that computers got faster.

 1  My question is, though, Dr. Mercer:  Yes or no, is it

 2  your opinion that Mr. Carter's invention in the '350

 3  patent was obsolete in 2003 when the patent issued?

 4      A.   I haven't issued an opinion one way or the

 5  other about that.

 6              MR. POLLINGER:  If we could go, Mr. Diaz,

 7  to PX1673.

 8      Q.   (By Mr. Pollinger) Now, you've got -- you like

 9  your yellow book.  I want to look at SAP's book, SAP's

10  book from SAP Press, PX1673.  You see it up here, SAP

11  Press.  You see here it's Effective SAP SD.  You see

12  that?

13      A.   Yes.

14      Q.   That's one of the --

15      A.   This book right here.

16      Q.   That's one of the books you have, but that's

17  not your favorite book, right?

18      A.   Well, actually, it's the one that I opened up

19  to say that -- at Page 106 or whatever, I found as close

20  as I could get to the '350 invention.

21      Q.   Okay.  Well, we'll turn to that page in a

22  minute here.

23              MR. POLLINGER:  Let's go to the page that

24  ends in Bates No. 940.  It's the third page in.  Excuse

25  me.  The 943.  940 is the first page.

1    Q.    (By Mr. Pollinger) So you see this SAP book is

2    talking about Effective SAP SD.  That's sales and

3    distribution, right?

4    A.    Correct.

5    Q.    It's telling you how to get the most out of

6    your SAP SD implementation.  You see that?

7    A.    Yes, I do.

8              MR. POLLINGER:  Now, if we go to the next

9    page, Mr. Diaz.

10   Q.    (By Mr. Pollinger) Let's check the date of

11   this.  This is when I think computers have gotten pretty

12   fast.  We see here this is the first edition, 2007.

13              You see that?

14   A.    Yes, I do.

15              MR. POLLINGER:  And if we could, then, go

16   to the page that Dr. Mercer referred to as Page 106.

17   It's Bates ending in 6045.

18              If we could blow out that top section.

19   Q.    We see at the very top, it talks about --

20              MR. POLLINGER:  Go higher a little bit,

21   please.

22   Q.    (By Mr. Pollinger) This is Section 3 or Chapter

23   3.  It talks about key techniques in sales and

24   distribution.

25              You see that?

1      A.   I do.

2      Q.   It's talking about hierarchy pricing.  You see

3  that?

4      A.   Well, it's -- yes, that says hierarchy

5  processing (sic), but it's a very specific kind of

6  hierarchy.

7      Q.   It is, in fact, right?  It's talking about

8  hierarchy accesses, right?

9      A.   Well, it's talking about product hierarchy, if

10  you look at the second line there.

11     Q.   It's talking about the hierarchical access

12  software, right?

13     A.   Into a product hierarchy, yes.

14     Q.   We'll take a look at that.  It's talking about

15  the hierarchical access -- hierarchy accesses optimized.

16               You see that?

17     A.   Yes.

18     Q.   Hierarchy accesses, optimized pricing for

19  hierarchy data structures, such as the product

20  hierarchy.

21     A.   Yes.  That's what it says.

22     Q.   Now, such as doesn't limit it to product

23  hierarchy.  Such as is, for example, product hierarchy,

24  right?

25     A.   I guess what it doesn't say is customer

1   hierarchy, and it doesn't say the combination of -- of

2   customer hierarchy and product hierarchy.  I read this

3   very carefully before I testified about it.

4          THE COURT:  Ladies and Gentlemen, I'm

5   going to have to take a quick recess here.  Take about

6   10 minutes, okay?  If you'll excuse yourself to the jury

7   room.  I've got another matter to take up, and I'll

8   invite you back in as quickly as I can.  But let's take

9   about 10 minutes.

10          LAW CLERK:  All rise for the jury.

11          (Jury out.)

12          THE COURT:  All right.  Y'all have a seat.

13          Dr. Mercer, I told you twice now in front

14   of the jury that you need to answer the questions that

15   call for a yes or no with yes or no.

16          THE WITNESS:  Okay.

17          THE COURT:  And the time for explaining

18   will be redirect.

19          THE WITNESS:  Okay.

20          THE COURT:  So here's -- here's the drill.

21   You understand the parties are on time limits, right?

22          THE WITNESS:  Yes.

23          THE COURT:  I've set aside 10 hours per

24   side for each side to present their case.

25          THE WITNESS:  Yes.

1                    THE COURT:  And when you don't answer

2     questions with yes or no answers, with yeses or noes or

3     I can't answer it like that, then what you're doing is

4     you're wasting the time that I've given to the

5     Plaintiff.

6                    So the way I correct that is I will take

7     time away from the Defendant and add it back to the

8     Plaintiffs' time.

9                    You understand that?

10                   THE WITNESS:  I do.

11                   THE COURT:  Okay.  So this is my Miranda

12    warning to you.  If you do it again, it's going to cost

13    SAP 30 minutes, and they need that 30 minutes, okay?

14                   THE WITNESS:  Okay.

15                   THE COURT:  So please follow that

16    instruction.  I'll see you back in here in about five

17    minutes.

18                   LAW CLERK:  All rise.

19                   (Recess.)

20                   LAW CLERK:  All rise.

21                   (Jury in.)

22                   THE COURT:  Please be seated.

23                   Sorry for the interruption, ladies and

24    gentlemen.  Sometimes we have to juggle more things than

25    we want to.

```
 1                    Please proceed.

 2                    MR. POLLINGER:  Thank you, Your Honor.

 3         Q.   (By Mr. Pollinger)  Dr. Mercer, we were talking

 4    about this book from SAP from 2007, the section that's

 5    talking about key techniques, and it's describing

 6    hierarchy access, right?

 7         A.   Yes.

 8         Q.   And the second sentence here says:  The

 9    functions in hierarchy accesses enable you to solve

10    problems by using one access to a condition table, see

11    that?

12         A.   Yes.

13         Q.   And then down here it says:  During pricing,

14    the system sorts the records found with this single

15    access according to priority and uses the record with

16    the highest priority.  It says that, right?

17         A.   Yes, it does.

18         Q.   And then the next sentence says:  Hierarchy

19    accesses also provide clear and easy master data

20    maintenance because the different condition records for

21    a condition type can be created together in the quick

22    entry screen for maintaining conditions.  Do you see

23    that?

24         A.   I do.

25         Q.   And this was 2007, right?
```

```
 1        A.   I believe that's correct.

 2        Q.   Now, in your expert report, you've never given

 3   an opinion that SAP's customers no longer use

 4   disconnected pricing, did you?

 5        A.   I don't -- not that I remember.

 6        Q.   Disconnected pricing, that's on a laptop not

 7   being connected to the internet, right?

 8        A.   That's the way I understand it.

 9        Q.   And in your expert report, you are not saying

10   that the importance of flexibility has changed from the

11   late 1990s to 2003?

12        A.   I don't believe I said that, no.

13        Q.   Now, I think we all can agree that computers

14   have gotten a lot faster, right?

15        A.   Yes.

16        Q.   We can all play video games or computations,

17   whatever we're doing, right?

18        A.   Yes.

19        Q.   But you're not saying that performance is no

20   longer an issue in computers after 2003, are you?

21        A.   No, I don't believe I said that.

22        Q.   Well, let's -- in fact, let's look at some SAP

23   e-mails on that.

24             MR. POLLINGER:  Let's look at PX2156.

25        Q.   (By Mr. Pollinger)  That's a SAP e-mail from
```

1  October 15, 2007.  You see the date up here.  And look

2  at -- if we go down a little bit and it discusses in the

3  middle there:  I just wanted to provide you a heads up,

4  that way we may be escalating Campbells.  It sounds like

5  it's Campbells Soup?

6     A.   I don't know.

7     Q.   They have a plan, go live with core ERP 2004;

8  that's SAP's product, right?

9     A.   Yes.

10     Q.   On October 29 and they are experiencing

11  performance problems and cannot meet their business KPIs

12  in two areas; do you see that?

13     A.   I do.

14     Q.   And then if we go down, discusses updates at

15  the customer product level; do you see that there?

16     A.   Could you point -- yes.

17     Q.   And then the next line says:  The BDL is still

18  40 percent too slow and it seems to focus on pricing

19  and/or COPA, but mainly PA; do you see that?

20     A.   I do.

21     Q.   Do you see those performance issues there

22  described?

23     A.   I see the words.

24     Q.   Performance is still an issue with computers

25  after 2003, right?

1      A.   I wouldn't argue with that.

2              MR. POLLINGER:  If we could, please, go to

3    PX2112.  This is an SAP document -- I must have called

4    it out wrong.  2122.

5      Q.   (By Mr. Pollinger)  This is an SAP document

6    entitled:  Feasibility Check, CRM marketing.  See the

7    date here March 18, 2005.  Skip there, it's an SAP

8    document.  And then if we could, please go to the second

9    page.  Got a questionnaire here we'll see at the bottom.

10   Let's -- maybe I called it out wrong.

11             MR. POLLINGER:  Excuse me, Mr. Diaz, it's

12   the page ending in the Bates number 5344, it's page 30,

13   I believe.

14     Q.   (By Mr. Pollinger)  In the bottom there,

15   Section 5.5.5, we've got questions here and answers, the

16   questionnaire; do you see that?

17     A.   Yes, I see questions and answers.

18     Q.   And if we go down here it's a question:  Will

19   you make use of customer hierarchies when selecting

20   business partners.  Do you see that?

21     A.   Yes.

22     Q.   If we go to the next page, please.  Up at the

23   top here, will you make use of product hierarchies when

24   selecting products; do you see that?

25     A.   Yes.

1     Q.   SAP is asking separate questions, do you use

2  customer hierarchies, do you use product hierarchies,

3  correct?

4     A.   Looks that way to me.

5     Q.   And then if we scroll down a little bit here,

6  right there.  Using customer and product hierarchies in

7  the marketing planner will influence the performance

8  when working in the marketing planner; do you see that?

9     A.   I do.

10    Q.   So what SAP did here, they asked a separate

11 question about customer hierarchies, a separate question

12 about product hierarchies, then when you come down here,

13 they use it together with the word and.  User, customer

14 and product hierarchies; that's what's in this document,

15 right?

16    A.   Yes.

17         MR. POLLINGER:  Now, if we could, please

18 go to my Slide 10.  Slide 10, please.

19    Q.   (By Mr. Pollinger)  So SAP was determined to

20 infringe in 2009, right?

21    A.   Yes.

22    Q.   And SAP released a change in May of 2010,

23 right?

24    A.   Yes.

25    Q.   And you say that disables the product, prevents

1    the infringement, correct?

2        A.   Yes.

3        Q.   Now, what SAP says in this note here is that

4    existing -- for existing access sequences, those will

5    continue to function as before, right?

6        A.   Yes.

7        Q.   Now, you're suggesting, well, it's bought and

8    paid for, so they can do that, right?

9        A.   Essentially.

10       Q.   And you're not a legal expert, are you?

11       A.   No.

12       Q.   Now, nothing has been paid for yet, right?

13       A.   Not to my knowledge.

14       Q.   And SAP sells additional license seats to those

15   existing customers, right?

16       A.   I think that's entirely possible.

17       Q.   Those additional license seats allow additional

18   employees at the company to use the software, right?

19       A.   I would think so.

20       Q.   Including these pre-existing access sequences,

21   right?

22       A.   If they exist, yes.

23                MR. POLLINGER:  Now go to Slide 13,

24   please.

25       Q.   (By Mr. Pollinger)  Let's talk about what was

1   done May 2010 with respect to the product.  Where --

2   where I think you say they disabled the product so it no

3   longer can infringe.

4               Now, what they did here, the change they

5   made, we call it the patch, the May 2010 patch.  What

6   they did by this patch is for the KNVH-type hierarchy,

7   if you put that KNVH type hierarchy, you can no longer

8   type the A in here and then save this, right?

9        A.   Yes, that's true.

10       Q.   But when the patch is installed, it doesn't

11  pull these A's out, does it?

12       A.   Would you repeat that, please?

13       Q.   When the patch is installed from May 2010, it

14  doesn't pull those A's out, does it?

15       A.   No.

16       Q.   And you can get those A's in there for any

17  other type of hierarchy, right?

18       A.   Yes.

19       Q.   Now Dr. Mercer, SAP has used both customer and

20  product hierarchies for a long time, right?

21       A.   I would agree with that.

22       Q.   And it's common for businesses to price based

23  on where the customer is, for example, Germany or U.S.,

24  right?

25       A.   Seems reasonable.

1    Q.   And it's common for businesses to price based

2  on the type of customer, retail customer, wholesale

3  customer, right?

4    A.   I expect that's the case, yes.

5    Q.   And it's common for businesses to price based

6  on what the product is, right?

7    A.   Absolutely.

8    Q.   So it's common for businesses to price based on

9  both who the customer is and what the product is, right?

10   A.   Could be, I don't know.  I can't answer that

11 question.

12   Q.   Now, you're saying -- I think you told us in

13 your direct examination, you're not happy with the way

14 we wrote the deposition questions to SAP's customers.

15 You don't think they were precise enough, right?

16   A.   That's true.

17   Q.   Now, SAP could have submitted their own

18 counter-questions when we submitted our questions; did

19 you know that?

20   A.   I -- I really -- I can't see why not.  I don't

21 know for sure one way or the other, but I wouldn't argue

22 with it.

23   Q.   And SAP didn't do that, did they?

24   A.   Not to my knowledge.

25   Q.   But after there was the infringement

1    determination in 2009, SAP did get two declarations,

2    right?

3         A.    That they did, yes.

4         Q.    One from Chevron, one from Microsoft, right?

5         A.    That's correct.

6         Q.    And Chevron, Microsoft said, hey, we don't --

7    we don't use this with both customer and product

8    hierarchies, right?

9         A.    That's what I understand.

10        Q.    Do you know whether SAP's lawyers wrote those

11   declarations for Microsoft or Chevron?

12        A.    I don't know.

13             MR. POLLINGER:  If we can go to Slide 16.

14        Q.    (By Mr. Pollinger)  Now, this was from

15   Mr. Gupta's testimony.  Before SAP got those two

16   declarations after the infringement in 2009

17   determination, there were 16 SAP customers up here,

18   right?

19        A.    Correct.

20        Q.    And that equated to 40 percent, right?

21        A.    40 percent of?

22        Q.    Of -- of all 40 that were served?

23        A.    Oh, I -- I would -- I would accept your

24   representation on that, yes.

25        Q.    Now, are you saying there was something wrong

1  with Trilogy's lawyers not serving questions on more

2  than forty customers?

3       A.   I don't believe I've said that, no.

4       Q.   That was proper, right?

5       A.   I -- I didn't say it was improper.  Yeah,

6  that's right.

7       Q.   You're not saying that Trilogy was supposed to

8  serve all 1,300, are you?

9       A.   No, I don't think I've said that.

10      Q.   40 is just fine, right?

11      A.   I haven't said that either.  I haven't said one

12  way or the other.

13      Q.   Are you -- are you suggesting that it should

14  have been more than 40?

15      A.   No.

16      Q.   Okay.  Now, after the declarations that SAP got

17  from Chevron and Microsoft, after the 2009 infringement

18  determination, what Mr. Gupta did is he moved them down

19  and so it reduced it from 16 to 14 and the percentage

20  went from 40 percent to 35 percent, right?

21      A.   That's correct.

22      Q.   So he's already made an adjustment, right?

23      A.   Yes, he has.

24      Q.   But what you want to do, you want to move them

25  all down.  You want to make it little bitty, right?

1      A.    That's what I suggested.

2      Q.    You want to make it go to zero, right?

3      A.    That's what I suggested.

4      Q.    And your argument is, well, we -- we just don't

5  have enough precise evidence that anybody wants to

6  price, based both on customer and product hierarchies

7  together to determine a price with hierarchical access,

8  right?

9      A.    In the appropriate time frame.

10     Q.    Well, customer use is not required for there to

11  be infringement, right?  We went over this already.

12     A.    I -- I believe that infringement can occur

13  after the patent issues.

14     Q.    And -- and damages are only being sought from

15  2003 forward, right, after the patent issued?

16     A.    Yes, that's true.

17     Q.    I mean, yesterday you referred to customer use

18  in 2001, but customer use isn't required for there to be

19  infringement, right?

20     A.    It's capability.

21     Q.    It's SAP's selling the software with the

22  capability in there after 2003, right?

23     A.    Well, certainly after 2003.

24     Q.    And that infringement determination has already

25  been made in 2009, right?

1    A.   Yes, it has.

2    Q.   Okay.

3         MR. POLLINGER:  Let's look at the next

4 document, PX2116, please.

5    Q.   (By Mr. Pollinger)  This is SAP business by

6 design.  You see this October 17, 2007?

7    A.   I do.

8         MR. POLLINGER:  If we could go down to the

9 page ending in Bates No. 4661.  I think it's the fourth

10 page.

11   Q.   (By Mr. Pollinger)  You see there it's an SAP

12 document over here, it's talking about portfolio

13 ranking.  It's an internal document; do you see that?

14   A.   Yes.

15   Q.   And if we go down to the bottom, we see here

16 this is -- says:  Expected coverage with top five

17 ranking; do you see that?

18   A.   Yes.

19   Q.   And if we go down to -- in the top five, No. 4,

20 it says there:  Pricing, rebates, discounts based on

21 customer and product hierarchies and listings.  Do you

22 see that?

23   A.   Yes.

24        MR. POLLINGER:  We can take that down.

25   Q.   (By Mr. Pollinger) Now, let's talk about the

1  design out.  We already talked about the existing uses.

2  You admitted you're not a legal expert on that issue,

3  right?

4      A.   True.

5      Q.   Let's talk about the second issue, using these

6  editing tools for that one type, the KNVH type, that

7  they blocked getting the A's in there with their own

8  tool.  Let's talk about getting those A's in there with

9  some off-the-shelf editing tool?

10     A.   Okay.

11     Q.   Now, are you saying that it's uncommon for

12  SAP's customers to use a database editing tool to modify

13  their data?

14     A.   I didn't testify about that one way or the

15  other.

16     Q.   So it's -- so it's common, right?

17     A.   No, I didn't testify to that.

18     Q.   Well, let's -- let's look at SAP's documents.

19          MR. POLLINGER:  If we pull up PX2148.

20     Q.   (By Mr. Pollinger)  Look at the top here.  We

21  see this is from March 9, 2010.  Subject line, it's SAP

22  edit.  SAP's edit tool?

23     A.   Yes.

24     Q.   Now, the claims in the 2009 infringement

25  determination, they weren't read on the editing tools,

1  right?

2      A.    They're capability.

3      Q.    It was the hierarchical access engine and

4  setting up the -- the customer and product hierarchies

5  and storing the pricing information; we heard that from

6  Mr. Gupta, right?

7      A.    Capability to do that.

8      Q.    Yes.  And -- and this SAP editing tool was

9  never accused of infringement, was it?

10     A.    I can't answer that one way or the other.

11     Q.    Let's look at what happened.  You know --

12  realize that in 2010, SAP shut that editing tool off for

13  a little while?

14     A.    I can't remember that.

15     Q.    Do you -- do you know that editing tool is used

16  by customers to edit the data directly in the databases;

17  do you know that?

18     A.    Can you be very specific about what editing

19  tool you're talking about?

20     Q.    This one right here, SAP's editing tool.  SAP

21  underscore edit?

22     A.    I'm afraid I just can't say one way or the

23  other.  I don't know.

24     Q.    Well, it looks -- look what happened when SAP

25  turned it off.  Let's scroll down, please.  It says

1  right there:  At the moment I have the greatest of

2  misgivings because 98 percent of our customers need SAP

3  edit and use -- and also use it sensibly.  They are

4  currently discussing how to reactivate it.

5          This was after the 2009 infringement

6  determination.

7          MR. POLLINGER:  And if we could go to

8  another exhibit on this, same editing tool, PX2149.

9      Q.  (By Mr. Pollinger)  We're looking at whether

10  it's common for customers to use an editing tool to edit

11  their database.  This is SAP's edit tool -- editing

12  tool, SAP, under score, edit.

13          MR. POLLINGER:  If we could jump to Page 6

14  of this.

15      Q.  (By Mr. Pollinger)  This is from March 2, 2010.

16  They're talking about SAP shutting this off.  And if we

17  look down here, what does it say?  This has had a

18  catastrophic effect on us.  Do you see that?

19      A.  I do.

20      Q.  Do you realize that after this, SAP turned the

21  editing tool back on?

22      A.  No, I'm not aware of that.

23      Q.  Did you know they turned it back on but they

24  didn't let you use it to get those A's in there?

25      A.  That I'm aware of, yes.

1    Q.   But you can use an off-the-shelf editing tool

2  to do it, right?

3    A.   I don't know one way or the other.

4    Q.   Now, let's turn to the last issue on the design

5  out.  And this doesn't go to whether there was

6  infringement in 2009.  That's already determined.  This

7  is just whether there's infringement after May 2010.

8         MR. POLLINGER:  If we go to my Slide 36.

9    Q.   (By Mr. Pollinger)  Now, your argument as well,

10  these other things that Mr. Gupta is pointing to, these

11  sale areas, he called them sale areas, hierarchies,

12  these -- these geography hierarchies.  And you said,

13  well, they're not hierarchies.  Well, we've got to use

14  the Court's definitions, right?

15    A.   Yes.

16    Q.   And here is the Court's definition.  Could you

17  read it out to us, please?

18    A.   Hierarchy according to the Court is -- means a

19  branching arrangement of at least two levels of data.

20    Q.   It doesn't say branching in only one direction,

21  does it?  It doesn't say that, does it?

22    A.   No, it doesn't.

23    Q.   Now Dr. Mercer, in -- in business, customers

24  can be grouped by geography, right?

25    A.   I would think they could.

1    Q.   You have customers in Texas, customers in
2 Dallas, customers in Marshall, right?
3    A.   Sure.
4    Q.   And customers can be grouped by sales areas,
5 right?
6    A.   Sure.  I think they could -- customers could be
7 grouped by sales areas.  I -- I -- I don't -- I don't
8 know one way or the other actually.  I don't have any --
9 you know, I don't have any data, but...
10    Q.   And at SAP's system, customers are set up in
11 the customer master file, right?
12    A.   I think customers are set up in the customer
13 master file, I'd agree with that.
14    Q.   Now, the infringement determination in 2009,
15 that wasn't based on use, it was based on capabilities,
16 right?
17    A.   I'd agree with that.
18    Q.   But even so, there was evidence in the 2009
19 presentation and here that there -- there is use.  Now,
20 you disagree with it, but -- but Trilogy has presented
21 evidence that it believes there was use of the claimed
22 capabilities, correct?
23    A.   I just can't say one way or the other.
24    Q.   And Trilogy gave an example of -- of use, using
25 that KNVH-type customer hierarchy, right?

1    A.    Again, I don't know exactly what you're talking

2  about.

3    Q.    Well -- well, the example Trilogy gave in the

4  2009 presentation was the KNVH-type customer hierarchy,

5  right?

6    A.    Oh, I remember that, yes.

7    Q.    Now, Trilogy wasn't required to give all

8  examples of use, was it?

9    A.    I would think they were not.

10    Q.    Now, your view is that in hierarchies the

11  branching can only go one way, that was -- that was

12  basically what you showed us in your pictures, right?

13    A.    Yes.

14    Q.    But we've already seen the Court's definition

15  of hierarchy does not say branching in only one

16  direction, does it?

17    A.    That's -- we read it off, and it doesn't have

18  those words, no.

19              MR. POLLINGER:  No further questions.

20              THE COURT:  Mr. Batchelder?

21              MR. BATCHELDER:  No redirect, Your Honor.

22  Thank you.

23              THE COURT:  Okay.  All right.  You may

24  step down, Dr. Mercer.

25              THE WITNESS:  Thank you.

```
 1                    THE COURT:  All right.  Who will be your
 2   next witness?
 3                    MR. MELSHEIMER:  Your Honor, SAP calls
 4   Mr. John Tully.
 5                    THE COURT:  Okay.
 6                    (Witness sworn.)
 7                    THE COURT:  Mr. Tully come around, please.
 8                    THE WITNESS:  Thank you, sir.
 9                    THE COURT:  Same place.
10                    MR. MELSHEIMER:  May it please the Court,
11   Your Honor.
12                    THE COURT:  Yes, sir.
13             JOHN TULLY, DEFENDANTS' WITNESS, SWORN
14                     DIRECT EXAMINATION
15   BY MR. MELSHEIMER:
16        Q.   Mr. Tully, introduce yourself to the Jury,
17   please, sir.
18        A.   Yes, sir.  Good morning.  My name is John
19   Tully.
20        Q.   Do you work at SAP?
21        A.   I do.
22        Q.   What is your current title or position?
23        A.   My -- my title is a regional vice president.
24        Q.   What do you do as regional vice president?
25        A.   I am charged with managing the sales team for
```

1    SAP in the Southwest part of the United States.

2        Q.    Does that include Texas?

3        A.    It does.

4        Q.    How many customers would you say SAP has in the

5    state of Texas, sir?

6        A.    In the state of Texas, we have approximately

7    150 customers in the state of Texas.

8        Q.    Can you identify some of those customers for

9    the Jury, including some -- some companies they might be

10   familiar with?

11       A.    Certainly.  Here in East Texas, Lufkin

12   Industries is a customer.  Pilgrim's Pride was a long

13   time.  Brookshire's.

14             Customers in Houston could include

15   chemical companies, oil companies, Exxon,

16   ConocoPhillips, Westlake Chemical.

17             Companies in Dallas would be, you know,

18   the airlines, American, Southwest Airlines, the

19   railroads, so Burlington Northern Santa Fe, Union

20   Pacific.  So a broad spectrum of accounts.

21       Q.    About how many employees does SAP have here in

22   Texas?

23       A.    In Texas we have approximately 700 employees.

24       Q.    I want to come back to your work at SAP in a

25   moment, but I want to let the Jury, give you a chance,

1   to hear a little bit about yourself.

2               So where were you born, sir?

3       A.   I was born in New Jersey.

4       Q.   Did you grow up in New Jersey?

5       A.   No, sir, I you grew up in Atlanta.

6       Q.   Why did you move to Atlanta?

7       A.   We moved to Atlanta, my father was a

8   professional fundraiser, raised money for charitable

9   organizations.  He was hired by Morehouse College to

10  help them on a project to build a medical school.

11      Q.   Did you go to college?

12      A.   I did.

13      Q.   Where?

14      A.   Auburn University.

15      Q.   Did you get a degree?

16      A.   I do.  I have a B.A. in Economics.

17      Q.   Where do you live now, sir?

18      A.   I live in Austin, Texas.

19      Q.   Do you have a family?

20      A.   I do.  Married, we have two girls, six and

21  four.

22      Q.   How long have you been with SAP in a sales

23  capacity?

24      A.   I began in 1997, but in total a little over 10

25  years.

 1      Q.   Did you start work in 1997 as kind of a junior

 2  salesman?

 3      A.   I did.

 4      Q.   Now, you said you're a manager now for a bunch

 5  of states including Texas, right?

 6      A.   Yes.

 7      Q.   I want to talk a little bit about your

 8  experience with competition and with customers, are you

 9  with me?

10      A.   Yes, sir.

11      Q.   All right.  Now, have you been involved in

12  competition for software that does pricing?

13      A.   Yes.

14      Q.   All right.  Has the market for software that

15  does pricing, has that been a competitive market since

16  you first was -- first got involved in it in 1997?

17      A.   Absolutely.

18      Q.   Are you familiar with other companies that have

19  pricing software that would compete with Trilogy's

20  Pricer product or SAP's pricing components?

21      A.   Yes, I am.

22      Q.   Can you tell the Jury some examples of

23  companies that have offered that kind of software since

24  1997?

25      A.   Sure.  Well, the market's evolved but, you

1  know, I think there's some common players.  So Callidus,

2  Trilogy, obviously, SAP, Oracle, PeopleSoft, JD Edwards.

3  There's companies like Vendavo and Vistex.  Zilliant is

4  another pricing company in Austin as well.  So

5  there's -- Siebel Systems is a significant player.

6  Salesforce.com offers pricing capability as well.  So

7  there's a significant market around pricing.

8      Q.   Do you have a personal experience of one of

9  your customers running pricing on a Siebel product and

10  doing the rest of its business on SAP?

11     A.   Yes.

12     Q.   Who is that customer?

13     A.   Schlumberger is a large oil field services

14  company headquartered in Paris and Houston.  They run

15  all their pricing in Siebel and then the rest of their

16  system, the rest of their ERP capabilities are executed

17  in SAP.

18     Q.   Do any of the companies that you just

19  described, do they sell their pricing software to

20  businesses that -- that already use SAP, I take it?

21     A.   Yes, all of them do.

22     Q.   Now, there's been some testimony about how you

23  can't mix Oracle and SAP.  That if you have Oracle, you

24  don't have SAP; if you have SAP, you don't have Oracle.

25  Is that true in your experience?

1      A.    I think that's inaccurate.

2      Q.    Why do you say that?

3      A.    I have many customers who run many different

4  applications from Oracle and I, in fact, I have other

5  customers that run Oracle applications as their core ERP

6  products and run line of business functions from SAP.

7      Q.    Now, you just assumed that they use SAP instead

8  of Oracle, right?

9      A.    We would greatly appreciate that business.

10      Q.    All right.  Now, when you compete with

11  companies, whether it be Oracle or whether it be the

12  other companies that you've described and you lose out

13  to them, do you ask the customers why they went with

14  another product or another company?

15      A.    Yes.

16      Q.    Do you get any information in that process?

17      A.    Most frequently, yes, definitely.

18      Q.    Do you always get that kind of information?

19      A.    Not always but frequently.

20      Q.    What kind of information do you get from

21  customers when you lose out on a sale?

22      A.    Generally we'll talk about alignment, did our

23  team execute well, did we understand their business

24  requirements, did we present our solutions in a way so

25  that that customer understood how our functionality met

1    the requirements.  You know, often we'll talk about

2    implementation.  Did they -- you know, did they like our

3    partners, did they like our approach or if they

4    preferred from the -- the other party.

5         Q.   How many companies would you say you have

6    personally dealt with over the years in selling SAP

7    software?

8         A.   Over 300.

9         Q.   In that 300, has anyone ever identified pricing

10   functionality as a reason not to buy SAP's overall

11   business suite?

12        A.   No.

13        Q.   Has any customer ever told you in those 300

14   over the years that they're buying SAP software because

15   of a hierarchy access feature that you've heard about in

16   the trial?

17        A.   No.

18        Q.   Now, back in -- let me ask you to look at --

19                  MR. MELSHEIMER:  If we could pull up

20   Exhibit 1947.

21                  May I approach the witness, Your Honor?

22                  THE COURT:  Yes.

23        Q.   (By Mr. Melsheimer) I've handed you what's been

24   marked as Exhibit 1947; can you identify that for the

25   Jury, please, sir?

```
 1        A.   Yes, sir.  It appears --

 2             THE COURT:  Mr. Melsheimer, pardon me, I

 3   apologize for interrupting you but our court reporter

 4   needs to change a disk real quick.

 5             (Pause.)

 6             THE COURT:  If counsel will

 7   approach while she's doing that.

 8             (Discussion off the record.)

 9             MR. MELSHEIMER:  Ma'am, are you ready?

10             THE COURT:  Let's proceed.

11             MR. MELSHEIMER:  Thank you.

12             May it please the Court.

13        Q.   (By Mr. Melsheimer) Exhibit 1947, what is that,

14   sir?

15        A.   It appears to be kind of a release notes or

16   release highlights of an upcoming release of SAP

17   software, 4.5.

18        Q.   Was that the 1998 release that first included

19   this hierarchy access functionality that we've heard

20   about in this trial?

21        A.   I understood it is, yes.

22        Q.   Does that document -- have you had a chance to

23   review that document?

24        A.   I have, yes.

25        Q.   Does it describe the highlights of the features
```

1  that are included in this particular release?

2      A.   It does.

3      Q.   Is there any mention of hierarchy access in

4  that document?

5      A.   Not that I have seen.

6      Q.   Now, let me ask you just one or two more

7  questions, sir.

8              Back in 1997-1998 timeframe when you were

9  at SAP working at the marketplace, was there an interest

10 in -- in the marketplace for what's called disconnected

11 pricing?

12     A.   Yes, I believe there was.

13     Q.   What is disconnected pricing?

14     A.   My understanding would be, you know, a

15 salesperson would be engaged with a prospect or a

16 customer and need to present them pricing, and at that

17 time, right, laptops -- salespeople used laptops, so

18 would be engaged with a customer with his laptop or

19 could create a quote or prepare a price for that

20 customer on his laptop.

21     Q.   Now, did that feature, that ability to do that

22 disconnected pricing, did that remain important in your

23 experience from 2003 and beyond?

24     A.   No.

25     Q.   Tell the jury why not.

1    A.   Well, 1998, right, was a very different time in

2  the technology industry.  2003, that's post-internet,

3  post-smart phones, and customers -- or salespeople no

4  longer required that disconnected capability and to

5  communicate with their -- they could communicate

6  directly with their corporate system via Wi-Fi on their

7  laptop as well.  They didn't need to be disconnected

8  anymore.

9    Q.   So what did that mean in terms of what you

10  didn't need to have on your laptop anymore?

11    A.   Well, you didn't need to run a self-contained

12  pricing application on your laptop anymore.

13             MR. MELSHEIMER:  No further questions.

14  Pass the witness.

15             THE COURT:  Cross-examination.

16             MR. BAXTER:  Yes, Your Honor.  Thank you.

17                    CROSS-EXAMINATION

18  BY MR. BAXTER:

19    Q.   Mr. Tully, we heard two new companies we

20  haven't heard before.  One of them is called Callidus;

21  is that right?

22    A.   Callidus, yes, sir.

23    Q.   Now, Callidus is a commissions company, isn't

24  it?

25    A.   I believe it was commissions, and I thought it

1  also did -- configured pricing similar to what Trilogy

2  did.

3      Q.   You don't really have any idea, do you?

4      A.   No, sir.  I mean, that was my recollection.

5      Q.   Okay.  They added pricing in 2010, didn't they?

6      A.   I do not know that.

7      Q.   Okay.  They -- in 2003, they weren't even in

8  existence in the pricing market, were they?  No

9  competition for Trilogy or SAP, were they?

10      A.   I -- I can't -- I can't tell you yes or no,

11  sir.

12      Q.   Zilliant, we heard about them.

13      A.   Yes, sir.

14      Q.   They're a pricing optimization company, aren't

15  they?

16      A.   Yes, they are.

17      Q.   They don't even do pricing the way that Trilogy

18  does it and the way that SAP does it, do they?

19      A.   I do not believe they do it the way we do it.

20      Q.   Okay.  Now, they're no competition for this,

21  are they?

22      A.   No, sir.  I believe they're direct competition.

23      Q.   Do you know of any company that uses SAP for

24  pricing and then uses Oracle for something else?

25      A.   Yes.

```
 1        Q.    Who is that?

 2        A.    Amdocs.

 3        Q.    Who is that?

 4        A.    Amdocs is an Israeli-based customer of mine.

 5  They're also in St. Louis.

 6        Q.    You -- okay.

 7        A.    And they run Oracle ERP.

 8        Q.    Yes.

 9        A.    And they use SAP for order management,

10  including pricing.

11        Q.    Okay.  That's the only one you know about?

12        A.    Yes, sir.

13        Q.    In the whole world --

14        A.    In the whole --

15        Q.    -- that's it?

16        A.    Under my -- with my knowledge, yes, sir.

17        Q.    Well, you're up here speaking for SAP.  SAP

18  doesn't know about anybody else either, do they?

19        A.    SAP may.  I do not.

20        Q.    Okay.  That is so rare as to be totally

21  unusual, isn't it?  Doesn't happen.

22        A.    It does happen, but it is not common, yes, sir.

23        Q.    One time?  Is that it?

24        A.    Yes, sir.

25        Q.    Okay.  Now, pricing important?
```

1     A.   Very.

2     Q.   When you go out or your SAP people go out and

3 you have -- you're trying to sell your product, do they

4 want -- do your customers want pricing?

5     A.   Are you asking, do they want pricing from me on

6 my products?

7     Q.   Yes.

8     A.   Oh, yes, sir.

9     Q.   If you said:  Sorry, don't have it, can't do

10 it, is that a bad day for you?

11    A.   Not particularly.  That is more common than

12 not.

13    Q.   I'm sorry?

14    A.   It is most common in my sales cycles and my

15 interaction with my customer that my sales reps will

16 discuss requirements with a customer, and there will be

17 a significant lag time before they can present that

18 customer a proposal for pricing of our products.

19    Q.   No, not my question.

20    A.   Okay.  I'm sorry.

21    Q.   My question is:  If your sales guy goes in the

22 office and he says:  I want to sell you this -- this SAP

23 product; by the way, before we get started, let me tell

24 you, we don't have pricing, is that a bad day for you?

25                    The Oracle guy is sitting out in the

1  waiting room.

2      A.   Uh-huh.

3      Q.   Is that a bad day for you?

4      A.   No, sir.  That's not typically how a sales

5  process or an interaction would happen.

6      Q.   Okay.  I'm just saying, for a change, your

7  salesman tells the truth, and he says right upfront:  No

8  pricing in my software, sorry, but I want to sell it to

9  you anyway.

10     A.   I don't understand the question, sir.

11     Q.   You have an SAP program --

12     A.   Yes.

13     Q.   -- that you're trying to sell to a business.

14     A.   Yes.

15     Q.   And your salesman goes in and he says:  I want

16 to tell you about all my features.

17     A.   Uh-huh.

18     Q.   By the way, I want to tell you right upfront, I

19 don't have pricing.  I can't do that for you.  Sorry.

20     A.   Oh, are you saying we wouldn't have pricing --

21 if we would tell a customer that we didn't have pricing

22 capability in our software?

23     Q.   Yes.

24     A.   Yes, that would be a bad day.

25     Q.   A bad day.

1      A.   But that doesn't happen.

2      Q.   So if you didn't have up-to-date,

3  state-of-the-art pricing, you're not going to be that

4  successful, are you?

5      A.   If we did not have that, we would not be

6  successful.

7                   MR. BAXTER:  Thank you, Mr. Tully.

8                   THE COURT:  Redirect?

9                   MR. MELSHEIMER:  No redirect, Your Honor.

10                  THE COURT:  All right.  You may step down.

11                  THE WITNESS:  Thank you, sir.

12                  THE COURT:  Call your next witness.

13                  MR. MELSHEIMER:  Your Honor, SAP calls

14  Mr. Michael Wagner.

15                  (Witness sworn.)

16        MICHAEL WAGNER, DEFENDANTS' WITNESS, SWORN

17                  DIRECT EXAMINATION

18  BY MR. MELSHEIMER:

19     Q.   Good morning, Mr. Wagner.

20     A.   Good morning, Mr. Melsheimer.

21     Q.   Tell the jury your name, please, sir.

22     A.   Michael Joseph Wagner.

23     Q.   Mr. Wagner, what were you asked to do in

24  your -- in this case?

25     A.   I was asked to calculate damages related to the

1    '350 patent.

2       Q.   Let's tell the jury a little bit about your

3    credentials.  Describe, sir, the -- your educational

4    background.

5       A.   I have a Bachelor of Science in engineering,

6    which I received from the University of Santa Clara in

7    1969.  I have a master's in business administration,

8    which I received from UCLA in 1971.  And I have a juris

9    doctor degree from Loyola University School of Law at

10   Los Angeles, which I received in 1975.

11      Q.   Did you go through school straight --

12      A.   I did --

13      Q.   -- without interruption?

14      A.   I did not.

15      Q.   What did you do between your MBA degree and

16   your JD degree?

17      A.   I served in the United States Army.

18      Q.   What was your rank in the Army?

19      A.   Well, I was commissioned as second lieutenant

20   when I graduated from Santa Clara in 1969, and when I

21   went on active duty in 1971, I was a first lieutenant,

22   and I was a field artillery officer in the United States

23   Army.

24      Q.   How long were you in the Army?

25      A.   Including my reserve commitment, I was in the

1   Army for eight years.

2       Q.   Are you married, sir?

3       A.   I am.

4       Q.   How long?

5       A.   37 years.

6       Q.   How many children do you have?

7       A.   I have four adult children and two

8   grandchildren.

9       Q.   Have any of them followed in your footsteps as

10  a damages analyst?

11      A.   No, none of them have.  The only one who's

12  followed in my footstep is my second son, who is still

13  in the Army reserves.

14      Q.   Do you have any professional licenses or

15  certifications, Mr. Wagner?

16      A.   I do.

17      Q.   What are they?

18      A.   I'm a certified public accountant in the State

19  of California.  I'm also a licensed attorney in the

20  State of California.

21      Q.   Now, you've had a long career, I take it.  Can

22  you summarize the work that you've done over the years

23  that's relevant to what you're going to tell the jury

24  about?

25      A.   For the last 35 years, I've been a management

1  consultant that specializes in analyzing damage issues

2  in matters that are in dispute.

3           I've been really with only four companies

4  in 35 years.  The longest I was with is Price

5  Waterhouse.  Now it's called Price Waterhouse Coopers,

6  which is one of the big four accounting firms.  And I

7  was the partner in their management consulting

8  department for 10 years.

9           The next longest tenure I had was with a

10 firm called Putnam, Hayes & Bartlett.  That's a

11 management consulting firm based out of Boston,

12 Massachusetts, formed by a number of Harvard business

13 professors who used that as their consulting vehicle,

14 and I was a managing director in that organization.

15          Then I was seven years with Charles Rivers

16 Associates, another Boston-based consulting firm that's

17 actually publicly owned, a very large consulting firm,

18 and I was the managing director at that firm as well.

19          And then most recently, I'm with a small

20 privately held management consulting firm in Silicon

21 Valley, California, called LitiNomics.  It specializes

22 in intellectual property consulting.

23     Q.   How would you characterize the subject matter

24 of your work during your professional career, sir?

25     A.   I've analyzed financial issues for all types of

1  companies, all types of industries, and every type of

2  cause of action that you lawyers can think of.

3      Q.   Have you been called upon to testify as an

4  expert in court?

5      A.   I have.

6      Q.   How many times have you been called upon to do

7  that, sir?

8      A.   I have been an expert witness in 120 trials in

9  court before today.

10     Q.   So this is not your first rodeo.

11     A.   It's not my first rodeo.

12     Q.   All right.  Now, do you testify for plaintiffs,

13  for defendants, or how does that shake out?

14     A.   I do for both, and it's a pretty even split

15  over my career between working for both plaintiffs who

16  are seeking damages or working for a defendant, like in

17  this case, who's responding to a damage claim.

18     Q.   Do you serve on any organizations or groups

19  that are relevant to the work you've done in this case?

20     A.   I do.

21     Q.   Which ones?

22     A.   Well, probably the most relevant to what I'm

23  doing here today is, I'm currently on a working group

24  for something called The Sedona Conference, which has a

25  working group on patent damages, and we're trying to

1  develop some thought pieces on how you should calculate

2  damages.

3      Q.   Without going into any details, who were the

4  participants in that group?

5      A.   There are two damage experts like myself that

6  are on that group, there are a number of leading

7  attorneys in the intellectual property area, and then a

8  number of federal judges.

9      Q.   You're one of the two damages experts in that

10  group?

11      A.   I am.

12      Q.   In the course of your professional career, have

13  you written any books or articles?

14      A.   I have 27 professional publications, including

15  contributions to a number of books.

16      Q.   Have you written or contributed to a leading

17  book on damages in patent cases?

18      A.   Well, I've -- I have to say the answer to that

19  is no precisely to your question.

20      Q.   Let me rephrase that.

21          Have you contributed to a book with regard

22  to the calculation of damages in lawsuits?

23      A.   Yes.  That I have done.  There's a book called

24  The Litigation Services Handbook.  It's currently in its

25  fourth edition published by John Wiley.  It's been in

1  the marketplace for over 20 years.

2  I was the original person approached by

3  John Wiley to write this book.  At that time, I was a

4  partner at Price Waterhouse and didn't have the time,

5  but said that I would be an editor of the book.  I would

6  contribute to certain of the chapters in the book, but I

7  would get other leading professionals to contribute

8  their knowledge to this book.

9  And that book is cited by the scientific

10  treatise on evidence that is put out by the Federal

11  Judicial Center, is only one of five reference sources

12  for judges to look at for how you compute damages.

13  Q.    Which chapter of that book have you

14  specifically contributed to?

15  A.    Well, I've contributed to four of them, but the

16  one that's relevant is, I am the co-author of the patent

17  damages chapter.

18  Q.    All right, sir.  What is the -- with all

19  that -- all that background in mind, what is the measure

20  of damages that you considered to be the appropriate

21  measure of damages in this case?

22  A.    Based on my review of the facts that are

23  relevant, a reasonable royalty measure of damages is

24  appropriate.

25  Q.    Mr. Wagner, what is a reasonable royalty?

1    A.   Well, a royalty is simply a payment for the use

2    of someone else's property.

3    Q.   Can you give an example that the folks may be

4    familiar with?

5    A.   Well, in Texas, if you're fortunate enough to

6    have oil or gas under your land, you may not have the

7    ability yourself to extract those minerals from under

8    your land, but an oil company might.

9         And if they are extracting oil or gas from

10   your land, they'll make a periodic payment to you, which

11   is a royalty for use of your property.

12   Q.   In that example that you gave, does the royalty

13   payment vary with the value of what's being taken out?

14   A.   Clearly, the amount of oil or gas extracted is

15   directly relevant to how much royalty you will be paid.

16   Q.   Why is a reasonable royalty an appropriate

17   measure of damages in this case, Mr. Wagner?

18   A.   Because that is the -- or one of the remedies

19   that Congress said was appropriate for this type of

20   case.  Title 35 of the U.S. Code, Section 284, describes

21   what damages are relevant, and that statute says that

22   you're to award no less than a reasonable royalty for

23   use of the invention by an infringer.

24   Q.   In the cases where you have been an expert in

25   patent damages, has the reasonable royalty measure of

1    damages been by far the most common that you've used?

2        A.    In -- in most fact situations, that is the

3    remedy sought.

4        Q.    So you've been here for all the testimony,

5    haven't you, sir?

6        A.    I have.

7        Q.    And what is your understanding -- just your

8    understanding of the issues that are before the jury in

9    terms of valuation?

10       A.    That infringement has been established, so

11   liability has been found, and it's your job to determine

12   the amount of money that should be paid for the use of

13   that invention by SAP.

14       Q.    What is the jury valuing?

15       A.    They are valuing 3 out of 31 claims of the '350

16   patent.

17       Q.    Now, I want to talk about that.  We've heard a

18   lot about the Pricer product.  That's the Trilogy

19   product that's -- was sold by Trilogy?

20       A.    It is.

21       Q.    Is the jury here to do a valuation of the

22   Pricer product?

23       A.    No.

24       Q.    Why not?

25       A.    Because the Pricer product is much broader than

1  just three claims of the '350 patent.  The Pricer

2  product has at least five other -- or five total patents

3  that it is practicing and has a lot of other

4  functionality that is different than just the three

5  claims that are at issue in this case.

6      Q.   All right.  I take it that you looked at a lot

7  of different facts and circumstances in evidence in

8  coming up with your conclusion, sir.

9      A.   I did.

10     Q.   And we're going to get into that in a little

11 more detail, but is there a particular piece of evidence

12 you'd like to direct the jury to at the beginning that

13 you think is important for them to understand in their

14 valuation decision?

15     A.   Yes.  I think any evidence that's relevant to

16 actual use of the invention is what's most important in

17 determining the value of the patent.

18     Q.   Did you prepare -- help me prepare some slides

19 to illustrate your testimony for the jury, sir?

20     A.   I did.

21          MR. MELSHEIMER:  Can we bring up Slide 2?

22     Q.   (By Mr. Melsheimer) What are we -- what does

23 this slide illustrate, Mr. Wagner?

24     A.   Well, it's got a lot of information on it, but

25 what it's really trying to show is common customers

1    between Versata and SAP that bought both of these

2    company's products and the number of users of the

3    respective products among this group of seven companies.

4        Q.   I just want to understand we're on the same

5    page.

6             So these are companies -- and we've heard

7    some -- we're heard a bit about Bridgestone just a few

8    minutes ago.  These are companies that bought SAP for

9    that big, big piece of software, right?

10       A.   Yes, their ERP system.

11       Q.   And then they also bought Pricer for some

12   pricing functionality.

13       A.   That is correct.

14       Q.   And so what are you showing in this chart

15   with -- in terms of Pricer-authorized users,

16   SAP-authorized users, and then this percentage?

17       A.   What I'm trying to show is that pursuant to the

18   contracts these customers entered into with both SAP and

19   with Versata, how many people were actually going to use

20   the software in these organizations.

21       Q.   And did you conclude that of the SAP-authorized

22   users for all -- for these customers, that only 1.6

23   percent was -- were people who were going to be using

24   Pricer at all?

25       A.   Yes.  That is the conclusion I reached based on

1  this analysis.

2      Q.    And this is important, Mr. Wagner.  Does this

3  mean that they're using the three claims of the '350

4  patent?

5      A.    Not necessarily.

6      Q.    Why do you say that?

7      A.    Because these are people who can use all the

8  functionality in SC Pricer.  It's just not limited to

9  the three claims of the '350 patent.

10     Q.    So we know it's not any more than 1.6 percent,

11 and it could be a whole lot less.

12     A.    That's accurate.

13     Q.    And, again, why is this relevant to your

14 valuation work?

15     A.    Well, when SAP is being asked to pay a royalty

16 for use of this invention in connection with their sale

17 of the ERP system, you have to understand how important

18 is this patent or this value to them and their

19 customers.

20     Q.    We've heard a lot about this, Mr. Wagner,

21 that -- well, wait a minute.  It's just the capability

22 that's infringing.  So that's all we need to look at.

23     A.    Well, that's all you need to look at for

24 liability, and I think that's been established.  Just

25 having the capability means that SAP infringes this

1   patent.  But when you want to look at the value of the

2   patent, how much to be paid, use is extremely relevant.

3       Q.   Did you also look at certain yardsticks or

4   benchmarks to assist the -- to assist you in doing the

5   valuation that you undertook?

6       A.   I did.

7       Q.   All right.

8            MR. MELSHEIMER:  And do we have a slide,

9   Mr. Barnes, on that?  It's Slide 4.

10      Q.   (By Mr. Melsheimer) We're displaying for the

11  jury a slide entitled Baseline Benchmarks Indicate

12  Starting Royalty Range of 0 to 3.4 million.

13           Can you explain for the jury, starting off

14  with the first one, no evidence of use, and going

15  through to Comparable No. 2, what are you illustrating

16  here, and why is it important?

17      A.   Well, to answer the second part of your

18  two-part question first, why it's important is that the

19  way I do these what we call hypothetical negotiations

20  for this license, I always try to find yardsticks for

21  what the parties could talk about to start their

22  analysis.

23           You've got to start from something.  So

24  let's look at yardsticks about what might be the

25  possible value of the invention.

1    Q.   And what did you look at?

2    A.   Well, I looked at four different possible

3 starting point analyses.

4         The first I called no evidence of use.

5 SAP would ask Trilogy:  Give me evidence that this is

6 important to my customers.  Why should I be paying you

7 anything for the right to use or give the capability of

8 my customers to do this one unique feature within

9 hierarchical pricing?

10   Q.   Mr. Wagner, let me ask you, we've heard all

11 kinds of testimony that pricing is real important.

12   A.   Well, pricing is absolutely important, but the

13 one part of hierarchical access at issue in this case is

14 not pricing; it is one very small part of pricing.

15   Q.   All right.  So what number did you come up with

16 there?

17   A.   Well, I've reviewed the record.  I've been here

18 in trial.  I still see no concrete evidence, I haven't

19 seen one customer come in here and testify or anyone say

20 they talked to a customer that said they actually use

21 the combinations that is required within the invention.

22   Q.   What's the next benchmark that you looked at?

23   A.   Next benchmark is, well, what did it cost to

24 design out this functionality in May of 2010?

25   Q.   Now, that's a term we've thrown out, and I will

1  be honest with you, it's a term I had never really heard

2  before this case.

3           What's a design -- I know what a design in

4  is or a design.  What's a design out?

5      A.   A design out is that you have been accused of

6  violating someone else's intellectual property, and so

7  you do what you should do, is you take it out of your

8  program and what it costs you to do that.

9      Q.   What did you find about the cost of that here?

10     A.   That -- that based on the declaration of

11  Dr. Nieswand, who was responsible for doing an analysis

12  of this and actually designing out this functionality at

13  SAP, with the total of amount of time and the cost of

14  the labor to do the design out.

15     Q.   And that was $213,000?

16     A.   It was.

17     Q.   Now, there's been some testimony that SAP is

18  continuing to infringe, and they haven't gone and --

19  although they've made some technical changes to the

20  software, they haven't gone out and taken the software

21  away from customers.  Have you understood that

22  testimony?

23     A.   I've heard that testimony.

24     Q.   Would that be appropriate in a reasonable

25  royalty analysis?

1     A.   Yes, because that's what we're here for, is to

2  find out how much SAP should pay for those existing

3  users of this invention.

4     Q.   Well, if they're going to pay for it, do they

5  have to go out and take it away from them?

6     A.   I don't think that should be appropriate, no,

7  because SAP will have a license after they have been

8  paid -- they've paid what they should pay for the use of

9  this invention.

10     Q.   And they would then be able to let their

11  customers use it?

12     A.   Absolutely.

13     Q.   And that's what we're here to decide as you

14  understand it?

15     A.   That's why I understand I'm here.

16     Q.   What's the next benchmark that you looked at,

17  sir?

18     A.   Well, I -- I try to find any other benchmarks

19  of what people pay for some type of pricing

20  functionality that's an add-on to SAP's ERP system.

21     Q.   Now, what do you mean an add-on?

22     A.   Well, I've heard the word bolt-on, but you get

23  core functionality in this suite of products that covers

24  generally usually 80 percent of your needs as a major

25  company, but you may have some specific needs that you

1  have that are beyond that capability, and so you need to

2  then bolt on or add on software to SAP's suite of

3  products to perform that functionality.

4      Q.   So what is Comparable No. 1?

5      A.   It's a company called Khimetrics that SAP

6  purchased, and then they added this functionality to

7  their customers or allowed their customers, if they

8  would pay for it, to add on this functionality to the

9  core suite of products.

10     Q.   What is the functional of Khimetrics as you

11 understand it?

12     A.   It's price optimization.

13     Q.   What's that?

14     A.   Well, it's -- it's different than the main

15 functionality we're talking about here, which is price

16 execution, getting an actual price to a customer.

17          Price optimization is really where the

18 true value in pricing software is.  It's telling a

19 company, what is the right price?  What is the right

20 price to charge my customers to maximize the profits

21 that I'm going to earn?

22     Q.   What is the base -- what is the range here

23 that's you've illustrated in your chart of 0 to 2.3

24 million?

25     A.   Well, based on, I think, properly adjusting the

1  metrics that I saw as to how much SAP customers have

2  paid for this -- these add-ons -- there are 12 customers

3  that have actually agreed to pay for this additional

4  functionality -- that over the damage period, if I

5  equate the two, it would work out to $2.3 million.

6      Q.   So that is, in a sense, a comparable to what

7  you're trying to value in this case, which is three

8  claims of the '350 patent?

9      A.   Well, it's -- it's a yardstick.  It's not

10  exactly comparable.  It's not price execution, but it is

11  a related functionality.

12      Q.   Sometimes you can't find an exact duplicate

13  comparable in your analysis?

14      A.   Frequently in my work, you can't find a perfect

15  yardstick.

16      Q.   Let's take a look at the final comparable, No.

17  2, Highdeal.  What's -- what is that?

18      A.   It's similar to Khimetrics.  This is another

19  company that SAP acquired, and then they took the

20  functionality of that company and allowed SAP's

21  customers, if they wanted this additional functionality,

22  to also purchase this as an add-on to the SAP business

23  suite.

24      Q.   And you have there 0 to 3.4 million.  What does

25  that represent?

1    A.   Well, again, trying to properly adjust the

2  revenues earned from these 11 customers and then

3  equating it to the 8-year damage period, it would work

4  out to a royalty of $3.4 million.

5    Q.   You have then your baseline benchmarks,

6  indicates starting royalty range of 0 to 3.4 million.

7  What does that mean exactly?

8    A.   Well, I think this is the range that both

9  parties would start talking about that you should

10 possibly pay for the three claims of the '350 patent,

11 but then you have to do another analysis to actually

12 come up with the final price.

13   Q.   Mr. Wagner, did you do -- did you conduct an

14 analysis known as a hypothetical negotiation?

15   A.   I did.

16   Q.   And is that based on a legal case called the

17 Georgia-Pacific case?

18   A.   It is.

19   Q.   And I want to get into it a little more detail,

20 but what is the Georgia-Pacific analysis generally that

21 you performed?

22   A.   Well, the Georgia-Pacific case was a case where

23 a judge made the decision on patent damages, and he laid

24 out 15 factors that that judge believed a damage expert

25 should consider in arriving at a reasonable royalty.

1          And the 15th factor is what's called the

2     hypothetical negotiation.

3      Q.   Now, that's a strange term.  I understand what

4     a negotiation is.  What's a hypothetical negotiation?

5      A.   Well, it's -- no actual negotiation occurred

6     between SAP and Versata for a license to the '350

7     patent, so we have to make a hypothetical.  We say we'll

8     assume that they would have done this right before the

9     date of first infringement.  They would have considered

10    all the facts appropriate and come to a reasonable

11    royalty rate.

12          MR. MELSHEIMER:  Your Honor, is this an

13    appropriate time for a break?

14          THE COURT:  Well, we can go ahead and take

15    our -- take our morning recess here.

16          Ladies and Gentlemen, I'm going to take a

17    shorter recess, 15 minutes.  Come back ready to come in

18    at -- excuse me -- 10 till the hour.  Remember my prior

19    instructions, and don't talk about the case.

20          LAW CLERK:  All rise for the jury.

21          (Jury out.)

22          THE COURT:  All right.  Mr. Woloson has

23    copies of the jury instructions and verdict forms, and

24    I'll see y'all at 10 till.

25          (Recess.)

```
 1              LAW CLERK:  All rise.

 2              (Jury in.)

 3              THE COURT:  Please be seated.

 4              Mr. Melsheimer.

 5              MR. MELSHEIMER:  May it please the Court.

 6      Q.   (By Mr. Melsheimer)  Mr. Wagner, you were

 7   talking about this Georgia-Pacific case and the various

 8   factors that go into determining the reasonable royalty.

 9   Do we have a slide that demonstrates the different

10   factors and then sort of what it's doing to what you

11   told the Jury earlier on this baseline range?

12      A.   Yes.  This chart lists the 15 Georgia-Pacific

13   factors.  And when I told you I have this baseline, this

14   range of zero to 3.4 million, I'm now going to either

15   raise or lower the number that I think I should come up

16   with based on these factors.

17      Q.   Now, the parties would have -- your -- your

18   hypothetical negotiation presumes that the parties would

19   have sat down in April of 2003?

20      A.   It does.

21      Q.   So this would have been as if Trilogy had

22   called up SAP and said, we've got this patent, we should

23   sit down and talk about it?

24      A.   That's what I'm assuming.

25      Q.   Okay.  Now, the ladies and gentlemen of the
```

1    Jury probably have a good feel for a real world

2    negotiation, two people sit back and forth and try to

3    bargain.  Is that's what happening here or is it a

4    little bit different?

5        A.   Well, it is what is happening, but it is very

6    different than a real world negotiation.

7        Q.   How so?

8        A.   Well first off, that -- in this hypothetical

9    you do assume and here it's a fact that this is a valid

10   patent, it's enforceable, and it's infringed by the

11   licensee, SAP.

12             In real world negotiations, licensees

13   always argue you don't have a valid patent, I don't

14   infringe it, and so they use that to lower the value.

15   They can't do that in this negotiation.

16             And the other very big difference is that

17   all facts are known.  All relevant information are known

18   by both parties.  In the real world, people always keep

19   their cards close to the vest.  They -- they don't tell

20   the other side their weaknesses.  Here both sides knows

21   each other's weakness and their strengths.

22       Q.   Does the law require us to presume that both

23   sides know the other side's cards, so to speak?

24       A.   Yes.

25       Q.   So all the different e-mails that we've seen

1   talking about what was going on in Trilogy or what was

2   going on at SAP, we're pretty much assuming that both

3   sides know that?

4        A.   We do.

5        Q.   All the facts and details about the marketplace

6   and what's happening in the marketplace, both sides are

7   going to know that as well?

8        A.   They do.

9        Q.   Now, you say you considered all of the 15

10  different factors.  Are some factors -- first of all,

11  did you consider all 15 factors?

12       A.   I did.  I issued a report on April 11th this

13  year and it's 166 pages long, but about 110 deal with my

14  Georgia-Pacific analysis and I considered all of these

15  factors.

16       Q.   What factors did you consider to be the most

17  important?

18       A.   Based on reviewing all the evidence and the

19  facts of this case, it's GP factors No. 3, 9 -- 3, 5, 9,

20  11, and 13.

21       Q.   So nature and scope of the license; competitive

22  nature of the parties; utility and advantages of the

23  invention; and profit credited to the invention?

24       A.   You skipped 11, extent of infringer's use.

25       Q.   Extent of infringer's use.  I apologize.  Thank

1   you, Mr. Wagner.  It's not the first time you've had to

2   correct me, is it?

3       A.   And it probably won't the last.

4       Q.   All right.  Let's turn to Georgia-Pacific

5   Factor number -- your first factor, No. 3, nature and

6   scope of the license.  Why is -- why is that important?

7       A.   Well, all of this either raising the rate to

8   the top end of that range or lowering it is based on

9   these yardsticks.  And first off you have to understand

10  what is the nature and scope of this hypothetical

11  license.  It's a nonexclusive license to use the three

12  claims of the '350 patent in the United States.

13      Q.   Is it a license to go out and sell Pricer as a

14  bolt-on to SAP?

15      A.   No, this has nothing to do with Pricer.  It has

16  to do with just the three claims of the '350 patent.

17      Q.   How is that different from a situation where

18  the parties are negotiating over a software program like

19  Pricer?

20      A.   Well, it's very different and it's like my two

21  yardsticks, that was the Khimetrics and the Highdeal.

22  In those situations, the actual user of these inventions

23  are getting a software product that has been developed,

24  there's maintenance on it, there's upgrades to it, and

25  so the value that these SAP customers paid for those

1    yardsticks is greater than what they get in this

2    hypothetical negotiation.

3         Q.    So what we -- here we're getting three claims

4    of a patent to go out and do whatever we want with it

5    versus if we were getting a software program, we'd get

6    all the code and all the effort that had gone into it?

7         A.    Correct, and all upgrades and all maintenance

8    and use of it worldwide.

9         Q.    How does this factor affect your baseline

10   analysis of 0 to 3.4 million?

11        A.    It would indicate the rate should be in the

12   lower end of that range.

13        Q.    Why?

14        A.    Because, again, you're getting less value than

15   SAP's customers got for the Khimetrics and Highdeal.

16        Q.    All right.  Let's take a look at

17   Georgia-Pacific Factor No. 5, competitive nature of the

18   parties.  Why is that important?

19        A.    Well, everything else being equal, if the

20   licensor here, Trilogy, does have a good faith basis to

21   say we're going to lose sales by licensing you, then the

22   royalty rate should go up.

23        Q.    Why is that?

24        A.    Because they're losing profits from sales they

25   would have made by licensing a competitor.

1     Q.   Now, did you look at some exhibits to determine

2  what Trilogy viewed as its competitors at or around the

3  time of this hypothetical negotiation?

4     A.   I did.

5          MR. MELSHEIMER:  Can we look at

6  Defendants' Exhibit 1069, Mr. Barnes.

7     Q.   (By Mr. Melsheimer)  Is this a document you

8  looked at?

9     A.   I did, and I think it's Page 3 of this

10 document.

11    Q.   What is this document?  Is it a Trilogy

12 document?

13    A.   It's a Trilogy document that's dated just about

14 18 months after this hypothetical negotiation where

15 they're looking at the marketplace and who their

16 competitors are in the pricing arena.

17    Q.   Now, you told us, though, it was -- the

18 negotiation was to be in 2003 and everybody would know

19 everything in 2003.  This didn't happen till 2004, so

20 how can this be important?

21    A.   Well it's -- we're here to calculate damages

22 over a damage period.  The infringement doesn't actually

23 occur until 2003, and the use is some time after the

24 hypothetical.  So you can look at facts after the

25 hypothetical negotiation date to tell you the true value

1   and the true use of the invention.

2       Q.   What does -- let's -- let's turn to Page 3 of

3   this document.

4               What -- what does Page 3 tell you about

5   Georgia-Pacific number -- Factor No. 5, the commercial

6   relationship of the parties, from Trilogy's perspective?

7       A.   Well, from Trilogy's perspective, SAP is not a

8   competitor to them in the pricing arena.  They have

9   listed 24 different companies as to who their

10  competitors are.

11      Q.   And PE is price execution.  PO is price

12  optimization; and PEN is -- is price enforcement?

13      A.   Yes, those are three different types of pricing

14  functionality how Trilogy categorizes the total pricing

15  market.

16      Q.   So price execution, is -- is that all the

17  companies in this column, sir?

18      A.   It is.  It's the 17 companies that are listed

19  with a color in that column.

20      Q.   And the color red is for high competition,

21  yellow is for medium, and G is for low?

22      A.   Correct.

23      Q.   Now, are these some of the same companies that

24  Dr. Becker explained to the Jury were listed as

25  competitors of Trilogy in that Gartner report?

1          A.     Yes, there's overlap.

2          Q.     And you remember there was some

3     cross-examination of Dr. Becker as to whether or not

4     those companies really were competing?

5          A.     There was.

6          Q.     And what did Trilogy say about those companies

7     as of 2004?

8          A.     Well, the ones that have either a red or yellow

9     in price execution are competitors of Trilogy.

10         Q.     Does that include Blue -- Blue Martini?

11         A.     It does.

12         Q.     Comergent?

13         A.     It does.

14         Q.     And a bunch of other companies that we heard

15    Dr. Becker talk about, correct?

16         A.     Yes.  And probably most importantly the bottom

17    two, which are Oracle, which is No. 23, and although

18    it's stamped over it, that's Microsoft in 24.  Those are

19    SAP's biggest competitors and yet both of them

20    apparently, according to Trilogy, do have pricing

21    technology that competes with them.

22         Q.     Is -- so SAP is no nowhere on this list?

23         A.     It is not.

24         Q.     And again, why is that important -- let's go

25    back to our other chart.  Why is this important to

1  determining where this baseline range should fall?

2      A.   Well, I'm trying to see whether I should raise

3  the rate as a result of a competitive relationship and

4  based on that document and a lot of other information

5  that I point out in my report, I do not believe that

6  there is any competitive relationship between Versata

7  and SAP in the damage period, which is 2003 to 2011.

8      Q.   So this factor, your analysis would tend to

9  support a range lower -- lower on this range than

10 higher?

11     A.   No, I have to correct you again.  It wouldn't

12 indicate lower, but it would not either raise or lower.

13 It would be neutral.

14     Q.   It's neutral because they're not competitors?

15     A.   Correct.

16     Q.   If they were competitors, it would be higher?

17     A.   Yes.

18     Q.   Okay.  Thank you.

19          Let's take a look at our next factor.

20 What's our next factor, Mr. Wagner?

21     A.   The one that I think is important is the

22 utility and advantage of the invention.

23     Q.   Right.  Why is that important here?

24     A.   Again, you want to look at is this a major

25 advance over the prior art, is it a small advance, or is

1  it kind of a typical advance that often patents bring to

2  bear when they're issued.

3      Q.   Again, are we talking here about whether the

4  Pricer software product was a big advance or whether

5  these three claims of this patent were a big advance?

6      A.   It's the latter.  It's only looking at the

7  three claims of the '350 patent.  It has nothing to do

8  with the reasons why SC Pricer was successful.

9      Q.   Now, but they got a patent, doesn't that mean

10 that it must have some value, those three claims must

11 have some value?  They got a patent?

12     A.   Oh, I do believe it does have some value, yes.

13     Q.   Does that mean it has substantial value?

14     A.   Not necessarily.

15     Q.   Why do you say that?

16     A.   Well again, you look at do people actually use

17 this capability and if a lot of people used them and a

18 lot of people said it was important to them, then that

19 would give me evidence that this is important

20 economically.  If I don't see evidence of any of that,

21 then it tells me it's not important economically.

22     Q.   What is the evidence that you've seen in this

23 case, both during the trial and in your analysis before

24 you came to court, that the advantages of the patent

25 claims are small compared to the prior art or the other

1 products that were out there before the patent?

2     A.   It's really more an absence of evidence, that I

3 have not seen any evidence of importance where customers

4 are actually using this functionality and it's the most

5 important driver of their decisions to buy products.

6     Q.   What other factors -- what other facts have you

7 seen or circumstances that the Jury should consider that

8 indicates that this was a minor -- minor improvement?

9     A.   Well again, there's the majority of the market

10 apparently is not using this functionality because SAP,

11 really their market share is more like 35 percent of the

12 big companies, not the 75 percent that you saw.  75

13 percent means that just -- they've made a sale to this

14 Fortune 500 company.

15          But you can go right now on the internet

16 and Oracle says they have 98 percent of the Fortune 500

17 because as you heard from Mr. Tully, a lot of these

18 companies use both companies and their products because

19 they're so large, they have so many needs.  But the

20 actual market share of SAP is really only about 35

21 percent of the big companies.  So that leaves 65 percent

22 of the market that isn't apparently thinking this is

23 important and is not using this functionality.  So that

24 shows it's not that important.

25     Q.   Based on the evidence you've talked about,

1  Mr. Wagner, in your conclusion that this was a

2  relatively minor improvement, what did you conclude

3  about Georgia-Pacific Factor 9?

4     A.   That as compared to these other yardsticks I

5  used, where these companies that actually decided to pay

6  for this additional functionality, they really thought

7  it was important or they wouldn't have paid for it.  So

8  this would lower the reasonable royalty rate.

9     Q.   In saying that, Mr. Wagner, are you criticizing

10  either Mr. Carter or -- or the Pricer product in any

11  way?

12     A.   I don't think so.  I think it was a good

13  product and I think the invention has some value.

14     Q.   But are we valuing the Pricer product or

15  something else?

16     A.   No, not the Pricer product, just three claims

17  of 31 claims of the '350 patent.

18     Q.   Let's take a look at our next -- what's the

19  next factor that you thought was important?

20     A.   Well, GP Factor No. 11, the extent of use.  How

21  did SAP use this functionality?  What I looked for as a

22  damage expert is let's look at the marketing materials

23  of SAP.

24            Did -- when this feature was put in their

25  product back in 1998, did they promote this feature to

1  their customers?  Did they say, here is the reason why

2  you should upgrade to us?  This is -- this is one of the

3  reasons you should buy our product.

4          And often I find that in cases, and that

5  gives me a message that this must be important, must be

6  a driver of demand for the infringer's product.

7      Q.   What did you find here?

8      A.   I found no evidence that this feature was even

9  mentioned, let alone highly profiled by SAP to their

10  customers.

11     Q.   Can you give the Jury an example of the kind of

12  feature based on the evidence you were looking for here,

13  maybe a product that they've heard about or read about,

14  where something -- that something the -- the -- the

15  manufacture said about the product could indicate that a

16  particular feature was important?

17     A.   Well, I mainly work in technology.  I'm in

18  Silicon Valley.  An example, one of the widely

19  successful products today is the Apple iPad and it is

20  starting to devastate the historical notebook and laptop

21  computer manufactures because the iPad now is an

22  extremely light, small device that has a lot of the same

23  capabilities.

24          So if you had a patent on making it light

25  and small, that would tell me that's got to be an

1 important patent.

2     Q.   Is that because Apple is going around bragging

3 about how light and small it is?

4     A.   It is.

5     Q.   Was SAP going around bragging about the use of

6 the three claims of the '350 patent?

7     A.   I have not seen any evidence, let alone

8 bragging, even really talking about it at all.

9     Q.   Were they talking at all about hierarchical

10 access in the way that we've talked about in this case?

11     A.   No.  How they promote their products and why

12 they're so successful is they're what is called a suite

13 vendor or an integrated vendor.  What they offer is

14 basically end-to-end software for a company and we can

15 do everything for you.  Not maybe a hundred percent of

16 what you need, but the vast majority of your needs, we

17 can satisfy and we're reliable, we're stable we have

18 good software and that's why people buy SAP.

19     Q.   Were you here for the testimony of Mr. Tully

20 and Mr. Childs?

21     A.   I was.

22     Q.   Did their testimony support your conclusions

23 about Georgia-Pacific Factor No. 11?

24     A.   They did.

25     Q.   How so?

1    A.    They're entirely consistent.  If this feature

2 that's at issue in this case was not promoted by SAP in

3 any way to get customers that, yes, pricing is

4 important, absolutely it's important, but this case is

5 not about pricing.  SAP was offering pricing

6 functionality decades before this one additional feature

7 came out in pricing and so that's what we have to focus

8 on.

9    Q.    Given the lack of evidence of -- regarding use

10 by SAP or its customers, what's your opinion regarding

11 the effect of this Factor 11?

12   A.    It would tend -- it would tend to make the

13 royalty at the lower end of this range, in my opinion.

14   Q.    Now, are you using the absence of use to

15 suggest that SAP should pay nothing?

16   A.    No, absolutely not.  Use has nothing to do with

17 the infringement in the case.  It has everything to do

18 with the value and how much you should pay.

19   Q.    What's the next factor you considered,

20 Mr. Wagner?

21   A.    Well the next one that I think is necessary to

22 talk about is 13.

23   Q.    Profit credited to the invention.  What is

24 that?

25   A.    That is a factor where you look at okay,

1  there's some contribution to the value of SAP's product

2  by this invention.  But what else does SAP bring to the

3  table?  What other value does SAP put into their product

4  as to the reasons why their customers are going to buy

5  an SAP product?

6      Q.   Were you here for Dr. Mercer's testimony?

7      A.   I was.

8      Q.   Did he -- did you hear him explain all the

9  different features and functionality of -- of SAP's ERP

10 product?

11     A.   I was here for that.

12     Q.   And is that consistent with the research and

13 analysis that you've previously done?

14     A.   Yes.  I did similar research in my report that

15 had the same type of conclusions.

16     Q.   What did you conclude about the functionality

17 within SAP as it relates to your -- the work you did

18 here?

19     A.   It is a very small piece of the thousands of

20 features that are offered in SAP product.

21     Q.   Now, is it your opinion that Factor 13 is -- is

22 really the most important factor for your analysis here?

23     A.   It is.  It is in almost every case that GP

24 Factor No. 13 is the most important factor to consider.

25     Q.   Why do you say that?

1      A.   Because you have to properly attribute value to

2  both the licensee in the product that is being licensed

3  and the contribution of the invention.  And SAP has

4  contributed substantial amounts of their own ideas and

5  technology to their products, that they have thousands

6  of features that have nothing to do with this invention.

7  They've licensed in from others.

8               As an example, they have licenses to every

9  IBM patent that exists.  They have a license to every

10  Microsoft patent that exists.  These are the two most

11  powerful patent portfolios in the software area in the

12  world.  All that functionality is in their products as

13  well.  And they have to be credited for that.

14      Q.   Meaning you don't have to pay for something

15  that you already paid for?

16      A.   Exactly.

17      Q.   Let's take a look, what does your conclusion

18  about Factor 13 do to the baseline royalty range of 0 to

19  3.4 million?

20      A.   Again, compared to my yardsticks, it would

21  lower or be at the low end of the range.

22      Q.   Is that because you're looking at one very

23  small feature in a very comprehensive product?

24      A.   Correct.

25      Q.   All right.  Now Mr. Wagner, now that you have

1  given us an overview of the 15 factors that you

2  considered and then the five that we've talked about

3  that you consider critical, can you give the Jury a

4  summary of your overall analysis?  Where do we stand?

5      A.   Well, I do believe the number should be greater

6  than zero.  There clearly has been some value and I've

7  seen some value demonstrated in the exhibits shown to

8  you in this courtroom.

9           I don't think it's as valuable as the 3.4

10  million dollars.  It was for a complete software product

11  that people really knew they wanted and was willing to

12  pay for.  So based on all of that and my consideration

13  of the GP factors, I have concluded that I think the

14  royalty rate should be around 2 million dollar lump sum

15  payment.

16      Q.   Now, is Trilogy offering a counter reasonable

17  royalty in this case?

18      A.   No.

19      Q.   They're seeking a different kind of damages?

20      A.   They're seeking appropriate remedy if they can

21  prove it, which is lost profits.

22      Q.   Now, are they entitled to lost profits in every

23  case?

24      A.   No.  They have to prove a basis for lost

25  profits.

1    Q.   And we've heard -- we've heard some discussion

2  about the different things they have to prove?

3    A.   Yes.  It's principally the Panduit factors.

4    Q.   But they didn't offer analysis, they're not

5  presenting an analysis like the one you did?

6    A.   They have not today.

7    Q.   Okay.  Now Mr. Wagner, after you -- so

8  you're -- let's just be clear, your number that you

9  think would be fair for SAP to pay Trilogy is 2 million

10 dollars?

11   A.   That is correct.

12   Q.   Okay.  Now, that -- that's a big difference

13 from 283 million dollars, isn't it, sir?

14   A.   I think you're understating what they're asking

15 for.  I think they're asking for 285.

16   Q.   285 million dollars, that's a pretty big

17 difference.  Does that --

18   A.   I think that's a very large difference.

19   Q.   Does what they're asking for in this case, does

20 that cause you to think, well, maybe my number is too

21 low, maybe I need to adjust it?

22   A.   No, not necessarily.

23   Q.   Why not?

24   A.   Well, I have done my own analysis, although you

25 had another expert present that evidence that I don't

1   think there is an entitlement to lost profits and just

2   because you ask for a big number, if that number is

3   wrong, you shouldn't award that number.  You shouldn't

4   split the difference between that number and my number.

5   If the Jury believes that my analysis is right, I have

6   the correct number.

7       Q.   Now, what else did you do to check your work on

8   the 2 million dollars as being a fair and reasonable

9   royalty?

10      A.   Well, here the licensee at this hypothetical

11  negotiation, the person who will be paying for and

12  getting a right to use the patent, is SAP.  During this

13  damage period, I looked at what do they normally pay

14  when they license in other people's technology.  And

15  during this damage period, I found 170 product licenses

16  licensing in technology from 122 different companies.

17          And of all these people that are licensing

18  technology, the median payment they made, which is the

19  middle payment, is $910,000 when they licensed in other

20  people's intellectual property right.

21      Q.   So that's when they pay for a license for

22  something that they're going to use, the median is about

23  $900,000?

24      A.   Correct.

25      Q.   Remind us again what the median is?

1   A.   Well, I think Mr. Weinstein properly explained

2   it in his testimony.  The median means that half of

3   these 122 companies are going to pay more than that and

4   half are going to pay less than that.  It's -- it's one

5   form of average.

6   Q.   Is that kind of number consistent with your

7   view of a -- what a software company like SAP would --

8   would pay in a context of a program that has hundreds of

9   thousands of features?

10   A.   Yes, because they have to use a lot of other

11   people's technology.  They can't invent everything in

12   SAP, so they need licenses from lots of people.  So you

13   can't pay a huge amount of money to any single licensee

14   or you'll probably not make any profits.  So I think

15   that's a fair metric.

16   Q.   So what did that median number of $900,000 or

17   so tell you in this case about your $2 million number?

18   A.   Well, I think it corroborates it and makes it

19   reasonable.  I'm asking my client to pay more than

20   double that amount of money to Versata in this case.

21   Q.   Mr. Wagner, just to clarify something that came

22   up earlier, so you know there's a -- under the law, do

23   you understand that in order to recover -- to be able to

24   even come to court for damages, that a patentee has to

25   mark their product?

1    A.    I'm aware of that requirement.

2    Q.    Now, does marking a product mean that you get

3  damages?

4    A.    No.  It just means that that will be a period

5  for which you can claim damages.

6    Q.    So you can claim damages for any period in

7  which you marked your product forward?

8    A.    For an apparatus claim, that's true.

9    Q.    Okay.

10             MR. MELSHEIMER:  One moment, Your Honor.

11             Your Honor, we tender Mr. Wagner for

12  cross-examination.

13             THE COURT:  Cross-examination?

14             MR. COLE:  Yes, Your Honor.  May it please

15  the Court.

16             THE COURT:  Mr. Cole.

17                  CROSS-EXAMINATION

18  BY MR. COLE:

19    Q.    Good afternoon, Mr. Wagner, how are you?

20    A.    It's morning, Mr. Cole, but good morning.

21    Q.    I'm the latest one to mess that one up, sorry

22  about that.  All right.

23             I think this is clear, but I just want to

24  sort of frame the issues first.  There are two different

25  ways to calculate damages in a patent case, right?

1      A.    There are.

2      Q.    And Mr. Weinstein went with the lost profits

3  approach and that's a whole separate analysis, right?

4      A.    It is.

5      Q.    And your analysis is a reasonable royalty

6  analysis and that's just a completely different

7  attack -- tact to take?

8      A.    It's not completely different, but it's very

9  different.

10     Q.    Very different.  They -- they can run parallel;

11  in other words, just because a reasonable royalty might

12  be X, that doesn't necessarily mean a lost profit should

13  be X also, right?

14     A.    Oh, I agree with that.

15     Q.    The two -- the two approaches can lead to very

16  different numbers?

17     A.    They could.

18     Q.    Okay.  And not every Plaintiff in a patent case

19  can claim lost profits, can they?

20     A.    That is true.

21     Q.    In order to claim lost profits, a Plaintiff has

22  to have actually sold his own products that embody the

23  patent, right?

24     A.    That's true.

25     Q.    And Trilogy did that?

```
1        A.    They did.

2        Q.    And did it in competition with SAP?

3        A.    They did in the 1990s, I agree with you.

4        Q.    That's right.  And they sold their Pricer

5   product that embodied their patent to over 60 SAP

6   customers in the late '90s, didn't they?

7        A.    I believe that's accurate.

8        Q.    And what happened to those sales once

9   hierarchical access was introduced?  Did they speed up?

10  Slow down?

11       A.    No, I've seen your chart; I think it was Slide

12  16 of Mr. Weinstein's.  Their sales fell precipitously.

13       Q.    And you don't dispute that at all, do you?

14       A.    I do not.

15       Q.    And you recognize that one of the things that

16  you're supposed to do in lost profits is look for --

17  look at the but-for world, right?

18       A.    I agree with that.

19       Q.    Okay.  And that's a -- it's a legal concept?

20       A.    It is.

21       Q.    And in the legal concept what you have to do is

22  imagine a world that didn't actually exist, right?

23       A.    That's correct.

24       Q.    And the law says you have to do that?

25       A.    It does.
```

1    Q.   And in that -- in the world that didn't

2 actually exist, SAP didn't infringe starting in 2003,

3 right?

4    A.   That's true.  They would have had a license.

5    Q.   And so Trilogy would have been in a position

6 with exclusive access to its patented technology?

7    A.   To about three claims of '350 patent they would

8 have the only right to use that.

9    Q.   That's right.  And in 1995 through 1998 that

10 was also true, wasn't it?

11    A.   That is true.

12    Q.   Okay.  And wouldn't you agree with me that in

13 trying to frame the but-for world, the world where

14 nobody else can use this technology, it would be a good

15 idea to look at the world that actually existed when

16 this product was sold on an exclusive basis; wouldn't

17 you agree with that?

18    A.   I agree with that if you properly adjust it.

19    Q.   If you properly adjust for the difference

20 between the market in the '90s and the market in 2003,

21 right?

22    A.   Exactly.

23    Q.   And Mr. Weinstein looked at that issue, didn't

24 he?

25    A.   I believe he did.

1    Q.   And you -- you -- you think he didn't adjust

2  enough, but he did look at the issue?

3    A.   He did look at the issue and I do agree that I

4  don't think he looked at it properly.

5    Q.   You agree that you disagree with it?

6    A.   That's correct.

7    Q.   Okay.  Fair enough.  Now, I know you disagree

8  with Mr. Weinstein in this case, but you do agree that

9  he is a well-respected damages expert, right?

10    A.   He is.  He's a former partner of mine.

11    Q.   And you two have a lot of mutual respect, don't

12  you?

13    A.   I do.  I have respect for Mr. Weinstein.

14    Q.   And if you -- if you pick up a case and you see

15  that Mr. Weinstein's the expert on the other side, you

16  are going normally expect to see a solid, well

17  documented approach.  You might disagree with it, but a

18  solid approach, right?

19    A.   I would.

20    Q.   And you'll agree with me that in patent

21  damages, it's very easy for reasonable people to differ,

22  right?

23    A.   It happens all the time.

24    Q.   It happens in every case pretty much, doesn't

25  it?

1    A.   Yes, it does.

2    Q.   I guess some agreements are -- some

3   disagreements are more reasonable than others?

4    A.   That's true as well.

5    Q.   All right.  Now, I want to talk a little bit

6   about lost profits.  This again, this is not the

7   approach you -- you did, but I'm talking about what

8   Mr. Weinstein did and you offered a little bit of

9   criticism about that.

10        Now, we've heard in this case from SAP at

11   length that Trilogy had some bad internal e-mails, that

12   they looked to hire a mole one time, that they had

13   parties on the lake, that their friends went on vacation

14   together, you -- you heard all that evidence?

15    A.   I did.

16    Q.   And I think the suggestion was made that that

17   evidence is relevant to the question of causation; is

18   that right?

19    A.   At least some of it is, yes.

20    Q.   And by that you mean we're looking to see if

21   what caused the lost sales was the infringement or

22   something else?

23    A.   That's true.

24    Q.   That's what causation is?

25    A.   Yes.

1    Q.   Now, the law in lost profits has a framework to

2  tell you how you prove causation for lost profits,

3  doesn't it?

4    A.   In patent cases, yes.

5    Q.   And that's the Panduit factors?

6    A.   That's a -- it's not a required approach, but

7  it is an accepted approach.

8    Q.   Accepted approach.  And it's from a case in the

9  law, right?

10   A.   It is.

11   Q.   And that's what Mr. Weinstein used, didn't he?

12   A.   He did.

13   Q.   And you'll agree with me that if you meet the

14  Panduit factors, all four of them, you have proved

15  causation?

16   A.   I agree with that.

17   Q.   Okay.  And if you've proved all four Panduit

18  factors, even if someone can point to a bunch of other

19  things going on in the world, that doesn't change the

20  fact that you've proved causation, does it?

21   A.   I agree with that statement.

22        MR. COLE:  Mr. Diaz, can you put the

23  Panduit factors up?

24   Q.   (By Mr. Cole)  And there are four of them,

25  we -- Mr. Weinstein talked about these, right?

1     A.    He talked about all four of them.

2     Q.    Now, let me -- let me talk about a couple of

3 things.  If the Jury in this case believes that there is

4 demand for the patented product, they believe that and

5 there's enough evidence to support it, that is a

6 satisfied element, right?

7     A.    Clearly.

8     Q.    Okay.  And it's demand for the patented product

9 not the invention, right.

10    A.    That's what the case says.

11    Q.    And that means demand for the product that

12 contains the invention, right?

13    A.    It does.

14    Q.    Now, you suggested a few times a minute ago

15 that you can't look at the product, you can only look at

16 just the three claims, right?

17    A.    When you're trying to value the patent itself,

18 yes.

19    Q.    But in lost profits, you look at the product,

20 don't you?

21    A.    For -- for Panduit Factor No. 1 you do.

22    Q.    And so Pricer is the product, right?

23    A.    That is the product they would have sold but

24 for the infringement.

25    Q.    And so the question for lost profits on Panduit

1  Factor 1 is is there demand for the patented product,

2  namely Pricer, right?

3      A.   That's correct.

4      Q.   And it can also be demand for the patented

5  product -- excuse me, the infringing product, SAP's

6  product with our invention that; can also be the

7  product, can't it?

8      A.   It could as well.

9      Q.   All right.  Now, if the Jury -- so that's --

10  that's Factor 1.  I'm going to skip Factor 2 and come

11  back to that one.

12           Let's go to Factor 3, that's a capacity,

13  right?

14      A.   It is.

15      Q.   And that factor in a software case is usually

16  the easiest one to satisfy; wouldn't you agree?

17      A.   I agree with that statement.

18      Q.   Because in a software case making additional

19  sales, there's no incremental marketing -- excuse me,

20  manufacturing cost, is there?

21      A.   No manufacturing.  Maybe incremental --

22  incremental integration cost, but not actual developing

23  a product.

24      Q.   Right.  It's not like a car manufacturer where

25  to make the -- offer a new line of cars, you'd have to

1    build a plant and all that kind of stuff, right?

2        A.    That is true.

3        Q.    Okay.  So in a software case, capacity is

4    usually relatively easy to meet?

5        A.    Usually.

6        Q.    Okay.  And in this case if the Jury believes

7    that Trilogy had the capability to make an additional 93

8    sales over eight years, that Factor 3 is met?

9        A.    If the Jury believes that, then you've

10   established that factor.

11       Q.    And number four is the amount, you've got to

12   quantify it, right?

13       A.    You do.

14       Q.    Mr. Weinstein quantified it?

15       A.    He did.

16       Q.    And people can disagree about whether it's the

17   right number or not, but he provided evidence of a

18   quantification, didn't he?

19       A.    He did analysis, and he concluded, based on his

20   judgment, what the appropriate revenues and costs would

21   be.

22       Q.    And you didn't do an analysis to counter that,

23   did you?

24       A.    Oh, I did in my report.

25       Q.    Okay.  You didn't present that here.

1      A.    I did not.

2      Q.    All right.  So if the jury believes that

3  someone has provided substantial evidence, enough

4  evidence for them to rely on, on the amount, that

5  Factor 4 met, right?

6      A.    I agree.  If the jury believes you've

7  established the four factors, you're entitled to lost

8  profits.

9      Q.    Okay.  Now, let's talk about No. 2, because

10  that's been a little bit of a disagreement here.

11              Absence of non-infringing alternatives.

12  And that factor is talking about whether you can go into

13  the market and see if there are other products being

14  sold that are -- number one, don't infringe the patent,

15  and number two, are alternatives to the patented

16  product, right?

17      A.    Yes.

18      Q.    And number three, the case law also makes clear

19  that these -- these alternatives have to have the

20  benefits of invention; isn't that right?

21      A.    Well, it's -- it's -- that's close.  It's not

22  exactly right, but I would agree with that in general.

23      Q.    Okay.  If you want to clarify a little bit,

24  feel free to do so.

25      A.    Yeah.  The thing is, whenever you do something

1   a different way economically, you look at the next best

2   alternative, and you may end up having a non-infringing

3   alternative that doesn't have all the capabilities of

4   the invention, but that may mean you have to lower your

5   price or you may lose some customers.  But that may be a

6   non-infringing alternative.

7        Q.   Okay.  But just so we're clear, the alternative

8   is focused on the advantages of the invention as opposed

9   to just being a general -- something in the general

10  market, right?

11       A.   I agree with that.

12       Q.   And so in this case, if you point to an

13  alternative and say, well, that's a pricing product,

14  that's not enough unless you also show that it has the

15  benefits of Mr. Carter's invention.

16       A.   I would agree with that.

17       Q.   All right.  And you were here when Mr. Carter

18  went through a slew of customers -- excuse me -- a slew

19  of competitors and explained why he didn't believe they

20  were acceptable alternatives to sell to large SAP

21  customers and -- excuse me -- a large SAP customer; is

22  that right?

23       A.   I think he testified to that, yes.

24       Q.   Mr. Smith did the same thing.

25       A.   He did.

1    Q.   Mr. Gupta talked about non-infringing

2  alternatives.

3    A.   I believe he did as well.

4    Q.   All right.  And SAP's first witness came out

5  and explained his position on why he disagreed with

6  that, right?

7    A.   Yes.

8    Q.   And then he was cross-examined, wasn't he?

9    A.   He was.

10    Q.   Okay.  And how did that go?

11    A.   You'd have to ask the witness.  I didn't talk

12  to him after he left.

13    Q.   Okay.  So if the jury believes that Mr. Becker

14  actually didn't study the details of those products and

15  didn't actually figure out if they're acceptable

16  non-infringing alternatives, then that's not much

17  evidence, is it?

18    A.   Well, if the jury concludes that that was not a

19  proper analysis, then they shouldn't adopt it.

20    Q.   Okay.  And just so we're clear, if the jury

21  believes all four of these things have been established

22  by the evidence, does it make any difference at all

23  whether some internal e-mail by Trilogy said:  Our

24  product is bad, or let's go hire a mole or something

25  like that?

1    A.   I would hope the jury is going to consider all

2    the evidence to reach their conclusion, and if they

3    conclude that in spite of that, you still established

4    the four factors and your quantification is correct,

5    then you're entitled your award.

6    Q.   No, sir.   The law says, if you meet the four

7    factors (claps hands), that proves causation, right?

8    A.   Yes.   But damages isn't just causation.   It's

9    also amount.

10   Q.   I understand.   The amount is in there, isn't

11   it?   Right?

12   A.   It is.

13   Q.   No. 4.

14        If the jury believes all four of these

15   things have been proved, that establishes causation

16   under the law, right?

17   A.   Yeah.   In my opinion, if you establish the

18   first three, you've established causation, and then you

19   would have to establish amount.

20   Q.   Fair enough.

21        So the first three -- if the jury believes

22   the first three have been proven, that establishes

23   causation.

24   A.   I agree with that statement.

25   Q.   And if they believe that's been met and they

1   also think:  Well, maybe there were some problems at

2   Trilogy; maybe they didn't have enough employees; maybe

3   they had layoffs, something like, that doesn't matter,

4   does it?

5       A.   Not to causation.

6       Q.   Okay.  And once you prove causation, then the

7   only question is how much the lost profits are?

8       A.   I agree with that.

9       Q.   All right.  I want to shift gears now and talk

10  about your analysis.  This is now going to the

11  reasonable royalty, okay?  This is the different -- a

12  different world than we were just in, right?

13      A.   It is.

14      Q.   All right.

15           MR. COLE:  Your Honor, may I approach?

16           THE COURT:  Yes.

17           THE WITNESS:  I have my own calculator.

18      Q.   (By Mr. Cole) I tried math in court before and

19  it didn't work -- oh, you've got your own?  Okay.  Good.

20  I tried math in court before, and it was a disaster, and

21  I don't know why I'm doing this to myself, but bear with

22  me.

23           Your -- you just testified about some

24  benchmarks you used, right?

25      A.   I did.

1    Q.   So when you were trying to figure out, for a

2  reasonable royalty, what's the right amount, you went to

3  look into the market to see what are some comparable

4  things out there that I can look to to assess value; is

5  that fair?

6    A.   That's fair.

7    Q.   And what you did is, you looked at pricing

8  products -- products that were sold on top of SAP's

9  broad suite.

10   A.   During the damage period.

11   Q.   All right.  Trilogy was sold -- Trilogy's

12  Pricer was sold on top of SAP, wasn't it?

13   A.   It was in the 1990s.

14   Q.   Okay.  And we know for sure, don't we, that

15  Trilogy's Pricer product embodies the patent.

16   A.   We do.

17   Q.   And you know that a product embodying the

18  patent tells you a lot more about the value of the

19  patent than some product that doesn't embody the patent.

20   A.   Everything else being equal, I agree with that

21  statement.

22   Q.   And in this case, you ignored Trilogy's Pricer

23  sales on top of SAP in favor of two products that do not

24  practice this invention at all.

25   A.   I wouldn't agree with it exactly that way.  I

```
 1   didn't ignore it.  I did consider it, because I did

 2   think that was a relevant benchmark, but based on all

 3   the differences, I thought it would be more problematic

 4   to use that as a basis.

 5       Q.   Fair enough.  You considered it.  You thought

 6   about using Pricer as a benchmark --

 7       A.   I did.

 8       Q.   -- but you rejected it.

 9       A.   That's fair.

10       Q.   And instead you focused on two products that

11   don't practice the invention at all.

12       A.   I agree with that.

13       Q.   Okay.  And you looked at a third product, too,

14   that was sold on top of SAP, right?

15       A.   Vendavo.

16       Q.   Vendavo.  And you rejected them.

17       A.   Yeah.  I've discussed why in my report, but I

18   did.

19       Q.   I understand.  You rejected Vendavo.

20       A.   As a useful yardstick, yes.

21       Q.   And the reason you rejected Vendavo in your

22   opinion was, they were too successful to compare to

23   Trilogy.

24       A.   That was one of them, yes.

25       Q.   And how much money did Vendavo make that made
```

1  it too successful to compare to Trilogy?

2      A.    Well, I think the Vendavo product was bolted on

3  to about 41 SAP customers.  I think the total revenue is

4  around 59 million, and I think Vendavo received about

5  $30 million of that.

6      Q.    So $59 million was too successful to compare to

7  Pricer?

8      A.    In the -- in the -- in the damage period, yes.

9      Q.    There's no rule that says you can only look at

10 the damage period when you're trying to come up with

11 comparable data to inform you about the reasonable

12 royalty, right?

13     A.    I agree with that.

14     Q.    You can look at any time -- as long as you take

15 into account any timing differences, you can look at any

16 time you want, right?

17     A.    That's exactly right.

18     Q.    Okay.  And you -- what you did is, you favored

19 looking in 2003 to the present at products that have

20 nothing to do with the patent over looking at -- over

21 looking at the actual patented product built and sold by

22 the inventor a few years earlier.

23     A.    I agree with that.

24     Q.    All right.  If you had used Pricer as your

25 yardstick, your number would have gone up, wouldn't it?

1    A.    Not necessarily, no, because I'd have to do a

2  lot of adjustments.

3    Q.    Okay.  You didn't look -- you didn't analyze

4  the Pricer product.  You said a couple of times on

5  direct that the -- and I think I got this exactly

6  right -- that the Pricer product has nothing to do with

7  the patent.  I mean, I think you may have been

8  overstating it, but you said it.

9    A.    If I did say that, I agree with you I

10  overstated it.  It does -- it is in the product, but it

11  has nothing to do with the total value that's at issue

12  in this case.

13    Q.    In other words, you would have to study the

14  Pricer product carefully to try to figure how much of

15  its value is derived from the patent and how much is

16  derived from other things.

17    A.    I agree with that.

18    Q.    And there's only one person that did that

19  analysis in this case, right?

20    A.    Mr. Gupta.

21    Q.    That's right.  And you didn't do it.

22    A.    Well, I criticized him in my report, but I did

23  not do an --

24    Q.    You didn't do your own.

25    A.    I'm sorry.

1    Q.    You didn't do your own.

2    A.    I did not do my own.

3    Q.    You're a critic, but you didn't do your own

4  alternative.

5    A.    That's fair.

6    Q.    Mr. Mercer didn't do it.

7    A.    He did not.

8    Q.    Mr. Becker didn't do it.

9    A.    I don't believe he did either.

10    Q.    Okay.  Mr. Gupta did it.  It was pages and

11  pages of his report, wasn't it?

12    A.    It was a number of pages, yes.

13    Q.    Mr. Mercer took a shot at him for mentioning it

14  quickly and then moving on, right?

15    A.    I think so.

16    Q.    Okay.  And we're about to run out of time,

17  aren't we?

18    A.    We are.

19    Q.    And you guys have gone through -- you've

20  skipped through some of the details of your analysis,

21  too.  I'm not criticizing you.  There's just only so

22  much time, right?

23    A.    That's fair.

24    Q.    And it is not a fair criticism of Mr. Gupta to

25  say:  Why didn't you spend 30 minutes of trial time

1  going through the 10 pages of your report where you did

2  that analysis; wouldn't you agree?

3      A.   Well, having the same problems that he has, I'm

4  not critical of him.

5      Q.   I understand.  You're -- when you're the

6  damages expert for the Defendant, you're pretty much

7  always the last guy, right?

8      A.   Unfortunately, true.

9      Q.   Fair enough.  All right.

10          Well, let's -- let's talk numbers a little

11  bit here for a minute.

12          And the two metrics that you actually did

13  use, one of them is the company called Khimetrics.  I

14  think we talked about them, right?

15     A.   Yes.

16     Q.   And for Khimetrics, you actually -- okay.  Let

17  me see if I've got the numbers right?

18          Khimetrics was the bolt-on product sold to

19  SAP customers.

20     A.   Correct.

21     Q.   And during the period you studied it, they sold

22  their product to 12 total SAP customers.

23     A.   That's correct.

24     Q.   And the total sales price -- the average sales

25  price per customer for Khimetrics was $333,000.

1       A.    I believe that's correct.

2       Q.    So $333,000 per customer for 12 customers.

3       A.    Correct.

4       Q.    And in your view, an appropriate royalty, using

5  this benchmark, was 40 percent of that amount.

6       A.    Correct.

7       Q.    Okay.  And so that's 100 and -- feel free to

8  use your calculation, if you need to.  That would mean a

9  royalty of $133,200 per customer.

10      A.    You did that correctly.

11      Q.    So far so good.

12            Now, let me ask you this:  How many

13  infringing sales were there by SAP to customers?  How

14  many customers?

15      A.    I think I've heard the number 1,386.

16      Q.    I think it's 1,380, but very close.  Will you

17  take my representation on that?

18      A.    See, I did hear that number for one, but I

19  heard another number that had a six on it, and I thought

20  I'd use the higher number for your benefit.

21      Q.    I appreciate the -- I appreciate the upward

22  adjustment, but we can stick with the 1380, and I'm sure

23  someone said it.  I'll probably say something wrong here

24  in a empty.

25            All right.  So assume with me there's 1380

1   SAP customers that they actually sold the infringing

2   product to.  Are you with me?

3        A.    I'm with you.

4        Q.    All right.  And Mr. Weinstein is claiming that

5   Trilogy would have won out of that base 93 of them,

6   right?

7        A.    Yes.

8        Q.    So for purposes of our discussion here today,

9   let's just take a hundred off to be conservative so that

10  we're talking about 1280 SAP customers.  Got it?

11       A.    I do.

12       Q.    And that's actual infringing sales, isn't it?

13       A.    It is.

14       Q.    And if the jury believes that your benchmark,

15  on a per-customer basis, is an appropriate way to assess

16  damages -- are you with me?

17       A.    I am.

18       Q.    And then they decide:  We think that

19  appropriate -- that royalty per customer should be

20  applied to every infringing customer that SAP sold it

21  to, how much would the damages be in that case?

22       A.    If you --

23       Q.    On just 1280.

24       A.    I already have erased my number, but I think I

25  put it in right.  It would about 170 million.

1      Q.    $170 million?

2      A.    Yes.

3      Q.    So if the jury believed that your per-customer

4   royalty rate should be applied to every infringing sales

5   instead of just 12, then the number is not 2 million but

6   170 million.

7      A.    That would be the correct math.

8      Q.    One quick clarifying point, and then I will let

9   you go.

10         You're claiming a reasonable royalty -- I

11  think you -- is it a lump sum or a running royalty?

12     A.    It's kind of a combination of both, because it

13  depends on the length of the period.  I calculate an

14  annual amount and then multiply it by the eight-year

15  license period from 2003 to 2011.

16     Q.    Okay.  And I just want it to be clear that your

17  amount that you calculated stops at the day of trial.

18  You're not claiming any compensation for anything in the

19  future.

20     A.    No, because my understanding -- it's my

21  client's position that they are no longer infringing.

22     Q.    Okay.  Understood.

23         But you're not -- your number would not

24  include any future damages.

25     A.    It does not.

```
 1          Q.    Okay.   Thank you very much.

 2                     MR. COLE:  Pass the witness.

 3                     THE COURT:  All right.   Counsel approach.

 4                     (Bench conference.)

 5                     THE COURT:  I didn't want to interrupt you

 6    in front of the jury, but by my count, you've got about

 7    15 minutes left on your time.

 8                     MR. MELSHEIMER:  Okay.

 9                     THE COURT:  And then you've got 30 minutes

10    left.

11                     MR. COLE:  Okay.

12                     THE COURT:  So I just wanted to give

13    you --

14                     MR. COLE:  Okay.  Thank you.

15                     THE COURT:  Maybe 29, Mr. Cole.

16                     MR. COLE:  Okay.  Thank you.

17                     (Bench conference concluded.)

18                     MR. MELSHEIMER:  May it please the Court.

19                     THE COURT:  Yes, sir.

20                          REDIRECT EXAMINATION

21    BY MR. MELSHEIMER:

22          Q.    Mr. Wagner, just a few more questions.  I've

23    got -- the jury can only hear from me for 15 more

24    minutes, so let me -- let me be quick.

25                     You noted Mr. Weinstein typically does a
```

1  sound -- sound analysis.

2      A.   His approaches are appropriate.

3      Q.   Now, do you think here that he had much to work

4  with?

5      A.   Well, he had plenty to work with.  I, in my

6  report, told the other side a number of problems I have

7  with his analysis.

8      Q.   What were some of the problems you had with his

9  analysis?

10     A.   Well, first off, the $1.8 million is not

11  correct.  That's not the average sales price for

12  SC Pricer.  He actually -- a number of deals -- there

13  were a number of different products sold, and sometimes

14  he would take the entire sales price and accredit a

15  hundred percent to Pricer.

16          I did the analysis, I think, correctly,

17  and the actual average price is 1.1 million, not 1.8.

18          I also don't believe that his incremental

19  costs are appropriate.  There are far more costs than he

20  has included in his analysis to make these incremental

21  sales.

22          And then finally, I think the period from

23  2003 to 2011 is so different than the '96 to '98 period

24  that 93 potential customers in that period is totally

25  unreasonable.

1    Q.   Mr. Wagner, there was not a patent between 1996

2  and 2003, correct?  There was not -- there was not

3  patent infringement between 1996 and 2003, correct?

4    A.   That is correct.

5    Q.   And that is the period that Mr. -- that

6  Mr. Weinstein looked at with respect to evaluating the

7  Pricer sales, correct?

8    A.   That's true.

9    Q.   And he projected those starting in 2003 to go

10  forward at basically the same rate that they'd been

11  going at back in the '90s; is that right?

12    A.   Exactly.

13    Q.   What's wrong with that?

14    A.   In the early '90s, this was state of the art.

15  It was a good invention, and there were people who

16  really needed it.  And these are the type of people we

17  call early adopters.  That's a very small segment of a

18  marketplace.

19            If you want to fast-forward to 2003, this

20  market totally changed.  Best of Breed was a viable

21  business in the 1990s.  By 2003, that had changed.  The

22  suite providers, the Oracles, the SAPs, were now

23  dominating the marketplace.

24            The Gartner Group, all the analysts were

25  saying that.  It's a different marketplace.  There's no

1  longer 93 early adopters who are willing to pay $5

2  million apiece to add some additional incremental

3  capability to an SAP product they've already spent a lot

4  of money for.

5      Q.   Mr. Wagner, you were asked a question about

6  Mr. Carter's testimony with respect to his view of the

7  marketplace in the damages period starting in 2003 and

8  beyond.

9      A.   Yes.

10     Q.   And you were asked about Dr. Becker's analysis

11 of that --

12     A.   I was.

13     Q.   -- as well.

14          Let me ask you this:  Whose analysis is

15 consistent --

16          MR. MELSHEIMER:  Defendants' Exhibit 1069.

17     Q.   (By Mr. Melsheimer) Whose analysis is

18 consistent with Trilogy's own document dated

19 November 1st, 2004:  Mr. Carter or Dr. Becker?

20     A.   I would say Dr. Becker.

21     Q.   Why do you say that?

22     A.   Because in this document, it wasn't prepared

23 for this litigation.  This is -- and their normal

24 conduct of their business identified these 24

25 competitors to them in the pricing arena.

1    Q.    Now, with respect to Mr. Weinstein, do you --
2 do you -- do you blame him for the facts that he had to
3 confront?

4    A.    Absolutely not.

5    Q.    And you have to take the facts as you find them
6 in these cases; isn't that right, sir?

7    A.    That is what we are limited to.

8    Q.    And with respect to whether or not, but for the
9 patent infringement, there would have been sales by
10 Trilogy, there's some pretty challenging facts to prove
11 that, isn't there, sir?

12    A.    There are, and they didn't exist in this case.

13    Q.    Why do you say that?

14    A.    Well, as I told you earlier in my examination,
15 through this entire time period, from '96 to today,
16 Trilogy could have sold this product to 65 percent of
17 the market, if it really was something that people
18 needed.  They chose not to do that.

19            For the last year, since May of 2010, when
20 this functionality is pulled out of SAP, they could sell
21 to SAP customers, they haven't sold one Pricer product
22 to any of these customers.

23            That's the type of evidence that I would
24 consider if I was calculating lost profits.  And since
25 there is no evidence that anyone wanted this product, I

1   don't think you can prove lost profits.

2       Q.   And when you said Trilogy could have sold, were

3   they trying to sell Pricer to these other companies back

4   in -- back in the damage period of 2003 following?

5       A.   No.  They stopped sometime around 1999 to 2000

6   trying to sell to all of this other available market.

7       Q.   The fact that they couldn't make sales to a big

8   chunk of the marketplace, over 60 percent by what you

9   just testified, what does that tell you about whether or

10  not there's demand for the patented invention?

11      A.   It tells me there is not demand.

12      Q.   Demand for the patented product?

13      A.   For the product, yes.

14              MR. MELSHEIMER:  May I have the ELMO,

15  please, ma'am?

16              COURTROOM DEPUTY:  Yes, sir.

17      Q.   (By Mr. Melsheimer) Mr. Wagner, do you recall

18  this exhibit that I used with Mr. Carter?

19      A.   I couldn't see the ELMO when I was sitting here

20  during that examination, but I do recognize this chart,

21  which is Slide 16 of Mr. Weinstein's testimony.

22      Q.   And have I made some adjustments to it, as far

23  as the facts, the feature added in 1998, the big decline

24  in sales, and then the patent issues in 2003?

25      A.   You did.

1    Q.   Is that an accurate representation of the facts
2  as you understand them?
3    A.   I can't judge your scale, but it looks
4  relatively accurate.
5    Q.   Thank you.
6           Now, final question.  With respect to the
7  evidence of what was happening at Trilogy -- and they
8  keep bringing up certain things, but with respect to the
9  evidence of what was happening at Trilogy and what was
10 happening in the marketplace during the time period that
11 the jury has to consider, why are those facts relevant
12 for the jury to consider in determining whether or not
13 Trilogy's proven an entitlement to lost profits?
14   A.   Because even if you have a good product, you
15 have to execute to be successful.  I've seen many
16 companies, particularly Silicon Valley, they have
17 tremendous technology, and they're failures because they
18 don't execute their business strategy properly.
19   Q.   Does -- does having a patent guarantee that
20 you'll be successful?
21   A.   No.
22   Q.   If you ask for lost profits, if you come in and
23 ask for lost profits, do you sort of put your company on
24 the line in terms of proving that they could have made
25 the sales and they could have made the profits?

1          A.    I believe you do.

2                      MR. MELSHEIMER:  No further questions.

3                      THE COURT:  Redirect?

4                      MR. COLE:  Thank you, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MR. COLE:

7          Q.    Just a few points, Mr. Wagner.

8                      You mentioned that in order to claim lost

9    profits, it's not enough to have a good product; you

10   also to have execute; is that right?

11         A.    I just said that.

12         Q.    Okay.  And there are a lot of other things

13   going on in the marketplace that can affect your ability

14   to sell -- to sell.

15         A.    I agree with that.

16         Q.    Now, here's my question:  From 1995, 1996,

17   1997, 1998, did Trilogy execute?

18         A.    They did.

19         Q.    Okay.

20         A.    I think they did well.

21         Q.    Now -- and the truth is, you have no specific

22   evidence whatsoever that says some fundamental change

23   happened in October of 1998 in Trilogy's ability to

24   execute, where before they could execute 60 sales, and

25   afterwards their ability to execute dropped down to

1  almost nothing.

2           You don't know of any specific thing that

3  happened that would change the ability to execute at

4  that point, do you?

5      A.   I do.

6      Q.   Well, I didn't hear you testify about that, but

7  putting aside SAP's addition of hierarchical access,

8  you'll agree with me that the ability to execute varies

9  over time, right?

10     A.   I agree with that.

11     Q.   Okay.  And there are a lot of things that vary

12  over time -- well, let me back up.

13          Another thing that's been mentioned a lot

14  here is the ability to integrate with SAP, and I think

15  the suggestion has been made that that -- the difficulty

16  integrating may have been one of the problems?

17     A.   I think it was.

18     Q.   Okay.  Now, you know, don't you, that the

19  ability to integrate with SAP was hard in '95, '96, '97,

20  and '98, right?

21     A.   It was.

22     Q.   And it was also hard later.

23     A.   I agree with that.

24     Q.   And I asked Mr. Weinstein -- maybe you

25  recall -- about the concept of background noise, right?

1    A.    You did.

2    Q.    And if there's a problem in the marketplace

3 that is consistent or relatively consistent over time,

4 that's generally not going to be a cause of some

5 dramatic change.

6    A.    I agree with that.

7    Q.    Okay.  Now, I think you mentioned that one of

8 the things you looked at was the fact that Trilogy

9 hasn't sold to non-SAP customers during the damages

10 period; is that right?

11    A.    That is accurate.

12    Q.    And you -- you've mentioned several times the

13 35 percent market share of SAP?

14    A.    I did at least once.

15    Q.    Okay.  Now, the number in your report, the

16 35-percent figure in your report, is a figure of SAP's

17 market share in the ERP market, right?

18    A.    I agree with that.

19    Q.    That's the general ERP market.

20    A.    It is.

21    Q.    The market Mr. Weinstein focused on in lost

22 profits was more limited, wasn't it?

23    A.    I agree with that.

24    Q.    And he limited himself to only SAP customers,

25 right?

1    A.   He did.

2    Q.   And within the SAP customers, only the biggest

3 companies, the Tier 1, right?

4    A.   He did.  I believe it was 435 customers after

5 subtracting out the customers that Trilogy already sold

6 to.

7    Q.   That's right.

8            So there were 480 total SAP Tier 1

9 customers.

10    A.   There were.

11    Q.   And Trilogy sold to, what, 45 of those?

12    A.   Yes.

13    Q.   They had 45 sales in the Tier 1 to SAP's

14 customers, right?

15    A.   Yes.

16    Q.   Okay.  So he backed those out.

17    A.   He did.

18    Q.   And he's basically saying, historically, they

19 had won 45 SAP Tier 1 customers, right?

20    A.   Yes.

21    Q.   That's about over three years?

22    A.   It's -- the three most successful years.  It's

23 actually over about five years.  But, yes, three years,

24 I would say that's true.

25    Q.   Say 45 customers over five years.

1          He's claiming as -- that Trilogy, but for

2    the infringement, would have sold 93 more Tier 1

3    customers of SAP, right?

4        A.   He does.

5        Q.   Over eight years.

6        A.   That's correct.

7        Q.   That's right.  Okay.

8              Now, let me talk about SAP's market share

9    in the Tier 1 market.

10             MR. COLE:  Mr. Diaz, can we have PX1950?

11             And if you could go to Page 12.

12        Q.   (By Mr. Cole) We saw this briefly the other

13   day.  This document is a spreadsheet from a presentation

14   given in 2010 by SAP's Chief Financial Officer.  Have

15   you seen it before?

16        A.   I have, yes.

17        Q.   All right.  Now, unlike your 35-percent figure,

18   this is talking about SAP's customers within the Global

19   500.  That's -- that's even bigger customers than just

20   the Fortune 500, right?

21        A.   It is.

22        Q.   The 500 largest companies in the world.

23        A.   That's what it represents.

24        Q.   Okay.  And what does SAP's Chief Financial

25   Officer say their market share is?

1    A.    He doesn't say anything about market share.  He

2  says it's 70 -- 76 percent of these customers are our

3  customers.  It doesn't say anything about market share.

4    Q.    Okay.  Well, 76 percent of the Global 500 are

5  SAP customers, right?

6    A.    That's true.

7    Q.    And what is SAP's flagship product?

8    A.    I would call it their business suite.  Some

9  people call it R/3 or ERP.

10    Q.    And that's an infringing product, right?

11    A.    It is.

12    Q.    Will you agree with me that the vast majority

13  of SAP customers have their flagship products?

14    A.    Yes.

15    Q.    That's what put them on the map, isn't it?

16    A.    Well, the product put them on the map.  I don't

17  think the patented feature did.

18    Q.    Ah, that wasn't my product.  SAP's ERP product

19  is what put them on the map, right?

20    A.    Oh, clearly, yes.

21    Q.    It is the foundation of their business.

22    A.    It is.

23    Q.    So you're not suggesting that the Global 500

24  companies -- that some substantial portion of them only

25  buy some non-infringing product, are you?

```
 1       A.    Oh, no.

 2       Q.    All right.

 3       A.    No.

 4       Q.    Thank you.

 5             MR. COLE:  Thank you, Mr. Wagner.

 6             THE COURT:  Thank you, Mr. Cole.

 7                   REDIRECT EXAMINATION

 8  BY MR. MELSHEIMER:

 9       Q.    Mr. Wagner, just because Mr. Weinstein limited

10  his focus to large SAP customers, does that mean the

11  jury should do the same thing?

12       A.    I'm not here to tell the jury what they should

13  do and not do as far as Mr. Weinstein's analysis.

14       Q.    But just because Mr. Weinstein limited his

15  focus to SAP customers, large SAP customers, does that

16  mean that's what Trilogy was doing at the time?

17       A.    I don't -- I heard testimony they were not

18  doing that.  Of course, both companies want to sell to

19  the biggest companies.  You make the most money.  But

20  still, the Fortune 500 or the Global 500 is a fraction

21  of the potential customers for either of these

22  companies' products.

23             So, no, I think both companies are trying

24  to sell to the smaller companies as well.

25       Q.    Is it fair to focus the market just on the
```

1  largest SAP customers when the facts illustrate that

2  Trilogy was, in fact, selling to a much broader customer

3  base or trying to?

4      A.   I can't -- I think it's -- it's fair that --

5  it's more likely that a larger customer would be --

6  someone would pay $5 million more just for this

7  additional functionality.  But, necessarily, the market

8  might be larger than that.

9      Q.   If people did not buy SAP because of the

10  patented feature -- are you with me?

11     A.   I am.

12     Q.   What does that say about whether SAP's product

13  from the 1990s would be a commercially acceptable

14  non-infringing alternative?

15     A.   It doesn't say anything.

16     Q.   And one final question, sir.

17          With respect to your analysis of the

18  reasonable royalty, is -- is that something that -- that

19  Trilogy would be entitled to in addition to lost profits

20  or alternatively to lost profits?

21     A.   For the same sale, they are not -- they're

22  duplicative.  You would not award both.

23          MR. MELSHEIMER:  Thank you.

24          MR. COLE:  Very briefly.

25                    RECROSS-EXAMINATION

1   BY MR. COLE:

2       Q.   On that last question, if it's not for the same

3   sale, you can get both, right?

4       A.   That's true.

5       Q.   Okay.  If there are 1360 infringing sales, you

6   would have to back out the 93 claimed lost sales, right?

7       A.   You would.

8       Q.   And the law says you can get a royalty on the

9   rest.

10      A.   It does.

11              MR. COLE:  Thank you.

12              MR. MELSHEIMER:  Nothing further, Your

13  Honor.

14              THE COURT:  You may step down.

15              THE WITNESS:  Thank you, Your Honor.

16              MR. MELSHEIMER:  Your Honor, just a couple

17  things, maybe not on the -- may we approach, Your Honor?

18              THE COURT:  Yes.

19              (Bench conference.)

20              MR. MELSHEIMER:  Subject to moving just a

21  couple of exhibits in as a housekeeping matter, we're --

22  we rest our case-in-chief, and we'd -- I would just like

23  the record to reflect that we'd renew all our motions

24  filed at the close of the Plaintiffs' case.

25              THE COURT:  Okay.  Well, what exhibits are

1    you trying to move in?

2                    MR. MELSHEIMER:  Oh, there's just that

3    timeline that I dealt with Carter and that I talked

4    about with Wagner.  It's a -- it's a timeline exhibit

5    that I created that I just forgot to introduce it with

6    Carter.

7                    MR. COLE:  It's a demonstrative, isn't it?

8                    THE COURT:  Yeah.  That's my view of it.

9                    MR. MELSHEIMER:  Well, he's -- he's

10   testified that it's accurate.  At least it ought -- it

11   ought to come in -- well, I'm moving it in.

12                   THE COURT:  Well, I'm sustaining the

13   objection.  You can use it for demonstrative purposes,

14   but it's not going to go back to the jury room.

15                   MR. MELSHEIMER:  Thank you, Your Honor.

16                   THE COURT:  If the jury wants to see it,

17   I'll bring them back in the courtroom and you can show

18   it to them in here.

19                   MR. MELSHEIMER:  Thank you, Your Honor.

20                   THE COURT:  Okay.

21                   MR. MELSHEIMER:  All right.

22                   THE COURT:  I'll let you rest in front of

23   the jury, but I'm going to overrule your motions that

24   you just made that you've incorporated by reference,

25   though, that you previously made --

1          MR. MELSHEIMER:  Yes, Your Honor.

2          THE COURT:  -- correct?

3          Are your responses the same?

4          MR. COLE:  Yes, Your Honor.

5          THE COURT:  Okay.  I'm overruling those

6    motions, but if you want to rest in front of the jury --

7          MR. MELSHEIMER:  Okay.

8          THE COURT:  -- depending what they want to

9    do in rebuttal.  By my count, you've got six minutes

10   left.

11         MR. BAXTER:  He's got six left?

12         THE COURT:  Yes.

13         MR. BAXTER:  I'm entitled to put something

14   on, but we're not.  I just wanted to watch him struggle

15   with the six minutes.

16              (Bench conference concluded.)

17         THE COURT:  Mr. Melsheimer, who will be

18   your next witness?

19         MR. MELSHEIMER:  Your Honor, we have no

20   further witnesses, and at this time, Ladies and

21   Gentlemen of the Jury, SAP rests its case.

22         THE COURT:  Okay.  Plaintiff have any

23   witness in rebuttal?

24         MR. BAXTER:  No need to, Your Honor.  We

25   close.

```
 1                    THE COURT:  Okay.  Does the Defense close?
 2                    MR. MELSHEIMER:  We do, Your Honor.
 3                    THE COURT:  All right.  Ladies and
 4   Gentlemen, you've now heard all of the evidence that
 5   you're going to hear in the case.
 6                    I'm going to recess at this time until
 7   2:00 o'clock for the purposes of finalizing the Court's
 8   jury instructions, and we'll reconvene at 2:00 o'clock
 9   with the final arguments of counsel, and then you'll get
10   the Court's instructions, and I would estimate by about
11   3:30, the case will be in your hands.
12                    So remember my prior instructions, and
13   don't talk about the case over your lunch break, but
14   please have a nice lunch break.
15                    LAW CLERK:  All rise for the jury.
16                    (Jury out.)
17                    THE COURT:  All right.  Y'all have a seat.
18                    Y'all give me about 10 minutes and send
19   your teams that are going to discuss the jury
20   instructions and the verdict form down to chambers.
21   I'll meet with y'all downstairs for a charge conference.
22   Let's do it at 12:10.
23                    Court's in recess.
24                    LAW CLERK:  All rise.
25                    (Lunch recess.)
```

1                        <u>CERTIFICATION</u>

2

3

4            I HEREBY CERTIFY that the foregoing is a

5   true and correct transcript from the stenographic notes

6   of the proceedings in the above-entitled matter to the

7   best of my ability.

8

9

10
    /s/_____        May 12, 2011
11  SHELLY HOLMES, CSR
    Deputy Official Court Reporter
12  State of Texas No. 7804
    Expiration Date:  12/31/12
13
    /s/_____        May 12, 2011
14  GLENDA FULLER, CSR
    Deputy Official Court Reporter
15  State of Texas No. 1042
    Expiration Date:  12/31/12
16

17

18

19

20

21

22

23

24

25