```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   VERSATA SOFTWARE, INC.,  ) Civil Docket No.
     ET AL                    ) 2:07-CV-00153-CE
 4                            ) May 12, 2011
     VS.                      ) 2:20 P.M.
 5                            )
     SAP AMERICA, INC., ET AL )

 6

 7                 TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE CHAD EVERINGHAM
 8                UNITED STATES MAGISTRATE JUDGE

 9   APPEARANCES:
     FOR THE PLAINTIFF:        MR. SAM BAXTER
10                             McKool Smith, P.C.
                               104 E. Houston Street
11                             Suite 300
                               Marshall, Texas  75670
12
                               MR. SCOTT L. COLE
13                             MR. STEVEN J. POLLINGER
                               MS. LAURIE L. FITZGERALD
14                             MR. KEVIN M. KNEUPPER
                               MS. LEAH B. BURATTI
15                             McKool Smith, P.C.
                               300 W. 6th Street, Suite 1700
16                             Austin, Texas 78701

17                             MS. ADA BROWN
                               MR. STEVEN CALLAHAN
18                             McKool Smith, P.C.
                               300 Crescent Court, Suite 1500
19                             Dallas, Texas 75201

20   APPEARANCES CONTINUED ON NEST PAGE:

21   COURT REPORTERS:          SHELLY HOLMES, CSR
                               GLENDA FULLER, CSR
22                             Deputy Official Court Reporters
                               100 East Houston, Suite 125
23                             Marshall, TX 75670
                               903/935-3868
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANT:          MR. THOMAS M. MELSHEIMER
                            MR. MICHAEL A. BITTNER
                            Fish & Richardson, P.C.
                            1717 Main Street, Suite 5000
                            Dallas, Texas 75201

                            MR. JOHN W. THORNBURGH
                            MR. JUSTIN M. BARNES
                            Fish & Richardson, P.C.
                            12390 El Camino Real
                            San Diego, California 92130

                            MR. JAMES R. BATCHELDER
                            Robes & Gray, LLP
                            1900 University Avenue
                            6th Floor
                            East Palo Alto, California 94303

                            MR. CHRISTOPHER BUNT
                            Parker Bunt & Ainsworth
                            100 E. Ferguson, Suite 1114
                            Tyler, Texas 75702

<u>P R O C E E D I N G S</u>

1                

2      (Jury out.)

3      LAW CLERK:  All rise.

4      THE COURT:  Please be seated.

5      I'll hear the Plaintiffs' objections to

6 the charge.

7      MR. POLLINGER:  Your Honor, before we do

8 that, can we lodge our JMOL motions very quickly?

9      THE COURT:  Yes.

10      MR. POLLINGER:  I'll go first on

11 infringement.

12      Your Honor, the Plaintiffs', Trilogy,

13 Versata, moves for judgment as a matter of law on

14 infringement on modified products from May 6th, 2010

15 forward, based upon the testimony of Mr. Gupta and the

16 other witnesses and in light of the 2009 infringement

17 verdicts.  The change, the 2010 patch does not avoid the

18 2009 infringement verdict.

19      Additionally, Mr. Gupta established that

20 all claim elements are met literally.  Established that

21 there's direct infringement of all three claims, 26, 28,

22 and 29, as well as indirect infringement of Claim 29 by

23 inducement and contributory infringement.

24      Each of these were established by a

25 preponderance of the evidence and we submit that we are

1  entitled to judgment as a matter of law.

2          THE COURT:  Okay.  Motions are denied.

3          MS. FITZGERALD:  Versata also moves for a

4  judgment as a matter of law that it properly complied

5  with the marking statutes.  The -- the -- the fact

6  testimony in evidence in this case establishes that

7  Versata carried its burden to show by a preponderance of

8  the evidence that it properly gave notice to the public

9  that its claimed inventions were patented by marking its

10 embodying product with the '350 patent substantially and

11 continuously between a -- a reasonable time after the

12 patent issued in April 2003 through the date that

13 this -- this patent infringement lawsuit was filed.

14          And that Versata also took reasonable

15 efforts to ensure that its resellers and licensee is

16 also properly marked any embodying products sold during

17 the relative time period.

18          THE COURT:  That motion is likewise

19 denied.

20          MS. FITZGERALD:  Should I go ahead with

21 the charge?

22          THE COURT:  Yes, please.

23          MS. FITZGERALD:  All right.  With respect

24 to the Court's charge, Versata requests a supplemental

25 Jury instruction on Page 2 of the Court's instruction.

 1          We ask that after the sentence that says
 2     Versata seeks damages in the form of lost profits to
 3     compensate it for SAP's infringement, that the following
 4     sentence be added:  The previous verdict of infringement
 5     is binding on this trial and our authority for that is
 6     McDaniel versus Anheuser-Busch, 957 F.2d 298; it's a
 7     Fifth Circuit case from 1993.
 8          And that states -- states that -- or that
 9     case states:  Inherent in the Seventh Amendment
10     guarantee of a trial by Jury is the general right of a
11     litigant to have only one Jury pass on a common issue of
12     facts.  Based on --
13          And then also it states that -- or it
14     holds that it's proper to use rulings in one stage of a
15     proceeding to dispose of common issues that would
16     otherwise arise in the later state of the same
17     proceeding.
18          Based on that same authority, Versata also
19     requests that on Pages 6 and 7 of the Court's Jury
20     instruction in the sentence that states:  In determining
21     whether SAP's modified products infringe Versata's
22     asserted claims, you must determine for each accused
23     product or its method of use, whether that product or
24     its method of use contains each and every limitation
25     recited in a claim, that the following clause be added

1    at the end:  Taking the prior infringement verdict as a

2    given.

3            Next, Versata requests that in the Court's

4    instructions about marking, the following sentence be

5    added:  However, there is no requirement that Versata

6    had to begin marking within any given time after the

7    patent issued and Versata had no duty to mark a product

8    that included the patented invention until Versata sold

9    or authorized others to sell the patented invention.

10           Versata asks for that instruction or that

11   that sentence be added to the marking instruction based

12   on William Brothers Boiler & Manufacturing Company

13   versus Gibson-Stewart Company, 312 F.2d 385.

14           And also American Medical Systems, Inc.

15   versus Medical Engineering Corp., 6 F.3d 1523.  Chisum

16   on Patents, Section 20.03, Section (7)(c).

17           And Wine Railway Appliance Company versus

18   Enterprise Railway Equipment Company, 297 U.S. 387,

19   which is noting that the purpose of patent marking is

20   for the information of the public.

21           Those are the supplemental instructions

22   that Versata requests.

23           May I approach and hand them up to the

24   Court?

25           THE COURT:  Yes.

1          MS. FITZGERALD:  We have two objections to

2     the charge as it stands.  On Page 13 of the charge we

3     object to the paragraph that states:  You have heard

4     evidence that SAP modified its products in 2010 and that

5     it did not require prior users to implement the modified

6     products.

7          Your damages award will compensate Versata

8     for damage resulting from that infringement and will

9     license SAP the use of '350 patent for those users.

10          You should not infer that SAP was acquired

11     to disable the infringing functionality.  Because of the

12     prior determination of infringement, I have allowed you

13     to consider this evidence because it may be relevant to

14     the question of demand for patented technology.

15          Versata objects to that paragraph on the

16     basis that SAP has never pled the defense of patent

17     exhaustion in this case and so -- and therefore we -- we

18     submit that this affirmative defense of patent

19     exhaustion should not be included in the instructions.

20          And finally, in -- and also on Page 13 at

21     the -- or I guess starting on page -- the bottom of Page

22     12 and carrying over to the top of 13, there's a

23     sentence that states:  If you find infringement, you may

24     consider demand for the infringing features of the

25     accused product to be demand for the patented invention.

1          Versata objects to the inclusion of the --

2    of the words the infringing features of, in that

3    sentence, based on DePuy Spine, Inc. versus Medtronic

4    Sofamor Danke, Inc., 567 F.3d 1314.  That's a Federal

5    Circuit case from 2009.

6          In that case, the Federal Circuit held

7    that Medtronic asked us to hold that the requisite

8    demand under the first Panduit factor is demand for the

9    specific feature; i.e., claim limitation that

10   distinguishes the patented product from a noninfringing

11   substitute, not simply demand for the patented product.

12         We decline Medtronic's request.

13   Medtronic's argument unnecessary conflates --

14   unnecessarily conflates the first and second Panduit

15   factors.

16         All that the first factor states and thus

17   requires is, quote:  Demand for the patented product,

18   end quote.  This factor does not require any allocation

19   of consumer demand among the various limitations recited

20   in a patent claim.  Sorry.

21         And on that basis from that clear Federal

22   Circuit holding from 2009 in DePuy Spine, we think it's

23   clear that the first Panduit factor is concerned with

24   demand for the product, clearly as it states here in --

25   in DePuy Spine, not for any features of the product.

And on that basis we –– we object to the inclusion of the words for the infringing feature and that sentence I'm discussing.

THE COURT:  Okay.  I've endorsed the requested instructions as having been refused.  I overrule the objections to the Jury instruction.

Do you have objections to the verdict form?

MS. FITZGERALD:  No, Your Honor.

THE COURT:  Okay.  Thank you.

MS. FITZGERALD:  Thank you.

MR. BITTNER:  May I approach?

THE COURT:  Yes.

MR. BITTNER:  First on the verdict form.  SAP objects to the absence of a marking –– separate marking instruction and requests that a separate marking –– marking instruction be provided by the Court.

On the Jury instructions, I've handed the Court three supplemental instructions.  The first on lost profits regarding need for the accused and embodying products to be sufficiently similar.

The second replaces the Court's noninfringing alternative instruction with that proposed by SAP in its recent proposed final instructions, Docket No. 514.

1                    The final replaces the Court's marking

2       instruction with that proposed by SAP in the same

3       proposed instructions, Docket No. 514.

4                    Finally, on Page 13 of the Court's charge,

5       SAP objects to the final sentence of the lost profit

6       instruction.  Reading, quote:  I have allowed you -- you

7       to consider this evidence because it may be relevant to

8       the question of demand for the patented technology,

9       unquote.

10                   THE COURT:  All right.  Any others?

11                   MR. BITTNER:  That's it.

12                   THE COURT:  Okay.  I've endorsed your

13      requested instructions as having been refused.  I

14      overrule the objections.

15                   I'm also declining the requested -- the

16      question on the verdict form.

17                   What types of warnings do you want for

18      final argument?

19                   MR. COLE:  We're going to split it

20      fifteen, fifteen.  I -- just a five minute warning for

21      me.

22                   THE COURT:  So you want -- you've got five

23      minutes after you've used 10 minutes?

24                   MR. COLE:  Yes, sir.

25                   MR. MELSHEIMER:  Is it -- is it the

1  Court's practice, Your Honor, to permit such an

2  impecunious splitting of the time?

3        THE COURT:  I'm not sure I want to admit

4  to that.  What are you asking me to do?

5        MR. MELSHEIMER:  Split it 15/15.

6        THE COURT:  They've got to use at least

7  half of their time in opening.

8        MR. MELSHEIMER:  I -- I just want to make

9  sure that was -- I thought the Court practice might be

10  20/10, but that's fine.  I just didn't know the Court

11  practice.

12        THE COURT:  No.

13        MR. MELSHEIMER:  Do you want to reconsider

14  it?

15        THE COURT:  I don't know, probably not

16  today.

17        MR. MELSHEIMER:  All right.  Thank you,

18  Your Honor.  I've offered no compelling reason, I

19  understand.

20        THE COURT:  Or any reason.

21        MR. MELSHEIMER:  Well he's going to be

22  laying in wait, that's why I'm wondering.

23        MR. BAXTER:  I've already taken out my

24  best slide, Your Honor.

25        THE COURT:  All the name calling that went

1  on, Mr. Melsheimer, I think he's entitled to it.

2            Ms. Lockhart, if you'll file these.

3            What types of warnings do you want.

4            MR. MELSHEIMER:  When I'm not answering a

5  question, five minutes, Your Honor.

6            THE COURT:  Tell you when you've got five

7  minutes left.

8            MR. MELSHEIMER:  Thank you.

9            MR. BAXTER:  And Your Honor, if I could

10 have five and two?

11           THE COURT:  You've got five left and two

12 left?

13           MR. BAXTER:  Yes, Your Honor.  Thank you.

14           THE COURT:  All right.  If you'll go ahead

15 and have them in there in about five minutes.

16           LAW CLERK:  All rise.

17           (Recess.)

18           (Jury in.)

19           LAW CLERK:  All rise.

20           THE COURT:  Please be seated.

21           Ladies and gentlemen, I apologize for the

22 delay.  We have a copier that's programmed to

23 malfunction whenever we have a rush job, so sometimes it

24 causes delays.  But we're going to hear the final

25 arguments of counsel, then you'll hear the Court's final

1  instructions.

2              Mr. Cole.

3              MR. COLE:  Thank you, Your Honor.

4              THE COURT:  You may address the jury.

5              MR. COLE:  May it please the Court.

6              THE COURT:  Mr. Cole.

7              MR. COLE:  You may have heard more than

8   once during this trial that SAP has already been found

9   to infringe, so I won't say it again except for that

10  once.

11             The reason we're here today and the real

12  dispute here is about the fact that SAP having been

13  found guilty wants to set the consequences of their own

14  wrongdoing.  They want to pick the price that they

15  should have to pay and they also want to set the terms

16  on which their product should be changed to stop

17  infringing, and they want to make all those decisions

18  for themselves.

19             But those are the decisions that you will

20  make here in a few minutes and we're asking you to make

21  them in a way that's different than what SAP has decided

22  it prefers for itself.

23             Now, the first question -- you're going to

24  have five questions, I believe, that you have to answer.

25  The first three are all about infringement of the

redesigned product, the one that they changed in May of

2010.  And as we showed you during this trial, that --

that revision, the one that SAP itself decided to make,

doesn't avoid the patent at all.

Mr. Diaz, if we could have the SAP note.

Now, as we showed you when SAP decided on

its own to make this change to its product after they

were found to infringe, they did some interesting

things.  This is the SAP note that made the change and

the crucial thing about this, for our purposes here

today, is that they decided to require only their

brand-new customers to make the changes.

If you were an SAP customer who bought

their product at any time from the founding of SAP until

2010, the change was not required for you.

And Mr. Mercer said during his examination

that the reason for that is because, well, those are

going to be bought and paid for by virtue of this trial.

But think about it this way, SAP's main

reason why that number should be really low is because

they claim nobody uses this feature.  Nobody uses this

teeny tiny, itty bitty circle of functionality.  Nobody

uses it and so the numbers should be small.

But if nobody uses the feature, why do

they go to the trouble of exempting all their existing

customers?  Why did they go to the trouble to make sure

all their existing customers could continue to use it?

If nobody cared and nobody uses it, why do you carve

everybody out?  That makes no sense.  That is not common

sense.

What that tells you is SAP is well aware

that its customers demand and need and use this feature.

If -- if they really believed what they said in this

trial, they would not have had any reason to do it this

way.

And common sense will tell you, too, that

the way this invention works is the -- is the right way

to use it.  I mean, their hierarchical access documents

say it's particularly suited for customer and product

hierarchies.

Mr. Carter testified and it's just common

sense that pricing is all about somebody, a customer,

buying some thing, a product.  That's how it works and

that's the way lots of people use it and our evidence

showed that.

Now, the -- the crux of the infringement

case, in other words, does their product still infringe,

we presented through Mr. Gupta our technical expert.  He

testified for probably about 30 minutes on his direct

about all the ways in which SAP's new product doesn't

1  avoid the patent.

2            He testified about the fact they exempted

3  their customers.  He showed you that not only did they

4  exempt their customers, all the old data, the old access

5  sequences that anyone set up during the 12-year period

6  that hierarchical access was sold, everyone, even the

7  people who took the new change, everyone could continue

8  to use those just the same way.  And as he said, that's

9  still infringement.

10            They also let their customers use any

11  off-the-shelf data editing tool to -- to create new data

12  structures.  Everyone can still do that.  Their change

13  didn't stop that.

14            And not only that, their change only

15  focused on a single customer hierarchy, very specific

16  one called the KNVH.  That's the only one that they

17  disabled.

18            But the evidence was very clear that there

19  are lots and lots of ways to organize a customer

20  hierarchy and the obvious one is the geography, which

21  everybody talked about.  Customers in Texas, customers

22  in Marshall, that geography -- geographical hierarchy is

23  a hierarchy of customers and it's still in their

24  product.

25            And so as a result, questions one,

Mr. Diaz if we can get that, we filled these out for
you.  These are the ways we believe the evidence shows
you should answer.

Question one is about infringement; in
other words, does the new product continue to infringe.
There are three patent claims and we believe the answer
for all three is yes.

Okay.  Question two, there are different
kinds of infringement, there's direct infringement and
question two is about induced infringement.  And Mr.
Gupta testified SAP also induced infringement and the
answer to that question is yes.

And then question three is -- is also
another kind of infringement called contributory or
contributed to infringement, and we believe the answer
to that is yes.  The infringement issues were all
handled together, but they're broken out into three
legal categories in the charge.

So questions one to three we believe the
answer is yes.

Now, I'll talk about damages which will be
the last question on your chart.  And most of the focus
on the case was about damages.

And Mr. Diaz, if we could have the lost
sales chart.

1          This was my chart, the graphics guys

2     called this coal mountain.  I can't tell if they're

3     making fun of me, but we used this a lot, particularly

4     me, so I figured better use it now.

5          Now, what -- I added a few things here to

6     make a couple of timeline issues clear that I think were

7     confusing during the trial.  And just so the -- just so

8     we're clear, the record -- the record is clear,

9     Mr. Carter made his invention, he came up with this idea

10    in 1995.  He filed for his patent in 1996.  And the

11    evidence is crystal clear that that's the priority date

12    he is entitled to for his invention.  That's when he

13    stuck his flag in the ground and the law gives him the

14    right to that priority date.

15         Now, the patent, as you can tell, was in

16    the Patent Office for a long time and didn't issue until

17    here.  And the evidence is also crystal clear that we

18    are not claiming any damages whatsoever for this period

19    of time, not one dime.  All of our damages start in

20    2003.

21         So the question then is:  What is the

22    evidence on damages?  And our position as we -- as we

23    showed you during trial is that Trilogy lost sales as a

24    result of SAP's infringement and we think the best

25    evidence is right here on this chart.

1          What happened in the real world when

2  Trilogy stopped being an exclusive provider of this

3  technology and SAP, the third largest software company

4  in the world, bundled it into their core products, and

5  you can see the obvious difference.

6          And as the evidence showed you, it is

7  difficult for Trilogy to compete selling their product

8  when SAP has bundled it in for free and is selling it to

9  all the same customers.  There is no way you can compete

10 against that and you can see the results.

11         But as the evidence was also clear, what

12 you have to decide in lost profits is what would have

13 happened if SAP hadn't infringed?  You have to create a

14 but-for world, a world that didn't exist in the real

15 world because SAP did infringe and from 2003 forward

16 they've infringed all along.

17         So when you look at the real world

18 evidence, you have to step back, given the job here, and

19 say okay what would the world look like if SAP hadn't

20 been infringing?

21         What sales might Trilogy have been able to

22 make if SAP could no longer offer this feature to its

23 customers?

24         And we think the best evidence of that is

25 what happened in the real world when Trilogy had an

1  exclusive, when Trilogy was the only one with the --
2  selling this patented product.
3          The patent gives you exactly that right.
4  And so in 2003 when the patent issued, that's what
5  Trilogy gets.  They get an exclusive again.
6          They get to get in 2003 what they once had
7  back here before SAP started infringing.  And
8  Mr. Weinstein was very clear that his lost profits
9  calculations, his view of the world was based entirely
10 on Trilogy's actual history.
11         And what he did was he said, well, in 2003
12 I think Trilogy would have been able to do the same
13 thing they actually did in the real world when they had
14 that exclusive right.
15         Now, I think you're going to hear a number
16 of things from Mr. Melsheimer in a minute.  I think one
17 thing you're going to hear, which we heard a lot, was
18 that all of the competition from SAP even here, even
19 starting with hierarchical access, all of that
20 competition was legitimate competition, legitimate
21 competition, and that the infringement didn't start
22 until here and so none of this matters in some sense
23 because it's legitimate competition.
24         I think you'll hear something like that.
25 A couple points about that.

1          First of all, we're not claiming any

2   damages for that period of time.  And second of all, the

3   fact that the patent hadn't issued and SAP could

4   therefore not offer this product without infringing

5   doesn't change the infringement there.

6          And third of all, the question of what's

7   legitimate competition is -- it's not going to be on

8   your chart and not only that, there's a lot of different

9   ways to think about that question.

10          Is it legitimate competition for SAP to

11  meet with Mr. Carter in a trade show, sit down, ask him

12  questions about his product, take notes about it, learn

13  about how it works under the pretense of doing a

14  partnership deal, which Mr. Carter wanted to do with

15  SAP.

16          THE COURT:  You've used 10 minutes.

17          MR. COLE:  Thank you, Your Honor.

18          While at the same time, having already

19  decided months earlier before they sat down with

20  Mr. Carter having already decided that they weren't

21  going to do a deal with Trilogy, they just weren't going

22  to tell them yet.  Is that legitimate competition?

23          Is it legitimate competition for SAP

24  engineers to study Trilogy's product and make theirs

25  work just like it and then promise its customers in

1  advance that it's going to introduce features just like

2  Trilogy's?  Is that legitimate competition?

3  　　　　　　　Not only does that address the question of

4  legitimate competition, but it also shows you how

5  important this invention was.  Because back here when

6  this was an exclusive, you saw all the internal e-mails

7  from SAP about how concerning it was to them, how

8  Trilogy was beating them in the marketplace.  And that

9  shows you what this is worth when it's in -- on an

10  exclusive basis.

11  　　　　　　　And so Mr. Diaz, if we could go to

12  question four.

13  　　　　　　　And so question four is the lost profits

14  question.  They have two separate questions because

15  Mr. Weinstein and Mr. Wagner had two separate approaches

16  to damages.

17  　　　　　　　Question four, this is Mr. Weinstein's

18  lost profits, and as he testified in his opinion, the

19  amount of lost profits suffered here is $285 million.

20  That's 93 customers over an eight-year period of time

21  which matches the historical record.

22  　　　　　　　And as you also heard Trilogy in the real

23  world sold Pricer to 45 of the same kinds of customers

24  Mr. Weinstein is pointing to during a four -- three or

25  four year window.  45 of these big companies bought

1  Pricer in the real world in four or five years and
2  Mr. Weinstein says 93 more would have bought it during a
3  longer period of time of eight years. We think that is
4  well supported by the evidence.
5          The last question, question five, this is
6  the second damages question, this is Mr. -- excuse me,
7  Mr. Wagner's reasonable royalty, that's the different
8  approach. And Mr. Wagner, as you know, said that that
9  number is $2 million. That was his analysis and his
10 opinion.
11         But on cross-examination, we saw that what
12 he did actually is he went out and he looked at some
13 benchmarks that were sold to 12 customers, 12 customers
14 total, and he used that to come up with a -- with a flat
15 fee kind of royalty, $2 million.
16         But if you applied his methodology at/to
17 all of the actual infringing sales, the number goes from
18 2 to 170 million and we think that is a more appropriate
19 number, but we leave that to your discretion.
20         That -- these are the questions that you
21 have to -- to deal with, and we leave the decision
22 ultimately to you to evaluate Mr. Wagner's approach that
23 he offered and the one that we showed on
24 cross-examination.
25         Thank you, Your Honor.

1                    THE COURT:  Mr. Cole.

2                    MR. MELSHEIMER:  May I have a moment, Your

3     Honor?

4                    THE COURT:  Yes, sir.

5                    MR. MELSHEIMER:  May it please the Court,

6     Your Honor.

7                    THE COURT:  Mr. Melsheimer.

8                    MR. MELSHEIMER:  Ladies and gentlemen,

9     thank you so much for your time.  I know how attentive

10    you've been and I really appreciate that.

11                    You may recall about 10 days ago at the

12    beginning of the case at Jury selection, I told you I

13    was concerned and I was concerned that we would start

14    the case in a hole because the infringement issues had

15    already been decided.  And I tried to talk to each of

16    you about that issue because I thought it was so

17    important.

18                    You may recall that a couple folks way

19    back in Jury selection gave answers that suggested maybe

20    they -- they had prejudged the case or couldn't be fair

21    because of that.  Those folks didn't make it into the

22    Jury.  They didn't make it into your seats.

23                    You're in your seats because you took an

24    oath to be fair to both sides and to not put anyone in a

25    hole.  And it's from the way you've paid attention, it's

quite clear to me that you've done just that and I'm
very grateful.

In the opening, I told you three important
facts that I thought would never be disputed in this
case and it turns out that I don't think they have been.

Fact number one, you didn't hear a single
customer testify that they decided not to buy Versata's
Pricer product because SAP had this hierarchy access
pricing feature, and that's the key issue in the case.
That's the causation issue that the Judge will instruct
you about in the Jury instructions.

Fact number two, back in 1998, when SAP
added this pricing feature, there was no infringement of
any patent.  So they kept talking about the patented
product or the patented invention back in the '90s.
It's a smoke screen.  There is no patented invention in
the '90s.

The patented invention only existed
starting in 2003.  And finally for the period of time
that infringement was determined, it was not determined
that it was deliberate or intentional.  It was found
that it was not willful.

So the fact is, we don't dispute the
determination, but don't make them -- don't let them
make it sound worse than it was because there was no

determination that it was deliberate or intentional.

Why are these facts so important?  Well, because I told you from day one that the evidence would show that SAP's actions did not cause this company to lose business, and that makes sense.  Because remember the feature here, it's a three-way component.  This three-way component of determining a price using a product group, a customer group, and hierarchy access is not something that SAP customers use.  It's not something they cite as a reason for buying the software, and because of that, it can't be a reason for Versata or Trilogy to have lost any business.

I'm going to go over some evidence with you and I'm going to look at some documents that you've seen several times.

Let me suggest to you that your role is a little bit like a detective.  Now, if this were a TV show, it'd probably get canceled for being boring, but it is a little bit like a detective because you have some detective work to do in the Jury room.

The investigation you're conducting is what killed Trilogy's Pricer business.  Was the wound self-inflicted?  Was it the result of changes in the marketplace for which no one can be held responsible?  Or was it, as they claim, SAP's fault?

1          Now, like any good detective, let me

2    suggest that you start at the beginning, which was way

3    back in the 1990s when Trilogy first introduced the

4    Pricer product.

5          Can we have the screen back?

6          COURTROOM DEPUTY:  Yes, sir.

7          MR. MELSHEIMER:  What do we know about

8    that time?  Well, we know that some companies liked the

9    product.  No doubt about it.  Some early adopters that

10   we heard about bought the product.

11          But like many early companies and early

12   products, that success did not continue.

13          What did we see in the evidence?  Well, we

14   saw this, from 1998, Trilogy itself, this is DX910 if

15   you're -- if you're -- if you're taking notes, DX910.

16   In 1998 Trilogy projected that Pricer would decline as a

17   percentage of revenue by product.  Way back in 1998 they

18   predicted that the decline would -- would occur.

19          Now, were these projections the fault of

20   SAP?  Now, this actually happened, they did have a

21   decline.  This is a decline as a percentage of revenue

22   but they had a decline throughout their efforts.

23          Now, they had success with early adopters,

24   but what did they tell us in Exhibit 514?  They weren't

25   able to move Pricer past the early adopters into the

1  mainstream.  They couldn't reach the mainstream.

2               What happened?  Well, they weren't able to

3  sell the product very successfully.

4               DX514, again, February 1998, the SC Pricer

5  team has met with over 40 SAP and Oracle companies.  So

6  remember they weren't just trying to sell to SAP.

7  Oracle, too, only one of those companies have

8  subsequently purchased the software.

9               A few months later we see more or actually

10  in the same month we see more.  Some bad assumptions

11  they made.  The Pricer team inaccurately assumed that

12  the majority of SAP customers needed enhanced pricing

13  execution capabilities; the market has indicated

14  otherwise.

15              A couple months later we see this, we see

16  that they conclude that they had bet big on Pricer and

17  it failed to deliver for this period of time, but they

18  concluded that it was a poor value proposition into the

19  SAP accounts.  Too maintenance, not technical -- not

20  enough business benefits.

21              These are all their conclusions before

22  they get the patent, before this lawsuit is filed.

23              But let's go back to their other

24  documents.  They knew their software had problems.  This

25  is Defendants' Exhibit 830.  This is what they said at

1  the end of 1998, after they've had some success after

2  they've made some sales.  We spent all -- they spent all

3  manner of stories to sell our code, talking about the

4  salespeople.

5             When someone attempts to deploy the code,

6  it's a nightmare.  The process is scary for the short

7  term, but it will not scale for the long-term.

8             What did they hear from Mr. Thompson at

9  the end of 1998?  Mr. Thompson says this software is

10  bad.  Ask any integrator.  Ask any user.  Ask any

11  customer.

12             Now, you're going to hear from them when I

13  sit down that you're insulting us, that your bringing up

14  irrelevant issues.  This is not me saying this.  This is

15  Trilogy's own developers saying that their software

16  doesn't work.  It's bad.  You can ask people and they

17  would tell you about it.

18             Now, does that suggest to you that there

19  was something else going on at Trilogy other than what

20  SAP was doing?  But whatever was going on in 1998, it

21  wasn't patent infringement.  And it's never been

22  determined to be unfair competition or anything else

23  that counsel just suggested to you.

24             It wasn't just Mr. Thompson that thought

25  the software was bad.  The -- the CEO of the company

Mr. Liemandt said, you know, there's about 50 people at
Trilogy that have the same view.

Now, we don't have to go through all of
these, but if you look at this time period when their
sales went up and down, you can see the problems people
were identifying.

What I've done is I've taken what Mr. Cole
called coal mountain.  See that's the problem it is coal
mountain.  For them to be able to convince you that they
have a winning case, it needs to be SAP mountain and
it's not.

Because they are having all these issues
and what I've interlineated here is all these different
facts, accounts lost, the software is bad, the Pricer is
a nightmare.  All these facts, you put them along these
lines and you get a very different picture.

And in fact you go down to here in 2000
and you get 57 percent of their clients are
dissatisfied.  You've got this TOPS exercise, remember
that was their self-criticism.  They brag about doing
that, which is great, but they don't want to accept the
consequences for it.  They don't want to accept
responsible for what they found.  They revealed the deep
problems.

And in 2000 at least some of the Trilogy

people concluded that Pricer does not drive sales, that
that -- that program does not drive sales and that it
may be dead.

That's all reflected in this customer
survey.  The facts don't lie.  When you're having
problems, when your software is bad, when you're having
problems selling it in the marketplace, when you call on
40 customers and you only sell one and then the
customers you do sell to, you've got people saying the
software is a nightmare to install, you have 57 percent
of your pop up -- 57 percent of the respondents in this
survey saying, you know, our expectations have not been
met.

Now, in bringing all this evidence to you,
I hope you don't think I was trying to unfairly
criticize Trilogy in any way.  I wasn't.

Keep in mind, the Court only allows
admission of evidence that's relevant.  It only allows
relevant arguments, and the relevance of this evidence
is clear.  You'll see it in the charge.

The Judge will tell you you need to look
at what caused Trilogy to lose sales.  If it wasn't
SAP's infringement, if it was something else, they can't
get damages for those lost sales.  It's just that
simple.

1    And again, you don't have to just listen
2  to my argument.  Their own witnesses told you this.  You
3  heard from Mr. Smith.

4    I asked him, you understand that Trilogy
5  is not entitled to lost profits if the reason for the
6  decline in business is related to, for example, their
7  own internal problem, fair.  That would be fair.

8    Mr. Weinstein, their expert, says the same
9  thing.  He says, if -- the dropoff of sales, the issues
10 with Pricer, the technology issues, the changes in the
11 marketplace, all that happened before 2003.  All that
12 can't be the basis for any damages in this case, you
13 know that, right?  Correct.  And of course that's right.

14    These other problems -- so things got so
15 bad with Trilogy that in 1999 -- again, this is not a
16 criticism, this is the facts.  This is what was
17 happening.  In 1999 Mr. Carter told us that they just
18 gave up.

19    I want to make this clear.  Your testimony
20 is that you stopped making efforts to try to sell Pricer
21 to SAP customers in the '98 or 99 time frame, right?
22 Yeah, in that rough time frame.  And just so we're
23 clear, that's thousands and thousands of potential
24 customers, fair?

25    Now, think about what they're doing.  They

stopped, they quit in 1998 and 1999.  And now they're
trying to say that the reason why they lost sales
starting in 2003 was because of something we did, that
doesn't make any sense.

Now, they talk about infringement.  They
want to talk about that over and over again.  I did a
word search last night.  This is roughly accurate.  I
didn't do one today.  They had -- their lawyers had used
the word infringement during this trial 169 times.  They
said the word reasonable one time.

They want you to focus on infringement
because they want to distract you from the issues in
this case, which is they stopped selling this product
and therefore they're not entitled to lost profits.

Now, you've heard of several reasons why
that might happen.  Well, let's talk about this -- this
Gartner study.

You've heard some descriptions of the
marketplace, and this was this 2002 Gartner study and,
again, this is as of February 2002.  This is in
evidence.  And it had Trilogy right there in the middle
of all this competition.

And again, it's competition in product and
pricing and pricing configuration, all these different
categories.

1           But just a year later, a year later in
2    February -- in February 2003, they're out of the
3    marketplace.  They're nowhere to be found and that makes
4    sense, doesn't it, because Mr. Carter said, well, they
5    quit several years earlier trying to sell to SAP
6    customers.  And then apparently between 2002 and 2003
7    they quit selling to everybody.  They quit selling to
8    everybody.
9           Now, there are several reasons why that
10   happened.  Again, doing your detective work, why did
11   that happen?  Why did they disappear from the market?
12          Well, one is those internal issues at
13   Trilogy that we talked about.  The failure to properly
14   integrate the software technically.
15          Now, they said, well, you should have
16   helped us.  You should have given us all the software
17   code to make our code work, but the witnesses said, no,
18   that's not what's done in this business.  That's not
19   what's done in the industry.  There was no legal
20   requirement to do that and there's nothing wrong with
21   someone saying, you know what, I'm going to let you
22   score your own touchdown, I'm not going to give you the
23   play.  There's nothing wrong with that.
24          The failure to learn about how SAP
25   software worked, you saw that over and over again.

Mr. Carter took personal responsibility for that and I

admire him for it because I think he's one of the few

people that has taken responsibility.

He says we screwed up.  We screwed up

because we just don't know enough about SAP software,

not because they won't tell us, not because they're

being unfair to us, not because they're holding back,

but because we haven't done the work.  That's what he

said, and that -- that's what those documents say.

Trilogy also had problems selling the

product in this time period at the prices they were

charging.  Some people said, you know what, we need to

lower our price.  If we sold it at a hundred thousand

dollars instead of 1.8 million, we'd probably get a lot

of sales.  Some people thought that $50,000 would be a

better price.

And you saw this document as well,

Defendants' Exhibit 811.  The previous exhibit is 514.

This one is 811.

Not compelling at 1 million, though it was

at 50K.  You're charging too much, another reason why

the mountain collapsed on them.

The other cause of the decline of Pricer

has nothing to do with Trilogy at all and we can't blame

them for this and no one has.  There was a lot of

competition in the marketplace.  You heard this from

Mr. Gupta.

Pricer was competing against the installed

system of customers who were already doing pricing?

Yes.  It was competing against SAP?  Yes.  It was

competing against Oracle pricing?  Yes.  It was

competing against the pricing solution of at least a

couple of other companies?  Correct.

When you look at the entire market, yes.

They're competing and they're not winning.  And that's

disappointing, but that's not the basis for coming into

court and saying pay me $285 million.

And even their own expert said it.  There

are many, many other companies other than SAP in this

marketplace.

Now, let's look back at that Gartner study

for just a minute.  Do you remember all the competitors

that Trilogy had in 2002 all those little dots?  Now,

you heard the Plaintiff suggest, well, maybe some of

those companies didn't offer all the functionality that

Pricer did.  But you never heard about Oracle.  You

never heard anyone say, well, Oracle doesn't offer that

functionality, which is one of the largest ERP companies

in the world.

You heard about Siebel.  Remember

1 Mr. Tully told you that Siebel was out there selling

2 pricing capability.

3 In fact, remember, Trilogy was so

4 concerned about Siebel that in March of 1998 that they

5 developed a marketing message that this is going to be a

6 frontal comparison oriented campaign.  Like the old

7 Oracle campaigns, hard hitting, aggressive, willing to

8 go over the line.

9 Again, I'm not criticizing them for being

10 aggressive.  They're competing.  This is back in March

11 of 1998.  But the fact is they're admitting to you in

12 their own documents in the relevant time period here

13 that, hey, there's a lot of people out there.  There's a

14 lot of other reasons why we're not making sales.

15 There's a lot of other companies that we have to compete

16 against.

17 You don't worry about a company and plan

18 to attack them and go over the line in a hard hitting

19 aggressive way unless you view them as a competitor.

20 But let's put all this aside, because one

21 of the great things about this case is whenever there's

22 a dispute, you can actually resolve it by looking at

23 either Trilogy's own documents, prepared long before the

24 lawsuit was filed, or listening to the testimony of

25 their own witnesses.

1          Because what was Trilogy's own conclusion?

2     Their own conclusion, this is the document you saw with

3     Mr. Wagner.  Remember, this was a 2 -- February 2004,

4     DX1069, if you're taking notes.  Look at all the

5     competitors in the pricing space.  Pricing execution.

6     Look at them all.  And some of them are high

7     competition.  I submit to you most of them are.  Most of

8     that chart in that column is red.  Very, very high

9     competition and some of the same companies that

10    Dr. Becker pointed out.

11         So Trilogy is saying this, not Dr. Becker,

12    not Gartner, but Trilogy is saying this way back in

13    2004.  But let's not overlook something.  It's not just

14    the mistakes that are causing the problems.  It's not

15    just the increased competition.  It's not just the

16    changes in technology, we heard all about that.

17         In 2004 they don't have a -- Trilogy

18    doesn't have a patent earlier than this.  They get their

19    patent in 2003.  Now, they have it in 2004, but they

20    don't have it in '98, '99, 2000, and 2001.

21         Remember this timeline that I did.  I know

22    it's probably the ugliest exhibit in the case, but it's

23    3182.  But remember this timeline we did with -- with

24    Mr. Carter?  This is all the decline that they show

25    happening and most of it is between 1998 and 2003.  And

1   when you look at that, you've got no infringement.

2   You've got no patent during that time frame.

3              So whatever is happening with Trilogy at

4   that time, it can't be the result of something we've

5   done.

6              Now, I will suggest to you that Trilogy

7   has tried to confuse this issue almost every day of the

8   trial.  And I've had to fix it with almost every

9   witness.

10             They talked about the filings in the

11  Patent Office.  They talked about the dates of different

12  patents that are not even involved in this case.  Well,

13  all the stuff was on file in 1996.  It doesn't matter.

14             You've got that patent in your binder.

15  That patent did not issue until April of 2003.  And

16  Mr. Carter told you, Mr. Carter told you they left the

17  market for selling Pricer several years earlier, and

18  they had not made a new sale to a new customer of Pricer

19  since about 2001.  Now, that is telling evidence that

20  anything we did after 2003 was not the cause of their

21  problems.

22             Now, those Patent Office filings, remember

23  they're secret, no one -- we didn't know about them, I

24  don't know if there's been some suggestion that we went

25  up to Washington and looked in these files.  That's not

the way it works.

Number one, they're secret.

Number two, you've heard no evidence of that.

But we do know number three, they never told us about the patents, they didn't have to.

I'm not fussing at them for not disclosing those patents to us, but the fact is they didn't. And we didn't know about it until 2007 when they filed this lawsuit.

What is their response to what I think is overwhelming evidence from their own files and their own witnesses?

Well, they say, look, you froze us out. You froze the marketplace by announcing the hierarchical access feature before it was ready.

What is your detective work going to tell you about that? Well, first off all, preannouncement, preannouncement is something a lot of companies do. We saw Trilogy does it. They announce things before they're actually ready to go. Nothing wrong with that. Two, it doesn't matter. They had no patent in 1998. And there was nothing that stopped SAP or any other company in the world from adding this specific pricing functionality to their products.

1          And that's why when you look at damages in

2   the case, you have to look at 2003 starting with the

3   facts leading up to 2003 and the facts beyond 2003.

4          Trilogy's lost profit damages require it

5   to prove lost sales, and you'll see this in the charge,

6   the Judge's instructions.

7          Without lost sales caused by SAP in 2003

8   or beyond, they can't recover.  Now, if they presented a

9   reasonable royalty theory to you, like you typically get

10  in an oil and gas case or something like that or might

11  think of a –– of a –– of a recording artist who gets a

12  royalty on each of the records that he sells, if they'd

13  done that, they wouldn't have to prove anything in lost

14  sales.  They would just be entitled to a royalty for the

15  value of the invention.

16          You saw from Mr. Wagner the right way to

17  do that, how to properly perform it.  You know, I don't

18  think they liked the numbers.  I don't think they liked

19  Mr. –– the numbers Mr. Wagner came up with, so instead

20  they presented a different theory, this lost profits

21  theory that allow them to put out a large number –– let

22  me tell you something else I'm worried about.  They're

23  going to put out a large number hoping that, well, if

24  you cut it in half, we're okay with that, but they still

25  have an enormous recovery that is not consistent with

1  the facts in the evidence, that's important.

2          Now, let's look at what they do in their

3  lost profits analysis.  You remember the factors,

4  demand, demand is a factor.  What does their expert have

5  to say about that?

6          The demand for this feature is not the

7  basis for demand for SAP's products, right?  That's

8  true, I agree with that.  Then the other factor, you

9  didn't analyze the existence of noninfringing

10 alternatives.  This is an important point because if

11 customers could go elsewhere, if customers could go

12 elsewhere other than price -- other than Trilogy or

13 other than SAP, then Trilogy can't claim they would have

14 gotten those sales.

15          A lot of this sounds like complex

16 economics, but it's really common sense.  If you can't

17 go to one place to get something, does that mean you're

18 going to go to the other -- to one other place if

19 there's actually 10 or 15 options?  And that's just

20 why -- that's why this is sort important, but Mr. --

21 Mr. Weinstein didn't do his homework.  He didn't do his

22 homework.

23          I assumed, that's a great word, that's a

24 great word to base $285 million on.  I assumed there

25 were no acceptable noninfringing alternatives.

1        And lastly let's look at how he figured

2 out the lost profits.  He looked at only their top 10

3 customers, their 10 best customers, and he did that not

4 because it was sound economics, not because it was

5 rational under the law, not because it squared with his

6 common sense.  He did it because Mr. Smith told him to.

7        So what is the right approach?  The right

8 approach is a reasonable royalty, which is what the law

9 says.

10        You heard the testimony of Mr. Wagner, it

11 was unrebutted.  They didn't put on a witness to rebut

12 him.  He went through loads and loads of information,

13 went through all the factors that go into this analysis,

14 showed you how the feature was just a tiny part of SAP's

15 software.  Showed that it turned out to not be very

16 important, that it didn't drive sales, you heard that

17 from Mr. Childs and Mr. Tully.  None of these customers

18 ever mentioned this feature.  It's a very small feature.

19        Now, that's not to criticize the feature,

20 but in a program that has hundreds of thousands of

21 features and there's one small feature and you're going

22 to hang $285 million on that, that does not make common

23 sense.  He concluded that a fair royalty was $2 million.

24        And I submit to you if before you came in

25 here you heard about a product that no one was ever

1  shown to actually use, only the capability that was

2  never shown to drive a sale or close a deal, and that a

3  company had abandoned from selling starting in about

4  1999, they'd just given up selling it, you'd think $2

5  million was a great deal, was a great deal under those

6  facts.  And it is a great deal for them and it is a

7  reasonable deal.

8            Now, let me talk about a couple of other

9  things.  I'm -- I'm running out of time, but let me say

10  something about what I think has been a real smokescreen

11  in the last couple of days.

12            They say, well, you haven't taken it out.

13  You haven't taken this out and people are still using

14  it.

15            Number one, there's no evidence that

16  anyone's ever used it.  You saw that survey, what was

17  bogus about that survey, got to get that three part

18  component.  They never asked the right question.  But

19  the Judge is going to tell you something to straighten

20  this out.  The software that's already sold is exactly

21  what we are here to pay a reasonable royalty on.  And

22  the Judge will tell you in his instructions about

23  pre-existing customers, that there's no obligation for

24  us to go rip that out because this is what you guys are

25  here to decide, what is reasonable for that capability,

1    that small capability in our software.

2                    THE COURT:  You've got five minutes

3    remaining.

4                    MR. MELSHEIMER:  Now, what about the

5    changes that we made?  You heard from Dr. Mercer that --

6    first of all, that it's technically always been an

7    option but that once people get the upgrade, once people

8    get the new maintenance, the feature is totaled

9    disabled.

10                    So if you want any new SAP, if you're a

11   new customer, or if you want an upgrade -- and who

12   doesn't want an upgrade, if you're an existing

13   customer -- the functionality just disappears.  It's out

14   there.

15                    Now, how is it disabled?  Well, he told

16   you that.  They took out one way of doing the

17   combination of hierarchical access with customer

18   hierarchy.  It's not allowed.  And remember what -- what

19   you heard from the experts.  If you just don't do one

20   part of this, you're not infringing.  You're not

21   infringing the patent.

22                    So everyone will have the upgraded version

23   of SAP when they upgrade, and no one will be able to do

24   this.  Does that prove that people are using it?  Does

25   that prove that we thought it was important?  It proves

1  nothing of the kind.

2           Now, let's talk about something else

3  regarding this infringement work, and it's a little bit

4  of a detective issue, too.

5           Is it fair to consider the credibility of

6  the witnesses?  If you're going to come in and ask for

7  nearly $300 million -- by the way, now it's over that.

8  I don't know if you noticed that.  It's over 300.  Now

9  they're asking for $500 million.

10          In bringing you that claim, you would

11 expect them -- you would expect them to bring an

12 independent expert witness.  They did bring two,

13 Bakewell and Weinstein, but on the issue of the

14 technology, what did they do?  They brought you

15 Mr. Gupta.

16          Now, I'm not fussing at Mr. Gupta, but did

17 they look around for an independent engineering expert

18 who's highly regarded in his field?  Did they look in a

19 college or university?  Did they go out in industry and

20 find an expert?

21          They brought you someone who's worked at

22 their company for 14 years.  He's close friends with all

23 the other witnesses.  He was involved in the oversight

24 of this very lawsuit for a couple of years.  Does that

25 sound like someone who's independent?

1              How do they fix that?  They fix that by

2   saying:  Mr. Gupta, are you biased?  Well, that's the

3   problem with bias.  It's insidious.  You're not aware of

4   it.  And it can affect things that you do.

5              It's not that I think he's saying things

6   that he believes are untrue.  I don't think that at all.

7   He may well believe them.  But it's his view of the

8   truth is shaded by his prior relationships, his prior

9   positions, and his prior responsibilities.

10             What's the first thing we ask in jury

11  selection?  Where do you work?  It's important.

12  Because, you know, it might be -- Trilogy might want to

13  know that if you work at SAP, maybe you wouldn't be a

14  fair juror for them, and I agree.

15             But Mr. Gupta, again, was he unbiased?  I

16  think he was biased, and I think you can reach that

17  conclusion.

18             Now, compare him to Dr. Mercer.  We know

19  one thing about Dr. Mercer.  He was loud.  We know a lot

20  of other things about him, too, though.  He's a

21  distinguished professor.  He's got a Ph.D.  He's worked

22  at Bell Labs.  He's worked at two of the most

23  prestigious universities in the state.

24             So you're going to have to judge the

25  credibility on a very complex technology issue, and

1  you're going to have to decide.  I suggest to you that

2  it's Mr. -- it's Dr. Mercer that's more credible.  And

3  Dr. Mercer explained to you how the feature was disabled

4  and how there's no future infringement.

5            Now, as to the questions in the charge,

6  I'm going to tell you to answer those no and to answer

7  the reasonable royalty of $2 million.  And that's what

8  you should consider.  They shouldn't get lost profits,

9  and they should get a reasonable royalty of $2 million.

10            But let me suggest to you that there's

11  some other questions you might want to ask yourself that

12  aren't on the charge.  And I'm going to finish very

13  quickly.

14            If Pricer was so good, how come nobody

15  bought it after 2001, even if -- even companies that

16  weren't using SAP?

17            If Pricer was so promising, why did

18  Trilogy's own projection show it as a decreasing

19  percentage of revenue beginning in 1997?

20            Why didn't a single SAP customer cite

21  hierarchy access as a reason to buy SAP software?  If

22  SAP's hierarchy access was the cause of Pricer's

23  decline, how come Trilogy never even heard of it?

24  Remember that?  They hadn't even heard of it before

25  2007.  It's killing your business, and you've never even

1 heard of it?

2         (5) If SAP took or copied anything

3 belonging to Trilogy, why was the infringement not

4 determined to be deliberate?  Because we didn't take

5 anything belonging to them or copy what they were doing.

6         (6) Why can't Trilogy name a single one of

7 those lost 93 customers?

8         Now, again, you're going to answer some

9 questions on the verdict form.  Let me suggest to you

10 these questions are pretty important as well.  And

11 maybe, maybe counsel for Trilogy will answer them when

12 he gets up here to speak to you as we're concluding.

13         Thank you very much for your time.  I

14 can't tell you how much I appreciate it.  The reasonable

15 royalty in this case is $2 million.  It's not 170

16 million, like Trilogy suggested.  It's certainly not

17 lost profits of $285 million.

18         Because remember what Mr. Weinstein told

19 you.  A patent is not a license to succeed.  It's not.

20 And God bless them, they tried hard; they succeeded in

21 some things; but they didn't succeed in selling Pricer.

22 And it didn't have anything to do with SAP.

23         Thank you for your time.

24         THE COURT:  Thank you, Mr. Melsheimer.

25         Mr. Baxter, you've got 14 minutes

1 remaining for rebuttal.

2          MR. BAXTER: Thank you, Your Honor.

3          Did you say 14, Judge?

4          THE COURT: Yes, sir.

5          MR. BAXTER: May it please the Court.

6          May I have the first slide, Mr. Diaz?

7          You know, when we started out in this

8 case, I heard this a lot from Mr. Melsheimer: Fair

9 competition. I hate it, I just hate it when the defense

10 is: We just competed with you fairly. So I want to

11 talk about that before I get down to the real issues.

12          The next slide.

13          Here's what they did. They used our

14 intellectual property. They can't even deny it now.

15 They infringed our patent, and they used it and put it

16 in their product. And I say that's not fair.

17          What else did they do? They refused us

18 access to the SAP product.

19          We said: Look, guys, we've got a really

20 good product. They looked at it, and they said: You

21 know what? It's really good. By the way, you can't use

22 it on our product because we're going to use it

23 ourselves. That's not fair.

24          What else did they do? They told

25 customers: Don't buy Trilogy. They told them: Look,

don't do it.  We're going to come out with something one
of these days.  By the way, we're going to have to use
their stuff, but it will be okay.  It will be good.

What else did they do?  They froze the
market.

They said:  In 1997, we're going to come
out with a product.  As late as April 1998, they didn't
have it.  They couldn't do it.  They showed it to
Bridgestone, and it didn't work.  Bridgestone said:
We're not buying that.  We're going with Trilogy.  But
they wanted people not to buy the Trilogy product.

What else did they do?  They said:  Oh-ho,
if you work with Trilogy, we're not going to work with
you.

All of that is unfair competition, but
that's exactly what they did, because they couldn't
compete.  And at the end of the day, they had to have
our technology in order to sell a product.

Now, what I really want to talk to you
about, however -- and you saw all those documents that
we showed you, but what I really want to talk about are
the Panduit factors, because that's really what the
Judge is going to ask you about.  And it's important to
focus on those.

And here's the very first one:  Demand for

the patented product.

Mr. Diaz, can I have the first slide on that?

Here is the issue. Did somebody want pricing? Well, who in the world comes into court and tells you that they really did it? It's SAP.

Because we got one of their documents from 2008, and here's what they said. They formed up a new committee to change their pricing product, our product, to see if it won't really get even better. We'll add some more features to it.

And what did they do? They tell the committee: Here's what we've got. We have very high and must-have features in this that people want and have to have if they're going to do pricing.

Can we go to the back, Mr. Diaz?

Here's what it says: Very high. More than 75 percent of our customers need this functionality, 75 percent.

Then they say: Must have. The functionality is absolute. Customers won't buy it without it.

Now, here's where we come to the crux of the matter. If in 2003, when the patent comes out, they had just stopped using it and not continued on to use

it, or even after 2007, when we filed the lawsuit, if

they had stopped then, that would be one thing.  But

they didn't.  They just kept right on going.  They just

kept right on using it.  And you know why?  Because

they've got to have the pricing product in their suite

that they sell to customers.

Thank goodness for John Tully.  What did

John Tully come into court and tell you about today?  He

said -- go to the next one, if you would, Mr. Diaz.

I asked him today -- you heard him -- I

said:  Is pricing important?

He didn't just say yes.  He said very.

I said:  By the way, I want you to, right

upfront, tell your customers, I don't have pricing.  I

can't do that for you.  Sorry.

And he says:  Oh, are you saying we

wouldn't have it?  If we tell a customer we didn't have

pricing ability in our software?

And I said yes.

And he said:  That would be a very bad

day.

And the reason is, they've got to offer

pricing to their customers.  We found that back in '95,

'96, '97, and '98 when we looked at all their documents.

What did they tell us?  They told us they had to have

1    it.  They're going to go get it.  They looked at the

2    Trilogy product, and the head engineer said:  It is very

3    easy to use, and that's why we can't compete in the

4    marketplace.

5              You can send for those documents from

6    Judge Everingham.  He'll send them in there, and you can

7    look at them.  And I urge you to do it.

8              But that's why the answer to Question No.

9    1 on demand, under the Panduit factors that Judge

10   Everingham is going to talk to you about, the answer is,

11   absolutely, there was a demand for the product.

12             What about the absence of non-infringing

13   products?  Can you remember what we did about that?

14             Mr. Diaz, go to the first one.

15             Dr. Becker got on the stand, and

16   Dr. Becker was their man that was going to say:  Oh,

17   I've looked at all this, and it's all non-infringing

18   products that are out there competing.

19             And that lasted until we started asking

20   him specific questions about the various products.  I

21   just took one of them, PeopleSoft.

22             He said:  That was a competing product.

23             PeopleSoft doesn't exist anymore.

24             He says no.

25             Bought by Oracle?

1                    Yes.

2                    And it was just an HR system, wasn't it?

3                    Yes.

4                    And it didn't have a pricing system in it,

5      did it?

6                    And he said:  I honestly don't know.

7                    But up until that time, he was telling you

8      that PeopleSoft was a great competitor and that people

9      could go out and buy PeopleSoft and have pricing, and it

10     turns out that was totally untrue.

11                   And they swore for them, and they vouched

12     for them, and he swore on it until he got caught.  And

13     then he had to admit it wasn't true.

14                   And then we went through ten of those

15     competitors, and each one of them, he had to give it up

16     that he knew they didn't compete.  Most of them didn't

17     exist.  A few of them had been bought by Oracle.

18                   And Oracle's not going to be somebody you

19     can consider to be a competitor in this, because you've

20     got to buy their whole Backbone.  You can't buy a

21     bolt-on.  There wasn't one single one of them left.  And

22     that came from the mouth of their expert.

23                   But you didn't have to really go that far.

24     Mr. Carter came in, who is very familiar with the

25     market, and he said:  Some of these are auction sites.

1    Some of them doing pricing optimization, but they don't
2    really do pricing.  There simply wasn't any competition.
3              I mean, SAP could have gone out in the
4    marketplace and bought somebody, I suppose, if they had
5    wanted it, but there wasn't anybody there.  There simply
6    were no non-infringing alternatives.  And you heard it
7    from both Mr. Carter, Mr. Gupta, but most importantly,
8    you heard it from Dr. Becker, that he simply couldn't
9    name one.  He couldn't name any.
10             No. 3 is manufacturing and market
11   capacity.  That one was pretty easy.  Even Mr. Wagner
12   today said:  You know what?  They could crank that up
13   anytime in 2003.  No problem.
14             And it's not that we abandoned the market.
15   We were still in the market.  We were out there
16   servicing all of our clients that we had from 1998 and
17   1999 and 1997.  We still had a team that was still
18   working on the software, and we could have put it out,
19   and they've not really contested that.
20             The amount of profit.  Well, what did we
21   say about that?  They said and they had their experts
22   say:  If you look at the profit of Trilogy overall for
23   one particular year, you can only find 6 percent.
24             And I asked him:  Is the Judge going to
25   ask the jury about the profit of the company or the

profit of the product?

And he said:  It's the profit of the product.  And he did not have one word to say about that.  He didn't offer an expert opinion on it.  He didn't do any research on it.

He tried to have a chart that eventually he was embarrassed to even show you.  I had to drag it out and put it up there on the stand where he had used some spreadsheet that was totally fallacious to figure up some profit number for one year for one-third of their business, and he finally had to admit it was all wrong and he couldn't use it.

No opinion from anybody that SAP put on the stand about the profit of this particular product.  But you do have Mr. Weinstein.

Mr. Diaz, can you put that slide up for me?

It said:  Look, here's what we're going to do.  We're going to look at their top 10 people.  Not in the whole company, but the top 10 people that had Pricer as the lead product.  And we're going to look at it over the entire span of the products starting in '96 but also including 93.

And what do we find?  That that product, when you look at the license, when you look at the

1  revenue that it generated for maintenance, and you look

2  at service, you look at all three, $778 million.

3          Now, folks that's a lot of money, but it

4  tells you how important the product was to these top 10

5  companies.

6          And as Mr. Weinstein said, he segmented

7  the market so that we're only looking at the very

8  largest companies, and those are the companies -- and

9  actually, we only looked at 1200 of them.  We looked at

10 the ones that SAP is in there doing business and selling

11 their Pricer product to.  The rest of the market we gave

12 back to them.  We haven't been try to get damages for

13 that.

14         THE COURT:  You've got five minutes

15 remaining.

16         MR. BAXTER:  Thank you, Your Honor.

17         Now, a profit of -- put that back up just

18 a second, Mr. Diaz -- of 72 percent.  All we're asking

19 for in this case is not those kinds of numbers.  We're

20 only asking for a million eight for the 93 that we would

21 have sold had they not given it away for free.

22         And remember, at one time they were going

23 to charge for it, and then, apparently, they had a board

24 meeting, and they said:  You know, we just gave it away

25 for free.  That little gnat of Trilogy, we can just swat

away.  And that's exactly what they did, and that's why
we deserve that particular money.

I'm going to look at the charge for you --
with you just a moment, if we can, Mr. Diaz.

And the very first question has to do with
infringement.  And this really has to do, not with
whether or not they infringe the '350 patent.  That's
already been established.  That was established in 2009.
It's about the patch.

And can you go to the slide that shows the
patch, Mr. Diaz?

And I noticed that Mr. Melsheimer didn't
really want to talk to you about the patch very much,
but here's what happened, and here's how it works.

If you were to look at this being the
product, they wanted to fence it off, okay, but here's
what they did.

Go to the next slide.

The first thing they did is they said:
Well, we're going to exempt -- just on their own, they
said:  We're going to exempt all our prior customers
prior to May of 2010.  And that's about 99 percent of
them.

So 99 percent of you get a free pass, and
they're already inside tromping on the intellectual

1  property that they infringe.

2          Then they said:  Well, wait a minute.

3  There may be a hundred that are new customers, and so

4  what we're going to do is, we're going to tell the jury

5  that we stopped giving it to them.

6          But the way it works is, they can go out

7  and buy a tool just off the shelf at any software store

8  that would allow them to open the gate and get in there

9  and use it, too, something that they already have.

10          You remember the document you saw today

11  where they were going to disable the SAP tool, and they

12  had so many complaints, they had to go back and undo

13  that?

14          That might have been a work-around, but

15  they gave it up and went to something different that

16  didn't work so that these customers -- because all

17  they've got to do is get that A -- the letter A in the

18  chart, and it works like a charm, and this tool will

19  allow you to do it.

20          But there's something else, and that is

21  there's a third way.

22          THE COURT:  You've got two minutes.

23          MR. BAXTER:  Thank you.

24          And that is, there are other gates to go

25  through, because there are other hierarchies that you

can use to get in the gate.  And that's why -- if you go
back to the chart, Mr. Diaz -- the answer to No. 1 is
yes, yes, yes.

These are the three claims.  These are the
three claims they've already been found to infringe in
2009, and they still infringe them with the patch.

Question No. 2 has to do with inducement.
By the way, to have a claim of inducement, you have to
have intent, and it's already been determined in the
previous determination that the answer was yes, and they
intended to do it.  So you put down yes, too.

No. 3 has to do with what's known as
contributory infringement.  Same issue.  The same thing
that was found in 2009, and the answer is yes.

Go to the next question.

You know what?  It's a lot of money, but
the truth is, they took our intellectual property, and
they put us out of business doing that, and that's a
small fraction of what we could have made.

The next one has to do with the reasonable
royalty.  That's not something we asked for.  It's
something they brought up.  But once they did, when you
run the numbers, it turns out to be $170 million just
using what Mr. Wagner said was appropriate.

If you look at a company that sold the

software at $140,000 a pop and look at the math, and it's $170,000, and I urge you to do that.

Go to the poll for me, would you, Mr. Diaz.

Now, this is something I don't think I've ever seen before in a patent case, and that is -- and I understand why they did it, because Mr. Melsheimer said they were afraid that when they came in here, they were already behind because they were found to be infringers. And that's worried them right from the first, just like he said.

So here's what they did. They decided to have a defense by smearing people. Mr. Gupta, Mr. Carter, it didn't make any difference who took the stand. They had something bad they were going to say.

You went on a vacation with Mr. Liemandt; therefore, you must be a perjurer. I've never seen such. He sent you to Harvard. Gosh, you must be lying.

THE COURT: Mr. Baxter, pardon me for interrupting you.

MR. BAXTER: Yes.

THE COURT: Your time has expired.

MR. BAXTER: Ladies and Gentlemen, I want you to take that into consideration when you write your answers down to these questions. We thank you very much

1  for your time and your consideration.

2             Thank you, Your Honor.

3             THE COURT:  Thank you, Mr. Baxter.

4             Ladies and Gentlemen of the Jury, you have

5  heard the evidence presented by the parties to this suit

6  and the argument of the respective attorneys in support

7  of their positions.  It is now my duty to give you the

8  charge in this case.

9             It will be an oral charge and is given in

10 an effort to assist you in your deliberations in

11 deciding the issues which you must decide in order to

12 reach a fair and impartial verdict in this case.

13 Perhaps this function of the Court is the most important

14 one the Court performs in the trial of a case, so I ask

15 you to pay close attention to my remarks.

16            You will remember that at the beginning of

17 this trial, I gave you some general instructions and

18 definitions.  Rather than repeat them, I ask you to

19 recall them now in deciding the facts and issues which

20 you are to decide.

21            As I instructed you at the beginning of

22 the trial, you are the exclusive judges of the facts,

23 the credibility of the evidence, and the weight to be

24 given the testimony of the witnesses.

25            You are to perform your duty without bias

or prejudice to any party.  The law does not permit
jurors to be governed by sympathy or prejudice.

A corporation and all other persons are
equal before the law and must be treated as equals in a
court of justice.

The Court and the parties expect that you
will carefully and impartially consider all of the
evidence, follow the law as I will give it to you, and
reach a just verdict.

You are instructed that all persons,
including the Plaintiff and the Defendant in this case,
stand equal before the law and are to be dealt with as
equals in this court.  The law is no respecter of
persons.

Now, I will now briefly review the
contentions of the parties and give you some additional
instructions and definitions that will guide you in
deciding the issues or facts that you must resolve in
this case.

The Plaintiff, Versata, also referred to
as Trilogy, seeks damages from the Defendant, SAP, for
infringement of Claims 26, 28, and 29 of the United
States Patent No. 6,553,350 B2, which has been referred
to as the '3-5-0 patent or the '350 patent.

It was previously determined that SAP

directly infringed Claims 26, 28, and 29 of the '350 patent and indirectly infringed Claim 29 of the '350 patent between April 22, 2003, and May 5th, 2010, by making, selling, offering for sale, using, or importing into the United States its R/3 4.6B; R/3 4.6C; R/3 Enterprise 47x110; R/3 Enterprise 47x200; mySAP ERP 2004; ERP 6.0 (also known as mySAP ERP 2005); CRM 2.0C; CRM 3.0 (IPC 3.0); CRM 3.1 (or IPC 3.0); CRM 4.0 (IPC 4.0); CRM 5.0; CRM 6.0 (also known as CRM 2007 and CRM 7.0).  Versata seeks damages in the form of lost profits to compensate it for SAP's infringement.

On May 6th, 2010, SAP modified its infringing products.  These will be referred to as the modified products.

Versata alleges that SAP continues to directly infringe Claims 26, 28, 29 of the '350 patent and indirectly infringes Claim 29 of the '350 patent by making, selling, offering for sale, or using the modified products in or importing the modified products into the United States.

Versata seeks additional damages for SAP's direct infringement of Claims 26, 28, and 29 and SAP's indirect infringement of Claim 29 of the '350 patent since May the 6th, 2010.

Now, SAP denies Versata's claims.  SAP

denies that its modified products continue to directly

infringe Claims 26, 28, and 29 of the '350 patent.  SAP

denies that its modified products continue to indirectly

infringe Claim 29 of the '350 patent.

SAP also contends that Versata failed to

properly mark its products.  SAP also contests the

amount of damages that Versata is entitled to.  SAP also

contends that Versata is not entitled to damages in the

form of lost profits and instead contends that Versata

is entitled to a reasonable royalty for the alleged

infringement.

Now, Versata bears the burden of proof by

a preponderance of the evidence that SAP's modified

products directly infringe the asserted claims of the

'350 patent.

Versata also bears the burden of proof by

a preponderance of the evidence that it gave notice to

the public that its claimed inventions were patented by

marking (in other words, placing on the product the word

patent or the abbreviation P-A-T with a number of the

patents) substantially all of the products Versata and

its licensees sold that included or used the patented

invention.

Versata also has the burden of proving by

a preponderance of the evidence the amount of lost

profits damages, if any caused by SAP's infringement.

I will now give you some instructions and definitions to help you in answering the questions to follow.

With respect to claim interpretation, Versata contends that SAP's modified products infringe the '350 patent. To decide the questions of infringement, you must first understand what the claims of the patent cover, that is, what they prevent anyone else from doing. This is called claim interpretation.

It's my duty under the law to interpret what the words used in the patent claims mean. I have made my determination, and I will instruct you accordingly. You must apply the meaning I give the patent claims to your decisions on infringement.

I will now instruct you how those words are to be construed and understood when deciding the issues of infringement. You have been provided with written copies of the '350 patent and copies of these claim term definitions, and you may use them during your deliberations.

Now, the term "according to said hierarchy" means according to respective hierarchical levels.

The terms "applying" and "applied" mean

determine how to use and use in the manner determined.

The term "computer instructions to implement" means computer instructions causing a computer to implement.

The term "computer readable program code configured to cause a computer" means program instructions, including software providing those instructions to cause a computer.

The term "denormalized number" means a number used as a price adjustment that does not have fixed units and may assume a different meaning and different units depending on the pricing operation that is being performed, the specific units to be associated with the number, and how the number will be applied or determined during run time, the time that the system uses the pricing adjustment data to determine the price of the product offered to the purchasing organization.

The term "each of said pricing adjustments" means each pricing adjustment mentioned in any limitation of the referenced independent claim.

The term "hierarchy" means a branching arrangement of at least two levels of data.

The term "organizational group or groups" means groups of purchasing organizations where each group has a characteristic.

1    The term "plurality" means at least two.

2    The term "pricing adjustment" or "pricing
3    adjustments" means a denormalized number that may affect
4    the determined price.

5    The term "pricing information" means any
6    information relating to price, other than an adjustment
7    to price, that is not a denormalized number.

8    The term "pricing type" means a class or
9    category of pricing adjustments.

10    The term "products" means any goods or
11    services offered in commerce.

12    The term "product group or groups" means
13    one or more products or services grouped together.

14    The term "purchasing organization" means
15    any organization that purchases goods or services
16    offered in commerce.

17    The term "receiving the price of the
18    product determined using pricing information applicable
19    to the one or more identified organizational groups and
20    the one or more identified product groups according to
21    the hierarchy of product groups and the hierarchy of
22    organizational groups" means receiving the product's
23    price which was determined by taking into account the
24    respective levels of applicable pricing information in
25    the product hierarchy and respected levels of applicable

pricing information in the organizational hierarchy.

The term "sorting the pricing information" means the pricing information is ordered.

The term "storing" means recorded in any manner.

And the term "the pricing information that is less than restrictive" means pricing information that is less specifically applicable to a product, a purchasing organization, an organizational group, or a product group.

Now, with respect to determining infringement, once the patent is issued, the owner of a patent has the right to exclude others from making, using, offering to sell, or selling the patented invention throughout the United States or importing the patented invention into the United States for a term of 20 years.

Thus, infringement occurs when a person, without the owner's permission, makes, uses, offers to sell, or sells the patented invention anywhere in the United States or imports the patented invention into the United States while the patent is in force.

To determine whether there's an infringement, you must compare the allegedly infringing modified products with the scope of the patent claims as

I have defined them for you.  You should not compare the
Plaintiffs' commercial embodiment of its invention to
the allegedly infringing modified product to determine
whether there is an infringement.

In order to infringe a patent claim, a
product or a method must include each and every
limitation of the claim.  In determining whether SAP's
modified products infringe Versata's asserted claims,
you must determine for each accused product or its
method of use whether that product or its method of use
contains each and every limitation recited in a claim.

A claim limitation is present if it exists
in the accused product or its method of use just as it
is described in the claim language, either as I have
explained that language to you, or if I did not explain
it, as it would be understood by a person of skill in
the art.

If such products or their methods of use
omit even a single limitation, then you must find that
the claim is not infringed.  You must consider each of
the patent claims separately.

If you find that each and every limitation
of a patent claim is found in the accused products or
their methods of use, then the claim is infringed, even
if the accused products or their methods of use may be

1  more or less efficient or may include additional

2  features or functions not found in the claims.

3          Whether or not SAP knew that what it was

4  doing was an infringement does not matter for direct

5  infringement.  A person may be found to be a direct

6  infringer of a patent even if he or she believed in good

7  faith that what he or she was doing was not an

8  infringement of any patent and even if he or she did not

9  know of the existence of the patent.

10          Now, the asserted claims use the word

11  "comprising."  When a claim uses the word "comprising,"

12  comprising means including or containing.

13          A claim that uses the word "comprising" or

14  "comprises" is not limited to products having only the

15  elements that are recited in the claim but also covers

16  products that add additional elements.

17          Let's take as an example a claim that

18  covers a table.  If the claim recites a table comprising

19  a tabletop, legs, and glue, the claim will cover any

20  table that contains these structures even if the table

21  also contains other structures, such as a leaf or wheels

22  on the legs.

23          Let's talk about dependent claims.  My

24  instructions on infringement so far have related to

25  independent claims.  Patent claims may exist in two

forms referred to as independent claims and dependent claims.

An independent claim does not refer to any other claim in the patent. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. Claim 29 in the '350 patent is an independent claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claim to which it refers, plus additional elements recited in the dependent claim itself.

Claim 26 in the '350 patent is a dependent claim that depends on Claim 17 of the '350 patent. In order for you to find that Claim 26 of the '350 patent is infringed, you must first find that Claim 17 is infringed.

If you find that independent Claim 17 of the '350 patent is not infringed, you must find that dependent Claim 26 is also not infringed.

Claim 28 in the '350 patent is a dependent claim that depends on Claim 27 of the '350 patent. In order for you to find that Claim 28 of the '350 patent is infringed, you must first find that Claim 27 is infringed.

1          If you find that independent Claim 27 of

2  the '350 patent is not infringed, then you must also

3  find that dependent Claim 28 is not infringed.

4          Now, with respect to induced infringement,

5  in addition to enforcing a patent against a direct

6  infringer, a patent owner may also enforce the patent

7  against indirect infringers.

8          There are two types of indirect

9  infringement:  Inducing infringement and contributory

10 infringement.

11         The act of encouraging or inducing others

12 to infringe a patent is called inducing infringement.

13         The act of contributing to the

14 infringement of others by, for example, supplying them

15 with components used in the patented invention, is

16 called contributory infringement.

17         Now, Versata asserts that SAP has induced

18 infringement of Claim 29 of the '350 patent.  To show

19 inducement, Versata must prove by a preponderance of the

20 evidence that a third party has directly infringed the

21 patent.

22         If there's no direct infringement by a

23 third party, SAP has not induced infringement.  If you

24 find that a third party has directly infringed Claim 29

25 of the '350 patent, it is not necessary to show that SAP

itself has directly infringed if Versata proves by a preponderance of the evidence that SAP actively and knowingly aided and abetted that direct infringement.

Furthermore, Versata must show that SAP actually intended to cause the acts that constitute direct infringement and that SAP knew or should have known that its actions would induce actual infringement.

Inducing third-party infringement cannot occur unintentionally.  This is different from direct infringement, which can occur unintentionally.

If you find that a third party has directly infringed Claim 29 of the '350 patent and that SAP knew -- SAP knew or should have known that its actions would induce direct infringement, you may find that SAP induced another to infringe Versata's patent if SAP provided instructions and directions to perform the infringing act through labels, advertisements, or other sales methods.

You may also find that SAP induced infringement by supplying the components that are used in an infringing apparatus with the knowledge and intent that its customer would directly infringe by using the components to make, use, or sell the patented invention.

With respect to contributory infringement, Versata asserts that SAP is liable for contributing to

the infringement of Claim 29 of the '350 patent.

Versata has the burden to prove contributory infringement by a preponderance of the evidence.

To establish contributory infringement by SAP, Versata must first show that a third party directly infringed one of the asserted claims of the patent; however, Versata does not need to prove that SAP itself directly infringed.

If there is no direct infringement by a third party, there can be no contributory infringement.

Now, if you find a third party has directly infringed the patent, then contributory infringement exists if Versata proves that:

(1) SAP sold or offered for sale in the United States;

(2) a material component of the patented invention that is not a staple article of commerce capable of substantial non-infringing use;

(3) with knowledge that the component was especially made or adapted for use in an infringing product.

A staple article of commerce capable of substantial non-infringing use is something that has uses other than as a part or component of the patented

product or other than in the patented method and those

uses -- excuse me -- and that those uses are not

occasional, farfetched, impractical, experimental, or

hypothetical.

Now, I will now instruct you as to the

calculation of damages.

As I have mentioned, it has been

previously determined that SAP directly and indirectly

infringed certain claims of the '350 patent between

April 22nd, 2003, and May 5th, 2010.

Your job as the jury in this case will be

to determine the amount of money that Versata should

receive as damages for that period.  If you determine

that SAP's modified products have continued to infringe

any of the claims -- any of the asserted claims of the

'350 patent since May 6th, 2010, then you should also

award Versata damages for the period from May 6th, 2010,

until today.

Versata has the burden of proving by a

preponderance of the evidence the amount of damages

caused by SAP's conduct.  Even though I am instructing

you on how you should measure damages and even though I

am instructing you that SAP's products infringed the

patent prior to May 6th, 2010, this should not be taken

to mean that I believe that SAP's modified products have

1  infringed the patent.

2          This is an issue for you to resolve under

3  the instructions I have given you.  I am instructing you

4  on damages only so that you will have guidance to

5  determine damages for infringement that has previously

6  been determined and so that you will have guidance

7  should you decide that SAP's modified products have

8  infringed the patent.

9          Versata is asking for damages in the

10  amount of lost profits.  To be entitled to lost profits,

11  Versata must first prove that but for any infringement,

12  it would have made additional sales and profits on those

13  sales.  You may hear this referred to as the but-for

14  test.  I will discuss lost profits in more detail

15  shortly.

16          Now, should you determine that Versata has

17  failed to prove with reasonable certainty its claim for

18  lost profits, you should award Versata a reasonable

19  royalty to compensate it in lieu of such profits.

20          You should also award a reasonable royalty

21  to Versata to compensate it for infringing sales of

22  SAP's products that were not included in Versata's lost

23  profits claim.

24          A reasonable royalty, which I will discuss

25  later in more detail, is defined by the patent law as

the reasonable amount that someone wanting to use the
patented invention should expect to pay to the patent
owner and the owner should expect to receive.

A patent owner may recover no less then a
reasonable royalty.  The amount of damages must be
adequate to compensate Versata for the infringement, but
in no event less than a reasonable royalty.

I will first instruct you about lost
profits damages.  Simply stated, lost profits damages
are the profits that Versata lost because of the
infringement.  They are not the profits SAP made.

Versata has the burden to show that it was
more probable than not that it would have made
additional profits if SAP had not infringed.

Versata may receive damages for lost
profits only on those products that compete with SAP's
products that infringe.  Versata may not receive lost
profits damages for other products or services that
might be sold along with a competing product for
convenience or business advantage but that are not
functionally part of the competing product.

In deciding whether Versata lost sales,
you should consider whether or not Versata has proved
that it had the manufacturing capacity and the marketing
capability to make the sales it says it lost.

1          Versata must prove that it was more
2  probable than not that it could have made or could have
3  had someone else make for it the additional products it
4  says it could have sold but for the infringement.
5  Versata also must prove that it had the capability to
6  market and sell the additional products.
7          You must also consider whether or not, if
8  SAP's infringing products were not available, some or
9  all of the people who bought from SAP would have bought
10 a different non-infringing product from SAP or from
11 somebody else rather than buy from Versata.
12         In deciding whether or not people who
13 bought from SAP would have bought a non-infringing
14 product, you should consider whether or not there was
15 such a demand for the patented aspects of the infringing
16 product that purchasers would not have bought a
17 non-infringing product.
18         If you find infringement, you may consider
19 demand for the infringing features of the accused
20 products to be demand for the patented invention.
21         It is not necessary for Versata to prove
22 that it and SAP were the only two suppliers in the
23 market in order for -- for Versata to demonstrate
24 entitlement to lost profits.
25         If the realities of the marketplace are

such that acceptable non-infringing substitutes were available from suppliers who would have made some but not all of the sales that were made by SAP, then Versata may be entitled to lost profits on a portion of the infringing sales.

The burden is on Versata, however, to show a reasonable probability that it would have sold that portion if SAP's product had never existed.

If Versata has proved that it lost profits due to the infringement by SAP, then you are to find the amount of profits that it lost. Versata must prove the amount of its lost profits to a reasonable probability. The amount of lost profits damages should not include amounts that are merely speculation.

You have heard evidence that SAP modified its products in May 2010 and that it did not require prior users to implement the modified product. Your damages award will compensate Versata for damage resulting from that infringement and will license SAP to use the '350 patent for those users.

You should not infer that SAP was required to disable the infringing functionality because of the prior determination of infringement. I have allowed you to consider this evidence because it may be relevant to the question of demand for the patented technology.

1    I will now instruct you about reasonable

2 royalty damages.

3    Generally, a reasonable royalty is defined

4 by the patent laws as the reasonable amount that someone

5 wanting to use the patented invention should expect to

6 pay the patent owner and the owner should expect to

7 receive.

8    A royalty is the amount of money a

9 licensee pays to a patent owner for each article the

10 licensee makes or uses or sells or offers to sell under

11 the patent or for the right to use the claimed method.

12    A reasonable royalty is the amount of

13 money a willing patent owner and a willing prospective

14 licensee would have agreed upon at the time of the

15 infringement for a license to make, use, sell, or offer

16 to sell the invention.

17    In making your determination of the amount

18 of a reasonable royalty, it is important that you focus

19 on the time period when the infringer first infringed

20 the patent and the facts that existed at that time.

21    Your determination does not depend on the

22 actual willingness of the parties to this lawsuit to

23 engage in such negotiations.  Your focus should be on

24 what the parties' expectations would have been had they

25 entered negotiations for royalties at the time of the

infringing activity.  The infringer's actual profits may or may not bear on the reasonableness of an award based on a reasonable royalty.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are;

(1) whether the patent-holder had an established royalty for the invention; in the absence of such a licensing history, any royalty arrangements that were generally used and recognized in the particular industry at that time;

(2) the nature of the commercial relationship between the patent owner and the licensee, such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

(3) the established profitability of the patented product, its commercial success, and its popularity at the time;

(4) whether the patent owner had an established policy of granting licenses or retaining the patented invention as its exclusive right or whether the patent-holder had a policy of granting licenses under special conditions designed to preserve his monopoly;

(5) the size of the anticipated market for the invention at the time the infringement began;

(6) the duration of the patent and of the license, as well as the terms and scope of the license, such as whether it is exclusive or nonexclusive or subject to territorial restrictions;

(7) the rates paid by the licensee for the use of other patents comparable to the Plaintiffs' patent;

(8) whether the licensee's sales of the patented invention promote sales of its other products and whether the invention generates sales to the inventor of his non-patented items;

(9) the utility and advantages of the patent property over the old modes or devices, if any, that had been use for working out similar results;

(10) the extent to which the infringer used the invention and any evidence probative of the value of such use;

(11) the portion of the profits in the particular business that are customarily attributable to the use of the invention or analogous inventions;

(12) the portion of the profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process,

business risks, or significant features or improvements

added by the infringer;

(13) the opinion and testimony of

qualified experts and of the patent-holder;

And finally (14) any other factors which

in your mind would have increased or decreased the

royalty the infringer would have been willing to pay and

the patent owner would have been willing to accept

acting as normally prudent business people.

You must not award the Plaintiff more

damages than are adequate to compensate for the

infringement nor shall you include any additional amount

for the purpose of punishing the Defendant or setting an

example.

You should not include damages that are

speculative, damages that are only possible, or damages

that are based on guesswork.

You may not award damages based on the

entire value of SAP's accused products unless you first

determine that it was the patented invention, as

distinct from other non-infringing elements or features

of the accused products, that caused the consumer demand

for the accused product as a whole.

You may not award damages for

non-infringing products or services unless you find that

1  the infringement caused the -- caused the customer to

2  purchase those products or services.

3  In addition, the non-infringing elements

4  or features of the accused products must function

5  together with the infringing features of the accused

6  products in some manner so as to produce a desired end

7  product or result.

8  All of the components together must be

9  analogous to components of a single assembly or be parts

10 of a complete machine or they must constitute a

11 functional unit.

12 If you find that SAP is liable for

13 contributory infringement or inducement of infringement

14 in connection with Claim 29 of the '350 patent, you

15 should award damages for infringement of that claim only

16 for instances of direct infringement shown by a

17 preponderance of the evidence that occurred after

18 April 20th, 2007, the date this suit was filed.

19 And with respect to marking, Versata may

20 recover damages for infringement that has occurred only

21 after Versata gave notice to SAP of its patent rights

22 directly or by public notice.

23 It is Versata's burden to prove that it is

24 more probable than not that it gave notice to the public

25 that its claimed inventions were patented.

1    Versata can give notice to the public in
2    general by placing the word "patent" or the abbreviation
3    P-A-T with the number of the patents on substantially
4    all of the products it sold that included or used the
5    patented invention.
6    Versata must take reasonable efforts to
7    ensure that its licensees who use the patented invention
8    also mark with the patent number substantially all of
9    their products that include the patented invention.
10   Marking notice is effective from the date
11   Versata and its licensees began to consistently and
12   continuously mark substantially all of their products
13   that use the patented invention with the patent number.
14   If Versata and its licensees did not mark
15   substantially all of their products that use the
16   patented invention with the patent number, then Versata
17   did not provide notice in this way.
18   If Versata does not demonstrate that it
19   gave this type of notice, then Versata can recover
20   damages for only those acts of infringement that
21   occurred after it sued SAP on April 20th, 2007.
22   Now, nothing that I may have said or done
23   during the course of this trial is intended to indicate
24   any view of mine as to the amount of damages you should
25   award or whether SAP's modified products still infringe.

1                   As I instructed you previously, the jury
2     is the sole judge of the credibility of the testimony
3     and the weight to be given the evidence.

4                   These instructions are given to you as a
5     whole, and you are not to single out one instruction
6     alone as stating the law but must consider the
7     instructions as a whole.

8                   You have heard all of the evidence in this
9     case, and you've heard the argument of counsel.  The
10    Court has given you the charge in this case.  In a few
11    moments, you will retire to the jury room, select one of
12    your members to act as foreperson, and begin performing
13    the function for which you have been chosen and for
14    which you have been impaneled in accordance with the
15    oath you took as jurors.

16                  You will remember that at the beginning of
17    the trial and throughout the trial, the Court admonished
18    you not to discuss the case with each other until it was
19    submitted to you.

20                  Well, now is the time for you to begin
21    your discussion, and you certainly may express an
22    opinion from the evidence that you have heard and use
23    any reasonable means to persuade other members of the
24    jury to your convictions and to your honest opinion.

25                  You are to reach a verdict which speaks

the truth and which does justice to all parties without favor, bias, or prejudice in any particular way either for or against any party to this lawsuit.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

As soon as you have reached a verdict, you will let this fact be known to the officer who will be waiting upon you, and he will report to the Court.

Now, your verdict will be in the form of questions for you to answer. You're going to take these questions to the jury room, and when you have reached a unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form and then advise the court security officer that you've reached a verdict.

During your deliberations, you may have

1  any of the exhibits which have been offered into

2  evidence, and the Court will send them to you upon

3  written request.

4         If you desire further instructions, your

5  foreperson may make this known in writing, and the Court

6  will try to comply with your wishes.  All communications

7  with the Court must be in writing, but at no time should

8  you indicate to the Court or anyone else how the jury is

9  divided in answering any particular question.

10        Any notes that you have taken during this

11 trial are only aids to your memory.  If your memory

12 should differ from your notes, then you should rely on

13 your memory and not on your notes.  The notes are not

14 evidence.

15        A juror who has not taken notes should

16 rely on his or her independent recollection of the

17 evidence and should not be unduly influenced by the

18 notes of other jurors.  Notes are not entitled any

19 greater weight than the recollection or impression of

20 each juror concerning the testimony.

21        Now, that concludes the Court's

22 instructions.  Up until now, I have set the schedule,

23 but, henceforth, you-all can set your own schedule.  I

24 mean, I'm available to work into the evening tonight, if

25 you'd like to, or you can come back in the morning, if

1   you like.  It's entirely up to you.  If you wish to take

2   a break, then y'all are in charge of setting your own

3   breaks.

4               So I will tell you, I would just ask that

5   you let me know sometime before 5:00 or 5:30 if you wish

6   to work into the evening tonight, and that way I can at

7   least make arrangements to have some staff here to --

8   to -- to help, okay?

9               I now hand the questions to Mr. Woloson.

10  He's going to follow you into the jury room, and you may

11  begin your deliberations.

12               LAW CLERK:  All rise for the jury.

13               (Jury out.)

14               THE COURT:  All right.  Any additional

15  objections to the charge as read from the Plaintiff?

16               MR. BAXTER:  No, Your Honor.

17               THE COURT:  From the Defendant?

18               MR. MELSHEIMER:  No, Your Honor.

19               THE COURT:  All right.  Court's in recess

20  pending communication from the jury.

21               (Jury deliberations.)

22               (Court adjourned.)

23

24

25

CERTIFICATION

1

2

3

4            I HEREBY CERTIFY that the foregoing is a

5    true and correct transcript from the stenographic notes

6    of the proceedings in the above-entitled matter to the

7    best of my ability.

8

9

10
      /s/_____          May 12, 2011
11   SHELLY HOLMES, CSR
     Deputy Official Court Reporter
12   State of Texas No. 7804
     Expiration Date:  12/31/12
13
      /s/_____          May 12, 2011
14   GLENDA FULLER, CSR
     Deputy Official Court Reporter
15   State of Texas No. 1042
     Expiration Date:  12/31/12
16

17

18

19

20

21

22

23

24

25