**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| VERSATA SOFTWARE INC., et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CASE NO. 2:07-CV-153 CE |
| | § | |
| SAP AMERICA, INC. and SAP AG, | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

Pending before the Court is Defendants SAP America, Inc.'s and SAP AG's (collectively, "SAP") motion for judgment as a matter of law ("JMOL") on the issues relating to damages or in the alternative new trial or remittitur (Dkt. No. 556).  In general, Defendants argue that: (1) Versata failed to prove that it is entitled to lost profits; (2) the jury's reasonable royalty verdict lacks evidentiary foundation; (3) the Court should order a new trial or remittitur; and (4) SAP's other motions for JMOL, which were denied during trial and after the conclusion of the previous trial, should be granted.  Having carefully considered the parties' submissions, the record, and the applicable law, the Court finds that the motion should be DENIED.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Following the August 2009 trial in this case, the jury found that SAP directly infringed claims 31, 35, and 36 of U.S. Patent No. 5,878,400 ("the '400 patent"), and claims 26, 28, and 29 of 6,553,350 B2 ("the '350 patent").  The jury also found that SAP induced and contributed to the infringement of claim 29 of the '350 patent.  In addition, the jury found that the asserted claims of the '400 and '350 patents were not invalid for failure to satisfy the best mode requirement.  The jury awarded Plaintiffs Versata Software, Inc., Versata Development Group,

and Versata Computer Industry Solutions, Inc. (collectively "Versata") damages in the amount of $138,641,000. (*See* Dkt. No. 318 (Verdict Form).)

On December 21, 2010, the Court granted SAP's motion for judgment as a matter of law regarding non-infringement of the '400 patent. (Dkt. No. 409.)  The Court, however, denied SAP's motion for judgment as a matter of law as to direct infringement of the asserted claims of the '350 Patent and indirect infringement of claim 29 of the '350 Patent.  On January 6, 2011, the Court granted SAP a new trial on damages.

On May 6, 2010, SAP modified the products that the first jury found infringed.  The issues of damages and infringement with regard to SAP's modified infringing products were tried to a second jury from May 9, 2011 to May 12, 2011.  After the close of evidence, the second jury found that SAP, by way of its modified infringing products, directly infringed claims 26, 28 and 29 of the '350 patent and induced and contributed to the infringement of claim 29 of the '350 patent.  The jury awarded Versata $260,000,000.00 as lost profits caused by SAP's infringement and $85,000,000.00 as reasonable royalty damages.

## III.    LEGAL STANDARD

### a)   JMOL

A motion for JMOL is a procedural issue not unique to patent law; thus, such motions are reviewed under the law of the regional circuit.  *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).  In the Fifth Circuit, JMOL may only be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did."  *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (internal citation omitted); *see also* Fed. R. Civ. P. 50(a)(1) (stating that JMOL may be granted only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue.").  In ruling on a motion for

JMOL, the court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).   The court, however, may not make credibility determinations or weigh the evidence, as those are solely functions of the jury.   *Id.*   That is, the court gives "great deference to a jury's verdict" and it should be overturned "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838 (5th Cir. 2004).

**b)  Damages**

The amount of a prevailing party's damages in a patent case "is a finding of fact on which the plaintiff bears the burden of proof."   *SmithKline Diag., Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991).   To carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case.   *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011).   Generally, patentees tend to try to fit their damages cases into either the "lost profits" framework or the statutory grant of a reasonable royalty. *See, e.g.*, 7 Donald S. Chisum, *Chisum on Patents* § 20.01 (2005) ("The three traditional modes of measuring compensatory damages are lost profits, established royalty, and reasonable royalty.").

A lost profits award requires (1) showing that the patent owner would have made the sale but-for the infringement, *i.e.*, causation existed, and (2) proper evidence for the computation of the loss of profits. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed. Cir. 1985). One way to establish causation is the four-part test applied in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).   Under *Panduit*, the patent owner must prove (1) a demand for the patented product, (2) an absence of acceptable non-infringing substitutes,

(3) the manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent owner would have made. *Standard Haven Prods. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1992) (citation omitted). However, *Panduit* is not the exclusive method of proving entitlement to lost profits. "This court has prescribed no one particular method by which the patent owner must meet [the] burden [of proving lost profits]; 'the methodology of assessing and computing damages is committed to the sound discretion of the district court.'" *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995) (quoting *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576-77 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990)); *see Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) ("This court has not restricted patentees to any one particular method of proving "but for" causation.") (citations omitted).

"[T]o prove that there are no acceptable non-infringing substitutes, the patent owner must show either that (1) the purchasers in the marketplace generally were willing to buy the patented product for its advantages, or (2) the specific purchasers of the infringing product purchased on that basis." *Standard Haven*, 953 F.2d at 1373. "However, it is not necessary for the patent holder to negate all possibilities that a purchaser might have bought a different product or might have foregone the purchase altogether." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992). "Once the patent owner establishes a reasonable probability of 'but for' causation, 'the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales.'" *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (citations omitted). The "[m]ere existence of a competing device does not make that device an acceptable substitute." *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901

(Fed. Cir. 1986). Moreover, "substitutes only theoretically possible," rather than actually available, will not limit lost profits. *Grain Processing*, 185 F.3d at 1353. If an "infringer had to design or invent around the patented technology to develop an alleged substitute" that weighs against a finding of availability. *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed. Cir. 2003).

Regarding a reasonably royalty award, as the Federal Circuit recently explained in *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010), "a reasonable royalty analysis requires a court to hypothesize, not to speculate." Therefore, "expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc*, 632 F.3d at 1317. Further, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in this case." *Id.*

### c)   New Trial

Pursuant to Federal Rule of Civil Procedure 59(a) the court "may, on motion, grant a new trial on all or some of the issues–and to any party . . . after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court . . ." Fed. R. Civ. P. 59(a). The regional circuit law generally applies to motions for new trials. *See Riverwood Intern. Court v. R.A. Jones & Co., Inc.,* 324 F.3d 1346, 1352 (Fed. Cir. 2003); *Sulzer Textil A.G. v. Picanol N.V.,* 358 F.3d 1356, 1362-1363 (Fed. Cir. 2004) ("[W]e will apply [Federal Circuit] law to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right.'") (quoting *Viam Corp. v. Iowa Exp.-Imp. Trading Co.*, 84 F.3d 424, 428 (Fed. Cir. 1996)). In the Fifth Circuit, a court may grant a new trial if it finds the verdict is against the great weight of the evidence, the damages awarded are excessive, the trial

was unfair, or prejudicial error was committed. *See, e.g., Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985). The Court, however, may not "grant a new trial simply because [it] would have come to a different conclusion then the jury did." *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998) (citations omitted). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

## IV.    DISCUSSION AND ANALYSIS

Defendants generally argue that: (1) Versata failed to prove that it is entitled to lost profits; (2) the jury's reasonable royalty verdict lacks evidentiary foundation; (3) the Court should order a new trial or remittitur; and (4) SAP's other motions for JMOL, which were denied during trial and after the conclusion of the previous trial, should be granted. The Court will now address each of these topics and the various subtopics raised by Defendants in their motion.

### A.  Legally Sufficient Evidence Supports the Jury's Lost Profits Verdict

In *Rite Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995), the Federal Circuit affirmed that to recover lost profits damages, the patentee must "show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." Once the patentee provides a "reasonable probability of 'but for' causation, the burden then shifts to the accused infringer to show that [the 'but for' claim] is unreasonable for some or all of the lost sales." *Grain Processing*, 185 F.3d at 1349; *see also Rite-Hite*, 56 F.3d at 1544-45. For the following reasons, the Court concludes that the jury had a legally sufficient evidentiary basis for awarding the amount of damages in this case.

Defendants first argue that Versata failed to define the relevant market. The Court

disagrees and notes that the Federal Circuit permits patentees "significant latitude" in presenting "market reconstruction theories showing all of the ways in which they would have been better off in the 'but for world,'" given these theories do not "laps[e] into pure speculation." *Grain Processing*, 185 F.3d at 1350.  Here, the reconstruction theory that Versata presented to the jury was not speculative, and was based on "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the picture." *Id.*; *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377-78 (Fed. Cir. 2003).

Specifically, Versata's lost profits methodology first identified the pool of customers from which its lost sales came.  To accomplish this, Versata's experts Mr. Neeraj Gupta, Mr. Chris Bakewell, and Mr. Roy Weinstein segmented the market for pricing software into "Tier I" (Fortune 500 and Global 2000 companies) and "Tier II" (everyone else).  The record establishes that Versata targeted Tier I as the "sweet spot" for its "Pricer" product, as larger companies were more likely to benefit from Pricer's unique value propositions. (5/9 AM Tr. at 63:8-17, 101:17-24; 5/9 PM Tr. 47:13, 83:13-84:8.)  Mr. Weinstein thus focused his lost profits analysis on Tier I companies. (5/11 AM Tr. at 6:7-15.)  Under this theory, all of Versata's lost customers are SAP customers who purchased the infringing software.  The Court does not find where Versata made any claim that SAP's infringement caused Versata to lose Pricer customers to Oracle.  Mr. Weinstein thus examined SAP's sales of infringing software during the damages period and identified a pool of 480 Tier I companies who licensed SAP's infringing products in that timeframe. (5/11 AM Tr. at 5:24-6:15, 29:4-7; DX2630 at 84.)  To be clear, Versata did not seek profits for any sales lost due to the "market freeze" in 1998, nor for any sales lost due to SAP's appropriation of Pricer technology from 1998 to 2003.  To the contrary, it sought profits only for sales lost due SAP's infringement from 2003 to 2011.

Mr. Weinstein then removed from the pool of 480 Tier I companies the 45 SAP customers who previously licensed Pricer, and therefore were not lost to SAP. (5/11 AM Tr. at 29:8-13; 30:1-15.)  All lost customers came from the remaining pool of 435 companies, which comprises the relevant market for evaluating lost profits: the "Tier 1 SAP customer" market. *See Yarway Corp. v. Eur-Control United States*, 775 F.2d 268, 276 (Fed. Cir. 1985) (finding that a "special niche" or a mini-market within the total market can be the relevant market for evaluating lost profits.)  While SAP now suggests that this relevant market was unclear and changing at trial, its own experts revealed no such confusion. (5/11 AM Tr. at 142 (Becker: "I heard Mr. Weinstein explain that his lost profits model is premised on them entering the market in 2003 as a bolt-on, not positioned as a full suite of capability, that they were going to just bolt on to SAP."); 5/12AM Tr. at 158–59 (Mr. Wagner noting that Mr. Weinstein's lost profits market was limited to the 435 Tier I SAP customers to whom Versata had not previously sold Pricer.).)

Having isolated the relevant market, Versata's expert then determined how many of those 435 customers Versata would have won but for SAP's infringement.  Specifically, Mr. Weinstein noted evidence establishing that Versata's historic win-rate was approximately 35%.  That is, Versata won about a third of the companies it targeted for Pricer. (5/9 PM Tr. at 101:11-23; 5/11AM Tr. at 31:8-32:4; DX2630 at 85.)  This evidence indicated that Versata would have been able to sell Pricer to 152 of the 435 customers in the relevant pool. (5/11 AM Tr. at 31:21-25; DX2630 at 86.)  With this target in mind, Mr. Weinstein next analyzed the pace at which Versata historically was able to close Pricer deals for Tier I customers, and found that from 1996 to 1998, Versata was able to sell Pricer to Tier I customers at a pace of 8, 11, and 12 new sales per year. (5/11 AM Tr. at 31:21-25; DX2630 at 85.)  He then used this historical experience to set the pace

at which Versata would have won customers in the relevant market starting in 2003. (5/11 AM Tr. at 9:21-10:5, 10:24-11:24; DX2630 at 85.)

Having determined that Versata had a pool of 435 potential customers; that Versata would likely have won 152 of those over time; and that it could have made such sales at a rate of 12 per year, Mr. Weinstein then calculated how much each such lost sale was worth.  To do this, Mr. Weinstein examined Versata's 12 Tier I "Pricer-isolated" sales.  Since Versata often sold other demand-generating software along with Pricer, Mr. Weinstein felt it was necessary to isolate the value of Pricer in order to calculate the amount of money each lost sale cost Versata. Mr. Weinstein examined this subset of Versata customers in order to isolate the value of Pricer, as distinct from other Versata products such as configuration software, so that the per-customer quantification of lost profits would be limited to losses associated with lost Pricer sales and not, for example, lost configuration sales. (5/10 PM Tr. at 157:3-158:12; 5/11 AM Tr. at 18:14-21, 26:6-27:10; DX2630 at 24-25, 81.)  Finally, Mr. Weinstein calculated the total amount of profits lost in the Tier 1 SAP customer market due to SAP's infringement during the years 2003 to 2011 by multiplying the anticipated rate of sales per year (just under 12, accounting for an historical ramp-up period), times the number of infringement years (approximately 8), times the amount lost for each sale (approximately $3 million).  The final number—$285 million, based on 93 sales—was not the product of speculation, but was based on sound economic proof confirmed by the historical record.  Accordingly, the Court finds that Versata's lost profits theory reasonably reconstructed a "but for world" in which Versata would have sold Pricer to 93 of SAP's Tier 1 customers between 2003 and 2011; and the jury's damages award was supported by sufficient evidence.

In addition, Versata also submitted evidence satisfying each of the four *Panduit* factors.

This evidence further confirms that the jury "reasonably infer[red] that the lost profits claimed were in fact caused by the infringing sales," *Rite-Hite*, 56 F.3d at 1545.  "When the patentee establishes the reasonableness of this ['but for'] inference, *e.g.*, by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales." *Id.* For example, the record contains sufficient evidence of demand thereby satisfying the first *Panduit* factor.  First, there was sufficient evidence of Pricer's value proposition and commercial success. (5/9 AM Tr. at 71:15–77:21; 5/9 PM Tr. at 84:11-90:12; 5/9 AM Tr. at 69; PX581 (Gartner Group: Versata's Pricer was "the first product to provide the majority of features that selling organizations require for pricing configuration"); 5/9 AM Tr. at 79:5–25; PX425 (Jack Aberdeen: Pricer was the "Rolls Royce" of the industry); 5/9 AM Tr. at 78:14–79:4; PX582; PX666; PX736; PX493 at 10 (SAP itself considered Versata a "market leader" with a "visionary product.").  Second, there was sufficient evidence reflecting continued demand for the infringing features during the damages period. (PX2120 (In 2006, "Broadband is NOT everywhere."); 5/10 AM Tr. at 99:18–100:14 (2006 discussion about the "critical" importance of disconnected pricing and performance on laptops and mobile handhelds); 5/10AM Tr. at 101:3–21 (testimony regarding PX956, a 2007 document reflecting customer's need for hierarchical access in a system that runs handheld devices).  Third, there was sufficient evidence of extensive use by SAP's customers—particularly Tier I customers—of the hierarchical access features (5/10 AM Tr. at 102:13–22; 5/10 PM Tr. at 96:25–97:6 (50% of the surveyed customers, and 75% of the Tier I customers, use hierarchical access); 5/10 AM Tr. at 103:4–15; PX2119 ("Most implementations use the Customer Hierarchy and Product Hierarchy in the pricing to reduce the number of records."); 5/10 AM Tr. at 102:13–18; 5/10 PM Tr. at 95:8–18 (35% of the surveyed customers, and 50% of the Tier I customers, used hierarchical access with customer and product

hierarchies).   Under this record, the jury had sufficient evidence to infer that SAP's customers used the accused products in an infringing manner.   Finally, there was sufficient evidence illustrating SAP's unwillingness and inability to stop infringing following the first trial.   That is, the jury heard evidence that SAP did not remove or change a single line of infringing code, (5/10 AM Tr. at 108:3–9); did not change anything about the infringing pricing engine, (5/10 AM Tr. at 85:25–86:18, 88:21–24); did not simply go back to its pre-infringement "classical access" solution that SAP's expert Mr. Mercer asserted "can't possibly infringe," (5/11 PM Tr. at 172:5–6); and allowed any infringing access sequence saved before its patch to remain "fully functional," (5/10 AM Tr. at 88:17–20).   Thus, the jury had sufficient evidence to conclude that *Panduit's* first factor was satisfied, and the Court finds that there are no grounds for JMOL on this point.

The record also contains sufficient evidence of an absence of acceptable nonifnringing alternative thereby satisfying the second *Panduit* factor.   To be sure, SAP's evidence regarding purported "competitors" was thoroughly impeached on cross-examination, revealing that SAP's experts' various attempts to identify acceptable noninfringing alternatives were not sustainable. (5/11 PM Tr. at 34:1–46:6.)   At best, SAP presented some conflicting evidence at trial that merely created a fact dispute, which the jury resolved in Versata's favor.   SAP has no credible argument that the evidence was so one-sided on this point as to justify JMOL for SAP under the controlling standard.   Indeed, Versata "need not negate every possibility that the purchaser might not have purchased a product other than its own." *Rite-Hite*, 56 F.3d at 1545.   The Court finds that Versata established a *prima facie* case of "reasonable probability," at which point the burden shifted to SAP to prove otherwise. *See id.*   Furthermore, demonstrating the existence of some arguably conflicting evidence at trial does SAP no good on this motion for JMOL; instead it

11

must show that reasonable minds could only conclude that there were acceptable noninfringing alternatives to Pricer in the Tier 1 SAP customer market. *Brown v. Bryan Cty.*, 219 F.3d 450, 456 (5th Cir. 2000). Thus, the jury had sufficient evidence to conclude that *Panduit's* second factor was satisfied, and the Court finds that there are no grounds for JMOL on this point.

The record also contains sufficient evidence that Versata had capacity to meet the demand for the patented product during the damages period thereby satisfying the third *Panduit* factor. SAP does not challenge the sufficiency of the evidence on this point because Versata limited the pace of its lost profits claim to the pace at which it had historically been able to close Tier I deals—specifically, a three-year ramp up to 12 such deals per year. (5/11 AM Tr. at 9:13–10:5.) Thus, the jury had sufficient evidence to conclude that *Panduit's* third factor was satisfied, and SAP concedes as much.

The record also contains sufficient evidence establishing an appropriate calculation of the profits lost due to infringement thereby satisfying the fourth *Panduit* factor. As discussed above, the record evidence established all of the necessary elements for an appropriate lost profits quantification: the pool of potential lost customers (435 Tier I SAP customers); Versata's historical win-rate prior to SAP's infringement (35%); the historical pace at which Versata made Tier I sales (ramping to 12 per year); Versata's average gross revenue from each Tier I sale, limited to the isolated value of Pricer (as distinct from Versata's other value-driving software); and Versata's average incremental profit. DX2630 at 24, 84-88; DX2600 at 22; 5/11AM at 9:21-11:24; 5/9PM at 101:11-23; 5/11AM Tr. at 10:9-32:4. Every element of Versata's lost profits claim was thus based on and drawn from the historical record, and the jury's lost profits award falls well within the range supported by the evidence. Thus, the jury had sufficient evidence to conclude that all of the *Panduit* factors were satisfied, and the Court finds that there are no

12

grounds for JMOL as it relates to lost profits.

### B.  Legally Sufficient Evidence Supports the Jury's Reasonable Royalty Verdict

Although SAP agreed at trial that Versata is entitled to a reasonable royalty, SAP contends that the particular royalty awarded by the jury cannot stand.  SAP argues that the jury's verdict was based on nothing more than a series of computations that Versata's counsel asked Mr. Wagner, SAP's damages expert, to perform.   What SAP overlooks is that the pertinent "comparable" license, Khimetrics, was put forward by SAP and its comparability was attested to by Mr. Wagner. (5/12 AM Tr. at 99:16–100:9 ("Q. So what is Comparable No. 1? A. It's a company called Khimetrics").)  As Mr. Wagner explained, Khimetrics software was sold as a bolt-on to 12 SAP customers at an average per-customer price of $333,000. (5/12 AM Tr. at 145:10–146:3.)  Mr. Wagner opined that the appropriate royalty rate was 40%, amounting to a $133,200 royalty per customer. (5/12 AM Tr. at 146:4–10.)  The evidence further demonstrated that SAP made at least 1,380 infringing sales during the damages period. (5/12 AM Tr. at 146:12–147:3.)  Backing out 100 sales (to account for the 93 claimed lost-profits customers) left 1,280 infringing SAP sales on which a royalty was required. *See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l,* 246 F.3d 1336, 1354 (Fed. Cir. 2001) ("A patentee receives a reasonable royalty for any of the infringer's sales not included in the lost profit calculation.").  The jury then heard evidence that applying Mr. Wagner's Khimetric benchmark royalty on a per-customer basis to all of the infringing sales results in a reasonable royalty of $170 million— exactly twice the jury's $85 million award. (5/12 AM Tr. at 147:8–148:7.)

To be sure, Mr. Wagner did not offer a conclusion that $170 million or $85 million was an appropriate reasonable royalty award.  But such a conclusion is not required. *See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003); *TWM*, 789 F.2d at 899; *see*

13

*also Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167-68 (Fed. Cir. 1991). Moreover, the only inference the jury needed to make from the evidence was that it would be appropriate to award a royalty on all infringing sales, rather than just 12. *See TWM*, 789 F.2d at 899 (noting that the fact-finder may "substitute its own recomputation"). That inference is not only appropriate, it is required. *See Crystal Semiconductor*, 246 F.3d at 1356 ("As previously discussed, the Patent Act mandates no less 'than a reasonable royalty' for every infringing sale."); *see also Siemens*, *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1291 (Fed. Cir. 2011) ("We therefore remand to the district court so that the court may determine a reasonable royalty for the additional 18 scanners, to be added to the award of $44,937,545 in lost profits for 61 scanners that were sold.").

In response, SAP offers two arguments regarding the jury's reasonable royalty verdict: first, that Mr. Wagner's "Comparable No. 1," Khimetrics, suffers from a fatal "lack of comparability"; and second, that the entire market value rule ("EMVR") precludes any royalty here. Again, in making these arguments SAP is improperly attacking its own evidence. In support of its first argument, SAP offers a litany of "technical and economic differences" that Versata was supposed to account for in order to justify using Khimetrics as a comparable. But of course it was SAP, not Versata, who decided that Khimeterics was sufficiently comparable to support a reasonable royalty presentation. And although SAP does not like the conclusion the jury reached from the Khimetrics evidence, it cannot legitimately challenge the comparability of its own comparable.

SAP's second argument attempts to leverage the EMVR into another attack on the Khimetrics comparable. According to SAP, the 12 Khimetrics sales are "inapposite" because they were made to customers who wanted Khimetrics, whereas no one purchased SAP's

14

infringing products because of the relevant features.  But again, SAP sponsored Khimetrics as a comparable, and it cannot credibly complain that this evidence is inapposite.

Moreover, the record contains sufficient evidence—in addition to the Khimetrics comparable and Mr. Wagner's 40% royalty rate on that base—showing that the Pricer invention is sufficiently valuable to justify a $66,000 per-customer royalty.  First, by 2003 Versata had sold Pricer to over 70 customers at much higher price points than Khimetrics commanded. *See* Dkt. No. 556 at 9.  Second, SAP intentionally bundled its pricing functionality into its core offerings for the specific purpose of eliminating competition from Versata, thereby deriving competitive benefits for itself above and beyond the benefits of the infringing features to SAP's customers. (PX270; 5/9AM Tr. at 110:10–111:3.)   Third, unlike Khimetrics, SAP incorporated the infringing functionality into its core offerings, and the jury heard evidence that SAP does not do that unless it believes there is broad demand for the feature. (5/12 AM Tr. at 40:6–25; PX657.) The Court finds that it was reasonable for the jury to infer from this and other evidence that there was broad demand for the infringing functionality—and this is true regardless of whether customers decide to buy SAP's products solely because of this feature.   Accordingly, the jury had a sufficient evidentiary basis to award the amount of damages that it did, and the Court DENIES SAP's JMOL as it relates to the jury's reasonable royalty award.

### C.  There are no Grounds for Another Trial or Remittitur

To show that a new trial is warranted in this Circuit, the "burden a movant must meet is high." *Ameranth, Inc. v. Menusoft Sys. Corp.*, No. 2:07-CV-271-CE, 2011 U.S. Dist. LEXIS 56501, at *5-6 (E.D. Tex. May 26, 2011).  Such a motion must be denied unless the verdict is against the great weight of the evidence. *Id*.  Moreover, a verdict awarding damages "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the

evidence, or based only on speculation or guesswork." *OPTi Inc. v. Apple, Inc.*, No. 2:07-CV-21-CE, 2009 U.S. Dist. LEXIS 112537, at *11 (E.D. Tex. Dec. 3, 2009).  For the reasons discussed above, the lost profits and reasonable royalty damages award is not excessive or contrary to the great weight of the evidence.

SAP's list of complaints regarding the jury's award is directed primarily to issues of the credibility or weight of the evidence, which the Court notes is the jury's unique province.  That is, the Court may not "grant a new trial simply because [it] would have come to a different conclusion then [sic] the jury did." *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998) (citations omitted).  For example, SAP's argument that the Court should order a new trial because Versata's Pricer business failed for reasons unrelated to SAP merely rehashes a core fact dispute fought during trial.  The Court notes that SAP emphasized this argument to the jury. (*See, e.g.,* 5/9 AM Tr. at 49:2-53:6; 5/12 PM Tr. 28:2-31:16.)  Likewise, Versata presented contrary evidence: that it was an innovative company with a strong record of success, (5/9 PM Tr. at 108:21-109:21); that internal Versata documents criticizing the company's practices were a product of its policy of encouraging employee feedback, (5/9 PM Tr. at 33:10-17, 25:10-26:20, 108:14-20); and that when its sales began to decline, Versata engaged in a process of self-analysis and questioning assumptions in its attempts to diagnose the problem, (5/9 PM Tr. at 108:14-21).  The jury's award demonstrates that it found Versata's evidence more credible and rejected SAP's view of the case.

Furthermore, as discussed above, Versata presented an economically sound model to calculate lost profits.  Versata provided sufficient evidence to allow the jury to conclude that all of the *Panduit* factors were satisfied, including demand and absence of non-infringing alternatives.  As noted above, the jury heard that disconnected pricing remained a valuable

characteristic of Pricer despite the greater availability of internet access (PX2120) and; Pricer's value propositions of speed, maintenance, and flexibility remained highly relevant to prospective customers. (5/9AM Tr. 71:20-77:21; 5/12AM 53:9-55:1.)  Although SAP faults Versata's experts for not explicitly spelling out opinions regarding demand curves, Mr. Weinstein addressed this issue and his approach accounted for the downward sloping demand curve. (5/11AM 26:16-28:6; *see also Ericsson*, 352 F.3d at 1377-78 (plaintiff's expert presented "sound economic evidence" where his calculations "were supported by actual sales records," despite not including "cross-elasticity calculations").)  Accordingly, the Court finds that the jury's damages award was not excessive and that there is no basis for remittitur.

### D.  There are no Grounds for Granting SAP's Previously Denied Motions

Finally, SAP renewed all of its JMOL motions denied or not explicitly ruled on following the 2009 trial and during the 2011 trial.  Specifically, SAP argues that Versata was not entitled to any damages and should not have been entitled to a second opportunity to prove damages when it failed to properly prove damages the first time, SAP's motion for a new trial on all issues including invalidity rather than just damages, and SAP's motions regarding noninfringement and marking.  In addition, SAP argues that the 2011 Modified Products continue to avoid infringement for the same reasons advanced in SAP's 2009 motions regarding the 2009 Accused Products.

As before, the Court has carefully considered the parties' submissions, the record, and the applicable law.   During trial, both sides provided evidence and testimony supporting their positions.  The Court finds that there is sufficient evidence in the record that supports the jury's findings with respect to the issues raised by SAP.  SAP has offered no persuasive arguments for the Court to disregard the jury's verdict or to award a new trial.   Accordingly, the Court

concludes that the verdict is not against the great weight of the evidence and DENIES Defendants' motion for a new trial as it relates to these issues.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for JMOL on the issues relating to damages or in the alternative new trial or remittitur.

It is so ORDERED.

SIGNED this 9th day of September, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE